UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| EUGENE MANNACIO, Individually and on Behalf of All Others Similarly Situated, | Case No. |
| Plaintiff, | |
| v. | CLASS ACTION COMPLAINT |
| DISCOVER FINANCIAL SERVICES, ROGER C. HOCHSCHILD, JOHN T. GREENE, and R. MARK GRAF, | JURY TRIAL DEMANDED |
| Defendants. | |

Plaintiff Eugene Mannacio ("Plaintiff"), individually and on behalf of all others similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants, alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Discover Financial Services ("DFS" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants that purchased or otherwise acquired DFS common stock

between February 21, 2019 and August 14, 2023, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.      DFS is an American financial services company that owns and operates Discover Bank, an online bank that offers checking and savings accounts, personal loans, home equity loans, student loans, and credit cards. DFS's shares trade on the New York Stock Exchange ("NYSE") under the ticker symbol "DFS".

3.      At all relevant times, DFS represented that it maintained robust risk management and compliance protocols for its various business segments and needs, including, among other things, its customer credit card and student loan practices.

4.      Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) DFS maintained deficient risk management and compliance procedures; (ii) as a result of the foregoing deficiencies, the Company had, *inter alia*, failed to comply with applicable student loan servicing standards, misclassified certain credit card accounts, overcharged customers, and failed to stem its ballooning credit card delinquency rate; (iii) the foregoing issues, when they became known, would subject DFS to significant financial exposure, regulatory scrutiny, and reputational harm; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

5.      On July 20, 2022, DFS issued a press release announcing its financial results for the second quarter of 2022. Among other items, DFS disclosed that it "is suspending until further

notice its existing share repurchase program because of an internal investigation relating to its student loan servicing practices and related compliance matters." The Company also advised that "[t]he investigation is ongoing and is being conducted by a board-appointed independent special committee."

6. On this news, DFS's stock price fell $9.80 per share, or 8.93%, to close at $100 per share on July 21, 2022.

7. On July 19, 2023, DFS issued a press release announcing its financial results for the second quarter of 2023. Among other items, DFS disclosed that it had misclassified certain credit card products over an approximate 15-year period as a result of an acknowledged compliance failure. Specifically, DFS disclosed that it had incorrectly classified certain credit card accounts into its highest merchant and merchant acquirer pricing tier, beginning around mid-2007. In addition, the Company disclosed receipt of a proposed consent order from the Federal Deposit Insurance Corporation ("FDIC") in connection with an unrelated regulatory matter.

8. On this news, DFS's stock price fell $19.40 per share, or 15.92%, to close at $102.45 per share on July 20, 2023.

9. On August 14, 2023, DFS issued a press release announcing that its Board of Directors (the "Board") and Defendant Roger C. Hochschild ("Hochschild") "have agreed that Hochschild will step down as Chief Executive Officer ["CEO"] and President and as a member of the Board", effective immediately. Notably, the same press release also quoted DFS's Chair of the Board, who assured investors that "[t]he Board is continuously focused on Discover reaching its full potential across the business, ***including our commitment to enhancing compliance, risk management and corporate governance***." (Emphasis added.)

10. That same day, in an exhibit to an SEC filing, DFS also disclosed that its credit card delinquency rate increased to 3.00% for the 24-month period ended July 31, 2023, as compared to 2.86% for the 24-month period ended June 31, 2023. As reported by *Seeking Alpha* that day, the Company's credit card delinquency rate now stood at a higher level than the pre-pandemic rate of 2.37% in July 2019.

11. Then, on August 15, 2023, *Seeking Alpha* published an article reporting on analyst speculation that Defendant Hochschild's resignation was directly tied to DFS's recently reported regulatory and risk oversight issues.

12. Following these developments, DFS's stock price fell $9.69 per share, or 9.44%, to close at $92.96 per share on August 15, 2023.

13. Finally, on August 17, 2023, during an earnings call hosted by DFS, the Company's top officers acknowledged that it was "paying the price" for past underinvestment in compliance, stressing that Defendant Hochschild's abrupt departure reflected a commitment to moving past regulatory troubles, thereby validating previously reported analyst suspicions on the matter.

14. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

**JURISDICTION AND VENUE**

15. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

16. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and Section 27 of the Exchange Act.

17.     Venue is proper in this Judicial District pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  DFS is headquartered in this Judicial District, Defendants conduct business in this Judicial District, and a significant portion of Defendants' actions took place within this Judicial District.

18.     In connection with the acts alleged in this complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

## PARTIES

19.     Plaintiff, as set forth in the attached Certification, acquired DFS common stock at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

20.     Defendant DFS is a Delaware corporation with principal executive offices located at 2500 Lake Cook Road, Riverwoods, Illinois 60015.  DFS's common stock trades in an efficient market on the NYSE under the ticker symbol "DFS".

21.     Defendant Hochschild served as DFS's CEO, President, and a Director of the Company at all relevant times until his resignation at the end of the Class Period.

22.     Defendant John T. Greene ("Greene") has served as DFS's Chief Financial Officer ("CFO") and Executive Vice President ("EVP") since September 2019.

23.     Defendant R. Mark Graf ("Graf") served as DFS's CFO and EVP from before the start of the Class Period to September 2019.

24.     Defendants Hochschild, Greene, and Graf are sometimes referred to herein as the "Individual Defendants".

25.     The Individual Defendants possessed the power and authority to control the contents of DFS's SEC filings, press releases, and other market communications. The Individual Defendants were provided with copies of DFS's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected. Because of their positions with DFS, and their access to material information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading. The Individual Defendants are liable for the false statements and omissions pleaded herein.

26.     DFS and the Individual Defendants are collectively referred to herein as "Defendants".

## SUBSTANTIVE ALLEGATIONS

### Background

27.     DFS is an American financial services company that owns and operates Discover Bank, an online bank that offers checking and savings accounts, personal loans, home equity loans, student loans, and credit cards.

28.     At all relevant times, DFS represented that it maintained robust risk management and compliance protocols for its various business segments and needs, including, among other things, its customer credit card and student loan practices.

### Materially False and Misleading Statements Issued During the Class Period

29.     The Class Period begins on February 21, 2019, the day after DFS filed an annual report on Form 10-K with the SEC after market close, announcing the Company's financial and

operational results for the quarter and year ended December 31, 2018 (the "2018 10-K"). In the 2018 10-K, with respect to DFS's risk management practices, the Company touted the purported efficacy of its ostensibly robust "enterprise-wide risk management framework to identify, measure, monitor, manage and report risks that affect or could affect the achievement of our strategic, financial and other objectives." DFS stated that "[o]ur enterprise risk management philosophy is expressed through five key principles that guide our approach to risk management: Comprehensiveness, Accountability, Independence, Defined Risk Appetite and Transparency."

30.     For example, the 2018 10-K represented, *inter alia*, that DFS's risk management framework "is designed to be comprehensive with respect to our business units and their control and support functions, and across all risk types"; and that "[w]e structure accountability across three lines of defense along the principles of risk management execution, oversight and independent validation."

31.     Among other features of its risk management approach, DFS emphasized in the 2018 10-K that:

> [E]ach line of business is responsible for managing risks inherent in its business with appropriate oversight from our senior management and Board of Directors. Various committees are in place to oversee the management of risks across our Company. We seek to apply operating principles consistently to each committee. These operating principles are detailed in committee charters, which are approved by the Risk Committee. Our banking subsidiaries have their own risk governance, compliance, auditing and other requirements. Our risk governance framework is implemented such that bank-level risk governance requirements are satisfied as well.

32.     With respect to DFS's credit risk management, the 2019 10-K stated, *inter alia*:

> Credit risk management is a critical component of our management and growth strategy. Credit risk refers to the risk of loss arising from borrower default when borrowers are unable or unwilling to meet their financial obligations to us. Our credit risk arising from consumer lending products is generally highly diversified across millions of accounts without significant individual exposures. We manage credit risk primarily based on customer segments and product types.

* * *

Credit Risk Management is responsible for (i) developing, validating and implementing credit policy criteria and predictive loan origination and servicing models in order to optimize the profitability of Company lending activities, (ii) ensuring adherence to our credit risk policies and approval limits, and that departmental policies, procedures, and internal controls are consistent with the standards defined by the Company, (iii) ensuring that we manage credit risk within approved limits, and (iv) monitoring performance for both new and existing consumer loan products and portfolios.

