**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| KBC ASSET MANAGEMENT NV, NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM, NEW YORK CITY POLICE PENSION FUND, NEW YORK CITY FIRE DEPARTMENT PENSION FUND, and TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:23-cv-06788 <br><br> <u>CLASS ACTION</u> |
| Plaintiffs, | |
| v. | <u>JURY TRIAL DEMANDED</u> |
| DISCOVER FINANCIAL SERVICES, ROGER C. HOCHSCHILD, JOHN T. GREENE, R. MARK GRAF, MARY K. BUSH, CANDACE H. DUNCAN, JOSEPH F. EAZOR, CYNTHIA GLASSMAN, THOMAS G. MAHERAS, MICHAEL MOSKOW, DANIELA O'LEARY GILL, JOHN B. OWEN, DAVID L. RAWLINSON II, and JENNIFER L. WONG, | |
| Defendants. | |

<u>**AMENDED CLASS ACTION COMPLAINT**</u>

## TABLE OF CONTENTS

<u>Page</u>

I.     NATURE OF THE ACTION ....................................................... 2

II.    JURISDICTION AND VENUE ................................................. 10

III.   CLASS ACTION ALLEGATIONS ........................................... 11

IV.   PARTIES ................................................................................ 13

    A.    Plaintiffs ....................................................................... 13

    B.    Defendants .................................................................... 14

          1.    Discover ............................................................ 14

          2.    Officer Defendants........................................... 14

          3.    Director Defendants ......................................... 15

V.    FORMER DISCOVER EMPLOYEES WHO HAVE PROVIDED RELEVANT INFORMATION................................................................. 17

VI.   DEFENDANTS REPEATEDLY TOUTED DISCOVER'S RISK MANAGEMENT, COMPLIANCE, AND CORPORATE GOVERNANCE SYSTEMS AND PRACTICES, AS WELL AS THE ADEQUACY OF ITS INTERNAL CONTROLS ......................................................... 19

    A.    Risk Management and Compliance Systems and Practices Are Essential to a Heavily Regulated Company's Business Operations and Financial Results.......................................................................... 19

    B.    Defendants Repeatedly Touted the Effectiveness of Discover's Compliance and Risk Management Systems...................................... 24

          1.    Defendants highlighted Discover's "enterprise risk management principles" and structure, including its "three lines of defense."........................................................ 24

          2.    Defendants touted Discover's purported focus on compliance and their efforts to "strengthen" the Company's compliance processes................................................. 27

    C.    Defendants Also Repeatedly Represented That Discover's Internal Controls Were Effective. ...................................................... 28

          1.    Establishing and maintaining effective internal controls is critical to a company's ability to identify and manage risks. ...... 28

          2.    Defendants repeatedly represented that Discover's internal controls were sufficient and effective. ......................................... 33

VII.  DISCOVER SUFFERED FROM SYSTEMIC AND PERVASIVE COMPLIANCE AND RISK MANAGEMENT FAILURES DURING THE CLASS PERIOD................................................................. 35

    A.    Discover's Risk and Compliance Processes Were Deficient and Ineffective. ........................................................................ 35

          1.    Discover had "a culture of non-compliance."............................. 36

i

**<u>TABLE OF CONTENTS</u>**

<u>Page</u>

| | | |
|---|---|---|
| | 2. | Discover's "three lines of defense" were plagued by problems. .................................................................................. 37 |
| | 3. | Discover's compliance department was severely understaffed, lacked the requisite expertise, and suffered from significant turnover. ........................................... 42 |
| | 4. | Discover had hundreds of unresolved regulatory violations, of which senior management—including Hochschild—was aware. ................................................................................. 46 |
| | 5. | Reflecting Defendants' awareness of compliance and control issues at Discover, the Company initiated an effort to address the problems—but then failed to rectify them. .......... 49 |
| B. | | The FDIC Consent Order Corroborates the FEs' Accounts and Details Systemic Compliance Failures at Discover. ....................................... 51 |
| | 1. | The FDIC found that at least as of 2021, Discover failed to establish and maintain a legally required compliance management system and violated numerous laws and regulations. ............................................................................. 51 |
| | 2. | The FDIC's remedial directives highlight the significant deficiencies that plagued Discover's compliance functions—in stark contrast to Defendants' representations to investors. ................................................................................ 52 |
| C. | | Discover Engaged in Systemic Improprieties Relating to Student Loan Servicing. ................................................................................ 57 |
| | 1. | Discover's misconduct goes back at least to 2015, when the CFPB revealed significant improprieties that the Company agreed to (but did not) rectify. ........................................ 57 |
| | 2. | Discover's misconduct relating to student loans continued during the Class Period. ........................................................... 62 |
| D. | | Discover Has Admitted It Misclassified Interchange Fee Revenues for More Than *15 Years*—Which, as the Company Acknowledges— "Underscored Deficiencies in Our Corporate Governance and Risk Management." ............................................................................. 69 |
| E. | | Hochschild and Greene Have Admitted Discover "Historically Underinvested" in Compliance, Its "Internal Systems Capabilities Weren't on Par," and It Experienced "Perennial Issues" Servicing Student Loans. ......... 71 |
| F. | | Beset by Compliance Failures, Discover Announced Its Plan to Sell Its $10 Billion Student Loan Business and Transfer Servicing to a Third Party. ....................................................................................... 72 |
| VIII. | | THE SIGNIFICANT AND LONG-RUNNING COMPLIANCE AND RISK MANAGEMENT PROBLEMS AT DISCOVER RENDERED DEFENDANTS' CLASS PERIOD STATEMENTS FALSE AND MISLEADING ................................. 75 |

## TABLE OF CONTENTS

**Page**

A.    In Discover's Form 10-Ks, Defendants Misrepresented the Company's "Risk Management" Structures and Capabilities, as well as the "Risk Management Culture" Established and Maintained by Hochschild. .................. 75

B.    The Officer Defendants Made Materially False and Misleading Statements Regarding Discover's Focus on, and Investment in, Compliance and Risk Management................................................................................................. 80

    1.    October 22, 2020: Q3 2020 Earnings Call.................................. 80

    2.    February 25, 2021: 22nd Annual Crédit Suisse Virtual Financial Services Forum ............................................................ 83

    3.    May 19, 2022: Annual Meeting of Shareholders......................... 84

    4.    September 13, 2022: Barclays Global Financial Services Conference ................................................................................... 86

    5.    December 6, 2022: Goldman Sachs 2022 US Financial Services Conference.................................................................... 88

    6.    February 14, 2023: Crédit Suisse 24th Annual Financial Services Forum ........................................................................... 89

    7.    March 21, 2023: Letter to Shareholders and 2022 Annual Report........................................................................................... 90

    8.    April 20, 2023: Q1 2023 Earnings Call ...................................... 91

    9.    May 11, 2023: Annual Meeting of Shareholders......................... 92

    10.    June 2, 2023: Bernstein 39th Annual Strategic Decisions Conference ................................................................................... 94

C.    Defendants Also Misrepresented the Sufficiency of Discover's Internal Controls.................................................................................................... 95

D.    Defendants Filed Materially False or Misleading SOX Certifications............... 97

E.    The Systemic and Pervasive Risk Management, Compliance, and Internal Control Failures at Discover Likewise Rendered Its Corporate Governance Documents Materially False and Misleading. .................................................. 100

F.    Defendants Violated Item 303 of SEC Regulation S-K..................................... 102

IX.    DISCOVER AND THE OFFICER DEFENDANTS MADE THEIR MISREPRESENTATIONS KNOWINGLY OR WITH RECKLESS DISREGARD FOR THE TRUTH.................................................................. 104

X.    DEFENDANTS' MISREPRESENTATIONS WERE MATERIAL............................. 110

XI.    DEFENDANTS' PURPORTED "CAUTIONARY" LANGUAGE CANNOT IMMUNIZE THEM FROM LIABILITY FOR THEIR MISREPRESENTATIONS ........................................................................... 113

## TABLE OF CONTENTS

**Page**

XII.    PLAINTIFFS AND OTHER CLASS MEMBERS ARE ENTITLED TO A PRESUMPTION OF RELIANCE ON DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................................................. 116

XIII.    DEFENDANTS' MISREPRESENTATIONS CAUSED INVESTORS' LOSSES ...... 118

    A.    *July 20, 2022*: Disclosure of Internal Investigation and Suspension of Discover's Share Repurchase Program ............................................... 119

    B.    *July 19-20, 2023*: Disclosure of Card Misclassification Issue, Proposed FDIC Consent Order, and Another Share Buyback Suspension ....................... 121

    C.    *August 14, 2023*: Hochschild's Resignation, Which Market Participants Understood Related to Discover's Compliance and Related Issues ................. 123

    D.    *October 18, 2023*: Ongoing Compliance Review and Continuation of Share Buyback Suspension ................................................................. 125

    E.    *January 17-18, 2024*: Increased Expenses Primarily Due to Investments in Compliance and Risk Management as Well as Customer Remediation ........ 126

XIV.    CLAIMS FOR RELIEF ...................................................................................... 128

XV.    PRAYER FOR RELIEF .................................................................................... 138

JURY TRIAL DEMANDED ......................................................................................... 139

iv

Lead Plaintiffs KBC Asset Management NV, New York City Employees' Retirement System, New York City Police Pension Fund, New York City Fire Department Pension Fund, and Teachers' Retirement System of the City of New York (collectively, "Plaintiffs") bring this federal class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as well as Securities and Exchange Commission ("SEC") Rule 10b-5, on behalf of all entities and individuals who purchased the common stock of Discover Financial Services ("Discover," "DFS," or the "Company") between February 21, 2019 and January 17, 2024, inclusive (the "Class Period"). Plaintiffs assert the allegations and claims in this Complaint against (1) Discover; (2) the Company's former Chief Executive Officer ("CEO") and President Roger C. Hochschild, its current Chief Financial Officer ("CFO") and Executive Vice President ("EVP") John T. Greene, and its former CFO and EVP R. Mark Graf (the "Officer Defendants"); and (3) the current and former directors identified below (the "Director Defendants," and together with Discover and the Officer Defendants, "Defendants").

Plaintiffs' allegations are based on, among other things, the investigation conducted by and through their attorneys, which included an analysis of:

- SEC filings made by Discover, including quarterly Form 10-Qs and annual Form 10-Ks, as well as other public filings concerning Discover or related entities;

- Defendants' additional public statements, including those made on Company earnings calls, at investor conferences, and in press releases;

- Research reports by securities and financial analysts concerning Discover;

- Economic analyses of Discover stock, including stock price movements in response to disclosures relating to the misconduct detailed in this Complaint;

- Other publicly available information regarding Discover, including the July 22, 2015 Consent Order issued by the Consumer Financial Protection Bureau ("2015 CFPB Consent Order"), the December 21, 2020 Consent Order issued by the CFPB ("2020 CFPB Consent Order," and together with the 2015 CFPB Consent Order, the "CFPB Consent Orders"), and the September 25, 2023 Consent Order

1

issued by the Federal Deposit Insurance Corporation ("FDIC Consent Order"); and

- Interviews with former Discover employees who worked at the Company during the Class Period on issues relating to risk management, compliance, or internal controls, and have firsthand knowledge of facts relating to the fraud giving rise to Plaintiffs' claims.

Lead Counsel's investigation is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiffs believe substantial additional evidentiary support for their allegations exists and would be uncovered through a reasonable opportunity for discovery.[1]

## I.      NATURE OF THE ACTION

1.       As a financial holding company, Discover is "subject to extensive regulation, supervision and examination under U.S. federal and state laws and regulations."[2] More specifically, as a bank holding company under the Bank Holding Company Act of 1956 and a financial holding company under the Gramm-Leach-Bliley Act, Discover is "subject to supervision, examination and regulation by the Federal Reserve," and "[a]s a large provider of consumer financial services," the Company is "subject to supervision, examination and regulation of the [CFPB]."[3] Additionally, the Company's bank subsidiary Discover Bank is regulated by the Office of the Delaware State Bank Commissioner and the FDIC.[4]

---

[1] Unless otherwise indicated, all emphasis in this Complaint has been added, and all internal citations, quotation marks, and footnotes have been omitted. Additionally, unless otherwise indicated, references to "¶ __" are to paragraphs of this Complaint.

[2] Discover Form 10-K for year ended Dec. 31, 2021, filed on Feb. 24, 2022 ("2021 Form 10-K"), at 19.

[3] *Id.*

[4] *Id.*

2.     As a heavily regulated financial institution, compliance with applicable laws and regulations is central to Discover's business operations and financial results.  Accordingly, the Company's ability to manage risk, including by implementing and maintaining systems and practices to enable it to comply with legal requirements, is essential.

3.     Through a litany of representations emphasizing Discover's purportedly robust compliance measures, as well as sound risk management and corporate governance systems and practices, Defendants portrayed a careful, prudent Company dedicated to compliance and appropriately managing risk.  For example, from 2019 to 2023, Discover stated in its Form 10-Ks that the Company's risk management framework was "designed to be comprehensive with respect to our business units and their control and support functions, and across all risk types," and was "based upon industry standards for managing risk and controls."  *See* ¶¶ 241-42. Defendants further represented that Discover's internal controls were effective based on well-established criteria, as certified by Defendants Hochschild, Greene, and Graf under the Sarbanes-Oxley Act of 2002 ("SOX").  *See* ¶¶ 98-99, 288-91.

4.     Defendants also touted Discover's commitment to risk management and compliance in press releases, earnings calls, and industry conferences throughout the Class Period.  In particular, then-CEO Roger Hochschild assured investors and analysts regarding Discover's investments in those areas, including that those investments were ***sufficient*** to enable the Company to comply with applicable laws and regulations.  Among other things, Hochschild represented that "[t]op of the list is our focus on compliance first, which means we'll continue to strengthen and fine-tune our processes and comply with all the regulations required of a large national bank"; "compliance is our top priority" and was thus "an area we need to make sure we continue to invest"; "[w]e have invested significantly in compliance" and in the Company's

3

"compliance management system"; and "[w]e expect that we're going to continue to invest so that our compliance management system meets our high standards and the high standards of the regulators." CFO John Greene likewise emphasized, among other things, Discover's "real focus on corporate cost and those dollars that aren't directly attributable to our ability to grow or our ability to grow in a compliant way," noting "[w]e're going to put money into risk and compliance as we want to."

5. The reality within the Company was far different, in at least three critical respects. *First*, as revealed through a damning consent order issued by the FDIC, the Company suffered from deficient compliance processes, including a "fail[ure] to establish and maintain a compliance management system [] providing for compliance with Consumer Protection Laws and Regulations." *Second*, as revealed through two consent orders issued by the CFPB, which ultimately forced Discover to conduct an internal investigation and twice suspend its share repurchase program, the Company was engaged in rampant improprieties with respect to student loan servicing—some of which Discover failed to rectify ***even after the first consent order was issued***. And *third*, Discover ***admitted*** it misclassified hundreds of millions of dollars in revenues associated with credit card interchange fees for over ***15 years***, which—as Hochschild acknowledged—"underscored deficiencies in our corporate governance and risk management."

6. Defendants concealed these highly material facts from investors, and in doing so caused the price of Discover shares to be artificially inflated throughout the Class Period. Given the centrality of risk management, compliance, corporate governance, and internal controls to a highly regulated financial institution like Discover, the Company's systemic and pervasive gaps and deficiencies in these areas would be important to investors. Defendants acknowledged as much. For example, in his letter to shareholders accompanying Discover's 2022 Annual Report,

Hochschild emphasized that the Company "invested significantly in key areas of our business" to, among other things, "strengthen compliance," which "position[ed] Discover to continue driving shareholder value."

7.        As detailed in ¶¶ 302-17 below, Discover and the Officer Defendants made these and other representations with scienter, i.e., knowing or recklessly disregarding they were false or misleading when made.  Their scienter rests on two independently sufficient grounds:

Conscious misbehavior or recklessness.  The accounts of well-placed former Discover employees, the findings by the FDIC and the CFPB, and Defendants' own admissions, among other things, demonstrate the Officer Defendants knowingly misrepresented the state of Discover's risk, compliance, governance, and control infrastructure and practices, or at least recklessly disregarded readily apparent facts that ran contrary to their statements to investors.  The concealed facts, moreover, did not reflect isolated or sporadic events, but rather significant, long-running problems that plagued the Company.  At minimum, the Officer Defendants consciously disregarded these glaring red flags for years.

Motive and opportunity.  The Officer Defendants had the motive and opportunity to commit fraud.  Because the compensation of certain executives, including Hochschild, depended heavily on Discover meeting earnings per share ("EPS") targets, they were highly motivated to keep the Company's expenses artificially low, which would help boost EPS.  Hochschild and others achieved that objective by, at least in part, failing to sufficiently invest in risk management, compliance, corporate governance, and internal controls.  At the same time, they caused the Company to buy back significant amounts of its stock, which lowered the number of publicly traded shares and in turn raised EPS (i.e., fewer shares resulted in a lower denominator

in the earnings/share calculation). Hochschild and others thus sacrificed investors' interests for their personal gain.

8.      When facts undermining Defendants' representations emerged through a series of disclosures from July 2022 to January 2024, the price of Discover shares declined significantly as investors learned the extent of Discover's systemic and pervasive failures.

9.      The first of these corrective disclosures occurred on July 20, 2022, when Discover revealed that problems relating to its servicing of student loans caused the Company to initiate an internal investigation and suspend its stock repurchase program. While the CFPB Consent Orders detailing student loan servicing issues were already public, the market did not appreciate the extent to which they were impacting the Company until the serious revelations in July 2022. This is particularly so given Defendants' continual assurances to analysts and investors that the Company was devoting sufficient resources to ensuring compliance with applicable laws and regulations, and was maintaining appropriate processes and practices for managing risk and ensuring compliance.

10.     Then, on July 21, 2023, Discover announced it had overcharged merchants on card interchange fees for more than 15 years and was engaged with the FDIC regarding a consent order addressing systemic compliance failures at the Company. The Company further disclosed it "ha[d] decided to pause share repurchases while the internal review of compliance, risk management and corporate governance is pending." As *Reuters* reported in the wake of these revelations:

> Discover's stock plunged 16% on [July 21, 2023] amid a deluge of bad news. The company said that it had overcharged merchants and their banks due to misclassifying some cards. The financial impact is a trifle. But it came alongside the revelation that regulators have proposed serving Discover with a punitive "consent order," for other undisclosed shortcomings. To cap it off,

Discover paused stock buybacks—a big deal for a company that repurchased 50% of its shares over the past decade.[5]

11.     Less than a month later, on August 14, 2023, Discover announced its board and Hochschild had "agreed" he would "step down" as CEO, President, and a director "effective immediately."  The Company's press release also quoted Interim CEO John Owen as stating "[t]he Board is continuously focused on Discover reaching its full potential across the business, including our commitment to enhancing compliance, risk management and corporate governance."  The message was clear: contrary to Defendants' prior representations, Discover had not sufficiently invested in risk management and compliance, and did not implement and maintain processes and practices to enable it to appropriately manage risk and comply with applicable laws and regulations.

12.     Both Hochschild and Greene have now directly contradicted their Class Period statements touting Discover's investment in risk management and compliance by since admitting that the Company had "***underinvested***" in compliance.  Specifically, in July 2023, when an analyst asked him about compliance, Hochschild replied, "I do believe ***we underinvested and that's something I take accountability for***."  And in August 2023, after Hochschild had abruptly resigned, an analyst asked Greene about Discover's "compliance investment . . . versus the industry," to which Greene responded, "[w]hat I would say is ***the company historically underinvested.  And we're paying the price right now***."  Further, during a call with analysts on December 5, 2023, Greene admitted that Discover's decision (announced on November 29, 2023) to sell its entire $10.4 billion student lending business was due to "***perennial issues in our***

---

[5] John Foley, "*Discover dabbles with two types of delinquency*," *Reuters* (July 21, 2023), https://www.reuters.com/breakingviews/discover-dabbles-with-two-types-delinquency-2023-07-21.

***ability to service that portfolio***" and because "***[the Company's] internal systems capabilities
weren't on par with what a professional servicing organization could do***."

13.     Additional facts undermining Defendants' prior representations emerged on
October 18, 2023, when Discover disclosed that total operating expenses rose $83 million year
over year, "primarily driven by," among other things, "expenses for professional fees . . . driven
by continued investment in compliance and risk management initiatives."  This news partially
(though not completely) alerted investors to Defendants' failure to sufficiently invest in risk
management, compliance, and related matters.

14.     Finally, in announcing its Q4 2023 financial results on January 17, 2024,
Discover disclosed a significant increase in operating expenses, which resulted largely from
"investments in compliance and risk management" as well as an $80 million reserve "for
customer remediation."  Analysts were quick to highlight the connection between disappointing
earnings and "higher provisions and compliance and risk management expenses."[6]

15.     During an earnings call held the next day, John Owen noted Discover "increased
[its] investments on risk and compliance in 2022 and 2023 up to about a $500 million level" and
acknowledged the Company "still ha[s] quite a bit of work to do" in those areas.  He also
previewed potential further regulatory action relating to the card misclassification issue.
Additionally, CFO John Greene specified that the $80 million remediation reserve "related to
[student loan] servicing issues" and "is not connected to the issues that we discussed in July
[2023]."

---

[6] *See* Barclays, "Discover Financial Services 4Q23 First Look: Big Miss and Messy Guide" (Jan.
17, 2024) (noting "4Q EPS of $1.54, missed our $2.54 and consensus of $2.52 due to higher
provisions and compliance and risk management expenses").

16.     The reactions of analysts and investors following each of the above disclosures demonstrate the importance of the previously concealed information, the impact of Defendants' false and misleading statements on the price of Discover stock, and the losses investors suffered due to those misrepresentations.  The below graph illustrates the stock price movement in response to the corrective disclosures:



17.     In light of the foregoing facts, which are further detailed below, Plaintiffs assert claims under Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) against Discover and the Officer Defendants.

18.     Plaintiffs also assert claims under Section 10(b) and SEC Rule 10b-5(a) and (c) against Discover and the Officer Defendants for perpetrating a fraudulent scheme or course of conduct on Plaintiffs and other Class members.  Defendants knowingly or recklessly concealed, among other things, information regarding systemic and pervasive risk management and

compliance failures, and caused Discover to underinvest in risk management and compliance so they could instead pursue an aggressive stock repurchase program that directly inflated Hochschild's and other Company executives' personal compensation.

19. Additionally, the Officer and Director Defendants are liable under Section 20(a) of the Exchange Act as "controlling persons" of Discover during the Class Period. In their roles as the Company's most senior executives, the Officer Defendants regularly acted and spoke on the Company's behalf regarding the issues detailed in this Complaint, and directed or oversaw others whose actions (or inaction) contributed to the significant failures in risk management, compliance, corporate governance, and internal controls that Defendants concealed through their representations to investors. Additionally, the Director Defendants participated in or oversaw activities at the core of the fraud detailed in this Complaint, in particular through their participation on board committees—the Risk Oversight Committee and the Audit Committee— whose stated purposes, objectives, and responsibilities addressed risk management, compliance, corporate governance, and internal controls. The Director Defendants' involvement in activities at the core of this case is even more pronounced given the CFPB's directives to the Discover board connected to examining and rectifying the significant compliance issues the agency identified in its 2015 and 2020 Consent Orders. In light of the facts relating to the Director Defendants, they are also liable as "controlling persons" under Section 20(a).

## II.  JURISDICTION AND VENUE

20. This Court has jurisdiction over the subject matter of this action in accordance with 28 U.S.C. §§ 1331 and 1337 as well as Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

21. Personal jurisdiction exists over Defendants in accordance with Section 27 of the Exchange Act and comports with constitutional due process principles.

10

22.     Venue is proper in this District in accordance with Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Discover is headquartered in this District and many of the acts and practices alleged in this Complaint occurred in substantial part in this District.

23.     In connection with the misconduct alleged in this Complaint, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the U.S. mails, interstate telephone communications, and the facilities of the national securities markets.

## III.     CLASS ACTION ALLEGATIONS

24.     Plaintiffs bring this action on their own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all entities and individuals who purchased or otherwise acquired the publicly traded common stock of Discover during the period between February 21, 2019 and January 17, 2024, inclusive, and were damaged thereby (the "Class").  Excluded from the Class are Defendants; members of the immediate families of the Officer Defendants or the Director Defendants; the Company's subsidiaries and affiliates; any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

25.     The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  Discover has approximately 250 million shares of common stock outstanding and actively trading on the NYSE.  While Plaintiffs do not currently know the exact number of Class members, Plaintiffs believe there are thousands of members.

11

26.     Record owners and other members of the Class may be identified from records maintained by Discover or its transfer agent, and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

27.     Plaintiffs' claims are typical of the claims of other Class members.  All members of the Class were similarly affected by Defendants' wrongful conduct in violation of the Exchange Act, as detailed in this Complaint.

28.     Plaintiffs will fairly and adequately protect the interests of the members of the Class, and have retained counsel competent and experienced in class and securities litigation.

29.     Common questions of law and fact exist as to all Class members, and those questions predominate over any questions solely affecting individual Class members.  The questions of law and fact common to the Class include:

(a)     Whether the federal securities laws were violated by Defendants' acts and omissions as detailed in this Complaint;

(b)     Whether the statements made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

(c)     Whether and to what extent the market price of Discover common stock was artificially inflated during the Class Period because of the material misstatements and omissions identified in this Complaint;

(d)     Whether Discover and the Officer Defendants acted with the requisite level of scienter;

(e)     Whether the Officer Defendants and the Director Defendants were controlling persons of the Company;

(f)     Whether reliance may be presumed; and

12

(g)    Whether the members of the Class have sustained damages as a result of the conduct alleged in this Complaint and, if so, the proper measure of damages.

30.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation render it practically impossible for Class members individually to redress the wrongs done to them.  Finally, there will be no difficulty in the management of this case as a class action.

## IV.    PARTIES

### A.    Plaintiffs

31.    On November 30, 2023, this Court appointed KBC Asset Management NV ("KBC"), as well as New York City Employees' Retirement System, New York City Police Pension Fund, New York City Fire Department Pension Fund, and Teachers' Retirement System of the City of New York (the "NYC Funds"), to serve as Lead Plaintiffs in this action pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").

32.    KBC is an asset management company based in Brussels, Belgium.  As set forth in its PSLRA certification, KBC's funds purchased Discover common stock during the Class Period and suffered damages as a result of the securities law violations alleged in this Complaint. *See* Dkt. 16-1.

33.    The NYC Funds are retirement plans established by law to provide benefits to New York City employees.  As set forth in their PSLRA certification, the NYC Funds purchased Discover common stock during the Class Period and suffered damages as a result of the securities law violations alleged in this Complaint.  *See* Dkt. 12-2.

13

### B.     Defendants

#### 1.     Discover

34.     Defendant **Discover Financial Services** is "a digital banking and payment services company" incorporated in Delaware with principal executive offices at 2500 Lake Cook Road, Riverwoods, Illinois 60015.  It is a bank holding company under the Bank Holding Company Act of 1956 as well as a financial holding company under the Gramm-Leach-Bliley Act.  The Company's common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "DFS."

