**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| KBC ASSET MANAGEMENT N.V., NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM, NEW YORK CITY FIRE DEPARTMENT PENSION FUND, NEW YORK CITY POLICE PENSION FUND, and TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK, Individually and on Behalf of All Others Similarly Situated, | Case No.  1:23-cv-06788 <br><br> Hon. Charles P. Kocoras |
| Plaintiffs, | |
| v. | |
| DISCOVER FINANCIAL SERVICES, ROGER C. HOCHSCHILD, JOHN T. GREENE, R. MARK GRAF, MARY K. BUSH, CANDACE H. DUNCAN, JOSEPH F. EAZOR, CYNTHIA GLASSMAN, THOMAS G. MAHERAS, MICHAEL MOSKOW, DANIELA O'LEARY GILL, JOHN B. OWEN, DAVID L. RAWLINSON II, and JENNIFER L. WONG, | |
| Defendants. | |

**MEMORANDUM OF LAW IN SUPPORT
OF DEFENDANTS' MOTION TO DISMISS**

## TABLE OF CONTENTS

*Page(s)*

PRELIMINARY STATEMENT ...................................................................................................1

BACKGROUND AND ALLEGATIONS OF THE AMENDED COMPLAINT..........................3

ARGUMENT .................................................................................................................................6

I.      PLAINTIFFS DO NOT PLEAD ANY MATERIAL MISREPRESENTATION
        OR OMISSION.................................................................................................................6

        A.      The Amended Complaint Fails To Allege That Any Statements Were
                False. ......................................................................................................................7

                1.      Plaintiffs Fail To Plead That Statements Describing Discover's
                        Design of and Investment in Risk Management and Compliance
                        Were False. ................................................................................................7

                2.      Plaintiffs Mischaracterize Various Statements That Are Not About
                        Risk Management or Compliance.............................................................15

                3.      Plaintiffs Fail To Plead That Forward-Looking Statements Were
                        False or Outside the PSLRA's Safe Harbor..............................................16

                4.      Plaintiffs Fail To Plead That Opinion Statements Were False. ................19

                5.      Plaintiffs Fail To Plead That Statements About Financial Reporting
                        or Disclosure Controls Were False. .........................................................21

        B.      The Challenged Statements Are Immaterial as a Matter of Law...........................22

        C.      Plaintiffs Fail To Plead Viable Omission Claims. ................................................25

II.     PLAINTIFFS DO NOT ADEQUATELY PLEAD SCIENTER. .....................................27

        A.      The Amended Complaint's Generic Allegations of Motive and
                Opportunity Are Insufficient.................................................................................28

        B.      The Amended Complaint's Speculation as to Conscious Misbehavior or
                Recklessness Is Insufficient. .................................................................................30

        C.      Plaintiffs Fail to Plead Corporate Scienter...........................................................36

III.    PLAINTIFFS FAIL TO ADEQUATELY PLEAD SCHEME LIABILITY
        UNDER RULES 10B-5(a) AND (c)..................................................................................37

IV.     PLAINTIFFS DO NOT ADEQUATELY PLEAD CONTROL PERSON
        LIABILITY UNDER SECTION 20(a)..............................................................................39

CONCLUSION............................................................................................................................40

# TABLE OF AUTHORITIES

*Page(s)*

CASES

*Anderson* v. *Abbott Laboratories*,
    140 F. Supp. 2d 894 (N.D. Ill. 2001) ...............................................................9, 26

*Antelis* v. *Freeman*,
    799 F. Supp. 2d 854 (N.D. Ill. 2011) ....................................................................30

*Arbitrage Event-Driven Fund* v. *Tribune Media Co.*,
    2020 WL 60186 (N.D. Ill. Jan. 6, 2020) ..............................................................31

*Asher* v. *Baxter International, Inc.*,
    377 F.3d 727 (7th Cir. 2004) ................................................................................17

*In re Banco Bradesco S.A. Securities Litigation*,
    277 F. Supp. 3d 600 (S.D.N.Y. 2017).............................................................11, 22

*Barilli* v. *Sky Solar Holdings, Ltd.*,
    389 F. Supp. 3d 232 (S.D.N.Y. 2019)....................................................................8

*Basic Inc.* v. *Levinson*,
    485 U.S. 224 (1988)...............................................................................................25

*In re Baxter International Inc. Securities Litigation*,
    2021 WL 100457 (N.D. Ill. Jan. 12, 2021) .....................................................33, 34

*Bonomo* v. *Nova Financial Holdings, Inc.*,
    2012 WL 2196305 (E.D. Pa. June 15, 2012) ........................................................18

*Brasher* v. *Broadwind Energy, Inc*.,
    2012 WL 1357699 (N.D. Ill. Apr. 19, 2012) ........................................................39

*In re Bristol-Myers Squibb Co. CVR Securities Litigation*,
    658 F. Supp. 3d 220 (S.D.N.Y. 2023).............................................................35, 36

*In re CBOE Volatility Index Manipulation Antitrust Litigation*,
    435 F. Supp. 3d 845 (N.D. Ill. 2020) ........................................................28, 30, 36

*Chandler* v. *Ulta Beauty, Inc.*,
    2022 WL 952441 (N.D. Ill. Mar. 30, 2022)....................................................20, 25

*In re Citigroup Securities Litigation*,
    2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) ............................................. *passim*

*In re Citigroup, Inc. Securities Litigation*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004)....................................................................38

*City of Livonia Employees' Retirement System & Local 295/Local 851* v. *Boeing Co.*,
711 F.3d 754 (7th Cir. 2013) ...............................................................................32

*City of Warren Police & Fire Retirement System* v. *Zebra Technologies Corp.*,
2020 WL 6118571 (N.D. Ill. Oct. 16, 2020)........................................................23

*Cornielsen* v. *Infinium Capital Management, LLC*,
916 F.3d 589 (7th Cir. 2019) ...............................................................................28

*Das* v. *Rio Tinto PLC*,
332 F. Supp. 3d 786 (S.D.N.Y. 2018)......................................................22, 35, 37

*Davis* v. *SPSS, Inc.*,
385 F. Supp. 2d 697 (N.D. Ill. 2005) ............................................................. 29-30

*Desai* v. *General Growth Properties, Inc.*,
654 F. Supp. 2d 836 (N.D. Ill. 2009) ........................................................ *passim*

*Donovan* v. *ABC-NACO Inc.*,
2002 WL 1553259 (N.D. Ill. July 15, 2002).......................................................39

*ECA, Local 134 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009)................................................................................23

*Fryman* v. *Atlas Financial Holdings, Inc.*,
2022 WL 1136577 (N.D. Ill. Apr. 18, 2022) .......................................................22

*Fryman* v. *Atlas Financial Holdings, Inc.*,
462 F. Supp. 3d 888 (N.D. Ill. 2020) ..................................................................38

*Gallagher* v. *Abbott Laboratories*,
269 F.3d 806 (7th Cir. 2001) ..................................................................... 2, 25-26

*Gardner* v. *MeTV*,
2024 WL 779728 (N.D. Ill. Feb. 15, 2024) .........................................................40

*Green* v. *Deutsche Bank Aktiengesellschaft*,
2019 WL 4805804 (S.D.N.Y. Sept. 30, 2019)............................................... 21-22

*Heavy & General Laborers' Local 472 & 172 Pension & Annuity Funds* v. *Fifth Third Bancorp*,
2022 WL 1642221 (N.D. Ill. May 24, 2022) .............................................. *passim*

*Higginbotham* v. *Baxter International, Inc.*,
495 F.3d 753 (7th Cir. 2007) .............................................................28-29, 31-32

*Lachman* v. *Revlon, Inc.*,
487 F. Supp. 3d 111 (E.D.N.Y. 2020) ...................................................................22

*Luo* v. *Sogou, Inc.*,
465 F. Supp. 3d 393 (S.D.N.Y. 2020)........................................................................8

*Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.*,
437 F.3d 588 (7th Cir. 2006) ...................................................................................29

*Makor Issues & Rights, Ltd.* v. *Tellabs, Inc.*,
513 F.3d 702 (7th Cir. 2008) ............................................................................28, 37

*Menaldi* v. *Och-Ziff Capital Management Group*,
277 F. Supp. 3d 500 (S.D.N.Y. 2017).............................................................. 10-11

*In re Midway Games, Inc. Securities Litigation*,
332 F. Supp. 2d 1152 (N.D. Ill. 2004) .............................................................19, 23

*In re NVIDIA Corp. Securities Litigation*,
768 F.3d 1046 (9th Cir. 2014) .................................................................................27

*Omnicare, Inc.* v. *Laborers District Council Construction Industry Pension Fund*,
575 U.S. 175 (2015)...........................................................................................13, 20

*Ong* v. *Chipotle Mexican Grill, Inc.*,
2017 WL 933108 (S.D.N.Y. Mar. 8, 2017) ............................................................27

*Oran* v. *Stafford*,
226 F.3d 275 (3d Cir. 2000).....................................................................................27

*Patten* v. *Northern Trust Co.*,
703 F. Supp. 2d 799 (N.D. Ill. 2010) ........................................................................4

*Phoenix Insurance Co.* v. *ATI Physical Therapy, Inc.*,
2023 WL 5748359 (N.D. Ill. Sept. 6, 2023) .....................................................20, 35

*Plumbers & Pipefitters Local Union No. 630 Pension-Annuity Trust Fund* v. *Allscripts-Misys*
*Healthcare Solutions, Inc.*,
778 F. Supp. 2d 858 (N.D. Ill. 2011) ................................................... 6, 13, 22-23

*Pugh* v. *Tribune Co.*,
521 F.3d 686 (7th Cir. 2008) ............................................................................28, 36

*Rehm* v. *Eagle Finance Corp.*,
954 F. Supp. 1246 (N.D. Ill. 1997) .........................................................................30

*Rosenblum* v. *Travelbyus.com Ltd.*,
299 F.3d 657 (7th Cir. 2002) .....................................................................................4

-iii-

*Rosenzweig* v. *Azurix Corp.*,
    332 F.3d 854 (5th Cir. 2003) ............................................24

*Rossy* v. *Merge Healthcare Inc.*,
    169 F. Supp. 3d 774 (N.D. Ill. 2015) ............................31

*Roth* v. *OfficeMax, Inc.*,
    527 F. Supp. 2d 791 (N.D. Ill. 2007) ............................34

*Scheiner* v. *Midas, Inc.*,
    2013 WL 329006 (N.D. Ill. Jan. 29, 2013) ..................29

*Seaman* v. *California Business Bank*,
    2014 WL 1339649 (N.D. Cal. Apr. 2, 2014) ................36

*Searls* v. *Glasser*,
    64 F.3d 1061 (7th Cir. 1995) ..........................................6

*SEC* v. *Kameli*,
    2020 WL 2542154 (N.D. Ill. May 19, 2020) ..............37

*SEC* v. *Ustian*,
    2019 WL 7486835 (N.D. Ill. Dec. 13, 2019) ..............37

*Segal* v. *Geisha NYC LLC*,
    2006 WL 8460090 (N.D. Ill. June 8, 2006) ..................4

*Singh* v. *Cigna Corp.*,
    918 F.3d 57 (2d Cir. 2019)....................................... 6-7, 23

*Société Générale Securities Services, GbmH* v. *Caterpillar, Inc.*,
    2018 WL 4616356 (N.D. Ill. Sept. 26, 2018) ............... *passim*

*Starr* v. *!Hey, Inc.*,
    2003 WL 21212596 (N.D. Ill. May 23, 2003) ............39

*Stavros* v. *Exelon Corp.*,
    266 F. Supp. 2d 833 (N.D. Ill. 2003) ............................17

