## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| KBC ASSET MANAGEMENT NV, NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM, NEW YORK CITY POLICE PENSION FUND, NEW YORK CITY FIRE DEPARTMENT PENSION FUND, and TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>DISCOVER FINANCIAL SERVICES, ROGER C. HOCHSCHILD, JOHN T. GREENE, R. MARK GRAF, MARY K. BUSH, CANDACE H. DUNCAN, JOSEPH F. EAZOR, CYNTHIA GLASSMAN, THOMAS G. MAHERAS, MICHAEL MOSKOW, DANIELA O'LEARY GILL, JOHN B. OWEN, DAVID L. RAWLINSON II, and JENNIFER L. WONG,<br><br>Defendants. | Case No. 1:23-cv-06788<br><br><u>CLASS ACTION</u><br><br>Hon. Martha M. Pacold |

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

Page

BACKGROUND AND SUMMARY OF ARGUMENT ............................................................... 1

ARGUMENT ............................................................................................................................. 7

I.     PLAINTIFFS PLAUSIBLY ALLEGE DEFENDANTS MADE FALSE OR MISLEADING STATEMENTS OF MATERIAL FACT ............................. 7

       A.     Plaintiffs Sufficiently Plead Falsity. ............................................................ 7

          1.     Defendants misrepresented Discover's investments in compliance. ....................................................................................... 7

          2.     Defendants misrepresented Discover's risk management structure. ........................................................................................ 9

          3.     Defendants misrepresented Discover's risk management and compliance capabilities. ........................................................ 13

          4.     Defendants' "opinions" are not immunized from liability. .......... 15

          5.     Defendants are liable for any "forward-looking statements." ............................................................................... 16

          6.     Plaintiffs sufficiently allege Defendants omitted material facts that rendered their statements misleading. ......................... 18

       B.     Plaintiffs Plausibly Allege Defendants' Statements Are Material............ 19

II.    PLAINTIFFS' ALLEGATIONS GIVE RISE TO A STRONG INFERENCE OF DEFENDANTS' SCIENTER ................................................ 22

       A.     The Duration and Magnitude of the Deficiencies and Misconduct at Discover Strongly Indicate Defendants' Knowledge or Recklessness. ............................................................................................ 23

       B.     Defendants' Admissions Support an Inference of Scienter. ..................... 31

       C.     Additional Facts Enhance the Scienter Inference. ................................... 33

       D.     Defendants Had the Motive and Opportunity to Commit Fraud. ............. 35

III.    PLAINTIFFS SUFFICIENTLY ALLEGE SCHEME LIABILITY .................... 37

IV.    PLAINTIFFS SUFFICIENTLY PLEAD CONTROL PERSON CLAIMS ......... 39

CONCLUSION ....................................................................................................................... 40

# TABLE OF AUTHORITIES

Page

**Cases**

*ABN AMRO, Inc. v. Capital Int'l Ltd.*,
595 F. Supp. 2d 805 (N.D. Ill. 2008) ........................................................................7

*In re Akorn, Inc. Sec. Litig.*,
240 F. Supp. 3d 802 (N.D. Ill. 2017) ......................................................................35

*Allison v. Oak St. Health, Inc.*,
2023 WL 1928119 (N.D. Ill. Feb. 10, 2023) .................................................. *passim*

*Arbitrage Event-Driven Fund v. Tribune Media Co.*,
2020 WL 60186 (N.D. Ill. Jan. 7, 2020) ..................................................................33

*Asher v. Baxter Int'l Inc.*,
377 F.3d 727 (7th Cir. 2004) .............................................................................17, 33

*Atlas v. Accredited Home Lenders Holding Co.*,
556 F. Supp. 2d 1142 (S.D. Cal. 2008) ...................................................................20

*In re Banco Bradesco S.A. Sec. Litig.*,
277 F. Supp. 3d 600 (S.D.N.Y. 2017) .......................................................................8

*In re Baxter Int'l Inc. Sec. Litig.*,
2021 WL 100457 (N.D. Ill. Jan. 12, 2021) .............................................................33

*Bell v. Publix Super Mkts., Inc.*,
982 F.3d 468 (7th Cir. 2020) .....................................................................................4

*In re BofI Holding, Inc. Sec. Litig.*,
2017 WL 2257980 (S.D. Cal. May 23, 2017) .....................................................19, 40

*CFTC v. Kraft Foods Grp., Inc.*,
153 F. Supp. 3d 996 (N.D. Ill. 2015) ......................................................................37

*Chandler v. Ulta Beauty, Inc.*,
2022 WL 952441 (N.D. Ill. Mar. 30, 2022) .......................................................30, 33

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
2018 WL 2382600 (S.D.N.Y. May 24, 2018) ..........................................................28

*In re Chi. Bd. Options Exch. Volatility Index Manipulation Antitrust Litig.*,
435 F. Supp. 3d 845 (N.D. Ill. 2020) ......................................................................37

*In re Citigroup Sec. Litig.*,
2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) .....................................................21, 22

**TABLE OF AUTHORITIES**
**(Cont'd)**

Page

*In re Citigroup, Inc. Sec. Litig.*,
330 F. Supp. 2d 367 (S.D.N.Y. 2004), *aff'd*, 165 F. App'x 928 (2d Cir. 2006)......................39

*City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*,
2013 WL 566805 (N.D. Ill. Feb. 13, 2013) ...................................................... *passim*

*Desai v. Gen. Growth Props., Inc.*,
654 F. Supp. 2d 836 (N.D. Ill. 2009) .......................................................................17

*DH2, Inc., v. Athanassiades*,
404 F. Supp. 2d 1083 (N.D. Ill. 2005) .....................................................................37

*In re FBR Inc. Sec. Litig.*,
544 F. Supp. 2d 346 (S.D.N.Y. 2008)................................................................11, 12

*Fryman v. Atlas Fin. Holdings, Inc.*,
2022 WL 1136577 (N.D. Ill. Apr. 18, 2022) ...............................................11, 16, 19

*Fryman v. Atlas Fin. Holdings, Inc.*,
462 F. Supp. 3d 888 (N.D. Ill. 2020) .................................................................27, 38

*In re Galena Biopharma, Inc. Sec. Litig.*,
117 F. Supp. 3d 1145 (D. Or. 2015) .......................................................................40

*Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*,
2011 WL 1303387 (N.D. Ill. Mar. 31, 2011).........................................................40

*Gomez v. Ill. St. Bd. of Educ.*,
811 F.2d 1030 (7th Cir. 1987) .................................................................................9

*Grae v. Corr. Corp. of Am.*,
2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017)....................................................29

*Heavy & Gen. Laborers' Local 472 & 172 Pension & Annuity Funds v. Fifth
Third Bancorp*,
2022 WL 1642221 (N.D. Ill. May 24, 2022) ...................................................12, 21

*Hedick v. Kraft Heinz Co.*,
2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ......................................11, 16, 17, 32

*Higginbotham v. Baxter Int'l, Inc.*,
495 F.3d 753 (7th Cir. 2007) ...........................................................................27, 36

*Jones v. Corus Bankshares, Inc.*,
701 F. Supp. 2d 1014 (N.D. Ill. 2010) .............................................21, 22, 31, 32

**TABLE OF AUTHORITIES**
**(Cont'd)**

Page

*Lachman v. Revlon, Inc.*,
487 F. Supp. 3d 111 (E.D.N.Y. 2020) ...............................................................11

*In re Lehman Bros. Sec. & ERISA Litig.*,
799 F. Supp. 2d 258 (S.D.N.Y. 2011)................................................................30

*Lorenzo v. SEC*,
587 U.S. 71 (2019).........................................................................................37, 38

*Macovski v. Groupon, Inc.*,
553 F. Supp. 3d 460 (N.D. Ill. 2021) ........................................................ *passim*

*Macquarie Infrastructure Corp. v. Moab Partners, L.P.*,
144 S. Ct. 885 (2024).......................................................................................18

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.*,
437 F.3d 588 (7th Cir. 2006) ("*Tellabs I*") ...............................................7, 23, 27

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ("*Tellabs II*").............................................. *passim*

*Marks v. CDW Computer Ctrs., Inc.*,
122 F.3d 363 (7th Cir. 1997) ..........................................................................19

*Marwil v. Ent & Imler CPA Grp., PC*,
2004 WL 2750255 (S.D. Ind. Nov. 24, 2004) .........................................................9

*Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*,
277 F. Supp. 3d 500 (S.D.N.Y. 2017)................................................................10

*Mulderrig v. Amyris, Inc.*,
492 F. Supp. 3d 999 (N.D. Cal. 2020) ..............................................................34

*No. 84 Emp'r-Teamster Joint Council Pension Trust Fund v. Am. W. Holding
Corp.*,
320 F.3d 920 (9th Cir. 2003) ...........................................................................36

*Norfolk Cnty. Ret. Sys. v. Ustian*,
2009 WL 2386156 (N.D. Ill. July 28, 2009).........................................................36

*O'Driscoll v. Argosy Univ.*,
2014 WL 714023 (N.D. Ill. Feb. 25, 2014) .............................................................9

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
575 U.S. 175 (2015).........................................................................................15

**TABLE OF AUTHORITIES**
**(Cont'd)**

Page

*Pension Tr. Fund for Operating Eng'rs v. DeVry Educ. Grp., Inc.*,
2018 WL 6714326 (N.D. Ill. Dec. 20, 2018) ........................................................................23

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
895 F.3d 933 (7th Cir. 2018) ................................................................................................34

*Phx. Ins. Co. v. ATI Physical Therapy, Inc*,
2023 WL 5748359 (N.D. Ill. Sept. 6, 2023) ...............................................................8, 16, 17

*In re Quality Sys., Inc. Sec. Litig.*,
865 F.3d 1130 (9th Cir. 2017) ..............................................................................................26

*Ross v. Career Educ. Corp.*,
2012 WL 5363431 (N.D. Ill. Oct. 30, 2012)................................................................ *passim*

*Rossy v. Merge Healthcare Inc.*,
169 F. Supp. 3d 774 (N.D. Ill. 2015) ..............................................................................32, 33

*Roth v. OfficeMax, Inc.*,
527 F. Supp. 2d 791 (N.D. Ill. 2007) ...................................................................................35

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
2024 WL 1898512 (S.D.N.Y. May 1, 2024) .........................................................................20

*Schleicher v. Wendt*,
529 F. Supp. 2d 959 (S.D. Ind. 2007) ...................................................................................40

*Seaman v. Cal. Bus. Bank*,
2014 WL 1339649 (N.D. Cal. Apr. 2, 2014) .........................................................................37

*SEC v. Infinity Grp. Co.*,
212 F.3d 180 (3d Cir. 2000)..................................................................................................31

*SEC v. Kameli*,
2020 WL 2542154 (N.D. Ill. May 19, 2020) ........................................................................38

*SEC v. Rio Tinto plc*
41 F.4th 47 (2d Cir. 2022) ....................................................................................................38

*SEC v. Ustian*,
2019 WL 7486835 (N.D. Ill. Dec. 13, 2019)..............................................................7, 15, 31

*In re Signet Jewelers Ltd. Sec. Litig.*,
2018 WL 6167889 (S.D.N.Y. Nov. 26, 2018)......................................................................22

*Silverman v. Motorola, Inc.*,
2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) .......................................................................39

**TABLE OF AUTHORITIES**
**(Cont'd)**

Page

*Sinnathurai v. Novavax, Inc.*,
645 F. Supp. 3d 495 (D. Md. 2022) .................................................................................28, 29

