**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |
|---|---|
| KBC ASSET MANAGEMENT N.V., NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM, NEW YORK CITY FIRE DEPARTMENT PENSION FUND, NEW YORK CITY POLICE PENSION FUND, and TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK, Individually and on Behalf of All Others Similarly Situated, | Case No. 1:23-cv-06788 <br><br> Hon. Martha M. Pacold |
| Plaintiffs, | |
| v. | |
| DISCOVER FINANCIAL SERVICES, ROGER C. HOCHSCHILD, JOHN T. GREENE, R. MARK GRAF, MARY K. BUSH, CANDACE H. DUNCAN, JOSEPH F. EAZOR, CYNTHIA GLASSMAN, THOMAS G. MAHERAS, MICHAEL MOSKOW, DANIELA O'LEARY GILL, JOHN B. OWEN, DAVID L. RAWLINSON II, and JENNIFER L. WONG, | |
| Defendants. | |

**REPLY MEMORANDUM OF LAW
IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS**

**TABLE OF CONTENTS**

*Page(s)*

PRELIMINARY STATEMENT ....................................................................................................1

ARGUMENT.................................................................................................................................2

I.     THE OPPOSITION CONFIRMS THAT PLAINTIFFS HAVE NOT PLED A MATERIAL MISREPRESENTATION OR OMISSION. ...................................................2

       A.     The Opposition Does Not Identify Any Misstatements or Omissions. ...................2

       B.     Plaintiffs Ignore the Overwhelming Case Law Establishing that the Challenged Statements Are Immaterial as a Matter of Law. ................................10

II.     THE OPPOSITION CONFIRMS THAT PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER. .........................................................................13

       A.     The Alleged "Duration and Magnitude of the Deficiencies and Misconduct" Do Not Show Knowledge or Recklessness. .....................................13

       B.     The Opposition Fails To Identify Particularized Facts Demonstrating Motive and Opportunity To Defraud. ....................................................................16

       C.     Plaintiffs' Remaining Arguments Do Not Support a Strong Inference of Scienter. ................................................................................................................17

III.    THE OPPOSITION CONFIRMS THAT PLAINTIFFS FAIL TO ADEQUATELY PLEAD SCHEME LIABILITY UNDER RULES 10b-5(a) AND (c). .............................19

IV.    PLAINTIFFS' OPPOSITION CONFIRMS THAT THEY HAVE NOT ADEQUATELY PLED CONTROL PERSON LIABILITY. .........................................20

CONCLUSION...........................................................................................................................20

# TABLE OF AUTHORITIES

*Page(s)*

CASES

*Arbitrage Event-Driven Fund* v. *Tribune Media Co.*,
2020 WL 60186 (N.D. Ill. Jan. 6, 2020) ................................................................................16

*In re Bally Total Fitness Securities Litigation*,
2006 WL 3714708 (N.D. Ill. July 12, 2006) .........................................................................15

*Chandler* v. *Ulta Beauty, Inc.*,
2022 WL 952441 (N.D. Ill. Mar. 30, 2022) .......................................................................7, 14

*In re Citigroup Securities Litigation*,
2023 WL 2632258 (S.D.N.Y. Mar. 24, 2023) ..................................................................11, 12

*City of Pontiac Policemen's & Firemen's Retirement System* v. *UBS AG*,
752 F.3d 173 (2d Cir. 2014) ..................................................................................................13

*Construction Workers Pension Fund-Lake County & Vicinity* v. *Navistar International Corp.*,
114 F. Supp. 3d 633 (N.D. Ill. 2015) .......................................................................................9

*In re HealthCare Compare Corp. Securities Litigation*,
75 F.3d 276 (7th Cir. 1996) ....................................................................................................19

*Desai* v. *General Growth Properties, Inc.*,
654 F. Supp. 2d 836 (N.D. Ill. 2009) .....................................................................................20

*ECA, Local 143 IBEW Joint Pension Trust of Chicago* v. *JP Morgan Chase Co.*,
553 F.3d 187 (2d Cir. 2009) ..............................................................................................12, 13

*In re FBR Securities Litigation*,
544 F. Supp. 2d 346 (S.D.N.Y. 2008) ..............................................................................5, 6, 8

*In re Galena*,
117 F. Supp. 3d 1145 (D. Or. 2015) .......................................................................................20

*Gissin* v. *Endres*,
739 F. Supp. 488 (S.D.N.Y. 2010) ............................................................................................8

*In re Hertz Global Holdings Inc.*,
905 F.3d 106 (3d Cir. 2018) ...................................................................................................19

*Lorenzo* v. *SEC*,
587 U.S. 71 (2019) ..................................................................................................................19

*Macovski* v. *Groupon Inc.*,
553 F. Supp. 3d 460 (N.D. Ill. 2021) .......................................................................................4

*Macquarie Infrastructure Corp.* v. *Moab Partners, L.P.*,
601 U.S. 257 (2024)................................................................................................9, 10

*Matrixx Initiatives, Inc.* v. *Siracusano*,
563 U.S. 27 (2011)......................................................................................................10

*Menaldi* v. *Och-Ziff Capital Management Group LLC*,
277 F. Supp. 3d 500 (S.D.N.Y. 2017)........................................................................4, 5

*Mulderrig* v. *Amyris, Inc.*,
492 F. Supp. 3d 999 (N.D. Cal. 2020) .......................................................................18

*Omnicare, Inc.* v. *Laborers District Council Construction Industry Pension Fund*,
575 U.S. 175 (2015).......................................................................................................1

*Ong* v. *Chipotle Mexican Grill, Inc.*,
294 F. Supp. 3d 199 (S.D.N.Y. 2018)...........................................................................7

*Pension Trust Fund for Operating Engineers* v. *DeVry Education Group, Inc.*,
2018 WL 6714326 (N.D. Ill. Dec. 20, 2018)...............................................................14

*Pension Trust Fund for Operating Engineers* v. *Kohl's Corp.*,
895 F.3d 933 (7th Cir. 2018) ......................................................................................17

*Pierrelouis* v. *Gogo, Inc.*,
414 F. Supp. 3d 1164 (N.D. Ill. 2019) ........................................................................14

*Pugh* v. *Tribune Co.*,
521 F.3d 686 (7th Cir. 2008) ................................................................................14, 15

*Ross* v. *Career Education Corp*,
2012 WL 5363431 (N.D. Ill. Oct. 30, 2012).................................................................6

*Silverman* v. *Motorola, Inc.*,
2008 WL 4360648 (N.D. Ill. Sept. 23, 2008) .............................................................20

*Tellabs, Inc.* v. *Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007)...............................................................................................3, 7, 13

