**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

KBC ASSET MANAGEMENT NV, NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM, NEW YORK CITY POLICE PENSION FUND, NEW YORK CITY FIRE DEPARTMENT PENSION FUND, and TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK, Individually and on Behalf of All Others Similarly Situated,

Plaintiffs,

v.

DISCOVER FINANCIAL SERVICES, ROGER C. HOCHSCHILD, JOHN T. GREENE, R. MARK GRAF, MARY K. BUSH, CANDACE H. DUNCAN, JOSEPH F. EAZOR, CYNTHIA GLASSMAN, THOMAS G. MAHERAS, MICHAEL MOSKOW, DANIELA O'LEARY GILL, JOHN B. OWEN, DAVID L. RAWLINSON II, and JENNIFER L. WONG,

Defendants.

Case No. 1:23-cv-06788

CLASS ACTION

Hon. Martha M. Pacold

**MEMORANDUM OF LAW IN SUPPORT OF**
**LEAD PLAINTIFFS' MOTION FOR LEAVE TO AMEND**

## TABLE OF CONTENTS


BASES FOR THE PROPOSED AMENDMENT .... 1

ARGUMENT .... 7

I. The SCAC States Actionable Claims Against All Defendants .... 8

A. Plaintiffs Sufficiently Plead Falsity and Materiality. .... 8

1. Discover issued materially false financial statements. .... 8

2. The Officer Defendants falsely certified that Discover's ICFR were "effective" throughout the Class Period. .... 9

3. The Card Misclassification Scheme and associated control deficiencies rendered Defendants' representations regarding "contractually defined per-transaction fee amounts" false or misleading. .... 11

4. Defendants misrepresented Discover's risk management and compliance measures as well as the Company's "risk culture." .... 12

B. The SCAC Sufficiently Pleads the Other Elements of Sections 10(b) and 20(a), Which the Court Did Not Previously Address. .... 14

1. The SCAC's allegations give rise to a strong inference of scienter. .... 14

2. The SCAC sufficiently pleads loss causation. .... 23

3. The SCAC also pleads control person claims under Section 20(a) against the Individual Defendants. .... 23

4. Plaintiffs also plead scheme liability under Rule 10b-5(a) and (c). .... 24

II. There Are No Other Bases To Disallow The Amendment .... 25

CONCLUSION .... 25

## TABLE OF AUTHORITIES

**Cases**

*In re Akorn, Inc. Sec. Litig.*,
240 F. Supp. 3d 802 (N.D. Ill. 2017) .................................................. 9, 16, 17

*Alberto-Culver Co. v. Gillette Co.*,
408 F. Supp. 1160 (N.D. Ill. 1976)........................................................25

*Allen v. Brown Advisory, LLC*,
41 F.4th 843 (7th Cir. 2022) ..................................................................25

*Allison v. Oak St. Health, Inc.*,
2023 WL 1928119 (N.D. Ill. Feb. 10, 2023) ......................................18, 22

*In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*,
741 F. Supp. 2d 511 (S.D.N.Y. 2010).....................................................17

*In re Am. Serv. Grp., Inc.*,
2009 WL 1348163 (M.D. Tenn. Mar. 31, 2009) .......................................20

*Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*,
377 F.3d 682 (7th Cir. 2004) ....................................................................7

*Basic Inc. v. Levinson*,
485 U.S. 224 (1988) ..................................................................................9

*In re Boeing Co. Aircraft Sec. Litig.*,
2022 WL 3595058 (N.D. Ill. Aug. 23, 2022) ..........................................23

*Campbell v. Cramer*,
2025 WL 715133 (C.D. Ill. Mar. 5, 2025).................................................7

*In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*,
2018 WL 2382600 (S.D.N.Y. May 24, 2018) ..........................................21

*Chow v. Archer-Daniels-Midland Co.*,
2025 WL 790854 (N.D. Ill. Mar. 12, 2025).........................................16, 22

*DH2, Inc. v. Athanassiades*,
404 F. Supp. 2d 1083 (N.D. Ill. 2005) ....................................................24

*Dobina v. Weatherford Int'l Ltd.*,
909 F. Supp. 2d 228 (S.D.N.Y. 2012).....................................................17

*Dura Pharm., Inc. v. Broudo*,
544 U.S. 336 (2005) ................................................................................23

*In re Equifax Inc. Sec. Litig.*,
357 F. Supp. 3d 1189 (N.D. Ga. 2019) ....................14

*Foman v. Davis*,
371 U.S. 178 (1962) ....................8

*Fryman v. Atlas Fin. Holdings, Inc.*,
2022 WL 1136577 (N.D. Ill. Apr. 18, 2022) ....................15, 23

*In re Golden Heaven Grp. Holdings Ltd. Sec. Litig.*,
2025 WL 714171 (C.D. Cal. Mar. 3, 2025) ....................18

*Grae v. Corr. Corp. of Am.*,
2017 WL 6442145 (M.D. Tenn. Dec. 18, 2017) ....................13

*In re Grupo Televisa Sec. Litig.*,
368 F. Supp. 3d 711 (S.D.N.Y. 2019) ....................9

*Hedick v. Kraft Heinz Co.*,
2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) .................... *passim*

*Holwill v. AbbVie Inc.*,
2020 WL 5235005 (N.D. Ill. Sept. 1, 2020) ....................18

*In re Inotiv, Inc. Sec. Litig.*,
2024 WL 1344784 (N.D. Ind. Mar. 29, 2024) ....................20

*In re LendingClub Sec. Litig.*,
254 F. Supp. 3d 1107 (N.D. Cal. 2017) ....................19

*Lorenzo v. SEC*,
587 U.S. 71 (2019) ....................7

*Lowry v. RTI Surgical Holdings, Inc.*,
532 F. Supp. 3d 652 (N.D. Ill. 2021) ....................6, 8, 9

*Luna v. Marvell Tech. Grp.*,
2017 WL 2171273 (N.D. Cal. May 17, 2017) ....................17

*Macovski v. Groupon, Inc.*,
553 F. Supp. 3d 460 (N.D. Ill. 2021) ....................7

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
513 F.3d 702 (7th Cir. 2008) ....................14

*Matrixx Initiatives, Inc. v. Siracusano*,
563 U.S. 27 (2011) ....................11

*Member Select Ins. Co. (AAA) v. Cub Cadet, LLC*,
2017 WL 563161 (N.D. Ind. Feb. 13, 2017) .....25

*In re MicroStrategy, Inc. Sec. Litig.*,
115 F. Supp. 2d 620 (E.D. Va. 2000).....15

*Mulligan v. Impax Labs., Inc.*,
36 F. Supp. 3d 942 (N.D. Cal. 2014) .....14

*Norfolk Cnty. Ret. Sys. v. Ustian*,
2009 WL 2386156 (N.D. Ill. July 28, 2009).....16

*Pensions & Death Benefits v. CSK Auto Corp.*,
525 F. Supp. 2d 1116 (D. Ariz. 2007).....21

*Pirnik v. Fiat Chrysler Autos., N.V.*,
2016 WL 5818590 (S.D.N.Y. Oct. 5, 2016).....13

*Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*,
89 F. Supp. 3d 602 (S.D.N.Y. 2015).....17

*In re PMA Cap. Corp. Sec. Litig.*,
2005 WL 1806503 (E.D. Pa. July 27, 2005).....9