33.    DFS also specifically stated in the 2018 10-K that its "Chief Executive Officer ('CEO') is ultimately responsible for risk management within our Company" and that, "[i]n that capacity, the CEO establishes a risk management culture throughout our Company and ensures that businesses operate in accordance with this risk culture."

34.    Among other "Risk Categories" listed in the 2018 10-K, DFS specifically identified, in relevant part, Credit Risk, Operational Risk, Compliance Risk, and Legal Risk:

*Credit Risk*

Our credit risk arises from the potential that a borrower or counterparty will fail to perform on an obligation. Our credit risk includes consumer credit risk and counterparty credit risk. Consumer credit risk is primarily incurred by Discover Bank through the issuance of (i) unsecured credit including credit cards, student loans and personal loans and (ii) secured credit including secured credit cards, deposit secured loans and home equity loans. Counterparty credit risk is incurred through a number of activities including settlement, certain marketing programs, treasury and asset/liability management, network incentive programs, guarantors, vendor relationships and insurers.

* * *

*Operational Risk*

Operational risk is defined as the risk of loss resulting from inadequate or failed internal processes, people and systems or from external events. Operational risk is inherent in all our businesses. Operational risk categories incorporate all of the operational loss event-type categories set forth by the BCBS [Basel Committee on Banking Supervision], which include the following: (i) internal fraud, (ii) external fraud, (iii) employment practices and workplace safety, (iv) clients, products and

business practices, (v) damage to physical assets, (vi) business disruption and system failures, and (vii) execution, delivery and process management.

*Compliance Risk*

Compliance risk is the operational risk of legal or regulatory sanctions, financial loss or damage to reputation resulting from failure to comply with laws, regulations, rules, other regulatory requirements, or codes of conduct and other standards of self-regulatory organizations applicable to us. Compliance risk exposures are actively and primarily managed by our business units in conjunction with our compliance department. Our compliance program governs the management of compliance risk. Our Risk Committee and Compliance Committee oversee our compliance program.

*Legal Risk*

Legal risk arises from the potential that unenforceable contracts, lawsuits or adverse judgments can disrupt or otherwise negatively affect our operations or condition. These risks are inherent in all of our businesses. Legal risk exposures are actively and primarily managed by our business units in conjunction with our law department. Our Risk Committee and Compliance Committee oversee our legal risk management. Specifically, the law department is responsible for providing advice, interpreting and identifying developments regarding laws, regulations, regulatory guidance and litigation, and setting standards for communicating relevant changes to corporate compliance, the business and internal audit. The law department also identifies and communicates legal risk associated with new products and business practices.

Although DFS's annual report contained rote, boilerplate recitations to the effect that a certain amount of risk was inherent and unavoidable in the Company's operations, the overall message that DFS conveyed to its investors was that the Company had robust, multi-faceted risk management and compliance protocols in place that were adequate to minimize, in relevant part, its exposure to meaningful credit, operational, compliance, or legal risk.

35.     Appended as an exhibit to the 2018 10-K were signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), wherein Defendants Hochschild and Graf certified that "[t]he [2018 10-K] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange

Act]" and that "[t]he information contained in the [2018 10-K] fairly presents, in all material respects, the financial condition and results of operations of the Company."

36.     On February 26, 2020, DFS filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operational results for the quarter and year ended December 31, 2019 (the "2019 10-K"). The 2019 10-K contained substantively the same statements as referenced in ¶¶ 29-33, *supra*, regarding the purported efficacy of DFS's ostensibly robust "enterprise-wide risk management framework", the Company's risk management and compliance procedures, the establishment of a risk management culture throughout DFS by the Company's CEO—*i.e.*, Defendant Hochschild, and that Defendant Hochschild ensured that DFS's businesses operate in accordance with the Company's risk culture.