35.     Discover provides digital banking products and services, as well as payment services, through its subsidiaries.  It offers private student loans, credit card loans, personal loans, home loans, and deposit products.  The Company also operates the Discover Network, the PULSE network, and Diners Club International, collectively known as the Discover Global Network.  The Discover Network "processes transactions for Discover-branded credit and debit cards and provides payment transaction processing and settlement services."[7]

#### 2.     Officer Defendants

36.     Defendant **Roger C. Hochschild** served as Discover's CEO and President, and as a director on Discover's board, from October 2018 until his resignation on August 14, 2023. Hochschild signed Discover SEC filings throughout the Class Period, including its Form 10-K for the year ended December 31, 2019, filed on February 26, 2020 ("2019 Form 10-K"); its Form 10-K for the year ended December 31, 2020, filed on February 17, 2021 ("2020 Form 10-K"); its Form 10-K for the year ended December 31, 2021, filed on February 24, 2022 (as defined above, the 2021 Form 10-K); and its Form 10-K for the year ended December 31, 2022, filed on

---

[7] 2021 Form 10-K at 1.

February 23, 2023 ("2022 Form 10-K"). Hochschild made numerous other statements on the Company's behalf during the Class Period.

37.     Defendant **John T. Greene** has served as Discover's CFO and EVP since September 18, 2019. Greene signed Discover SEC filings over much of the Class Period—including the 2019, 2020, 2021, and 2022 Form 10-Ks—and made numerous other statements on the Company's behalf during the Class Period.

38.     Defendant **R. Mark Graf** served as Discover's CFO and EVP from April 2011 until September 18, 2019. Graf signed Discover SEC filings during the Class Period, including its Form 10-K for the year ended December 31, 2018, filed on February 20, 2019 ("2018 Form 10-K"), and made other statements on the Company's behalf during the Class Period.

39.     As noted above, Defendants Hochschild, Greene, and Graf are sometimes referenced collectively in this Complaint as the "Officer Defendants."

### 3.     Director Defendants

40.     Defendant **Mary K. Bush** served as a director of Discover from before the Class Period until on or about June 2, 2023, including as a member of the board's Risk Oversight Committee.

41.     Defendant **Candace H. Duncan** has served as a director of Discover from before the Class Period, including as a member (and currently as Chair) of the board's Audit Committee.

42.     Defendant **Joseph F. Eazor** has served as a director of Discover from before the Class Period, including as a member of the Audit Committee.

43.     Defendant **Cynthia Glassman** served as a director of Discover from before the Class Period until on or about May 11, 2023, including as Chair of the Audit Committee.

15

44. Defendant **Thomas G. Maheras** has served as a director of Discover since before the Class Period, and was named "Independent Chairman" in May 2020. He has served as a member of the Risk Oversight Committee since before the Class Period.

45. Defendant **Michael Moskow** served as a director of Discover from before the Class Period until on or about May 11, 2023, including as Chair of the Risk Oversight Committee.

46. Defendant **Daniela O'Leary Gill** has served as a director of Discover since June 14, 2023, including as Interim Chair of the Risk Oversight Committee.

47. Defendant **John B. Owen** has served as a director of Discover since June 2022, including as a member of the Risk Oversight Committee from June 2022 until August 14, 2023, when, following Hochschild's resignation, Owen was appointed Interim CEO and President. The Company recently announced that as of February 1, 2024, Michael G. Rhodes became the new CEO and President of Discover, and that Owen will continue as a director.

48. Defendant **David L. Rawlinson II** has served as a director of Discover since on or about February 22, 2021, including as a member of the Audit Committee.

49. Defendant **Jennifer L. Wong** has served as a director of Discover since 2019, including as a member of the Risk Oversight Committee.

50. The individuals identified in ¶¶ 40-49 above are sometimes referenced collectively in this Complaint as the "Director Defendants." The Director Defendants and the Officer Defendants collectively comprise the "Individual Defendants."

16

## V.    FORMER DISCOVER EMPLOYEES WHO HAVE PROVIDED RELEVANT INFORMATION

51.    Among the numerous sources of factual support for the allegations in this Complaint are contemporaneous accounts by six former Discover employees (collectively, the "FEs"), each of whom worked at the Company during the Class Period and had responsibilities relating to compliance or risk management.

52.    **FE 1** worked at Discover as a principal risk compliance manager starting in the first half of 2021 until the fall of 2023.  FE 1's responsibilities included building out a first-line scoping program for the Company, which encompassed the deposits, personal loans, home loans, student loans, and cards business units, as well as building out the remediation and restitution process in response to the 2020 CFPB Consent Order.  FE 1 also created a policy for the cards business with respect to credit card interchange fees.

53.    **FE 2** worked at Discover as a risk manager from before the Class Period until late 2020.  FE 2 reported to Dianne Rischke, who served from January 2017 to November 2022 as Vice President, Credit and Card Operations Risk Officer/Consumer Banking Risk Officer.  In that position, Rischke (according to her LinkedIn profile) "manag[ed] operational and compliance risk for all banking products: Deposits, Personal Loans, Student Loans, and Home Equity Loans," and "serv[ed] as the businesses' voice of risk to the CEO and President governing the bank's risk profile."[8]

54.    **FE 3** worked at Discover from before the Class Period until the late summer/early fall of 2022.  FE 3's responsibilities included leading a team of student loan call center

---

[8] https://www.linkedin.com/in/diannerischke/.

representatives and working as a member of the student loan restitution team formed in response to the 2020 CFPB Consent Order.

55.     **FE 4** worked at Discover from before the Class Period until the fall of 2021.  FE 4 was involved in two of the Company's "three lines of defense" with respect to risk management (discussed in ¶¶ 71-74 below), including as a senior manager of business risk and internal controls, which FE 4 described as part of the "1.5 line of defense" (i.e., a "0.5" addition to the first-line of defense).  FE 4 reported to a director under President, Consumer Banking Carlos Minetti's reporting structure.[9]

56.     **FE 5** worked at Discover from before the Class period until the fall of 2021, including most recently as a senior manager who worked in compliance.

57.     **FE 6** worked at Discover for more than a decade, until the summer of 2022.  FE 6's responsibilities while at the Company included serving as a director of risk management and compliance for the cards and consumer banking units during the Class Period, reporting to Scott Michelau, who at the time was Vice President – US Cards Risk Officer and reported to EVP Dan Capozzi.[10]  FE 6 also had "dotted line" reporting responsibilities to Dianne Rischke, who in turn reported to Carlos Minetti.  Capozzi and Minetti reported to Hochschild.

---

[9] References to "directors" in the FEs' accounts refer to management-level positions, not members of Discover's board of directors.

[10] According to Capozzi's LinkedIn profile, he served as EVP, President – Credit Operations & Decision Management from October 2018 to January 2021, and since then has served as EVP, President – US Card.  *See* https://www.linkedin.com/in/dan-capozzi-39246514/.

VI.    **DEFENDANTS REPEATEDLY TOUTED DISCOVER'S RISK MANAGEMENT, COMPLIANCE, AND CORPORATE GOVERNANCE SYSTEMS AND PRACTICES, AS WELL AS THE ADEQUACY OF ITS INTERNAL CONTROLS**[11]

A.    **Risk Management and Compliance Systems and Practices Are Essential to a Heavily Regulated Company's Business Operations and Financial Results.**

58.    The concepts of risk management and compliance are closely related.  Indeed, as Hochschild stated during the Class Period, "compliance and a lot of the focus, it's risk management."[12]

59.    These concepts are embodied in principles espoused by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO").  COSO began in 1985, in the wake of accounting scandals of the 1970s and 80s, as an initiative to investigate the factors that lead to fraudulent financial reporting.  It was initially led by former SEC Commissioner James C. Treadway, Jr., and was sponsored by several major U.S. professional associations: the American Accounting Association, the American Institute of Certified Public Accountants, Financial Executives International, the Institute of Internal Auditors, and the National Association of Accountants (n/k/a Institute of Management Accountants).  COSO's stated mission is "to help organizations improve performance by developing thought leadership that enhances internal control, risk management, governance and fraud deterrence."[13]  To that end, COSO has issued widely followed guidance and practices in those areas.

---

[11] This section provides background facts and a summary of the types of false and misleading statements Defendants made during the Class Period.  Section VIII provides a detailed discussion of each false or misleading statement alleged in this Complaint, as well as the reasons each identified statement was false or misleading when made.

[12] Discover Q2 2023 Earnings Call (July 20, 2023).

[13] https://www.coso.org/about-us.

60.     COSO defines **compliance risks** as "those risks relating to possible violations of applicable laws, regulations, contractual terms, standards, or internal policies where such violation could result in direct or indirect financial liability, civil or criminal penalties, regulatory sanctions, or other negative effects for the organization or its personnel."[14]  Further, "[a]lthough most compliance risks relate to specific laws or regulations, others do not"; the latter "may include risks associated with failures to comply with professional standards, internal policies of an organization (including codes of conduct and business ethics), and contractual obligations."[15]

61.     **Enterprise risk management** (or "**ERM**") consists of "[t]he culture, capabilities, and practices, integrated with strategy-setting and its performance, that organizations rely on to manage risk in creating, preserving, and realizing value."[16]  **Consumer compliance risk management** "considers the adequacy of board and management oversight of compliance-related activities and includes policies and procedures, monitoring activities supported by management information systems, and internal controls."[17]  Because "value that has been created by an organization can quickly become impaired when accompanied by violations of laws and regulations," compliance risk management "is an important element of both the internal control and the broader ERM functions and processes of an organization."[18]

---

[14] COSO, *Compliance Risk Management: Applying the COSO ERM Framework*, at 1, https://www.fdic.gov/news/financial-institution-letters/2006/2cep_compliance.pdf.

[15] *Id.*

[16] *Id.* at 4.

[17] Kathleen Benson (Lead Examiner, Federal Reserve Bank of Chicago), "Compliance Risk Assessments," *Consumer Compliance Outlook* (2023), https://www.consumercomplianceoutlook.org/2023/second-third-issue/compliance-risk-assessment/.

[18] COSO, *Applying the COSO ERM Framework*, at 5.

62.     The FDIC has explained that to address risks inherent in operating its business, "a financial institution must develop and maintain a sound compliance management system that is integrated into the overall risk management strategy of the institution."[19]  Compliance thus "should be part of the daily routine of management and employees of a financial institution."[20]

63.     An effective compliance management system typically consists of "three interdependent elements": (1) "Board and management oversight," (2) "Compliance program," and (3) "Compliance audit."[21]  When all of these elements "are strong and working together," the financial institution "will be successful at managing its compliance responsibilities and risks."[22]

64.     On the other hand, failure to comply with federal consumer protection laws and regulations "can result in monetary penalties, litigation, and formal enforcement actions."[23]

65.     Discover has acknowledged the importance of implementing and maintaining effective compliance and risk management systems.  In the 2022 Annual Report accompanying its Form 10-K, for example, the Company noted "[m]anaging risk is an essential part of the way we work and requires a strong compliance management system (CMS)."[24]

66.     The culture of compliance within a company, moreover, is set from the top.  In other words, as the FDIC has instructed, "[l]eadership on compliance by the board of directors and *senior management* sets the tone in an organization."[25]  Setting a proper tone is necessary to

---

[19] FDIC, *Compliance Management System*, at 1.

[20] *Id.*

[21] *Id.*

[22] *Id.*

[23] *Id.*

[24] Discover 2022 Annual Report (Mar. 2023) at 10.

[25] FDIC, *Compliance Management System*, at 2.

ensure that managers who report to senior management, as well as staff members, "have a clear understanding that compliance is important to the board and senior management, and that they are expected to incorporate compliance in their daily operations."[26]  Fostering a culture of compliance also requires that management "provide the firm's employees with the necessary tools and resources to fulfill their compliance functions, such as hiring the right people, developing effective compliance controls, and designing appropriate policies and procedures that take into consideration the firm's fiduciary obligations to its clients."[27]

67.     In the same vein, senior management is responsible for ensuring appropriate risk management processes are in place.  The Federal Reserve Board ("Fed"), for example, directs that senior management "is responsible for implementing strategies in a manner that manages, monitors, and mitigates risks associated with each strategy and that promotes compliance with laws and regulations on both a long-term and day-to-day basis."[28]  To that end, "senior management should be fully involved in the activities of their institutions and possess sufficient knowledge of all major business lines to ensure that appropriate policies, controls, and risk monitoring systems are in place and that accountability and lines of authority are clearly delineated."[29]  Senior management "is also responsible for establishing and communicating a strong awareness of and need for effective internal controls and high ethical standards," which

---

[26] *Id.*

[27] SEC Comm'r Luis A. Aguilar, "Doing the Right Thing: Compliance That Works for Investors," Presented to The Regulatory Compliance Association (Apr. 18, 2013), https://www.sec.gov/news/speech/2013-spch041813laahtm.

[28] Board of Governors of the Federal Reserve System, Division of Banking Supervision and Regulation, SR 95-51 (SUP), *Rating the Adequacy of Risk Management Processes and Internal Controls at State Member Banks and Bank Holding Companies*, Nov. 14, 1995 (rev. Feb. 26, 2021) ("Fed Board SR 95-51 (SUP)"), https://www.federalreserve.gov/boarddocs/srletters/1995/sr9551.htm.

[29] *Id.*

"requires senior managers of a bank or bank holding company to have a thorough understanding of banking and financial market activities and detailed knowledge of the activities their institution conducts, including the nature of internal controls necessary to manage, monitor, and mitigate the related risks."[30]

> 68.  As one commentator has aptly noted:
>
> > [I]ntegrity flows outward from the CEO and her office. Without a deeply committed and constantly consistent CEO who leads the performance with integrity . . . there can never be the requisite high-integrity culture. Such a culture is based on shared principles (values, policies, and attitudes) and shared practices (norms, systems, and processes) that influence how people feel, think, and behave.[31]

Further, as part of "'operationalizing' . . . high performance with high integrity," the CEO (aided by others) must, among other things, "embed[] integrity practices in business operations in the core areas of prevention, detection, and response—through risk assessment of business processes, appropriate risk mitigation techniques, constant monitoring and review, and appropriate discipline and remediation when wrongdoing occurs."[32]

> 69.  At Discover, the CEO "is ultimately responsible for risk management," and in that capacity "establishes a risk management culture throughout [the] Company and ensures that businesses operate in accordance with this risk culture."[33] Given the CEO's leading role in risk management within the Company, failures in risk management or compliance ultimately rest with him.

---

[30] *Id.*

[31] Ben W. Heineman, Jr., "*Only the Right CEO Can Create a Culture of Integrity*," Harvard Law School Forum on Corporate Governance & Financial Regulation (June 5, 2013), https://corpgov.law.harvard.edu/2013/06/05/only-the-right-ceo-can-create-a-culture-of-integrity/.

[32] *Id.*

[33] 2022 Form 10-K at 14.

**B.     Defendants Repeatedly Touted the Effectiveness of Discover's Compliance and Risk Management Systems.**

70.     Throughout the Class Period, Defendants assured investors that Discover had implemented and maintained sufficient compliance and risk management processes to enable the Company to comply with applicable laws and regulations and appropriately manage risk.

**1.     Defendants highlighted Discover's "enterprise risk management principles" and structure, including its "three lines of defense."**

71.     Discover represented that its "enterprise risk management philosophy" was reflected through "five key principles": "Comprehensiveness, Accountability, Independence, Defined Risk Appetite and Transparency."[34]  In particular, the Company highlighted its "three lines of defense along the principles of risk management execution, oversight and independent validation."[35]

72.     As its "first line of defense," the Company's business units "seek to achieve business objectives while identifying and managing risks that arise from day-to-day operations as well as those driven by change."[36]

73.     The Company further stated its "second and third lines of defense" operate "independently of the business units."[37]  The "second line of defense" includes the Company's corporate risk management ("CRM") department, led by its Chief Risk Officer ("CRO").  The CRM department "(i) oversees the establishment of enterprise-level risk management standards and policies; (ii) oversees the processes that are designed to be consistent with the size and complexity of our business, industry practices and applicable legal and regulatory requirements;

---

[34] *Id.* at 12.

[35] *Id.*

[36] *Id.*

[37] *Id.*

and (iii) independently test[s] business units' compliance with applicable regulatory requirements."[38]

74.     The "third line of defense" consists of the internal audit department, which "performs periodic, independent reviews and tests compliance with risk management policies, procedures and standards across [the] Company," and "periodically reviews the design and operating effectiveness of our risk management program and processes," including "the independence and effectiveness of our CRM function."[39]

75.     Discover also assured investors its "governance structure" with respect to risk management "is based on the principle that each line of business is responsible for managing risks inherent in its business with appropriate oversight from our senior management and Board of Directors."[40]  Discover further noted that while its bank subsidiary "has its own risk governance, compliance, auditing and other requirements," the Company's risk governance framework "is designed such that bank-level risk governance risk requirements are satisfied as well."[41]

76.     Discover highlighted numerous components of its risk management governance structure, including (in addition to the CEO and the CRM department) the Risk Oversight Committee, the Audit Committee, and the Risk Committee.

77.     The Risk Oversight Committee "is responsible for overseeing our risk management policies and the operations of our enterprise-wide risk management framework," and among other things "receiv[es] and review[s] regular reports from our CRO . . . on risk

---

[38] *Id.*

[39] *Id.*

[40] *Id.* at 13.

[41] *Id.*

management deficiencies and significant risks," and "receiv[es] reports on compliance with our risk appetite and limit structure and risk management policies, procedures and controls."[42]

78.     The Audit Committee's responsibilities include "receiving and reviewing reports from [Discover's] CRO and other members of management as the Committee deems appropriate on the guidelines and policies for assessing and managing [the Company's] exposure to risks, the corporation's major financial risk exposures and the steps management has taken to monitor and control such exposures," and "sharing information and liaising with the Risk Oversight Committee as necessary or desirable to help ensure that the committees have received the information necessary to permit them to fulfill their duties and responsibilities with respect to oversight of risk management matters."[43]

79.     The Risk Committee is "an executive management-level committee that establishes and oversees a comprehensive enterprise risk management program," which includes:

- "providing a regular forum for representatives of our different functional groups to identify and discuss key risk issues and to recommend to senior management actions that should be taken to manage the level of risk taken by the business lines";

- "establishing and overseeing an enterprise-wide approach to risk management through the development of our Enterprise Risk Management Policy and the associated oversight framework for the identification, measurement, monitoring, management and reporting of enterprise risk";

- "communicating our risk appetite and philosophy, including establishing limits and thresholds for managing enterprise-wide risks"; and

- "reviewing, on a periodic basis, our aggregate enterprise-wide risk exposures and the effectiveness of risk identification, measurement, monitoring, management and reporting policies and procedures and related controls within the lines of business."[44]

---

[42] *Id.*

[43] *Id.*

[44] *Id.* at 14.

80.     Additionally, the Risk Committee "has formed and designated a number of committees to assist it in carrying out its responsibilities," including the Compliance Committee.[45]  These committees are "made up of representatives from senior levels of management."[46]

### 2. Defendants touted Discover's purported focus on compliance and their efforts to "strengthen" the Company's compliance processes.

81.     Defendants, particularly then-CEO Hochschild, repeatedly emphasized Discover's purported commitment to compliance, including its investments to bolster compliance processes. Defendants' representations also made clear that strong compliance was important to shareholders and thus to the Company's financial condition and prospects.

82.     During Discover's 2022 annual shareholders meeting held on May 19, 2022, for example, Hochschild noted that to achieve the Company's goals, "we must balance agility, innovation and growth with the discipline and control required in a high-risk highly regulated industry."  In pointing to "some of the things we're doing this year," he emphasized that "[t]op of the list is our focus on compliance first, which means we'll continue to strengthen and fine-tune our processes and comply with all the regulations required of a large national bank."

83.     In a March 21, 2023 letter to shareholders that accompanied Discover's 2022 Annual Report, Hochschild emphasized (as part of "Succeeding with Shareholders") that the Company "invested significantly in key areas of our business" to, among other things, "strengthen compliance."  Those investments, he added, "position Discover to continue driving shareholder value."

---

[45] *Id.*

[46] *Id.*

84.     In the 2022 Annual Report, Discover noted it "focused on three key areas to strengthen our CMS over the past few years":

- "Increased management oversight through a dedicated team in compliance that monitors regulatory changes and helps assess our processes and makes required changes to avoid customer harm";

- "Strong compliance programs to ensure we understand and follow regulatory requirements, identify potential risks, and put in place robust, effective processes that we regularly monitor and test to be certain they are working as designed"; and

- "Identifying and solving problems before customer harm happens, or when mistakes do occur, find the root causes, fix them quickly and prevent them from happening again."

85.     The Company added, "When we know, monitor and improve our processes through strong compliance management, we enhance the customer experience and eliminate or mitigate issues *before* they cause customer harm."

86.     In April 2023, Hochschild said "we . . . continue to focus on enhancing our compliance management systems."  Likewise, in May 2023 he stated "we're focused on maturing our compliance and risk management, including strengthening our monitoring and testing and strengthening all 3 lines of defense to better identify, assess and mitigate risk."

## C.     Defendants Also Repeatedly Represented That Discover's Internal Controls Were Effective.

### 1.     Establishing and maintaining effective internal controls is critical to a company's ability to identify and manage risks.

87.     Internal controls are closely related to risk management.  Reflecting this connection, the Fed emphasizes "the importance of sound risk management processes and strong internal controls when evaluating the activities of the institutions it supervises."[47]  Accordingly,

---

[47] Fed Board SR 95-51 (SUP).

"while an institution's financial performance is an important indicator of the adequacy of management," the quality of risk management practices and internal controls is "significant . . . when evaluating the management and overall financial condition of banking organizations."[48] Indeed, "comprehensive internal controls" are elements of "a sound risk management system."[49]

88.     COSO defines "internal control" as "a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives relating to operations, reporting, and compliance."[50]  This definition reflects a number of "fundamental concepts," including that internal control "consist[s] of ongoing tasks and activities—a means to an end, not an end in itself"; and it is "not merely about policy and procedure manuals, systems, and forms, but about people and the actions they take at every level of an organization to affect internal control."[51]

89.     The Public Company Accounting Oversight Board ("PCAOB") similarly defines "internal control" as "a process—effected by an entity's board of directors, management, and other personnel—designed to provide reasonable assurance regarding the achievement of objectives in the following categories: (*a*) reliability of financial reporting, (*b*) effectiveness and efficiency of operations, and (*c*) compliance with applicable laws and regulations."[52]

---

[48] *Id.*

[49] *Id.*

[50] COSO, *Internal Control – Integrated Framework* (May 2013) ("COSO Framework"), Executive Summary at 3.  While the COSO Framework refers to "internal control," the Fed and other sources refer to "internal controls."  The terms are used interchangeably in this Complaint.

[51] *Id.*

[52] AU Section 319: Consideration of Internal Control in a Financial Statement Audit, https://pcaobus.org/oversight/standards/archived-standards/details/AU319.

90.     COSO further explains: "Internal control is not solely about accounting and financial matters.  Compliance with laws and regulations is one of the three fundamental objectives of an organization's system of internal controls."[53]  Those consist of:

1)  Operations Objectives, which "pertain to effectiveness and efficiency of the entity's operations, including operational and financial performance goals, and safeguarding assets against loss";

2)  Reporting Objectives, which "pertain to internal and external financial and non-financial reporting and may encompass reliability, timeliness, transparency, or other terms as set forth by regulators, recognized standard setters, or the entity's policies"; and

3)  Compliance Objectives, which "pertain to adherence to laws and regulations to which the entity is subject."[54]

91.     A company's "control environment" consists of "the set of standards, processes, and structures that provide the basis for carrying out internal control across the organization."[55]  The control environment encompasses:

> the integrity and ethical values of the organization; the parameters enabling the board of directors to carry out its governance oversight responsibilities; the organizational structure and assignment of authority and responsibility; the process for attracting, developing, and retaining competent individuals; and the rigor around performance measures, incentives, and rewards to drive accountability for performance.[56]

---

[53] COSO, *Applying the COSO ERM Framework*, at 4.

[54] COSO Framework, Executive Summary at 3.

[55] *Id.* at 4.

[56] *Id.*

The resulting control environment "has a pervasive impact on the overall system of internal control."[57]  Notably, "[t]he board of directors and senior management establish the ***tone at the top*** regarding the importance of internal control including expected standards of conduct."[58]

92.     Control activities consist of "the actions established through policies and procedures that help ensure that management's directives to mitigate risks to the achievement of objectives are carried out."[59]  Those activities "are performed at all levels of the entity, at various stages within business processes, and over the technology environment"; they "may be preventive or detective in nature and may encompass a range of manual and automated activities such as authorizations and approvals, verifications, reconciliations, and business performance reviews."[60]  Further, "[s]egregation of duties is typically built into the selection and development of control activities."[61]

93.     Among the types of internal controls, internal control over financial reporting ("ICFR")—is:

> [a] process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.[62]

---

[57] *Id.*

[58] *Id.*

[59] *Id.*

[60] *Id.*

[61] *Id.*

[62] *See* SEC Rules 13a-15(f) and 15d-15(f).

94.     Because reliable financial statements must be materially accurate, "a central purpose of the assessment of [ICFR] is to identify material weaknesses that have . . . more than a remote likelihood of leading to a material misstatement in the financial statements."[63]  While identifying control deficiencies is important, "the overall focus of internal control reporting should be on those items that could result in material errors in the financial statements."[64]

95.     Inadequacies or failures of ICFR typically are classified as "deficiencies," "significant deficiencies," or "material weaknesses."  A **deficiency** exists "when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis."[65]  A deficiency in design exists "when (a) a control necessary to meet the control objective is missing or (b) an existing control is not properly designed so that, even if the control operates as designed, the control objective would not be met."[66]  A deficiency in operation exists "when a properly designed control does not operate as designed, or when the person performing the control does not possess the necessary authority or competence to perform the control effectively."[67]  A **significant deficiency** is "a deficiency, or a combination of deficiencies, in [ICFR] that is less severe than a material weakness, yet important enough to merit attention by

---

[63] SEC Division of Corporation Finance, Office of the Chief Accountant, *Staff Statement on Management's Report on Internal Control Over Financial Reporting* (May 16, 2005) ("SEC Staff Statement re ICFR"), https://www.sec.gov/info/accountants/stafficreporting.htm.

[64] *Id.*

[65] PCAOB, Auditing Standard No. 5, *An Audit of Internal Control Over Financial Reporting that is Integrated with an Audit of Financial Statements*, App'x A (Definitions), https://pcaobus.org/oversight/standards/archived-standards/pre-reorganized-auditing-standards-interpretations/details/Auditing_Standard_5_Appendix_A.

[66] *Id.*

[67] *Id.*

those responsible for oversight of the company's financial reporting."[68]  A **material weakness** is "a deficiency, or a combination of deficiencies, in [ICFR], such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis."[69]

> ### 2. Defendants repeatedly represented that Discover's internal controls were sufficient and effective.