*Stransky* v. *Cummins Engine Co.*,
    51 F.3d 1329 (7th Cir. 1995) .....................................7, 12

*Tellabs, Inc.* v. *Makor Issues & Rights., Ltd.*,
    551 U.S. 308 (2007)....................................................28, 29

*In re Time Warner Inc. Securities Litigation*,
    9 F.3d 259 (2d Cir. 1993) ..............................................26

*Walleye Trading LLC* v. *AbbVie, Inc.*,
    2019 WL 4464392 (N.D. Ill. Sept. 18, 2019) ............................................................39

*Washtenaw County Employees' Retirement System* v. *Walgreen Co.*,
    2016 WL 5720375 (N.D. Ill. Sept. 30, 2016) .........................................................13

*Weir* v. *Allianz SE*,
    No. 23-cv-719, slip op. (C.D. Cal. Mar. 13, 2024) ...........................................15, 24

*West Palm Beach Firefighters' Pension Fund* v. *Conagra Brands, Inc.*,
    495 F. Supp. 3d 622 (N.D. Ill. 2020) .......................................................................35

**STATUTES, RULES, AND REGULATIONS**

Federal Rule of Civil Procedure Rule 9(b) .....................................................28, 31, 39

Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4 *et seq.*................. *passim*

SEC Item 303, 17 C.F.R. § 229.303 ......................................................................26, 27

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ...............................................................27, 37

## PRELIMINARY STATEMENT

Plaintiffs are investors in Discover Financial Services ("Discover") stock that seek to turn general and aspirational statements about risk management and compliance into a multi-year securities fraud. This putative class action stems from Discover's announcement last year that it had put certain credit cards into an incorrect pricing tier, as well as from regulatory consent orders that Discover entered into related to student loan servicing practices and other compliance matters. Plaintiffs here are *not* merchants that claim they were subject to inaccurate pricing due to misclassified credit cards; nor are they borrowers who claim that they were impacted by Discover's student loan servicing practices. Rather, Plaintiffs are sophisticated investors asserting that Discover and three current and former officers made false or misleading statements and failed to disclose alleged risk management and compliance deficiencies. But Plaintiffs do not allege specific facts to plausibly support these assertions, let alone to meet the heightened pleading requirements for securities fraud claims.

*First*, Plaintiffs do not adequately plead that any challenged statement was false or misleading. Plaintiffs challenge dozens of statements that describe in general terms Discover's risk management framework, investments in risk management, and financial reporting controls, including: Discover's risk management framework "is designed to be comprehensive"; Discover "ha[s] policies and a defined governance structure in place to manage risks"; and Discover is "obviously continuing to make those investments on the compliance side." (Dkt. 74, ¶¶ 242, 280 ("Amended Complaint" or "AC").) Plaintiffs assert that these statements in effect guaranteed that Discover's risk management and compliance framework would prevent any future regulatory action or compliance issues, and were therefore rendered false by the card misclassification issue, student loan servicing issues, and the consent orders. But none of the challenged statements contained any such assurances, or was otherwise false. Nor would any reasonable investor have

believed that Discover—a heavily regulated banking and payment services company—was free from regulatory or compliance risk. Discover repeatedly disclosed that it faced compliance risk and the threat of regulatory action, and the regulatory consent orders it entered before and during the putative class period were publicly available. That Discover has fallen short of its goals does not mean that its risk management and compliance framework was not *designed* to be comprehensive or that Discover was not making "investments" in that framework.

*Second*, nearly all of the challenged statements are immaterial as a matter of law. Courts routinely hold that virtually identical statements regarding a financial institution's risk management and compliance systems are "general and aspirational, and therefore not actionable." *Heavy & Gen. Laborers' Loc. 472 & 172 Pension & Annuity Funds* v. *Fifth Third Bancorp*, 2022 WL 1642221, at *16 (N.D. Ill. May 24, 2022).

*Third*, Plaintiffs fail to plead that Defendants made actionable omissions by not disclosing alleged compliance and risk management deficiencies. "[F]irms are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose," *Gallagher* v. *Abbott Lab'ys*, 269 F.3d 806, 808 (7th Cir. 2001), and Plaintiffs identify no such duty. Contrary to Plaintiffs' assertion, SEC disclosure rules did not require Defendants to predict the outcome of future regulatory actions or "confess guilt to uncharged crimes," and, in any event, Discover *did* disclose the regulatory risks that it faced. *Société Générale Sec. Servs., GbmH* v. *Caterpillar, Inc.*, 2018 WL 4616356, at *6 (N.D. Ill. Sept. 26, 2018) (quotation omitted).

*Fourth*, Plaintiffs' claims fail for the independent reason that they do not plead particularized facts raising a strong inference of scienter under the PSLRA. Plaintiffs' theory that the compensation structure of the Officer Defendants (former CEO Roger Hochschild, current CFO John Greene, and former CFO Mark Graf, who retired just seven months into the five-year

-2-

class period) incentivized them to try to increase Discover's earnings per share and stock price is disconnected from the challenged statements. It is also precisely the type of generic allegation of profit motive that courts routinely reject as insufficient to plead scienter. Similarly, Plaintiffs' various theories that the Officer Defendants knew or should have known of alleged compliance or regulatory problems do not raise the required compelling inference that Defendants made conscious or reckless misrepresentations. Just as Plaintiffs fail to plead scienter for any individual Defendant, they also fail to plead any viable theory of "corporate" scienter.

*Fifth*, Plaintiffs' attempt to transform their defective omission theory into a scheme liability claim also fails. Plaintiffs assert that the Officer Defendants engaged in a "scheme" to inflate Discover's stock price by making "aggressive" stock repurchases instead of investing in risk management and compliance (AC ¶ 18), but Plaintiffs fail to plead with particularity that any of the alleged conduct constitutes a deceptive or manipulative act.

*Finally*, Plaintiffs' Section 20(a) control person claims fail because they have not pleaded a primary securities violation. Nor have Plaintiffs adequately alleged that the Director Defendants exercised specific control over the challenged statements, let alone with particularity.

## BACKGROUND AND ALLEGATIONS OF THE AMENDED COMPLAINT

Discover is an Illinois-based financial services company that offers a variety of loan and deposit products. (*Id*. ¶¶ 34-35.) In July 2015, certain of Discover's subsidiaries entered into a public consent order with the Consumer Financial Protection Bureau related to student-loan servicing practices, agreeing "to refund $16 million to consumers, pay a $2.5 million penalty, and improve [their] billing, student loan interest reporting, and collection practices." (*Id.* ¶¶ 177-91.) In December 2020, the same subsidiaries entered into another public consent order with the CFPB that addressed violations of the previous order and additional student loan servicing issues and included an order to pay $10 million in redress and a $25 million penalty. (*Id.* ¶¶ 5, 200, 207-11.)

In July 2022, Discover announced that it was "suspending until further notice its existing share repurchase program because of an internal investigation relating to its student loan servicing practices and related compliance matters." (*Id.* ¶ 343.) Discover subsequently announced that "[i]n November 2022, the investigation was completed and [Discover] resumed share repurchases," and also noted that it would "continue to communicate with the supervisory staff of our regulators regarding the internal investigation, and we may be subject to reviews, investigations, proceedings, fines or other actions in connection with our student loan servicing practices and related compliance matters." (Ex. 7 at 74.)[1]

In July 2023, Discover announced that since 2007, it had "incorrectly classified certain credit card accounts into [its] highest merchant and merchant acquirer pricing tier." (AC ¶¶ 219, 223.) Discover stated that "[a]n investigation into this issue by an external law firm working at the direction of the Audit Committee of the Board of Directors is ongoing" and that the "Company has decided to pause share repurchases while the internal review of compliance, risk management and corporate governance is pending." (*Id.* ¶ 352.) Discover further announced that it had "received a proposed consent order from the FDIC in connection with consumer compliance," which did "not include the card product classification matter." (*Id.*) In September 2023, a Discover subsidiary entered into a consent order with the FDIC, which, among other things, determined that the compliance management system had certain deficiencies and directed the Board to make specified improvements. (*Id.* ¶¶ 160, 165-68.)

---

[1]     Citations to "Ex. __" refer to exhibits to the Declaration of Christopher M. Viapiano. The Court may consider documents "if they are referred to in the plaintiff's complaint and are central to his claim," which are treated as "exhibit[s] to [the] pleading," *Rosenblum* v. *Travelbyus.com Ltd.*, 299 F.3d 657, 661 (7th Cir. 2002) (quotation omitted), and "need not accept plaintiff's allegations when they are contradicted by an exhibit," *Segal* v. *Geisha NYC LLC*, 2006 WL 8460090, at *3 (N.D. Ill. June 8, 2006), *aff'd*, 517 F.3d 501 (7th Cir. 2008). The court may also take "judicial notice of matters of public record, such as stock prices and SEC filings." *Patten* v. *N. Tr. Co.*, 703 F. Supp. 2d 799, 803 n.3 (N.D. Ill. 2010).

Seizing on Discover's disclosure of the consent orders and investigations, Plaintiffs assert claims for securities fraud and scheme liability against Discover and the Officer Defendants, as well as control person liability against each of the Officer Defendants and ten current and former members of Discover's Board (the "Director Defendants," and together with the Officer Defendants, the "Individual Defendants"). Plaintiffs challenge 143 statements in Discover's annual and quarterly reports on Form 10-K and 10-Q,[2] as well as in "press releases, earnings calls, and industry conferences" that "emphasiz[ed] Discover's purportedly robust compliance measures." (*Id.* ¶¶ 3-4.) The allegedly false and misleading statements fall into one or more of the following five categories:

|  | Category | Examples |
|---|---|---|
| 1. | General statements regarding the design of or investment in risk management and compliance | "[T]he CEO establishes a risk management culture throughout the Company and ensures that businesses operate in accordance with this risk culture." (*Id.* ¶ 242(f).)<br><br>"We have established various policies to help govern these risks." (*Id.* ¶ 242(j).) |
| 2. | Statements that are not about risk management at all | "I think our investments have been appropriate. But at the beginning of the year, we saw an opportunity to invest more." (*Id.* ¶ 248.) |
| 3. | Forward-looking statements | "Let's look at some of the things we're doing this year. Top of the list is our focus on compliance first, which means we'll continue to strengthen and fine-tune our processes and comply with all the regulations required of a large national bank." (*Id.* ¶ 257.) |
| 4. | Opinions | "[T]he team is doing a lot of great work." (*Id.* ¶ 265.) |

---

[2]     This includes statements from the Company's 10-Ks and 10-Qs for the years 2018 through 2022 that, according to Plaintiffs, were the same or "substantially similar." (AC ¶ 241.) The Amended Complaint primarily excerpts and discusses the 2018 10-K, but notes that "certain relevant language was altered in subsequent years." (*Id.* ¶¶ 241-42 & nn.148-53.)

| 5. | Statements about the Company's financial reporting or disclosure controls | "All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting" have been disclosed to Discover's auditors and the audit committee.  (*Id.* ¶ 291.) |

Exhibit 1 is a chart listing and categorizing the challenged statements for the Court's convenience.[3]

## ARGUMENT

## I.   PLAINTIFFS DO NOT PLEAD ANY MATERIAL MISREPRESENTATION OR OMISSION.

Plaintiffs fail to plead an actionable misrepresentation or omission for three reasons.  *First*, none of the challenged statements is false or misleading.  The Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(a) *et seq.*, "requires plaintiffs to not only 'specify each statement alleged to have been misleading,' but also specify 'the reason or reasons why the statement is misleading.'"  *Plumbers & Pipefitters Loc. Union No. 630 Pension-Ann. Tr. Fund* v. *Allscripts-Misys Healthcare Solutions, Inc.*, 778 F. Supp. 2d 858, 877 (N.D. Ill. 2011) (quotation omitted).  Although the Amended Complaint is stuffed with allegations about purported risk management and compliance deficiencies at Discover, it fails to explain with particularity why those allegations render false or misleading any of the challenged statements, which are high-level descriptions of, or opinions about, the Company's risk and compliance framework.