*Starr v. !Hey, Inc.*,
2003 WL 21212596 (N.D. Ill. May 23, 2003) .........................................................................39

*Stransky v. Cummins Engine Co.*,
51 F.3d 1329 (7th Cir. 1995) ....................................................................................................9

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)........................................................................................................7, 22, 23

*Todd v. STAAR Surgical Co.*,
2016 WL 6699284 (C.D. Cal. Apr. 12, 2016) .........................................................................24

*W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*,
495 F. Supp. 3d 622 (N.D. Ill. 2020) ..................................................................................17, 30

*In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*,
259 F.R.D. 490 (W.D. Wash. 2009) ........................................................................................40

*Washtenaw Cnty. Emps.' Ret. Sys. v. Walgreen Co.*,
2016 WL 5720375 (N.D. Ill. Sept. 30, 2016) .........................................................................14

*Weir v. Allianz SE*,
2024 WL 1813520 (C.D. Cal. Mar. 14, 2024).........................................................................22

**Statutes**

Private Securities Litigation Reform Act..........................................................................................6

Securities Exchange Act of 1934, § 10(b) ..........................................................................6, 11, 39

Securities Exchange Act of 1934, § 20(a) ..........................................................................6, 39, 40

**BACKGROUND AND SUMMARY OF ARGUMENT**[1]

As a financial holding company operating in the student loan, credit card, and banking businesses, Discover is "subject to extensive regulation, supervision and examination under U.S. federal and state laws and regulations." ¶ 1 (quoting Discover 2021 Form 10-K). The U.S. Consumer Financial Protection Bureau ("CFPB"), for example, imposes extensive requirements with respect to Discover's student loan practices, and the Federal Deposit Insurance Corporation ("FDIC") oversees Discover Bank, the Company's banking subsidiary. *Id.* Because compliance touches virtually every aspect of Discover's operations, its ability to manage risk—including by implementing and maintaining an appropriate compliance management system ("CMS") as well as investing sufficiently in resources and personnel to perform compliance functions—is essential. That was particularly true during the Class Period (February 21, 2019 to January 17, 2024) because the CFPB had already admonished Discover for significant loan servicing improprieties.

Specifically, in 2015 the CFPB issued a consent order finding the Company had, among other things, (1) engaged in deceptive and unfair practices in providing tax information statements to student loan borrowers; (2) misrepresented the amounts due for thousands of borrowers over several years; (3) made thousands of improper phone calls to borrowers; and (4) failed to provide important information to borrowers regarding loans that had been "charged off," in violation of federal law. ¶¶ 179-91. The Company agreed to refund $16 million to borrowers; pay a $2.5 million penalty; and improve its billing, student loan interest reporting, and collection practices.

---

[1] While this section summarizes key aspects of Plaintiffs' allegations, the Amended Complaint (Dkt. 74, "Complaint") identifies each of Defendants' misrepresentations and specifies why it was false or misleading when made (¶¶ 241-301) explains why the statements were material to Discover investors (¶¶ 318-25); and details facts demonstrating Defendants' fraudulent state of mind in making the misrepresentations (¶¶ 302-17); *see also* Decl. of Michael J. Miarmi ("Miarmi Decl.") Ex. 1 (listing all misrepresentations by category and noting corresponding bases for falsity and materiality). Unless otherwise stated, "¶ __" refers to paragraphs of the Complaint, all emphasis has been added, and internal citations and quotation marks have been omitted.

¶ 177.  Over the next five years, however, the situation at Discover worsened, leading to a *second* consent order by the CFPB, which found the Company had failed to correct problems identified in the agency's 2015 order and engaged in additional improper conduct.  ¶¶ 201-09.  Given Discover's "numerous" violations, which "harmed tens of thousands of consumers," the CFPB required it to pay $10 million in consumer redress and a $25 million civil penalty.  ¶¶ 198, 211.

Against this backdrop, Discover and its senior officers—then-CEO Roger Hochschild and successive CFOs Mark Graf and John Greene (the "Officer Defendants")—assured analysts and investors both that the Company had implemented strong systems and processes to manage risk and comply with the law, *and* that those measures were *effective*.  Discover said, for example, it "focused on three key areas to strengthen our CMS over the past few years," including "[s]trong compliance programs to ensure we understand and follow regulatory requirements, identify potential risks, and put in place robust, *effective* processes that we regularly monitor and test to be certain they are working as designed."  ¶ 84.  The Company further highlighted its focus on "[i]dentifying and solving problems *before* customer harm happens" and "prevent[ing] [problems] from happening again" (*id.*), as well as its "three lines of defense" for risk management, with the second and third lines operating "independently of the business units."  ¶¶ 71-74, 242, 276.

Defendants also repeatedly represented that Discover's *investments* in compliance were "appropriate" and it had "invested significantly" to "strengthen compliance."  ¶¶ 248, 270. Hochschild, Graf, and Greene also certified that the Company's internal controls were effective. As the Committee of Sponsoring Organizations of the Treadway Commission ("COSO")—the preeminent authority in this area—explains, internal controls encompass more than purely financial matters, including "operations, reporting, and compliance."  ¶ 88; *see also* ¶ 90.

Having spoken publicly on all of these matters, Defendants assumed a duty to be both accurate and complete, which includes avoiding "half-truths" and misleading omissions. As detailed extensively in the Complaint, however, Defendants eschewed that obligation. ¶¶ 238-301. Six former Discover employees ("FEs"), who performed compliance and control-related functions at the Company and interacted with senior executives, recount that the Company suffered from systemic and widespread problems in those areas. ¶¶ 51-57, 102-59. Among other things, as employees alerted senior management during meetings Hochschild attended, the compliance department lacked the staff and expertise necessary to perform its job effectively. ¶¶ 125-52. Further, the Company's vaunted "three lines of defense" were compromised by conflicts of interest and internal tension, resulting in delayed control testing and the sanitizing of reports that were supposed to address, not *conceal*, problems. ¶¶ 107-24. Reflecting these deficiencies, Discover had hundreds of unresolved regulatory violations, which "freaked out" the president of its U.S. Cards business. ¶¶ 149. Hochschild received reports alerting him to this issue. ¶¶ 144-48, 150.

Further indicating how deep its problems ran, in July 2023 Discover revealed that *for over 15 years* it had misclassified interchange fees associated with its credit cards, thereby overcharging merchants by at least hundreds of millions of dollars. ¶¶ 218-27, 352-55. Hochschild admitted the problem "underscored deficiencies in our corporate governance and risk management." ¶ 226. Additionally, in contrast to Discover's purported "focus[] on . . . areas to strengthen [its] CMS over the past few years" and its "[s]trong compliance programs to ensure we understand and follow regulatory requirements," in September 2023 the FDIC issued a consent order finding the Company engaged in "unsafe or unsound banking practices" by, among other things, "*failing to establish and maintain* a compliance management system . . . providing for compliance with Consumer Protection Laws and Regulations." ¶¶ 160-61. The FDIC also determined Discover

violated federal law and regulations.  ¶ 162.  These were not newly discovered issues: the order memorialized "the findings of the FDIC's October 18, 2021 examination along with [CFPB] findings during the review period and the results of FDIC visitation reports, targeted reviews, and ongoing monitoring conducted during the review period."  ¶ 163.

As a consequence of those myriad improprieties, Discover has twice suspended its share repurchase program, conducted two internal investigations—without reporting a clean bill of health after either one—and paid hefty regulatory penalties and remuneration to injured borrowers and merchants.  Hochschild and Greene were ultimately forced to admit what Hochschild had earlier denied: for years the Company had "*underinvested*" in compliance, and is now "paying the price."  ¶¶ 229-30.  The situation was so bad that Discover decided to exit the student loan business entirely, acknowledging its "internal systems capabilities weren't on par with what a professional servicing organization could do for this portfolio."  ¶ 231.  Amid the fallout from the numerous revelations of poor compliance, in August 2023 Hochschild "agreed" to immediately "step down."  ¶¶ 11, 356.  Further, on January 17 and 18, 2024, Discover reported an 18% year-over-year increase in operating expenses, resulting largely from "investments in compliance and risk management," as well as an $80 million reserve "for customer remediation" relating primarily to loan servicing issues.  ¶¶ 14-15, 367-68.  Indeed, the Company has since increased its estimated liability arising from the card misclassification issue to *$1.2 billion*, announced it "will likely" face "enforcement actions," and noted "additional losses are probable."  Miarmi Decl. Ex. 2 at 29.[2]

Acknowledging the Complaint is "stuffed" with factual support (MTD Br. 6), Defendants nonetheless contend Plaintiffs fail to plead a cognizable securities claim.  But their arguments turn

---

[2] Plaintiffs are "free to assert new facts in [their] brief opposing [Defendants'] motion to dismiss," which they provide "to illustrate the allegations that are the proper focus of the Rule 12(b)(6) motion."  *Bell v. Publix Super Mkts., Inc.*, 982 F.3d 468, 480 n.2 (7th Cir. 2020).

on distorting Plaintiffs' theory of liability. Plaintiffs do not allege Discover "guarantee[d]" that it "would never experience adverse regulatory action" or that its risk management processes would "always" function as intended (*id.* at 13). Rather, Defendants are liable for disseminating "a litany of representations emphasizing Discover's purportedly robust compliance measures, as well as sound risk management and corporate governance systems and practices," which "portrayed a careful, prudent Company dedicated to compliance and appropriately managing risk," in stark contrast to the reality inside the Company. ¶¶ 3-6.

Defendants claim their statements were mostly "puffery." Even assuming this fact-intensive inquiry is appropriate at the pleading stage, Plaintiffs plausibly allege materiality. In this regard, the Complaint specifies (1) Defendants reiterated those statements throughout the Class Period, including in response to analysts and in reports to shareholders; (2) the statements addressed issues critical to Discover's operations, particularly in light of the CFPB and FDIC enforcement actions; (3) Defendants *knew* or *recklessly disregarded* those statements were false or misleading when made; and (4) Discover's share price declined sharply each time the market learned facts undermining the statements. ¶¶ 318-25. Notably, Defendants do *not* challenge loss causation, and thus concede that Plaintiffs sufficiently allege "Defendants' prior misrepresentations, omissions, and fraudulent conduct were disclosed to the market, causing the share price to decline significantly as the artificial inflation in the stock price dissipated." ¶ 340. Yet Defendants insist that while investors deemed those revelations significant enough to drive down Discover's stock price, *no reasonable shareholder* would consider the related representations important in deciding whether to invest in the Company. That is implausible, as is Defendants' assertion that they sufficiently "cautioned" investors about Discover's problems.

Plaintiffs' allegations also raise a strong inference of Defendants' fraudulent intent. The scienter inference is both cogent and *at least as* compelling as any nonculpable inference, given (1) the duration and magnitude of the deficiencies and improprieties detailed by the regulators and FEs; (2) Discover's admissions that it misclassified credit card interchange rates for over 15 years, underinvested in compliance, and suffered from defective corporate governance and risk management; (3) Defendants' litany of Class Period statements concealing those facts; (4) the importance of the concealed information to Discover's operations and financial success; (5) the Officer Defendants' certifications attesting to the integrity of the Company's internal controls; (6) Hochschild's departure as CEO as the truth was ultimately revealed; and (7) the Officer Defendants' motive and opportunity to commit fraud, due to the direct connection between their performance-based compensation and the Company's earnings per share ("EPS") targets—which these Defendants manipulated by underinvesting in compliance and pushing the Company to undertake aggressive share buybacks. ¶¶ 302-17.