*Vicom, Inc.* v. *Harbridge Merchant Services, Inc.*,
20 F.3d 771 (7th Cir. 1994) ........................................................................................19

*West Palm Beach Firefighters' Pension Fund* v. *Conagra Brands, Inc.*,
495 F. Supp. 3d 622 (N.D. Ill. 2020) ..............................................................7, 8, 9, 13

**STATUTES, RULES, AND REGULATIONS**

15 U.S.C. §§ 77z-2(i)(1)(B), (D) ........................................................................................8

Exchange Act Rule 13a-15, 17 C.F.R. § 240.13a-15.......................................................18

Exchange Act Rule 15d-15, 17 C.F.R. § 240.15d-15 ......................................................18

SEC Rule 10b-5, 17 C.F.R. § 240.10b-5 ..............................................................9, 10, 19

## PRELIMINARY STATEMENT

Plaintiffs' Opposition confirms their failure to plead that general and aspirational statements regarding Discover's compliance and risk management amounted to a multi-year securities fraud. Plaintiffs argue that even if none of the challenged statements is literally false, they were nonetheless fraudulent because they implicitly assured the effectiveness of compliance systems, and those assurances were misleading in light of Discover's alleged compliance shortcomings. But the fatal flaw with Plaintiffs' *securities fraud* theory is that none of the Defendants made any actionable assurances about compliance or risk management, or otherwise made a misstatement with intent to defraud.

*First*, Plaintiffs' fraud claims fail because each challenged statement was literally true, and none amounted to a misleading assurance. Plaintiffs thus resort to taking statements out of context or asking the Court to ignore context altogether. But even at the pleading stage, the Court must review the "surrounding text" and "context" of each statement. *Omnicare, Inc.* v. *Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190 (2015).

*Second*, Plaintiffs barely engage with the many cases holding, at the pleading stage, that substantively indistinguishable statements are immaterial. Without much elaboration, Plaintiffs assert that the challenged statements here are "far more specific" (Opp. 12), but that is incorrect, and the PSLRA requires more to adequately plead materiality. The other factors that Plaintiffs cite either go to a different element of their claim, such as scienter, are generically true for all public statements by large companies, or are simply irrelevant to the materiality analysis.

*Third*, Plaintiffs' allegations do not give rise to a strong inference of scienter as to any Defendant. Plaintiffs plead no scienter allegations specific to Greene and Graf beyond their titles as CFO, which is not enough. Plaintiffs do not even attempt to respond to Defendants' argument that Graf retired from Discover in 2019—near the very beginning of the class period. As for

Hochschild, Plaintiffs at most allege that he received reports of open compliance issues and attended meetings at which unnamed attendees allegedly complained about a lack of "the right people" to remediate unspecified compliance issues. But such vague assertions do not support a strong inference that he made any of the challenged statements—which are all quite general—with fraudulent intent. Similarly, that Hochschild and Greene said, in hindsight, that Discover could have invested more in compliance does not support the inference that they knew any statement was false or misleading *at the time it was made*.

*Finally*, Plaintiffs' scheme liability and control person claims fail, and the Amended Complaint should be dismissed in its entirety.

## ARGUMENT

## I. THE OPPOSITION CONFIRMS THAT PLAINTIFFS HAVE NOT PLED A MATERIAL MISREPRESENTATION OR OMISSION.

### A. The Opposition Does Not Identify Any Misstatements or Omissions.

None of the six categories of statements or omissions discussed in Plaintiffs' Opposition misleadingly "assured" investors of the effectiveness of Discover's risk management systems.

*1. Statements About Investments in Compliance.* Plaintiffs contend that several of Hochschild's and Discover's general statements about investments in compliance "communicated a narrative of improvement," which supposedly was misleading in light of Discover's compliance shortcomings. (Opp. 7.) For their argument to work, Plaintiffs must either point to statements providing assurances that Discover's investments were sufficient to prevent compliance failures, or allege with particularity that at the time the statements were made, Discover was not, in fact, investing to improve its compliance. Plaintiffs do neither. Instead, they double down on their argument that these statements were misleading because Discover was not investing enough.

*First*, Plaintiffs' allegation that Hochschild's reference to "appropriate" resources

somehow was a "determinate and verifiable" assurance about Discover's compliance systems is inaccurate. (*Id.* at 8.) Hochschild was not talking about compliance expenditures. He was talking about the Company's total expenses. In response to a question about COVID-19, he explained that, insofar as the Company took advantage of "an opportunity to invest more" in early 2020, that increase did not imply its earlier expenditures had been inadequate. (Ex. 8 at 8; *see* Br. 15.)[1] Plaintiffs respond that the Court cannot look at the statement itself and must accept their characterization. (Opp. 9.) That is wrong—under the PSLRA, the Court "must consider the complaint in its entirety," including "documents incorporated into the complaint by reference." *Tellabs, Inc.* v. *Makor Issues & Rts., Ltd.*, 551 U.S. 308, 322 (2007). Here, that includes the full transcript of Hochschild's statement.[2]

*Second*, Plaintiffs' argument that statements describing Discover's compliance investments are misleading because the Company allegedly was not investing enough fails. Plaintiffs cite Hochschild's and Discover's statements from March 2023 that "the Company 'invested significantly in key areas of our business' to, among other things, 'strengthen compliance'" (AC ¶ 270) and that Discover "focused on three key areas to strengthen our [compliance management system] over the past few years" (*id.* ¶ 271). But Plaintiffs do not allege that Discover was not increasing its investments in compliance at that time. (Br. 11-12.) Indeed, Plaintiffs cite (and do not dispute) Hochschild's June 2023 statement that Discover's compliance-

---

[1] Citations to Exs. 1 - 40 are to the March 27, 2024 Declaration of Christopher M. Viapiano; citations to Exs. 41 - 44 are to the June 3, 2024 Reply Declaration of Christopher M. Viapiano. Defined terms have the meaning ascribed in Defendants' opening brief (Dkt. No. 90) ("Br."), unless otherwise noted.

[2] Plaintiffs argue that Hochschild's statement would still be false, even if it were about general expenses, because he would have had a duty "to inform investors of Discover's significant underinvestment in compliance." (Opp. 9.) Plaintiffs cite no authority for this proposition, and there is nothing about Hochschild's statement regarding Discover's decision to increase overall expenditures that is misleading in the absence of a specific comment on that single category of expenses.

related spending "is up roughly $250 million a year from 2019." (AC ¶ 280.) Instead, Plaintiffs continue to point to *publicly disclosed* consent orders and former employees' allegations to claim that Defendants "misrepresent[ed] the scale of the Company's investments in compliance staff and resources." (Opp. 8.) But alleged compliance deficiencies do not render false or misleading statements that Discover was investing significantly to strengthen its compliance systems.