*Rensin v. U.S. Cellular Corp.*,
755 F. Supp. 3d 1048 (N.D. Ill. 2024) .....22

*In re Rent-Way Sec. Litig.*,
209 F. Supp. 2d 493 (W.D. Pa. 2002) .....21

*Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*,
268 F. Supp. 3d 526 (S.D.N.Y. 2017).....20

*Ohio Pub. Emps. Ret. Sys. v. Meta Platforms, Inc.*,
2024 WL 4353049 (N.D. Cal. Sept. 30, 2024) .....18

*Ross v. Career Educ. Corp.*,
2012 WL 5363431 (N.D. Ill. Oct. 30, 2012) .....21

*Rubinstein v. Gonzalez*,
241 F. Supp. 3d 841 (N.D. Ill. 2017) .....14

*San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*,
732 F. Supp. 3d 300 (S.D.N.Y. 2024).....17

*In re Sears, Roebuck & Co. Sec. Litig.*,
291 F. Supp. 2d 722 (N.D. Ill. 2003) .....18

*SEC v. Fisher*,
2012 WL 3757375 (N.D. Ill. Aug. 28, 2012) ....................15

*SEC v. Winemaster*,
529 F. Supp. 3d 880 (N.D. Ill. 2021) ....................8, 16

*Singer v. Reali*,
883 F.3d 425 (4th Cir. 2018) ....................12

*In re Spiegel, Inc. Sec. Litig.*,
382 F. Supp. 2d 989 (N.D. Ill. 2004) ....................15, 23

*Stransky v. Cummins Engine Co.*,
51 F.3d 1329 (7th Cir. 1995) ....................11

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
551 U.S. 308 (2007) ....................14, 15

*TSC Indus., Inc. v. Northway, Inc.*,
426 U.S. 438 (1976) ....................9

*U.S. Commodity Futures Trading Comm'n v. Kraft Foods Grp.*,
153 F. Supp. 3d 996 (N.D. Ill. 2015) ....................24

*United Ass'n Nat'l Pension Fund v. Carvana Co.*,
2024 WL 5153343 (D. Ariz. Dec. 16, 2024) ....................18

**Statutes**

15 U.S.C. § 78t(a) ....................23

**Court Rules**

Fed. R. Civ. P. 15(a)(2) ....................1, 7

**Other Authorities**

SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150 (Aug. 8, 1999) ....................9

**Regulations**

17 C.F.R. § 240.10b-5(b) ....................11

Pursuant to Federal Rule of Civil Procedure 15(a)(2) and this Court's March 31, 2025 Order (Dkt. 104, "March 2025 Order"), Lead Plaintiffs KBC Asset Management NV and New York City Employees' Retirement System, New York City Police Pension Fund, New York City Fire Department Pension Fund, and Teachers' Retirement System of the City of New York (together, "Plaintiffs") respectfully submit this memorandum of law in support of their motion for leave to file the [Proposed] Second Amended Class Action Complaint ("SCAC").[1]

## BASES FOR THE PROPOSED AMENDMENT

In its March 2025 Order, the Court dismissed the CAC, holding Plaintiffs failed to plead falsity or materiality based on the then-existing facts. Among other things, the Court determined Plaintiffs had not alleged "with any particularly—that Discover's financial reporting or accounting practices were deficient." Mar. 2025 Order 38. While Plaintiffs respectfully disagree with the Court's rulings, those facts have changed dramatically since the CAC was filed.

In December 2024, Discover restated previously issued financial results due to its long-running misclassification with respect to "interchange fees" from transactions involving Discover credit cards (the "Card Misclassification Scheme"). As a result of improperly charging its merchant customers higher fees than were permitted in the governing contracts or regulations, Discover "restated cumulative discount and interchange revenue by a total of ***approximately $992 million as of June 30, 2023, and $1,047 million as of December 31, 2023***." ¶ 197. The Company is "reclassifying these amounts from revenue (including through adjustments to retained earnings) to a refund liability" consistent with relevant accounting principles. *Id.* Reclassifying those

[1] A copy of the SCAC is attached as Exhibit A to the accompanying Declaration of Michael J. Miarmi, and a redline comparing the SCAC to the prior Amended Class Action Complaint ("CAC") is attached as Exhibit B to the declaration. Additionally, unless otherwise indicated, "¶ __" refers to paragraphs of the SCAC, capitalized terms have the meanings ascribed in the SCAC, all emphasis in this brief has been added, and all internal citations and quotation marks have been omitted.

revenues also led to a restatement of the Company's earnings per share ("EPS") for each quarter of 2023, including ***a nearly 15% reduction*** for the third quarter, and for the full year. ¶ 193.

Discover further disclosed "three material weaknesses in its internal control over financial reporting [ICFR]"—i.e., the Company (1) "did not have controls designed or implemented to ensure that Discover Bank-issued credit cards were placed in appropriate merchant and merchant acquirer pricing tiers, ***which in turn led to inaccurate revenue recognition***"; (2) "selected a methodology to estimate the revenue error and associated liability that the [SEC] Staff believed to be, and [Discover] ultimately accepted as, ***a misapplication of GAAP*** related to the card product misclassification"; and (3) "did not maintain an effective control environment, as [the Company] ***did not demonstrate an appropriate commitment to integrity and ethical values***, specifically in the approach to evaluating and addressing the card product misclassification, and this control deficiency constitutes a material weakness." ¶ 300(a). The Company also reported that, as part of its "remediation efforts [and] to reemphasize [its] commitment to integrity and ethical values in [its] control environment," it had "appointed new individuals in key roles," including ***the Chief Executive Officer***." ¶ 109. In other words, Discover's board of directors forced Defendant Roger Hochschild to resign in August 2023 because of his failure to uphold "integrity and ethical values" in connection with the Card Misclassification Scheme. The board also "approved a new code of Ethics for Senior Financial Officers, which emphasized the importance of ethics and compliance and the expectation that the Company's leaders set the tone at the top." ¶ 9.

Regulators also issued damning findings concerning Discover just last month. On April 16, 2025, the FDIC issued an amended consent order (the "2025 Amended FDIC Consent Order"), which directed Discover to pay restitution of $1.225 billion to the Company's merchant customers and imposed a civil monetary penalty of $150 million. ¶¶ 4, 97. The order includes new factual

findings (which Discover neither admits nor denies, but consented to their issuance) concerning the Card Misclassification Scheme. The FDIC determined Discover had "***recklessly*** engaged in unsafe and unsound banking practices by, among other things, failing to establish and maintain a compliance management system (CMS) providing for compliance with all applicable consumer protection laws and implementing regulations," including Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) ("FTCA"). ¶ 11. The FDIC further found that Discover "engaged in violations of, among other things, Section 5 [of the FTCA]," including through its "classification of certain credit card accounts for purposes of assessing fees in connection with accepting or facilitating payments on the Discover Network . . . into the highest merchant and merchant acquirer interchange pricing tier, . . . which resulted in the overcharging of merchants, merchant acquirers, and other intermediaries." *Id.*