37.     The 2019 10-K also contained substantively the same rote, boilerplate recitations as referenced in ¶ 34, *supra*, to the effect that a certain amount of risk was inherent and unavoidable in DFS's operations, while continuing to downplay the potential magnitude of these inherent and unavoidable risks by repeatedly and simultaneously assuring investors regarding the Company's purportedly robust, multi-faceted risk management and compliance protocols.

38.     Appended as an exhibit to the 2019 10-K were substantively the same SOX certifications as referenced in ¶ 35, *supra*, signed by Defendants Hochschild and Greene.

39.     On February 17, 2021, DFS filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operational results for the quarter and year ended December 31, 2020 (the "2020 10-K"). The 2020 10-K contained substantively the same statements as referenced in ¶¶ 29-33, *supra*, regarding the purported efficacy of DFS's ostensibly robust "enterprise-wide risk management framework", the Company's risk management and compliance procedures, Defendant Hochschild's establishment of a risk management culture

10

throughout DFS, and that Defendant Hochschild ensured that DFS's businesses operate in accordance with the Company's risk culture.

40.     The 2020 10-K also contained substantively the same rote, boilerplate recitations as referenced in ¶ 34, *supra*, to the effect that a certain amount of risk was inherent and unavoidable in DFS's operations, while continuing to downplay the potential magnitude of these inherent and unavoidable risks by repeatedly and simultaneously assuring investors regarding the Company's purportedly robust, multi-faceted risk management and compliance protocols.

41.     Appended as an exhibit to the 2020 10-K were substantively the same SOX certifications as referenced in ¶ 35, *supra*, signed by Defendants Hochschild and Greene.

42.     On February 24, 2022, DFS filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operational results for the quarter and year ended December 31, 2021 (the "2021 10-K"). The 2021 10-K contained substantively the same statements as referenced in ¶¶ 29-33, *supra*, regarding the purported efficacy of DFS's ostensibly robust "enterprise-wide risk management framework", the Company's risk management and compliance procedures, Defendant Hochschild's establishment of a risk management culture throughout DFS, and that Defendant Hochschild ensured that DFS's businesses operate in accordance with the Company's risk culture.

43.     The 2021 10-K also contained substantively the same rote, boilerplate recitations as referenced in ¶ 34, *supra*, to the effect that a certain amount of risk was inherent and unavoidable in DFS's operations, while continuing to downplay the potential magnitude of these inherent and unavoidable risks by repeatedly and simultaneously assuring investors regarding the Company's purportedly robust, multi-faceted risk management and compliance protocols.

44.     Appended as an exhibit to the 2021 10-K were substantively the same SOX certifications as referenced in ¶ 35, *supra*, signed by Defendants Hochschild and Greene.

45.     The statements referenced in ¶¶ 29-44 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies.    Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) DFS maintained deficient risk management and compliance procedures; (ii) as a result of the foregoing deficiencies, the Company had, *inter alia*, failed to comply with applicable student loan servicing standards, misclassified certain credit card accounts, overcharged customers, and failed to stem its ballooning credit card delinquency rate; (iii) the foregoing issues, when they became known, would subject DFS to significant financial exposure, regulatory scrutiny, and reputational harm; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

## **The Truth Begins to Emerge**

46.     On July 20, 2022, after market close, DFS issued a press release announcing its financial results for the second quarter of 2022.  Among other items, DFS disclosed an internal investigation into its student loan servicing practices and related compliance matters, stating, in relevant part:

> The company is suspending until further notice its existing share repurchase program because of an internal investigation relating to its student loan servicing practices and related compliance matters. The investigation is ongoing and is being conducted by a board-appointed independent special committee.

47.     On this news, DFS's stock price fell $9.80 per share, or 8.93%, to close at $100 per share on July 21, 2022.  Despite this decline in  the Company's stock price, DFS stock continued trading at artificially inflated prices throughout the remainder of the Class Period because of

Defendants' continued misstatements and omissions regarding deficiencies in the Company's risk management and compliance procedures.

48. For example, on February 23, 2023, DFS filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operational results for the quarter and year ended December 31, 2022 (the "2022 10-K"). The 2022 10-K contained substantively the same statements as referenced in ¶¶ 29-33, *supra*, regarding the purported efficacy of DFS's ostensibly robust "enterprise-wide risk management framework", the Company's risk management and compliance procedures, Defendant Hochschild's establishment of a risk management culture throughout DFS, and that Defendant Hochschild ensured that DFS's businesses operate in accordance with the Company's risk culture.