96. Defendants were required to attest to the integrity of Discover's internal controls in periodic reports to investors during the Class Period.  Specifically, SEC Rules 13a-14 and 15d-14 required the CEO and CFO to represent in each Form 10-Q and Form 10-K that, among other things:

- They "disclosed to [Discover]'s auditors and to the audit committee of the board of directors (or persons fulfilling the equivalent function) . . . [a]ll significant deficiencies in the design or operation of internal controls . . . which could adversely affect [Discover]'s ability to record, process, summarize and report financial data," and "have identified for [Discover]'s auditors any material weaknesses in internal controls";[70]

- They "[a]re responsible for establishing and maintaining 'disclosure controls and procedures,'" which consist of "controls and other procedures of [Discover] that are designed to ensure that information required to be disclosed by [Discover]" in its filings or other submissions under the Exchange Act "is recorded, processed, summarized and reported, within the time periods specified in the [SEC]'s rules and forms";[71]

---

[68] *Id.*

[69] *Id.*  A "reasonable possibility" exists "when the likelihood of the event is either 'reasonably possible' or 'probable,' as those terms are used in Financial Accounting Standards Board Statement No. 5, *Accounting for Contingencies* ('FAS 5')."  *Id.*

[70] SEC Release No. 8124, Certification of Disclosure in Companies' Quarterly and Annual Reports, 67 Fed. Reg. 57276, 57277 (Sept. 9, 2002).  The SEC notes "internal controls" is "a pre-existing term relating to internal controls regarding financial reporting," and cites AU 319.

[71] *Id.* at 57277-78.

- They "designed such disclosure controls and procedures to ensure that material information is made known to them, particularly during the period in which the periodic report is being prepared";[72] and

- They "evaluated the effectiveness of the issuer's disclosure controls and procedures," and "presented in the report their conclusions about the effectiveness of the disclosure controls and procedures based on the required evaluation."[73]

97.    Throughout the Class Period, Defendants assured investors that Discover's internal controls were sufficient and effective.  In its 2020, 2021, and 2022 Form 10-Ks, the Company stated that "[m]anagement assessed the effectiveness of our internal control over financial reporting as of [the end of the reporting year]" using "the criteria set forth in *Internal Control - Integrated Framework (2013)* issued by [COSO],"and that "[b]ased on management's assessments and those criteria, management has concluded that our internal control over financial reporting was effective as of [the end of the reporting year]."

98.    Similarly, each Form 10-Q and Form 10-K issued during the Class Period included certifications by Hochschild and Greene or Graf (required under Sections 302 and 906 of SOX) representing that, among other things, they:

- "Evaluated the effectiveness of [Discover]'s disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation"; and

- "Disclosed in this report any change in [Discover]'s internal control over financial reporting that occurred during [Discover]'s most recent fiscal quarter ([Discover]'s fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, [Discover]'s internal control over financial reporting."

---

[72] *Id.* at 57277.

[73] *Id.*

99.     Hochschild, Greene, and Graf further certified that they "disclosed, based on [their] most recent evaluation of internal control over financial reporting, to [Discover]'s auditors and the audit committee of [Discover]'s board of directors (or persons performing the equivalent functions)":

>   (a) All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect [Discover]'s ability to record, process, summarize and report financial information; and
>
>   (b) Any fraud, whether or not material, that involves management or other employees who have a significant role in [Discover]'s internal control over financial reporting.

100.     In short, through their repeated representations, Defendants conveyed to investors that (1) Discover had implemented and maintained controls and procedures necessary to detect and prevent fraud; (2) the Company's senior management team—in particular, the Officer Defendants—were actively monitoring those controls and procedures to ensure their integrity; (3) the Officer Defendants, among others, had knowledge of the Company's activities and practices sufficient to enable them to attest to the sufficiency of those controls and procedures; and (4) based on that knowledge, the Officer Defendants determined there were no significant deficiencies or material weaknesses in the design or operation of the Company's ICFR.

## VII.   DISCOVER SUFFERED FROM SYSTEMIC AND PERVASIVE COMPLIANCE AND RISK MANAGEMENT FAILURES DURING THE CLASS PERIOD

### A.   Discover's Risk and Compliance Processes Were Deficient and Ineffective.

101.     Contrary to Defendants' representations to investors regarding Discover's purportedly strong systems and processes to manage risk and ensure the Company complied with laws and regulations, those systems and processes were in fact woefully deficient and led to serious compliance failures.

35

### 1.    Discover had "a culture of non-compliance."

102.    While Defendants publicly touted Discover's purported focus on compliance, the reality within the Company was quite different.  For example, according to FE 1, a former principal risk compliance manager at Discover from 2021 to 2023, "there was genuinely a terrible compliance situation" at Discover.  FE 1 added that the apathy toward compliance came from the top; the Company's executives "did not care – there was a culture of non-compliance."

103.    Indeed, when FE 1 was hired in 2021, a Discover human resources representative told FE 1 that the Company's compliance efforts were "just beginning."  Other members of the risk and compliance organization also told FE 1 that the Company's compliance culture was "beginning, burgeoning, new" as of 2021.  FE 1 thought it was "weird" that a company as large and old as Discover was only beginning its compliance efforts in 2021.

104.    FE 6 recounted raising concerns as far back as 2013 that Discover was not "reviewing processes," a "basic" and necessary step in identifying control gaps, which typically entails "mapping out" a company's business processes and assessing whether there are adequate controls related to them.  Brian Hughes, who later became the Company's CRO, told FE 6 it was "too much work" to map out the processes and review them for control gaps.

105.    FE 6 described the culture of risk and compliance in Discover's U.S. cards business and the consumer banking business as the "wild west" when FE 6 joined the cards business in 2017.  FE 6 recounted that the first line of defense "did not have a handle on what risk and controls were," and the focus was getting out new products and services.  FE 6 noted, "It was market, market, market, how do we get [products] out there," with little attention to the risk management function.

106.    FE 1 recounted flaws in Discover's compliance practices.  FE 1 explained that across the banking industry, the first line of defense performs "process" testing (such as testing a

36

deposit process or a mail return process) while the second line performs regulatory testing. At Discover, however, that structure was "flipped." FE 1 complained "incessantly" about this violation of industry standards, but was told: "This is how it functions at Discover."

### 2. Discover's "three lines of defense" were plagued by problems.

107. FE 2, a former risk manager who left Discover in 2021, recounted that the Company did not structure its "three lines of defense" appropriately. FE 2 explained that a company's business managers, who comprise the first line of defense, are the "risk owners" who are supposed to understand the regulations and conduct their businesses in compliance with those standards. But at Discover, FE 2 added, rather than truly owning the risk themselves, the Company's executives "leaned on" compliance personnel—specifically, "a little mini risk office inside the business to help the business with risk, controls and compliance," known at Discover as the "one and half lines of defense"—to "do their controls and their compliance for them." In other words, instead of truly knowing the regulations, business executives had a "mini team" to tell them "if their stuff was working the way it needed to." FE 1 identified this group as business unit testing and monitoring, i.e., "BUTM."

108. According to FE 2, this delegation of responsibilities "is probably what has led to some of the [regulatory] issues" the Company experienced. FE 2 noted the managers responsible for the student loan business "didn't know the regulations that applied to student loans."

109. Further, FE 1 recounted that when FE 1 joined Discover in 2021 the BUTM group was "widely ineffective" across the bank because it engaged only in control "validation" and not control "testing." The difference between validation and testing, FE 1 explained, is that the latter not only checks whether a given control was actually implemented but also whether it was effective and operated with the appropriate frequency. As a result, FE 1 had to build the first-

line testing function "from scratch" because "whatever regulatory testing was happening before . . . was not happening at the first line."

110.    FE 4 likewise recounted that until FE 4 departed Discover in 2021, the first-line testing team was only testing whether controls happened, not whether they were effective—i.e., "Are you executing [a documented control], not are you executing the way you should or was the control the right thing to do?"  Further, "the compliance structure lacked the right roles and responsibilities" and Discover "lacked the right leadership to instill effective compliance and controls."

111.    After FE 1 joined Discover, the Company organized a group to perform first-line control testing, which was divided into a "scoping" team and a "testing" team.  The scoping team reviewed internal control standards (i.e., "CSTs," which FE 1 described as "laypeople interpretations of the regulations") and business unit data to determine the fundamentals of the testing that needed to occur.  The testing team carried out the tests, liaised with the business unit staff to preliminarily review initial testing results, and provided the scoping team with a testing report.  After the tests were run, the scoping team worked with the business unit heads to issue a final first-line compliance report.  FE 1 noted the separation of first-line scoping and testing was abnormal in the banking industry.

112.    FE 1 recounted that the separation of scoping and testing led to tensions between the teams.  According to FE 1, meetings between the scoping and testing teams were "terrible and combative."  First-line testing would not tell first-line scoping what they were actually testing, and the testing team had "major issues" with what its counterpart was scoping, usually because the scoping team was preparing for more tests than the testing team wanted to perform.  Indeed, FE 1 observed, first-line testing was often delayed, and the testing team would

sometimes refuse to start testing until the scoping team agreed to remove certain points that the testing team did not want to perform.

113.    According to FE 1, this toxicity led the scoping and testing teams to file human resources reports against each other, with the scoping team saying the testing team was "demeaning" and creating a "hostile work environment," and the testing team saying the scoping team lacked experience and was "bullying" the testing team.  FE 1 recounted that Discover did not implement any changes or positive improvements in response to these complaints.

114.    Additionally, FE 1 described that first-line scoping reported to first-line management, while first-line testing reported to second-line management (that is, the Director of Testing reported to Vesela Zlateva, the second-line testing vice president).  FE 1 described this reporting structure as a "massive problem and a huge conflict of interest."  Because of this structure, in the course of reviewing the first-line testing, the second-line team would only speak with the first-line scoping team—not with the first-line testing team.  As a result, the second line would confirm that a particular procedure existed but was unable to identify gaps in the procedure or its execution.

115.    FE 6 likewise recounted that it was inappropriate for first-line testing to report into the second line.  That arrangement allowed the first-line testing team to reject the testing plans FE 6's team attempted to implement.  FE 6 complained to Vice Presidents Scott Michelau and Dianne Rischke about the first-line testing team's refusal to conduct planned tests.

116.    FE 1 also recounted that the first-line testing team refused to put their "scripts of what they were actually testing" in Discover's internal tracking software (known as Archer).  FE 1 explained this was a "big problem" because it meant the scoping team could not validate that the scope of a test had been met, even though its responsibilities included this validation

39

requirement. Because the first-line testing team did not want the first-line scoping team "to touch their stuff," the only group looking at the scripts was the second line—but (as noted in ¶ 114 above), the first-line testing team *was actually part of the second line*. FE 1 noted this overlap in personnel created a conflict of interest and resulted in no oversight of the scripts being used to test compliance.

117.    FE 1 repeatedly told Michelau that the compliance function was "not working," that the second-line compliance team did not know what they were doing, and that there was a lack of experience across both first and second lines.

118.    Further, noting Discover "did not have a culture of taking compliance seriously," FE 1 recounted that business unit executives *would refuse to sign off on first-line compliance reports until certain findings were removed*. The first-line scoping team "fought viciously" with the business units over this matter, telling the executives this was "ridiculous."

119.    FE 6 likewise noted business units—typically the directors in those businesses— pushed to get findings removed from risk reports or to get findings downgraded to observations.

120.    There were also significant issues with CSTs. FE 1 explained that compliance risk assessment at Discover entailed second-line compliance personnel assigning a risk rating to all consumer regulations that applied to the Company, and first-line tests were supposed to be scheduled and conducted according to the risk rating for each regulation the second-line compliance personnel established.

121.    Because (as noted above) CSTs were interpretations of applicable regulations, when the scoping team was designing the tests, it was not doing so based on the actual regulatory language. Notably, FE 1 recounted that the CSTs *were incomplete and did not have all the control standards that applied to a particular regulation*, which meant the scoping team would

40

have to check the regulations on their own if they wanted to be sure that "all the pieces had been added." Compounding this difficulty, FE 1 noted, was the fact that after a CST was edited, employees could not see when it was last modified or what it previously said. FE 1 added that the CSTs were also supposed to be mapped to Discover's various business units and products, but the mapping was "garbage." Further, FE 1 noted, as a unit of just four to eight employees, the scoping team did not have time to do everything necessary to ensure the CSTs were accurate and relevant.

122. When FE 1 complained to others, including Michelau, about the CSTs and emphasized to them that the scoping team needed to use the actual regulatory language and not interpretations of the regulations, Michelau told FE 1: "This is how Discover does it." As a result, FE 1 recounted, the first- and second-line scoping teams continued to be "forced to scope on non-regulatory language."

123. According to FE 1, at the end of 2021 the compliance group began to revamp the CSTs to make them "more complete and accurate." But FE 1 recounted that the revamping project did not guarantee the CSTs were complete and accurate (though employees can now see the date a CST was last updated).

124. Additionally, FE 6 recounted that just after the middle of 2021, FE 6 learned from Dianne Rischke that with respect to the consumer banking business (which, as noted above, included student loans), the testing group was "not going to test controls, only transactions," which FE 6 found ludicrous. FE 6 discussed the issue with superiors, including Vesela Zlateva, to no avail. FE 6 emphasized that senior management "did not like control testing."

41

### 3. Discover's compliance department was severely understaffed, lacked the requisite expertise, and suffered from significant turnover.

125.    While Defendants represented to investors that they devoted significant resources to compliance, in fact the Company's compliance department was critically understaffed.  FE 1 recounted that in 2021, the scoping team had just four employees and the testing team had just three employees, and while Discover later increased the scoping team's size from four to six or eight, there was a "lot of turnover" and both teams were chronically understaffed.  FE 1 estimated the scoping team alone needed 15 employees to adequately handle the workload.  Further, FE 1 noted that while Discover increased the size of the first-line group (though not to an adequate level), those additional members were "just internal transfers who did not have any experience in compliance."

126.    FE 4 similarly recounted that Discover was "significantly under-resourced" in compliance.

127.    FE 1 recounted that others, including Michelau, told FE 1 they did not "have budget" for more staffing.  Although FE 1 was told staffing would increase "next year," inevitably it did not.

128.    FE 1 described how FE 1 and other first-line compliance employees would work up to 80-hour weeks due to lack of staffing: "There were a number of us who were in these horrendous situations."

129.    According to FE 1, there were other first-line functions beyond FE 1's testing group.  In these other groups, too, there was "a real big problem" of understaffing: "The entire compliance, across the entire Company, first and second line, was understaffed."  These other understaffed groups included the "process and control assessment testing" function, which was responsible for correcting compliance failures.

130.    FE 1 reported that Discover had a "massive layoff" in the second-line compliance group in early 2023, which did not make sense to FE 1 because the compliance organization was already so understaffed.

131.    FE 1 further recounted that there was a lot of turnover in the CRO and chief compliance officer positions.  FE 4 likewise recounted that there was an abnormal amount of turnover at the executive compliance level, and while FE 4 was at Discover the Company did not have a "leader who knows how to run a compliance program."

132.    Compounding the understaffing problem, Discover hired people who were unqualified to handle the Company's compliance matters.  FE 2 recounted that instead of hiring leaders from outside the Company who had experience with addressing compliance problems, the Company frequently hired unqualified candidates from within.  Indeed, FE 2's own supervisor had a background "that was not really in risk management."  FE 1 similarly observed there "was a tendency toward nepotism," noting, for example, that when Jennifer Rubin recently took over Scott Michelau's role as Vice President, she promoted all of her friends to director positions.  FE 4 likewise recounted that Discover failed to put the right resources and structure in place for compliance.  In other words, "If it's the wrong people or they are not directed at the right thing, it is not a good investment."  FE 4 further noted the Company regularly transferred employees from non-compliance groups and roles to work in compliance: "They put people in compliance positions [who] were shocking to me, just to put a body in there."

133.    FE 6 similarly recounted the lack of experience among risk personnel at Discover. During FE 6's last two years at the Company, FE 6's team was responsible for first-line compliance testing.  FE 6 noted, "They literally gave me call center agents to do compliance testing."  FE 6 explained that Discover needed first-line testing staff who could evaluate business

43

processes and determine whether the Company met its regulatory obligations related to those processes, which the call agents were "not well equipped to do."  Indeed, FE 6 added, those call agents comprised the entire BUTM team for the U.S. cards business.  FE 6 further noted call agents worked in first-line testing for the consumer banking business, which encompassed student loans, home loans, personal loans, and deposits.

134.    FE 4 observed that because Discover did not have the right employees in compliance, there was a "lack of ability within the compliance function."  As a result, the business units "did not have confidence in the people in compliance and their understanding of compliance programs—there was no faith that people in those positions knew what they were doing."  FE 4 recalled hearing those sentiments repeatedly from the business units.  Further, given the lack of compliance acumen at the "second line" of defense, more responsibility was placed on the first line to say whether the business units "met regulatory requirements."  That should have been the second line's function; but, according to FE 4, they were not capable of doing so.

135.    The understaffing and significant turnover in Discover's compliance department undermined its ability to effectively test for and address compliance-related problems.

136.    FE 1 observed regular delays in testing.  For example, there was one test using data from the third quarter of 2021 that did not finish until late summer 2022.  FE 1 added: "It is not supposed to take that long"; rather, testing should have been completed in three to five months, rather than spanning an "eight, nine, ten-month period."  Similarly, FE 1 recounted, the testing team was supposed to plan scripts and begin testing for the fourth quarter of 2021 in the first quarter of 2022; however, the testing team did not even begin to look at the tests until April 2022.  These delays affected all of the business units in the bank.

137.    FE 1 noted Vice Presidents Scott Michelau and Vesela Zlateva received reports of regular meetings between the first-line scoping and testing teams, where attendees discussed the delays and that first-line testing was "getting cancelled" (which Michelau had to approve). Additionally, FE 1 recounted, the scoping team regularly complained to Michelau and Zlateva about the testing delays.  FE 1 further noted the first-line testing team argued that planned testing should be cancelled because "the second line was already testing it," but the first and second lines of testing serve different purposes, and the second line was *also* understaffed.

138.    Indeed, FE 1 recounted that the testing team would frequently cancel planned tests due to understaffing.  For instance, FE 1 designed a test for compliance with certain regulations the CFPB Consent Orders determined Discover was violating, but the first-line testing team "got the test cancelled because they said they did not have enough resources."  FE 1 noted there were "endless examples" of the testing team filing "plan change requests" to cancel tests due to insufficient capacity.  FE 1 further recounted that in addition to the testing unit not having the staffing to run the tests, the relevant business units also frequently "did not have capacity."  As FE 1 noted, insufficient staffing is not a "legitimate reason for not conducting necessary testing in the eyes of regulators."

139.    To put the understaffing problem in perspective, in its Annual Report accompanying the 2021 Form 10-K, Discover reported that in 2021 it had ***$93.7 billion in loans (including $10.1 billion in student loans), $61.9 billion in consumer deposits, and $503 billion in total network volume***.  It was virtually impossible for the Company's thinly staffed compliance department to test for and attempt to rectify issues associated with such a massive level of business.

45

140.     Indeed, FE 6 recounted that due to the volume of new products or services the cards or consumer banking businesses were trying to "get out the door," risk personnel could not possibly review everything that needed to be assessed, but instead only performed a "cursory review."

### 4.     Discover had hundreds of unresolved regulatory violations, of which senior management—including Hochschild—was aware.

141.     Discover's lack of appropriate commitment to risk management and compliance—reflected in the numerous structural and performance issues recounted by the well-placed former employees referenced above—resulted in an inordinate number of internal findings of regulatory violations.  Senior management long knew about these issues, but failed to timely address them.

142.     FE 5 stated that based on the regulatory information presented to the board on a quarterly basis, Defendants had information about the number of open regulatory findings available to them at any given time.  FE 5 further observed that Hochschild would have received those quarterly reports via the main PowerPoint slides and the supplemental information included in the board package, which included an inventory of regulatory findings.  In other words, FE 5 noted, "the information was cascaded up for every board report," including newly issued findings, if volumes were going up or down, and trends.

143.     FE 5 also recounted that Hochschild was a member of the Compliance Committee, which met more frequently than once a quarter—potentially "seven or nine times a year"—each time for approximately 90 minutes to two hours.  FE 5 explained that the Compliance Committee materials included a page of various metrics and disclosures for each Discover product, and the members received the materials in advance of the meetings to allow

the Committee members to review the information.  FE 5 recalls Hochschild actively participating in Compliance Committee meetings.

144.    FE 6 similarly recounted that Hochschild received a "monthly scorecard on risk management activity," which was prepared by the risk group and presented to Hochschild in "monthly business review" meetings.  FE 6 noted there were separate monthly review meetings for the U.S. cards business and the consumer banking businesses.  FE 6 attended meetings for the U.S. cards business, which also included—in addition to Hochschild—all the vice presidents in that business as well as Capozzi, Michelau, and Rischke, and the head of technology.

145.    FE 6 further recounted that the risk scorecard showed "where the remediations were" for the cards business.  FE 6 explained that "because our processes caused consumer harm, we showed month over month, how many projects were messed up and caused consumer harm"—specifically, the number of open issues and how many had been closed, as well as delays in closing issues.

146.    FE 6 prepared the portion of the reports addressing risk.  According to FE 6, the reports, which were originally in Tableau format and then PowerPoint as of around the beginning of 2021, were e-mailed to Hochschild before the meetings so he could review them.  FE 6 observed Hochschild reviewing the decks during meetings.

147.    FE 6 recalled that meeting attendees said they did not have enough resources to address issues requiring remediation, as well as statements to the effect of "we do not have the right people with the right skillset" to complete "fixes."  FE 6 noted Hochschild was present when these statements were made.  FE 6 further recounted that Scott Michelau told FE 6 not to even ask for more resources, including during monthly business review meetings, "because you are not going to get it."

47

148.    Given the extent and frequency of the information they received regarding compliance and risk management issues, Hochschild and other senior executives knew of the serious challenges facing the compliance department—and its failure to meet those challenges.

149.    Indeed, FE 1 recounted that around May 2023, FE 1 was present when Dan Capozzi (President, U.S. Cards) "freaked out" about the number of open regulatory findings at the Company.  FE 1 observed Capozzi "yelling at people in meetings" about the issue.  FE 1 noted that at that time Discover had *more than 250 open regulatory findings*, and a few months earlier there were more than *300*.  According to FE 1, these findings had apparently been known to management "for a long time."

150.    FE 1 specified that during one nine-hour meeting held via Microsoft Teams in May 2023, Capozzi was "screaming at people that if they don't" close the regulatory findings, "it is a fireable offense," and said the findings needed to be closed because "it is a big issue for Roger [Hochschild]."  FE 1 noted Capozzi "heavily implied" that Hochschild knew how many open regulatory findings there were.

151.    FE 1 further recounted that senior vice presidents told Capozzi they were hindered in their ability to close regulatory findings because "they did not have the staff or the technology," and that if they devoted resources to closing regulatory findings, other projects would be delayed.

152.    FE 1 noted the nine-hour meeting in May 2023 was not the only time senior management and executives complained they did not have sufficient resources to perform important compliance functions; FE 1 recalled Michelau and Vice President Dan Nickele raising similar issues.

     **5.**    **Reflecting Defendants' awareness of compliance and control issues at Discover, the Company initiated an effort to address the problems— but then failed to rectify them.**

153.    Discover management knew the Company suffered from serious deficiencies with respect to risk management, compliance, corporate governance, and internal controls. But their attempts to address those issues were lackluster—exemplified by the inaptly named "Project Operational Excellence," which was ostensibly intended to address internal control issues but only highlighted how broadly and deeply the Company's problems ran.

154.    FE 4 recounted that in 2020, Discover initiated Project Operational Excellence to "clean house" and "make sure all the control deficiencies were identified and reported internally" so they could be "fixed." FE 4 emphasized that the project had the attention of the most senior leadership at the Company. For example, there were "project sponsors" among the executive team, including CRO Brian Hughes.

155.    FE 4 explained that Project Operational Excellence involved several steps: *First*, the various business processes at the Company were defined, which entailed specifying the minimum requirements to manage a given process, defining the associated job aids, mapping out systems used in the process, and determining what other procedures were tied to the process. Representatives from various functions—including first-line risk, compliance, the business units, information technology, and others—participated in defining the processes. Each business process had various levels, including offering an account, opening an account, etc. *Second*, the risks associated with the process were identified. *Third*, there was an assessment of what the business needed to do to ensure compliance for the process. And *fourth*, the controls for the process were evaluated.

156.    FE 4 estimated there may have been around 100 processes defined and mapped for each of the consumer bank businesses (student loans, personal loans, home loans, deposits,

and credit cards). Employees working on the project had to complete a "read-out" of a given process within an assigned number of weeks, before moving to the next process. The read-outs, which were documented in PowerPoint, specified the control gaps identified for a given process. FE 4 noted it was not unusual to have as many as ten control gaps per process, and the number of control gaps "really started to build" across all of the consumer bank by the time FE 4 left the Company in the second half of 2021. All of the control gaps identified through the project were entered into the Archer GRC information system, which resulted in "many things to solve or tackle."

157. FE 6 similarly recounted that Discover identified numerous control gaps through Project Operational Excellence.

158. By the time FE 4 left Discover, the Company had identified "all this information" and control gaps, but did not have a plan for resolving them: "It was more like we have all these gaps. What are we going to do with all this information?" FE 4 noted the project went "down a very crazy path," meaning the control gaps had been identified but no one seemed to be focused on determining "what direction was needed" next or "what is all this coming to."

159. Even more alarming to FE 4 was that no one seemed to be addressing "the bigger scope of what do we expect of a compliance program for a control environment." Indeed, the project seemed to go "way off the rails" because of failed leadership and "tapping into resources for support when we were already stretched thin."

**B.** **The FDIC Consent Order Corroborates the FEs' Accounts and Details Systemic Compliance Failures at Discover.**

    **1.** **The FDIC found that at least as of 2021, Discover failed to establish and maintain a legally required compliance management system and violated numerous laws and regulations.**

160.    Consistent with the accounts of the former risk and compliance personnel detailed above, the FDIC determined that—as described in a Consumer Compliance Report of Examination issued in 2021 ("2021 ROE")—Discover "engaged in (i) unsafe or unsound banking practices" by, among other things, "failing to establish and maintain" a proper compliance management system ("CMS"); and "(ii) violations of, and consumer harm related to," consumer protection statutes and regulations.[74]

161.    The FDIC specified that Discover "fail[ed] to establish and maintain a compliance management system (CMS) providing for compliance with Consumer Protection Laws and Regulations, . . . including":

> (a) board of directors (Board) and Bank-management oversight and commitment, change management, comprehension, identification, and management of risk, corrective action and self-identification, and third party risk management; and (b) written policies, procedures, standards, and/or processes (collectively, Procedures), training, monitoring and testing, audit, and consumer complaint response programs designed to prevent, or identify and self-correct violations of all applicable consumer protection laws and/or regulations, including those administered by the CFPB, (collectively, Consumer Protection Laws and Regulations) and associated consumer harm with internal controls and information systems and audit systems appropriate to the size of the Bank and the nature, scope and risk of its activities, whether conducted by the Bank or on behalf of the Bank through Third-Party Relationships.[75]

---

[74] FDIC Consent Order at 1-2.

[75] *Id.* at 1.