*Second*, the vast majority of the challenged statements are immaterial as a matter of law because they are "devoid of any substantive information."  *Searls* v. *Glasser*, 64 F.3d 1061, 1066 (7th Cir. 1995).  Contrary to Plaintiffs' claims, "a reasonable investor would not rely on" "simple and generic assertions about having 'policies and procedures' and allocating 'significant resources'" to risk management and compliance efforts "as representations of satisfactory

---

[3]     Because Graf retired on September 18, 2019, the only challenged statements conceivably attributed to him are those in Discover's 2018 10-K and two subsequent 10-Qs that Graf signed as Discover's CFO. (*See* AC ¶¶ 38, 98-99; 241-42.)

compliance." *Singh* v. *Cigna Corp.*, 918 F.3d 57, 63-64 (2d Cir. 2019).

*Third*, Plaintiffs fail to state any omission-based fraud claim, which requires Plaintiffs to plead with particularity that Defendants had an affirmative duty to disclose the information omitted or that the omission rendered an affirmative statement false or materially misleading. *See Stransky* v. *Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995). "Mere silence about even material information is not fraudulent absent a duty to speak." *Id.*

### A. The Amended Complaint Fails To Allege That Any Statements Were False.

#### 1. Plaintiffs Fail To Plead That Statements Describing Discover's Design of and Investment in Risk Management and Compliance Were False.

Plaintiffs first challenge statements describing the design and objectives of, and investments in, Discover's risk management and compliance systems.[4] Plaintiffs' overarching theory of falsity is that Defendants made a "litany of representations emphasizing Discover's purportedly robust compliance measures" when in fact the Company experienced "systemic and pervasive gaps and deficiencies." (AC ¶¶ 3, 6.) Plaintiffs point to three alleged "critical" failures: (i) the 2023 FDIC Consent Order; (ii) the Company's 2023 disclosure that it had incorrectly classified certain credit card accounts; and (iii) the 2015 and 2020 CFPB Consent Orders related to student loan servicing, "which ultimately forced Discover to conduct an internal investigation and twice suspend its share repurchase program." (*Id.* ¶ 5.) Plaintiffs also point to several statements attributed to purported former employees alleging that Discover had a "toxic compliance culture," was "plagued by internal tension and organizational dysfunction," was "woefully understaffed," and had "hundreds of unresolved regulatory violations." (*Id.* ¶ 246.)

Plaintiffs' claim, however, cannot be that Discover's risk management systems were poorly

---

[4]     *See* AC ¶¶ 242, 253, 257, 270, 271, 272, 274, 276, 280, 294, 295.

managed.  Their claim instead must be that Defendants committed securities fraud by deliberately making false or misleading statements to investors.  Plaintiffs attempt to carry their burden by asserting that alleged compliance deficiencies made each challenged statement false—or, for the statements that "may have been literally true," misleading (*id.* ¶ 239)—because Defendants "assured investors that Discover had implemented and maintained sufficient compliance and risk management processes" (*id.* ¶ 70).  But the Amended Complaint does not identify any such assurances.  And the many "literally true" statements describing Discover's risk management and compliance programs are not misleading just because those programs allegedly fell short.  *See Barilli* v. *Sky Solar Holdings, Ltd.*, 389 F. Supp. 3d 232, 253 (S.D.N.Y. 2019) ("statements regarding the introduction of internal controls" are not "assertions that the controls are adequate").  Because Defendants "provided no assurance to investors" that its risk management procedures and investments "would be sufficient to guarantee compliance," Plaintiffs cannot plead falsity based on these alleged deficiencies.  *Luo* v. *Sogou, Inc.*, 465 F. Supp. 3d 393, 409 (S.D.N.Y. 2020).

***Design of Risk Management and Compliance Program.***  Plaintiffs challenge statements describing the design of Discover's risk management and compliance program, including:

- Discover's "[risk management] framework is designed to be comprehensive with respect to our business units" (AC ¶ 242(a));

- Discover "structure[s] accountability across three lines of defense" (*id.* ¶ 242(b));

- "CEO establishes a risk management culture throughout the Company and ensures that businesses operate in accordance with this risk culture" (*id.* ¶ 242(f)); and

- Discover "ha[s] policies and a defined governance structure in place to manage risks" (*id.* ¶ 242(j)).

Plaintiffs assert that these statements were false or misleading because "the Company had glaring and significant gaps in its risk management and compliance framework."  (*Id.* ¶ 243.)  Plaintiffs point generally to the regulatory consent orders, allegations of purported former employees, and

Hochschild's and Greene's 2023 statements that in hindsight they believed Discover had previously "underinvested" in compliance. (*Id.* ¶¶ 243-46.) None of these allegations constitutes particularized facts that render the challenged statements *false*. It is not enough merely to pair statements generally describing Discover's risk management and compliance framework with a subsequent compliance or regulatory failure. The PSLRA's "stringent requirements" for pleading falsity require more. *Anderson* v. *Abbott Lab'ys*, 140 F. Supp. 2d 894, 901 (N.D. Ill. 2001).

For example, in *In re FBR Inc. Securities Litigation*, the defendant company stated that it had implemented a "corporate wide risk management program" focused on "[i]dentifying, assessing and reporting on corporate risk exposures and trends," and "[m]onitoring and reporting on adherence with risk policies and limits." 544 F. Supp. 2d 346, 359 (S.D.N.Y. 2008). The court rejected the plaintiffs' argument that these "description[s] of the compliance program's aims" "misled investors into believing that [the company] had an effective compliance program that would root out any impropriety," noting that "[t]he Complaint d[id] not allege that the risk management program did not exist, or that it did not have the abovementioned aims." *Id.*

Similarly, in *Fifth Third*, the defendant company represented in various SEC filings that it "focuses on managing regulatory compliance risk . . . which ensures consistent processes for identifying, assessing, managing, monitoring, and reporting risk"; that "Compliance Risk Management provides independent oversight to ensure consistency and sufficiency in the execution of the program"; and that its "core principles" of risk management included "conduct[ing] business in compliance with all applicable laws, rules and regulations." 2022 WL 1642221, at *5-6. The court rejected plaintiffs' argument that these statements were "materially false and misleading and omitted material facts" because the defendants did not disclose the CFPB's decade-long investigation into certain sales practices or "senior management's failure to

remediate these illegal sales practices." *Id.* at *6. In addition to being immaterial as a matter of law (*see infra* Section I.B), the challenged statements necessarily "acknowledge[d] the potential for noncompliance" and therefore did "not present the type of specific, factual statement of compliance that courts have found to be misleading." *Fifth Third*, 2022 WL 1642221, at *16.

Many of the challenged statements here are nearly identical to those in *FBR* and *Fifth Third*. For example, Plaintiffs challenge Defendants' statement that Discover "evaluate[s] the potential impact of a risk event on the Company by assessing . . . the legal and regulatory impact," and that the Company has "established various policies to help govern these risks." (AC ¶ 242.) Plaintiffs assert that Discover "did not, in fact, 'have established policies' to 'govern [the] risk' of 'legal and regulatory impact' or 'client/customer impact,' or to 'actively' manage risk." (*Id.* ¶ 243.) But just as in *FBR* and *Fifth Third*, Plaintiffs plead no particularized facts supporting this assertion.

Plaintiffs also recount allegations of purported former employees regarding alleged risk management and compliance deficiencies, but none of those allegations demonstrates that the challenged statements were false or misleading. For example, FE 2 asserts that Discover "did not structure its 'three lines of defense' appropriately" because the Company's "business managers," who "comprise the first line of defense," "'leaned on' compliance personnel" rather than "truly owning the risk themselves." (*Id.* ¶ 107.) FE 1 says in conclusory fashion that this system was "widely ineffective." (*Id.* ¶ 109.) But even if Discover's first line of defense was not functioning as intended (or as FEs 1 and 2 thought it should), that would not render false the statement that Discover "structure[s] accountability across three lines of defense." (*Id.* ¶ 242(b).) Statements regarding a company's efforts or design of its risk management program are not false or misleading when that company has "indeed implemented a compliance program and issued policies and procedures aiming to ensure . . . compliance," even if ineffective. *Menaldi* v. *Och-Ziff Cap. Mgmt.*

-10-

*Grp.*, 277 F. Supp. 3d 500, 512 (S.D.N.Y. 2017). If alleged deficiencies in risk management or compliance programs were enough to render general statements describing their existence or objectives false or misleading, then "any company that has a compliance program and discloses that program in even the most austere terms would be required, *ipso facto*, to disclose any possible deviation that came to its attention." *FBR*, 544 F. Supp. 2d at 360. That is not the law. *Id.*

      ***Investments in Risk Management and Compliance.*** Plaintiffs also challenge a series of statements regarding Discover's risk management and compliance "investments." For instance:

- "[T]he Company 'invested significantly in key areas of our business' to, among other things, 'strengthen compliance'" (AC ¶ 270); and

- Discover was "obviously continuing to make those investments on the compliance side" (*id.* ¶ 280).

But Plaintiffs do not contend that Discover did not make those investments. Indeed, Plaintiffs note that Hochschild said that Discover's "spending on compliance and risk management is up roughly $250 million a year from 2019" (*id.*), and they do not challenge the accuracy of that statement.

      Plaintiffs appear to argue instead that Discover's general statements about investment in risk management and compliance were misleading because Discover was not investing *enough* in those areas. But Plaintiffs' disagreement with Discover's investment decisions is not securities fraud. Plaintiffs point, for example, to various statements from the purported former employees that Discover's "compliance department was critically understaffed." (*Id.* ¶ 125.) But the fact that Defendants were subject to consent orders or that purported former employees believe that Discover's compliance team was understaffed does not mean that Discover was not investing in its risk management systems at the time the challenged statements were made. *See In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp. 3d 600, 648 (S.D.N.Y. 2017) ("[p]laintiff has not alleged that [company] management did not, in fact, conduct the evaluations described in those statements," even if the evaluations ultimately proved inadequate). Indeed, Plaintiffs themselves

-11-

acknowledge that over the course of the putative class period, "Discover later increased the scoping team's size from four to six or eight" and that "Discover increased the size of the first-line group." (AC ¶ 125.)  Plaintiffs' assertion that these efforts did not bring staffing to an "adequate level" (*id.*) does not make the statement that Discover was "continuing to make those investments on the compliance side" actionable.

Finally, Plaintiffs point to statements by Hochschild and Greene in the second half of 2023 that they believed Discover previously "underinvested" in risk management, and that "[w]e benchmarked systems capability, and we found that our internal systems capabilities weren't on par with what a professional servicing organization could do for this portfolio," in an effort to establish that earlier statements describing investments in risk management were false or misleading.  (*Id.* ¶¶ 229-31.)  But again, even if they both believed *in 2023* that Discover had previously "underinvested" in risk management, that does not render false earlier statements that Discover was "continuing to make those investments on the compliance side" or that Discover was "going to put money into risk and compliance" at the time those statements were made.  "[T]he securities laws typically do not act as a Monday Morning Quarterback."  *Stransky*, 51 F.3d at 1332.

***Purported Assurances of Compliance.***  Perhaps recognizing these pleading defects, Plaintiffs also attempt to carry their burden by mischaracterizing statements about the design and objectives of Discover's risk management and compliance systems as ironclad assurances that those systems would prevent future compliance deficiencies.  (*See*, *e.g.*, AC ¶¶ 4, 9, 70.)  This argument fails because none of the challenged statements remotely provides any such guarantee.