In short, the Complaint satisfies the pleading requirements of Rules 8 and 9(b), as well as the Private Securities Litigation Reform Act ("PSLRA"), with respect to claims under Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and SEC Rule 10b-5. Plaintiffs also sufficiently allege Discover and the Officer Defendants perpetrated a scheme to defraud under Rules 10b-5(a) and (c) by underinvesting in compliance, thereby artificially lowering the Company's expenses and enabling Hochschild and others to meet earnings per share ("EPS") targets on which much of their compensation depended. Finally, the Officer and Director Defendants' attempt to evade liability under Section 20(a) of the Exchange Act based on the implausible and highly fact-dependent assertion that they exercised no "control" over Discover's operations or public statements fails. The Court should deny Defendants' motion in its entirety.

<u>**ARGUMENT**</u>

**I.    PLAINTIFFS PLAUSIBLY ALLEGE DEFENDANTS MADE FALSE OR MISLEADING STATEMENTS OF MATERIAL FACT**

**A.    Plaintiffs Sufficiently Plead Falsity.**

To plead falsity under the PSLRA, a complaint need only allege facts "sufficient to support a reasonable belief as to the misleading nature of the statement or omission." *ABN AMRO, Inc. v. Capital Int'l Ltd.*, 595 F. Supp. 2d 805, 835 (N.D. Ill. 2008) (quoting *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 595 (7th Cir. 2006) ("*Tellabs I*"), *vacated and remanded on other grounds*, *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308 (2007)).  An omission "renders a statement materially misleading when it creates an impression of a state of affairs that differs in a material way from the one that actually exists." *SEC v. Ustian*, 2019 WL 7486835, at *28 (N.D. Ill. Dec. 13, 2019).  Plaintiffs amply allege Defendants made false or misleading representations.

**1.    Defendants misrepresented Discover's investments in compliance.**

Hochschild assured investors that compliance stood at the "[t]op" of Discover's priorities and the Company was "invest[ing] significantly" in it, and that "we'll continue to strengthen and fine-tune our processes and comply with all the regulations required of a large national bank." ¶¶ 82-83, 257.  Discover also said it "strengthen[ed] our CMS over the past few years," including "through a dedicated team in compliance" and "[i]dentifying and solving problems *before* customer harm happens, or when mistakes do occur, find the root causes, fix them quickly and prevent them from happening again." ¶ 84.  These and other statements "communicated a narrative of improvement" despite Defendants' access to "material adverse information indicating otherwise." *Macovski v. Groupon, Inc.*, 553 F. Supp. 3d 460, 476-77 (N.D. Ill. 2021).

In *Macovski*, the court held the complaint sufficiently pleaded falsity as to a CEO's representations that the company was "making progress on initiatives" that would "lay the

foundation for long-term, profitable growth," because plaintiff "explained what contrary information he believe[d] [the CEO] knew at the time he made the statements." *Id.* Similarly here, Defendants represented Discover had an effective and heavily resourced compliance infrastructure, despite knowing (and later admitting) it had a woefully *under-resourced* and inexperienced compliance team as well as serious deficiencies in its compliance and risk management systems and practices. ¶¶ 228-32.

Additionally, the court in *Phoenix Insurance Co. v. ATI Physical Therapy, Inc.* held "concrete and target[ed]" statements about "specific aspect[s] of [a company's] operations," including that it was "right now experiencing very strong retention and low turnover," were actionable. 2023 WL 5748359, at *6 (N.D. Ill. Sept. 6, 2023). Defendants' representations that Discover was "strengthen[ing] compliance" and dedicating "appropriate" resources to it (¶¶ 83-86, 248, 270-71) are likewise actionable because they were "determinate and verifiable" and referred to the current state of the Company's operations. *Phx. Ins.*, 2023 WL 5748359, at *6.

Defendants contend the CFPB and FDIC consent orders, as well as the FEs' accounts of severe deficiencies in Discover's compliance functions, do not indicate "Discover was not investing in its risk management systems at the time the challenged statements were made." MTD Br. 11. But Plaintiffs do not claim Discover failed to invest *at all* in risk management or compliance, and in contrast to *In re Banco Bradesco S.A. Securities Litigation*, Plaintiffs do not allege Discover's controls "must have been deficient because they may have failed to detect some weaknesses in its financial reports or disclosures in some instances." 277 F. Supp. 3d 600, 648 (S.D.N.Y. 2017). Rather, Defendants repeatedly misled investors regarding Discover's risk management and compliance efforts, including by misrepresenting the scale of the Company's investments in compliance staff and resources. *E.g.*, ¶¶ 249-50, 254-55, 259, 273, 281.

Further, given the numerous, corroborative sources supporting Plaintiffs' allegations, their reference to Hochschild's and Greene's later admissions that Discover had for years "underinvested" in compliance is not fraud by hindsight (MTD Br. 12). *See Marwil v. Ent & Imler CPA Grp., PC*, 2004 WL 2750255, at *6 (S.D. Ind. Nov. 24, 2004) (rejecting fraud-by-hindsight argument where complaint alleged defendants knew statements were false based on "data that were available" at the time). Nor do Plaintiffs attempt, as in *Stransky v. Cummins Engine Co.*, to "impos[e] a duty to update." 51 F.3d 1329, 1332 (7th Cir. 1995). As summarized earlier (*supra* pp. 1-6) and detailed in the Complaint (¶¶ 238-301), Plaintiffs specify *contemporaneous* facts that rendered the challenged statements false or misleading *when made*.

Finally, Defendants contend Plaintiffs incorrectly allege Hochschild's October 2020 representations that Discover did not suffer from "chronic underinvestment" and that its investments "have been appropriate" (¶ 248) do not relate to compliance and risk management. "As the Seventh Circuit explained approximately [3]7 years ago," however, "'the defendant cannot, in presenting its 12(b)(6) challenge, attempt to refute the complaint or to present a different set of allegations.'" *O'Driscoll v. Argosy Univ.*, 2014 WL 714023, at *5 (N.D. Ill. Feb. 25, 2014) (St. Eve, J.) (quoting *Gomez v. Ill. St. Bd. of Educ.*, 811 F.2d 1030, 1039 (7th Cir. 1987)). And even if Hochschild was referring to "*all* of the Company's expenses," MTD Br. 15 (emphasis in original), failing to inform investors of Discover's significant underinvestment in compliance—a key component of the Company's operations—rendered his statements at least misleading.

### 2. Defendants misrepresented Discover's risk management structure.

Defendants contend the FEs' accounts do not "render false the statement that Discover 'structure[s] accountability across three lines of defense.'" MTD Br. 10 (quoting ¶ 242(b)). But those accounts confirm that the lines of defense were blurred, at best, and that Discover did not structure its "risk management framework" anywhere close to the "industry standards" Defendants

conveyed through those representations. ¶ 242(i). For example, according to FE 2, although the Company's business managers (the ostensible "first line of defense") were supposed to be the "risk owners" who understood the regulations and conducted their businesses in compliance with those standards, they delegated their responsibilities to "a little mini risk office inside the [manager's] business" (the "BUTM"). ¶ 107. FE 1 recounted that the BUTM was "widely ineffective" across the bank because it engaged only in control "validation" (i.e., confirming a control was implemented and existed) and not "testing" (i.e., confirming a control was actually *effective*). ¶¶ 108-10. FE 1 also noted the separation of first-line "scoping" and "testing" into two separate teams, whose "terrible and combative" relationship led to the testing team's refusal to perform tests prepared by the scoping team or even to tell the scoping team what was being tested. ¶¶ 111-12, 116. Further, the first-line scoping team reported to first-line management (i.e., the business unit heads), which created "a huge conflict of interest." ¶¶ 111, 114. This inherent conflict was realized, as business unit executives refused to sign off on first-line compliance reports until the scoping team agreed to remove certain detrimental findings. ¶ 118.

Defendants claim their representations cannot be false or misleading because the Company "'indeed implemented a compliance program and issued policies and procedures aiming to ensure . . . compliance.'" MTD Br. 10 (quoting *Menaldi v. Och-Ziff Capital Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 512 (S.D.N.Y. 2017)). But the statements in *Menaldi* "did not describe . . . specific initiatives" or "make any assurances of efficacy." 277 F. Supp. 3d at 513. Discover, by contrast, emphasized its "[s]trong compliance programs to *ensure* we understand and follow regulatory requirements, identify potential risks, and put in place robust, *effective* processes that we regularly monitor and test to be *certain* they are working as designed." ¶ 84. While Plaintiffs do not contend those statements guaranteed 100% efficacy, they concealed the severe deficiencies and

improprieties plaguing Discover's risk management processes, thus conveying a misleading impression to investors. *See Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at *11 (N.D. Ill. Apr. 18, 2022) ("Even statements that are literally true can still be actionable under § 10(b) as misleading if they are susceptible to another interpretation by a reasonable investor.").

Additionally, through Sarbanes-Oxley Act ("SOX") certifications in SEC filings, the Officer Defendants stated they had disclosed "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting." ¶¶ 290-91. Those representations were false or misleading, as demonstrated by the FEs' accounts that Discover's compliance function was "understaffed," "under-resourced," and "not working" (¶¶ 117, 125-26); by the regulators' damning findings with respect to Discover's risk management and compliance systems (¶¶ 160-71, 177-211); and by Defendants' ultimate admission of "deficiencies in our corporate governance and risk management" (¶¶ 226, 292); *see also Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *10 (N.D. Ill. Aug. 11, 2021) (plaintiffs sufficiently alleged falsity of SOX certifications where company "admitted that its internal controls were materially deficient").[3]

Plaintiffs in *In re FBR Inc. Securities Litigation*, on the other hand, "claim[ed] that defendants' brief description of the compliance program's aims misled investors into believing that they had an effective compliance program *that would root out any impropriety*, including the alleged insider trading scheme." 544 F. Supp. 2d 346, 359 (S.D.N.Y. 2008). Plaintiffs here are not attempting to hold Defendants liable for failing to "root out any impropriety," but rather for misleadingly conveying to investors that the Company had implemented and maintained appropriate systems, supported by adequate resources, to identify and address regulatory violations

---

[3] Plaintiffs in *Lachman v. Revlon, Inc.*, by contrast, did not allege defendants had actual knowledge that their "underlying operational issues . . . had caused a material weakness" in the company's internal controls. 487 F. Supp. 3d 111, 135 (E.D.N.Y. 2020).

and other systemic misconduct. As extensively detailed in the Complaint, they did not. ¶¶ 125-237. And unlike in *FBR*, Defendants repeatedly touted the effectiveness of their risk management and compliance measures, including their purportedly robust investments in them. ¶¶ 248, 253, 257, 262, 267, 270-72, 274, 276, 280.