Plaintiffs try to analogize the challenged statements about investments here to those in *Macovski* v. *Groupon Inc.*, 553 F. Supp. 3d 460 (N.D. Ill. 2021). (Opp. 7-8.) The plaintiff in *Macovski*, however, had challenged concrete representations about sales that were far more specific than any statement at issue here. The defendants stated that Groupon's Select program "would 'almost double the average gross profit per customer'" and that "metrics showed a '60 percent increase in purchase frequency and a 20 percent jump in average order value,'" but did not disclose known adverse information about the underlying program to which Select was indexed— Goods—which was not performing well. 533 F. Supp. 3d at 471. Without accompanying information about the poor prospects for Goods, concrete statements about improving sales would "support a reasonable," but misleading, "belief" that the Select program was expected to perform well. *Id.* at 477. Plaintiffs make no comparable allegations here.

**2. Statements About Compliance Structure.** Plaintiffs next argue that Defendants' statements about Discover's compliance structure—particularly its "three lines of defense"—were misleading because they allegedly "concealed [] severe deficiencies." (Opp. 9-10.) Plaintiffs do not dispute that the Company "indeed implemented a compliance program and issued policies and procedures aiming to ensure . . . compliance." (Br. 10 (quoting *Menaldi* v. *Och-Ziff Cap. Mgmt. Grp. LLC*, 277 F. Supp. 3d 500, 512 (S.D.N.Y. 2017)).) Instead, Plaintiffs assert that even if these statements were not literally false, they were nevertheless misleading because they contained

-4-

"assurances of efficacy" and identified "specific initiatives." (Opp. 10.) But statements describing risk structures at a high level of generality are not "assurances of efficacy." The statements Plaintiffs challenge here are no more specific or assuring than the statements held not to be misleading in *Menaldi* describing "comprehensive policies and supervisory procedures" and "mandatory compliance training." 277 F. Supp. 3d at 512-13.

Grasping for some kind of guarantee, Plaintiffs claim that Discover emphasized in its 2022 Annual Report "[s]trong compliance programs to *ensure* we understand and follow regulatory requirements . . . and put in place robust, *effective* processes." (Opp. 10.) But even leaving aside its immateriality (*infra* at 10-11), this statement did not "ensure" effectiveness—it merely appeared on a list of key areas on which Discover was "focused . . . to strengthen" its compliance management system (Ex. 15 at 2). In other words, this was an aspirational statement about Discover's *efforts to strengthen* its compliance system—not an assurance that Discover's system was already sufficiently effective to prevent compliance breaches.

Plaintiffs also fail to distinguish the statements held not to be misleading in the cases Defendants cite. For instance, Plaintiffs claim, without elaborating, that the statements "in this case are far more specific than those in *Fifth Third*." (Opp. 12.) If anything, one of the statements that the *Fifth Third* court held was not misleading—that "Compliance Risk Management provides independent oversight to *ensure* consistency and sufficiency in the execution of the program, and *ensures* that lines of business, regions and support functions are *adequately* identifying, assessing and monitoring compliance risks and adopting proper mitigation strategies," 2022 WL 1642221, at *16 (emphases added)—is a *greater* assurance than any challenged statement here.[3]

_____

[3] Plaintiffs also try to distinguish *In re FBR Securities Litigation*, 544 F. Supp. 2d 346 (S.D.N.Y. 2008), on the ground that the plaintiffs in that case "attempt[ed] to hold [d]efendants liable for failing to 'root out any impropriety,'" whereas Plaintiffs here allege that Defendants "misleadingly convey[ed] to investors that

**3. Statements About Compliance Capabilities.** Plaintiffs also argue that Defendants' statements regarding "risk management and compliance capabilities" were misleading because they "assured investors that Discover's risk management structures were appropriate to meet its compliance requirements." (Opp. 13.) Again, Plaintiffs' characterizations are inaccurate, as they continue to distort generic statements to make them appear to be assurances, and then insist that the Court ignore the full context. For example, Plaintiffs argue that Defendants "touted the Company's 'strong compliance programs' and 'strong compliance management,' as well as the 'risk management culture' Hochschild had 'establishe[d].'" (Opp. 13.) Plaintiffs not only pluck these snippets from different statements made at different times (*see* AC ¶¶ 242(f), 271-72; Exs. 3-7, 15), but they also modify the statement that "the CEO establishes a risk management culture" to suggest that the 10-Ks affirmatively represented that Hochschild in fact established an effective risk management culture. (Exs. 3-7; *see* Opp. 13.) The statements simply do not say that.[4]

Plaintiffs also assert that Defendants "falsely represented that their compliance and risk management efforts were *successful*," and point to Greene's statement that, "[f]ortunately, we got that behind us." (Opp. 14.) But Greene never said that the Company's student loan issues were resolved. He said only that the pause on the stock repurchase plan had ended. (*See* Br. 15; Ex. 13

---

the Company had implemented and maintained appropriate systems, supported by adequate resources, to identify and address regulatory violations and other systemic misconduct." (Opp. 11-12.) Again, none of the challenged statements assured investors of *anything*. But even so, the statements in *In re FBR*—that the company's "corporate wide risk management program approved by our Board of Directors" focused on, among other things, "[i]dentifying, assessing and reporting on corporate risk exposures and trends" and "[e]stablishing and revising as necessary policies, procedures and risk limits"—are at least as specific as the statements here. 544 F. Supp. 2d at 359.

[4] *Ross* v. *Career Education Corp.*, 2012 WL 5363431 (N.D. Ill. Oct. 30, 2012), is therefore not "on point." (Opp. 13.) Unlike the plaintiffs in *Ross*, Plaintiffs here do not identify any specific statements assuring investors of a "culture of compliance"—for instance, by claiming, as in *Ross*, that the Company had "a great increase in our culture in terms of compliance." 2012 WL 5363431, at *6, *8. Stating that the CEO is generally responsible for establishing a risk management culture is not the same as affirmatively representing that the Company in fact had a "culture of compliance."

at 6.)  Plaintiffs do not explain why this statement is false—they simply assert that they "disagree[]" about the proper interpretation" while ignoring the full statement.  (Opp. 15.)  But again, "[c]ourts must consider the complaint in its entirety," including "documents incorporated into the complaint by reference."  *Tellabs*, 551 U.S. at 322; (*see supra* at 3).

**4. Opinions.**  Opinion statements are "generally not actionable."  *Chandler* v. *Ulta Beauty, Inc.*, 2022 WL 952441, at *7 (N.D. Ill. Mar. 30, 2022).  Plaintiffs do not even attempt to explain why most of the opinion statements here are actionable.  Plaintiffs instead focus only on: (1) Hochschild's statement that he "think[s] [Discover's] investments have been appropriate" and (2) the SOX certifications.  (Opp. 15-16.)