Additionally, on April 18, 2025, the Board of Governors of the Federal Reserve issued a cease-and-desist/consent order (the "2025 Federal Reserve Board Consent Order"), which imposed a civil monetary penalty of $100 million on Discover. ¶ 224. The order also includes factual findings, which the Company waived its rights to challenge or contest, concerning the Card Misclassification Scheme. ¶ 5. For example, the Federal Reserve Board determined that (1) "Discover Network did not have any policies, procedures, or other controls to ensure that credit cards were properly classified as 'consumer' or 'commercial' for interchange fee purposes"; (2) "from 2007 through at least 2023," Discover "charged its Merchant Customers the higher interchange fees associated with the 'commercial' credit cards ***for the purpose of increasing [Discover]'s revenues*** for certain credit cards that did not meet the definition of 'commercial' in Discover Network's standard contracts and operating regulations and were used for ordinary consumer spending"; (3) "from 2007 through 2023, [Discover] did not disclose to its Merchant

Customers that it was charging the higher 'commercial' interchange fees for certain credit cards that were used for ordinary consumer spending"; (4) "at the end of 2022, [Discover] had classified approximately ***five million*** 'consumer' credit cards as 'commercial,' and ***approximately 98%*** of those cards were 'consumer' cards that were misclassified"; (5) "[Discover]'s Merchant Customers suffered monetary harm of approximately ***one billion dollars*** as a result of the Discover Card Interchange Fee Practices in the Relevant Period." ¶¶ 5, 11. The agency further found that during the period 2007 through 2023, "***senior executives of [Discover] were aware*** that numerous Discover consumer credit cards were improperly classified as 'commercial' credit cards and were therefore assessed a higher interchange fee," and "***despite this awareness, DFS's senior management failed to take adequate steps to correct***" the card misclassification practices. *Id.*

The Court previously held there was no connection between the alleged deficiencies at Discover and any material, financial harm to the Company, but these recent revelations demonstrate otherwise. Indeed, there was a direct, linear connection between what Defendants failed to do—create proper internal controls relating to credit card classification—and the financial harm to shareholders when Defendants' misconduct and its impact were revealed through a series of disclosures in 2022, 2023, and 2024. Accordingly, and as further detailed below, Plaintiffs sufficiently plead each of the elements under Sections 10(b) and 20(a) of the Exchange Act against Hochschild as well as Discover's former CFO Mark Graf and its current CFO John Greene.

*First*, the above facts, which are consistent with the contemporaneous accounts of well-placed former Discover employees ("FEs") detailed in the SCAC, stand in sharp contrast to numerous Class Period representations by Defendants. Among other things, they:

- falsely reported revenues associated with credit card interchange fees and made other materially false statements regarding the Company's financial results;

- falsely represented in Discover's quarterly SEC reports that "[t]he accompanying condensed consolidated financial statements have been prepared in accordance with [GAAP] for interim financial information";
- falsely certified that Discover's annual SEC filings "fairly present[ed] in all material respects the financial condition, results of operations and cash flows of [Discover] as of, and for, the periods presented in th[e] report[s]";
- falsely or misleadingly represented, with respect to discount and interchange revenue, that "[c]ontractually defined per-transaction fee amounts typically apply to each type of transaction processed and are recognized as revenue at the time each transaction is captured for settlement";
- falsely certified that the Company's ICFR were "effective";
- falsely or misleadingly represented that Discover's Credit Risk Management ("CRM") department "sets risk management standards and policies that are consistent with the size and complexity of our business, industry practices and applicable legal and regulatory requirements"; and
- falsely or misleadingly represented that the Company's risk management framework was "based upon industry standards for managing risk and controls."

Plaintiffs thus unequivocally allege false or misleading representations of facts that would be highly material to a reasonable investor. Indeed, by virtue of its restatement, Discover has admitted to making false statements of material fact.

*Second*, the SCAC's allegations give rise to the requisite strong inference of scienter. In addition to Discover's admissions about its failures of "integrity and ethical values," which the Company tied directly to Hochschild's resignation, as well as the long-running deficiencies in Discover's "control environment," the regulators' findings signify fraud. The Federal Reserve Board found "senior executives were aware" that credit cards were being misclassified and the Company did so "for the purpose of" increasing its revenues. While the order does not identify those executives by name, it does not require a large inferential leap to conclude that Hochschild—whom the Discover board saw fit to remove in 2023—was among them. It is likewise reasonable to infer that the Company's Chief Financial Officers during the Class Period—Graf and Greene—

were aware of such long-running misconduct that directly impacted the Company's revenues. That each of the Officer Defendants personally attested to the effectiveness of internal controls that were in fact materially deficient "for an extended period of time" strengthens the scienter inference. Further, the FDIC expressly determined Discover's failure to institute an appropriate CMS to address card misclassification issues was "reckless." ¶ 11. And these findings are corroborated by the contemporaneous accounts of the six FEs, who were integrally involved in compliance, risk management, and internal control matters during the Class Period. ¶¶ 110-68.

It is thus entirely reasonable to infer that these senior executives were aware of a misclassification problem that persisted ***for 15 years***, and that they knew (or recklessly disregarded) that the Company completely lacked internal controls to address the issue. "The fact that each defendant attested to the accuracy of information in quarterly and annual SEC filings yet failed to even once detect a risk of erroneous financial reporting during the class period is more than sufficient at the pleading stage to indicate recklessness." *Lowry v. RTI Surgical Holdings, Inc.*, 532 F. Supp. 3d 652, 663 (N.D. Ill. 2021). Indeed, the abundance of particularized facts in the SCAC affords an inference that the Officer Defendants knew they were making false or misleading statements to investors. That Discover's revenue misclassification and ICFR deficiencies related to its core operations—compliance and risk management being critical to the Company's very ability to function—bolsters that inference.

*Third*, the SCAC sufficiently pleads the other elements of Plaintiffs' claims as well. Plaintiffs easily satisfy their modest burden under Rule 8(a) to allege loss causation. And given the Section 10(b) violations Plaintiffs have pleaded, control person liability under Section 20(a) attaches to the Officer Defendants and to the current and former directors who served on the board's Audit Committee or Risk Oversight Committee (the "Director Defendants," and with the

Officer Defendants, the "Individual Defendants"). As Discover's most-senior executives and directors, these individuals plainly exercised control over the Company's activities.

Plaintiffs also plead scheme liability under Rule 10b-5(a) and (c). Discover perpetrated the Card Misclassification Scheme for more than 15 years, for the purpose of artificially inflating revenues, which ultimately cost the Company $1.5 billion (thus far) in remediation and regulatory penalties. At the same time, Defendants severely underinvested in compliance measures, which helped perpetuate the Card Misclassification Scheme, and used significant stock repurchases to lower the amount of outstanding shares. Those things combined to artificially inflate the Company's EPS, which directly benefitted the Officer Defendants—particularly Hochschild, whose compensation depended heavily on meeting specific EPS targets. Defendants' actions fall well within the "broad range of conduct" prohibited by Rule 10b-5, which aims "to root out all manner of fraud." *Lorenzo v. SEC*, 587 U.S. 71, 85 (2019).

Given the above considerations, the proposed amendment is not futile. Nor are there any other grounds to deny this motion: the amendment is neither unduly prejudicial nor the result of undue delay or bad faith. The Court should therefore permit Plaintiffs to file the SCAC.