49. The 2022 10-K also contained substantively the same rote, boilerplate recitations as referenced in ¶ 34, *supra*, to the effect that a certain amount of risk was inherent and unavoidable in DFS's operations, while continuing to downplay the potential magnitude of these inherent and unavoidable risks by repeatedly and simultaneously assuring investors regarding the Company's purportedly robust, multi-faceted risk management and compliance protocols.

50. Appended as an exhibit to the 2022 10-K were substantively the same SOX certifications as referenced in ¶ 35, *supra*, signed by Defendants Hochschild and Greene.

51. The statements referenced in ¶¶ 48-50 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) DFS maintained deficient risk management and compliance procedures; (ii) as a result of the foregoing deficiencies, the Company had, *inter alia*, failed to comply with applicable student loan servicing

standards, misclassified certain credit card accounts, overcharged customers, and failed to stem its ballooning credit card delinquency rate; (iii) the foregoing issues, when they became known, would subject DFS to significant financial exposure, regulatory scrutiny, and reputational harm; and (iv) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Fully Emerges

52. On July 19, 2023, after market close, DFS issued a press release announcing its financial results for the second quarter of 2023. Among other items, DFS disclosed that it had misclassified certain credit card products over an approximate 15-year period as a result of an acknowledged compliance failure and had received a proposed consent order from the FDIC in connection with an unrelated regulatory matter. Specifically, the press release stated, in relevant part:

**Background on Card Product Misclassification**

Beginning around mid-2007, Discover incorrectly classified certain credit card accounts into our highest merchant and merchant acquirer pricing tier. Incremental revenue resulting from this card product misclassification amounted to less than 1% of our cumulative discount and interchange revenue, gross, since that time, or less than two basis points as a percentage of sales over this timeframe. The misclassification affected pricing for certain merchants and merchant acquirers, but not for cardholders. Based on information available as of June 30, 2023, the Company determined that the revenue impact of the incorrect card product classification was not material to the consolidated financial statements of the Company for any of the impacted periods. Notwithstanding, for go-forward comparative purposes, the Company corrected the recognition of discount and interchange revenue as well as the related impacts to assets, liabilities and retained earnings in all prior periods presented. ***After adjusting for tax effects, the cumulative impact to beginning retained earnings as of April 1, 2023, was a decrease of $255 million, and the impact to net income for the quarter ended March 31, 2023, was a reduction of $8 million. As of June 30, 2023, the Company's consolidated financial statements reflect a liability of $365 million within accrued expenses and other liabilities to provide refunds to merchants and merchant acquirers as a result of the card product misclassification.***

Management is taking actions to correct the card product misclassification going forward and to prepare a program to compensate affected direct merchants and merchant acquirers. However, given differences in individual merchant agreements, changes in network terms, and availability of historical data, ***it is difficult to determine the final amount of potential refunds at this time. An investigation into this issue by an external law firm working at the direction of the Audit Committee of the Board of Directors is ongoing***.

***Discover is in discussions with its regulators regarding this matter and corporate governance and risk management. In addition, the Company received a proposed consent order from the FDIC in connection with consumer compliance. This proposed consent order does not include the card product classification matter. Additional supervisory actions could occur.***

**Share Repurchase**

During the second quarter of 2023, the company repurchased approximately 6.8 million shares of common stock for $700 million. Shares of common stock outstanding declined by 2.6% from the prior quarter. ***The Company has decided to pause share repurchases while the internal review of compliance, risk management and corporate governance is pending.***

(Emphases in bold and italics added.)

53. On this news, DFS's stock price fell $19.40 per share, or 15.92%, to close at $102.45 per share on July 20, 2023.

54. On August 14, 2023, after market close, DFS issued a press release announcing that its Board and Defendant Hochschild had agreed that Defendant Hochschild would resign from his role as DFS's CEO, President, and a Director of the Company, effective immediately. Specifically, that press release stated, in relevant part:

[T]he Discover Board of Directors and [Defendant] Hochschild have agreed that Hochschild will step down as [CEO] and President and as a member of the Board. Hochschild will serve in an advisory role at the Company through the end of the year to ensure a smooth transition. John Owen, a member of the Board, has been appointed Interim CEO and President. These changes are effective immediately.