162.    The FDIC further specified that Discover "violat[ed]," and caused "consumer harm related to," among other things, Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1); the Truth-in-Lending Act, 15 U.S.C. § 1601, *et seq.*; the Servicemembers Civil Relief Act, 50 U.S.C. § 501, *et seq.*; and the Electronic Records and Signatures in Commerce Act, 5 U.S.C. § 7001, *et seq.*; as well as related implementing regulations.[76]

163.    The 2021 ROE, which led to the FDIC Consent Order, was based on "the findings of the FDIC's October 18, 2021 examination along with Consumer Financial Protection Bureau (CFPB) findings during the review period and the results of FDIC visitation reports, targeted reviews, and ongoing monitoring conducted during the review period."[77]

164.    Notably, while Discover did not "admit[] or deny[] any charges or unsafe or unsound banking practices or violations of law or regulation," it "consented to the issuance of" the FDIC Consent Order.[78]

> **2.    The FDIC's remedial directives highlight the significant deficiencies that plagued Discover's compliance functions—in stark contrast to Defendants' representations to investors.**

165.    In light of its findings, the FDIC issued numerous directives addressing the deficiencies it identified, all of which demonstrate the false or misleading nature of Defendants' representations to investors.

166.    The FDIC ordered that Discover's board of directors "must immediately and appropriately increase, commensurate with the size of the Bank and the nature, scope and risk of Bank Activities," the board's "supervision and direction of Bank management," as well as "its

---

[76] *Id.* at 2.

[77] *Id.* at 1.

[78] *Id.* at 2.

oversight and monitoring of the Bank's enterprise risk management framework (ERM Framework), corporate governance framework (CG Framework), consumer compliance program (CC Program), and compliance vendor management program (CVM Program)."[79]

167.    The FDIC further specified that the Board "must, at a minimum," take the following measures:

a)   "set and clearly communicate expectations regarding ethics and compliance with Consumer Protection Laws and Regulations for the Board, Bank management, staff, and any person associated with a business arrangement between the Bank and another entity, by contract or otherwise," including third parties;

b)   "ensure that the Bank establishes and maintains a proactive, effective risk-based ERM Framework, CC Program and CVM Program";

c)   "ensure that the Bank maintains one or more compliance officers with appropriate experience and expertise and sufficient authority, independence, and suitable resources, both staffing and systems, to enable them to satisfactorily oversee the implementation of the CC Program and the CVM Program and assure the Bank's compliance with Consumer Protection Laws and Regulations";

d)   "ensure adequate information systems and Procedures are in place to provide the Board with timely, relevant and accurate information regarding risks related to potential and identified violations of Consumer Protection Laws and Regulations and incidents that may involve consumer harm in a consistent and readily understandable format at regular intervals and enable it to act on such reporting";

e)   "engage in robust consumer compliance-related discussions as part of all full Board and appropriate Board committee meetings," as well as "comprehensively and accurately document those discussions in meeting minutes";

f)   "set clear and measurable expectations for Bank management regarding their (a) ethics and commitment to compliance with Consumer Protection Laws and Regulations; (b) leadership across business lines and operations; (c) sound and consistent management of the Bank's ERM Framework, CC Program and CVM Program; (d) oversight and monitoring of Third-Party Relationships providing products, services, and/or conducting other activities either to, through, or on behalf of the Bank, for compliance with Consumer Protection Laws and Regulations; and (e) managing consumer compliance risks to stay within the Board's risk appetite parameters and established risk limits, and establish and

---

[79] *Id.* at 2-3.

maintain Procedures to monitor and regularly evaluate Bank management's adherence to these Board expectations";

g) "have and maintain Procedures to monitor and regularly evaluate the adherence to and effectiveness of the Bank's ERM Framework, CC Program and CVM Program," and "ensure appropriate revisions are timely made . . . to assure on-going compliance with Consumer Protection Laws and Regulations";

h) "ensure the Bank's internal audit function (Internal Audit) (a) is appropriate to the size of the Bank and the nature and scope of Bank Activities; (b) appropriately considers available risk assessments, studies, reports, including regulatory findings, plans, and/or Procedures related to the Bank's compliance with Consumer Protection Laws and Regulations; and (c) appropriately assesses the Bank's implementation of and adherence to the Bank's ERM Framework, CC Program, CVM Program and any other Procedures adopted by the Board related to compliance with Consumer Protection Laws and Regulations and any revisions to them"; and

i) "have and maintain Procedures to track actions to (a) eliminate or correct any unsafe or unsound banking practices identified and violations of law or regulation cited in reports of examination, visitation reports or supervisory letters; (b) appropriately address any instances of consumer harm and/or any deficiencies or weaknesses identified in future reports of examination, visitation reports or supervisory letters; and (c) appropriately address non-compliance with Consumer Protection Laws and Regulations and corrective and preventive action for identified deficiencies and weaknesses in the Bank's ERM Framework, CC Program and/or CVM Program to ensure such corrective actions are implemented in a timely manner and thereafter monitor implementation of and adherence to resulting revisions."[80]

168.    The FDIC also ordered that Discover's board must, among other things, "ensure that the Bank takes all steps necessary, consistent with other provisions of this ORDER and safe and sound banking practices, to": (1) "eliminate or correct, and prevent the unsafe or unsound banking practices and the violations of law or regulation identified in the 2021 ROE"; (2) "appropriately address the instances of consumer harm and the deficiencies and weaknesses

---

[80] *Id.* at 3-5.

identified in the 2021 ROE in a timely manner"; and (3) "fully comply with the provisions of this ORDER in a timely manner."[81]

169.    Additionally, the FDIC noted the provisions of the Consent Order did not preclude the FDIC or any other federal or state agency or department "from taking any other action against the Bank or any of the Bank's current or former [institution-affiliated parties], or any of their respective directors, officers, employees and agents . . . arising from, out of, or related to the facts and circumstances forming the basis of this ORDER."[82]

170.    The FDIC Consent Order thus established that the FDIC had determined as of 2021—***more than two years before the end of the Class Period***—that whatever CMS Discover had implemented was deficient, the Company had violated numerous laws and regulations, and the agency had identified specific "deficiencies and weaknesses" in the 2021 ROE.[83]

171.    Further, given the FDIC's directive that Discover's board must "ensure that the Bank ***establishes*** and maintains a proactive, effective risk-based ERM Framework" and "[consumer compliance] Program,"[84] the clear implication of the FDIC Consent Order is that Discover ***had not established*** a proactive, effective risk-based ERM framework.  So, too, with respect to the FDIC's directives that the board must "***establish*** and maintain Procedures to monitor and regularly evaluate Bank management's adherence to . . . Board expectations" regarding, among other things, "managing consumer compliance risks to stay within the Board's risk appetite parameters and established risk limits."[85]  And the FDIC's other directives listed

---

[81] *Id.* at 5.

[82] *Id.* at 25.

[83] *Id.* at 5.

[84] *Id.* at 3.

[85] *Id.* at 4.

above reflect the agency's official determination that Discover's existing systems, processes, and measures were deficient.

172.     The issues identified in the FDIC Consent Order are consistent with those detailed by the FEs, including the need to ensure the Company maintains one or more compliance officers "with appropriate experience and expertise," as well as "suitable resources, both staffing and systems," to enable them "to satisfactorily oversee the implementation of the [consumer compliance] Program . . . and assure the Bank's compliance with Consumer Protection Laws and Regulations."[86]

173.     Defendants almost certainly had contemporaneous knowledge of the problems identified in the FDIC's 2021 ROE.  In addition to the FEs' accounts detailing the systemic nature of risk management and compliance problems at Discover and Hochschild's participation on the Compliance Committee—all of which indicate he and others knew about these issues even before the 2021 ROE—the FDIC has explained ROEs "***will . . . be communicated to the Board of Directors and management of the institution***."[87]  An ROE "provides an account of the strengths and weaknesses of a compliance management system"; it "is more than an exception-based document and should add value to the institution's compliance efforts."[88]  Thus, the FDIC's written policies required it to contemporaneously provide the 2021 ROE to Discover's board and senior management, including Defendants.

---

[86] *Id.* at 3.

[87] FDIC, *Consumer Compliance Examination Manual*, at II - 1.4 (June 2019), https://web.archive.org/web/20210826105046/https://www.fdic.gov/resources/supervision-and-examinations/consumer-compliance-examination-manual/documents/2/ii-1-1.pdf.

[88] *Id.*

### C. Discover Engaged in Systemic Improprieties Relating to Student Loan Servicing.

174. On September 17, 2010, Discover paid $600 million to acquire Citigroup's student loan division (formally known as the Student Loan Corporation). In doing so, Discover became the loan servicer for more than 800,000 private student loan accounts with a combined balance (at that time) of approximately $4.2 billion.

175. As a loan servicer, Discover is responsible for performing basic services for its borrowers, including providing periodic account statements reflecting the amount due, as well as year-end tax information, and contacting borrowers to collect past-due payments.

176. The risk management and compliance problems detailed above led to pervasive, deficient student loan servicing practices that violated consumer protection laws and regulations. Indeed, FE 3 recounted that "most of the compliance and risk issues" at Discover pertained to the student loan business. And Hochschild has acknowledged the 2020 CFPB Consent Order "was a compliance matter," noting "there is a link between that and the broader focus on our compliance management system."[89]

### 1. Discover's misconduct goes back at least to 2015, when the CFPB revealed significant improprieties that the Company agreed to (but did not) rectify.

177. On July 22, 2015, the CFPB announced that Discover agreed to a consent order with the agency regarding serious issues with the Company's student-loan servicing. The 2015 Consent Order revealed the Company had been severely deficient in executing its basic duties as a student loan servicer, which harmed thousands of borrowers. As a condition of the consent order, Discover agreed to refund $16 million to consumers, pay a $2.5 million penalty, and

---

[89] Discover Q2 2023 Earnings Call.

improve its billing, student loan interest reporting, and collection practices to eliminate the misconduct the agency had identified.

178.    The CFPB determined Discover engaged in numerous improper activities, detailed below.

179.    _First_, Discover engaged in deceptive and unfair practices with respect to providing tax information statements to student loan borrowers, which were likely to cause consumers substantial injury.[90]

180.    By way of background, student loan servicers are required to provide borrowers who paid more than $600 in student loan interest during a calendar year with a Form 1098-E specifying the amount of interest paid.[91]  This information is important because the borrower may be able to deduct the interest as an adjustment to income.[92]  A Form 1098-E is only proper for borrowers who have certified that the loan proceeds will be used solely to pay for "qualified higher education expenses."[93]  That certification can be made via a W-9S form or incorporated into other loan documents.[94]

181.    The CFPB found that Discover (1) failed to provide its borrowers with a Form 1098-E unless the borrower had previously submitted a W-9S form; and (2) did not send borrowers the W-9S form unless the borrower requested it, and did not alert borrowers who were lacking a W-9S form about the absence of this document or that its absence would prevent the

---

[90] 2015 CFPB Consent Order ¶¶ 26-29.

[91] _Id._ ¶ 14.

[92] _Id._ ¶ 11.

[93] _Id._ ¶ 12 (quoting 26 C.F.R. § 1.6050S-3(e)(2)).

[94] _Id._ ¶ 13.

borrower from receiving a Form 1098-E.[95]  Instead, on the first or second page of borrowers' October or November billing statements in 2011 and 2012, Discover told borrowers they would not receive a Form 1098-E unless they had submitted a W-9S.[96]

182.    This was not a harmless technicality.  Borrowers who did not have a W-9S form on file with Discover would be informed through the Company's website that the qualified interest they paid during the relevant tax year was "$0.00."[97]  This was true even if the borrowers had in fact paid interest on their private student loans.[98]

183.    *Second*, Discover misrepresented the amounts due for thousands of student loan borrowers over several years.

184.    When a loan exits its grace status and enters repayment, the borrower receives a statement reflecting the minimum amount due.[99]  The statements Discover was sending to such borrowers included "(1) the actual minimum amount due on loans in or approaching repayment and (2) interest accrued on loans that were still in deferment and thus not required to be paid."[100] By including interest accrued on loans that were still in deferment, the account statements Discover provided "substantial[ly] overstate[d]" the minimum payment due in many cases.[101]

---

[95] *Id.* ¶¶ 15-16.

[96] *Id.* ¶ 17.

[97] *Id.* ¶¶ 19-20.

[98] *Id.* ¶¶ 21, 25.

[99] *Id.* ¶ 30.

[100] *Id.* ¶ 31.

[101] *Id.*

185.     The CFPB found that from January 2011 to January 2014, Discover overstated the minimum payment due in approximately 30,000 account statements sent to around 7,000 borrowers, which constituted deceptive acts or practices.[102]

186.     *Third*, the CFPB found that Discover violated applicable regulatory requirements by making thousands of improper phone calls to borrowers, which constituted unfair practices likely to cause substantial injury to consumers.[103]

187.     Specifically, between January 2011 and January 2013, Discover initiated over 150,000 collection calls to the cellphone numbers of student loan borrowers before 8:00 a.m. or after 9:00 p.m. in the time zone of the borrower's address.[104]  Many borrowers received multiple collection calls at "these inconvenient times," and over 1,000 consumers received ***dozens*** of calls during these prohibited hours.[105]

188.     *Fourth*, the CFPB determined Discover violated the Fair Debt Collection Practices Act ("FDCPA") by failing to provide important information to borrowers regarding loans that had been "charged off" (i.e., written off).

189.     The CFPB reported that more than 6,000 of the student loans Discover had acquired from Citigroup were in charged-off status when Discover purchased them.[106]  Although Discover referred some of these defaulted loans to third-party collection agencies, it retained

---

[102] *Id.* ¶¶ 32, 35.

[103] *Id.* ¶¶ 40-41.

[104] *Id.* ¶ 36.

[105] *Id.* ¶ 38.

[106] *Id.* ¶ 42.

some of the loans for collection.[107]  The Company collected on more than 250 of these defaulted

loans by making an initial telephone call to the borrowers.[108]

190.    Noting Discover was a "debt collector" under the FDCPA with respect to the

defaulted loans, the CFPB explained Section 809 of the Act requires debt collectors "to provide

consumers with specific information about the amount and source of the debt and the consumers'

right to contest the debt's validity."[109]  Debt collectors must provide this information "during the

debt collector's initial communication with the consumer or in a written debt-validation notice

sent within five days of that initial communication."[110]

191.    The CFPB found that Discover had failed to provide the required information to

the affected borrower during the initial calls or in writing within 5 days, which violated the

FDCPA.[111]

192.    As a result of its findings, the CFPB "permanently restrained" Discover from

calling consumers at improper times or "[f]ailing to comply with the requirements of the

FDCPA."[112]  The CFPB further directed that in connection with servicing student loans,

Discover "may not misrepresent, or assist others in misrepresenting . . . to consumers" (1) "the

minimum periodic payment owed by consumers"; (2) "the amount of interest paid by

consumers"; or (3) "any other fact material to consumers concerning the servicing of their

---

[107] *Id.* ¶ 43.

[108] *Id.* ¶ 44.

[109] *Id.* ¶ 46 (citing 15 U.S.C. § 1692g(a)(1)-(5)).

[110] *Id.* (citing 15 U.S.C. § 1692g(a)).

[111] *Id.* ¶¶ 47-48.

[112] *Id.* ¶ 49(a).

loans."[113]  The CFPB also required Discover to take a number of "affirmative actions" to address the improper practices with respect to borrowers' tax forms and account statements.[114]

193.    Additionally, the CFPB ordered Discover to submit "a comprehensive compliance plan designed to ensure that [Discover]'s student-loan-servicing activities comply with the terms of this Consent Order."[115]  And the CFPB directed that Discover's board or a board committee must review the compliance plan before it was submitted to the agency.[116]

194.    The CFPB also ordered that within 30 days of the Consent Order's effective date, Discover must deliver a copy of the order to "each of its board members and executive officers," among others, and that for five years after the effective date, the Company must deliver a copy to "any future board members and executive officers," among others, "before they assume their responsibilities."[117]

## 2. Discover's misconduct relating to student loans continued during the Class Period.

195.    Despite the requirements imposed by the 2015 CFPB Consent Order, Discover continued engaging in improper loan servicing practices, including some practices expressly prohibited by the 2015 CFPB Consent Order.  Indeed, the Company's misconduct led to a *second* consent order issued in December 2020, in which the CFPB found the Company had failed to comply with the agency's prior directives.

---

[113] Id. ¶ 49(b).

[114] *Id.* ¶ 49(c).

[115] *Id.* ¶ 50.

[116] *Id.* ¶ 53.

[117] *Id.* ¶ 73.

196.    The CFPB examined Discover in September 2017 to assess its compliance with the 2015 CFPB Consent Order."[118]

197.    As recounted in the 2020 Consent Order, also in September 2017 (approximately two years after the 2015 CFPB Consent Order was issued), Discover began migrating its student loan servicing platform to a new system.[119]  FE 3 recounted that the new system was called Finacle, a third-party platform developed by Infosys.  The CFPB noted Discover migrated approximately 1.5 million student loans for 778,000 borrowers to the new system.[120]

198.    Based on its examination of Discover, the CFPB found the migration to the new system resulted in hundreds of issues "that harmed tens of thousands of consumers" and resulted in "numerous" violations of the 2015 CFPB Consent Order (referenced in the 2020 CFPB Consent Order as "Consent Order Violations").

199.    The CFPB further found that Discover knew about potential violations of the 2015 CFPB Consent Order but failed to report them to the Bureau during its September 2017 examination, and made "incomplete and misleading" representations to the agency.  Specifically:

- "[Discover] knew shortly after the Migration that many Migration Issues were leading to potential Consent Order Violations";

- "Although [Discover] was aware of potential Consent Order Violations arising from the Migration while Bureau examiners were on-site examining [Discover]'s compliance with the 2015 Consent Order, [Discover] did not report these violations to the Bureau at that time";

- "While Bureau examiners were on-site, [Discover] was also aware of other potential Consent Order Violations that occurred before the Bureau's examination that were unrelated to the Migration," yet "[Discover] did not report these potential pre-Migration Consent Order Violations to the Bureau while Bureau examiners were on-site"; and

---

[118] 2020 CFPB Consent Order ¶ 12.

[119] *Id.* ¶ 9.

[120] *Id.* ¶ 10.

- "[Discover]'s representations to the Bureau during the examination about its compliance with the 2015 Consent Order were incomplete and misleading."[121]

200.    The agency specified that Discover violated the 2015 CFPB Consent Order by making numerous material misrepresentations to consumers.

201.    *First*, in violation of the CFPB's prior directive that "[Discover] 'may not misrepresent . . . the minimum periodic payment owed by consumers,'" the Company "made misrepresentations to more than 100,000 consumers about the minimum periodic payment these consumers owed."[122]  Specifically, Discover either overstated or understated the minimum periodic payments those borrowers owed, which harmed them, as some borrowers "pa[id] more or less than the correct monthly amount" and some "may have become late or delinquent because they could not pay the amount they believed was the minimum amount due."[123]

202.    *Second*, in violation of the CFPB's prior directive that "[Discover] 'may not misrepresent . . . the amount of interest paid by consumers,'" the Company "misrepresented to more than 8,000 consumers" the amount of interest they had paid on their student loans.[124] Specifically, Discover either overstated or understated the amount of interest those borrowers paid by amounts of up to more than $40,000, "which could have impacted consumers' student loan interest deductions by as much as $2,500."[125]  Those misrepresentations "may have caused

---

[121] *Id.* ¶¶ 13-16.

[122] *Id.* ¶¶ 21-22 (ellipsis in original) (quoting 2015 CFPB Consent Order ¶ 49(b)(i)).

[123] *Id.* ¶¶ 24-25.

[124] *Id.* ¶¶ 27, 29 (ellipsis in original) (quoting 2015 CFPB Consent Order ¶ 49(b)(ii)).

[125] *Id.* ¶¶ 31-32.

consumers to claim an inaccurate student loan interest deduction, which could lead to financial harm."[126]

203.   *Third*, in violation of the CFPB's prior directive that "[Discover] 'may not misrepresent . . . any other fact material to consumers concerning the servicing of their loans,'" the Company "misrepresented multiple other facts material to the terms and servicing of consumers' student loans to more than 390,000 consumers."[127]  Specifically, Discover falsely represented:

> (a) the amount of interest some consumers owed due to charging incorrect interest rates or incorrectly capitalizing interest, (b) the applicable interest rate, (c) how payments would be allocated by failing to properly apply consumers' payments, (d) the due date, amount due, or whether a payment was past due, (e) repayment information, and (f) the availability of a reward or a discount, among other things.[128]

204.   Those misrepresentations "were material because they related to important facts about consumers' loans that could influence consumers' decisions about their loans."[129]

205.   The CFPB determined Discover's "numerous misrepresentations" violated the 2015 CFPB Consent Order and the Consumer Financial Protection Act.[130]

206.   Additionally, in violation of the 2015 CFPB Consent Order's requirement that Discover provide monetary remediation to borrowers it had called six or more times before 8:00 a.m. or after 9:00 p.m. in their respective time zones, the Company improperly excluded borrowers it called between January 29, 2014 and July 21, 2015, which affected hundreds of

---

[126] *Id.* ¶ 33.

[127] *Id.* ¶¶ 35-36 (ellipsis in original) (quoting 2015 CFPB Consent Order ¶ 49(b)(iii)).

[128] *Id.* ¶ 38.

[129] *Id.*

[130] *Id.* ¶¶ 26, 34, 39.

individuals.[131]  Discover only rectified the situation "more than two years after the 2015 [CFPB] Consent Order was issued, after the Bureau questioned [Discover] about its failure to remediate this population."[132]

207.    The CFPB also found that Discover engaged in additional improper practices not previously identified in the 2015 CFPB Consent Order.

208.    For example, Discover withdrew automatic payments from more than 17,000 borrowers' bank accounts without proper authorization.[133]  The improper conduct included withdrawing more than the amount specified in the borrower's billing statement, withdrawing unauthorized automatic payments without providing advance notice to the borrower, and withdrawing the same automatic payment twice.[134]  As a result of Discover's actions, borrowers "were deprived the use of their funds and may have incurred [non-sufficient funds] and overdraft charges or other fees."[135]

209.    Additionally, Discover cancelled or failed to withdraw automatic payments with respect to 14,000 borrowers without notifying them.[136]  As a result, the Company incorrectly placed some of these 14,000 borrowers in delinquency status, caused some of their loans to accrue excess interest, and deprived borrowers of certain interest rate benefits.[137]

---

[131] *Id.* ¶¶ 41-42.

[132] *Id.* ¶ 43.

[133] *Id.* ¶ 48.

[134] *Id.*

[135] *Id.* ¶ 49.

[136] *Id.* ¶ 50.

[137] *Id.* ¶ 51.

210.    The CFPB determined the practices described above constituted unfair acts and practices in violation of the CFPA, and violated the Electronic Fund Transfer Act.[138]

211.    In light of Discover's numerous violations of law, the CFPB required the Company to pay $10 million in consumer redress and an additional $25 million civil penalty.[139] The 2020 CFPB Order also mandated that Discover, among other things:

- "must consider compliance with the Consent Order in any new initiatives affecting its student loan servicing";

- may not misrepresent, or assist others in misrepresenting, to borrowers (a) the minimum periodic payment owed by student loan borrowers, (b) the amount of annual interest student loan borrowers paid, or (c) "any other fact material to consumers concerning the servicing of their student loans"; and

- may not withdraw payments from borrowers' accounts without authorization, or cancel authorized withdrawals or fail to withdraw payments from borrowers' accounts without providing notice to borrowers.[140]

212.    FE 3 recounted that "everyone" at the executive level was "very aware of DSL's [Discover Student Loans] issues." FE 3's observation was based on calls and other conversations FE 3 had with several managers, directors, and vice presidents, who informed FE 3 that they had calls with Hochschild as well as EVP (and President, Consumer Banking) Carlos Minetti regarding student loan issues. Indeed, the managers, directors, and vice presidents specified to FE 3 that they were having a call to discuss the "status of DSL and the [2020 CFPB] consent order." FE 3 further recounted that Hochschild reportedly was involved in some of those calls. FE 3 believes the information discussed on the calls between higher-level managers and Hochschild or Minetti was from the ServiceNow system, a common software used in the loan

---

[138] *Id.* ¶¶ 54, 60; *see also id.* ¶ 63.

[139] *Id.* ¶¶ 77, 87.

[140] *Id.* ¶¶ 64-69.

industry for issues management.  In general, FE 3 emphasized, "all the executives were really concerned with what was going on in the student loan business unit."

213.    The 2020 CFPB Consent Order was far from the end of Discover's risk management and compliance problems.  To the contrary, the Company continued to experience pervasive problems well after the consent order was issued.

214.    FE 1 recounted that understaffing impacted efforts to remediate student loan borrowers.  FE 1 was involved in "exception handling"—the process of responding to computer program errors—for student loan remediation.  To write the processes for that program, FE 1 needed the assistance of "data people" within Discover, but there were not enough.  FE 1 accordingly held a call with senior management in which FE 1 pleaded for just two data employees to work with FE 1 on writing those processes.  Discover subsequently assigned two people, including Senior Manager of Business Strategy Margaret Winters, to work on the project.  But doing so prevented Winters from completing "multiple other procedures that needed to happen," according to FE 1.

215.    FE 3 specified that by early 2022, a "backlog" of "400 items"—i.e., "outstanding issues that had to go through restitution and redress"—had developed in the student loan business.  FE 3 noted that even with the addition of staff hired from another company, Protiviti, resolving the backlog of open issues was rushed and likely resulted in errors; the "deadline and resources, human capital was not sufficient."  Adding to that problem, the remediation process "was really awful," with "not a lot of standardization."  FE 3 further observed there was no quality process in place, resulting in delays in executing remediation efforts due to quality personnel taking time "to decide that restitution [wa]s good to go on a particular ticket."

216.    According to FE 3, one of the reasons issues in Discover's student loan business persisted for so long was that there were "a lot of problems committing to one plan and executing a plan without changing it a million times."

217.    FE 3 believes that as a result of its problematic remediation efforts, Discover "absolutely missed people" whom the Company was required to remediate.

**D.    Discover Has Admitted It Misclassified Interchange Fee Revenues for More Than *15 Years*—Which, as the Company Acknowledges—"Underscored Deficiencies in Our Corporate Governance and Risk Management."**

218.    Further demonstrating Discover's failure to implement and maintain appropriate risk management and compliance systems and practices, as well as its deficient internal controls, the Company misclassified credit card interchange revenues for more than 15 years.

219.    As Discover admitted in July 2023, it "incorrectly classified certain credit card accounts into [its] highest merchant and merchant acquirer pricing tier," for which the Company recognized (as of June 30, 2023) a liability of $365 million "to provide refunds to merchants and merchant acquirers as a result of the card product misclassification."[141]

220.    By way of background, credit card transactions involve several components and participants: (1) the cardholder, who makes the purchase; (2) the merchant; (3) the acquiring bank (i.e., "acquirer"), an intermediary that pays the transaction funds to the merchant; (4) the card processor, which works with the acquirer to process card transactions; (5) the cardholder's issuing bank, which issues the credit card; and (6) the card network.