For example, Plaintiffs allege that statements in Discover's 10-Ks that its "risk governance framework" was "implemented" or "designed" "such that bank-level risk governance requirements are satisfied" were false because "Discover's risk management governance structure did not, in

fact, include 'bank-level risk governance requirements' that were 'satisfied.'" (*Id.* ¶¶ 242-43.) The challenged statement does not contain any assurance, however, that implementing or designing the risk governance framework to satisfy governance requirements meant the Company would never experience adverse regulatory action. (*See* Ex. 3 at 11.)[5] Plaintiffs similarly allege that the statement that "[t]he internal audit department . . . validates that risk management controls are functioning as intended" is false because Discover's "risk management governance structure did not" include "a framework that was 'functioning as intended.'" (*Id.* ¶¶ 242-43.) But again, this standard description of the role of internal audit did not purport to guarantee that the risk management controls would always "function[] as intended."

Plaintiffs also point to an allegation from FE 1 that as of May 2023, "Discover had more than 250 open regulatory findings." (*Id.* ¶ 149.) But none of the challenged statements contains a representation about the number of open regulatory findings or assurance that adverse regulatory actions would never occur. *See Washtenaw Cnty. Emps' Ret. Sys.* v. *Walgreen Co.*, 2016 WL 5720375, at *6 (N.D. Ill. Sept. 30, 2016) ("[D]efendants' statement was that there were measures to 'mitigate' the risk, not to 'eliminate' it."). Furthermore, risk management at a large financial institution such as Discover is a complex and iterative process, with regular back and forth with the Company's regulators. Given these "practices of the relevant industry," *Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 186, 190 (2015), no reasonable investor could interpret general descriptions regarding the design and objectives of Discover's risk

---

[5]     Although Plaintiffs challenge statements across five of Discover's 10-Ks (for years 2018 through 2022), and acknowledge that Discover's 10-Ks were revised from one year to the next (AC ¶ 242 n.150), the Amended Complaint focuses on excerpts from the 2018 10-K only. Plaintiffs assert that the challenged language "appears in substantially similar form" in each 10-K (AC ¶ 241), but they do not explain with the requisite specificity how each iteration—made at different times and in different contexts—is misleading. *Allscripts*, 778 F. Supp. 2d at 877. This pleading deficiency is especially pronounced because, as Plaintiffs acknowledge in a series of footnotes, "certain relevant language was altered in subsequent years." (AC ¶¶ 241-42 & nn.148-53.)

management and compliance processes as assurance that those processes were always "sufficient to enable the Company to comply with applicable laws and regulations" (AC ¶ 4), and that there would be no regulatory issues. Indeed, Discover regularly cautioned investors during the putative class period that "supervisory guidance and practices, or the application thereof, may adversely affect our business," that "[l]itigation and regulatory actions could subject us to significant fines, penalties" and other adverse outcomes, and that Discover's risk management framework "may not be effective." (*See*, *e.g.*, Ex. 5 at 35, 41-42; Ex. 3 at 32-33, 38-39; *see also infra* Section I.A.3.)

Unable to identify any actual assurances, Plaintiffs cobble together clauses from different paragraphs of the Company's 10-K to create their own statements about the Company's risk management. For instance, Plaintiffs rely on a purported assurance that Discover has "'policies,' or a 'governance structure in place' 'based on industry standards' that 'ensur[ed] . . . risk exposures were appropriately assessed.'" (AC ¶ 243 (alteration and omission in original).) In fact, the 10-K says, in different paragraphs and under different headings, that: (i) "We have policies and a defined governance structure in place to manage risks"; (ii) "[o]ur risk measurement process seeks to ensure that the identified risk exposures are appropriately assessed . . . [using] econometric modeling, statistical analysis, peer benchmarking and qualitative assessments"; and (iii) "[o]ur enterprise risk management principles are executed through a risk management framework that is based upon industry standards." (Ex. 3 at 15.) Plaintiffs do not plead particularized facts showing that Discover did not have these policies and processes in place. And far from providing ironclad assurances, the 10-K "clearly acknowledges the potential for noncompliance," *Fifth Third*, 2022 WL 1642221, at *16, by noting, among other things, that the risk management "framework seeks to . . . reduce[] impact of potential risk events" (Ex. 3 at 15).[6]

---

[6]       Several other challenged statements similarly convey the speaker's understanding that risk events

2.      **Plaintiffs Mischaracterize Various Statements That Are Not About Risk Management or Compliance.**

Plaintiffs also misconstrue the meaning of several challenged statements, or strip them of clarifying context.[7]  Plaintiffs first allege that Hochschild's October 2020 statements that "I have to maybe disagree with the phrase chronic underinvestment" and that "I think our investments have been appropriate" are misleading because "for years Discover failed to make critical investments in compliance and risk management."  (AC ¶¶ 248-49.)  But Plaintiffs plead no particularized facts showing that these statements related to compliance and risk management at all.  In context, Hochschild was responding to a question about his view on the effect of COVID-19 on *all* of the Company's expenses (Ex. 8 at 8)—an issue about which Plaintiffs allege nothing.

Plaintiffs also challenge Greene's February 14, 2023 statement that "[f]ortunately, we got that behind us" (AC ¶ 267), which, in context, plainly refers to the July 2022 pause on the share repurchase program (Ex. 13 at 6-7).  In full, he said:

> In 2022, we put forward a really, really robust plan in terms of return of capital. We are executing on that very, very well, and then *we had to pause at the end of the second quarter into the third quarter*.  Fortunately, we got that behind us.  At the end of the year, I believe we had $2.8 billion remaining on our authorization, and the plan is to execute on that authorization in the first quarter of '23 and into the second quarter of '23.  Then, we'll share a proposal with our Board.  (*Id.* at 6.) (emphasis added).

Plaintiffs do not (and cannot) plead that the Company had not, in fact, resumed its share repurchase program and concluded its investigation by the time of the statement, which is what Greene

---

were possible.  For instance, Hochschild's statement that Discover was "focused on *maturing* our compliance and risk management . . . to better identify, assess, and *mitigate* risk" plainly acknowledges the potential for noncompliance.  (AC ¶ 276); *see also Weir* v. *Allianz SE*, No. 23-cv-719, slip op. at 15 (C.D. Cal. Mar. 13, 2024) ("[a] description of risk management is not an 'assurance of actual compliance,'" particularly where the "purported misrepresentations explain that '[t]he risk . . . is *mitigated* by a system of internal controls,' . . . not that the risk . . . is *eliminated* by the system of internal controls").

[7]      *See* AC ¶¶ 248, 262, 267.

conveyed.  Plaintiffs allege instead that this statement is "materially false or misleading" because the share repurchase pause was "specifically tied to 'student loan servicing practices and related matters.'"  (AC ¶ 268.)  In other words, Plaintiffs' argument appears to be that Greene's statement about resuming the share repurchase program also implied that the Company had resolved any regulatory and compliance deficiencies related to student loan servicing.  This argument fails for three independent reasons.

*First*, Greene said nothing about student loan serving issues being "behind us"—only the pause on share repurchases.  *Second*, the Company's SEC disclosures made clear that share repurchases were suspended during "an *internal investigation* relating to our student loan servicing practices and related compliance matters"—linking the pause not to any and all student loan servicing issues, but to the internal investigation itself.  (Ex. 29 at 71 (emphasis added).)  The investigation concluded in November 2022, well before Greene's statement.  (Ex. 7 at 74.)  *Third*, no reasonable investor would understand Greene's statement that the pause was "behind us" to mean, in context, that the Company had resolved all student loan servicing deficiencies.  The Company's 2022 10-K, filed only nine days after Greene's statement, expressly states that although the Company's internal investigation had concluded in November 2022, Discover "continue[d] to communicate with the supervisory staff of our regulators regarding the internal investigation, and we may be subject to reviews, investigations, proceedings, fines or other actions in connection with our student loan servicing practices and related compliance matters."  (*Id.*)

### 3.  Plaintiffs Fail To Plead That Forward-Looking Statements Were False or Outside the PSLRA's Safe Harbor.

Plaintiffs next challenge several forward-looking statements.[8]  (Exhibit 2 is a chart of the

---

[8]     *See* AC ¶¶ 253, 257, 262, 274, 276.

forward-looking statements and their accompanying cautionary language.)  Under the PSLRA's safe harbor, 15 U.S.C. § 78u-5(c)(1), a forward-looking statement cannot be actionable if it is "(1) identified as a forward looking statement and is accompanied by meaningful cautionary language identifying factors that could cause actual results to materially differ from those in the forward-looking statement; (2) immaterial; *or* (3) the plaintiff fails to prove that the forward statement was made with actual knowledge of its falsity." *Société Générale Sec. Servs., GbmH* v. *Caterpillar, Inc.*, 2018 WL 4616356, at *5 (N.D. Ill. Sept. 26, 2018) (emphasis added).

Cautionary language is meaningful "if it puts an investor on notice of the danger of the investment to make an intelligent decision about it according to her own preferences for risk and reward." *Stavros* v. *Exelon Corp.*, 266 F. Supp. 2d 833, 843 (N.D. Ill. 2003).  The language "need not expressly refer to the risk that ultimately caused the projection to differ from the results"— "prevision" is not necessary. *Desai* v. *Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 845 (N.D. Ill. 2009) (quotation omitted).  Nor does the PSLRA "require the *most* helpful caution" that is possible. *Asher* v. *Baxter Int'l, Inc.*, 377 F.3d 727, 734 (7th Cir. 2004).  It is enough to "identify[] important factors that could cause actual results to differ materially from those in the forward-looking statement." *Id.* (quotation omitted).  And when plaintiffs invoke a fraud-on-the-market theory, as Plaintiffs do here, they "must acknowledge that *all* public information is reflected in the [stock] price." *Id.* at 732.

Each of the challenged forward-looking statements is accompanied by meaningful cautionary language.  Several of the challenged oral statements include meaningful cautionary language uttered in the very same breath.  For instance, Plaintiffs challenge Greene's September 13, 2022 statement that "[m]y hope is that by the end of the year, this will be behind us"—again, referring to the pause accompanying the internal investigation (*see supra*

Section I.A.2, at 16)—and that "we'll be able to resume share repurchases." (AC ¶ 262.) Greene said in the very next sentence that whether the Company resumed its share repurchase program "will be subject to the Board's review and conclusion of the work they're doing on this." (*Id.*; *see also* Ex. 11 at 10.) Plaintiffs also challenge Hochschild's April 20, 2023 statement that "[a]s we look to the remainder of 2023," "we also continue to focus on enhancing our compliance management systems." (AC ¶ 274.) But Hochschild also expressly cautioned that "we may adjust our outlook as conditions evolve" and "[w]e believe there is the potential for more stringent regulation." (*Id.*; *see also* Ex. 16 at 3.) Far from mere "boilerplate" (AC ¶ 329), these statements appropriately note the "prospective and conditional nature" of future events. *Bonomo* v. *Nova Fin. Holdings, Inc.*, 2012 WL 2196305, at *8 (E.D. Pa. June 15, 2012).[9]

The Amended Complaint also omits that before several of the challenged oral statements, Hochschild expressly directed investors to meaningful cautionary statements in Discover's SEC filings. (*See* Ex. 10 at 3 ("[T]oday's presentation contains certain forward-looking statements . . . which are subject to risks and uncertainties and speak only as of today. Factors that could cause actual results to differ materially from these forward-looking statements are set forth in [Discover's SEC filings]."); Ex. 17 at 4 (same).) The Company's 2020 10-K, for example, contains several pages of statements cautioning investors, with reference to specific risk factors, that "supervisory guidance and practices, or the application thereof, may adversely affect our business, financial condition and results of operations," that "[l]itigation and regulatory actions could subject us to significant fines, penalties and/or requirements resulting in increased expenses, oversight and reputation risk," and that "[w]e may be limited in our ability to pay dividends on and repurchase

---

[9] Each of these forward-looking statements is also protected by the safe harbor for the independent reasons that they are immaterial (*see infra* Section I.B) and that Plaintiffs do not allege that any Defendant had contemporaneous actual knowledge of their falsity (*see infra* Section II).

our stock." (Ex. 5 at 41-43.) The 2020 10-K also states that Discover's "risk management framework and models for managing risks may not be effective in mitigating our risk of loss." (*Id.* at 35.) These "cautionary statements" were "absorbed into the market and may be considered by this Court in determining whether the oral statements at issue were accompanied by meaningful cautionary language" because "they were available when the purportedly misleading statements cited by Plaintiffs were made." *Desai*, 654 F. Supp. 2d at 844; *see also In re Midway Games, Inc. Sec. Litig.*, 332 F. Supp. 2d 1152, 1167 (N.D. Ill. 2004) ("Cautionary statements in SEC filings incorporated by reference are adequate to invoke the PSLRA's safe harbor."). And to remove all doubt, Discover also repeatedly informed investors that the cautionary language and risk factors in each 10-K "expressly qualify *all subsequent oral and written forward-looking statements* attributable to us or persons acting on our behalf." (*See, e.g.*, Ex. 6 at 45 (emphasis added).)