Additionally, *Heavy & General Laborers' Local 472 & 172 Pension & Annuity Funds v. Fifth Third Bancorp.*—Defendants' marquee case—involved the opening of "a relatively small number of unauthorized accounts." 2022 WL 1642221, at \*21 (N.D. Ill. May 24, 2022). This pales in comparison to the numerous systemic and widespread deficiencies plaguing Discover, which presented precisely the sort of "bank-wide, persistent problem that would have been escalated to [the CEO and the CFO]." *Id*. Further, unlike this case, the former employees referenced in the *Fifth Third* complaint did not recount providing information to senior management (including the CEO) regarding severe deficiencies in the company's processes and practices, and the court said it could not infer scienter merely "based on the defendants' executive positions, Board committee membership, or job responsibilities." *Id*. at \*3, \*22. Nor were defendants' "signatures on SEC filings and certifications" probative of fraud "without additional details supporting knowledge that the statements were false." *Id*. at \*22. And many of the challenged misrepresentations in this case are far more specific than those in *Fifth Third*. *See supra* pp. 1-6; Miarmi Decl. Ex. 1. In short, the facts missing in *Fifth Third* are present here.[4]

---

[4] The court in *Fifth Third* also held "[n]o reasonable investor would conclude that," in stating "Fifth Third is . . . subject to risk from potential employee misconduct," the company "promised that no employee misconduct had ever occurred." 2022 WL 1642221, at \*17. Again, Plaintiffs do not claim Discover was assuring investors no deficiencies or violations "ever occurred."

### 3. Defendants misrepresented Discover's risk management and compliance capabilities.

Defendants assured investors that Discover's risk management structures were appropriate to meet its compliance requirements. *E.g.*, ¶ 242(d) ("Our risk governance framework is implemented such that bank-level risk governance requirements are satisfied as well."). They also touted the Company's "strong compliance programs" and "strong compliance management," as well as the "risk management culture" Hochschild had "establishe[d]." ¶¶ 242(f), 271-72. These and other similar statements were false or at least misleading. ¶¶ 257, 265, 270.

In addition to the CFPB's and FDIC's findings, the FEs confirm Hochschild and other executives understood the extent of Discover's compliance problems. In May 2023, Dan Capozzi, President of U.S. Cards, reportedly "freaked out" about the number of open (i.e., unresolved) regulatory findings at the Company." ¶ 149. During one nine-hour meeting, Capozzi "scream[ed] at people" about the number of such findings and noted "it is a big issue for Roger [Hochschild]," whom Capozzi implied knew about the lack of compliance. ¶ 150. Senior management made similar complaints on other occasions. ¶ 152. Further, though the Company initiated "Project Operational Excellence" in 2020 to review its consumer business processes—which revealed numerous control gaps—there was no plan for *resolving those deficiencies*. ¶¶ 156-58.

*Ross v. Career Education Corp.* is on point. The court there held plaintiffs sufficiently alleged statements regarding a company's "culture of compliance" were false because "a reasonable investor" could understand them "to convey that [the company] had rectified a long period of sustained compliance problems" when, in fact, it had not. 2012 WL 5363431, at *8 (N.D. Ill. Oct. 30, 2012). This conclusion followed from "the context in which the statements were made," particularly that they came after the revelation of earlier compliance failings. *Id.* at *6, *8. A reasonable investor likewise would have understood Defendants' repeated assurances

- 13 -

about "manag[ing] risk," implementing "a defined governance structure . . . to manage risks," and satisfying "bank-level risk governance requirements" to mean Discover had implemented and was maintaining appropriate compliance measures, including those imposed by the CFPB's and FDIC's consent orders. ¶ 242. Discover's systemic and widespread regulatory issues belied those representations. *See City of Sterling Heights Gen. Emps.' Ret. Sys. v. Hospira, Inc.*, 2013 WL 566805, at \*20 (N.D. Ill. Feb. 13, 2013) (St. Eve, J.) (relying on confidential witness accounts, plaintiffs sufficiently alleged the company suffered from "systemic" regulatory issues).

By contrast, in *Washtenaw County Employees' Retirement System v. Walgreen Co.*, which Defendants cite, the CFO stated "[o]ur adjusted operating income goal . . . is currently tracking below the [compound annual growth rate] required to meet this goal and below our initial expectations," and "[w]e continue to recognize that there are risks to achieving this goal" but there were factors that could "help *mitigate* these risks." 2016 WL 5720375, at \*5 (N.D. Ill. Sept. 30, 2016). Focusing on the word "mitigate," the court reasoned that "for the[] statement to be false or misleading the plaintiff must allege facts demonstrating that the defendants' measures were unable to in any way reduce the EBIT shortfall," which plaintiff had not done. *Id.* at \*6. The challenged statements here are more affirmative than those in *Walgreen*. *E.g.*, ¶¶ 242, 257, 265, 270-72. Further, unlike in that case, Defendants did not clearly acknowledge the severe risk management, compliance, corporate governance, and control deficiencies impacting Discover.

Defendants also falsely represented that their compliance and risk management efforts were *successful*. For instance, in response to an analyst's question in February 2023 regarding Discover's "targeted capital levels" in light of its share repurchase suspension due to an internal investigation relating to student loan practices and compliance, Greene said, "Fortunately, we got that behind us." ¶ 267. But Discover's student loan-related problems persisted, and later that year

- 14 -

the Company again suspended share buybacks due to compliance issues.  ¶¶ 268-69.  Defendants claim Greene's statement "plainly" refers only to the buyback suspension rather than more broadly to student loan issues.  MTD Br. 15-16.  As with Hochschild's October 2020 "investment" remarks, however, "the parties' disagreement about the proper interpretation of the . . . statements suggests the need for this question to proceed to a jury."  *Ustian*, 2019 WL 7486835, at *33.

### 4.    Defendants' "opinions" are not immunized from liability.

"[A]n opinion that has been issued without a genuine belief or reasonable basis is an 'untrue' statement which, if made knowingly or recklessly, is culpable conduct actionable under [the securities laws]."  *Ustian*, 2019 WL 7486835, at *30 (second alteration in original).  Given the severe problems plaguing Discover's risk management and compliance functions throughout the Class Period, Plaintiffs plausibly allege Defendants lacked a reasonable basis for their "opinions" and offered them while knowing or recklessly disregarding those facts.

For example, Hochschild's October 2020 statements that "I have to maybe disagree with the phrase chronic underinvestment" (which he later contradicted, *see* ¶ 229) and "I think our investments have been appropriate" (¶ 248) were false or misleading given the rampant deficiencies and improprieties at Discover, of which he was aware or recklessly disregarded. ¶¶ 249-52.  In other words, these statements are actionable because they did not "fairly align[] with the information in [Hochschild's] possession at the time" he made them.  *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 189 (2015).

The same is true of other statements, including the Officer Defendants' certifications that (1) Discover's quarterly and annual SEC filings "d[id] not contain" any false statements or omissions of material facts; (2) the financial information included in the reports "fairly present[ed] in all material respects the financial condition, results of operations and cash flows of [Discover]"; (3) the Officer Defendants "evaluated the effectiveness of [Discover]'s disclosure controls and

procedures"; and (4) they "[d]isclosed . . . any change in [Discover]'s internal control over financial reporting [ICFR]" that "materially affect[ed], or [wa]s reasonably likely to materially affect, the [Company]'s [ICFR]." ¶¶ 289-90. Plaintiffs' allegations support the falsity of the foregoing representations, and the numerous indicia of Defendants' scienter (*see infra* pp. 22-37) likewise render them actionable. *See Fryman*, 2022 WL 1136577, at *18 (plaintiffs sufficiently pleaded falsity by "alleg[ing] that Defendants made the statements about Atlas' internal controls despite knowing that at least two state regulatory bodies had determined that Atlas' subsidiaries had violated [Statement of Statutory Accounting Principles] 55, had materially under-reserved, and that the subsidiaries needed to remediate the reserve deficiencies," and a report concluded "Atlas had an internal control problem with respect to its IT controls and/or processes").

### 5. Defendants are liable for any "forward-looking statements."

Defendants contend the PSLRA's safe harbor for "forward-looking statements" encompasses several of the alleged misrepresentations. They are wrong.

*First*, whereas a forward-looking statement "is one whose truth or falsity cannot be determined until after the statement has been made," some of the challenged statements "are in fact firmly planted in the present or past." *Hedick*, 2021 WL 3566602, at *14-15. For example, on May 19, 2022, Hochschild said: "Let's look at some of the things *we're doing* this year. Top of the list is our focus on compliance first, which means we'll *continue* to strengthen and fine-tune our processes and comply with all the regulations required of a large national bank." ¶ 257; *see also* ¶ 274 (Company would "*continue* to focus on enhancing our compliance management systems"); ¶ 276 ("[i]n 2023, *we're focused on* maturing our compliance and risk management"). These statements at least in part address what Discover purportedly was *already* doing. *See Phx. Ins.*, 2023 WL 5748359, at *7 ("To say that ATI 'continues' to match its staffing levels to client-visit volume implies that—at the time that the statement was made—staffing levels were indeed

keeping up with rebounding customer visits."). Even if any of these are "mixed present/future statement[s]," they are "not entitled to the safe harbor with respect to the part[s] of the statement[s] that refer[] to the present." *Tellabs II*, 513 F.3d at 705.

*Second*, none of the "cautionary language" Defendants cite is "meaningful"—that is, "substantive and tailored to the specific predictions made in the allegedly misleading statement." *Macovski*, 553 F. Supp. 3d at 479. Four of the five statements Defendants identify as forward-looking concern investment in risk management and compliance. *E.g.*, ¶ 253 ("We're going to put money into risk and compliance as we want to."). Defendants respond with generic language in Discover's Form 10-K such as "risk management framework and models for managing risks may not be effective in managing our risk of loss." MTD Br. 18-19. Such "relatively broad" disclaimers do not rise to the "highly specific" level needed to trigger the safe harbor. *Hedick*, 2021 WL 3566602, at *16; *see also W. Palm Beach Firefighters' Pension Fund v. Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 656-57 (N.D. Ill. 2020) (statements such as "the risk that the cost savings and any other synergies from the proposed transaction may not be fully realized or may take longer to realize than expected" merely "warn[ed] of general risks applicable to any business"). Defendants' cases, by contrast, involved "specific and detailed" warnings of risks that arose. *Desai v. Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 845 (N.D. Ill. 2009). Their reliance on *Asher v. Baxter International Inc.* is especially misplaced because the Seventh Circuit there determined plaintiffs' allegations "raise[d] the possibility . . . that Baxter omitted important variables from [its] cautionary language," and "th[e] complaint could not be dismissed under the safe harbor." 377 F.3d 727, 734 (7th Cir. 2004).

Further, the issues undermining Discover's compliance and risk management "had materialized by the time that the cautionary statements were made." *Phx. Ins.*, 2023 WL 5748359,

- 17 -

at *8. In this regard, Defendants point to Hochschild's statement during the April 20, 2023 earnings call that "[w]e believe there is the potential for more stringent regulation." ¶ 274. Far from appropriately cautioning investors, this language *was itself misleading* given what Hochschild understood at the time. ¶ 275.

*Third*, the Complaint gives rise to a strong inference that the Officer Defendants knew the statements were false when made. *See infra* pp. 22-37. The safe harbor therefore does not apply.