As Defendants have explained (Br. 15), Plaintiffs' challenge to Hochschild's October 2020 statement fails because he did not say what Plaintiffs claim.  In context, Hochschild said that he believed Discover's overall investments were appropriate, and neither he nor the questioner mentioned compliance.  (Ex. 8 at 8; *see also supra* at 2-3.)  Plaintiffs plead no facts at all, let alone particularized ones, that Hochschild did not believe his expressed opinion at the time.[5]

Plaintiffs also continue to conflate the consumer compliance systems at issue in this case with the *financial reporting* and *disclosure* controls discussed in the SOX certifications.  (*See infra* at 18.)  Plaintiffs plead no facts about those controls, let alone particularized facts showing that Hochschild, Greene, and Graf did not believe their certifications, or that a reasonable investor would read those certifications to be assurances about the Company's compliance systems.

**5. Forward-Looking Statements.**  Plaintiffs' attempts to avoid the safe harbor for

---

[5] Furthermore, no "reasonable person reading the statement fairly and in context," *W. Palm Beach Firefighters' Pension Fund* v. *Conagra Brands, Inc.*, 495 F. Supp. 3d 622, 650 (N.D. Ill. 2020), would understand Hochschild's statement about the Company's general expenses to mean that Discover had invested "adequate resources" specifically in compliance and risk management because the connection between general expenses and specific investments in risk management is too attenuated (Opp. 11).  *See Ong* v. *Chipotle Mexican Grill, Inc.*, 294 F. Supp. 3d 199, 233 (S.D.N.Y. 2018).

forward-looking statements also fail. Statements such as "we'll *continue* to strengthen and fine-tune our processes" and "we're focused on *maturing* our compliance and risk management" fall well within the PSLRA's definition of forward-looking statements as "plans and objectives of management for future operations" and "statement[s]" of "relat[ed]" or "underlying" "assumptions." 15 U.S.C. §§ 77z-2(i)(1)(B), (D). Characterizing some statements as "mixed" does not help Plaintiffs where the statements "refer to present circumstances only as a basis for forecasting future performance." *Gissin* v. *Endres*, 739 F. Supp. 488, 507 n.108 (S.D.N.Y. 2010). And even if these statements could be read to say anything about present circumstances, Plaintiffs do not allege facts showing that the present-tense components of these statements were false.

Plaintiffs argue that even if the statements are forward-looking, they are not protected by the safe harbor because "none of the 'cautionary language' Defendants cite is 'meaningful'"— only "generic language in Discover's Form 10-K." (Opp. 17.) As an initial matter, this ignores entirely the specific oral cautionary statements that accompanied several of the challenged forward-looking statements. (*See* Ex. 2.) Plaintiffs do not address, for instance, Greene's caution that whether the Company resumed its share repurchase program "will be subject to the Board's review and conclusion of the work they're doing on this." (AC ¶ 262; *see also* Ex. 11 at 10.)[6]

Further, the cautionary language in the Company's SEC disclosures appropriately identified the "sources of variance that . . . were the principal or important risks," *Conagra*, 495 F. Supp. 3d at 656, and was not "generic." Discover's 10-Ks contained pages of cautionary

---

[6] Plaintiffs argue that Hochschild's statement that "we may adjust our outlook as conditions evolve" and "[w]e believe there is the potential for more stringent regulation" (AC ¶ 274; *see also* Ex. 16 at 3) "was itself misleading." (Opp. 18.) "[C]autionary statements of potential risk have only rarely been found to be actionable by themselves." *In re FBR*, 544 F. Supp. 2d at 360. This makes sense—a contrary rule would disincentivize disclosing potential risks. This statement is also an inactionable opinion. (*See supra* at 7.)

statements that were "substantive and tailored to the specific predictions made in the allegedly misleading statement," *id.* at 657, including the possibility that the Company may pause its share repurchases and that its compliance framework may fail.[7]

Plaintiffs also argue that even forward-looking statements accompanied by meaningful cautionary language are actionable because "the Officer Defendants knew the statements were false." (Opp. 18.) But "[t]he safe harbor is disjunctive, meaning it applies if either the statement was accompanied by sufficient meaningful cautionary statements or it was made without actual knowledge of the statement's falsity or misleading nature." *Conagra*, 495 F. Supp. 3d at 654. Plaintiffs have not adequately pled that any forward-looking statement was false or made with scienter. (*See infra* at Section II.) But even if they had, the safe harbor would still apply.

**6. Omissions.** Finally, Plaintiffs contend that because Defendants did not "ke[ep] silent about Discover's purported risk management," they were obligated to disclose any known deficiencies. (Opp. 18.) This argument would eviscerate the general principle that "§ 10(b) and Rule 10b-5(b) do not create an affirmative duty to disclose any and all material information." *Macquarie Infr. Corp.* v. *Moab Partners, L.P.*, 601 U.S. 257, 264 (2024). To plead a viable omission claim, Plaintiffs must identify "a specific statement that is made misleading by an omission, and offer specific, contradictory information known to Defendants sufficient to establish that Defendants made any misleading statements." *Constr. Workers Pension Fund-Lake Cnty. & Vicinity* v. *Navistar Int'l Corp.*, 114 F. Supp. 3d 633, 651 (N.D. Ill. 2015). That Defendants spoke about compliance generally did not obligate the disclosure of all information about compliance.

The cases Plaintiffs cite to support their omission claims involved half-truths. For example,

---

[7] *See*, *e.g.*, Ex. 5 at 35 ("risk management framework and models for managing risks may not be effective"); *id*. at 43 ("[w]e may be limited in our ability to . . . repurchase our stock").

in *Allison* v. *Oak Street Health, Inc.*, the defendants stated that the company "engag[ed] community partners . . . to obtain referrals" and "ask[ed] [insurance agents] for referrals," but did not disclose that it paid referral fees on a per-patient basis in violation of the Anti-Kickback Statute. 2023 WL 1928119, at \*5 (N.D. Ill. Feb. 10, 2023). By "choosing to tell the market that it paid insurance agents for referrals," *id*. at \*6, the defendants were obligated to disclose material information necessary to make their statements, "in the light of the circumstances under which they were made, not misleading," *Matrixx Initiatives, Inc.* v. *Siracusano*, 563 U.S. 27, 44 (2011)— *i.e.*, that they paid illegal kickbacks in the form of per-patient referral fees. Plaintiffs here by contrast do not even specify which statements they believe to be half-truths requiring additional disclosure, let alone distinguish between statements made in 2019—before the 2020 CFPB consent order or the FDIC consent order—and statements made in later years. (*See* Opp. 18-19.) They simply assert that "the challenged statements" are misleading because they "omitted the fact that [Discover] engaged in the . . . specific practices alleged to be illegal." (*Id*. at 18.) This is a pure omission argument dressed in the garb of a half-truth theory. And "[p]ure omissions are not actionable under Rule 10b-5(b)." *Moab*, 601 U.S. at 266.[8]