## ARGUMENT

Courts "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Leave to amend is thus appropriate "[u]nless it is *certain* from the face of the complaint that any amendment would be futile or otherwise unwarranted." *Campbell v. Cramer*, 2025 WL 715133, at *2 (C.D. Ill. Mar. 5, 2025) (alteration and emphasis in original). "An amendment is futile 'only if it appears to a certainty that [the] plaintiff cannot state a claim.'" *Macovski v. Groupon, Inc.*, 553 F. Supp. 3d 460, 473 (N.D. Ill. 2021) (alteration in original) (quoting *Barry Aviation Inc. v. Land O'Lakes Mun. Airport Comm'n*, 377 F.3d 682, 687 (7th Cir. 2004)). Additional considerations bearing on leave to amend include "undue delay, bad faith or dilatory motive on

the part of the movant" and "undue prejudice to the opposing party by virtue of allowance of the amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962). None of those deficiencies exist here.

## I. The SCAC States Actionable Claims Against All Defendants

### A. Plaintiffs Sufficiently Plead Falsity and Materiality.

The Court previously held the CAC "d[id] not allege, with any particularity, that Discover's internal control over financial reporting was inadequate, that Discover submitted erroneous financial reports or accounting documents, or that such errors exposed the company to litigation or regulatory action affecting its stock price." Mar. 2025 Order 34; *see also id.* at 38 ("[W]ith respect to . . . certifications corresponding to § 302(a)(4) of the Sarbanes-Oxley Act, plaintiffs do not allege—with any particularly—that Discover's financial reporting or accounting practices were deficient."). The SCAC, on the other hand, alleges exactly that.

#### 1. Discover issued materially false financial statements.

By restating its financials, Discover has admitted that its previous financial statements contained misstatements of material fact. In particular, Discover "restated cumulative discount and interchange revenue by a total of ***approximately $992 million as of June 30, 2023, and $1,047 million as of December 31, 2023***." ¶ 197. The Company further directed that "any previously issued or filed reports, press releases, earnings releases and investor presentations or other communications describing the Company's consolidated or condensed consolidated financial statements and other related financial information covering the periods [encompassed by the restatement] ***should no longer be relied upon***." ¶ 198. "[T]he allegations that [Discover] had to restate its financial statements due to the improper recognition of revenue from the subject transactions sufficiently demonstrates that the financial statements were false when made." *SEC v. Winemaster*, 529 F. Supp. 3d 880, 908 (N.D. Ill. 2021). Further, "[a] company's restatement of previously reported financial results is likely enough by itself to show materiality." *Lowry*, 532

F. Supp. 3d at 660. This is because, "under GAAP, previously-issued financial statements should be restated only to correct material accounting errors." *Id.*; *accord In re Akorn, Inc. Sec. Litig.*, 240 F. Supp. 3d 802, 815 (N.D. Ill. 2017) (recognizing companies restate financials "only when errors are material").[2]

The Card Misclassification Scheme, as well as Defendants' failure to establish or implement an appropriate CMS, likewise rendered their representations in Form 10-Qs that Discover's financial statements were "prepared in accordance with [GAAP]" false or misleading. ¶¶ 202-04. So, too, with respect to Defendants' representations in Form 10-Ks that those reports "fairly present[ed] in all material respects the financial condition, results of operations and cash flows of [Discover] as of, and for, the periods presented in th[e] report[s]" (¶¶ 205-07). *See, e.g.*, *Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *9 (N.D. Ill. Aug. 11, 2021) ("*Kraft Heinz*") (plaintiffs sufficiently alleged falsity with respect to representations "that the Company prepared its financial statements in accordance with GAAP").

**2. The Officer Defendants falsely certified that Discover's ICFR were "effective" throughout the Class Period.**

"[I]t is a violation of [the] securities laws to fail to disclose the true facts regarding the adequacy of . . . internal controls." *In re PMA Cap. Corp. Sec. Litig.*, 2005 WL 1806503, at *10 n.8 (E.D. Pa. July 27, 2005); *In re Grupo Televisa Sec. Litig.*, 368 F. Supp. 3d 711, 720 (S.D.N.Y. 2019) ("Misstatements . . . concerning the . . . efficacy of internal controls are actionable.").

[2] The concept of materiality from an accounting or financial disclosure perspective is consistent with materiality as contemplated under the Exchange Act. SEC guidance, for example, explains that the formulation of materiality in the accounting literature "is in substance identical to the formulation used by the courts in interpreting the federal securities laws," i.e., "a fact is material if there is—a substantial likelihood that the . . . fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." SEC Staff Accounting Bulletin No. 99, 64 Fed. Reg. 45150, at 45151 (Aug. 8, 1999) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976), and citing *Basic Inc. v. Levinson*, 485 U.S. 224 (1988)).

Discover has admitted its ICFR suffered from "material weaknesses," as detailed *supra* at 2. Among other things, the Company acknowledges it "did not maintain an effective control environment, as [it] ***did not demonstrate an appropriate commitment to integrity and ethical values, specifically in the approach to evaluating and addressing the card misclassification***." ¶ 300(a). Indeed, Discover admitted that as to credit card misclassification its controls were not merely weak—"[t]he Company ***did not have*** controls designed or implemented to ensure that Discover Bank-issued credit cards were placed in appropriate merchant and merchant acquirer pricing tiers . . . , which in turn led to inaccurate revenue recognition." ¶ 300(b).

Discover's admissions are corroborated by the regulators' findings. The FDIC determined the Company had entirely failed "to establish and maintain" a CMS for "applicable consumer protection laws and implementing regulations." ¶ 98. The Federal Reserve Board also found that, for more than 15 years, Discover "charged its Merchant Customers the higher interchange fees associated with the 'commercial' credit cards ***for the purpose of increasing the Firm's revenues***," and "did not have ***any*** policies, procedures, or other controls to ensure that credit cards were properly classified as 'consumer' or 'commercial' for interchange fee purposes." ¶¶ 5, 218. These material (and previously concealed) facts undermine the Officer Defendants' repeated certifications that Discover's ICFR were "effective." ¶¶ 310-13.

When, as here, a public company admits that its controls were materially deficient and that the deficiency led to overstating revenue, courts regularly conclude the officers' SOX certifications and related representations were materially false or misleading when issued. In *Kraft Heinz*, for example, plaintiffs sufficiently alleged falsity where senior executives "certified that Kraft Heinz's internal controls were effective and provided reasonable assurances regarding the reliability of the Company's financial reports," and the company "later admitted that its internal controls were

deficient and had material weaknesses." 2021 WL 3566602, at *7. The court rejected defendants' argument that the complaint "lack[ed] allegations that these statements inaccurately reflect[] the conclusions reached by the CEO and CFO at that time or incorrectly portrayed the process used to reach those conclusion[s]." *Id.* (second alteration in original). Judge Dow explained:

> [T]he amended complaint alleges that the material weaknesses in Kraft Heinz's financial controls caused specific deficiencies that led to overstatements in the financial reporting, despite its public statements to the contrary during the class period and despite knowing that the SEC was investigating Kraft Heinz's accounting practices. That is enough to satisfy the falsity requirement at this stage.

*Id.* That reasoning applies equally here.

### 3. The Card Misclassification Scheme and associated control deficiencies rendered Defendants' representations regarding "contractually defined per-transaction fee amounts" false or misleading.