The Board has engaged a leading global executive search firm to commence a process to identify a permanent CEO and President.

Tom Maheras, Chair of the Board, said, "The Board and Roger have agreed that now is the right time to transition leadership, and we thank Roger for his 25 years of service to the Company. The Board is continuously focused on Discover reaching its full potential across the business, ***including our commitment to enhancing compliance, risk management and corporate governance***. We will continue to take actions to advance Discover's strategic priorities and generate high returns and capital."

(Emphasis added.)

55.     That same day, DFS filed a current report on Form 8-K with the SEC, appended to which as an exhibit were "Monthly Credit Card Charge-off and Delinquency Statistics as of and for each of the twenty-four months ended July 31, 2023", which disclosed that DFS's credit card delinquency rate increased to 3.00% for the 24-month period ended July 31, 2023, as compared to 2.86% for the 24-month period ended June 31, 2023.  As reported by *Seeking Alpha* that day, in an article entitled "Discover credit card delinquency rate rises above prepandemic levels in July", the Company's credit card delinquency rate now stood at a higher level than the pre-pandemic rate of 2.37% in July 2019, stating:

- Discover Financial (NYSE:DFS) credit card delinquency rate increased to 3.00% in July from 2.86% in June and now stands at higher level than the prepandemic rate of 2.37% in July 2019.

- The net charge-off rate, though, edged down to 3.77% in July 2023 from 3.80% in June, but was also higher than the July 2019 level of 3.23%.

- Ending loans increased to $95.6B from $94.0B in June.

- Separately, the consumer finance company said its CEO and president, Roger Hochschild, resigned effective Aug. 14.

- Discover (DFS) stock slid 5.2% in Monday after-hours trading.

56.     Then, on August 15, 2023, during intraday trading hours, in an article entitled "Discover Financial stock sinks on sudden CEO exit amid regulatory concerns", *Seeking Alpha*

published an article reporting on analyst speculation that Defendant Hochschild's resignation was directly tied to DFS's recently reported risk management and compliance issues, stating:

> Discover Financial (NYSE:DFS) stock slid 10% in Tuesday afternoon trading after the consumer finance company surprised investors by announcing the departure of its president and CEO, Roger Hochschild, without giving a reason for the sudden exit.
>
> Evercore ISI analyst John Pancari added Discover (DFS) to its Tactical Underperform List as a result. He's maintaining the stock's In Line rating at this time.
>
> Although the company didn't provide an explicit reason for Hochschild's departure, ***analysts suspect it's related to recent regulatory and risk oversight issues. "In discussing Hochschild's resignation in the 8K, DFS' Chair cited the board's commitment to enhancing compliance, risk management and corporate governance," Pancari wrote in a note to clients.***
>
> In Discover's (DFS) Q2 results, released on July 19, the company disclosed that it took a $365M charge to provide refunds to merchants and merchant acquirers for the card misclassification issue. It also said it's pausing its stock buybacks while it reviews its compliance, risk management, and corporate governance practices.
>
> ***Pancari sees the risk of further regulatory actions persisting and expects the review to increase expenses and weight on shares.***
>
> ***Wolfe Research analyst Bill Carcache also expects the regulatory issues, including a recent consent order, may have triggered the CEO change. "While the company has not explicitly provided a reason, several internal control failures that occurred under Hochschild's watch may have been behind his departure," the analyst said.***
>
> Discover's (DFS) 10-Q, on July 28, disclosed that it's in talks with regulators regarding the product misclassification as well as corporate governance and risk management. "DFS's 10Q also noted that the company expects these discussions will likely result in enforcement actions," said Carcache.

(Emphases added.)

57.    Following these disclosures, DFS's stock price fell $9.69 per share, or 9.44%, to close at $92.96 per share on August 15, 2023.