221.    A credit card transaction goes through several steps:

- When a Discover cardholder uses a Discover card to make a transaction, the merchant processes the transaction and submits it to the card processor, who in turn submits the transaction to the card network.

---

[141] Discover July 19, 2023 Press Release.

- Because Discover issues its cards directly to consumers (rather than through third-party banks), it serves as both the issuing bank and the card network.

- The card network then processes the transaction, which includes assigning an interchange fee for the transaction. The fee is based primarily on the applicable interchange rate, expressed as a percentage of the transaction amount. Discover assigns an interchange rate and calculates the interchange fee for a transaction.

- Discover (as the issuing bank) then charges the full transaction amount to the cardholder's account and sends that amount, less the interchange fee, to the acquirer. For most merchants, the acquirer or processor passes the interchange fee on to the merchant directly in the form of a reduced payment to the merchant on the transaction (for some merchants, the acquirer or processor charges the merchant indirectly for the interchange fee, which also results in reduced payment to the merchant on the transaction).

- Finally, the processor deducts its own fee (a "markup") and the acquirer may deduct its own fee (an "assessment") from the amount received from the issuing bank. The processor then deposits the remaining amount for the transaction into the merchant's account.

222.     The amount of Discover's interchange fees differs based on the category of cardholder involved in the transaction. As a general matter, the interchange rates applicable to Discover consumer cards were lower than the rates applicable to Discover consumer cards.

223.     As Discover ultimately admitted, since at least 2007 it misclassified certain cardholders into its highest merchant and merchant-acquirer pricing tier, and in doing so charged those merchants higher interchange fees than the Company had represented it would charge them.

224.     FE 1 recounted that in September 2023, Scott Michelau and Vice President of Consumer Banking Ed Carlos asked FE 1 to write a policy for the cards business unit regarding account classification. FE 1 discerned from that meeting that "a huge population of accounts was misclassified."

225.     The policy FE 1 wrote detailed that accounts needed to be properly classified in accordance with a network agreement, and directed employees involved with the interchange fee

70

process to consult the network agreement for information about the classifications and interchange rates.  According to FE 1, ***this policy did not exist before September 2023***.

226.    In the wake of Discover's disclosure of its long-running misclassification of credit card interchange fees, during the Company's Q2 2023 earnings call on July 20, 2023, Hochschild admitted the misclassification issue "underscored ***deficiencies in our corporate governance and risk management***."  He added, "We're in discussions with our regulators regarding these matters."

227.    Hochschild further explained that the proposed consent order Discover had received from the FDIC, which ultimately led to the 2023 FDIC Consent Order, "d[id] not cover the misclassification topic," and that "[w]e believe additional supervisory actions could occur." Hochschild thus acknowledged there could be additional fallout from the misclassification problem.

E.    **Hochschild and Greene Have Admitted Discover "Historically Underinvested" in Compliance, Its "Internal Systems Capabilities Weren't on Par," and It Experienced "Perennial Issues" Servicing Student Loans.**

228.    In addition to broadly acknowledging prior deficiencies in Discover's risk management and compliance efforts, Defendants have specifically attributed those issues to their failure to sufficiently invest in those areas.

229.    During the Company's Q2 2023 earnings call on July 20, 2023, an analyst asked Hochschild to "give us some color on what you're investing in compliance today," adding: "Now if it's people or percentage of expenses versus historically?  And has it become a lot more difficult?"  Hochschild responded: "***Yes.  It certainly is a challenging environment, but I'm not going to blame that, right?  As I look back, I do believe we underinvested and that's something I take accountability for, but we are very focused on it <u>now</u>***."

71

230.    Additionally, during a "Business Update Call" held on August 17, 2023 in the wake of Hochschild's resignation, an analyst asked Greene "how . . . [he] look[ed] at [Discover's] compliance investment," to which Greene responded: "*[T]he company historically underinvested.  And we're paying the price right now.  So we're going to make sure we don't underinvest going forward*."

231.    Further, on December 5, 2023, Greene attended the Goldman Sachs Financial Services Conference, during which an analyst stated to him, "we all saw that you announced the announcement regarding the student lending business," and asked, "can you provide some color on how you and the Board came to that conclusion?"  Greene responded:

> *[W]hen we looked at it, we have perennial issues in our ability to service that portfolio.  So we had a consent order in '15 and another one in '20.  And then the '23 [FDIC] consent order also contained some elements related to that.  We benchmarked systems capability, and we found that our internal systems capabilities weren't on par with what a professional servicing organization could do for this portfolio.  And then ultimately, it came down to choices.  Do we try to retain and fix?  We ruled that out.*

232.    Hochschild's and Greene's admissions stand in stark contrast to Defendants' repeated assurances to investors during the Class Period, including that the Company had "invested significantly" to "strengthen compliance."

**F.    Beset by Compliance Failures, Discover Announced Its Plan to Sell Its $10 Billion Student Loan Business and Transfer Servicing to a Third Party.**

233.    On September 15, 2023, *Bloomberg* reported "Discover Financial Services is exploring the potential sale of its student-loan business as the company seeks to clean up operations in the aftermath of a series of regulatory lapses, according to people familiar with the

matter."[142]  The article attributed the reported sale of Discover's "$10.2 billion portfolio of private student loans" to the fact that the "[student loan] business has long been in regulators' crosshairs."  The article further noted this decision followed Hochschild's "abrupt departure" only a month earlier, which occurred amid Discover's decision to "temporarily suspend buybacks amid an internal review of compliance, risk management and corporate governance."[143]  Analysts at Keefe, Bruyette & Woods ("KBW") similarly connected Discover's decision to "sell[] this business" with its need to "accelerate the resolution of [its] outstanding compliance issues related to . . . student-lending."[144]

234.    On November 29, 2023, Discover issued a press release[145] confirming its plan to sell its student loan business and to transfer servicing of its loans to a third party, and to stop accepting new loan applications on February 1, 2024.[146]

235.    Several financial analysts and journalists immediately commented on Discover's announcement.  For example, on November 29, 2023, RBC Capital Markets reported that Discover "is exploring the sale of the private student lending business," which "[a]s of 3Q23, . . . totaled $10.4 billion or ~8.5% of total loans," while noting "this business is a compliance heavy

---

[142] Gillian Tan and Matthew Monks, "Discover Considers Possible Sale of Its Student-Loan Arm," *Bloomberg* (Sept. 15, 2023), https://www.bloomberg.com/news/articles/2023-09-15/discover-is-said-to-mull-possible-sale-of-its-student-loan-arm.

[143] *Id.*

[144] *Id.*

[145] *See* Discover Form 8-K (Nov. 29, 2023) Ex. 99.1 ("[Discover] today announced that the Company's Board . . . has authorized Discover management to explore the sale of the Discover Student Loans portfolio and the transfer of servicing of these loans to a third-party provider as it pursues strategic alternatives for the Discover Student Loans business.").

[146] *Id.* ("Additionally, Discover will stop accepting new applications for student loans February 1, 2024."); *see also* https://www.discover.com/student-loans/ (stating "Discover is no longer accepting new student loan applications. . . . Lender . . . Discover Bank . . . Member FDIC").

product" and "[Discover] has had compliance issues related to this business in recent years including the entrance into a CFPB consent order in 2020 related to student servicing practices" and "a new FDIC consent order in September of 2023 related to consumer compliance issues."

236.    On November 30, 2023, BofA Global Research published an article titled "Discover Financial Exiting student loan business," observing "the decision to exit the business does appear to be driven at least somewhat by the increasing compliance burden." The same day, *Payments Dive* reported that Discover was "seeking to offload its $10.4 billion student loan portfolio," and tied the decision to "regulatory scrutiny" the Company was facing, including the 2015 and 2020 CFPB "consent order[s]," the "July 2022 . . . internal investigation," and the "consent agreement with the [FDIC] in September [2023] in connection with a consumer compliance probe at Discover Bank."[147]

237.    Finally, as noted above, on December 5, 2023, Greene attended the Goldman Sachs Financial Services Conference where an analyst asked him to explain "how you and the Board" decided to sell Discover's "student lending business." Greene explained "we have perennial issues in our ability to service that portfolio"; attributed the decision to "the [CFPB] consent order in '15 and another one in '20"; noted "the '23 [FDIC] consent order also contained some elements related to that" [i.e., Discover's problems servicing its student loan portfolio]"; and acknowledged "our internal systems capabilities weren't on par with what a professional servicing organization could do for this portfolio."

---

[147] Caitlin Mullen, "Discover pursues sale of student loan business," *Payments Dive* (Nov. 30, 2023), https://www.paymentsdive.com/news/discover-pursues-sale-student-loan-portfolio-payments/701111/.

## VIII.   THE SIGNIFICANT AND LONG-RUNNING COMPLIANCE AND RISK MANAGEMENT PROBLEMS AT DISCOVER RENDERED DEFENDANTS' CLASS PERIOD STATEMENTS FALSE AND MISLEADING

238.    In light of the broad, long-running deficiencies in Discover's compliance and risk management organization and practices, their numerous representations to investors touting those very systems and practices were false or misleading when made.

239.    Defendants disseminated both *false* and *misleading* statements during the Class Period.  In this regard, while certain of Defendants' statements may have been literally true, Defendants' concealment of the myriad facts detailed in Section VII above rendered those statements at least materially misleading.

240.    Defendants' numerous false or misleading statements during the Class Period are identified in ¶¶ 241-301 below.  With respect to the various public filings or other sources of representations Defendants issued or otherwise made throughout the Class Period, Plaintiffs identify (1) the materially false or misleading statements in those representations (which are *bolded and italicized*); and (2) why those statements were false or misleading when made, including the information Defendants either misstated or failed to disclose.

A.    **In Discover's Form 10-Ks, Defendants Misrepresented the Company's "Risk Management" Structures and Capabilities, as well as the "Risk Management Culture" Established and Maintained by Hochschild.**

241.    For each fiscal year during the Class Period, Discover filed an Annual Report with the SEC on Form 10-K that was signed by Hochschild (as CEO) and either Graf or Greene (as CFO).  On February 20, 2019, for example, the Company filed its 2018 Form 10-K, signed by Hochschild and Graf.  Discover's 2019, 2020, 2021, and 2022 Form 10-Ks were signed by Hochschild and Greene.  The excerpted language below is from the Company's 2018 Form 10-K and appears in substantially similar form in the subsequent Form 10-Ks (certain relevant

75

language was altered in subsequent years; those alterations are indicated in footnotes after the

relevant text).

242.     In the Form 10-Ks, Defendants made numerous representations to assure

investors of the Company's commitment to risk management and its ability to appropriately

manage risk:

a)    "*Our [risk management] framework is designed to be comprehensive with respect to our business units and their control and support functions, and across all risk types.*"

b)    "*We structure accountability across three lines of defense along the principles of risk management execution, oversight and independent validation. . . . The principles apply across all businesses and risk types and guide the definition of specific roles and responsibilities.*"[148]

c)    "*The CRM department sets risk management standards and policies that are consistent with the size and complexity of our business, industry practices and applicable legal and regulatory requirements.*"[149]

---

[148] This section was <u>revised</u> as follows in subsequent Form 10-Ks:  2020 Form 10-K ("As the first line of defense, our business units seek to <u>create, sustain and improve a particular process to achieve business outcomes and identify and manage risks that arise from day-to-day operations as well as those driven by change.</u>"); 2021 Form 10-K ("As the first line of defense, our business units seek to create, sustain and improve a particular process to achieve business outcomes <u>through appropriate controls and monitoring</u>, and identify and manage risks that arise from day-to-day operations as well as those driven by change."); 2022 Form 10-K ("As the first line of defense, our business units seek to <u>achieve business objectives while identifying and managing</u> risks that arise from day-to-day operations as well as those driven by change.").

[149] This sentence was <u>revised</u> as follows in subsequent Form 10-Ks:  2019 Form 10-K ("The CRM department sets risk management standards and policies that are <u>designed to be</u> consistent with the size and complexity of our business, industry practices and applicable legal and regulatory requirements."); 2020 Form 10-K ("The CRM department <u>oversees the establishment of enterprise-level</u> risk management standards and policies and <u>designs processes</u> that are designed to be consistent with the size and complexity of our business, industry practices and applicable legal and regulatory requirements."); 2021 Form 10-K ("The CRM department <u>(i)</u> oversees the establishment of enterprise-level risk management standards and policies; <u>(ii) oversees the</u> processes that are designed to be consistent with the size and complexity of our business, industry practices and applicable legal and regulatory requirements<u>; and (iii) independently test [sic] business units' compliance with applicable regulatory requirements.</u>"); 2022 Form 10-K (same).

d) *"Our risk governance framework is implemented such that bank-level risk governance requirements are satisfied as well."*[150]

e) *"Our Risk Committee . . . establishes a comprehensive enterprise risk management program, which includes . . . establishing and overseeing an enterprise-wide approach to risk management through the development of our Enterprise Risk Management Policy and the associated oversight framework for the identification, measurement, monitoring, management and reporting of enterprise risk . . . and . . . reviewing, on a periodic basis, our aggregate enterprise-wide risk exposures and the effectiveness of risk identification, measurement, monitoring, management and reporting policies and procedures, and related controls within the lines of business."*[151]

f) *"[T]he CEO establishes a risk management culture throughout the Company and ensures that businesses operate in accordance with this risk culture."*

g) *"[T]he CRM department has enterprise risk management, corporate compliance, third-party risk management, model risk management, information security and risk and insurance management frameworks to manage potential risk that might arise within these respective areas."*[152]

h) *"The internal audit department . . . validates that risk management controls are functioning as intended by reviewing and evaluating the design and operating effectiveness of the CRM program and processes, including the independence and effectiveness of the CRM function."*[153]

---

[150] "[I]mplemented" is <u>revised</u> to "<u>designed</u>" in the 2019, 2020, 2021, and 2022 Form 10-Ks.

[151] This section was <u>revised</u> as follows in subsequent Form 10-Ks: 2020 Form 10-K ("Our Risk Committee is an executive management-level committee that establishes <u>and oversees</u> a comprehensive enterprise risk management program . . . ."); 2021 and 2021 Form 10-Ks (same).

[152] This section was <u>revised</u> as follows in subsequent Form 10-Ks: 2019 Form 10-K ("The CRM department is comprised of <u>enterprise, operational, consumer credit, counterparty credit, market, liquidity, compliance, Bank Secrecy Act/anti-money laundering, third-party, business technology, model, information security and insurance risk functions, each of which manages the risks associated with their respective area.</u>"); 2020 Form 10-K (same); 2021 Form 10-K ("The CRM department is <u>composed</u> of enterprise, operational, consumer credit, counterparty credit, market, liquidity, compliance, Bank Secrecy Act/anti-money laundering, third-party, <u>risk testing</u>, <u>business technology and information security and model risk functions</u>, each of which manages the <u>oversight of</u> risks associated with their respective area."); 2022 Form 10-K ("The CRM department <u>includes, but is not limited to, teams that are responsible for oversight</u> of enterprise, operational, consumer credit, counterparty credit, market, liquidity, compliance, Bank Secrecy Act/anti-money laundering, third-party <u>and business technology and information security risk, as well as model validation and risk testing functions.</u>").

[153] This section was <u>revised</u> as follows in subsequent Form 10-Ks: 2020 Form 10-K ("The internal audit department . . . validates that risk management controls are functioning as intended

      i)    "***Our enterprise risk management principles are executed through a risk management framework that is based upon industry standards for managing risk and controls.***"

      j)    "***We have policies and a defined governance structure in place to manage risks.***"

      k)    "We evaluate the potential impact of a risk event on the Company by assessing the financial impact, the impact to our reputation, the legal and regulatory impact, and the client/customer impact.  ***In addition, we have established various policies to help govern these risks.***"

      l)    "***Compliance risk exposures are actively and primarily managed by our business units in conjunction with our compliance department.***"

243.    The foregoing statements were all materially false or misleading when made because, as the FDIC Consent Order and Defendants' own statements demonstrate, the Company had glaring and significant gaps in its risk management and compliance framework.  Further, Discover's risk management governance structure did not, in fact, include "bank-level risk governance requirements" that were "satisfied," "risk management controls" that "function[ed] as intended," or a framework that was "comprehensive" or "functioning as intended."  Nor did Discover have "policies," or a "governance structure in place" "based on industry standards" that "ensur[ed] . . . risk exposures were appropriately assessed."  Additionally, Hochschild, as the CEO, failed to "establish[] a risk management culture throughout the Company" or "ensure[] that businesses operate[d] in accordance with this risk culture."  Discover also did not, in fact, "have established polices" to "govern [the] risk" of "legal and regulatory impact" or "client/customer impact," or to "actively" manage risk.

---

by reviewing and evaluating the design and operating effectiveness of the CRM program and processes, <u>including the effectiveness</u> of the CRM function."); 2021 and 2022 Form 10-Ks (same).

244.    To the contrary, there were significant gaps and deficiencies in the Company's risk management and corporate governance framework.  Among other things, the FDIC determined that Discover "engaged in [] unsafe and unsound banking practices by . . . *failing to establish and maintain* a compliance management system for providing for compliance with Consumer Protection Laws and Regulations."  ¶ 161.  Additionally, Defendants *admitted* in the wake of disclosing Discover's 15-year practice of misclassifying credit card interchange fees that the misclassification "underscored deficiencies in our corporate governance and risk management."  ¶ 226.  Hochschild *admitted* in July 2023 that "we underinvested [in compliance] and that's something I take accountability for."  ¶ 229.  Likewise, Greene *admitted* in August 2023 that Discover "historically underinvested" in compliance and is "paying the price right now."  ¶ 230.  They further *admitted* in December 2023 that Discover has experienced "perennial issues in [its] ability to service that portfolio" and that "[its] internal systems capabilities weren't on par with what a professional servicing organization could do."  ¶ 231.

245.    The 2015 and 2020 CFPB Consent Orders further illustrate the significance and pervasiveness of Discover's compliance, risk management, corporate governance, and internal control deficiencies.  Each of the consent orders details widespread, systemic practices that affected thousands—in some cases, hundreds of thousands—of student loan borrowers.  Further, the 2020 CFPB Consent Order resulted in part from Discover's *failure to comply* with the obligations of which it was aware from the 2015 CFPB Consent Order.  The facts detailed in the CFPB Consent Orders, in conjunction with Discover's disclosure in June 2022 that "student loan servicing practices and related compliance matters" led to an internal investigation and the suspension of the Company's share repurchase program, demonstrated the scope of Defendants' compliance failures.  ¶¶ 177-217, 343-45.

246.     Information provided by the former Discover employees detailed in ¶¶ 51-57, 101-59, 212-17, and 224-25 above further contradicts Defendants' representations identified in ¶ 242.  The FEs recounted numerous issues plaguing the Company's compliance, risk management, and internal control functions.  *First*, there was a toxic compliance culture at Discover.  *Second*, the Company's ERM framework—highlighted by its "three lines of defense"—was plagued by internal tensions and organizational dysfunction.  *Third*, the compliance department was woefully understaffed, lacked the expertise necessary to appropriately perform its functions, and suffered from significant turnover.  *Fourth*, Discover had hundreds of unresolved regulatory violations, which caused senior management to "freak out."  Hochschild and other senior executives also received regular reports highlighting the number of open regulatory issues.  And *fifth*, senior executives were further apprised of gaps in internal controls through their implementation of "Project Operational Excellence," but failed to take action to remedy those deficiencies.

**B.     The Officer Defendants Made Materially False and Misleading Statements Regarding Discover's Focus on, and Investment in, Compliance and Risk Management.**

247.     In earnings calls, presentations, and other forums throughout the Class Period, the Officer Defendants highlighted Discover's purported commitment to compliance efforts—emphasizing, in particular, the extent of the Company's investment in compliance.  Those representations were materially false or misleading when made, however, in light of the facts detailed in ¶¶ 101-237 above.

**1.     October 22, 2020: Q3 2020 Earnings Call**

248.     On October 22, 2020, Discover held its fiscal Q3 2020 earnings call attended by Hochschild and Greene.  During the call, an analyst noted "some concern among investors when [the Company] gave guidance earlier th[at] year, pre COVID, that Discover lost its expense

80

discipline," adding, "And that's the reason you guys had, at the time, guided to negative operating leverage was due to years of chronic underinvestment."  The analyst asked Hochschild whether he could "speak to [his] confidence level in being able to continue to generate positive operating leverage as we look to the other side of this."  Hochschild responded:

> So first, having been here for over 20 years, *I have to maybe disagree with the phrase chronic underinvestment*. *I think our investments have been appropriate.  But at the beginning of the year, we saw an opportunity to invest more.  And so I would characterize it that way.*

249.    Hochschild's disagreement "with the phrase chronic underinvestment," and his statement that "I think our investments have been appropriate," were materially false or misleading when made because for years Discover failed to make critical investments in compliance and risk management, including investments necessary "to establish and maintain a compliance management system [] providing for compliance with Consumer Protection Laws and Regulations." ¶ 161.  Indeed, Hochschild and Greene have since *admitted* the Company "*underinvested* [in compliance]." ¶ 230.

250.    Additionally, Hochschild's representations regarding Discover's "appropriate" investment in compliance were directly undermined by the FDIC Consent Order and revelations at the end of the Class Period, which confirm the Company's risk management and corporate governance framework suffered from significant gaps and deficiencies.  Among other things, the FDIC determined Discover "engaged in [] unsafe and unsound banking practices by . . .*failing to establish and maintain* a compliance management system for providing for compliance with Consumer Protection Laws and Regulations." ¶ 161.  Additionally, Defendants *admitted* that Discover's 15-year practice of misclassifying credit card interchange fees "underscored deficiencies in our corporate governance and risk management." ¶ 226.

251.    The facts detailed in the 2020 CFPB Consent Order further illustrate the significance and pervasiveness of Discover's compliance, risk management, and internal control deficiencies, which at the very least rendered Hochschild's positive statements regarding investment in compliance materially misleading.  The CFPB detailed widespread, systemic practices that affected thousands—in some cases, hundreds of thousands—of student loan borrowers.  Further, the 2020 CFPB Consent Order resulted in part from Discover's *failure to comply* with the obligations of which it was aware from the 2015 CFPB Consent Order.  The 2020 CFPB Consent Order, in conjunction with Discover's disclosure in June 2022 that "student loan servicing practices and related compliance matters" led to an internal investigation and the suspension of the Company's share repurchase program, demonstrate the extent of Defendants' compliance failures.  ¶¶ 195-217, 343-45.

252.    Information provided by the former Discover employees detailed in ¶¶ 51-57, 101-59, 212-17, and 224-25 above also contradicts Hochschild's representations.  The FEs recounted numerous issues plaguing the Company's compliance, risk management, corporate governance, and internal control functions.  *First*, there was a toxic compliance culture at Discover.  *Second*, the Company's ERM framework—highlighted by its "three lines of defense"—was plagued by internal tensions and organizational dysfunction.  *Third*, the compliance department was woefully understaffed, lacked the expertise necessary to appropriately perform its functions, and suffered from significant turnover.  *Fourth*, Discover had hundreds of unresolved regulatory violations, which caused senior management to "freak out."  Hochschild and other senior executives also received regular reports highlighting the number of open regulatory issues.  And *fifth*, senior executives were further apprised of gaps in

internal controls through their implementation of "Project Operational Excellence," but failed to take action to remedy those deficiencies.

### 2. February 25, 2021: 22nd Annual Crédit Suisse Virtual Financial Services Forum

253.    During the 22nd Annual Crédit Suisse Virtual Financial Services Forum on February 25, 2021, Greene was asked about Discover's guidance on expenses for 2021 and his "views on operating efficiency, how they evolved over the last year and how we should kind of think about that going forward."  Greene responded:

> [W]hat we are going to do is manage the business efficiently.  ***And so by that, I mean, is a real focus on corporate cost and those dollars that aren't directly attributable to our ability to grow or our ability to grow in a compliant way.  So we're a regulated financial services institution.  We're going to put money into risk and compliance as we want to.***

254.    Greene's statements that, as "a regulated financial institution," Discover was "ab[le] to grow in a compliant way" and "put money into risk and compliance as we want to" were materially false or misleading when made because, as he later ***admitted***, the Company "historically underinvested" in compliance, experienced "perennial issues in [its] ability to service [its student loan] portfolio," and had "internal systems capabilities [that] weren't on par with what a professional servicing organization could do."  ¶ 231.  Nor did the Company "grow in a compliant way."  Among other things, the FDIC determined Discover "fail[ed] to establish and maintain a compliance management system [] providing for compliance with Consumer Protection Laws and Regulations."  ¶ 161.  This included failing to provide "written policies, procedures, standards, and/or processes [ ], training, monitoring and testing, audit, and consumer complaint response programs designed to prevent, or identify and self-correct violations of all applicable consumer protection laws and/or regulations."  *Id.*  Additionally, Defendants ***admitted*** in the wake of disclosing Discover's 15-year practice of misclassifying credit card interchange

fees that the misclassification "underscored deficiencies in our corporate governance and risk management." ¶ 226. The 2020 CFPB Consent Order, in conjunction with Discover's disclosure in June 2022 that "student loan servicing practices and related compliance matters" led to an internal investigation and the suspension of the Company's share repurchase program, also demonstrated the extent and seriousness of Defendants' compliance failures. ¶¶ 195-217, 343-45.

255.    Further underscoring its prior underinvestment in compliance, after Discover first disclosed the FDIC Consent Order and the credit card misclassification issue, the Company announced significant expense increases related to risk management and corporate governance. For example, during the Company's September 12, 2023 analyst conference call, Greene stated "so from 2021, when we [sic] first begin how can we involve the investment in risk and compliance, we've invested an incremental $300 million." One month later, on October 19, 2023, Greene told analysts that for Q3 2023 "[t]otal operating expenses were up $86 million year-over-year . . . and up 4% from the prior quarter," which was "driven primarily by investments in our compliance and risk management programs."

256.    Discover's numerous gaps and deficiencies in risk management, compliance, corporate governance, and internal controls are further detailed by well-placed former employees with firsthand knowledge. ¶¶ 51-57, 101-59, 212-17, 224-25. These contemporaneous facts likewise undermined Greene's representations during the financial services forum.

### 3.    May 19, 2022: Annual Meeting of Shareholders

257.    On May 19, 2022, Discover held its annual shareholder meeting, in which Hochschild and Greene participated. During the meeting, Hochschild emphasized the Company's purported focus on, and success with respect to, compliance:

To achieve our goals, we must balance agility, innovation and growth with the discipline and control required in a high-risk highly regulated industry. ***Let's look at some of the things we're doing this year. Top of the list is our focus on compliance first, which means we'll continue to strengthen and fine-tune our processes and comply with all the regulations required of a large national bank.***

258.    Hochschild's statement that Discover's "top" focus during 2022 was "compliance first" was materially false or misleading when made because he failed to disclose that the Company's risk management and governance framework failed to include critical "compliance management programs," and that these risk management and governance deficiencies required significant investment and remediation.  Specifically, among other things, the FDIC determined Discover "fail[ed] to establish and maintain a compliance management system [] providing for compliance with Consumer Protection Laws and Regulations."  ¶ 161.  Indeed, Discover lacked "written policies, procedures, standards, and/or processes [ ], training, monitoring and testing, audit, and consumer complaint response programs designed to prevent, or identify and self-correct violations of all applicable consumer protection laws and/or regulations."  *Id.*  Additionally, Defendants ***admitted*** in the wake of disclosing Discover's 15-year practice of misclassifying credit card interchange fees that the misclassification "underscored deficiencies in our corporate governance and risk management."  ¶ 226.  The 2020 CFPB Consent Order, in conjunction with Discover's disclosure in June 2022 that "student loan servicing practices and related compliance matters" led to an internal investigation and the suspension of the Company's share repurchase program, also demonstrated the scope of Defendants' compliance failures.  ¶¶ 195-217, 343-45.