Finally, Plaintiffs' alternative theory—that "Defendants are nonetheless liable" even if "the statutory safe harbor applies" because "(1) the person responsible for the statement knew it was false, or (2) the statement was authorized or approved by an executive officer of the Company who knew it was false" (AC ¶ 331)—also fails. "[U]nder the literal language of the safe harbor statute the author of any forward-looking statement—even though a deliberate falsehood—is insulated from liability so long as that statement is accompanied by some meaningful cautionary statement." *Desai*, 654 F. Supp. 2d at 844. Plaintiffs have not adequately pleaded that any forward-looking statement was false or made with scienter. But even if they had, the safe harbor would still apply.

### 4. Plaintiffs Fail To Plead That Opinion Statements Were False.

Plaintiffs also challenge several opinion statements, which are "generally not actionable."[10] *Chandler* v. *Ulta Beauty, Inc.*, 2022 WL 952441, at *7 (N.D. Ill. Mar. 30, 2022). An opinion

---

[10]     *See* AC ¶¶ 248, 262, 265, 274, 289, 290, 291, 295.

statement is actionable only if (i) "the speaker did not hold the belief she professed," (ii) "the supporting fact[s] she supplied were untrue," or (iii) the opinion "omits material facts about the [speaker's] inquiry into or knowledge concerning a statement of opinion" and "those facts conflict with what a reasonable investor would take from the statement itself." *Omnicare*, 575 U.S. at 186, 189. Sufficiently pleading an actionable opinion statement is "no small task for an investor." *Phx. Ins. Co.* v. *ATI Physical Therapy, Inc.*, 2023 WL 5748359, at *11 (N.D. Ill. Sept. 6, 2023) (quotation omitted).

Plaintiffs do not meet this high standard. They do not allege with particularity that any Defendant did not, in fact, believe any opinion statement or that any Defendant provided supporting facts that were untrue. For example, Plaintiffs challenge Hochschild's December 6, 2022 statement, "In student loans, I think it's been public. We've had some compliance challenges there, but the team is doing a lot of great work." (AC ¶ 265.) But Hochschild stated that he believed Discover's compliance challenges with student loan servicing were well understood by the public. He then expressed his opinion that "the team" addressing these issues was "doing a lot of great work." (Ex. 12 at 12.) Plaintiffs do not allege that Hochschild did not believe his statement, that he supplied supporting facts that were untrue, or that a reasonable investor would understand his statement as an assurance that regulators would not identify later deficiencies. Plaintiffs also challenge Greene's September 13, 2022 statement that "Discover has traditionally been conservative on accounting matters and legal matters" and that "we *believe* the financial exposure related to any matters related to the [student loan internal] investigation was able to be absorbed within our existing expense guidance" (AC ¶ 262 (emphasis added)), which fails for the same reasons.

-20-

> **5.** **Plaintiffs Fail To Plead That Statements About Financial Reporting or Disclosure Controls Were False.**

Finally, Plaintiffs assert that Defendants are liable for a handful of other opinions regarding the truthfulness of Discover's financial reporting and disclosure controls.[11]  In particular, Plaintiffs allege that regulatory deficiencies rendered false the following certifications that the Officer Defendants made pursuant to the Sarbanes-Oxley Act ("SOX"):  the Officer Defendants "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under [their] supervision"; "[e]valuated the effectiveness of [Discover]'s disclosure controls and procedures and presented in this report [their] conclusions about the effectiveness of the disclosure controls and procedures"; "report[ed] any change in [Discover]'s internal control over financial reporting"; and disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal controls over financial reporting" as well as "[a]ny fraud . . . that involves management or other employees who have a significant role in [Discover]'s internal control over financial reporting."  (AC ¶¶ 290-91.)

Plaintiffs conflate the kind of risk management and compliance issues that are discussed throughout the Amended Complaint—those dealing with the consent orders, deficiencies with student loan servicing practices, and the misclassification of certain credit card accounts—with the financial reporting and disclosure controls at issue in SOX certifications.  Courts have rejected precisely this kind of claim, holding that SOX certifications "pertain to the effectiveness" of *financial reporting and disclosure controls* and "do not concern controls generally."  *Green* v. *Deutsche Bank Aktiengesellschaft*, 2019 WL 4805804, at *2 (S.D.N.Y. Sept. 30, 2019); *see also Banco Bradesco*, 277 F. Supp. 3d at 649 n.13.  The SOX certifications do not, as Plaintiffs suggest,

---

[11]    *See* AC ¶¶ 262, 283, 289, 290, 291.

cover non-financial and non-disclosure controls, and Plaintiffs plead no particularized facts establishing that Discover's financial and disclosure controls covered by the SOX certifications were deficient.

In any event, even if Plaintiffs meant to allege that the SOX certifications are false because there are unspecified deficiencies in the Company's financial reporting or disclosure controls, Plaintiffs would still fail to plead falsity as to those statements for the same reasons discussed above in Section I.A.1. [12]   Plaintiffs mischaracterize statements regarding the "design[]" (AC ¶ 291) of financial reporting and disclosure controls as assurances that Discover had and would have no control deficiencies.  Courts uniformly reject these sorts of arguments in the SOX certification context.  *See*, *e.g.*, *Lachman* v. *Revlon, Inc.*, 487 F. Supp. 3d 111, 134 (E.D.N.Y. 2020) ("Plaintiffs fail to allege that [the company's] SOX certifications were materially false or misleading simply because a weakness in [the company's internal controls over financial reporting] was later discovered.").[13]

## B.     The Challenged Statements Are Immaterial as a Matter of Law.

Plaintiffs' claims also fail for the independent reason that the vast majority of challenged statements are immaterial as a matter of law.[14]   "[C]ourts everywhere have demonstrated a willingness to find immaterial as a matter of law" "rosy affirmation[s]" and "optimistic statements that are so vague" and "so lacking in specificity" that "no reasonable investor could find them important to the total mix of information available." *Allscripts*, 778 F. Supp. 2d at 872 (quotation

---

[12]     The SOX certification statements are also inactionable "statements of opinion." *Fryman* v. *Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at *17 (N.D. Ill. Apr. 18, 2022); *see supra* Section I.A.4.

[13]     Because SOX certifications "contain[] an important qualification that the certifying officer's statements are true 'based on [his] knowledge,'" courts also require plaintiffs to plead particularized facts showing actual knowledge that the statements were false. *Das* v. *Rio Tinto PLC*, 332 F. Supp. 3d 786, 812 (S.D.N.Y. 2018) (quotation omitted).  Plaintiffs do not do so.  (*See infra* at Section II.)

[14]     *See* AC ¶¶ 242, 248, 253, 257, 262, 265, 270, 271, 272, 274, 276, 280, 283, 294, 295.

omitted). "Scrutiny of vaguely optimistic statements for immateriality as a matter of law is 'especially robust' in cases involving a fraud-on-the-market theory of liability," like this one, because "[t]he market . . . is not easily misled by the rosy forecasts commonly issued by corporate spokespersons." *Midway Games*, 332 F. Supp. 2d at 1164-65 (quotation omitted).

"[S]imple and generic assertions" that a company has "'policies and procedures' and allocat[es] 'significant resources'" cannot "mislead a reasonable investor." *Fifth Third*, 2022 WL 1642221, at *16 (quoting *Singh*, 918 F.3d at 63-64); *see also City of Warren Police & Fire Ret. Sys.* v. *Zebra Techs. Corp.*, 2020 WL 6118571, at *6 (N.D. Ill. Oct. 16, 2020) (statement that enterprise resource planning system was "functioning really well" was clearly puffery). "No investor would take such statements seriously in assessing a potential investment, for the simple fact that almost every" financial institution makes these "routine representations." *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009).

The vast majority of the challenged statements are the kinds of "simple and generic" statements about policies, procedures, and allocating resources that courts routinely find inactionable. For example, Plaintiffs challenge statements in Discover's 10-Ks that its:

- "CEO establishes a risk management culture throughout the Company and ensures that businesses operate in accordance with this risk culture" (AC ¶ 242(f)); and

- "[risk management] framework is designed to be comprehensive" (*id.* ¶ 242(a)).

Plaintiffs also challenge statements by Hochschild that:

- "the team is doing a lot of great work" and that "I'm really excited about that product" (*id.* ¶ 265);

- "[t]op of the list is our focus on compliance first, which means we'll continue to strengthen and fine-tune our processes and comply with all the regulations required of a large national bank" (*id.* ¶ 257);

- "[i]n 2023, we're focused on maturing our compliance and risk management, including strengthening our monitoring and testing and strengthening all 3 lines of defense to better identify, assess and mitigate risk" (*id.* ¶ 276); and

-23-

- "continuing to make those investments on the compliance side . . . will continue to let us succeed" (*id.* ¶ 280).

*In re Citigroup Securities Litigation*, 2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023), is instructive. In that case, the plaintiffs challenged statements that Citigroup "made 'sustainable,' 'necessary,' 'essential,' and 'significant' investments in risk, control, and compliance"; "was and would remain 'commit[ted]' to making the necessary investments in these areas and would not 'compromise'"; "developed" its "Risk Governance Framework" "in alignment with the expectations of the [OCC]"; and "'manages its risks' through 'three lines of defense [that] collaborate with each other in structured forums and processes.'" *Id.* at *13-15. The court held that these statements were "nothing more than 'simple and generic assertions' regarding Citigroup's 'commitment to regulatory compliance' and intention 'to allocate significant resources,'" and were "not materially misleading absent significantly more detailed 'assurances of actual compliance.'" *Id.* at *14; *see also Rosenzweig* v. *Azurix Corp.*, 332 F.3d 854, 870 (5th Cir. 2003) ("'[M]aking steady progress' is precisely the sort of generalized positive characterization that is not actionable."); *Allianz SE*, No. 23-cv-719, slip op. at 15 (C.D. Cal. Mar. 13, 2024) (statements describing Allianz's "three lines of defense" were immaterial as a matter of law, despite "internal control failures").