### 6. Plaintiffs sufficiently allege Defendants omitted material facts that rendered their statements misleading.

While "[s]ilence, absent a duty to disclose, is not misleading" (MTD Br. 25 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988) (alteration in original)), Defendants hardly kept silent about Discover's purported risk management, compliance, corporate governance, and internal control processes and practices. ¶¶ 241-301. And while the securities laws may not require corporate executives "to confess to uncharged, unadjudicated claims of wrongdoing" (MTD Br. 25), that "misses the point." *Allison v. Oak St. Health, Inc.*, 2023 WL 1928119, at *6 (N.D. Ill. Feb. 10, 2023). The challenged statements "are not misleading because [Discover] was independently required to disclose the existence of the [CFPB or FDIC] investigation or confess to violating [applicable laws and regulations], but rather because the statements omitted the fact that [Discover] engaged in the . . . specific practices alleged to be illegal." *Id.*[5]

Additionally, "[t]he failure to disclose information required by Item 303 can support a Rule 10b-5(b) claim . . . if the omission renders affirmative statements made misleading." *Macquarie*

---

[5] The court in *Allison* distinguished *Société Générale Securities Services, GmbH v. Caterpillar, Inc.*, which Defendants cite. While the defendants in *Société Générale* "disclosed the alleged wrongful conduct," the defendants in *Allison* "conveyed that Oak Street complied with the [statute] without disclosing the specific marketing practices that the [plaintiffs] allege drastically increased the risks investors faced and concealed that [Oak Street]'s legal practices were insufficient to attract sufficient patients." *Allison*, 2023 WL 1928119, at *6 (third alteration in original). The basis of Defendants' liability resembles *Allison*, not *Société Générale*.

*Infrastructure Corp. v. Moab Partners, L.P.*, 144 S. Ct. 885, 892 (2024). Plaintiffs sufficiently allege that Discover's massive risk management and compliance deficiencies, including its continuous failure to sufficiently invest in those areas, were "known trends" the Company was obligated (but failed) to disclose, which rendered Defendants' representations at least misleading. ¶¶ 102-232; *see also Fryman*, 2022 WL 1136577, at *21 ("In light of Plaintiffs' allegations showing that Atlas' ongoing deficiency was a systemic failure and trend known to Defendants during the Class Period, it is plausible that Item 303 required disclosure.").

### B.    Plaintiffs Plausibly Allege Defendants' Statements Are Material.

"The crux of materiality is whether, in context, an investor would reasonably rely on the defendant's statement as one reflecting a consequential fact about the company." *Macovski*, 553 F. Supp. 3d at 476. Because determining materiality "requires delicate assessments of the inferences a reasonable shareholder would draw from a given set of facts and the significance of those inferences to him," it is "rarely appropriate at the summary judgment stage, let alone on a motion to dismiss." *Marks v. CDW Computer Ctrs., Inc.*, 122 F.3d 363, 370 (7th Cir. 1997).

Far from "simple and generic" (MTD Br. 23), representations regarding Discover's investments in compliance were affirmative and specific. Hochschild said, for example, those investments "have been appropriate," touted compliance as Discover's "top priority," and promised that the Company had "invested significantly" to "strengthen compliance." ¶¶ 82-83, 248, 280. Those misrepresentations "would have been material to investors because whether [Discover] had the human capacity to enforce its internal controls would inevitably affect its ability to carry out the compliance systems meant to protect the bank, and its stock, from risk." *In re BofI Holding, Inc. Sec. Litig.*, 2017 WL 2257980, at *11 (S.D. Cal. May 23, 2017). Further, positive statements "made in a context relating directly to regulatory compliance," including emphasis on a "culture of compliance," can be materially misleading, particularly against the backdrop of

"sustained compliance problems." *Ross*, 2012 WL 5363431, at *8. Similarly, the court in *Hospira* determined a statement that the company was "working across our operations to make sure that we meet the highest level of compliance and quality for both pharmaceutical and device products" was actionable, albeit "general in nature." 2013 WL 566805, at *24; *see also San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 2024 WL 1898512, at *5 (S.D.N.Y. May 1, 2024) (CEO's statement that "[w]e feel very good that we have adequate supply" was "plausibly not puffery" because "a reasonable investor plausibly could interpret 'adequate supply' to mean the supply necessary to meet demand" and "though it is preceded by 'we feel,' it could reasonably be read to communicate a reasonable basis for that feeling").

"[T]he frequency with which Defendants emphasized [Discover]'s [risk management, compliance, corporate governance and controls] in press releases and other public statements, as well as the fact that analysts frequently repeated and commented on Defendants' statements," further demonstrates their materiality. *Atlas v. Accredited Home Lenders Holding Co.*, 556 F. Supp. 2d 1142, 1155 (S.D. Cal. 2008); *see also, e.g.*, ¶¶ 248, 253, 257, 265, 270-72, 274, 276. Notably, Hochschild stated in a "Letter to Shareholders" that Discover "invested significantly in key areas of our business" to "strengthen compliance," and those investments "position[ed] Discover to continue driving shareholder value." ¶ 270. Having stressed to investors the importance of compliance to the Company's financial success, it is hardly plausible for Defendants now to suggest those statements were "so obviously *unimportant* that reasonable minds could not question their materiality." *Macovski*, 553 F. Supp. 3d at 476-77 ("whether the[] particular statements are too vague to be material seems exactly the kind of inquiry that would lead reasonable minds to different conclusions"). Indeed, "even where a statement is not actionable when considered individually, it can be actionable if it reinforce[s] factual misstatements and

therefore contribute[s] to ongoing deception." *Jones v. Corus Bankshares, Inc.*, 701 F. Supp. 2d 1014, 1027 (N.D. Ill. 2010) (alterations in original). And even "generic assertions of legal compliance" may be actionable where, as here, Plaintiffs allege "a systemic organizational disregard for compliance." *Allison*, 2023 WL 1928119, at *7 n.2. The critical importance of risk management and compliance to Discover's operations and financial well-being also speaks to the materiality of Defendants' representations. ¶¶ 318-25; *see also Macovski*, 553 F. Supp. 3d at 476 (it was "not *obvious* that a reasonable investor would not view the[] statements as important, especially when considering the importance of Goods [products] to Groupon's overall business" and that the subject program was implemented to increase, *inter alia*, the company's "business over time") (emphasis in original).

"The market's negative reaction" following disclosures about Discover's compliance, risk management, corporate governance, and control deficiencies "further tends to show that defendants' alleged misstatements were material." *Ross*, 2012 WL 5363431, at *6. Discover's stock price dropped promptly and decisively in response to each of the five corrective disclosures identified in the Complaint, strongly indicating investors regarded *both* the information disclosed *and* Defendants' prior statements about it as important. ¶¶ 340-73.

The facts likewise permit the reasonable inference that Defendants' statements that Discover's "second and third lines of defense" operated "independently of the business units" and that each line of business is responsible for managing risk in its business" (¶¶ 73, 75) were material. Those representations falsely or misleadingly portrayed "the present condition" at the Company. *Hospira*, 2013 WL 566805, at *23. Further, they differ from the generic assurances in *Fifth Third* that "[w]e are managing the risk across the company today exceptionally well" and "[c]onduct risk at Fifth Third Bank is well managed." 2022 WL 1642221, at *17. Nor is *In re Citigroup Securities*

*Litigation* persuasive. The court there held statements about the bank's "risk management framework," including that "Citigroup 'manages its risks' through 'three lines of defense,'" were "routine representations" and thus inactionable. 2023 WL 2632258, at *14 (S.D.N.Y. Mar. 24, 2023). Unlike in *Citigroup*, the Complaint here details a series of representations that masked systemic and pervasive deficiencies in the very areas it touted to investors, which the Officer Defendants knew or recklessly disregarded. *See Jones*, 701 F. Supp. 2d at 1027-28 ("statements that would otherwise amount to puffery can be actionable if the speaker is aware that the statement is deceptive"). Additionally, in contrast to *Citigroup*, the FEs' accounts directly undermine, for example, Discover's representation that it maintained "three lines of defense" and that they operated "independently of the business units." ¶¶ 71-74, 107-24. In contrast to *Weir v. Allianz SE*, where plaintiffs alleged "Allianz's Internal Audit group failed to thwart the fund managers' scheme, making its description of 'the third line of defense' misleading," 2024 WL 1813520, at *8 (C.D. Cal. Mar. 14, 2024), Plaintiffs here detail how Discover's "three lines of defense" did not exist in a manner anywhere near what the Company had portrayed.

Finally, "statements contained in a code of conduct are actionable where they are *directly at odds with the conduct alleged in a complaint*." *In re Signet Jewelers Ltd. Sec. Litig.*, 2018 WL 6167889, at *17 (S.D.N.Y. Nov. 26, 2018). That is precisely the situation here. ¶¶ 294-98.

## II. PLAINTIFFS' ALLEGATIONS GIVE RISE TO A STRONG INFERENCE OF DEFENDANTS' SCIENTER

In evaluating the Complaint, the appropriate inquiry "is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs*, 551 U.S. at 322-23 (emphasis in original). The inference "need not be irrefutable, *i.e.*, of the 'smoking-gun' genre, or even the most plausible of competing inferences"; rather, the Complaint must withstand dismissal "if a reasonable person

would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324. Plaintiffs can carry their burden by alleging Defendants either knew "or w[ere] reckless in disregarding a substantial risk" that the challenged statements were false or misleading when made. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008) ("*Tellabs II*"). "One of the classic fact patterns giving rise to a strong inference of scienter is that defendants published statements when they knew facts *or* had access to information suggesting that their public statements were materially inaccurate." *Tellabs I*, 437 F.3d at 603 (quoting *Fla. St. Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 665 (8th Cir. 2001)). Plaintiffs allege numerous bases supporting a strong inference that Discover and the Officer Defendants made misrepresentations knowingly or with reckless disregard for the truth.

> ### A. The Duration and Magnitude of the Deficiencies and Misconduct at Discover Strongly Indicate Defendants' Knowledge or Recklessness.

"The magnitude of defendants' alleged fraud lends weight to plaintiffs' allegations of scienter." *Ross*, 2012 WL 5363431, at *9. The CFPB's and FDIC's findings, as corroborated and expanded upon by the FEs, support a strong inference of fraud. "[E]ven if . . . the [consent orders] did not require [Discover] to admit wrongdoing and do not have the force of a judicial finding of wrongdoing," the agencies' determinations "strengthen[] the inference that these investigations must have given defendants reason to know of a serious risk that [the alleged misrepresentations] w[ere] false." *Pension Tr. Fund for Operating Eng'rs v. DeVry Educ. Grp., Inc.*, 2018 WL 6714326, at *3 (N.D. Ill. Dec. 20, 2018); *see also Hospira*, 2013 WL 566805, at *26 (scienter sufficiently alleged where FDA's "Warning Letter advised Defendants that 'certain identified issues may be symptomatic of serious problems in your firm's manufacturing and quality assurance systems'") (quoting complaint).

Further, the CFPB required that its 2015 order be delivered to "each of [Discover's] board members and executive officers" and that for five years after the effective date, the Company must deliver a copy to "any future board members and executive officers." ¶ 194. Each of the Officer Defendants thus knew about the CFPB's 2015 findings, making it even more likely they were aware of or recklessly disregarded the continuing violations of that consent order. Additionally, the CFPB directed Discover to submit "a comprehensive compliance plan designed to ensure that [Discover]'s student-loan-servicing activities comply with the terms of this [2015] Consent Order," and directed that the Company's board or a board committee must review the compliance plan before it was submitted to the agency. ¶ 193. It is therefore reasonable to infer that as a member of the board Hochschild received information regarding the improper conduct detailed in the 2015 order and either knew or recklessly disregarded that the same (and additional) misconduct was continuing during the Class Period. *See Todd v. STAAR Surgical Co.*, 2016 WL 6699284, at *13 (C.D. Cal. Apr. 12, 2016) ("STAAR's alleged history of noncompliance further supports the inference that [the CEO] kept a close watch on possible violations of FDA regulations."). Further, given Defendants' repeated representations regarding Discover's risk management infrastructure, it is reasonable to infer the Officer Defendants knew or recklessly disregarded that, as the FDIC found, Discover utterly failed to implement a CMS that would enable the Company to comply with consumer protection laws and regulations.