**B.      Plaintiffs Ignore the Overwhelming Case Law Establishing that the Challenged Statements Are Immaterial as a Matter of Law.**

Plaintiffs insist that the challenged statements here, unlike those at issue in the many cases cited by Defendants (Br. 22-25), are not immaterial as a matter of law because they are "affirmative and specific" rather than "simple and generic." (Opp. 19.) The statements Plaintiffs challenge,

---

[8] In *Moab*, the Supreme Court "confirm[ed] that the failure to disclose information required by Item 303 can support a Rule 10b-5(b) claim only if the omission renders affirmative statements made misleading." 601 U.S. at 265. Plaintiffs cling to their Item 303 argument by claiming that Defendants' purported failure to disclose "Discover's massive risk management and compliance deficiencies" "rendered Defendants' representations at least misleading." (Opp. 19.) But Plaintiffs do not identify which specific statements in the Management's Discussion and Analysis required by Item 303 they believe lack "information necessary to ensure that [they] are clear and complete." *Moab*, 601 U.S. at 264.

however, are similar—sometimes, virtually identical—to the statements about risk management and investments in compliance that courts routinely find immaterial as a matter of law.

For example, Plaintiffs characterize as "affirmative and specific" Hochschild's statements that Discover's spending on compliance "reflects that compliance is our top priority" and that Discover had "invested significantly in key areas of [its] business" to "strengthen compliance." (*Id.* at 19, 20.) Plaintiffs do not explain how these statements are more "affirmative and specific" than statements about how "prudent risk management was top of mind for both management and the board," *In re Citigroup Sec. Litig.*, 2023 WL 2632258, at *8 (S.D.N.Y. Mar. 24, 2023), or about "allocating 'significant resources'" to compliance, *Fifth Third*, 2022 WL 1642221, at *16.

Plaintiffs argue that *Fifth Third* involved only "generic assurances," like "[w]e are managing the risk across the company today exceptionally well" and "[c]onduct risk . . . is well managed." (Opp. 21.) Plaintiffs do not explain how these statements are more generic than those Plaintiffs challenge, such as "the team is doing a lot of great work" and "I'm really excited about that product."[9] (AC ¶ 265.) Plaintiffs also cherry-pick the most anodyne statements from *Fifth Third* and ignore other more affirmative statements that were held immaterial as a matter of law.[10] The statements Plaintiffs highlight stating that Discover's "'second and third lines of defense' operated 'independently of the business units'" (Opp. 21) are not meaningfully different from

---

[9] Plaintiffs invoke *Allison* for the proposition that "'generic assertions of legal compliance' may be actionable where" plaintiffs "allege 'a systemic organizational disregard for compliance.'" (Opp. 21.) But *Allison* is clear that the plaintiffs did "not base their Section 10(b) claim on [the defendants'] more general compliance assertions" and acknowledged that "those general assertions themselves are not actionable." 2023 WL 1928119, at *7.

[10] *Compare Fifth Third*, 2022 WL 1642221, at *5 (holding statement that "Compliance Risk Management provides independent oversight to ensure that an enterprise-wide framework . . . [is] in place to comply with applicable laws, regulations, rules and other regulatory requirements" is immaterial as a matter of law), *with* AC ¶ 242(c) ("The CRM department sets risk management standards and policies that are consistent with . . . industry practices and applicable legal and regulatory requirements.").

those found immaterial in *Citigroup* that the company "'manages its risks' through 'three lines of defense'" to "steer the organization toward outcomes that . . . are systemically responsible." 2023 WL 2632258, at *14.[11]  Plaintiffs' other materiality arguments also fare no better:

**Importance of Risk Management.**  Plaintiffs claim that "the critical importance of risk management and compliance to Discover's operations . . . speaks to the materiality of Defendants' representations." (Opp. 21.)  But "Plaintiffs conflate the importance of a bank's" risk management "with the materiality of a bank's statements regarding" risk management.  *ECA, Loc. 143 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 206 (2d Cir. 2009).  "While a bank's reputation" and risk management are "undeniably important, that does not render a particular statement by a bank" on these topics, however generic, "per se material."  *Id.*  "[B]road, general statements" about risk management, such as those challenged here, are not material.  *Id.*

**Frequency of Statements.**  Plaintiffs argue that "[t]he frequency with which Defendants emphasized" compliance "further demonstrates their materiality."[12]  (Opp. 20.)  But the case Plaintiffs cite for that proposition—*Atlas* v. *Accredited Home Lenders Holding Co.*—involved repeated statements by a subprime mortgage lender emphasizing that its underwriting policies were "better and more conservative" than those of other lenders, even though the company had "abandon[ed] adherence" to those policies.  556 F. Supp. 2d 1142, 1149, 1150 (S.D. Cal. 2008).  That is quite different from year-to-year repetition of general statements of the kind that every

---

[11] Plaintiffs claim that *Citigroup* is distinguishable because "the Complaint here details a series of representations that masked systemic and pervasive deficiencies in the very areas it touted to investors." (Opp. 22.) But that was exactly the theory advanced by the plaintiffs, and rejected by the court, in *Citigroup*—that "statements related to Citigroup's investments in risk compliance" "were materially false and misleading" because consent orders revealed that "Citigroup had failed to implement a sound system of internal controls and risk management." 2023 WL 2632258, at *16.

[12] Plaintiffs do not explain how this "frequency" argument applies to Graf, who at most spoke to compliance only once: in the 2018 Form 10-K.

company in the industry makes. *See ECA*, 553 F.3d at 206.

**Scienter.** Plaintiffs assert that whether "Defendants knew or recklessly disregarded facts undermining their representations" factors into materiality. (Dkt. 98-2 at 1.) But this confuses materiality and scienter, and ignores that the "generality" of statements can "prevent[] them from rising to the level of materiality" even if they "were knowingly and verifiably false." *City of Pontiac Policemen's & Firemen's Ret. Sys.* v. *UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014).

**Stock Price Reaction.** Plaintiffs also argue that "'[t]he market's negative reaction' following [the] disclosures" demonstrates materiality. (Opp. 21.) But "stock drop and investor reaction allegations" are not "enough to show the materiality of [] particular statements" where—as here—those statements are "consistent with other statements amounting to immaterial corporate puffery." *Conagra*, 495 F. Supp. 3d at 653.[13]

## II. THE OPPOSITION CONFIRMS THAT PLAINTIFFS FAIL TO PLEAD A STRONG INFERENCE OF SCIENTER.

The Opposition confirms that Plaintiffs' scienter allegations, taken individually or together, do not create a strong inference that any Defendant made any of the challenged statements with "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs*, 551 U.S. at 319.