With respect to credit card interchange fees, Defendants repeatedly represented during the Class Period that "[c]ontractually defined per-transaction fee amounts typically apply to each type of transaction processed and are recognized as revenue at the time each transaction is captured for settlement." ¶ 208. The SCAC's detailed averments, including Discover's admissions, support Plaintiffs' allegations that those statements were false or misleading when made.

While "[m]ere silence about even material information is not fraudulent absent a duty to speak," Rule 10b-5 prescribes that "[i]f one speaks, he must speak the whole truth." *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995). Because Defendants chose to discuss the basis for interchange fees in Discover's public filings, they assumed a duty to disclose their long-running misclassification of those fees, as well as the material internal control weaknesses that allowed the misconduct to occur and persist for more than 15 years. Disclosure was "necessary" to make Defendants' representations about contractually defined fee amounts, "'in the light of the circumstances under which they were made, not misleading.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011) (quoting 17 C.F.R. § 240.10b-5(b)).

Specifically, Discover routinely ***violated*** its contracts with merchants by ***not*** charging them "contractually defined per-transaction fee amounts." Defendants caused approximately $1 billion in damages to merchants by charging them fees at the wrong pricing tier, which the Federal Reserve Board found was "for the purpose of increasing [Discover]'s revenues." This concealed information—which, as Discover's recent admissions confirm, was highly material—rendered Defendants' statements false or misleading when made. *See, e.g.*, *Singer v. Reali*, 883 F.3d 425, 440 (4th Cir. 2018) ("[B]y choosing to inform the market that it was training surgeons on how to obtain reimbursements for the System in the wake of the AMA's Category III coding requirement, the Company was obliged to further disclose its fraudulent reimbursement scheme, i.e., its instructions to surgeons to unlawfully code the System under Category I. Otherwise, the Officers' statements about the Company's training efforts were utterly misleading.").

### 4. Defendants misrepresented Discover's risk management and compliance measures as well as the Company's "risk culture."

Defendants also made several false or misleading statements regarding Discover's risk management and compliance standards, policies, and practices. For example, Discover represented that its risk management policies were "consistent with the size and complexity of our business, industry practices and applicable legal and regulatory requirements." ¶ 217. The Company also stated the CEO—at the time, Hochschild—"establishe[d] a risk management culture throughout the company and ensure[d] that businesses operate[d] in accordance with this risk culture." ¶ 86. The Court previously concluded these statements were inactionable when read in "context" because no reasonable investor would view them as guarantees or predictions of perfect compliance. Mar. 2025 Order 9-10. The context has since materially changed.

Plaintiffs recognize the Court determined that risk management or compliance policies or practices were not "bound to deliver specific results" (Mar. 2025 Order 25). But the primary basis

for falsity alleged in the SCAC, which Discover's admissions and the regulators' recent findings confirm, is the ***complete absence*** of risk- and compliance-related measures relating to card classification. ¶¶ 96-109. Further, contrary to Discover's representation that its risk management policies were "consistent with the size and complexity of our business, industry practices and applicable legal and regulatory requirements," the FDIC found that the Company did not establish or maintain "internal controls and information systems and audit systems appropriate to the size of the Bank and the nature, scope and risk of its activities." ¶ 98.

The FDIC's findings that Discover "recklessly engaged in unsafe and unsound banking practices" by "failing to establish and maintain" an appropriate [CMS], and violated consumer protection laws, also contradict representations that the Company "complie[d] with both the letter and the spirit of fair and responsible banking laws," including laws that prohibit unfair, deceptive, or abusive acts or practices (¶¶ 222-24). *See Grae v. Corr. Corp. of Am.*, 2017 WL 6442145, at *15 (M.D. Tenn. Dec. 18, 2017) ("A reasonable juror could conclude that CoreCivic's statements, in context, were false or misleading because they ran directly counter to a wealth of available evidence establishing that its operations had pervasively failed to live up to . . . standards."); *Pirnik v. Fiat Chrysler Autos., N.V.*, 2016 WL 5818590, at *5 (S.D.N.Y. Oct. 5, 2016) ("easily conclud[ing]" that company's statements about being "substantially in compliance" plausibly were false and material given "widespread noncompliance"). These regulatory findings, as well as Discover's admissions regarding material weaknesses in its "control environment" and specific material weaknesses in ICFR, fill any gaps in Plaintiffs' prior allegations.

The same is true of Defendants' representations about the "risk management culture" Hochschild purportedly had "establishe[d]" and "ensure[d] that businesses operate[d] in accordance with." A reasonable investor would understand those representations to convey that

Hochschild had established a culture that prioritized risk management and he held Discover's business units to that standard, which is consistent with the widespread understanding that corporate CEOs have significant responsibility for setting an appropriate "tone at the top." ¶ 90. This is particularly so given Discover's history of compliance failures, which Defendants often addressed, including in response to analysts' inquiries. *See In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1225 (N.D. Ga. 2019) (concluding "statements affirming a commitment to cybersecurity" were "not so obviously unimportant to investors given the repeated nature of these statements, the context of Equifax's business, and the widespread nature of the deficiencies alleged in the Amended Complaint"); *Mulligan v. Impax Labs., Inc.*, 36 F. Supp. 3d 942, 968 (N.D. Cal. 2014) (holding statement that company "remains committed to providing the highest quality products to our customers" plausibly was material in "an industry where regulatory compliance . . . is essential").

### B. The SCAC Sufficiently Pleads the Other Elements of Sections 10(b) and 20(a), Which the Court Did Not Previously Address.

#### 1. The SCAC's allegations give rise to a strong inference of scienter.

A plaintiff pleads scienter under Rule 10b-5 by alleging the defendant either knew "or was reckless in disregarding a substantial risk" that its statements to investors were false or misleading when made. *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 704 (7th Cir. 2008). The Court "must consider the complaint in its entirety" and ask "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322-23 (2007) (emphasis in original). Plaintiffs can carry their burden by alleging "defendants had both motive and opportunity to commit fraud, or . . . by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Rubinstein*

*v. Gonzalez*, 241 F. Supp. 3d 841, 850 (N.D. Ill. 2017). Because the allegations need only give rise to a fraudulent inference that is "cogent and ***at least as*** compelling as any opposing inference one could draw from the facts alleged," *Tellabs*, 551 U.S. at 324, "where two contrary inferences of scienter are equally probable, the tie goes to the plaintiff." *Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at *21 (N.D. Ill. Apr. 18, 2022). When viewed collectively and holistically, the averments in the SCAC give rise to a strong inference of scienter.

*First*, Discover's admissions are probative of fraud. While "[t]he mere *fact* that there was a restatement or a violation of GAAP, by itself, cannot give rise to a strong inference of scienter[,] the *nature* of such a restatement or violation . . . may ultimately do so." *In re MicroStrategy, Inc. Sec. Litig.*, 115 F. Supp. 2d 620, 635 (E.D. Va. 2000) (emphases in original). Discover's financial restatement concerned a scheme that (a) persisted for more than 15 years, (b) violated governing laws, (c) caused approximately $1 billion in damages to its merchant customers, (d) allowed the Company to artificially inflate its revenues and EPS in violation of GAAP (which in turn allowed the Officer Defendants to increase their personal EPS-based compensation), (e) resulted in the CEO's resignation, and (f) exposed the Company to approximately $1.5 billion in restitution payments and regulatory penalties. These circumstances support a strong inference of scienter.