**Post-Class Period Developments**

58.    On August 17, 2023, DFS held an earnings call, during which the Company's top officers acknowledged that it was "paying the price" for past underinvestment in compliance.  During the call, Interim CEO John Owen ("Owen") and CFO Defendant Greene stressed that Defendant Hochschild's abrupt departure reflected a commitment to moving past regulatory troubles, thereby validating previously reported analyst suspicions on the matter.  Owen said that DFS had hired more than 200 compliance personnel in recent months and replaced about half of its senior management team.  Meanwhile, Defendant Greene stated that DFS was focused on "investing in the right areas, getting the right people in place and driving accountability and ensuring that we don't put profits before compliance excellence."

59.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's common stock, Plaintiff and other Class members have suffered significant losses and damages.

**PLAINTIFF'S CLASS ACTION ALLEGATIONS**

60.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the Company's common stock during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures.  Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

61.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, DFS common stock was actively traded on the

NYSE.  While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by DFS or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

62.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

63.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

64.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of DFS;

- whether the Individual Defendants caused DFS to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of DFS common stock during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

65. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

66. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- DFS common stock is traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

- Plaintiff and members of the Class purchased, acquired, and/or sold DFS common stock between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

67. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

68. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v.*

*United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

**(Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)**

69. Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

70. This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

71. During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of DFS common stock; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire DFS common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

72. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described

above, including statements made to securities analysts and the media that were designed to influence the market for DFS common stock. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about DFS's finances and business prospects.

73.     By virtue of their positions at DFS, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants. Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth. In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

74.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control. As the senior managers and/or directors of DFS, the Individual Defendants had knowledge of the details of DFS's internal affairs.

75.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein. Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly, control the content of the statements of DFS. As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to DFS's businesses, operations, future financial condition and future prospects. As a result of the dissemination of the

aforementioned false and misleading reports, releases and public statements, the market price of DFS common stock was artificially inflated throughout the Class Period. In ignorance of the adverse facts concerning DFS's business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired DFS common stock at artificially inflated prices and relied upon the price of the common stock, the integrity of the market for the common stock, and/or upon statements disseminated by Defendants, and were damaged thereby.

76.     During the Class Period, DFS common stock was traded on an active and efficient market. Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued, or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of DFS common stock at prices artificially inflated by Defendants' wrongful conduct. Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said common stock, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of DFS common stock was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of DFS common stock declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

77.     By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

78.     As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases,

acquisitions, and/or sales of the Company's common stock during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against the Individual Defendants)

79.    Plaintiff repeats and re-alleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

80.    During the Class Period, the Individual Defendants participated in the operation and management of DFS, and conducted and participated, directly and indirectly, in the conduct of DFS's business affairs.  Because of their senior positions, they knew the adverse non-public information about DFS's misstatement of income and expenses and false financial statements.

81.    As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to DFS's financial condition and results of operations, and to correct promptly any public statements issued by DFS which had become materially false or misleading.

82.    Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which DFS disseminated in the marketplace during the Class Period concerning DFS's results of operations.  Throughout the Class Period, the Individual Defendants exercised their power and authority to cause DFS to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of DFS within the meaning of Section 20(a) of the Exchange Act.  In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of DFS common stock.

83.     Each of the Individual Defendants, therefore, acted as a controlling person of DFS. By reason of their senior management positions and/or being directors of DFS, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, DFS to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of DFS and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

84.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by DFS.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.     Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated:  September 1, 2023                    Respectfully submitted,

                                            POMERANTZ LLP

                                            */s/ Jeremy A. Lieberman*
                                            Jeremy A. Lieberman

J. Alexander Hood II
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
jalieberman@pomlaw.com
ahood@pomlaw.com

POMERANTZ LLP
Patrick V. Dahlstrom
Louis C. Ludwig
10 South LaSalle Street, Suite 3505
Chicago, Illinois 60603
Telephone: (312) 377-1181
Facsimile: (312) 377-1184
pdahlstrom@pomlaw.com
lcludwig@pomlaw.com

PORTNOY LAW FIRM
Lesley F. Portnoy, Esq.
(*pro hac vice* application forthcoming)
1800 Century Park East, Suite 600
Los Angeles, California 90067
Telephone: (310) 692-8883
lesley@portnoylaw.com

*Attorneys for Plaintiff*