259.    Indeed, at this time Hochschild almost certainly knew the FDIC's October 18, 2021 ROE included findings that Discover, among other things, suffered from systemic compliance gaps and failures, rendering it unable to reasonably ensure compliance with

85

consumer protection laws and regulations. ¶¶ 160-63. Hochschild was also in a position to know, like Greene, that the Company "historically underinvested" in compliance. Indeed, Hochschild admitted as much in July 2023 when he acknowledged "we underinvested [in compliance] and that's something I take accountability for." ¶ 229.

260.    Discover's numerous gaps and deficiencies in risk management, compliance, corporate governance, and internal controls are further detailed by well-placed former employees with firsthand knowledge. ¶¶ 51-57, 101-59, 212-17, 224-25. These contemporaneous facts likewise undermined Hochschild's representations during the annual shareholder meeting.

261.    For these same reasons, Hochschild's attempt to downplay any compliance issues as simply warranting "fine-tun[ing]" of "[Discover's] processes" was materially false or misleading, as was his representation that the Company would "continue to . . . comply with all the regulations required of a large national bank."

### 4.    September 13, 2022: Barclays Global Financial Services Conference

262.    During the Barclays Global Financial Services Conference on September 13, 2022, in response to an analyst's question regarding the status of "the suspension of the share repurchase program and the internal investigation," Greene stated:

> So what we said on the second quarter call . . . *we believe the financial exposure related to any matters related to the investigation was able to be absorbed within our existing expense guidance. So that was a bit of a quantification of it.*
>
> * * *
>
> *And we took a conservative approach* as discovered us [sic]. *So Discover has traditionally been conservative on accounting matters and legal matters.* And we said, "Okay, with a Board investigation going on related to the student loan servicing [consent] order items, it'd be better to hold off on share repurchase."
>
> My hope is that by the end of the year, this will be behind us, and we'll be able to resume share repurchases. Now that will be subject to the Board's review and conclusion of the work they're doing on this. *But overall, I look at this as a matter of timing, not anything greater than that.*

86

263. Greene's statements that "Discover has traditionally been conservative on accounting matters and legal matters," "we took a conservative approach," "we believe the financial exposure related to any matters related to the investigation was able to be absorbed within our existing expense guidance," and "overall, I look at this as a matter of timing, not anything greater than that" were materially false or misleading when made because Greene downplayed the Company's chronic and persistent compliance failures. These failures include (1) the FDIC's determination that Discover "fail[ed] to establish and maintain a compliance management system [] providing for compliance with Consumer Protection Laws and Regulations"; (2) the admitted "deficiencies in [Discover]'s corporate governance and risk management" that caused the Company's 15-year card misclassification practice; and (3) Discover's unlawful practices with respect to student loans, as detailed in the CFPB Consent Orders, which in part caused the Company to engage in a "broader focus on our compliance management system" and once again suspend its share buyback program, as disclosed in July 2023. ¶¶ 160-227, 352. Discover's numerous gaps and deficiencies in risk management, compliance, corporate governance, and internal controls are further detailed by well-placed former employees with firsthand knowledge. ¶¶ 51-57, 101-59, 212-17, 224-25. These contemporaneous facts likewise undermined Greene's statements during the conference.

264. Additionally, Greene's representation that the "financial exposure" concerning Discover's student loan compliance problems was "able to be absorbed" was materially false or misleading because these issues continued to persist. Indeed, as recently as January 18, 2024, Greene told analysts during Discover's Q4 2023 earnings call that the Company incurred another $80 million remediation charge, which "was related to servicing issues, the lion's share of that, the significant share of that was related to student loans."

### 5. December 6, 2022: Goldman Sachs 2022 US Financial Services Conference

265. During the Goldman Sachs 2022 US Financial Services Conference on December 6, 2022, an analyst asked Hochschild "what [he] [was] thinking about for the student loan business as we think about the next 12 months ahead." Hochschild responded:

> In student loans, I think it's been public. We've had some compliance challenges there, **but the team is doing a lot of great work. I'm really excited about that product. We see good returns. We're the second largest originator of private student loans. It's a great way to get your product and your brand in front of the next generation of consumers. So that's a business that I'm very excited about.**

266. Hochschild's statements that "the [student loan] team is doing a lot of great work," he was "excited about that product," and "We see good returns" were materially false or misleading when made because they concealed the Company's chronic and persistent compliance failures. These included (1) the FDIC's determination that Discover "fail[ed] to establish and maintain a compliance management system [] providing for compliance with Consumer Protection Laws and Regulations"; (2) the admitted "deficiencies in [Discover]'s corporate governance and risk management" that caused the Company's 15-year card misclassification practice; and (3) Discover's unlawful practices with respect to student loans, as detailed in the CFPB Consent Orders, which in part caused the Company to engage in a "broader focus on our compliance management system" and once again suspend its share buyback program, as disclosed in July 2023. ¶¶ 160-227, 352. Discover's numerous gaps and deficiencies in risk management, compliance, corporate governance, and internal controls are further detailed by well-placed former employees with firsthand knowledge. ¶¶ 51-57, 101-59, 212-17, 224-25. These contemporaneous facts likewise undermined Hochschild's statements during the conference.

88

6. **February 14, 2023: Crédit Suisse 24th Annual Financial Services Forum**

267.    During the Crédit Suisse 24th Annual Financial Services Forum on February 14, 2023, an analyst asked about Discover's "targeted capital levels" and how it saw those levels "evolving over time," given that the Company "paused [its] capital return for a portion of 2022," i.e., suspended its share repurchase program.  Greene responded:

> Yes, so, what we've historically said is we would—we had a target of 10.5% and we've been persistently higher than that. In 2022, we put forward a really, really robust plan in terms of return of capital. We are executing on that very, very well, and then we had to pause at the end of the second quarter into the third quarter. **_Fortunately, we got that behind us._** At the end of the year, I believe we had $2.8 billion remaining on our authorization, and the plan is to execute on that authorization in the first quarter of '23 and into the second quarter of '23. Then, we'll share a proposal with our Board. The expectation is that we'll continue to maintain our capital allocation priorities. So first, investment in organic growth; second, return excess capital to shareholders; and then third, if there's some sort of bolt-on M&A, we'll look at it. But no major changes in the priorities.

268.    Greene's statement that "Fortunately, we got that behind us" was materially false or misleading when made because the July 2022 share buyback suspension, according to the Company's own statements, was specifically tied to "student loan servicing practices and related compliance matters," an issue that was not in fact "behind [the Company]" in February 2023 or even today.  Most recently, on January 18, 2024, Greene disclosed that Discover had incurred an additional $80 million charge "related to servicing issues," the "lion's share" of which "related to student loans."

269.    Greene's representation further concealed Discover's chronic and persistent compliance failures, including (1) the FDIC's determination that Discover "fail[ed] to establish and maintain a compliance management system [] providing for compliance with Consumer Protection Laws and Regulations"; (2) the admitted "deficiencies in [Discover]'s corporate governance and risk management" that caused the Company's 15-year card misclassification

practice; and (3) Discover's unlawful practices with respect to student loans, as detailed in the CFPB Consent Orders, which in part caused the Company to engage in a "broader focus on our compliance management system" and once again suspend its share buyback program, as disclosed in July 2023. ¶¶ 160-227, 352. Discover's failures with respect to risk management, compliance, corporate governance, and internal controls are further detailed by well-placed former employees with firsthand knowledge. ¶¶ 51-57, 101-59, 212-17, 224-25. These contemporaneous facts likewise undermined Greene's statements during the forum.

### 7. March 21, 2023: Letter to Shareholders and 2022 Annual Report

270. As noted above (*see* ¶ 83), in a March 21, 2023 letter to shareholders accompanying Discover's 2022 Annual Report, Hochschild emphasized that the Company "***invested significantly in key areas of our business***" to, among other things, "***strengthen compliance***." Those investments, he added, "position Discover to continue driving shareholder value."

271. Similarly, in its 2022 Annual Report following Hochschild's letter, Discover noted it "***focused on three key areas to strengthen our CMS over the past few years***," including:

- "***Strong compliance programs to ensure we understand and follow regulatory requirements, identify potential risks, and put in place robust, effective processes that we regularly monitor and test to be certain they are working as designed***"; and

- "***Identifying and solving problems before customer harm happens, or when mistakes do occur, find the root causes, fix them quickly and prevent them from happening again.***"

272. The Company added, "When we know, monitor and improve our processes through strong compliance management, we enhance the customer experience and eliminate or mitigate issues ***before*** they cause customer harm."

273. The above statements were materially false or misleading when made because they concealed Discover's systemic and pervasive risk management, compliance, corporate governance, and internal control failures. These included (1) Discover's "failure to establish and maintain a compliance management system [] providing for compliance with Consumer Protection Laws and Regulations," as the FDIC found; (2) the admitted "deficiencies in [Discover]'s corporate governance and risk management" that caused the Company's 15-year card misclassification practice; and (3) Discover's unlawful practices with respect to student loans, as detailed in the CFPB Consent Orders, which in part caused the Company to engage in a "broader focus on our compliance management system" and once again suspend its share buyback program, as disclosed in July 2023. ¶¶ 160-227, 352. Discover's numerous gaps and deficiencies in risk management, compliance, corporate governance, and internal controls are further detailed by well-placed former employees with firsthand knowledge. ¶¶ 51-57, 101-59, 212-17, 224-25. These contemporaneous facts likewise undermined Hochschild's statements in his letter to shareholders and Discover's representations in the 2022 Annual Report.

**8. April 20, 2023: Q1 2023 Earnings Call**

274. On April 20, 2023, Discover held its fiscal Q1 2023 earnings call, in which Hochschild and Greene participated. During the call, Hochschild stated:

> As we look to the remainder of 2023, we may adjust our outlook as conditions evolve. ***We believe there is the potential for more stringent regulation.*** We believe we're well positioned for more rigorous regulatory capital and liquidity requirements given our strong internal standards, ***and we also continue to focus on enhancing our compliance management systems.***

275. Hochschild's representation that "we . . . continue to focus on enhancing our compliance management systems" was materially false or misleading when made because it concealed Discover's systemic and pervasive risk management, compliance, corporate

91

governance, and internal control failures.  These included (1) Discover's "failure to establish and maintain a compliance management system [] providing for compliance with Consumer Protection Laws and Regulations," as the FDIC found; (2) the admitted "deficiencies in [Discover]'s corporate governance and risk management" that caused the Company's 15-year card misclassification practice; and (3) Discover's unlawful practices with respect to student loans, as detailed in the CFPB Consent Orders, which in part caused the Company to engage in a "broader focus on our compliance management system" and once again suspend its share buyback program, as disclosed in July 2023.  ¶¶ 160-227, 352.  Discover's numerous gaps and deficiencies in risk management, compliance, and internal controls are further detailed by well-placed former employees with firsthand knowledge.  ¶¶ 51-57, 101-59, 212-17, 224-25.  These contemporaneous facts likewise undermined Hochschild's statement during the earnings call. Hochschild's reference to the "potential for more stringent regulation" was likewise at least materially misleading, as the above facts (unbeknownst to investors) rendered it far more likely the Company would be subject to "more stringent regulation."

### 9.    May 11, 2023: Annual Meeting of Shareholders

276.    On May 11, 2023, Discover held its annual shareholder meeting, in which Hochschild and Greene participated.  During the meeting, Hochschild represented:  "***In 2023, we're focused on maturing our compliance and risk management, including strengthening our monitoring and testing and strengthening all 3 lines of defense to better identify, assess and mitigate risk.***"

277.    Hochschild's statement was materially false or misleading when made because in fact Discover needed to do much more than merely ensure it was "maturing" or "strengthening" its compliance and risk management.  Instead, as detailed in ¶¶ 101-237 above, unbeknownst to

investors, the Company was suffering from longstanding, significant, and costly risk management and corporate governance failures.

278.    As the FDIC Consent Order makes clear, Discover's risk management and governance framework failed to include critical "compliance management programs," and these risk management and governance deficiencies required significant investment and remediation. Specifically, among other things, the FDIC determined Discover "fail[ed] to establish and maintain a compliance management system [] providing for compliance with Consumer Protection Laws and Regulations." ¶ 161.  This included failing to provide "written policies, procedures, standards, and/or processes [ ], training, monitoring and testing, audit, and consumer complaint response programs designed to prevent, or identify and self-correct violations of all applicable consumer protection laws and/or regulations."  *Id.*  Additionally, Defendants ***admitted*** in the wake of disclosing Discover's 15-year practice of misclassifying credit card interchange fees that the misclassification "underscored deficiencies in our corporate governance and risk management." ¶ 226.  The 2020 CFPB Consent Order, in conjunction with Discover's disclosure in July 2023 that it was engaged in a "broader focus on our compliance management system" and would once again suspend its share buyback program, also demonstrated the scope of Defendants' risk management, compliance, corporate governance, and internal control failures.  ¶¶ 195-217, 352.  Discover's numerous gaps and deficiencies in risk management, compliance, and internal controls are further detailed by well-placed former employees with firsthand knowledge.  ¶¶ 51-57, 101-59, 212-17, 224-25.  These contemporaneous facts further undermined Hochschild's representation during the annual shareholder meeting.

279.    Accordingly, regardless whether Defendants were in fact attempting to "strengthen[]" the Company's monitoring and testing as well as its three lines of defense,

93

Hochschild's omission of the myriad facts detailed in this Complaint rendered his statement at least materially misleading.

### 10.    June 2, 2023: Bernstein 39th Annual Strategic Decisions Conference

280.    On June 2, 2023, Hochschild attended the Bernstein 39th Annual Strategic Decisions Conference, in which he discussed Discover's purported commitment to, and investment in, compliance:

> [**Hochschild:**]  And so our spending on compliance and risk management is up roughly $250 million a year from 2019.  ***It reflects that compliance is our top priority.  And so an area we need to make sure we continue to invest.***  In terms of the puts and takes and how that translates into overall expense levels, it's a bit hard to say.
>
> And so John [Greene] talked at the last call about there being some upward pressure on that range. Part of it will also depend on the economy because if conditions deteriorate, you tend to cut back on marketing, and so there's an offsetting savings on the expense side. So we'll probably provide an update on the next call as we get more clarity towards the back half of the year.  ***But obviously continuing to make those investments on the compliance side,*** but also on building capabilities that will continue to let us succeed.

281.    Hochschild's statements that "compliance is our top priority" and "we need to make sure we continue to invest [in compliance]," as well as his reference to "continuing to make those investments on the compliance side," were materially false or misleading when made because they concealed Discover's systemic and pervasive risk management, compliance, corporate governance, and internal control failures.  These included (1) Discover's "failure to establish and maintain a compliance management system [] providing for compliance with Consumer Protection Laws and Regulations," as the FDIC found; (2) the admitted "deficiencies in [Discover]'s corporate governance and risk management" that caused the Company's 15-year card misclassification practice; and (3) Discover's unlawful practices with respect to student loans, as detailed in the CFPB Consent Orders, which in part caused the Company to engage in a

"broader focus on our compliance management system" and once again suspend its share buyback program, as disclosed in July 2023. ¶¶ 160-227, 352. Discover's numerous gaps and deficiencies in risk management, compliance, corporate governance, and internal controls are further detailed by well-placed former employees with firsthand knowledge. ¶¶ 51-57, 101-59, 212-17, 224-25. These contemporaneous facts further undermined Hochschild's representations during the conference.

> ### C.     Defendants Also Misrepresented the Sufficiency of Discover's Internal Controls.

282.     As discussed in ¶ 97 above, Defendants repeatedly represented that (1) management had assessed the sufficiency of Discover's internal controls; (2) in doing so, management applied the COSO 2013 Framework; and (3) based on management's assessment and the COSO criteria, the Company's controls were "effective."

283.     Discover's 2018 Form 10-K, for example, included "Management's Report on Internal Control over Financial Reporting," which represented:

> Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2018[.] ***In making this assessment, management used the criteria set forth in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on management's assessments and those criteria, management has concluded that our internal control over financial reporting was effective as of December 31, 2018[.]***

284.     Discover's 2019, 2020, 2021, and 2022 Form 10-Ks each contained the same representations with respect to those respective reporting periods.

285.     The statements that management "used the criteria set forth in [the COSO 2013 Framework]," and that under those criteria Discover's "internal control over financial reporting was effective," were materially false or misleading when made because the COSO 2013 "criteria" by definition include internal controls designed to identify and monitor compliance

with applicable laws and regulations.  *See* ¶ 90 ("'Internal control is not solely about accounting and financial matters.  Compliance with laws and regulations is one of the three fundamental objectives of an organization's internal controls [under the COSO 2013 Framework].'") (quoting COSO, *Compliance Risk: Applying the COSO ERM Framework*, at 4).

286.    As the FDIC found, Discover "fail[ed] to establish and maintain a compliance management system [] providing for compliance with Consumer Protection Laws and Regulations."  ¶ 161.  Indeed, Discover lacked "written policies, procedures, standards, and/or processes [ ], training, monitoring and testing, audit, and consumer complaint response programs designed to prevent, or identify and self-correct violations of all applicable consumer protection laws and/or regulations."  *Id.*  Additionally, Defendants **admitted** in the wake of disclosing Discover's 15-year practice of misclassifying credit card interchange fees that the misclassification "underscored deficiencies in our corporate governance and risk management." ¶ 226.  The 2020 CFPB Consent Order, in conjunction with Discover's disclosure in July 2023 that it was engaged in a "broader focus on our compliance management system" and would once again suspend its share buyback program, also demonstrated the extent of Discover's internal control deficiencies (as well as its failures in risk management, compliance, and corporate governance).  ¶¶ 195-217, 352.

287.    Additionally, the well-placed former Discover employees referenced in this Complaint recounted numerous issues plaguing the Company's compliance, risk management, corporate governance, and internal control functions.  *First*, there was a toxic compliance culture at Discover.  *Second*, the Company's ERM framework—highlighted by its "three lines of defense"—was plagued by internal tensions and organizational dysfunction.  *Third*, the compliance department was woefully understaffed, lacked the expertise necessary to

appropriately perform its functions, and suffered from significant turnover. *Fourth*, Discover

had hundreds of unresolved regulatory violations, which caused senior management to "freak

out." Further, Hochschild and other senior executives received regular reports highlighting the

number of open regulatory issues. And *fifth*, senior executives were further apprised of gaps in

internal controls through their implementation of "Project Operational Excellence," but failed to

take action to remedy those deficiencies. ¶¶ 51-57, 101-59, 212-17, 224-25. These

contemporaneous facts further undermined Defendants' representations regarding the assessment

and effectiveness of Discover's internal controls throughout the Class Period.

### D. Defendants Filed Materially False or Misleading SOX Certifications.

288.    As noted in ¶¶ 98-99 above, each of the Company's Form 10-Ks and Form 10-Qs

filed during the Class Period contained SOX certifications signed by Hochschild and either Graf

or Greene.[154]

289.    In each of those Form 10-Ks and Form 10-Qs, the Officer Defendants certified

that based on their knowledge:

- "***this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report***"; and

- "***the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of [Discover] as of, and for, the periods presented in this report***."

---

[154] Hochschild and Graf signed the SOX certifications for Discover's 2018 Form 10-K (filed on February 20, 2019) and Q1 and Q2 2019 Forms 10-Q (filed on May 2 and August 1, 2019, respectively). Hochschild and Greene signed the SOX certifications for all of Discover's Form 10-Qs and 10-Ks throughout the remainder of the Class Period.

290.    The Officer Defendants further certified that they were "responsible for establishing and maintaining disclosure controls and procedures" and "internal control over financial reporting," as defined in applicable SEC rules, and that they:

- "*Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to [Discover], including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared*";

- "*Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*";

- "*Evaluated the effectiveness of [Discover]'s disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation*"; and

- "*Disclosed in this report any change in [Discover]'s internal control over financial reporting that occurred during [Discover]'s most recent fiscal quarter (the [Company]'s fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the [Company]'s internal control over financial reporting*."

291.    Additionally, the Officer Defendants represented that they "disclosed, based on [their] most recent evaluation of [ICFR], to [Discover]'s auditors and the audit committee of [Discover]'s board of directors (or persons performing the equivalent functions)":

- "*All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect [Discover]'s ability to record, process, summarize and report financial information*"; and

- "*Any fraud, whether or not material, that involves management or other employees who have a significant role in [Discover]'s internal control over financial reporting.*"

292.     The Officer Defendants' representations in ¶¶ 289-91 above were materially false or misleading when made, in light of the myriad contemporaneous facts (detailed throughout this Complaint) demonstrating Defendants' systemic and pervasive failures to implement and maintain appropriate risk management, compliance, corporate governance, and internal control systems and practices.  For example, as the FDIC found, Discover "fail[ed] to establish and maintain a compliance management system [] providing for compliance with Consumer Protection Laws and Regulations."  ¶ 161.  Indeed, Discover lacked "written policies, procedures, standards, and/or processes [ ], training, monitoring and testing, audit, and consumer complaint response programs designed to prevent, or identify and self-correct violations of all applicable consumer protection laws and/or regulations."  *Id.*  Additionally, Defendants ***admitted*** in the wake of disclosing Discover's 15-year practice of misclassifying credit card interchange fees that the misclassification "underscored deficiencies in our corporate governance and risk management."  ¶ 226.  The 2020 CFPB Consent Order, which led to an internal investigation and suspension of the Company's share buyback program in 2022, as well as a "broader focus on our compliance management system" and a second share buyback suspension in 2023, also demonstrated the scope of Discover's risk management, compliance, corporate governance, and internal control failures.  ¶¶ 195-217, 343-45, 352.

293.     Additionally, the well-placed former Discover employees referenced in this Complaint recounted numerous issues plaguing the Company's compliance, risk management, and internal control functions.  *First*, there was a toxic compliance culture at Discover.  *Second*, the Company's ERM framework—highlighted by its "three lines of defense"—was plagued by internal tensions and organizational dysfunction.  *Third*, the compliance department was woefully understaffed, lacked the expertise necessary to appropriately perform its functions, and

suffered from significant turnover. *Fourth*, Discover had hundreds of unresolved regulatory violations, which caused senior management to "freak out." Further, Hochschild and other senior executives received regular reports highlighting the number of open regulatory issues. And *fifth*, senior executives were further apprised of gaps in internal controls through their implementation of "Project Operational Excellence," but failed to take action to remedy those deficiencies. ¶¶ 51-57, 101-59, 212-17, 224-25. These contemporaneous facts further undermine the Officer Defendants' representations in SOX certifications throughout the Class Period.

### E. The Systemic and Pervasive Risk Management, Compliance, and Internal Control Failures at Discover Likewise Rendered Its Corporate Governance Documents Materially False and Misleading.

294. Throughout the Class Period, Discover publicly disseminated its Code of Conduct (including on its website), and regularly referenced it in SEC filings and other Company documents. The Code of Conduct stated, among other things:

- "***The Company complies with both the letter and the spirit of fair and responsible banking laws***" (Oct, 23, 2019 version);[155] and

- "***[T]he Company complies with federal and state laws that prohibit unfair, deceptive, or abusive acts or practices***" (2024 version).

295. Additionally, on May 10, 2023, Discover issued a press release announcing the Company's 2022 Environmental, Social and Governance Report ("2022 ESGR"), which was signed by Hochschild. Addressing corporate governance and risk management, the 2022 ESGR stated:

- ***[H]aving strong governance and risk management is critical. We adhere to a rigorous Code of Conduct, have protocols in place to meet regulatory requirements,*** prioritize cybersecurity and data privacy to

---

[155] The version as of December 8, 2020 similarly stated: "***We comply with both the letter and the spirit of fair and responsible banking laws.***"

protect consumers from online attacks, and are committed to transparency, accountability, and ethical behavior in all we do.

- ***Our enterprise-wide risk management framework . . . enables the consistent execution of risk management principles through a comprehensive set of programs.*** These programs are defined in formal policies and procedures and support our businesses in identifying, measuring, managing, monitoring, and reporting their risks. Independent oversight, including adherence to policy requirements, is provided by the second and third lines of defense.

296. The statements that (1) "having a strong governance and risk management is critical," (2) "We adhere to a rigorous Code of Conduct" and "have protocols to meet regulatory requirements," (3) "Our enterprise risk management framework . . . enables the consistent execution of risk management principles through a comprehensive set of programs," (4) "The Company complies with both the letter and the spirit of fair and responsible banking laws," and (5) "the Company complies with federal and state laws that prohibit unfair, deceptive, or abusive acts or practices" all were materially false or misleading when made because they concealed from investors that Discover had not implemented and maintained a properly functioning, robust, and compliant risk management and corporate governance framework, and that the Company had failed in significant ways to comply with banking and consumer protection laws.

297. Myriad contemporaneous facts detailed throughout this Complaint demonstrate Defendants' systemic and pervasive failures to implement and maintain appropriate risk management, compliance, corporate governance, and internal control systems and practices. For example, as the FDIC found, Discover "fail[ed] to establish and maintain a compliance management system [] providing for compliance with Consumer Protection Laws and Regulations." ¶ 161. Indeed, Discover lacked "written policies, procedures, standards, and/or processes [ ], training, monitoring and testing, audit, and consumer complaint response programs designed to prevent, or identify and self-correct violations of all applicable consumer protection

101

laws and/or regulations." *Id.* Additionally, Defendants **admitted** that Discover's 15-year practice of misclassifying credit card interchange fees "underscored deficiencies in our corporate governance and risk management." ¶ 226. The 2020 CFPB Consent Order, which led to an internal investigation and suspension of the Company's share buyback program in 2022, as well as a "broader focus on our compliance management system" and a second share buyback suspension in 2023, also demonstrated the scope of Discover's risk management, compliance, corporate governance, and internal control failures. ¶¶ 195-217, 343-45, 352.

298.     Additionally, the well-placed former Discover employees referenced in this Complaint recounted numerous issues plaguing the Company's compliance, risk management, and internal control functions. *First*, there was a toxic compliance culture at Discover. *Second*, the Company's ERM framework—highlighted by its "three lines of defense"—was plagued by internal tensions and organizational dysfunction. *Third*, the compliance department was woefully understaffed, lacked the expertise necessary to appropriately perform its functions, and suffered from significant turnover. *Fourth*, Discover had hundreds of unresolved regulatory violations, which caused senior management to "freak out." Further, Hochschild and other senior executives received regular reports highlighting the number of open regulatory issues. And *fifth*, senior executives were further apprised of gaps in internal controls through their implementation of "Project Operational Excellence," but failed to take action to remedy those deficiencies. ¶¶ 51-57, 101-59, 212-17, 224-25. These contemporaneous facts further undermined Defendants' representations in Discover's Code of Conduct and its 2022 ESGR.