Similarly, in *Fifth Third*, the bank's statement that "Compliance Risk Management provides independent oversight to *ensure* consistency and sufficiency in the execution of the program" was immaterial as a matter of law because it was "general and aspirational." 2022 WL 1642221, at *5, *16 (emphasis added). As was the CEO's statement that "[w]e are managing the risk across the company today exceptionally well." *Id.* at *17. So too here. Statements that Discover's CEO would "ensure[] that businesses operate in accordance with this risk culture" (AC ¶ 242(f)) or that Discover was "focused" on "strengthening all 3 lines of defense to better" "mitigate risk" (*id.* ¶ 276), and the vast majority of other challenged statements, are substantively

-24-

indistinguishable from those in *Citigroup* and *Fifth Third*.

Plaintiffs also challenge statements in or relating to Discover's Code of Conduct, including:

- "[t]he Company complies with both the letter and the spirit of fair and responsible banking laws" (*id.* ¶ 294 (quoting the 2019 Code of Conduct)); and

- "having strong governance and risk management is critical" and "[w]e adhere to a rigorous Code of Conduct" (*id.* ¶ 295).

"It is well-established that general statements about reputation, integrity, and compliance with ethical norms are inactionable puffery." *Chandler*, 2022 WL 952441, at *9 (quotation omitted). And a "company's adoption and publication of a code of ethics does not imply that all of its directors and officers are in compliance with that code." *Desai*, 654 F. Supp. 2d at 859. For example, in *Chandler* the court held that "Code of Conduct" statements promising to "act ethically" and to "deal[] with customers fairly, honestly and with integrity" were "precisely the types of general promises and commitments that other courts have held to be immaterial puffery as a matter of law." 2022 WL 952441, at *9.

## C. Plaintiffs Fail To Plead Viable Omission Claims.

Unable to identify any false statement, Plaintiffs finally gesture toward unspecified "omissions" of material facts. (*See, e.g.*, AC ¶ 302 (alleging that "the public statements detailed in Section VIII" "were materially false and misleading, including by omitting material facts").) It is axiomatic that under the securities laws "[s]ilence, absent a duty to disclose, is not misleading." *Basic Inc.* v. *Levinson*, 485 U.S. 224, 239 n.17 (1988). "[F]irms are entitled to keep silent (about good news as well as bad news) unless positive law creates a duty to disclose." *Gallagher*, 269 F.3d at 808. This is true even if a "reasonable investor would very much like to know" that information. *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993).

Neither adverse regulatory actions nor investigations, on their own, "impose . . . a duty upon publicly traded corporations to confess to uncharged, unadjudicated claims of wrongdoing."

*Société Générale*, 2018 WL 4616356, at *6. *Fifth Third* is again illustrative. The court there rejected the plaintiff's argument that the defendant company was required to disclose the "existence of [a] CFPB investigation" or that it "participated in the investigation." 2022 WL 1642221, at *15. Similarly, none of the investigations or consent orders at issue here imposed on Defendants an affirmative duty to publicly report alleged risk management or compliance deficiencies or to volunteer predictions about future adverse regulatory action. *See Anderson*, 140 F. Supp. 2d at 902 (FDA investigation did not impose duty to disclose despite previous audits).

Plaintiffs try next to invoke SEC Item 303, which requires publicly traded companies to disclose "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). Plaintiffs assert that Item 303 required Defendants to "disclose[] the information detailed in [their] Complaint regarding the systemic, pervasive, and long-running deficiencies and failures relating to Discover's risk management, compliance, corporate governance, and internal controls" because "[t]hose issues 'had a material impact on [Discover]'s reported operations' and were 'reasonably likely . . . to have a material impact on future operations.'" (AC ¶ 300.) This argument fails for at least three reasons.

*First*, Plaintiffs plead no particularized facts showing that Discover's alleged underinvestment in compliance was a "known" adverse trend beginning in 2019 or at the time of any of the allegedly false statements. *See Citigroup*, 2023 WL 2632258, at *20 (Item 303 claims failed where plaintiff did not adequately allege that the "underinvestment in risk management" was "'presently known' to the Defendants at the relevant times") (quotation omitted); *see also infra* Section II.

*Second*, Item 303 does not create an affirmative duty to disclose all alleged deficiencies in risk management and compliance and thus cannot give rise to an omission claim. *See In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1056 (9th Cir. 2014) ("Item 303 does not create a duty to disclose for purposes of Section 10(b) and Rule 10b-5."); *Oran* v. *Stafford*, 226 F.3d 275, 287-88 (3d Cir. 2000) ("Item 303 does not lead inevitably to the conclusion that such disclosure would be required under Rule 10b-5."); *see also* Pet. for Writ of Cert. at i, *Macquarie Infrastructure Corp.* v. *Moab Partners, L.P.*, No. 22-1165 (May 30, 2023) (cert. granted Sept. 29, 2023). If Plaintiffs were correct, Item 303 would entirely swallow the general rule that the securities laws "do not require a company's management to confess guilt to uncharged crimes." *Société Générale*, 2018 WL 4616356, at *5.

*Finally*, Plaintiffs' Item 303 argument ignores that Discover's SEC filings contained extensive "disclosures regarding its risks that were company-specific and related to the direct risks it uniquely faced." *Ong* v. *Chipotle Mexican Grill, Inc.*, 2017 WL 933108, at *11 (S.D.N.Y. Mar. 8, 2017). As discussed above (*see supra* Section I.A.3, at 18-19), Discover repeatedly disclosed to investors in its SEC filings that regulators could find that its compliance efforts were insufficient, that "supervisory guidance and practices, or the application thereof, may adversely affect our business, financial condition and results of operations," and that "regulatory actions could subject us to significant fines, penalties and/or requirements resulting in increased expenses, oversight and reputation risk." (*See*, *e.g.*, Ex. 5 at 41-42.) Defendants "provided disclosures regarding its risks that were company-specific and related to the direct risks it uniquely faced." *Citigroup*, 2023 WL 2632258, at *20. They were "not required to do more." *Id*.

## II.    PLAINTIFFS DO NOT ADEQUATELY PLEAD SCIENTER.

The Amended Complaint should also be dismissed for the independent reason that Plaintiffs fail to adequately plead "a strong inference of scienter with respect to each" Defendant.

*Pugh* v. *Tribune Co.*, 521 F.3d 686, 693 (7th Cir. 2008).

Plaintiffs' burden here is significant. Under the PSLRA and Rule 9(b), a plaintiff must plead particularized facts that the defendant acted with a contemporaneous "intent to deceive, demonstrated by knowledge of the statement's falsity or reckless disregard of a substantial risk that the statement is false." *Higginbotham* v. *Baxter Int'l, Inc.*, 495 F.3d 753, 756 (7th Cir. 2007). Recklessness requires "an extreme departure from the standards of ordinary care . . . to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it." *Makor Issues & Rts., Ltd.* v. *Tellabs, Inc.,* 513 F.3d 702, 704 (7th Cir. 2008). Further, the PSLRA requires that plaintiff plead particularized facts establishing "a strong inference" of scienter. *Cornielsen* v. *Infinium Cap. Mgmt., LLC*, 916 F.3d 589, 601 (7th Cir. 2019). A strong inference exists "only if a reasonable person would deem the inference . . . cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). Plaintiffs must plead particularized facts (i) "showing that the defendants had both the motive and opportunity to commit fraud," or (ii) "presenting strong circumstantial evidence of conscious misbehavior or recklessness." *In re CBOE Volatility Index Manip. Antitrust Litig.*, 435 F. Supp. 3d 845, 861 (N.D. Ill. 2020), *aff'd*, 42 F.4th 619 (7th Cir. 2022).[15] The Amended Complaint does neither.

### A. The Amended Complaint's Generic Allegations of Motive and Opportunity Are Insufficient.

To plead scienter based on "motive and opportunity," Plaintiffs must allege particularized facts that each Defendant had both the motive ("concrete benefits that could be realized by" the

---

[15] Although some courts in this district have treated motive and opportunity as a separate prong for demonstrating scienter, the Seventh Circuit has instead endorsed the view that motive and opportunity "may be useful indicators" to be considered "collectively" with other allegations. *Makor Issues & Rts., Ltd.* v. *Tellabs, Inc.*, 437 F.3d 588, 601 (7th Cir. 2006), *vacated and remanded on other grounds*, 551 U.S. 308 (2007).

alleged fraud) *and* opportunity ("the means and likely prospect" of achieving the fraud).  *Scheiner* v. *Midas, Inc.*, 2013 WL 329006, at *8 (N.D. Ill. Jan. 29, 2013).

Notably, Plaintiffs do not allege that any Defendant engaged in "[i]nsider trading" that was "suspicious in scope or timing."  *Davis* v. *SPSS, Inc.*, 385 F. Supp. 2d 697, 715 (N.D. Ill. 2005); *see Higginbotham*, 495 F.3d at 759 ("the *absence* of sales by" company managers "who would have been in the know . . . implies that nothing was thought to be out of the ordinary").  Instead, Plaintiffs allege that the Officer Defendants were incentivized to increase Discover's earnings per share and stock price, including through "aggressive" stock repurchases, because "Hochschild's and other [*unspecified*] executives' annual compensation" was tied to those metrics.  (AC ¶¶ 316, 388-89.)[16]  But such compensation-based allegations are "too common among corporations and their officers to be considered evidence of scienter."  *Fifth Third*, 2022 WL 1642221, at *23.  Plaintiffs offer no explanation for why Defendants' standard compensation incentives would have motivated them to misrepresent Discover's compliance and risk management systems.  "Were courts to accept these motives as sufficient to establish scienter, most corporate executives would be subject to such allegations, and the heightened pleading requirements for these claims would be meaningless."  *Davis*, 385 F. Supp. 2d at 714.  Moreover, Plaintiffs allege no facts regarding Greene's or Graf's compensation structure, and Graf retired from Discover in 2019, before the purportedly "aggressive" repurchases from 2021 through 2023.  (*See* AC ¶¶ 38, 316, 388-89.)

---

[16]     Plaintiffs' assertion that repurchases were more "aggressive" during the class period than in prior years is contradicted by judicially noticeable SEC filings.  Discover in fact repurchased *fewer shares* during each year of the class period compared to every prior year since 2012.  (Ex. 40; *see also supra* note 1.)  Plaintiffs rely on a graph showing that the *dollar value* of repurchases was higher in some *quarters* from 2021-2023, as compared to 2011-2020, though the same graph also shows that the value of repurchases was lower in other quarters of 2021-2023, compared to 2011-2020.  (AC ¶ 388.)  Plaintiffs thus do not indicate whether the value of repurchases was up on an *annualized* basis at all, let alone whether any increases in the value of repurchases were disproportionate to increases in Discover's stock price (which *quadrupled* over the same period (Ex. 39)), or out of line with historical trends for Discover or its peers.

### B. The Amended Complaint's Speculation as to Conscious Misbehavior or Recklessness Is Insufficient.

Having failed to allege motive and opportunity, Plaintiffs attempt to plead conscious misbehavior or recklessness. The strength of these "circumstantial allegations must be correspondingly greater than the allegations used to support 'motive and opportunity.'" *Rehm* v. *Eagle Fin. Corp.*, 954 F. Supp. 1246, 1255 (N.D. Ill. 1997). An allegation that a defendant "should have known about fraud is not enough." *CBOE*, 435 F. Supp. 3d at 861. Rather, Plaintiffs must allege particularized facts showing that each Defendant's conduct in making the challenged statements was "an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or was so obvious that the defendant must have been aware of it." *Antelis* v. *Freeman*, 799 F. Supp. 2d 854, 865 (N.D. Ill. 2011). Plaintiffs rely on a number of speculative theories and assumptions, none of which supports a compelling inference that any Defendant made any challenged statement with conscious misbehavior or recklessness.