The FEs' accounts confirm that the deficiencies and improprieties detailed in the regulators' consent orders were systemic and resulted from a "culture of non-compliance" that permitted—even encouraged—deviations from proper compliance practices. ¶¶ 102-06. Those derelictions were exacerbated by Discover's deficient investment in risk management and compliance, contrary to Defendants' contemporaneous public assurances.

The FEs recount specific interactions with high-level executives responsible for compliance and risk management—including Scott Michelau, Discover's Vice President – US Cards Risk Officer, and Dianne Rischke, the Company's Vice President, Credit and Card Operations Risk Officer/Consumer Banking Risk Officer—regarding deficiencies that undermined the proper performance of risk management and compliance processes. ¶¶ 115-17, 122-24, 127, 137, 144, 152, 224. FE 1 recounted informing Michelau and Rischke of the first-line testing team's refusal to conduct planned tests, and repeatedly telling Michelau that the compliance function was "not working," that the second-line compliance team did not know what they were doing, and that both the first and second lines of defense suffered from a lack of experience. ¶¶ 115, 117. FE 1 also noted business unit executives refused to sign off on first-line compliance reports until certain findings were removed, a serious breach of protocol. ¶ 118. FE 6 recounted similar reluctance from senior management to implement proper control testing. Around mid-2021, FE 6 learned from Rischke that with respect to the consumer banking business (which included student loans), the testing group was "not going to test controls, only transactions"—another major deviation from appropriate practice. ¶ 124. FE 6 discussed this issue with superiors, including Vesela Zlateva (the second-line testing vice president), to no avail. *Id.*

FE 1 further observed "[t]he entire compliance, across the entire Company, first and second line, was understaffed," including the "process and control assessment testing" group, which was responsible for correcting compliance failures. ¶ 129. Unqualified compliance personnel and high turnover at the executive compliance level compounded the problem, undermining the Company's ability to effectively test for and address compliance-related issues. ¶¶ 131-32, 135-36. Senior management was aware of these issues, but disregarded them or indicated they lacked the ability to change things. *E.g.*, ¶¶ 127, 137. Indeed, FE 6 recalled that during meetings Hochschild

attended, participants said they did not have enough resources to address issues requiring remediation and made statements to the effect of "we do not have the right people with the right skillset" to complete "fixes." ¶ 147. Michelau told FE 6 not to even ask for more resources, including during monthly business review meetings, "because you are not going to get [them]." *Id.* Additionally, FE 3 recounted that "everyone" at the executive level was "very aware of DSL's [Discover Student Loans] issues," and that several managers, directors, and vice presidents had informed FE 3 they had calls with Hochschild regarding student loan issues, as well as the "status of DSL and the [2020 CFPB] consent order." ¶ 212. But because the "resources, [and] human capital was not sufficient," the remediation process "was really awful" and Discover "absolutely missed" borrowers it was required to aid. ¶¶ 215-17.

"Taken collectively, statements by confidential witnesses establish that members of executive-level management, including individual defendants, had access to and used reports documenting in real time the [compliance and risk management problems] during the Class Period." *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130, 1145 (9th Cir. 2017). While Defendants criticize Plaintiffs' (pre-discovery) references to "senior management," the relevant question is whether it is reasonable to infer the CEO and CFO knew or recklessly disregarded the extent to which such long-running and pervasive problems undermined their representations to investors. The answer is plainly yes—particularly as to Hochschild, who was "responsible for risk management," including the Company's "risk management culture." ¶ 69 (quoting Discover 2022 Form 10-K at 14); *see also Ross*, 2012 WL 5363431, at *9 (scienter sufficiently pleaded where "the CWs cited by plaintiffs . . . detailed facts supporting the claim that defendants' practice of improperly inflating job placement statistics was both widespread and pervasive").

The FE allegations do not "require a heavy discount" (MTD Br. 31). In *Tellabs II*, "the Seventh Circuit clarified that a particularly troubling use of the confidential sources prompted" its prior ruling in *Higginbotham v. Baxter International, Inc.*, 495 F.3d 753, 757 (7th Cir. 2007), on which Defendants rely. *Hospira*, 2013 WL 566805, at \*17. A discount is warranted only "when the complaint lacks enough detail for the Court to determine whether the unnamed witnesses were 'in a position to know at first hand the facts to which they are prepared to testify.'" *Ross*, 2012 WL 5363431, at \*4 (quoting *Tellabs II*, 513 F.3d at 712). That is not the case here. By "provid[ing] the job title, duration of employment at [Discover], and a description of employee responsibilities," Plaintiffs "have sufficiently described their sources 'to support the probability that a person in the position occupied by the source would possess the information alleged.'" *Hospira*, 2013 WL 566805, at \*17 (quoting *Tellabs I*, 437 F.3d at 596); ¶¶ 51-57. Further, Plaintiffs rely on the FEs "to corroborate and particularize their allegations that Defendants' statements were misleading in light of the employees' observations and opinions regarding conditions at [Discover], rather than to allege a basis for the misleading nature of the statements that is otherwise absent from the Complaint." *Id.* And the facts known to the FEs are "set forth in convincing detail, with some of the information, moreover, corroborated by multiple sources." *Tellabs II*, 513 F.3d at 712.

Regarding the substance of the FEs' accounts, Greene and Graf contend they only oversaw "*financial* matters, not consumer compliance," and emphasize that none of the FEs describe direct interactions with them. MTD Br. 32 (emphasis in original). But Greene spoke publicly on the Company's behalf regarding compliance issues. *E.g.*, ¶ 253 (touting Discover's "ability to grow in a compliant way"); ¶ 230 (admitting Discover "historically underinvested" in compliance and was "paying the price right now"). Further, given the significance of compliance and risk management to Discover's financial results and prospects, it is reasonable to infer that Graf and

Greene—as the Company's CFOs—were informed about important developments relating to those subjects. In this regard, Graf and Greene (as well as Hochschild) attested to the integrity of Discover's internal controls, which (as discussed in Section II.C below) were not limited to strictly "financial" matters. Additionally, "[t]hat some of the [FE]s lacked direct contact with the [Officer] Defendants does not undermine their evidence." *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *10 (S.D.N.Y. May 24, 2018). The FEs "detail[] the types of relevant information made available to senior executives," and they confirm that information regarding significant compliance and risk management problems was "discussed at [regular] meetings." *Id.* These accounts "taken together are sufficient to raise a strong inference of scienter." *Id.*

Defendants likewise attempt to minimize Hochschild's involvement in the matters addressed by the FEs and the regulators. But the Complaint's particularized allegations tell a different story. For example, FE 5 recounted that Discover had hundreds of unresolved regulatory violations, and that senior management and board members—including Hochschild—received quarterly reports noting open regulatory findings and other regulatory information. ¶ 142; *see also Sinnathurai v. Novavax, Inc.*, 645 F. Supp. 3d 495, 526 (D. Md. 2022) ("A CW report that the senior company official making public statements remained abreast of the relevant issues is probative on the issue of scienter."). FE 5 confirmed that the Compliance Committee, which included Hochschild, met up to seven or nine times a year to review various metrics and disclosures for each Discover product. ¶ 143.

FE 6 similarly recounted that Hochschild received a "monthly scorecard on risk management activity" that was prepared by the risk group and presented to Hochschild in monthly business review meetings for both the U.S. cards business (which FE 6 attended) and the consumer banking businesses. ¶ 144. Other senior executives—including Capozzi, Michelau, and

- 28 -

Rischke—attended the meetings for the U.S. cards business. *Id.* FE 6 noted that "because our processes caused consumer harm," the risk scorecard showed the number of open issues and how many had been closed, as well as delays in closing issues. ¶ 145. FE 6, who prepared the portion of the monthly reports addressing risk, also recounted that the reports were emailed to Hochschild, who reviewed them during meetings. ¶ 146. Further, FE 6 recalled, meeting attendees said— while Hochschild was present—that they did not have sufficient resources to address issues requiring remediation and noted they did not have people qualified to fix the problems. ¶ 147.

These allegations collectively support the inference that Hochschild had information demonstrating systemic compliance and control deficiencies at the Company, and knew or recklessly disregarded that the information rendered Defendants' public statements on those issues false or misleading. *See Hospira*, 2013 WL 566805, at *26 ("Defendants' participation in various meetings on Hospira's remediation efforts support the inference that they were aware of the quality-control issues at Rocky Mount and other Hospira facilities"); *Grae v. Corr. Corp. of Am.*, 2017 WL 6442145, at *20 & n.8 (M.D. Tenn. Dec. 18, 2017) (strong inference of scienter where, *inter alia*, confidential witness "confirm[ed] that . . . the ongoing QAD tracking included the results of [Bureau of Prisons] audits and Notices of Concern and . . . [defendants] were among the senior executives who routinely received QAD information," notwithstanding that witness did "not claim[] to have spoken directly to any of the Individual Defendants"). Defendants' suggestion that Plaintiffs must "point[] to . . . an[] internal document or information contradicting Hochschild's public statements" (MTD Br. 32) is incorrect. *See Allison*, 2023 WL 1928119, at *10 (rejecting argument "that allegations of specific reports, conversations, or meetings demonstrating the defendants' knowledge are required to plead a strong inference of scienter").

The present facts differ significantly from two prior cases this Court dismissed, both of which Defendants cite. The complaint in *Chandler v. Ulta Beauty, Inc.* "contain[ed] no allegations that [the CEO and CFO] ever accessed" documents that allegedly contained information undermining the executives' public statements. 2022 WL 952441, at *27 (N.D. Ill. Mar. 30, 2022). The allegations here, by contrast, specify (1) the information Hochschild and other executives received, (2) how often they received it, and (3) how it undermined their public representations.

Similarly, plaintiffs in *Conagra* alleged only that "Defendants had access to an electronic data room established for Conagra's diligence that contained sales, pricing, promotional contracts and other key financial data." 495 F. Supp. 3d at 659. The complaint "include[d] no allegations about any specific information . . . that (1) was available to Defendants during diligence, and (2) could have put Defendants on notice about [the acquired company]'s alleged channel stuffing, promotions, and practices." *Id.* And there were "no allegations suggesting that the individual defendants actually reviewed" information "that would have put Defendants on notice." *Id.* at 660. Those facts do not resemble the allegations here.

Defendants contend the FEs' accounts "highlight . . . that Discover had policies and procedures in place to support the risk management and compliance systems, with senior management engaged in governance and oversight of those systems." MTD Br. 33. But Plaintiffs do not aver that Discover had *no* "policies and procedures in place"; rather, they allege Defendants concealed material information regarding massive deficiencies in those policies and procedures, which rendered their public representations false or misleading. *See In re Lehman Bros. Sec. & ERISA Litig.*, 799 F. Supp. 2d 258, 285 (S.D.N.Y. 2011) ("[G]iven the allegations of frequent, significant departures from Lehman's internally stated policies, there is enough in the [complaint] to permit the inference that its senior officers' statements to the effect that Lehman had 'strong'

and 'conservative' risk management were false in the sense that these individuals knew or recklessly disregarded their misleading effect."). In light of the vast disparity between Defendants' public representations and the concealed facts, "it is difficult to imagine a non-culpable explanation as to how Defendants, given their monitoring of [Discover]'s [systems and practices] in connection with [Discover]'s remediation efforts . . . could have made the statements without scienter." *Hospira*, 2013 WL 566805, at *26.[6]

### B. Defendants' Admissions Support an Inference of Scienter.

As with Discover's years-long violations of laws and regulations governing its loan servicing business, as well as its failure to implement proper risk management and control processes, it is implausible to suggest the Company's senior executives were unaware of its admitted misclassification of credit card interchange rates *for over 15 years*. ¶¶ 218-27; *see also Jones*, 701 F. Supp. 2d at 1029 ("While a court cannot 'presume' scienter, a strong inference of scienter may still be credited where it is almost inconceivable that an individual defendant would be unaware of the matters at issue."). And Hochschild's acknowledgment that the improper misclassification issue "underscored deficiencies in [Discover's] corporate governance and risk management" (¶ 226)—among the very subjects about which Defendants assured investors throughout the Class Period—suggests knowledge or recklessness.