### A. The Alleged "Duration and Magnitude of the Deficiencies and Misconduct" Do Not Show Knowledge or Recklessness.

**Duration and Magnitude.** The Opposition points to alleged deficiencies with Discover's compliance, and argues that the "duration and magnitude" of those deficiencies, as well as related "admissions," support a "strong inference of fraud." (Opp. 23, 31.) For example, Plaintiffs argue

---

[13] Plaintiffs wrongly claim that Defendants concede loss causation by not addressing it in Defendants' opening brief. (Opp. 5.) Although loss causation issues are generally not appropriate on a motion to dismiss, *Fryman* v. *Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at *33 (N.D. Ill. Apr. 18, 2022), and thus not raised here amid the myriad other deficiencies in the Amended Complaint, none of the so-called corrective disclosures alleged by Plaintiffs in fact "corrected" any of the statements they challenge as misleading.

that the CFPB and FDIC consent orders and investigations "must have given defendants reason to know of a serious risk" that the challenged statements were false. (*Id.* at 23.) The Opposition also spends pages reiterating criticisms from unnamed former employees. (*Id.* at 23-25.)

In order to adequately plead scienter, Plaintiffs' complaint "must make 'fact-based connections between a speaker, a statement, and specific, contradictory information presumably known to that speaker at the time the statement was made.'" *Pierrelouis* v. *Gogo, Inc.*, 414 F. Supp. 3d 1164, 1176 (N.D. Ill. 2019). Plaintiffs here do not explain how any of the alleged compliance deficiencies *contradicted* any of the challenged statements, which described Discover's compliance systems and investments in general and aspirational terms. Alleged awareness of "general problem[s]" with compliance therefore does not indicate an awareness that the specific challenged statements were false or misleading when made. *See Chandler*, 2022 WL 952441, at *25. The more cogent and compelling inference here is that even if Defendants were generally aware of compliance deficiencies, they believed that Discover was appropriately allocating resources to address them.[14]

The assertion of one former employee that Discover developed a new policy in September 2023 to address the card misclassification issue also does not support an inference of scienter. (Opp. 31-32.) Adding a new policy as a remedial measure does not show that the existing policies were "insufficient, much less that any individual defendant knew of or was recklessly indifferent to an actual, ongoing fraud." *Pugh* v. *Trib. Co.*, 521 F.3d 686, 695 (7th Cir. 2008). Similarly, the

---

[14] Plaintiffs' reliance on *Pension Trust Fund for Operating Engineers* v. *DeVry Education Group., Inc.*, 2018 WL 6714326 (N.D. Ill. Dec. 20, 2018) (Opp. 23), is misplaced. In *DeVry*, the court held that the plaintiffs adequately pled a strong inference of scienter because, among other things, a confidential witness reported the falsity of *specific* disclosures reflecting that 90% of DeVry graduates secured employment to an in-house attorney, and was told those findings were shared with the defendant CEO. 2018 WL 6714326, at *2. In addition, four government investigations into DeVry's marketing practices gave "defendants reason to know of a serious risk that the 90% [statistic] was false." *Id.* Plaintiffs here do not allege that any particular deficiency contradicted any challenged statement and was reported to any Defendant.

decision in late 2023 to exit student loan servicing and recognition that prior investments were inadequate (Opp. 32) are "hindsight conclusions" that "do[] not support an inference of scienter." *In re Bally Total Fitness Sec. Litig.*, 2006 WL 3714708, at *7 (N.D. Ill. July 12, 2006).

    ***Greene and Graf.*** Plaintiffs concede that "some of the [FEs] lacked direct contact" with Greene and Graf. (Opp. 28.) In fact, *none* worked in Discover's finance organization or had *any* contact with Greene or Graf at all.[15] Nor do they assert—even based on indirect knowledge—that Greene or Graf received any reports or participated in any meetings regarding compliance matters.[16] That Greene once used the word "compliant" and once responded to an analyst question about investment in compliance does not constitute a strong inference of scienter. (*Id.* at 27.) Nor does the fact that executive officers received a copy of the 2015 CFPB consent order. (*Id.* at 24.) Knowledge of the 2015 CFPB order does not equate to knowledge of a violation of that order. And although the Opposition suggests the same information was available for the entire time period from 2019 to 2024, the Court must consider the state of mind of each Defendant at the time he made each statement. Plaintiffs' scienter allegation for Greene and Graf therefore comes down to the claim that "as the Company's CFOs" "it is reasonable to infer . . . [they] were informed about important developments relating to" "risk management." (*Id.* at 27-28.) But "scienter may not rest on the inference that defendants must have been aware . . . based on their positions."[17]

---

[15] Plaintiffs misleadingly argue that, "unlike this case, the former employees referenced in the *Fifth Third* complaint did not recount providing information to senior management." (Opp. 12.) But that is also true for Greene and Graf—the former employees in the Amended Complaint said nothing about Greene or Graf, provided no information to them, and were not even employed within the finance organization. Moreover, the only statements attributed to Graf are his "signatures on SEC filings and certifications," which *Fifth Third* recognized "add nothing substantial to the scienter calculus." *See* 2022 WL 1642221, at *22.

[16] By contrast, the confidential witnesses in *In re Chicago Bridge & Iron Co. N.V. Sec. Litig.* confirmed that the operative meetings were attended by "all three Individual Defendants," even though some of the witnesses lacked direct contact with the defendants. 2018 WL 2382600, at *3 (S.D.N.Y. May 24, 2018).

[17] Moreover, the challenged statements attributed to Graf are all over a year before the 2020 CFPB consent order and over four years before the 2023 FDIC consent order.

-15-

*Arbitrage Event-Driven Fund* v. *Trib. Media Co.*, 2020 WL 60186, at \*10 (N.D. Ill. Jan. 6, 2020).

***Hochschild.*** Although Plaintiffs cite two FEs for allegations that Hochschild received a "monthly scorecard" of unspecified "open issues" relating to "risk management activity" (AC ¶¶ 144-46; Opp. 3) and that, at unspecified times, he attended meetings where unnamed attendees complained about a lack of "the right people" to remediate unspecified compliance issues (AC ¶ 147), those do not come close to pleading scienter as to the challenged statements. The fact that Hochschild was aware at unspecified times of unspecified "open issues" does not provide any basis for concluding that he knew that his challenged statements about compliance generally were false.