"The more serious the error, the less believable are defendants' protests that they were completely unaware of [the company's] true financial status." *In re Spiegel, Inc. Sec. Litig.*, 382 F. Supp. 2d 989, 1020 (N.D. Ill. 2004). Indeed, courts have inferred scienter based on financial errors or restatements far smaller than Discover's. *See id.* at 995 (strong inference of scienter when company "overstate[d] its earnings by $240 million"); *SEC v. Fisher*, 2012 WL 3757375, at *13 (N.D. Ill. Aug. 28, 2012) (denying summary judgment when company overstated value of inventory by $172 million and noting "it is long settled that a magnitude of reporting errors lend

weight to allegations of recklessness where defendants were in a position to detect the errors"). Further, the issue that caused to the revenue inflation and resulting restatement was not particularly complicated and did not turn on matters of judgment; rather, the credit cards were blatantly misclassified into the wrong pricing tier. This renders it more likely Discover's GAAP violations were the product of fraud. *See Chow v. Archer-Daniels-Midland Co.*, 2025 WL 790854, at *4 (N.D. Ill. Mar. 12, 2025) ("*ADM*") (when "the accounting fraud did not involve complex accounting standards or require the exercise of judgment," it "provide[d] further support for a strong inference of knowing or deliberate disregard"); *Winemaster*, 529 F. Supp. 3d at 912 ("[I]f the GAAP rules . . . [the defendant is] alleged to have violated are relatively simple, it is more likely that [he was] aware of the violations and consciously or intentionally implemented or supported them, or [was] reckless in this regard." (all but first alteration in original)).

The inference of fraud is strengthened by Discover's admissions that it "did not demonstrate an appropriate commitment to integrity and ethical values . . . in the approach to evaluating and addressing the card product misclassification, and this control deficiency constitutes a material weakness" that "persisted for an extended period of time"; and that the Company attempted to remediate these failures by "appoint[ing] new individuals in key roles including the [CEO] and other leadership roles" (¶¶ 109, 300(a)). These facts—which, though revealed only recently, relate to conduct during the Class Period—directly undermine Defendants' representations. *E.g.*, ¶ 209 (certifying that "[m]anagement assessed the effectiveness of our internal controls over financial reporting" under the "[COSO 2013 Framework]" and "concluded that our internal control over financial reporting ***was effective***"); *see also Akorn*, 240 F. Supp. 3d at 819-20 ("[S]ignificant violations of GAAP, taking place over an extended period of time, give rise to a strong inference of scienter."); *Norfolk Cnty. Ret. Sys. v. Ustian*, 2009 WL 2386156, at

*10 (N.D. Ill. July 28, 2009) ("[T]he magnitude and nature of accounting errors may belie a defendant's claim that she or it was unaware of any improprieties.").[3]

*Second*, the Federal Reserve Board found that "senior executives of [Discover] were aware that numerous Discover consumer credit cards were improperly classified as 'commercial' credit cards and were therefore assessed a higher interchange fee," but "despite this awareness, [Discover]'s senior management failed to take adequate steps to correct" the card misclassification practices. ¶ 181. They did this, moreover, "for the purpose of increasing [Discover]'s revenues." ¶ 299(c). In other words, the Card Misclassification Scheme was no accident; nor was it the result of mere mismanagement or even negligence. This was intentional misconduct. *See Akorn*, 240 F. Supp. 3d at 819-20 (strong inference of scienter when accounting violations increased "reported revenue and net income, unlike what one might expect from a random series of innocent mistakes"). Indeed, "[c]ourts . . . have repeatedly held that improper tone at the top and poor internal controls support an inference of scienter." *San Antonio Fire & Police Pension Fund v. Dentsply Sirona Inc.*, 732 F. Supp. 3d 300, 321 (S.D.N.Y. 2024); *see also Luna v. Marvell Tech. Grp.*, 2017 WL 2171273, at *4-5 (N.D. Cal. May 17, 2017) (finding strong inference of scienter against CEO when company admitted senior management employed an inappropriate "tone at the top," CEO was terminated shortly after audit committee's investigation, and company provided remedial training to senior management and executives after CEO's termination).

[3] *See also Plumbers & Pipefitters Nat'l Pension Fund v. Orthofix Int'l N.V.*, 89 F. Supp. 3d 602, 618-19 (S.D.N.Y. 2015) (concluding that, "[a]s shown by Orthofix's Restatement, Orthofix undisputedly has made material misstatements and admitted to violations of GAAP," and the downward revisions to net income of between $1.1 million and $42.8 million were "large enough to render less credible the defendants' arguments that they had no notice of any of the accounting improprieties that led to the Restatement"); *Dobina v. Weatherford Int'l Ltd.*, 909 F. Supp. 2d 228, 247-48 (S.D.N.Y. 2012) (plaintiffs sufficiently pleaded scienter based on "the stark realities about the inadequacies of the internal controls that were revealed in the . . . restatement"); *In re Am. Int'l Grp., Inc. 2008 Sec. Litig.*, 741 F. Supp. 2d 511, 533 (S.D.N.Y. 2010) (certification of financial statements despite knowledge of weakened internal risk controls supported scienter inference).

_Third_, the FDIC found that Discover "***recklessly*** engaged in unsafe and unsound banking practices by, among other things, failing to establish and maintain a [CMS] providing for compliance with all applicable consumer protection laws and implementing regulations." ¶ 11. The agency made clear that the Company's recklessness caused the card misclassification misconduct by "engag[ing] in violations of, among other things, Section 5 [of the FTCA]," including unfair acts or practices related to the card misclassification. *Id.* Such a "broad chasm" between Defendants' statements "and the reported reality suggests that Defendants [either] failed to review or check information that they had a duty to monitor, or ignored obvious signs of fraud," *In re Golden Heaven Grp. Holdings Ltd. Sec. Litig.*, 2025 WL 714171, at *7 (C.D. Cal. Mar. 3, 2025), or actually knew their statements conflicted with reality, *see Ohio Pub. Emps.' Ret. Sys. v. Meta Platforms, Inc.*, 2024 WL 4353049, at *18 (N.D. Cal. Sept. 30, 2024) ("Where Defendants directly address a specific issue . . . , courts may infer that Defendants were aware of the issue."); *In re Sears, Roebuck & Co. Sec. Litig.*, 291 F. Supp. 2d 722, 727 (N.D. Ill. 2003) (scienter adequately alleged because "[l]ogically, defendants in their positions would be expected to have knowledge of the facts regarding the . . . portfolio at the time they were making statements about the portfolio"). Indeed, if "Defendants reassured investors . . . without actual knowledge . . . those statements would at least evince deliberate recklessness." *United Ass'n Nat'l Pension Fund v. Carvana Co.*, 2024 WL 5153343, at *25 (D. Ariz. Dec. 16, 2024).