### F.     Defendants Violated Item 303 of SEC Regulation S-K.

299.     In light of the misconduct detailed above, Defendants also violated Item 303 of SEC Regulation S-K (17 C.F.R. § 229.303), which addresses "Management's discussion and analysis of financial condition and results of operations." Item 303 directs that "[t]he objective

of the discussion and analysis is to provide material information relevant to an assessment of the financial condition and results of operations of the registrant including an evaluation of the amounts and certainty of cash flows from operations and from outside sources." The discussion and analysis "must focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition," including "descriptions and amounts of matters that have had a material impact on reported operations, as well as matters that are reasonably likely based on management's assessment to have a material impact on future operations." Each of Discover's Form 10-Qs and Form 10-Ks issued during the Class Period included a section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" (the "MD&As").

300. None of the MD&As disclosed the information detailed in this Complaint regarding the systemic, pervasive, and long-running deficiencies and failures relating to Discover's risk management, compliance, corporate governance, and internal controls. Those issues "had a material impact on [Discover]'s reported operations" and were "reasonably likely . . . to have a material impact on future operations." Among other things, these systemic deficiencies and failures were reasonably likely to, and did, result in regulatory actions that would have a material effect on the Company's future operating results. They also exposed the Company to significant, negative reputational risk.

301. This is particularly so with respect to the issues identified in the FDIC Consent Order, in which the agency found that Discover "engaged in (i) unsafe or unsound banking practices" by, among other things, "failing to establish and maintain" a proper compliance management system; and "(ii) violations of, and consumer harm related to," consumer protection

103

statutes and regulations. So, too, with respect to Discover's long-running card misclassification issue—which, as Hochschild admitted, "underscored deficiencies in our corporate governance and risk management." These problems materially impacted Discover's reported operations and were reasonably likely to materially impact the Company's future operations. Among other things, Discover has been forced to increase its spending on risk management, compliance, and corporate governance by hundreds of millions of dollars to address the issues they concealed from investors for years. *See* ¶¶ 15, 368. Item 303 required Defendants to timely and accurately disclose these issues during the Class Period, but they failed to do so.

## IX. DISCOVER AND THE OFFICER DEFENDANTS MADE THEIR MISREPRESENTATIONS KNOWINGLY OR WITH RECKLESS DISREGARD FOR THE TRUTH

302. When Discover and the Officer Defendants made the public statements detailed in Section VIII above, they knew, or with extreme recklessness disregarded, that those statements were materially false and misleading, including by omitting material facts. These Defendants knew their statements would be issued and disseminated to the investing public, knew analysts and investors were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of those statements. Indeed, the ongoing fraud as detailed in this Complaint could not have been perpetrated without the knowledge or recklessness of personnel at the highest level of the Company, including the Officer Defendants.

303. The facts detailed in ¶¶ 101-301 above, in conjunction with the additional indicia of scienter discussed in ¶¶ 304-17 below, collectively demonstrate that throughout the Class Period, Defendants knew or, at a minimum, recklessly disregarded that their statements were materially false and misleading when made.

104

304.     _First_, the CFPB Consent Orders and the FDIC Consent Order detailed systemic and pervasive failures in Discover's risk management, compliance, corporate governance, and internal controls that persisted for years.  Further, as the executive responsible for maintaining a corporate culture that fostered compliance (i.e., a "tone at the top"), Hochschild either knew of these widespread deficiencies, or if he did not, acted recklessly by exhibiting deliberate indifference to them.

305.     _Second_, the inference of Hochschild's scienter, as well as that of Greene and Graf, is particularly compelling in light of the directives in both the 2015 and 2020 CFPB Orders requiring "timely reporting by management to the Board" and "timely and appropriate corrective action" to "ensure adherence" to the Orders.  Further, the fact that Discover repeatedly violated the 2015 CFPB Consent Order—which in part led to the 2020 CFPB Consent Order—indicates senior management did not adhere to those directives.  Given the Officer Defendants' indisputable awareness of the CFPB's mandates, it is evident that their failure to comply with them was deliberate.

306.     _Third_, the fact that Discover admits to having misclassified credit card interchange rates for over **15 years** indicates senior management knew and perpetuated that practice, or, at the very minimum, recklessly disregarded it.  It is highly unlikely such a systematic and long-running practice escaped management's attention for the better part of two decades.

307.     _Fourth_, the Officer Defendants' repeated emphasis on Discover's purported commitment to—and investment in—compliance and risk management strongly suggests they were intimately familiar with that issue.  This is particularly so in light of Defendants' admission that the Company had in fact "underinvested" in those areas during the Class Period.  That is, the

Officer Defendants' detailed and continual pronouncements on compliance and risk management provide strong evidence that they were receiving specific information about the Company's efforts (or lack thereof) on these matters.  Alternatively, if the Officer Defendants did not know about these widespread, long-running, and significant problems—which went to the heart of topics they repeatedly spoke about—they were at least reckless in disregarding them.

308.    *Fifth*, the centrality of risk management, compliance, and corporate governance to Discover's business itself supports an inference that the Officer Defendants knew about significant problems in those areas.  As Discover operates in a heavily regulated industry, risk management, compliance, corporate governance, and internal controls are among the Company's core operations.  Indeed, as noted by Kwabena Poku, Discover's Vice President, Enterprise, Operational, and Model Risk Management, "***Risk management is embedded in everything we do.***"  Further, Hochschild stated in the Company's 2022 ESG Report that "having strong governance and risk management *is critical*."  The Officer Defendants also knew these core operations significantly impacted Discover's required financial reporting and were important to analysts and investors, as evidenced by numerous references in Defendants' public statements during the Class Period.

309.    *Sixth*, the detailed accounts by former Discover employees also strongly indicate the Officer Defendants knew, or at least recklessly disregarded, the significant risk management, compliance, corporate governance, and internal control problems at the Company.  The FEs, each of whom worked at Discover in compliance or related departments for some or all of the Class Period, recounted that (1) there was a toxic compliance culture at Discover; (2) the Company's ERM framework—highlighted by its "three lines of defense"—was plagued by internal tensions and organizational dysfunction; (3) the compliance department was woefully

106

understaffed, lacked the expertise necessary to appropriately perform its functions, and suffered from significant turnover; (4) the Company had hundreds of unresolved regulatory violations, of which senior management was aware; and (5) senior executives were further apprised of gaps in internal controls through their implementation of "Project Operational Excellence," but failed to take action to remedy those deficiencies. ¶¶ 51-57, 101-59, 212-17, 224-25. The FEs' accounts, which are consistent with each other and with the regulators' findings, are probative of fraud, and do not suggest mere mismanagement or negligence.

310. _Seventh_, the Officer Defendants' SOX certifications indicate they knew or recklessly disregarded the issues detailed in this Complaint. SOX's certification requirements were designed to prevent senior executives from adopting a "head in the sand" defense to actions for securities fraud committed on their watch. SOX required the Officer Defendants to assess Discover's internal controls and perform an inquiry sufficient to enable them to attest that the Company's financial statements were fairly presented—which, as the SEC has directed, includes making any disclosure "necessary to provide investors with a materially accurate and complete picture of an issuer's financial condition, results of operations and cash flows."[156] It is therefore evident, particularly in light of all the other facts suggesting the Officer Defendants' knowledge, that in performing their statutory duties they became aware (to the extent they did not already know) of the major gaps and deficiencies impacting Discover's risk management, compliance, corporate governance, and internal controls. In other words, if the Officer Defendants had actually evaluated the effectiveness of the Company's controls, as they claimed in their SOX certifications, then Discover personnel could not have engaged in the blatant and pervasive misconduct that occurred throughout the Class Period.

---

[156] SEC Release No. 8124, 67 Fed. Reg. 57276, at 57279.

107

311.    Indeed, the magnitude, scope, and duration of the Company's internal control failures described in this Complaint indicate scienter.  It is highly improbable that Discover's systemic and longstanding internal control deficiencies for **well over a decade** occurred without the Officer Defendants' knowledge.  The contrary notion—that certain lower-level or rogue employees acted without the Officer Defendants' knowledge for so long on such a wide range of control failures—is not credible.

312.    *Eighth*, the timing and circumstances surrounding the unexpected departure of the Company's CEO, Hochschild, in August 2023 further support an inference of scienter.  Hochschild's resignation took place, moreover, soon after his July 20, 2023 admission, when asked by an analyst about "what you're investing in compliance today . . . versus historically," that "***I do believe we underinvested and that's something I take accountability for***."  During the Company's August 17, 2023 Business Update Call with analysts, Interim CEO John Owen conceded the connection between Hochschild's departure and Discover's pervasive risk, compliance, governance, and control failures, stating, "I think given the regulatory environment and the consent orders we're facing, it's time to make some changes in the management."

313.    Analysts and the financial press also understood that Hochschild's sudden departure was both involuntary and directly related to Discover's compliance issues and related problems.  For example, during the August 17, 2023 Business Update Call, an analyst with Wolfe Research stated to Owen, "***[Hochschild's] departure was certainly seen as abrupt***," and asked, "Can you give any color on perhaps the extent to which his departure might have been influenced by a lack of tolerance among regulators in this environment following the March [2023] bank failures and perhaps this is just a reflection of greater urgency that regulators want

108

to impress on the banks that they supervise?" to which Owen responded, "it's really directed by the Board from the Board, not from the regulators." Additionally, on August 21, 2023, *Crain's Business Chicago* wrote that during Discover's "business update," Owen "made clear Hochschild was leaving because of troubles with compliance." And on August 24, 2023, S&P Global Ratings stated it "believe[d] the recently announced CEO transition at [Discover] underscores compliance issues at the company."

314.    *Ninth,* that the Officer Defendants focused attention on risk management matters during their calls with analysts also indicates they acted with scienter.

315.    *Tenth*, the Officer Defendants, in particular Hochschild, had the motive and opportunity to commit fraud. As senior executives of Discover, they had the opportunity to subvert the Company's interests in favor of their own. And, as further detailed in ¶¶ 316-17 and ¶¶ 387-95 below, they did so.

316.    As reported in Discover's 2020 Definitive Proxy Statement, "a significant portion" of Hochschild's and other executives' annual compensation was "directly" tied to Discover's EPS and stock price. Specifically, if the Company failed to meet cumulative three-year EPS targets, those executives would receive none of their awards of performance stock units ("PSUs"), which represented 50% or more of Hochschild's total compensation during the Class Period. Hochschild thus had a strong financial motive to do whatever he could to increase the Company's EPS and stock price. He and other Discover executives accordingly were motivated to underinvest in compliance, which kept the Company's expenses artificially low and caused its EPS to be higher than it otherwise would have been.

317.    Further, because stock buybacks increase a company's EPS by reducing the number of publicly traded shares, Hochschild was motivated to initiate and maintain Discover's

stock repurchase program while maintaining expenses at artificially depressed levels.  In doing so, he contributed to the Company's failure to implement and maintain appropriate risk management, compliance, and corporate governance systems and practices, as well as effective internal controls.

## X.     DEFENDANTS' MISREPRESENTATIONS WERE MATERIAL

318.    Defendants' numerous misrepresentations during the Class Period were material, and the information Defendants concealed would have been important to investors in determining whether to invest in Discover stock.

319.    *First*, Defendants highlighted the importance of issues relating to risk management, compliance, and corporate governance by repeatedly addressing—and touting—the processes and practices Discover purportedly had implemented and maintained in those areas. Beyond discussing these issues in filings and conferences throughout the Class Period, the Officer Defendants emphasized them to analysts during regularly scheduled calls regarding the Company's business practices, financial condition, and prospects.  Indeed, in addition to Defendants' numerous statements detailed above, Dan Capozzi (EVP & President, US Cards) addressed an analyst's inquiry during the KBW Fintech Payments Conference on March 1, 2023, regarding any "regulatory" concerns for the Company:

> **[Analyst:]**  Okay.  And any other . . . regulatory stuff that you're concerned about?
>
> **[Capozzi:]**  Just the continued heightened focus of the regulatory environment on financial services is something I spent a lot of time on, but ***nothing***, and I think it is fair.

Analysts' strong interest in risk management and compliance issues at Discover, and Discover executives' continual assurances to analysts regarding those matters, evidence the importance

market participants placed on those issues and demonstrates the materiality of Defendants' representations.

320.    *Second*, the context in which Defendants made those representations indicates their materiality, including that Defendants intended (or at least expected) analysts and investors would rely on their statements.  Defendants did not make statements regarding the importance of compliance to the Company or their commitment to compliance, for example, in a vacuum. Rather, they did so in connection with assuring analysts and investors about Discover's financial stability and prospects—whether in the Company's SEC filings, on earnings calls, or through other means—which depended substantially on the Company's ability to appropriately manage risk and on its compliance with applicable laws and regulations.  The context surrounding Defendants' representations rendered it reasonable for investors to rely on those statements. Further, in repeatedly highlighting, in particular, Discover's risk management and compliance, Defendants signaled the extent to which ***they*** regarded those issues as important to the Company and investors' evaluation of it.

321.    *Third*, risk management, compliance, and corporate governance were core to Discover's operations, rendering Defendants' representations regarding those and related matters material to investors.  While those functions arguably are important for any number of businesses, ***they are essential to Discover's very ability to conduct business***.  A financial institution such as Discover simply cannot operate effectively without appropriately managing risk as well as implementing and maintaining sufficient policies and practices to comply with the laws and regulations that govern the banking and student loan industries.

322.    Risk management, compliance, and corporate governance were even more significant to investors during the Class Period in light of the CFPB and FDIC Consent Orders.

111

The agencies' enforcement actions, including their findings of serious failings at the Company, rendered it all the more important for Defendants to implement and maintain sufficient systems, practices, and controls for managing risk, ensuring compliance with legal (including contractual) and regulatory requirements, and promoting proper corporate governance. Amid the revelations of the regulators' findings and ensuing directives, Defendants assured analysts and investors that Discover **had** implemented and **was** maintaining such systems, practices, and controls, including investing appropriate resources to "strengthen" the Company's capabilities.

323. *Fourth*, internal controls are critical to a public company and its investors because they are supposed to provide reasonable assurance that the company's reported financial results are materially accurate and that any material fraud is detected. Among other things, SOX emphasizes the importance of internal controls by placing specific obligations on a company's senior executives to meaningfully assess the condition of its controls and identify any substantial deficiencies. SOX certifications thus stand as important indicators to investors that senior management has complied with those responsibilities and is presenting "a materially accurate and complete picture of an issuer's financial condition, results of operations and cash flows."[157] By concealing the facts detailed in this Complaint, the Officer Defendants failed to meet those obligations, to investors' detriment.

324. *Fifth*, Defendants' knowledge or reckless disregard of facts undermining their representations indicates those statements, as well as the information Defendants withheld from investors, were material. That Defendants continually chose to mislead the market regarding Discover's ability to manage its risk and comply with legal and regulatory requirements strongly

---

[157] SEC Release No. 8124, 67 Fed. Reg. 57276, at 57279.

indicates Defendants understood that investors regarded those issues as critical and would rely on statements addressing them.

325.    *Sixth*, the market's strong, negative reaction when the previously concealed facts described in this Complaint were publicly revealed demonstrates the importance of those facts to investors, as well as the extent to which investors had relied on Defendants' misrepresentations.

## XI.    DEFENDANTS' PURPORTED "CAUTIONARY" LANGUAGE CANNOT IMMUNIZE THEM FROM LIABILITY FOR THEIR MISREPRESENTATIONS

326.    None of the purported "risk" disclosures or other "cautionary" language included in Defendants' filings or accompanying certain of their public statements limit or preclude their liability for the false and misleading statements identified in this Complaint.

327.    For example, the PSLRA's statutory "safe harbor" applicable to "forward-looking statements" under certain circumstances does not apply to any of Defendants' misrepresentations.  Many of these statements were not identified as "forward-looking statements" when made.  And to the extent any of the representations identified in this Complaint constitute "forward-looking statements" as contemplated by the PSLRA, they were not accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."[158]  Such cautions were glaringly absent from Defendants' Class Period statements.

328.    Further, there can be no safe harbor protection where the supposed cautionary language remained fixed even as the relevant risks changed.  Discover's purported cautionary language remained substantially the same throughout the Class Period, despite changing— indeed, worsening—conditions.  The consistency of Defendants' language over time despite the

---

[158] 15 U.S.C. § 78u-5(c)(1)(A)(i).

existence of new or evolving information belies any contention that the cautionary language was tailored to a specific future projection, especially where, as here, that risk had already materialized as of when the "cautions" were issued.

329. Discover's 2019 Form 10-K filed with the SEC on February 20, 2020, for example, contained the following boilerplate "cautionary" language:

> Our risk management framework seeks to identify and mitigate risk and appropriately balance risk and return. We have established processes and procedures intended to identify, measure, manage, monitor and report the types of risk to which we are subject, including credit risk, market risk, liquidity risk, operational risk, compliance and legal risk, and strategic risk. We seek to monitor and control our risk exposure through a framework of policies, procedures, limits and reporting requirements.

330. This supposed cautionary statement failed to warn the market of the systemic and pervasive failures with respect to risk management, compliance, corporate governance, and internal controls of which the Officer Defendants were aware or recklessly disregarded. Defendants simply repeated this statement (or a substantially similar version) in similar filings for the duration of the Class Period.[159] Cautions cannot be "meaningful" if they merely repeat

---

[159] *See* 2020 Form 10-K ("Our risk management framework seeks to identify and mitigate risk and appropriately balance risk and return. We have established processes and procedures intended to identify, measure, manage, monitor and report the types of risk to which we are subject, including credit risk, market risk, liquidity risk, operational risk, compliance and legal risk and strategic risk. We seek to monitor and control our risk exposure through a framework of policies, procedures, limits and reporting requirements."); 2021 Form 10-K ("Our risk management framework seeks to identify and mitigate risk and appropriately balance risk and return. We have established processes and procedures intended to identify, measure, manage, monitor and report the types of risk to which we are subject, including credit risk, market risk, liquidity risk, operational risk, compliance and legal risk and strategic risk. We seek to monitor and control our risk exposure through a framework of policies, procedures, limits and reporting requirements."); 2022 Form 10-K ("Our risk management framework seeks to identify and mitigate risk and appropriately balance risk and return. We have established processes and procedures intended to identify, measure, manage, monitor and report the types of risk to which we are subject, including credit risk, market risk, liquidity risk, operational risk, compliance and

themselves, reporting period after reporting period, without taking into account material changes to the business.

331.    Alternatively, to the extent the statutory safe harbor applies to any statement identified in this Complaint, Defendants are nonetheless liable because—as detailed in ¶¶ 101-317 above—at the time each such statement was made (1) the person responsible for the statement knew it was false, or (2) the statement was authorized or approved by an executive officer of the Company who knew it was false.

332.    The foregoing considerations likewise apply to Defendants' other purported "risk" disclosures.  For example, Discover's 2022 Form 10-K states:

> Regulatory and legislative developments, findings and actions have had and could continue to have a negative impact on our business strategies or require us to: limit, exit or modify our business practices and product offerings; restructure our products in unanticipated ways; invest more management time and resources in compliance efforts; limit the fees we charge for services; impact the value of our assets; or limit our ability to pursue certain innovations and business opportunities and obtain related required regulatory approvals.

333.    Referencing that unspecified regulatory "developments," findings, and actions had impacted unspecified "business strategies" is very different from disclosing Discover's systemic and pervasive failures in risk management, compliance, corporate governance, and internal controls detailed in this Complaint.  Further, suggesting those developments, findings, and actions "***could*** . . . require [the Company] to," among other things, "invest more management time and resources in compliance efforts" did not inform investors that the

_____

legal risk and strategic risk.  We seek to monitor and control our risk exposure through a framework of policies, procedures, limits and reporting requirements.").

115

Company **already had**—as Hochschild and Greene later admitted—"**underinvested**" in those areas.

334.     Indeed, in failing to apprise investors of material, existing facts of which Defendants were aware, the above statements and similar purported "cautions" were themselves false or misleading.

## XII. PLAINTIFFS AND OTHER CLASS MEMBERS ARE ENTITLED TO A PRESUMPTION OF RELIANCE ON DEFENDANTS' FALSE AND MISLEADING STATEMENTS

335.     Plaintiffs and other Class members are entitled to a presumption of reliance established by the fraud-on-the-market doctrine as endorsed in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the presumption of reliance for omissions as endorsed in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

336.     A presumption of reliance under the fraud-on-the-market doctrine is appropriate because, among other things:

         (a)     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

         (b)     The misrepresentations and omissions were material;

         (c)     The Company's stock traded in an efficient market; and

         (d)     Plaintiffs and other Class members purchased common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowing of the misrepresented or omitted facts.

337.     At all relevant times, the market for Discover common stock was efficient for the following reasons, among others:

(a) The stock was actively traded on the NYSE, an internationally efficient market, throughout the Class Period. Shares were highly liquid during the Class Period, with an average daily volume of approximately 2.3 million shares traded;

(b) The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and others;

(c) Discover stock was covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms, which were publicly available; and

(d) The market reacted promptly to public information disseminated by the Company.

338. As a result of the foregoing facts, the market for Discover common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the stock price. Under these circumstances, all purchasers of Discover common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices, and a presumption of reliance applies.

339. In addition to the *Basic* presumption, a classwide presumption of reliance is appropriate under the Supreme Court's holding in *Affiliated Ute* to the extent Plaintiffs' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Discover's business operations and financial performance—information Defendants were obligated to disclose—positive proof of

reliance is not a prerequisite to recovery. Rather, all that is necessary to invoke the *Affiliated Ute* presumption of reliance is that the withheld facts were material in that a reasonable investor would have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions as set forth above, that requirement is satisfied.

## XIII. DEFENDANTS' MISREPRESENTATIONS CAUSED INVESTORS' LOSSES

340. During the Class Period, Defendants' material misstatements and omissions detailed in Section VIII above caused the price of Discover common stock to be artificially inflated, whether by introducing new inflation into the stock or by maintaining preexisting inflation, with the stock price reaching as high as $135.69 per share on August 13, 2021. As a result of their purchases of Discover common stock during the Class Period, Plaintiffs and other Class members suffered economic loss under the federal securities laws when Defendants' prior misrepresentations, omissions, and fraudulent conduct were disclosed to the market, causing the share price to decline significantly as the artificial inflation in the stock price dissipated.

341. The previously misstated or concealed facts emerged through a series of disclosures (i.e., "corrective disclosures") starting in July 2022 and following in July 2023, August 2023, October 2023, and January 2024. Defendants' misstatements and omissions were the proximate cause of those stock declines and the losses suffered by Plaintiffs and other Class members.

342. The declines in the price of Discover common stock following the corrective disclosures resulted directly from Defendants' fraudulent misrepresentations being revealed to the market. The timing and magnitude of the price declines in Discover common stock compared to contemporaneous changes in equity market and peer company indices, as well as a review of the Company's disclosures and subsequent commentary by market professionals,

118

negate any inference that investors' losses resulted from changed market conditions,

macroeconomic or industry factors, or Company-specific facts unrelated to the fraud detailed in

this Complaint.

    A.    ***July 20, 2022*****:  Disclosure of Internal Investigation and Suspension of Discover's Share Repurchase Program**

    343.    On July 20, 2022, investors began to learn the relevant truth relating to

Defendants' false and misleading statements, as Discover disclosed an internal investigation into

its student loan servicing practices and related compliance matters and announced the Company

was suspending its share repurchase program.  Specifically, the Company stated in a press

release:

> During the second quarter of 2022, the company repurchased
> approximately 5.8 million shares of common stock for $601
> million.  Shares of common stock outstanding declined by 2.0%
> from the prior quarter.  The company is suspending until further
> notice its existing share repurchase program because of an internal
> investigation relating to its student loan servicing practices and
> related compliance matters.  The investigation is ongoing and is
> being conducted by a board-appointed independent special
> committee.

    344.    Further, during the Company's Q2 2022 earnings call that day, it became clear

that the matters addressed in the CFPB Consent Orders were at least in part related to the

"student loan servicing practices and related compliance matters" encompassed by the internal

investigation:

> **[Analyst**:]  [I]n the public, we know that there's also a consent order related to this with
> the CFPB, it looks like in 2020, and I believe it's even tied to a consent order for 2015.
> Did that . . . influence the [share buyback] suspension?  And was there something new
> that develop[ed] that caused the internal investigation?
>
> **[Hochschild**:]  I guess the only thing I can say is both the consent order and the
> investigation are in the area of student loan servicing.  But beyond that, there really isn't
> anything else I can add at this time.

119

345.     While the CFPB Consent Orders had been publicly disclosed in 2015 and 2020, respectively, Defendants' July 2022 revelation of the internal investigation and suspension of the share buyback program alerted investors (though not entirely) to the scope of the compliance issues at Discover and their impact on the Company's financial condition and prospects.

346.     Indeed, analysts emphasized the significance of the compliance issues.  On July 20, 2022, Citi published a report ("2Q22 First Look; Very Strong Results Overshadowed by Announced Investigation and Suspended Buyback") noting "[t]he suspension of share repurchases could mean a significant expected legal/regulatory reserve" and expressing "disappoint[ment]" about "this newly announced investigation."

347.     Also that day, Wells Fargo published a report ("DFS: Q2 Early Look—Good Results, but Halts Buy-Back on Student Loan Issue") stating "[t]he big news was that Discover halted its share buy-back given an ongoing internal investigation related to its student loan servicing practices."

348.     The next day, Stephens published a report ("The Debate On the Student Lending Investigation; Fundamentals Otherwise Strong") stating:

> The investigation into Discover's student loan servicing, and related suspension of share repurchases, dominate our investor discussions and is driving DFS shares down 9% as of this writing. . . . The bear case is that the share repurchase suspension must be due to significant issues that will impair the student lending business.

349.     Bank of America similarly noted in a July 22, 2022 report ("Uncertainty is a potent overhang; but patience could be rewarded; Reiterate Buy") that Discover shares "declined 9% yesterday, following news that it had suspended share buybacks amidst an internal Board investigation into DFS' student loan servicing practices and associated compliance matters."

350.     Additionally, Evercore ISI noted that on the earnings call, "Mgmt confirmed that the investigation and DFS' existing consent order with the CFPB are both generally tied to the same area—i.e[.] student loan servicing practices."

351.     In response to the Company's disclosures, the price of Discover stock fell $9.80 per share, or 8.9%, from a closing price of $109.80 on July 20, 2022 to a closing price of $100.00 on July 21, 2022, on extraordinary trading volume of more than 6.5 million shares (approximately 3.6 times the average daily volume during the prior year).