***Assumptions Based on Corporate Role.*** Plaintiffs attempt to show scienter by asserting that the alleged fraud "could not have been perpetrated without the knowledge or recklessness of personnel at the highest level of the Company, including the Officer Defendants." (AC ¶ 302.) For example, Plaintiffs assert that the duration of the credit card misclassification issue "indicates *senior management*" knew of or recklessly disregarded that practice (*id.* ¶ 306 (emphasis added)), and that the "magnitude, scope, and duration of . . . internal control failures" made it unlikely that they "occurred without the Officer Defendants' knowledge" (*id.* ¶ 311). Plaintiffs also state that Hochschild in particular must have known or acted recklessly with respect to the compliance and risk "failures" identified in the FDIC and CFPB consent orders in light of his role as "the executive responsible for maintaining a corporate culture." (*Id.* ¶ 304.) Courts have repeatedly rejected these kinds of conclusory attempts to impute scienter to individual officers on the basis of their

-30-

positions. *See Rossy* v. *Merge Healthcare Inc.*, 169 F. Supp. 3d 774, 784 (N.D. Ill. 2015) ("Allegations, for example, that defendants were high-ranking officers and directors of [the company] merit scant consideration."). Far from constituting particularized facts sufficient to establish a strong inference of scienter, the Officer Defendants' "respective positions within a company prove nothing about fraud or knowledge thereof but rather are exactly the type of generalized allegations the court must disregard under the PSLRA." *Arbitrage Event-Driven Fund* v. *Tribune Media Co.*, 2020 WL 60186, at *10 (N.D. Ill. Jan. 6, 2020).

Moreover, Plaintiffs have not alleged that Discover's Chief Financial Officers (Graf and Greene) had any involvement in, responsibility for, or specialized knowledge regarding, consumer law and regulatory compliance risk management in the first place. Instead, Plaintiffs acknowledge that Discover's compliance function reports up to a Chief Risk Officer, not the CFO. (AC ¶ 73.) Further, all of the allegations that attempt to impute scienter to "the Officer Defendants" or "senior management" amount to impermissible group-pleading and do not satisfy the requirements of the PSLRA or Rule 9(b). *Rossy*, 169 F. Supp. at 781.

**Former Employee Allegations.** Nor do purported statements from six unnamed former employees provide a strong inference of scienter. As an initial matter, the Seventh Circuit has admonished that the use of unnamed confidential sources to support securities fraud claims "does nothing but obstruct the judiciary's ability to implement the PSLRA." *Higginbotham*, 495 F.3d at 757. Even at the motion to dismiss stage, such allegations "require a heavy discount" because the "sources may be ill-informed, may be acting from spite rather than knowledge, may be misrepresented, [or] may even be nonexistent." *City of Livonia Emps.' Ret. Sys. & Loc. 295/Loc. 851* v. *Boeing Co.*, 711 F.3d 754, 759 (7th Cir. 2013).

Regardless, the allegations do not show that any Officer Defendant acted with scienter.

-31-

Plaintiffs assert in general terms that, according to the former employees, the Company had "a toxic compliance culture" (AC ¶ 246); "executives 'did not care—there was a culture of non-compliance'" (*id*. ¶ 102); "executives 'leaned on' compliance personnel . . . to help the business with risk" (*id*. ¶ 107); and "senior management and executives complained they did not have sufficient resources to perform important compliance functions" (*id*. ¶ 152). But general allegations about unspecified "executives" and "senior management" do not raise a strong inference of scienter. As to Greene or Graf, who had oversight over *financial* matters, not consumer compliance, the Amended Complaint does not contain a single allegation from any of the alleged former employees. In fact, none of the former employees is alleged to have reported to, provided information to, or even to have spoken to Greene or Graf, and the Amended Complaint affirmatively alleges facts demonstrating that four of the former employees did not have any direct or indirect reporting relationship to or through Greene or Graf. (*See id.* ¶¶ 52, 53, 55, 57.)

The handful of former employee allegations referencing Hochschild fare no better. According to Plaintiffs, one former employee alleges that Hochschild "reportedly was involved in some of those calls" regarding the "status of DSL and the [2020 CFPB] consent order" and that "all the executives were really concerned with what was going on in the student loan business unit." (*Id.* ¶ 212 (alteration in original).) But Plaintiffs do not explain why Hochschild's knowledge of the publicly disclosed consent order—or concern from unnamed executives about unspecified student loan servicing issues—shows that Hochschild, or any other individual, acted with scienter when describing the Company's compliance and risk management functions. Nor do they allege that any former employee pointed to any internal document or information contradicting Hochschild's public statements. Plaintiffs merely allege that, according to former employees, Hochschild "actively participat[ed] in Compliance Committee meetings" (*id*. ¶ 143);

Hochschild "would have received those quarterly reports . . . which included an inventory of regulatory findings" (*id*. ¶ 142); and "clos[ing] the regulatory findings . . . [was] a big issue for [Hochschild]" (*id*. ¶ 150). Again, Plaintiffs do not explain why the CEO's oversight of compliance and risk management matters—especially in connection with regulatory consent orders—shows that any challenged statement was made with scienter. Indeed, one would expect the CEO to be involved with those efforts. And again, although a former employee alleges, according to Plaintiffs, that Hochschild attended "meetings for the U.S. cards business" and "received a 'monthly scorecard on risk management activity,'" the former employee is not alleged to claim that those meetings or scorecards surfaced information that was inconsistent with what Discover said about its compliance systems. (*Id*. ¶ 144.) If anything, all these allegations highlight the accuracy of what Discover *actually* said in its disclosures—that Discover had policies and procedures in place to support the risk management and compliance systems, with senior management engaged in governance and oversight of those systems.

***Core Operations.*** Plaintiffs invoke the "core operations" doctrine, alleging that the "centrality of risk management, compliance, and corporate governance to Discover's business itself supports an inference that the Officer Defendants knew about significant problems in those areas," given that Discover "operates in a heavily regulated industry." (*Id.* ¶ 308.) The "core operations" inference "typically applies only where the operation in question constitute[s] nearly all of a company's business." *In re Baxter Int'l Inc. Sec. Litig.*, 2021 WL 100457, at *13 (N.D. Ill. Jan. 12, 2021) (quotation omitted). Although risk management and compliance are undoubtedly critical components of any business in a heavily regulated industry, Plaintiffs do not allege facts showing they "constitute nearly all" of Discover's business. A contrary finding would eviscerate

the scienter requirement for any securities fraud case involving a heavily regulated industry.[17]

**SOX Certifications.** Plaintiffs assert that the Officer Defendants' SOX certifications "indicate they knew or recklessly disregarded the issues detailed in this Complaint." (AC ¶ 310.) But "signatures on SEC filings and certifications, without additional details supporting knowledge that the statements were false, 'add nothing substantial to the scienter calculus.'" *Fifth Third*, 2022 WL 1642221, at *22 (quotation omitted). Here, because the SOX certifications relate to the design and effectiveness of "financial reporting" and "disclosure" controls and procedures (AC ¶ 290)— and say nothing about Discover's risk management or compliance systems—the SOX certifications especially do not support scienter. Notably, Plaintiffs do not explain how an assessment focused on financial reporting and disclosure controls, as required by SOX, would also require the Officer Defendants to conduct a sweeping evaluation of "Discover's risk management, compliance, corporate governance, and internal controls" more generally. (*Id*. ¶ 310.)

**Reliance on CEO Resignation.** Plaintiffs attempt to plead scienter by citing the resignation of Hochschild as CEO and related media speculation (*id*. ¶¶ 312-13), but do not explain how "an individual's resignation from a company is sufficient to create an inference—much less a strong one—of scienter as to that individual." *Roth* v. *OfficeMax, Inc.*, 527 F. Supp. 2d 791, 803 n.14 (N.D. Ill. 2007); *see also Rio Tinto*, 332 F. Supp. 3d at 815 ("[T]here are any number of reasons that an executive might resign, most of which are not related to fraud."). And Greene remains Discover's CFO. Even if a "suspicious change in personnel" could "lend modest support to an inference of scienter" in some circumstances, *Phx. Ins.*, 2023 WL 5748359, at *19, Plaintiffs

---

[17] This theory also misses the point, as Plaintiffs cannot succeed by merely pleading that the Officer Defendants knew Discover had unresolved compliance issues. They must instead plead the Officer Defendants knew Discover lacked the compliance framework or had not made the investments in risk management described in their challenged public statements. *See Société Générale*, 2018 WL 4616356, at *8 ("[E]ven assuming each individual defendant here was aware" company took a certain tax position, "it does not necessarily follow that they disbelieved their statements" concerning compliance with tax laws).

have not made such a showing here. Plaintiffs highlight that Hochschild's resignation came about a month after he stated, "I do believe we underinvested [in compliance] and that's something I take accountability for." (AC ¶ 312.) But it does not follow from Hochschild's hindsight opinion that he or any other Defendant believed *during the historical period* that they were underinvesting or that they otherwise knew or recklessly disregarded that any challenged statement was false or misleading. *See W. Palm Beach Firefighters' Pension Fund* v. *Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 659 (N.D. Ill. 2020) ("fraud by hindsight" allegations insufficient to establish scienter), *aff'd*, 2022 WL 1449184 (7th Cir. May 9, 2022).

**Other Theories.** Plaintiffs also assert that they have adequately pleaded scienter because "the Officer Defendants focused attention on risk management matters during their calls with analysts" (AC ¶ 314), and "repeated emphasis on . . . compliance and risk management" suggest that "they were intimately familiar with that issue" (*id.* ¶ 307).[18] In other words, Plaintiffs argue that the fact that the Officer Defendants made statements related to compliance and risk management shows that they must have known that those statements about compliance and risk management were false. "This circular argument is without merit." *In re Bristol-Myers Squibb Co. CVR Sec. Litig.*, 658 F. Supp. 3d 220, 233 n.6 (S.D.N.Y. 2023) (rejecting plaintiffs' argument that "top management repeatedly ma[king] false or misleading statements" was probative of scienter). It would eviscerate the PSLRA's heightened pleading standard if allegations that an executive merely spoke on a topic were enough to establish a strong inference of scienter.

Plaintiffs also allege that the inference of the Officer Defendants' scienter is "particularly compelling in light of the directives in both the 2015 and 2020 CFPB Orders," which "require[d]

---

[18] Although asserted against "the Officer Defendants" as a group, all of the alleged analyst calls postdate Graf's departure from Discover. (*See supra* note 3.)

'timely reporting by management to the Board.'"  (AC ¶ 305.)  According to Plaintiffs, "the fact that Discover repeatedly violated the 2015 CFPB Consent Order" "indicates senior management did not adhere to those directives."  (*Id.*)  If anything, the Officer Defendants' awareness of the consent orders supports the *opposite* inference.  If, as Plaintiffs allege, the Officer Defendants were aware that Discover's compliance and risk management programs were deficient and were incentivized by their compensation structure to increase the Company's stock price and earnings per share, it is unlikely that they would let those problems fester, since adverse regulatory action would potentially require a pause in share repurchases pending any investigation and would possibly subject Discover to the risk of further regulatory actions and fines.  *See Seaman* v. *Cal. Bus. Bank*, 2014 WL 1339649, at *6 (N.D. Cal. Apr. 2, 2014) (that company "was subject to a consent order . . . does not give Defendants a *greater* motive to lie. . . .  If anything, it would tend to suggest the opposite").  Indeed, there is a far more compelling inference here:  Defendants made good-faith general statements regarding Discover's compliance and risk management systems, but those systems nonetheless fell short, as Discover had disclosed could occur.  *See CBOE*, 435 F. Supp. 3d at 865 (court must "consider plausible opposing inferences").