Further, FE 1 recounted that in September 2023—approximately two months after the Company admitted to misclassifying interchange fees—Michelau (a Vice President) and Vice President of Consumer Banking Ed Carlos asked FE 1 to write a policy for the cards business unit regarding account classification. ¶ 224. FE 1 accordingly developed a policy mandating that

---

[6] Whether Defendants acted in "good[ ]faith" (MTD Br. 36) is irrelevant, at least at this stage, because "good faith, without more, does not necessarily preclude a finding of recklessness." *SEC v. Infinity Grp. Co.*, 212 F.3d 180, 192 (3d Cir. 2000); *accord Ustian*, 2019 WL 7486835, at *38.

accounts be properly classified in accordance with a network agreement and directing employees involved with the interchange fee process to consult the network agreement for information about classifications and rates. ¶ 225. As FE 1 noted, *this policy did not exist before September 2023. Id.* This indicates either a conscious attempt to generate artificial fee revenues (for which the Company has already reported a $365 million liability, *see* ¶ 219) or a reckless failure of oversight.

Hochschild's and Greene's admissions in 2023 that Discover had in fact *not* adequately invested in risk management and compliance, when considered alongside the numerous sources of contemporaneous facts undermining their prior representations, also support a scienter inference. So, too, does Greene's acknowledgement in December 2023 that Discover decided to exit the student loan business because "our internal systems capabilities weren't on par with what a professional servicing organization could do for this portfolio." ¶ 231. Hochschild's and Greene's admissions are especially compelling given their prior repeated emphasis on Discover's purported commitment to compliance and its "significant[]" investments in that area. *See Allison*, 2023 WL 1928119, at *10 ("[T]he defendants' repeated statements about Oak Street's marketing practices and [Anti-Kickback Statute] compliance support an inference that the defendants knowingly concealed the allegedly improper practices."); *Hedick*, 2021 WL 3566602, at *13 ("The Court may readily and reasonabl[y] infer from [defendants'] repeated references to the sustainability of cost-cutting from synergies and post-merger efficiencies that they made it [their] business to look into these issues.") (first and third alterations in original).

Plaintiffs do not "attempt[] to impute scienter" to Hochschild, Greene, and Graf "on the basis of their positions" alone (MTD Br. 30-31). *Rossy v. Merge Healthcare Inc.*, which Defendants cite, stands for the unremarkable proposition that "[a]n individual's position as a corporate officer, *without more*, is generally insufficient to support a strong inference of scienter."

169 F. Supp. 3d 774, 784-85 (N.D. Ill. 2015) (alteration in original); *see also Arbitrage Event-Driven Fund v. Tribune Media Co.*, 2020 WL 60186, at *10 (N.D. Ill. Jan. 7, 2020) (cited at MTD Br. 31) ("allegations that Kern and Bigelow were Tribune's CEO and CFO are *insufficient* to establish scienter"). Further, most of the confidential witnesses' accounts in *Rossy* were "wholly lacking in detail," "d[id] not reference any defendant or allege any specific information known to any of them," and with limited exception did not "meaningfully corroborate one another." 169 F. Supp. 3d at 783-84. Once those accounts were "discarded," little remained other than plaintiffs' allegations regarding the individual defendants' positions at the company. *Id.* at 784-85. The "more" that was lacking in *Rossy* is present in this case. The FEs here recount Company-wide deficiencies with respect to compliance, risk management, and internal controls, and identify senior executives whom the FEs informed of the problems, as well as in-person meetings during which Hochschild reviewed reports provided to him that addressed these issues. *E.g.*, ¶¶ 143-47.

### C. Additional Facts Enhance the Scienter Inference.

Other facts, perhaps insufficient on their own, further bolster the scienter inference. *First*, the significance of compliance, risk management, and corporate governance to Discover's very existence supports an inference of scienter. "Courts have held that scienter can be inferred" where "the subject at issue is critical to a business's core operations or to an important transaction." *Chandler*, 2022 WL 952441, at *25. The Complaint "support[s]" this inference with "particularized facts" (*id.*) demonstrating risk management and compliance were critical to Discover's operations. ¶¶ 58-69.

Defendants contend Plaintiffs must allege facts "showing [risk management and compliance] 'constitute nearly all' of Discover's business." MTD Br. 33 (quoting *In re Baxter Int'l Inc. Sec. Litig.*, 2021 WL 100457, at *13 (N.D. Ill. Jan. 12, 2021)). Not so. In *Allison*, the court addressed this very point and noted that unlike *Baxter*, "[i]n this case, the [plaintiffs] are not

- 33 -

relying exclusively on the core operations inference that the defendants can be 'assumed to know of facts critical to [Oak Street]'s core operations or to an important transaction that would affect [Oak Street]'s performance,' but also on the defendants' specific statements about Oak Street's marketing practices that indicate knowledge." 2023 WL 1928119, at *10 (third and fourth alterations in original). The court further observed "the Seventh Circuit has indicated that the core operations inference applies where the practices 'are *a significant part* of [a company]'s financial picture.'" *Id.* (quoting *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 937 (7th Cir. 2018)). As in *Allison*, the core operations inference is just one of numerous indicia of scienter, and "compliance and risk management" unquestionably comprised "a significant part"— indeed, an "*essential* part" (¶ 65)—of Discover's highly regulated business. ¶¶ 62-67, 82, 257.

*Second*, "the defendants' repeated statements about . . . compliance" and risk management "support an inference that the defendants knowingly concealed the allegedly improper practices." *Allison*, 2023 WL 1928119, at *10; *see also* ¶¶ 307-08; Miarmi Decl. Ex. 1. Because Plaintiffs do not contend "allegations that an executive merely spoke on a topic [ar]e *enough* to establish a strong inference of scienter" (MTD Br. 35), Defendants' argument is misplaced.

*Third*, Hochschild, Greene, and Graf signed SOX certifications attesting that they "[d]esigned . . . disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under [their] supervision, to ensure that material information relating to [Discover] . . . [wa]s made known to [them] by others within those entities," and that they "[e]valuated the effectiveness of" those controls and procedures. ¶ 290. These certifications "support an inference that defendants were aware of matters relevant to their certifications or recklessly failed to make themselves aware." *Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1028 (N.D. Cal. 2020). Defendants contend their certifications "say nothing about Discover's risk

- 34 -

management or compliance systems."  MTD Br. 34.  But this fails to assume the truth of Plaintiffs'

well-supported allegations, which specify that internal controls encompass the "effectiveness . . .

of operations" and "compliance with applicable laws and regulations."  ¶ 89 (quoting Public

Company Accounting Oversight Board definition); *see also* ¶ 88 (COSO definition of internal

control includes "operations, reporting, and compliance"); ¶ 90.  Indeed, Discover represented that

it evaluated its controls under the COSO standard referenced in the Complaint.  ¶¶ 282-84.

*Fourth*, Hochschild's abrupt departure as CEO in August 2023—shortly after the Company

disclosed the credit card misclassification issue and just a month before the FDIC's consent order

was finalized—supports a scienter inference.  ¶¶ 312-13, 356.  *See In re Akorn, Inc. Sec. Litig.*,

240 F. Supp. 3d 802, 820 (N.D. Ill. 2017) ("Further reinforcing the case for scienter is the

allegation that [the CFO] resigned in the wake of the restatement, before a replacement CFO was

selected.").  Analysts' observations that Hochschild's ouster resulted from Discover's compliance

problems strengthen this inference.  ¶¶ 357-60.  In sum, "given the complaint's additional

allegations regarding [Hochschild]'s knowledge of improper practices, the timing of his

resignation lends weight to a finding of scienter."  *Ross*, 2012 WL 5363431, at *10.[7]

### D.      Defendants Had the Motive and Opportunity to Commit Fraud.

Plaintiffs also allege the Officer Defendants had a strong motive to commit fraud, as well

as the opportunity (as senior officers of Discover) to do so.  If Discover failed to meet cumulative

three-year EPS targets, Hochschild and other executives would receive none of their performance

stock unit ("PSU") awards, which represented 50% or more of Hochschild's total compensation.

¶¶ 315-17, 383-95.  These Defendants were thus motivated to underinvest in compliance, which

---

[7] Defendants' reliance on *Roth v. OfficeMax, Inc.* is misplaced, as Plaintiffs do not argue Hochschild's resignation "is sufficient" to infer scienter.  *See* 527 F. Supp. 2d 791, 803 n.14 (N.D. Ill. 2007).

kept the Company's expenses artificially low and thus increased EPS. They also had a powerful incentive to deploy the funds saved from underinvesting in compliance to repurchase billions of dollars of Discover stock, thereby reducing Discover's outstanding shares and boosting EPS. ¶ 392. "Personal profit, coupled with professional motives to hide internal weaknesses . . . lend weight to not only a cogent inference of scienter, but a compelling one in light of the alternative suggested by defendants"—that Discover's compliance efforts simply "fell short" (MTD Br. 36). *Norfolk Cnty. Ret. Sys. v. Ustian*, 2009 WL 2386156, at *10 (N.D. Ill. July 28, 2009).[8]

Defendants' fact-dependent assertions regarding *how* aggressive the share buybacks were do not change the reality that Discover spent more than $10 billion to repurchase shares during the Class Period, which reached unprecedented *dollar values* in 2021-2022 compared to the prior decade. ¶ 389. Those actions lowered Discover's outstanding shares by *24%* and materially increased EPS, all while Defendants underinvested in compliance. ¶¶ 229-30, 389 n.162.

The Officer Defendants posit that if they were motivated to push for stock repurchases and raise EPS, their awareness of the CFPB's 2015 order renders it "unlikely" they would risk exposing Discover to further regulatory action and "a pause in any share repurchases." MTD Br. 36. But this "confuses expected with realized benefits." *Tellabs II*, 513 F.3d at 710. It is plausible to infer the Officer Defendants either elevated their near-term personal interests over potential

---

[8] The lack of insider trading does not undermine the scienter inference. *See, e.g.*, *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. Am. W. Holding Corp.*, 320 F.3d 920, 944 (9th Cir. 2003) (strong inference of scienter even though defendants "did not engage in insider trading," where they "were motivated to inflate America West's financial results and stock prices because their eligibility for stock options and executive bonuses were based principally on the company's financial performance"). While the Seventh Circuit reasoned in *Higginbotham* that the absence of sales by several managers could afford a "possible" inference "that nothing was thought to be out of the ordinary," the collective scienter allegations there—which relied primarily on "hindsight"—were far less substantial than those here. 495 F.3d at 759.