### B. The Opposition Fails To Identify Particularized Facts Demonstrating Motive and Opportunity To Defraud.

***Compensation Structure.*** Plaintiffs' argument that Hochschild's compensation structure created the motive and opportunity for each Officer Defendant to commit fraud was rejected in *Plumbers & Pipefitters Local Union 719 Pension Fund* v. *Zimmer Holdings, Inc.*, which postdates the cases cited by Plaintiffs. (Opp. 35-36.) In *Zimmer*, the Seventh Circuit held that compensation-based allegations are "too generic" to establish scienter because "[a] similar assertion could be made about every firm in the world." 679 F.3d 952, 956 (7th Cir. 2012).

***Share Repurchases.*** Plaintiffs also claim that Defendants "had a powerful incentive" to underinvest in compliance so they could deploy funds to "repurchase billions of dollars of Discover stock, thereby . . . boosting EPS," which in turn could increase compensation. (Opp. 36.) Defendants pointed out that, during the years Plaintiffs claim Discover's share repurchases were the most "aggressive," Discover actually repurchased *fewer shares*. (Br. 29 n.16.) Plaintiffs assert that Discover's share repurchases "reached unprecedented *dollar values* in 2021-2022 compared to the prior decade" (Opp. 36), but their own chart belies that claim: in 2018 (before the start of the Class Period), Discover repurchased $2.1 billion in stock. (AC ¶ 389.) Its share repurchases

then declined to $1.8 billion in 2019.  (*Id*.)  And, although repurchases in 2021 and 2022 were slightly higher in isolation, the yearly average from 2020-2022 was less than $1.7 billion.  (*Id*.)

> **C.      Plaintiffs' Remaining Arguments Do Not Support a Strong Inference of Scienter.**

Unable to plead scienter based on duration, magnitude, or motive arguments, Plaintiffs offer a hodgepodge of other miscellaneous arguments, but these too fall short.

***Core Operations.***   As Plaintiffs concede, their "core operations" allegations, standing alone, are insufficient to establish a strong inference of scienter.  (Opp. 33-34; Br. 33.)  Plaintiffs cite *Allison* for the proposition that the core operations inference, in conjunction with specific statements indicating knowledge of falsity, can support a strong inference of scienter.  (Opp. 33-34.)  But Plaintiffs do not point to any such specific statements here.  As for Greene and Graf, Plaintiffs plead no particularized facts showing that they, as CFOs, had any material involvement in compliance or risk management matters, let alone made specific statements indicating such knowledge.  (*See supra* at 15-16.)  As for Hochschild, even if he knew of general problems with Discover's compliance, it does not follow that he believed those problems contradicted the general and aspirational statements that Plaintiffs challenge here.  (*See supra* at 16.)[18]

***Repeated Statements.***   Plaintiffs also rely on *Allison* for the proposition that "repeated statements" about compliance support an inference of scienter.  (Opp. 32, 34.)  The key point in *Allison*, however, was that the content of the particular statements being repeated suggested awareness that the company's practice of paying insurance agents on a per-patient basis for referrals amounted to an illegal kickback.  2023 WL 1928119, at \*10.  *Allison* does not say that

---

[18] Plaintiffs' reliance on *Pension Trust Fund for Operating Engineers* v. *Kohl's Corp.*, 895 F.3d 933 (7th Cir. 2018) (Opp. 34), is misplaced.  In *Kohl's*, the Seventh Circuit held that plaintiffs failed to plead scienter, even though the leases containing the alleged misstatements were "a significant part of Kohl's financial picture that [could not] be expected to evade executive knowledge altogether."  *Id.* at 937, 941.

merely repeating statements on any topic supports a strong inference of scienter.

*SOX Certifications.* The SOX certifications do not support scienter because they address only "*financial reporting*" and "*disclosure*" controls and procedures, as required by Exchange Act Rules 13a-15(e)-(f) and 15d-15(e)-(f). Plaintiffs rely on an out-of-date PCAOB standard that was "[s]uperseded" in 2010 (Ex. 41)—nearly a decade before the Class Period—for the proposition that, in addition to financial reporting, internal controls can "encompass the 'effectiveness . . . of operations' and 'compliance with applicable laws and regulations.'" (Opp. 35 (quoting Ex. 41 § 319.06).) The PCAOB definition of "[i]nternal control over financial reporting" in place during the Class Period does not mention compliance or operations objectives at all. (*See* Exs. 42 at 161; 43 at 154-55.) And even if a given internal control *can* encompass other objectives besides financial reporting, the SOX certifications here do not address any such non-reporting controls (and were not required to do so). (*See* Exs. 3-7, 19-33.)[19] Discover's annual reports make clear that management assessed and confirmed only "the effectiveness of our internal control over *financial reporting.*"[20] (*See* Exs. 3 at 145; 4 at 143; 5 at 153; 6 at 144; 7 at 139 (emphasis added).)

*CEO Transition.* Hochschild's August 2023 decision to step down as CEO, while remaining at the Company in an advisory role, adds nothing to the mix. Even where executives resign from a company entirely, courts have held scienter is not established where, as here, plaintiffs fail to adequately plead "the resignations resulted from the . . . executives' knowing or

---

[19] Similarly, that the COSO's *Internal Control – Integrated Framework* (2013) recognizes that an internal control can encompass multiple objectives (besides financial reporting) in "distinct but overlapping categories" (Ex. 44) says nothing about the objective of the financial reporting controls addressed in the SOX certifications. Plaintiffs' own source makes clear that "not all of these objectives and related controls are relevant to an audit of the entity's financial statements." (Ex. 41 § 319.09.)

[20] The single case Plaintiffs cite in which a SOX certification supported an inference of scienter involved allegedly false "*financial statements* [that] overstated estimations of future royalty payments . . . in violation of GAAP." *Mulderrig* v. *Amyris, Inc.*, 492 F. Supp. 3d 999, 1005 (N.D. Cal. 2020) (emphasis added).

reckless involvement in a fraud." *In re Hertz Glob. Holdings Inc.*, 905 F.3d 106, 119 (3d Cir. 2018).

### III. THE OPPOSITION CONFIRMS THAT PLAINTIFFS FAIL TO ADEQUATELY PLEAD SCHEME LIABILITY UNDER RULES 10b-5(a) AND (c).

Plaintiffs' scheme liability claims fail because Plaintiffs do not plead with particularity who played what role in the alleged scheme, and because misrepresentations or omissions alone cannot form the basis for scheme liability.[21] (Br. 37-38.) Plaintiffs' three responses fail.