The Officer Defendants, in particular, signed or otherwise made numerous statements regarding Discover's compliance and risk management systems and practices, including its CMS. ¶ 309. These repeated pronouncements "constitute strong circumstantial evidence that [the Officer] Defendants had detailed information regarding" those topics, *Holwill v. AbbVie Inc.*, 2020 WL 5235005, at *5 (N.D. Ill. Sept. 1, 2020), or "that they 'knew about what they spoke of,'" *Allison*

*v. Oak St. Health, Inc.*, 2023 WL 1928119, at *9-10 (N.D. Ill. Feb. 10, 2023) ("[D]efendants' repeated statements about Oak Street's marketing practices and [anti-kickback statute] compliance support an inference that the defendants knowingly concealed the allegedly improper practices."); *see also Kraft Heinz*, 2021 WL 3566602, at *13 ("repeated references" to an issue shows defendants "made it [their] business to look into" it (alteration in original)).

In challenging the CAC, Defendants contended Plaintiffs did not "allege[] that Discover's Chief Financial Officers (Graf and Greene) had any involvement in, responsibility for, or specialized knowledge regarding, consumer law and regulatory compliance risk management in the first place." Dkt. 90 at 31. While no "specialized knowledge" is required to commit securities fraud, Graf and Greene indisputably certified that the Company's financial statements complied with GAAP and that its ICFR were effective—neither of which was true. *See In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1122 (N.D. Cal. 2017) (CFO could not "escape allegations of scienter" given that "[i]nternal controls over *financial* reporting fell squarely within her oversight" (emphasis in original)). Discover's own "remediation" efforts—which include "approv[ing] a new code of Ethics for Senior Financial Officers, which emphasized the importance of ethics and compliance and the expectation that the Company's leaders set the tone at the top" (¶ 9)—acknowledge the CFOs' relevance to the card misclassification issues. And while Graf has emphasized that he "retired on September 18, 2019," he signed "Discover's 2018 10-K and two subsequent 10-Qs . . . as Discover's CFO." Dkt. 90 at 6 n.3; *see also* ¶ 210. Further, by September 2019 the Card Misclassification Scheme had already persisted for 12 years; this is, therefore, not a case where a senior executive left the company within a short time after the misconduct ***began***.

*Fourth*, the timing of Hochschild's abrupt departure as CEO in August 2023 contributes to a strong inference of scienter. Discover has now admitted that he left as part of the Company's

efforts to remediate its failure of "integrity and ethical values." ¶ 9. "[C]ourts have recognized that the departure of a key executive involved in matters that form the basis of alleged fraud supports a strong inference of scienter." *In re Inotiv, Inc. Sec. Litig.*, 2024 WL 1344784, at *28 (N.D. Ind. Mar. 29, 2024); *see also Fresno Cnty. Emps.' Ret. Ass'n v. comScore, Inc.*, 268 F. Supp. 3d 526, 552-53 (S.D.N.Y. 2017) ("The timing and circumstances surrounding the resignations of [company executives] . . . contribute[d] to the inference of scienter" when, *inter alia*, the company "disclosed that one of its remedial measures for improving 'accounting and internal control practice . . . included . . . separating certain personnel'" (second and third ellipses in original)).

In *In re Sipex Corp. Securities Litigation*, where the company's audit committee had conducted an investigation related to accounting improprieties and implemented remedial actions to address deficiencies in the company's internal controls, the court observed that "[s]uch house-cleaning and reforms do not follow innocent mistakes"; rather, "they customarily, even if not invariably, follow systemic and fraudulent abuse of internal financial controls." 2005 WL 3096178, at *1 (N.D. Cal. Nov. 17, 2005). So too, here. *See also In re Am. Serv. Grp., Inc.*, 2009 WL 1348163, at *58 (M.D. Tenn. Mar. 31, 2009) ("adoption of sweeping internal Reforms" supported scienter).

*Fifth*, the FEs' detailed accounts strongly indicate the Officer Defendants knew about or recklessly disregarded the significant risk management, compliance, corporate governance, and internal control problems at Discover. ¶ 12. The FEs detail, among other things, that (a) the Company's risk management framework—highlighted by its "three lines of defense"—was plagued by internal tensions and organizational dysfunction; (b) the compliance department was woefully understaffed, lacked the expertise necessary to appropriately perform its functions, and suffered from significant turnover; (c) Discover had hundreds of unresolved regulatory violations,

which caused senior management to "freak out," and Hochschild and other senior executives received regular reports highlighting the number of open regulatory issues; and (d) senior executives were further apprised of gaps in internal controls through their implementation of "Project Operational Excellence," but failed to take action to remedy those deficiencies. ¶¶ 110-68. The FEs thus have "detailed the types of relevant information made available to senior executives" and confirmed that information regarding significant compliance and risk management problems was "discussed at [regular] meetings." *In re Chi. Bridge & Iron Co. N.V. Sec. Litig.*, 2018 WL 2382600, at *10 (S.D.N.Y. May 24, 2018). These accounts "taken together . . . raise a strong inference of scienter." *Id.*

Sixth, the duration and "magnitude of defendants' alleged fraud"—spanning more than ***15 years*** and involving more than ***$1 billion*** in falsely reported revenue and overcharges to customers—supports an inference of fraud. *See Commc'ns Workers of Am. Plan for Emps.' Pensions & Death Benefits v. CSK Auto Corp.*, 525 F. Supp. 2d 1116, 1124 (D. Ariz. 2007) ("[T]he extensive and systematic nature of the accounting irregularities would not likely have escaped the attention of the CEO and CFO. This is more than a case of isolated incidents or transactions."); *In re Rent-Way Sec. Litig.*, 209 F. Supp. 2d 493, 507 (W.D. Pa. 2002) ("We are satisfied that the magnitude of the fraud and the duration of the irregularities (spanning two fiscal years) are such that it is reasonable to find them probative of scienter."). Discover's repeated violations of remedial compliance requirements imposed by the Consumer Financial Protection Bureau during the Class Period (¶¶ 314-15) only enhance the inference. *See Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *9 (N.D. Ill. Oct. 30, 2012) (finding company's "checkered past and . . . subsequent claims of renewed compliance" bolstered scienter allegations).

*Seventh*, the matters at issue in this case involve Discover's core operations, not some ancillary part of its business. While the "inference that the defendants can be assumed to know of facts critical to [Discover]'s core operations or to an important transaction that would affect [Discover]'s performance" generally "will not establish a strong inference of scienter ***by itself***," it "can be one relevant part of a complaint supporting that inference." *Allison*, 2023 WL 1928119, at *10. As Hochschild acknowledged, "having strong governance and risk management" was "***critical***" to the Company given Discover's status as a highly regulated financial institution. ¶ 307. The inference that the Officer Defendants were aware of facts bearing on such an important aspect of Discover's business corroborates the "other bases" of scienter detailed in the SCAC. *See, e.g.*, *Rensin v. U.S. Cellular Corp.*, 755 F. Supp. 3d 1048, 1066 (N.D. Ill. 2024).

*Finally*, while allegations of personal financial motive are not required to plead scienter, the Officer Defendants ***did have*** the motive and opportunity to commit fraud. A significant portion of their annual compensation (in the form of performance stock units), including 50% for Hochschild, was tied to EPS targets. ¶ 317. EPS was among the financial metrics Discover misstated due to the Card Misclassification Scheme, and the Company's stock repurchases—which the Officer Defendants oversaw—further allowed them to artificially inflate EPS.

In short, "Plaintiffs have made strong allegations of motive, public statements, the core nature of the [matters at issue], and the straightforward nature of the fraud. These allegations combined with the suspicious departures and government investigations create a strong inference of scienter." *ADM*, 2025 WL 790854, at *4. Accepting the facts as pleaded—including the extent and duration of the malfeasance in question—it would be implausible to infer the Officer Defendants were unaware of such matters.