**B.     *July 19-20, 2023*: Disclosure of Card Misclassification Issue, Proposed FDIC Consent Order, and Another Share Buyback Suspension**

352.     Almost exactly a year after the initial corrective disclosure, on July 19-20, 2023 Discover made several disclosures relevant to the Company's risk management, compliance, corporate governance, and internal controls:

- "Beginning around mid-2007, Discover incorrectly classified certain credit card accounts into our highest merchant and merchant acquirer pricing tier," and "[a]s of June 30, 2023, the Company's consolidated financial statements reflect a liability of $365 million within accrued expenses and other liabilities to provide refunds to merchants and merchant acquirers as a result of the card product misclassification";

- "An investigation into this issue by an external law firm working at the direction of the Audit Committee of the Board of Directors is ongoing";

- "Discover is in discussions with its regulators regarding this matter and corporate governance and risk management";

- The Company "received a proposed consent order from the FDIC in connection with consumer compliance," which "does not include the card product classification matter";

- "Additional supervisory actions could occur"; and

- "The Company has decided to pause share repurchases while the internal review of compliance, risk management and corporate governance is pending."

121

Relatedly, Hochschild noted during the Company's Q2 2023 earnings call on July 20, 2023 that there was "a link between" the 2020 CFPB Consent Order "and the broader focus on our compliance management system."

353.    Analysts emphasized the seriousness of the revelations.  On July 20, 2023, for example, Citi published a report ("2Q23 Review; Déjà Vu All Over Again") stating "[t]he second year in a row of regulatory issues followed by pausing share repurchases, higher expenses and internal investigations has us feeling as if we've gone down this road before."  The report further noted "the uncertainty about the regulatory fallout is the same," and "[t]he negative share reaction, down 15% midday, seems appropriate due to this uncertainty, the impact to EPS from lower buybacks and notably higher expenses to boost its compliance functions. . . .  The [net interest income] was a miss as well as the surprise regulatory announcements further exacerbating the negative impact."

354.    Also that day, Jefferies published a report ("2Q Recap: Qtr and Guide Mixed but Biz Intact; Issue Is Temporary and Dip is Opp") stating: "Buyback pause and internal issue was a surprise . . . .  Compliance & risk management top priorities.  Top of mind was the buyback pause due to the misclassification of certain credit card accounts into the highest merchant and merchant-acquiring pricing tiers."

355.    In response to the Company's disclosures, the price of Discover stock fell $19.40 per share, or 15.9%, from a closing price of $121.85 on July 19, 2023 to a closing price of $102.45 on July 20, 2023, on extraordinary trading volume of more than 11.2 million shares (approximately 5.5 times the average daily volume during the prior year).

C.     *August 14, 2023*:  Hochschild's Resignation, Which Market Participants Understood Related to Discover's Compliance and Related Issues

356.    On August 14, 2023, Discover announced that the board of directors and Hochschild "agreed that Hochschild will step down as Chief Executive Officer and President and as a member of the Board."  Immediately after thanking Hochschild for his "years of service," the release stated: "The Board is continuously focused on Discover reaching its full potential across the business, ***including our commitment to enhancing compliance, risk management and corporate governance***. We will continue to take actions to advance Discover's strategic priorities and generate high returns and capital."

357.    Analysts understood Hochschild's departure resulted from Discover's risk management, compliance, and corporate governance failures.  On August 14, 2023, for example, RBC Capital Markets published a report ("Roger Hochschild steps down as CEO and President effective immediately.  New CEO search underway") describing Hochschild's resignation as "a surprise given that the company had not previously signaled a CEO succession plan to the investor community" and noting "we expect investors to question if the recently disclosed merchant pricing issues or last year's student loan servicing issues were factors in the CEO change."  The report further observed that Discover "disclosed pending regulatory action by the FDIC surrounding compliance management and an eventual consent order," adding "[o]ur view is that investors will assume a more negative read from this change."

358.    Likewise, on August 15, 2023, Morgan Stanley published a report ("CEO Resignation: More Regulatory Actions Coming?") noting "CEO immediate resignation a surprise," and explaining:

> While we do not know what drove this resignation, given the regulatory reviews of DFS currently in motion, we would not be surprised if the Board is looking for a CEO with additional qualifications to address any potential regulatory/compliance

123

issues. Especially after the number of compliance issues that have emerged in recent years, particularly within student loan servicing as well as the recently announced card misclassification issue. . . . Discover board separately announced the addition of a new board member, J. Michael Shepherd, who has "deep experience" in compliance, risk management, and corporate governance.

359.    On August 15, 2023, Wolfe Research published a report ("DFS: Unexpected CEO Exit Likely a Result of Regulatory Shortfalls; Shares Likely Range-Bound NT") stating "Deficiencies in Corporate Governance & Controls Likely Behind Unexpected CEO Exit. The investment community regarded Hochschild as an exceptionally strong CEO operationally, and DFS's announcement yesterday evening that he would be stepping down came as a surprise to the market."

360.    On August 21, 2023, *Crain's Business Chicago* published an article[160] referencing Discover's "hastily scheduled" Business Update call, during which Interim CEO John Owen "made clear Hochschild was leaving because of the troubles with compliance." The article also highlighted that during the call, CFO John Greene "gave a sense of just how substantial Discover's underinvestment in compliance had been over the years," from which the article concluded "the regulatory cloud over Discover seems potentially darker than it appeared last month when Discover first disclosed that the [FDIC] was preparing a consent order in response to compliance shortcomings over several years." The article recounted that "[u]sing bracing language, Greene told analysts Discover is in the process of 'ensuring we don't put profits before compliance excellence,'" and that "[u]nspoken but implied . . . was that that was the outcome."

---

[160] Steve Daniels, "Discover's CEO was pushed out by board; The credit-card company held a hastily arranged call with analysts to discuss Roger Hochschild's departure and its regulatory problems," Crain's Chicago Business (Aug. 21, 2023), https://www.chicagobusiness.com/finance-banking/discovers-board-pushed-hochschild-out-ceo-not-regulators.

Finally, the article observed that Hochschild's "abrupt[]" "remov[al]" had "jolted investors and spurred a high-volume sell-off of Discover stock over two days."

361.     In response to the Company's disclosures, the price of Discover stock fell $9.69 per share, or 9.4%, from a closing price of $102.65 on August 14, 2023 to a closing price of $92.96 on August 15, 2023, on extraordinary trading volume of more than 8.6 million shares (approximately 4.2 times the average daily volume during the prior year).  The news caused the stock to continue to decline on August 16, 2023, to a closing price of $90.26 that day, on extraordinary volume of more than 7.5 million shares (approximately 3.6 times the average daily volume during the prior year).  The stock's two-day decline totaled $12.39, or nearly 12.1%.

### D.     *October 18, 2023*:  Ongoing Compliance Review and Continuation of Share Buyback Suspension

362.     On October 18, 2023, Discover disclosed that total operating expenses rose $83 million year over year, "primarily driven by," among other things, "expenses for professional fees . . . driven by continued investment in compliance and risk management initiatives."

363.     Following that announcement, Piper Sandler published a report on October 18, 2023 ("First Look: Sizable Reserve Build Overshadows Core PPNR Beat") noting Discover "stat[ed] a continued focus on risk management capabilities and engaging in discussions with merchants on the card product misclassification."

364.     On October 19, 2023, Citi published a report ("3Q23 Review: Good, Bad, and Uncertain") stating, "Discover reported a big miss primarily from an unexpected large loan loss reserve build to address higher expected losses in 2024 and weakening macro factors . . . .  still paused share buybacks, and worries about expenses to meet its FDIC consent order compliance issues."

365.     Likewise, on October 19, 2023, Evercore ISI published a report ("3Q Call Takes: Credit Takes Center Stage; CEO Search Ongoing & Buybacks Still on Hold") stating "[r]eserve build at forefront" and noting "[s]hare repurchases remain on pause."

366.     In response to the Company's disclosures, the price of Discover stock fell $7.26 per share, or 7.9%, from a closing price of $91.85 on October 18, 2023 to a closing price of $84.59 on October 19, 2023, on extraordinary trading volume of more than 7.1 million shares (approximately 3.2 times the average daily volume during the prior year).

### E.  *January 17-18, 2024*:  Increased Expenses Primarily Due to Investments in Compliance and Risk Management as Well as Customer Remediation

367.     In a press release issued after the market closed on January 17, 2024, Discover announced its financial results for Q4 2023.  Among other things, the Company reported a $267 million, or 18%, year-over-year increase in operating expenses, resulting largely from "investments in compliance and risk management" as well as an $80 million reserve "for customer remediation."  Analysts responded negatively.  For example, that day Barclays noted "4Q EPS of $1.54 missed our $2.54 and consensus of $2.52 due to higher provisions and compliance and risk management expenses," and TD Cowen observed "[t]he miss to our est[imate] was primarily driven by higher-than-expected opex ($0.59 impact), driven by investments in compliance and risk mgmt, reserve for customer remediation (we assume this is about the card tiering issue)."

368.     During an earnings call held on January 18, 2024, Interim CEO John Owen specified that Discover "increased [its] investments on risk and compliance in 2022 and 2023 up to about a $500 million level."  Owen further acknowledged that while the Company has "made improvements in risk and compliance," they "still have quite a bit of work to do."  He also previewed potential further regulatory action relating to the card misclassification issue, noting

the FDIC Consent Order "does not include the misclassification issue in its scope of work" and "[w]e're working closely with our regulators on that topic and really don't have anything further to add on that topic at this point in time."  Additionally, Greene addressed the $80 million remediation reserve, which "related to servicing issues," noting "the significant share of that was related to student loans" and the reserve "is not connected to the issues that we discussed in July [2023]."

369.    Following that announcement, Evercore ISI published a January 18, 2024 report ("4Q Call Takes: Credit Stress, Regulatory Issues & Loan Growth Outlook Take Center Stage") stating:

> ***New 4Q23 customer remediation charge un-related to recent merchant tiering issue****. . . .*  Separately, mgmt noted that the FDIC consumer compliance consent order disclosed in 3Q23 does not include the merchant tiering issue. . . . While the fact that the $500M [expectation for risk/compliance costs] is intact is encouraging, we do not rule out upside risk to this amount as new regulatory/customer issues surface and broaden.

370.    On January 19, 2024, J.P. Morgan published a report ("2023 Vintage Performance Will Be Key To 2024 Outcomes") stating:

> Compliance risk remains elevated . . . . The prior CFPB consent order did not include the card tiering issue, as management consistently points out, ***and today's disclosure of a $83M reserve for issues related to student loan servicing (and a little related to personal loans) goes to show that more issues may be discovered*** as DFS ramps up compliance efforts.

371.    The information discussed on January 17 and 18, 2024 revealed new facts regarding the scope of Discover's failures in risk management, compliance, corporate governance, and internal controls.

372.    In response to the Company's disclosures, the price of Discover stock fell $11.74 per share, or nearly 10.8%, from a closing price of $108.74 on January 17, 2024 to a closing

price of $97.00 on January 18, 2024 on extraordinary trading volume of more than 11.2 million

shares (approximately 4.9 times the average daily volume during the prior year).

373.    Through the above corrective disclosures, investors and other market participants

became aware of the true state of affairs at Discover: that, contrary to Defendants' repeated

representations touting Discover's risk management, compliance, and corporate governance

policies and practices, as well as attesting to the sufficiency of its internal controls, the Company

suffered from chronic and widespread failures in all of those critical areas.  As a result of these

disclosures, the artificial inflation of Discover stock dissipated, causing damages to Plaintiffs and

other Class members who had purchased shares at artificially inflated prices.

## XIV.   CLAIMS FOR RELIEF

### COUNT I

### Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b)
### Against Discover and the Officer Defendants

374.    Plaintiffs incorporate the allegations in ¶¶ 1-373 above as if fully set forth in this

paragraph.

375.    Plaintiffs assert this Count under Section 10(b) of the Exchange Act and SEC

Rule 10b-5(b) against Discover and the Officer Defendants (i.e., Hochschild, Greene, and Graf).

376.    Throughout the Class Period, these Defendants, individually and in concert,

directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the

mails or the facilities of national securities exchanges, made materially untrue statements of

material fact or omitted to state material facts necessary to make their statements not misleading,

and carried out a plan, scheme, and course of conduct, in violation of Section 10(b) of the

Exchange Act and SEC Rule 10b-5(b).

377.    Discover and the Officer Defendants intended to and did deceive the investing public, including Plaintiffs and other Class members, and artificially inflated and maintained the prices of Discover common stock.  These Defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged in this Complaint, and having engaged in a plan, scheme, and course of conduct designed to deceive Plaintiffs and other members of the Class, by virtue of having made public statements and prepared, approved, signed or disseminated documents that contained untrue statements of material fact or omitted facts necessary to make their statements not misleading.  *See, e.g.*, ¶¶ 238-301 (identifying Defendants' false and misleading statements during the Class Period).

378.    As set forth above, Discover and the Officer Defendants made their materially false and misleading statements and omissions, and engaged in the fraudulent activity described in this Complaint knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and other Class members who purchased Discover common stock during the Class Period.  *See, e.g.*, ¶¶ 302-17 (scienter).

379.    Further, Defendants' false and misleading representations were material to investors, in that the statements conveyed or concealed information a reasonable investor would deem important in determining whether to invest in Discover stock.  *See, e.g.*, ¶¶ 318-25 (materiality).

380.    In ignorance of the materially false and misleading nature of those statements and omissions, and relying directly or indirectly on those statements, on the integrity of the market price for the Company's common stock, or on Defendants' omissions, Plaintiffs and other members of the Class purchased the Company's common stock at artificially inflated prices during the Class Period.  But for the fraud, Plaintiffs and other Class members would not have

purchased the Company's stock at such artificially inflated prices.  *See, e.g.*, ¶¶ 335-39 (reliance).

381.    When the true facts were subsequently disclosed, the price of Discover common stock declined precipitously, and Plaintiffs and other Class members were damaged as a direct and proximate result of their purchases of the stock at artificially inflated prices and the subsequent decline in the stock price when the truth was disclosed to the investing public.  *See, e.g.*, ¶¶ 340-73 (loss causation).

382.    Discover and the Officer Defendants accordingly are liable to Plaintiffs and other Class members for violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b).

## COUNT II

**Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(a) and (c)**
**Against Discover and the Officer Defendants**

383.    Plaintiffs incorporate the allegations in ¶¶ 1-373 above as if fully set forth in this paragraph.

384.    Plaintiffs assert this Count under the Exchange Act as well as SEC Rule 10b-5(a) and (c).  Accordingly, Plaintiffs need not allege or prove for this Count that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be held liable under Rule 10b-5(b) or any other provision of law.

385.    During the Class Period, the Officer Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did, (1) deceive the investing public, including Plaintiffs and other Class members; (2) artificially inflate the price of Discover common stock; and (3) cause Plaintiffs and other Class members to purchase Discover common stock at artificially inflated prices.

130

386.     In furtherance of this unlawful plan, scheme, and course of conduct, the Officer Defendants employed devices, schemes, and artifices to defraud, and knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit on Plaintiffs and other Class members in connection with their purchases of Discover common stock, in violation of Section 10(b) of the Exchange Act as well SEC Rule 10b-5(a) and (c).

387.     The Officer Defendants' deceptive acts, practices, and course of business included the knowing or reckless cover-up, suppression, and concealment of, among other things, (1) information regarding systemic and pervasive risk management, compliance, corporate governance, and internal control failures that the Officer Defendants knew about or recklessly disregarded during the Class Period; and (2) causing Discover to underinvest in those areas so the Company could instead pursue an aggressive stock repurchase program that directly impacted Defendant Hochschild's and other Company executives' personal compensation, as set forth below.

388.     While Plaintiffs and other Class members reasonably relied on the integrity of the market for Discover shares, they were unaware that Discover's stock repurchase program— which was the most aggressive in the Company's history, as shown in the graph below—was occurring at a time when Discover was systemically, pervasively, and secretly underinvesting in risk management, compliance, corporate governance, and internal controls.

131



389.    In 2019, 2020, 2021, 2022, and 2023, respectively, Discover repurchased $2.1

billion, $1.8 billion, $0.3 billion, $2.3 billion, $2.4 billion, and $1.9 billion in stock, as depicted

in the following graph (excerpted from Discover's January 17, 2024 Form 8-K):[161]



390.    Aside from the unprecedented amount, the stock repurchases[162] had a direct

impact on Hochschild's and other executives' compensation.  According to Discover's 2020

Definitive Proxy Statement, "a significant portion" of Hochschild's (and other executives')

annual compensation—in the form of PSUs—was "directly" tied to Discover's EPS and stock

price:

> ***At-risk [PSUs] are granted annually at the beginning of <u>a three-</u>***
> ***<u>year Company performance period</u>*** to further reinforce [executive
> management's] accountability for the Company's future financial
> and strategic goals by tying a ***<u>significant portion of compensation</u>***
> ***<u>directly to the Company's EPS</u> and ultimately the Company's***
> ***stock price.***
>
> […]

---

[161] Discover Form 8-K (Jan. 17, 2024) Ex. 99.3, at 10.

[162] Discover's SEC filings confirm that the number of outstanding shares substantially decreased during the Class Period.  For example, from approximately February 15, 2019 to July 21, 2023, the Company's outstanding shares decreased from approximately 328 million to 249 million, a 24.4% decline.  *Compare* 2018 Form 10-K (reporting 328,386,672 shares of common stock outstanding as of Feb. 15, 2019), *with* Q2 2023 Form 10-Q (reporting 249,947,996 shares of common stock outstanding as of July 21, 2023).

> Target PSU payout will be achieved if the Company meets its cumulative business plan goals, while achievement of maximum and threshold performance goals are each expected to be infrequent in occurrence. ***Participants will receive <u>no portion</u> of the award if the minimum performance is not met. If the Company exceeds the target performance hurdles, the [executive officer] can potentially earn an award in excess of the target,*** up to a maximum of one and one-half times the target award based on Company performance.[163]

391.    In other words, if Discover failed to meet cumulative three-year EPS targets, Hochschild and other executives would receive "no portion" of their PSU awards; if targets were met three years later, they could receive additional PSUs.[164]  For Hochschild, this EPS target was particularly significant given that 50% or more of his total compensation during the Class Period was in "at-risk" PSUs.  Hochschild and other Discover executives thus had strong financial motives to underinvest in compliance and, at the same time, keep the Company's EPS and stock price elevated.

392.    It is well established that stock repurchases increase a public company's EPS, and in turn its stock price, because they reduce the number of publicly traded shares:

> Why are such massive resources being devoted to stock repurchases?  Corporate executives give several reasons . . . [b]ut none of them has close to the explanatory power of this simple truth:  Stock-based instruments make up the majority of their pay, and in the short term buybacks drive up stock prices.  In 2012, the 500 highest-paid executives named in proxy statements of U.S. public companies received, on average, $30.3 million each; 42% of their compensation came from stock options and 41% from stock awards.  ***By increasing the demand for a company's shares, open-market buybacks automatically lift its stock price, even if only***

---

[163] Discover Definitive Proxy Statement (Mar. 23, 2020) at 31.

[164] Similar provisions tying Hochschild's compensation directly to EPS targets were included in his compensation plans for 2020, 2021, and 2022—years when he also received a significant portion of compensation in the form of PSUs.

> *temporarily, and can enable the company to hit quarterly*
> *earnings per share (EPS) targets.*[165]

393.    In sum, the Officer Defendants' fraudulent scheme and course of conduct included causing Discover to pursue an aggressive and unprecedented stock repurchase program—thereby lifting the Company's EPS, and in turn Hochschild's and others' compensation—at a time when critical investments in risk management, compliance, corporate governance, and internal controls were necessary to address pervasive and longstanding deficiencies in these areas.  Further, while perpetuating their scheme, neither Discover nor the Officer Defendants disclosed the extent of those deficiencies to investors.  Had Plaintiffs and other Class members known the true extent of the Officer Defendants' conduct, including their personal financial motives to underinvest in key areas so they could increase the Company's EPS through an unprecedented stock repurchase program, they would not have purchased Discover's common stock, or if they had, would not have done so at the artificially inflated prices they paid.

---

[165] William Lazonick, *Profits Without Prosperity*, HARV. BUS. REV. (Sept. 2014), https://hbr.org/2014/09/profits-without-prosperity; *See also* Hannah Miao, *Corporate Stock Buybacks Keep Market Afloat*, WALL ST. J. (Feb. 27, 2023), https://www.wsj.com/articles/corporate-stock-buybacks-help-keep-market-afloat-67f95615 ("The fewer shares outstanding on the market as a result of buybacks . . . have the effect of lifting a company's per-share earnings."); Lenore Palladino, *The $1 Trillion Question: New Approaches to Regulating Stock Buybacks*, 36 YALE J. ON REG. BULL. 89, 94-95 (2018) ("Stock buybacks have become a favorite corporate practice because they are a straightforward and fast mechanism to raise share prices and boost [EPS]. . . . Corporate executives hold large amounts of stock and their compensation is often tied to an increase in the company's [EPS] metric.  That gives executives a personal incentive to time buybacks so that they can profit off of a rising share price."); Bruce Dravis, *Dilution, Disclosure, Equity Compensation, and Buybacks*, 74 BUS. LAW. 631, 656 (2019) ("By repurchasing shares, a company can spread a given level of earnings over a lower number of shares, raising [EPS].");  Heitor Almeida, Vyacheslav Fos & Mathias Kronlund, "The Real Effects of Share Repurchases," 119 J. FIN. ECON. 168, 168 (2016) ("[M]anagers are willing to trade off investments and employment for stock repurchases that allow them to meet analyst EPS forecasts."); Statement by Jaime Lizárraga, SEC Comm'r, *Modernizing Share Repurchase Disclosures* (May 3, 2023), https://www.sec.gov/news/statement/lizarraga-statement-share-repurchase-disclosure-modernization-050323 ("CFO surveys have indicated that increasing [EPS] is an important factor affecting share repurchase decisions.").

394.     As a direct and proximate result of these Defendants' scheme to defraud and such

unlawful course of conduct, Plaintiffs and other Class members suffered damages in connection

with their purchases of Discover common stock during the Class Period.

395.     Discover and the Officer Defendants accordingly violated Section 10(b) of the

Exchange Act as well as SEC Rule 10b-5(a) and (c).

## COUNT III

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

396.     Plaintiffs incorporate the allegations in ¶¶ 1-373 above as if fully set forth in this

paragraph.

397.     Plaintiffs assert this Count under Section 20(a) of the Exchange Act against each

of the Individual Defendants.

398.     As alleged above, Discover violated Section 10(b) of the Exchange Act and SEC

Rule 10b-5 by making materially false and misleading statements in connection with the

purchase and sale of the Company's common stock, and by participating in a fraudulent scheme

and course of business or conduct throughout the Class Period.

399.     By virtue of the Individual Defendants' positions within Discover, they had

access to undisclosed adverse information about the Company, its business, operations,

operational trends, finances, and present and future business prospects.  The Individual

Defendants ascertained such information through the Company's internal corporate documents,

conversations, and connections with other corporate officers, bankers, traders, risk officers,

marketing experts, employees, attendance at management and board meetings (including board

committees), and through reports and other information provided to them in connection with

their roles and duties as Company officers or directors.

136

400.    It is appropriate to presume that the materially false and misleading information detailed in this Complaint resulted from the collective actions of the Individual Defendants. The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company, its business, operations, prospects, growth, finances, and financial condition, as alleged in this Complaint.

401.    The Individual Defendants were involved in drafting, producing, reviewing, approving, or disseminating the materially false and misleading statements identified in this Complaint, and approved or ratified these statements, in violation of the federal securities laws.

402.    As controlling persons of a publicly held company whose common stock was and is registered with the SEC pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, each of the Individual Defendants had a duty to disseminate prompt, accurate, and truthful information with respect to Discover's financial condition and performance, growth, operations, financial statements, business, markets, management, risk, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.

403.    By virtue of the foregoing, the Individual Defendants each had the power to, and did, influence and control (directly or indirectly) the decision-making of the Company, including the content of its public statements with respect to risk management, compliance, corporate governance, and internal controls. As for the Director Defendants, they participated in or

oversaw activities at the core of the fraud detailed in this Complaint, through their participation on two board committees (Risk Oversight and Audit). Each of those Committees was tasked with addressing issues that were inextricably related to risk management, compliance, corporate governance, and internal controls. Further, the CFPB had tasked the Discover board generally with examining and rectifying the significant compliance issues the agency identified in the CFPB Consent Orders.

404. The Individual Defendants are thus liable to Plaintiffs and other Class members as controlling persons of Discover under Section 20(a) of the Exchange Act.

## XV. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

(a) Determining this is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representatives, and appointing Motley Rice LLC and Lieff Cabraser Heimann & Bernstein, LLP as class counsel under Rule 23(g);

(b) Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged in this Complaint;

(c) Awarding Plaintiffs and other Class members compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment interest;

(d) Awarding Plaintiffs and other Class members their reasonable costs and expenses incurred in connection with this action, including attorneys' fees and costs; and

(e) Granting such other and further relief as the Court may deem just and proper.

**JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury on all issues so triable.


Dated: February 9, 2024                    Respectfully submitted,

**MOTLEY RICE LLC**                    **LIEFF CABRASER HEIMANN**
                                       **& BERNSTEIN, LLP**


/s/ Gregg S. Levin                     /s/ Michael J. Miarmi
Gregg S. Levin                         Steven E. Fineman (*admitted pro hac vice*)
Lance V. Oliver                        Daniel P. Chiplock (*admitted pro hac vice*)
William S. Norton                      Michael J. Miarmi (*admitted pro hac vice*)
Christopher F. Moriarty                Gabriel A. Panek (*admitted pro hac vice*)
Joshua C. Littlejohn (*admitted pro hac vice*)  250 Hudson Street, 8th Floor
28 Bridgeside Blvd.                    New York, NY 10013
Mt. Pleasant, SC 29464                 Telephone: (212) 355-9500
Telephone: (843) 216-9000              Facsimile: (212) 355-9592
Facsimile: (843) 216-9450              sfineman@lchb.com
glevin@motleyrice.com                  dchiplock@lchb.com
loliver@motleyrice.com                 mmiarmi@lchb.com
bnorton@motleyrice.com                 gpanek@lchb.com
cmoriarty@motleyrice.com
jlittlejohn@motleyrice.com             Richard M. Heimann (*admitted pro hac vice*)
                                       275 Battery Street, 29th Floor
*Counsel for Co-Lead Plaintiff KBC Asset*  San Francisco, CA 94111
*Management NV and Co-Lead Counsel for*  Telephone: (415) 956-1000
*the proposed Class*                   Facsimile: (415) 956-1008
                                       rheimann@lchb.com
**KIRBY MCINERNEY LLP**
Anthony E. Maneiro                     *Counsel for Co-Lead Plaintiffs the NYC*
211 West Wacker Drive, Suite 550       *Funds and Co-Lead Counsel for the proposed*
Chicago, IL 60606                      *Class*
Telephone: (312) 767-5180
Facsimile: (312) 757-5181              **COHEN MILSTEIN SELLERS**
amaneiro@kmllp.com                     **& TOLL, PLLC**
                                       Carol V. Gilden
*Local Counsel for KBC Asset Management*  190 South LaSalle Street, Suite 1705
*NV*                                   Chicago, IL 60603
                                       IL Bar: 6185530
                                       Telephone: (312) 357-0370
                                       cgilden@cohenmilstein.com

                                       *Liaison Counsel for the proposed Class*