## C.      Plaintiffs Fail to Plead Corporate Scienter.

Because a corporation can act only through its employees, "the corporate scienter inquiry" focuses on "the state of mind of the individual corporate official or officials who make or issue [or approve] the statement . . . rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment."  *Pugh*, 521 F.3d at 697.  For the reasons explained above, Plaintiffs have failed to adequately plead scienter for any of the Individual Defendants, and thus have failed to adequately plead scienter for Discover as well.[19]

---

[19]      The Seventh Circuit has posited that a narrow exception could exist for statements that are so

### III.    PLAINTIFFS FAIL TO ADEQUATELY PLEAD SCHEME LIABILITY UNDER RULES 10b-5(a) AND (c).

Plaintiffs' attempt to repackage their defective false statement and omission claims into "scheme liability" claims under Rules 10b-5(a) and (c) also fails.  As a threshold matter, scheme liability does not apply here as a matter of law because Plaintiffs' claims are based on alleged "misstatements and omissions alone."  *See SEC* v. *Rio Tinto plc*, 41 F.4th 47, 54 (2d Cir. 2022).[20] But even putting that issue aside, Plaintiffs fail to plead with particularity that each defendant (1) acted with scienter for the reasons discussed above (*see supra* Section II), and (2) committed a deceptive or manipulative act, as discussed below.  *Desai*, 654 F. Supp. 2d at 862.

*First*, Plaintiffs do not plead with particularity "who played what role in the alleged scheme."  *Id.*  Plaintiffs assert that the "Officer Defendants" carried out a "scheme" to inflate Discover's stock price and earnings per share by "causing Discover to pursue an aggressive and unprecedented stock repurchase program" instead of making "critical investments" in compliance and risk management, and not "disclos[ing] the extent of [compliance and risk management] deficiencies."  (AC ¶ 393.)  But Plaintiffs never explain which Officer Defendant(s) even had authority to institute share repurchases.[21]  Plaintiffs' scheme liability allegations never mention

---

dramatically false that corporate scienter can be inferred without naming the responsible individuals. *Tellabs, Inc.*, 513 F.3d at 710.  The example provided in *Tellabs* is if GM "announced that it had sold one million SUVs . . . and the actual number was zero," *id.*, which is a far cry from any of the challenged statements here.

[20]    Although some district courts in this circuit have held that a scheme liability claim can be "predicated on the same conduct as that supporting claims under Rule 10b-5(b)," *SEC* v. *Kameli*, 2020 WL 2542154, at *15 (N.D. Ill. May 19, 2020), "[t]he Seventh Circuit has not considered the issue," and "the majority of courts to have done so have required deceptive conduct beyond a mere misstatement or omission."  *SEC* v. *Ustian*, 2019 WL 7486835, at *40 (N.D. Ill. Dec. 13, 2019).  That rule makes good sense, as a contrary rule would "allow private litigants to repackage their misstatement claims as scheme liability claims to 'evade the pleading requirements imposed in misrepresentation cases.'"  *Rio Tinto*, 41 F.4th at 55 (quotation omitted).

[21]    Discover's SEC filings reflect (and Plaintiffs do not dispute) that share repurchases are approved by the Board.  (*See*, *e.g.*, Ex. 3 at 71; *supra* note 1.)

Greene or Graf by name, and reference Hochschild only when discussing the alleged scheme's impact on his "and other Company executives' personal compensation." (*See*, *e.g.*, *id*. ¶ 387.)

*Second*, "pursu[ing] an aggressive stock repurchase program" and "underinvest[ing]" in compliance and risk management (*id*.) do not constitute deceptive and manipulative acts, even if Plaintiffs now believe those decisions "reflect[ed] bad business judgment." *Fryman* v. *Atlas Fin. Holdings, Inc.*, 462 F. Supp. 3d 888, 898 (N.D. Ill. 2020); *see also In re Citigroup, Inc. Sec. Litig.*, 330 F. Supp. 2d 367, 377 (S.D.N.Y. 2004), *aff'd*, 165 F. App'x 928 (2d Cir. 2006). It strains credulity to suggest that pursuing share repurchases was deceptive, given that share repurchases are disclosed in SEC filings (*see*, *e.g.*, Ex. 3 at 71; Ex. 7 at 113), as are executive compensation amounts and structure (AC ¶¶ 390-92). Further, Plaintiffs do not plead particularized facts showing that any of the Officer Defendants "caused Discover to underinvest" in compliance and risk management (*id*. ¶ 18), or did so somehow to increase their compensation. Notably, Plaintiffs do not dispute Hochschild's statement that Discover's "spending on compliance and risk management is up roughly $250 million a year from 2019" to 2023 (*id*. ¶ 280), *i.e.*, during the lion's share of the class period, which is inconsistent with the theory that any of the Officer Defendants schemed to deliberately underinvest.[22]

*Finally*, Plaintiffs also do not plead any particularized factual allegations that the Officer Defendants "suppress[ed]" or "conceal[ed]" alleged risk management and compliance deficiencies or underinvestment. (*Id*. ¶ 387.) The securities laws do not require Defendants "to confess to uncharged, unadjudicated claims of wrongdoing." *Société Générale*, 2018 WL 4616356, at *15.

---

[22]    Plaintiffs do not, and cannot, allege that Graf had any involvement in the purportedly "aggressive" repurchases between 2021 and 2023 because he retired in 2019. (*See* AC ¶¶ 38, 389.)

## IV.    PLAINTIFFS DO NOT ADEQUATELY PLEAD CONTROL PERSON LIABILITY UNDER SECTION 20(a).

Plaintiffs fail to plead that each Individual Defendant is liable under Section 20(a) as a control person with respect to the challenged statements.  To state a claim under Section 20(a), which is "subject to the heightened pleading standards" of Rule 9(b), Plaintiffs must allege: (1) "a primary securities violation"; (2) "each of the [individual defendants] possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated, whether or not that power was exercised"; and (3) "each of the [individual defendants] exercised general control over the operations of" the violator.  *Brasher* v. *Broadwind Energy, Inc.*, 2012 WL 1357699, at *12 (N.D. Ill. Apr. 19, 2012).  *First*, because Plaintiffs fail to allege a "primary securities violation" for the reasons stated above, their control person claims fail as well.  *Walleye Trading LLC* v. *AbbVie, Inc.*, 2019 WL 4464392, at *5 (N.D. Ill. Sept. 18, 2019).

*Second*, Plaintiffs fail to plead with particularity that any Individual Defendant had control over the drafting or preparation of the specific challenged statements.  Plaintiffs allege in conclusory fashion that each had control "by virtue of their high-level positions within the Company."  (AC ¶ 400.)  But "a plaintiff may not premise control person liability solely upon status within the company."  *Starr* v. *!Hey, Inc.*, 2003 WL 21212596, at *4 (N.D. Ill. May 23, 2003); *see also Donovan* v. *ABC-NACO Inc.*, 2002 WL 1553259, at *6 (N.D. Ill. July 15, 2002) ("[T]he mere fact that . . . these Defendants are directors is not enough.").  Moreover, Plaintiffs do not allege a single fact supporting their assertions that the Director Defendants were "directly involved" in Discover's "day-to-day operations" or "decision-making."  (AC ¶¶ 400, 403.)[23]

---

[23]    Plaintiffs resort to group pleading based on the supposed "collective actions" of the 13 Individual Defendants (AC ¶ 400), which is prohibited by Rule 9(b), *Donovan*, 2002 WL 1553259, at *4.  "[L]umping together" the Individual Defendants, *id.* (quotation omitted), also ignores that the composition of both the Board and management changed throughout the class period.  For example, Graf left Discover in September

Plaintiffs' assertion that "the CFPB had tasked the *Discover Board* generally with examining and rectifying the significant compliance issues the agency identified in the CFPB Consent Orders" (*id.* ¶ 403) (emphasis added) is "contradicted by the incorporated documents." *Borsuk*, 2023 WL 8764390, at *1. For one, neither Discover nor its Board are parties to the consent orders with the CFPB. Rather, the consent orders were entered by *Discover Bank* and other subsidiaries, and impose certain requirements on *Discover Bank's board*, which was separate from Discover's Board. (Ex. 37 ¶¶ 3(c), 53-55; Ex. 38 ¶¶ 3(d), 74-76.) Further, the CFPB in fact directed "the [Discover Bank] Board, or a relevant committee, thereof" to exercise routine oversight *of management*, such as "timely reporting *by management* to the [Discover Bank] Board on the status of compliance obligations," authorizing management to take "whatever actions are necessary" for such compliance, and reviewing management's submissions to the CFPB. (*Id.*)

*Finally*, Plaintiffs' assertion that every Individual Defendant somehow controlled oral statements by Hochschild and Greene during "earnings calls, presentations, and other forums" (AC ¶¶ 247, 401) fails. Plaintiffs do not allege that Graf or any Director Defendant even joined or was present for any of those calls or presentations, let alone that any of them helped prepare or draft, or otherwise had control over, Hochschild's and Greene's responses to questions in real time.

## CONCLUSION

For the foregoing reasons, and because Plaintiffs have already had the opportunity to amend, the Court should dismiss Plaintiffs' Amended Complaint with prejudice. *See Gardner* v. *MeTV*, 2024 WL 779728, at *4 (N.D. Ill. Feb. 15, 2024).

---

2019 and therefore cannot be a control person for any challenged statement made after that date. (AC ¶ 38.) Similarly, O'Leary-Gill and Rawlinson cannot be control persons for statements made before they joined Discover's Board, in June 2023 and February 2021, respectively. (*Id.* ¶¶ 46, 48.)

Dated: March 27, 2024

Respectfully submitted,

SULLIVAN & CROMWELL LLP

/s/ Christopher M. Viapiano

Christopher M. Viapiano
David N. Whalen
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006
Telephone: (202) 956-7500
Facsimile: (202) 293-6330
viapianoc@sullcrom.com
whalend@sullcrom.com

Leonid Traps
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
trapsl@sullcrom.com

*Counsel for Discover Financial Services*

SIDLEY AUSTIN LLP

/s/ Hille Sheppard (with consent)

Hille Sheppard
Christopher Lee
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
hsheppard@sidley.com
chris.lee@sidley.com

*Counsel for R. Mark Graf*

GOODWIN PROCTER LLP

/s/ John Barker (with consent)
Deborah Birnbach
John Barker
100 Northern Avenue
Boston, Massachusetts 02210
Telephone: (617) 570-1000
DBirnbach@goodwinlaw.com
JBarker@goodwinlaw.com

*Counsel for John T. Greene*

WINSTON & STRAWN LLP

/s/ Seth Farber (with consent)
Seth Farber (admitted *pro hac vice*)
Thania ("Athanasia") Charmani (admitted *pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 294-6400
SFarber@winston.com
ACharmani@winston.com

Joseph Motto
35 W Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-3728
JMotto@winston.com

*Counsel for Roger C. Hochschild*

WILLKIE FARR & GALLAGHER LLP

/s/ Todd G. Cosenza (with consent)

Todd G. Cosenza (admitted *pro hac vice*)
Charles D. Cording (admitted *pro hac vice*)
Joshua S. Levy (admitted *pro hac vice*)
Amanda M. Payne (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
tcosenza@willkie.com
ccording@willkie.com
jlevy@willkie.com
apayne@willkie.com

*Counsel for Mary K. Bush, Candace H. Duncan, Joseph F. Eazor, Daniela O'Leary Gill, Cynthia Glassman, Thomas G. Maheras, Michael Moskow, John B. Owen, David L. Rawlinson II, and Jennifer L. Wong*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on March 27, 2024, I caused the foregoing Memorandum of Law in Support of Defendants' Motion To Dismiss to be electronically filed via the Court's CM/ECF system, which effected service upon all counsel of record.


           /s/ Christopher M. Viapiano
           Christopher M. Viapiano