- 36 -

consequences down the road or "thought that there was a chance that the situation" at Discover

"would right itself," in which case "the benefits of concealment might exceed the costs." *Id.*[9]

### III.    PLAINTIFFS SUFFICIENTLY ALLEGE SCHEME LIABILITY

Plaintiffs amply allege "scheme liability" under Rules 10b-5(a) and (c) against Discover

and the Officer Defendants based on their improper manipulation of shares outstanding and EPS

through stock buybacks.  ¶¶ 383-95.  The Complaint thus sets forth "what" actions constitute the

scheme, "who" performed them, "when" they occurred, and the scheme's "effect" on Discover's

stock price.  *DH2, Inc., v. Athanassiades*, 404 F. Supp. 2d 1083, 1092 (N.D. Ill. 2005).  That is

sufficient, particularly as Plaintiffs need not plead scheme liability with the same degree of

specificity as for their Rule 10b-5(b) claims.  *CFTC v. Kraft Foods Grp., Inc.*, 153 F. Supp. 3d

996, 1012 (N.D. Ill. 2015).  Defendants' challenges to Plaintiffs' scheme claims lack merit.

*First*, Defendants assert scheme liability "does not apply here as a matter of law because

Plaintiffs' claims are based on alleged misstatements and omissions alone."  MTD Br. 37.  But in

*Lorenzo v. SEC*, the U.S. Supreme Court held "dissemination of false or misleading statements

with intent to defraud can fall within the scope of subsections (a) and (c) of Rule 10b-5."  587 U.S.

71, 78 (2019).  Among other things, "[t]he idea that each subsection of Rule 10b-5 governs a

separate type of conduct is . . . difficult to reconcile with the language of subsections (a) and (c),"

which is "expansive."  *Id.* at 81.  The Court thus upheld an SEC order finding scheme liability as

to a defendant who "sent false statements directly to investors, invited them to follow up with

---

[9] To the extent *Seaman v. California Business Bank* holds otherwise, it is unavailing in light of *Tellabs II*. The overall scienter picture in *Seaman* also differed sharply from this case, as the challenged private placement memorandum there "candidly acknowledged the bank's precarious financial situation."  2014 WL 1339649, at *7 (N.D. Cal. Apr. 2, 2014).  Discover offered no such candid acknowledgment regarding its risk management and compliance failures.  *In re Chicago Board Options Exchange Volatility Index Manipulation Antitrust Litigation* is also inapposite, as plaintiffs there "d[id] not plead any facts supporting the inference that [the exchange] knew that its design choices would expose the process to manipulation." 435 F. Supp. 3d 845, 862 (N.D. Ill. 2020).

questions, and did so in his capacity as vice president of an investment banking company." *Id.* at 79. *Lorenzo*'s reasoning encompasses the Officer Defendants' concealment of material information from investors regarding the Company's underinvestment in risk management and compliance for the purpose of artificially inflating EPS and reaping undue compensation based on that manipulated metric.[10] In any event, as detailed in the Complaint (¶¶ 383-95) and summarized above, Plaintiffs' scheme liability claims *do* include conduct beyond misrepresentations.

*Second*, Defendants contend Plaintiffs fail to adequately allege "who played what role in the alleged scheme." MTD Br. 37. But the Complaint specifies that Hochschild, Graf, and Greene perpetrated the scheme, and articulates their motive due to receiving EPS-based PSUs. ¶¶ 390-93. And while the board *authorized* Discover's share repurchases, the Officer Defendants (as Greene specified) "*execute[d]* on that authorization" by "return[ing] excess capital to shareholders" through share repurchases based on proposals "share[d] . . . with our Board." ¶ 267.

*Third*, whether pursuing aggressive stock repurchases or underinvesting in risk management and compliance themselves "constitute deceptive and manipulative acts" (MTD Br. 38) is irrelevant. It is *the use of the share repurchases to artificially lower EPS for the Officer Defendants' personal benefit*, in addition to *their improper concealment of material facts*, that was deceptive and manipulative. Unlike in *Fryman v. Atlas Financial Holdings, Inc.*, Plaintiffs allege (1) "what specific information and data" compliance personnel and regulators "uncovered to establish that" the Company's risk management and compliance "were inadequate"; (2) that "such

---

[10] Defendants cite *SEC v. Rio Tinto plc*, in which the Second Circuit interpreted *Lorenzo* as "consistent with" the position "that misstatements and omissions cannot form the sole basis for liability under the scheme subsections." 41 F.4th 47, 53 (2d Cir. 2022). *Lorenzo*'s plain language compels otherwise. *See SEC v. Kameli*, 2020 WL 2542154, at *14 (N.D. Ill. May 19, 2020) (defendants' argument "that the conduct used to support a claim under Rule 10b-5(b)—defendants' false/misleading statement/omissions—cannot also be used as the basis for claims under Rule 10b-5(a) and (c)" was "no longer tenable . . . in light of . . . *Lorenzo*"). Further, unlike in *Rio Tinto*, Defendants here "disseminate[d]" false or misleading statements to the market, which the Second Circuit viewed as "key" to *Lorenzo*'s holding. *Rio Tinto*, 41 F.4th at 53.

information was available to the [Officer] Defendants"; and (3) when the concealed facts "w[ere] learned and therefore should have been revealed to the public." 462 F. Supp. 3d 888, 898 (N.D. Ill. 2020). This case likewise bears no resemblance to *In re Citigroup, Inc. Securities Litigation*, where plaintiffs alleged "Citigroup's business would have been conducted differently had the company adhered to the management principles disclosed in its public filings." 330 F. Supp. 2d 367, 376 (S.D.N.Y. 2004), *aff'd*, 165 F. App'x 928 (2d Cir. 2006).

*Finally*, the Complaint's ample facts belie the Officer Defendants' assertion that Plaintiffs fail to allege they concealed compliance deficiencies and underinvestment. ¶¶ 101-237.

## IV. PLAINTIFFS SUFFICIENTLY PLEAD CONTROL PERSON CLAIMS

"Determination of whether an individual defendant is a 'controlling person' under section 20(a) is a question of fact that cannot be determined at the pleading stage." *Allison*, 2023 WL 1928119, at *15. "The Seventh Circuit has yet to speak directly on whether control must be alleged with particularity, and the courts in this district are divided on the issue." *Silverman v. Motorola, Inc.*, 2008 WL 4360648, at *16 (N.D. Ill. Sept. 23, 2008) ("we are not convinced that the allegations of control are . . . subject to the heightened standards" governing Section 10(b) claims). That debate is academic here because Plaintiffs' detailed allegations satisfy either standard.

As discussed in Sections I – III above, the Complaint sufficiently alleges Discover committed a primary Section 10(b) violation. Plaintiffs further allege "the individual defendants exercised control over [Discover] by virtue of their position as senior executives in the company," which "for now is enough." *Motorola*, 2008 WL 4360648, at *16. While "a single paragraph" that "alleges no facts" regarding control might not suffice, *Starr v. !Hey, Inc.*, 2003 WL 21212596, at *4 (N.D. Ill. May 23, 2003) (cited at MTD Br. 39), the Complaint here is far more detailed and specific. ¶¶ 19, 77-80, 98-99, 193-94, 229-31, 241-42, 288-91. That is particularly true with respect to the Officer Defendants, who incredibly suggest that as the CEO or CFO they lacked

- 39 -

"control over the drafting or preparation of the specific challenged statements" (MTD Br. 39), including those they *signed*. *E.g.*, ¶¶ 241, 288, 295, 377.

Plaintiffs also specify that as members of the board's Risk Oversight and Audit Committees, the Director Defendants "participated in or oversaw activities at the core of the fraud." ¶¶ 40-49, 77-80, 396-404. Such "allegations of membership in a committee whose responsibilities relate [ ] directly to the subject of [the] fraud allegations are sufficient to plead control-person liability." *In re Galena Biopharma, Inc. Sec. Litig.,* 117 F. Supp. 3d 1145, 1200 (D. Or. 2015); *see also BofI*, 2017 WL 2257980, at *30 (it was "reasonable to infer that the Audit Committee Defendants had the ability to control the mechanisms intended to prevent, at the very least, BofI's misrepresentations as to the sufficiency of its compliance infrastructure"). FE 5's account of providing reports to the board identifying serious control deficiencies further bolsters Plaintiffs' control allegations. ¶ 142. Defendants' observations that Discover and Discover Bank had separate boards and that Discover and its board were not named as parties to the CFPB's 2015 and 2020 consent orders are unavailing. *See In re Wash. Mut., Inc. Sec., Derivative & ERISA Litig.*, 259 F.R.D. 490, 509 (W.D. Wash. 2009) (upholding Section 20(a) claims where allegations "affirmatively link[ed] board membership to WaMu's primary violations"). Finally, each Director Defendant "signed at least one of the [relevant] SEC filings," which "satisfies th[e 20(a)] standard." *Schleicher v. Wendt*, 529 F. Supp. 2d 959, 981 (S.D. Ind. 2007) (Hamilton, J.).

## CONCLUSION

Defendants' motion should be denied in full. Plaintiffs respectfully request leave to amend in the event the Court grants any part of the motion. *See, e.g.*, *Garden City Emps.' Ret. Sys. v. Anixter Int'l, Inc.*, 2011 WL 1303387, at *31 n.33 (N.D. Ill. Mar. 31, 2011) (as it was "the first time that the Court . . . dismissed Plaintiffs' complaint," court "d[id] not see why Plaintiffs should not have at least one opportunity to correct the pleading deficiencies identified in th[e] opinion").

Dated: May 2, 2024

Respectfully submitted,

| | |
|---|---|
| **MOTLEY RICE LLC** | **LIEFF CABRASER HEIMANN** <br> **& BERNSTEIN, LLP** |

*/s/ Gregg S. Levin* (with consent)

Gregg S. Levin
Lance V. Oliver
William S. Norton
Christopher F. Moriarty
Joshua C. Littlejohn (*admitted pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
glevin@motleyrice.com
loliver@motleyrice.com
bnorton@motleyrice.com
cmoriarty@motleyrice.com
jlittlejohn@motleyrice.com

*Counsel for Co-Lead Plaintiff KBC Asset
Management NV and Co-Lead Counsel for
the proposed Class*

**KIRBY MCINERNEY LLP**
Anthony E. Maneiro
211 West Wacker Drive, Suite 550
Chicago, IL 60606
Telephone: (312) 767-5180
Facsimile: (312) 757-5181
amaneiro@kmllp.com

*Local Counsel for KBC Asset Management
NV*

*/s/ Michael J. Miarmi*

Steven E. Fineman (*admitted pro hac vice*)
Daniel P. Chiplock (*admitted pro hac vice)*
Michael J. Miarmi (*admitted pro hac vice*)
Gabriel A. Panek (*admitted pro hac vice*)
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
sfineman@lchb.com
dchiplock@lchb.com
mmiarmi@lchb.com
gpanek@lchb.com

Richard M. Heimann (*admitted pro hac vice*)
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
rheimann@lchb.com

*Counsel for Co-Lead Plaintiffs New York City
Employees' Retirement System, New York
City Police Pension Fund, New York City
Fire Department Pension Fund, and
Teachers' Retirement System of the City of
New York, and Co-Lead Counsel for the
proposed Class*

**COHEN MILSTEIN SELLERS**
**& TOLL, PLLC**
Carol V. Gilden
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
IL Bar: 6185530
Telephone: (312) 357-0370
cgilden@cohenmilstein.com

*Liaison Counsel for the proposed Class*