*First*, Plaintiffs allege that Defendants underinvested because they were motivated by "receiving EPS-based PSUs." (Opp. 38.) This generic allegation does not satisfy Plaintiffs' pleading burden. Plaintiffs may not simply "lump[] all the defendants together" without "specify[ing] who was involved in what activity." *Vicom, Inc.* v. *Harbridge Merch. Servs., Inc.*, 20 F.3d 771, 778 (7th Cir. 1994). Indeed, Plaintiffs admit their alleged scheme, the allegedly "unprecedented" stock repurchases, occurred in 2021–2022, years after Graf retired. (Opp. 36.)

*Second*, Plaintiffs continue to argue that *Lorenzo* v. *SEC*, 587 U.S. 71 (2019), holds that misrepresentations and omissions alone can support a scheme liability claim. (Opp. 37-38.) But Plaintiffs overread *Lorenzo*, which does not allow them to "repackage their misstatement claims as scheme liability claims to 'evade the pleading requirements imposed in misrepresentation cases.'" *SEC* v. *Rio Tinto plc*, 41 F.4th 47, 55 (2d Cir. 2022).

*Finally*, Plaintiffs argue that even if they were required to plead some additional deceptive conduct, it is enough to allege that the Officer Defendants "use[d] . . . share repurchases to artificially lower [*sic*] EPS for the Officer Defendants' personal benefit." (Opp. 38.) But even if

---

[21] Plaintiffs claim that they "need not plead scheme liability with the same degree of specificity as for their Rule 10b-5(b) claims." (Opp. 37.) Although scheme liability claims are not subject to the PSLRA's heightened pleading requirement for scienter, they are fraud claims, and "[p]leading fraud with specificity is both an element of the SEC Rule 10b-5 cause of action and a pleading requirement of the Federal Rules." *In re HealthCare Compare Corp. Sec. Litig.*, 75 F.3d 276, 280-81 (7th Cir. 1996).

"us[ing]" misstatements or omissions to affect earnings per share constituted "deceptive" conduct, Plaintiffs plead no *particularized* facts showing which Defendant did what or when.

## IV.   PLAINTIFFS' OPPOSITION CONFIRMS THAT THEY HAVE NOT ADEQUATELY PLED CONTROL PERSON LIABILITY.

Plaintiffs assert that control person liability "cannot be determined at the pleading stage" (*id.* at 39), but ignore that courts routinely do so (*see* Br. 39).  Plaintiffs do not identify any well pled allegations that any Individual Defendant controlled the preparation of any challenged statement made by another Defendant.  As to the Officer Defendants, Plaintiffs assert control person liability exclusively "by virtue of their position as senior executives in the company." (Opp. 39.)  Plaintiffs rely on *Silverman* v. *Motorola, Inc.*, 2008 WL 4360648, at *16 (N.D. Ill. Sept. 23, 2008), but that case is out of step with the majority of decisions in this District that "have consistently held that a plaintiff may not premise control person liability solely upon status within the company."  *Desai* v. *Gen. Growth Props., Inc.*, 654 F. Supp. 2d 836, 863 (N.D. Ill. 2009).

As to the Director Defendants, Plaintiffs do not dispute that they fail to allege that the Director Defendants were involved in Discover's day-to-day operations, prepared any challenged statements, or controlled Hochschild's and Greene's oral statements.  Instead, Plaintiffs assert control person liability because the Director Defendants had "membership in a committee" and signed certain SEC filings.  (Opp. 40.)  Plaintiffs' own authority holds that "[t]he fact that certain directors were members of the [relevant] Committee, without more, does not suffice to allege that those directors were control persons."  *In re Galena*, 117 F. Supp. 3d 1145, 1201 (D. Or. 2015).

## CONCLUSION

For the foregoing reasons, and for the reasons outlined in Defendants' opening brief, the Court should dismiss Plaintiffs' Amended Complaint with prejudice.

Dated:  June 3, 2024

Respectfully submitted,

SULLIVAN & CROMWELL LLP

/s/ Christopher M. Viapiano

Christopher M. Viapiano
David N. Whalen
1700 New York Avenue, N.W., Suite 700
Washington, D.C. 20006
Telephone: (202) 956-7500
Facsimile: (202) 293-6330
viapianoc@sullcrom.com
whalend@sullcrom.com

Leonid Traps
125 Broad Street
New York, New York 10004
Telephone: (212) 558-4000
Facsimile: (212) 558-3588
trapsl@sullcrom.com

*Counsel for Discover Financial Services*

SIDLEY AUSTIN LLP

/s/ Hille Sheppard (with consent)

Hille Sheppard
Christopher Lee
One South Dearborn
Chicago, Illinois 60603
Telephone: (312) 853-7000
Facsimile: (312) 853-7036
hsheppard@sidley.com
chris.lee@sidley.com

*Counsel for R. Mark Graf*

-21-

GOODWIN PROCTER LLP

/s/ John Barker (with consent)

Deborah Birnbach
John Barker
100 Northern Avenue
Boston, Massachusetts 02210
Telephone: (617) 570-1000
DBirnbach@goodwinlaw.com
JBarker@goodwinlaw.com

*Counsel for John T. Greene*


WINSTON & STRAWN LLP

/s/ Seth Farber (with consent)

Seth Farber (admitted *pro hac vice*)
Thania ("Athanasia") Charmani (admitted
*pro hac vice*)
200 Park Avenue
New York, New York 10166
Telephone: (212) 294-6400
SFarber@winston.com
ACharmani@winston.com

Joseph Motto
35 W. Wacker Drive
Chicago, Illinois 60601
Telephone: (312) 558-3728
JMotto@winston.com

*Counsel for Roger C. Hochschild*

WILLKIE FARR & GALLAGHER LLP

/s/ Todd G. Cosenza (with consent)
Todd G. Cosenza (admitted *pro hac vice*)
Charles D. Cording (admitted *pro hac vice*)
Joshua S. Levy (admitted *pro hac vice*)
Amanda M. Payne (admitted *pro hac vice*)
787 Seventh Avenue
New York, New York 10019
Telephone: (212) 728-8000
tcosenza@willkie.com
ccording@willkie.com
jlevy@willkie.com
apayne@willkie.com

*Counsel for Mary K. Bush, Candace H. Duncan, Joseph F. Eazor, Daniela O'Leary Gill, Cynthia Glassman, Thomas G. Maheras, Michael Moskow, John B. Owen, David L. Rawlinson II, and Jennifer L. Wong*

-23-

-24-

## CERTIFICATE OF SERVICE

I hereby certify that on June 3, 2024, I caused the foregoing Reply Memorandum of Law in Support of Defendants' Motion to Dismiss to be electronically filed via the Court's CM/ECF system, which effected service upon all counsel of record.


/s/ Christopher M. Viapiano
Christopher M. Viapiano