**2. The SCAC sufficiently pleads loss causation.**

"Allegations of loss causation are governed by the notice pleading standard of Rule 8." *In re Boeing Co. Aircraft Sec. Litig.*, 2022 WL 3595058, at *28 (N.D. Ill. Aug. 23, 2022). Therefore, Plaintiffs need only provide Defendants "with some indication of the loss and the causal connection that the[y have] in mind." *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005). The SCAC comfortably surpasses this modest threshold.

Plaintiffs plausibly allege the truth regarding Defendants' misconduct emerged through a series of corrective disclosures, each of which caused a prompt and sharp drop in Discover's share price on extraordinarily high trading volume. ¶¶ 350-84. "Plaintiffs have thus put Defendants on notice of . . . the causal connection that Plaintiffs have in mind—that Defendants' misrepresentations led to Plaintiffs purchasing [Discover] stock at inflated prices, and that the value of that stock began and continued to plummet as the truth about [Discover's compliance and control] deficiencies and the overall health of the company was revealed." *Fryman*, 2022 WL 1136577, at *32. Indeed, the Company's recent admissions, as well as the damning findings in the 2025 FDIC Consent Order and the 2025 Federal Reserve Board Consent Order, further demonstrate that Defendants' misconduct, rather than unrelated or general market factors, caused investors' losses.

**3. The SCAC also pleads control person claims under Section 20(a) against the Individual Defendants.**

Section 20(a) of the Exchange Act imposes secondary liability on "controlling persons" of the entity that commits a "primary violation" of the securities laws. 15 U.S.C. § 78t(a). Generally, determining whether a particular individual was a "controlling person" under the statute "is a question of fact that cannot be determined at the pleading stage." *Spiegel*, 382 F. Supp. 2d at 1031. Plaintiffs state Section 20(a) claims by pleading viable Section 10(b) claims and sufficiently

alleging that the Individual Defendants, each of whom was a senior executive or a board member who served on the Audit or Risk Oversight Committee, "exercised general control over [Discover]'s operations" and "possessed the power or ability to control the specific transaction or activity upon which the primary violation was predicated." *Kraft Heinz*, 2021 WL 3566602, at *17; *see also* ¶¶ 410-23. That is enough, especially as these claims "are not . . . required to" satisfy the PSLRA's pleading standards and "the Seventh Circuit has, so far, declined" to require that plaintiffs must allege "culpable participation by the Defendants in the alleged misstatements or omissions." *Kraft Heinz*, 2021 WL 3566602, at *17-18.

**4. Plaintiffs also plead scheme liability under Rule 10b-5(a) and (c).**

The Court previously concluded Plaintiffs failed to plead "deceptive" conduct under Rule 10b-5(a) and (c). Mar. 2025 Order 41. While Plaintiffs respectfully disagree, the SCAC's expanded allegations regarding Discover's Card Misclassification Scheme address this concern. ¶¶ 395-408. Plaintiffs allege Discover's senior executives were aware of the card misclassification improprieties—which, as the Federal Reserve Board has determined, were committed "for the purpose of increasing [Discover]'s revenues"—yet failed to address them. ¶¶ 5, 299. Meanwhile, these same executives (a) underinvested in compliance and risk management and (b) manipulated Discover's EPS by decreasing its outstanding shares through stock repurchases. The Officer Defendants did all of this, moreover, to artificially inflate Discover's EPS and thereby boost their EPS-based incentive compensation. ¶¶ 317-22. The SCAC thus sets forth what actions constitute the scheme, who performed them, when they occurred, and the scheme's effect on Discover's stock price. *See, e.g., DH2, Inc. v. Athanassiades*, 404 F. Supp. 2d 1083, 1092 (N.D. Ill. 2005). That is sufficient, especially because Plaintiffs need not plead scheme liability with the same degree of specificity as for their Rule 10b-5(b) claims. *See U.S. Commodity Futures Trading Comm'n v. Kraft Foods Grp.*, 153 F. Supp. 3d 996, 1012 (N.D. Ill. 2015).

## II. There Are No Other Bases To Disallow The Amendment

None of the other grounds for denying leave to amend—undue prejudice to Defendants, undue delay, or bad faith—are present. "Only where the prejudice outweighs the moving party's right to have the case decided on the merits should amendment be prohibited." *Alberto-Culver Co. v. Gillette Co.*, 408 F. Supp. 1160, 1162 (N.D. Ill. 1976). This type of prejudice exists in cases of delay or bad faith, but neither exists here. Plaintiffs promptly responded to the March 2025 Order and addressed the concerns the Court expressed, and while the SCAC includes new facts, Plaintiffs are not asserting entirely new claims. *See Allen v. Brown Advisory, LLC*, 41 F.4th 843, 853 (7th Cir. 2022) ("An amended pleading is less likely to cause prejudice if it comes without delay or asserts claims related to allegations asserted in prior pleadings."). Nor have Plaintiffs acted in bad faith; for example, they did not "kn[o]w the facts pertinent to the amendment before the original complaint was filed." *Member Select Ins. Co. (AAA) v. Cub Cadet, LLC*, 2017 WL 563161, at *2 (N.D. Ind. Feb. 13, 2017). Leave to amend is warranted.

## CONCLUSION

For the foregoing reasons, the Court should permit Plaintiffs to file the SCAC.

Dated: May 14, 2025

Respectfully submitted,

**MOTLEY RICE LLC**

*/s/ Gregg S. Levin* (with consent)
Gregg S. Levin
Lance V. Oliver
William S. Norton
Christopher F. Moriarty
Joshua C. Littlejohn (*admitted pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
glevin@motleyrice.com
loliver@motleyrice.com

**LIEFF CABRASER HEIMANN & BERNSTEIN, LLP**

*/s/ Michael J. Miarmi*
Steven E. Fineman (*admitted pro hac vice*)
Daniel P. Chiplock (*admitted pro hac vice)*
Michael J. Miarmi (*admitted pro hac vice*)
Gabriel A. Panek (*admitted pro hac vice*)
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
sfineman@lchb.com
dchiplock@lchb.com
mmiarmi@lchb.com

bnorton@motleyrice.com
cmoriarty@motleyrice.com
jlittlejohn@motleyrice.com

*Counsel for Co-Lead Plaintiff KBC Asset Management NV and Co-Lead Counsel for the proposed Class*

gpanek@lchb.com

Richard M. Heimann (*admitted pro hac vice*)
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
rheimann@lchb.com

*Counsel for Co-Lead Plaintiffs the NYC Funds and Co-Lead Counsel for the proposed Class*

**KIRBY MCINERNEY LLP**
Anthony E. Maneiro
211 West Wacker Drive, Suite 550
Chicago, IL 60606
Telephone: (312) 767-5180
Facsimile: (312) 757-5181
amaneiro@kmllp.com

*Local Counsel for KBC Asset Management NV*

**COHEN MILSTEIN SELLERS & TOLL, PLLC**
Carol V. Gilden
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
IL Bar: 6185530
Telephone: (312) 357-0370
cgilden@cohenmilstein.com

*Liaison Counsel for the proposed Class*