# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

|  |  |
|---|---|
| KBC ASSET MANAGEMENT NV, NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM, NEW YORK CITY POLICE PENSION FUND, NEW YORK CITY FIRE DEPARTMENT PENSION FUND, and TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>DISCOVER FINANCIAL SERVICES, ROGER C. HOCHSCHILD, JOHN T. GREENE, R. MARK GRAF, MARY K. BUSH, CANDACE H. DUNCAN, JOSEPH F. EAZOR, CYNTHIA GLASSMAN, THOMAS G. MAHERAS, MICHAEL MOSKOW, DANIELA O'LEARY GILL, JOHN B. OWEN, DAVID L. RAWLINSON II, and JENNIFER L. WONG,<br><br>Defendants. | Case No. 1:23-cv-06788<br><br><u>CLASS ACTION</u><br><br><br><br><u>JURY TRIAL DEMANDED</u> |

## [PROPOSED] SECOND AMENDED CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

**Page**

I. SUMMARY OF PLAINTIFFS' CLAIMS ........................................................ 2

    A.    Defendants Committed Serious Misconduct During the Class Period. ................. 3

        1.    Discover suffered from severe CMS and internal-control deficiencies, which allowed Defendants to perpetrate a long-running credit card misclassification scheme. ......................................... 3

        2.    Violations of Consumer Protection Laws Relating to Student Loans ........................................................................................... 8

    B.    In Concealing the Misconduct, Discover and the Officer Defendants Knowingly or Recklessly Made False and Misleading Statements of Material Fact to Investors. .......................................................................... 9

    C.    Defendants' Misconduct Was Revealed Through a Series of Disclosures in 2022, 2023, and 2024, which Caused Billions of Dollars in Losses to Discover Shareholders. ...................................................................... 12

    D.    Defendants' Misconduct Gives Rise to Liability Under the Exchange Act. ....... 16

II. JURISDICTION AND VENUE .................................................................... 18

III. CLASS ACTION ALLEGATIONS ............................................................. 18

IV. PARTIES AND NON-PARTY FORMER DISCOVER EMPLOYEES........................ 20

    A.    Plaintiffs ............................................................................................ 20

    B.    Defendants ......................................................................................... 21

        1.    Discover ................................................................................... 21

        2.    Officer Defendants.................................................................... 22

        3.    Director Defendants.................................................................. 23

    C.    Former Discover Employees with Contemporaneous Knowledge of Relevant Facts .................................................................................... 24

V. DISCOVER FAILED TO ESTABLISH OR MAINTAIN AN APPROPRIATE CMS OR INTERNAL CONTROLS, WHICH ALLOWED DEFENDANTS TO PERPETUATE THE CARD MISCLASSIFICATION SCHEME................................ 26

    A.    Discover's Ability to Manage Risk Depended on Having a CMS that Was Commensurate with the Company's Operations and Complied with Industry Standards. ............................................................................. 26

    B.    Effective Internal Controls Were Critical to Discover's Ability to Prevent or Address Misconduct, and More Broadly to Manage Risk............................. 33

    C.    Discover Failed to Establish and Maintain a Legally Required CMS. ................ 36

    D.    Discover Has Admitted that It "Failed to Maintain an Appropriate Control Environment" and that Its ICFR Suffered from Material Weaknesses................ 40

**TABLE OF CONTENTS**

**Page**

E.    FEs with Firsthand Knowledge of Discover's Risk Management, Compliance, and Internal Control Processes Have Detailed Major Deficiencies at the Company. ................................................................ 42

    1.    Discover had "a culture of non-compliance.".......................................... 42

    2.    Discover's "three lines of defense" were plagued by problems. ............. 43

    3.    Discover's compliance department was severely understaffed, lacked the requisite expertise, and suffered from significant turnover. ................................................................................................. 48

    4.    Discover had hundreds of unresolved regulatory violations, of which senior management—including Hochschild—was aware. ........... 52

    5.    Reflecting Defendants' awareness of compliance and control issues at Discover, the Company initiated an effort to address the problems—but then failed to rectify them. ............................................... 55

F.    Defendants' Failure to Establish an Appropriate CMS and the Company's Material Weaknesses in ICFR Invited and Perpetuated the Card Misclassification Scheme ......................................................................... 57

VI.    DISCOVER'S CMS AND INTERNAL CONTROL FAILURES, INCLUDING THE CARD MISCLASSIFICATION SCHEME, RENDERED DEFENDANTS' CLASS PERIOD STATEMENTS FALSE OR MISLEADING ..................................... 64

A.    Discover Materially Misstated Its Financial Results as a Result of the Card Misclassification Scheme ......................................................................... 65

B.    Discover's Severe CMS and Control Failures Rendered Numerous Additional Representations False or Misleading. ................................................. 69

    1.    Statements Regarding GAAP Compliance ............................................. 69

    2.    SOX Certifications Regarding No "Untrue" or "Misleading" Statements, as well as "Fairly Present[ing] Financial Information.......... 70

    3.    Statements Regarding Interchange Revenue ........................................... 71

    4.    SOX Certifications Regarding Discover's ICFR.................................... 72

    5.    Statements Representing Adherence to Industry Standards and Regulatory Requirements Regarding Risk Management........................ 76

    6.    Statements Regarding Compliance with Applicable Banking and Consumer Protection Laws .................................................................... 78

C.    Defendants' Violation of Item 303 of SEC Regulation S-K Also Rendered Their Statements False or Misleading When Made. ........................................... 81

VII.    DISCOVER'S CMS AND CONTROL DEFICIENCIES ALSO RESULTED IN SYSTEMIC IMPROPRIETIES RELATING TO STUDENT LOAN SERVICING, WHICH DEFENDANTS CONCEALED FROM INVESTORS............. 83

**TABLE OF CONTENTS**

**Page**

A.   Discover's Misconduct Goes Back at Least to 2015, When the CFPB Revealed Significant Improprieties that the Company Agreed to (But Did Not) Rectify, and Continued During the Class Period.......................................... 84

B.   Discover's Student-Lending Misconduct Rendered Numerous Class Period Statements False or Misleading When Made. ........................................... 95

    1.   Statements Regarding Discover's Investment in Compliance................. 95

    2.   Statements Regarding Discover's Compliance with Applicable Laws and Regulations ................................................................... 99

    3.   Statement Relating to Share Buyback Suspension ............................... 101

VIII.   DISCOVER AND THE OFFICER DEFENDANTS MADE THEIR MISREPRESENTATIONS KNOWINGLY OR WITH RECKLESS DISREGARD FOR THE TRUTH........................................................................ 102

A.   Regulatory Findings................................................................................ 103

B.   Discover's Admissions Regarding Integrity and Internal-Control Material Weaknesses ................................................................................. 104

C.   Discover's Restatement of Previously Issued Financial Results ........................ 105

D.   Hochschild's Resignation, which Discover Acknowledges Related to the Card Misclassification Misconduct................................................................ 106

E.   The Detailed Contemporaneous Accounts Provided by FEs Who Worked Closely on Risk Management, Compliance, and Internal-Control Matters During the Class Period ............................................................................. 107

F.   The Centrality of Risk Management, Compliance, and Internal Controls to Discover's Business Operations and Financial Results .................................... 108

G.   The Officer Defendants' Attestations in SOX Certifications ........................... 109

H.   Discover's Long-Running and Significant Student-Lending Misconduct......... 111

I.   The Officer Defendants' Motive and Opportunity to Commit Fraud................ 111

IX.   DEFENDANTS' MISREPRESENTATIONS WERE MATERIAL............................. 113

X.   DEFENDANTS' PURPORTED "CAUTIONARY" LANGUAGE CANNOT IMMUNIZE THEM FROM LIABILITY FOR THEIR MISREPRESENTATIONS ............................................................................... 117

XI.   PLAINTIFFS AND OTHER CLASS MEMBERS ARE ENTITLED TO A PRESUMPTION OF RELIANCE ON DEFENDANTS' FALSE AND MISLEADING STATEMENTS................................................................................ 121

XII.   DEFENDANTS' MISREPRESENTATIONS CAUSED INVESTORS' LOSSES...... 123

A.   *July 20, 2022*:  Disclosure of Internal Investigation and Suspension of Discover's Share Repurchase Program............................................................ 124

B.   *July 19-20, 2023*:  Disclosure of Card Misclassification Issue, Proposed FDIC Consent Order, and Another Share Buyback Suspension....................... 126

**TABLE OF CONTENTS**

**Page**

C.  *August 14, 2023*: Hochschild's Resignation, Which Market Participants (Correctly) Understood Was Connected to Discover's Compliance and Related Issues ........................................................................... 127

D.  *October 18, 2023*: Ongoing Compliance Review and Continuation of Share Buyback Suspension ................................................................. 130

E.  *January 17-18, 2024*: Increased Expenses Primarily Due to Investments in Compliance and Risk Management as Well as Customer Remediation ........ 131

XIII.  CLAIMS FOR RELIEF ................................................................................... 133

XIV.  PRAYER FOR RELIEF .................................................................................. 144

JURY TRIAL DEMANDED ...................................................................................... 145

iv

Lead Plaintiffs KBC Asset Management NV, New York City Employees' Retirement System, New York City Police Pension Fund, New York City Fire Department Pension Fund, and Teachers' Retirement System of the City of New York (collectively, "Plaintiffs") bring this federal class action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as well as Securities and Exchange Commission ("SEC") Rule 10b-5, on behalf of all entities and individuals who purchased the common stock of Discover Financial Services ("Discover," "DFS," or the "Company") between February 21, 2019 and January 17, 2024, inclusive (the "Class Period"). Plaintiffs assert the allegations and claims in this Complaint against (1) Discover; (2) the Company's former Chief Executive Officer ("CEO") and President Roger C. Hochschild, its current Chief Financial Officer ("CFO") and Executive Vice President ("EVP") John T. Greene, and its former CFO and EVP R. Mark Graf (the "Officer Defendants"); and (3) the current and former directors identified below (the "Director Defendants," and together with Discover and the Officer Defendants, "Defendants").

Plaintiffs' allegations are based on, among other things, the investigation conducted by and through their attorneys, which included an analysis of:

- SEC filings made by Discover, including quarterly Form 10-Qs and annual Form 10-Ks, as well as other public filings concerning Discover or related entities;

- Defendants' additional public statements, including those made on Company earnings calls, at investor conferences, and in press releases;

- Research reports by securities and financial analysts concerning Discover;

- Economic analyses of Discover stock, including stock price movements in response to disclosures relating to the misconduct detailed in this Complaint;

- Other publicly available information regarding Discover, including (i) the July 22, 2015 Consent Order issued by the Consumer Financial Protection Bureau ("2015 CFPB Consent Order"); (ii) the December 21, 2020 Consent Order issued by the CFPB ("2020 CFPB Consent Order," and together with the 2015 CFPB Consent Order, the "CFPB Consent Orders"); (iii) the September 25, 2023 Consent Order issued by the Federal Deposit Insurance Corporation ("2023 FDIC Consent

1

Order"); (iv) the April 16, 2025 Amended and Restated Consent Order for Restitution, and Order to Pay issued by the FDIC ("2025 Amended FDIC Consent Order"); and (v) the April 18, 2025 Order to Cease and Desist and Order of Assessment of a Civil Money Penalty Issued Upon Consent Pursuant to the Federal Deposit Insurance Act, as Amended, issued by the Board of Governors of the Federal Reserve System ("2025 Federal Reserve Board Consent Order"); and

- Interviews with former Discover employees who worked at the Company during the Class Period on issues relating to risk management, compliance, or internal controls, and have firsthand knowledge of facts relating to the fraud giving rise to Plaintiffs' claims.

Lead Counsel's investigation is continuing, and many of the relevant facts are known only by Defendants or are exclusively within their custody or control. Plaintiffs believe substantial additional evidentiary support for their allegations exists and would be uncovered through a reasonable opportunity for discovery.[1]

## I. SUMMARY OF PLAINTIFFS' CLAIMS

1. Discover is an Illinois-based "digital banking and payment services company" whose common stock trades on the New York Stock Exchange ("NYSE"). It is "subject to extensive regulation, supervision and examination under U.S. federal and state laws and regulations."[2] As a bank holding company under the Bank Holding Company Act of 1956 and a financial holding company under the Gramm-Leach-Bliley Act, Discover is "subject to supervision, examination and regulation by the Federal Reserve," and "[a]s a large provider of consumer financial services," the Company is "subject to supervision, examination and

---

[1] Unless otherwise indicated, all emphasis in this Complaint has been added, and all internal citations, quotation marks, and footnotes have been omitted. Additionally, unless otherwise indicated, references to "¶ __" are to paragraphs of this Complaint.

[2] Discover Form 10-K for year ended Dec. 31, 2021, filed on Feb. 24, 2022 ("2021 Form 10-K"), at 19.

regulation of the [CFPB]."[3]  Additionally, the Company's bank subsidiary Discover Bank is regulated by the Office of the Delaware State Bank Commissioner and the FDIC.[4]

2.    As a heavily regulated financial institution, compliance with applicable laws and regulations is central to Discover's business operations and financial results.  Accordingly, the Company's ability to manage risk, including by implementing and maintaining systems and practices to enable it to comply with legal requirements and to accurately report its financial results, is essential.

3.    As detailed below, throughout (and even before) the Class Period, Defendants eschewed those obligations, and in doing so defrauded investors, in two principal respects that are summarized immediately below and further detailed in Sections V and VII.

### A.    Defendants Committed Serious Misconduct During the Class Period.

#### 1.    Discover suffered from severe CMS and internal-control deficiencies, which allowed Defendants to perpetrate a long-running credit card misclassification scheme.

4.    For more than 15 years, Defendants knowingly or recklessly engaged in a scheme to misclassify credit cards (the "Card Misclassification Scheme"), which caused the Company to issue materially false or misleading financial results and make numerous other materially false or misleading statements to investors.  The Company has agreed to pay nearly ***$1.5 billion*** to resolve the Card Misclassification Scheme: $1.225 billion in restitution to merchants, merchant acquirers, and other intermediaries who were unwittingly defrauded by this scheme, and $250 million in civil monetary penalties imposed by federal regulators.

---

[3] *Id.*

[4] *Id.*

5.      The Card Misclassification Scheme is detailed in the April 2025 cease-and-desist order issued by the Federal Reserve Board against Discover, to which the Company consented. Specifically:

- "Discover Bank offered 'commercial' credit cards that were defined in Discover Network's standard contracts with its merchant customers and operating regulations as cards that were expected to be used primarily for business purposes, and offered 'consumer' credit cards that were expected to be used primarily for ordinary consumer spending."

- "[I]nterchange fees for 'commercial' credit cards generally are higher than interchange fees for 'consumer' credit cards."

- "[F]rom 2007 through at least 2023 (the 'Relevant Period'), the Firm"—i.e., DFS as well as Discover Bank, DFS Services LLC, and other Discover subsidiaries— "charged its Merchant Customers the higher interchange fees associated with the 'commercial' credit cards *for the purpose of increasing the Firm's revenues* for certain credit cards that did not meet the definition of 'commercial' in Discover Network's standard contracts and operating regulations and were used for ordinary consumer spending."

- "[F]rom 2007 through 2023, the Firm did not disclose to its Merchant Customers that it was charging the higher 'commercial' interchange fees for certain credit cards that were used for ordinary consumer spending."

- "[A]t the end of 2022, the Firm had classified approximately five million 'consumer' credit cards as 'commercial,' and approximately 98% of those cards were 'consumer' cards that were misclassified."

- "[T]he Firm's Merchant Customers suffered monetary harm of approximately one billion dollars as a result of the Discover Card Interchange Fee Practices in the Relevant Period."

6.      Discover recently restated certain of its previously issued financial results from the Class Period due to the Card Misclassification Scheme, thus admitting it had made *false* statements of *material* fact to investors.

7.      The Card Misclassification Scheme resulted from (a) Defendants' failure, as the FDIC has found, "to establish and maintain a compliance management system (**CMS**) providing

4

for compliance with all applicable consumer protection laws and implementing regulations"[5]; and (b) Defendants' *now-admitted* failure to "maintain an effective control environment,"[6] which caused "material weaknesses in [Discover's] internal control over financial reporting that led to a material misstatement of the Company's consolidated financial statements."[7]

8.      Discover has specified the following control deficiencies related to the Card Misclassification Scheme: (i) "[t]he Company did not have controls designed or implemented to ensure that Discover Bank-issued credit cards were placed in appropriate merchant and merchant acquirer pricing tiers ('pricing tiers'), which in turn led to inaccurate revenue recognition"[8]; and (ii) "[i]n quantifying the historical revenue error and associated card product misclassification refund liability, the Company selected a methodology which the [SEC] Staff believed to be, and the Company ultimately accepted as, a misapplication of GAAP."[9]

9.      Indeed, the Company has further admitted that in failing to maintain an effective control environment, it "did not demonstrate an appropriate commitment to *integrity and ethical values*, specifically in the approach to evaluating and addressing the card product misclassification, and this control deficiency constitutes a material weakness."[10]  Further, as part of its "remediation efforts to reemphasize [its] commitment to integrity and ethical values in [its] control environment," the Company "appointed new individuals in key roles including *the Chief*

---

[5] 2025 Amended FDIC Consent Order at 1.

[6] Discover Amended Form 10-K for year ended Dec. 31, 2023, filed on Dec. 23, 2024 ("Amended 2023 10-K"), at 47, 85, 161.

[7] *Id.* at 160.

[8] *Id.* at 161.

[9] *Id.*

[10] *Id.* at 47, 161.

5

*Executive Officer* and other leadership roles."[11]  In other words, Discover has admitted that Defendant Roger Hochschild's resignation in August 2023—shortly after information regarding the card revenue misclassification first emerged and the Company reported that the board was overseeing an internal investigation into it—related directly to the misclassification issues and reflected *deficiencies* in "integrity and ethical values."  The board also "approved a new code of Ethics for Senior *Financial* Officers, which emphasized the importance of ethics and compliance and the expectation that the Company's leaders set the tone at the top."[12]

10. The Card Misclassification Scheme did not result from innocent mistakes, mismanagement, or even negligence.  Rather, Defendants knowingly or recklessly engaged in this misconduct and concealed it from investors and other market participants throughout the Class Period.

11. In this regard, the FDIC—in its April 2025 order that "amends and restates" the agency's September 2023 order against Discover—found that the Company (i) "*recklessly* engaged in unsafe or unsound banking practices by, among other things, failing to establish and maintain a [CMS] providing for compliance with all applicable consumer protection laws and implementing regulations,"[13] including Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45(a)(1) ("FTCA"); and (ii) "engaged in violations of, among other things, Section 5 [of the FTCA]," including as "related to the classification of certain credit card accounts for purposes of assessing fees in connection with accepting or facilitating payments on the Discover Network . . . into the highest merchant and merchant acquirer interchange pricing tier, . . . which

---

[11] *Id.* at 161.

[12] *Id.*

[13] 2025 Amended FDIC Consent Order at 1.

resulted in the overcharging of merchants, merchant acquirers, and other intermediaries"—i.e., the Card Misclassification Scheme. Further, the Federal Reserve found that "during the Relevant Period"—i.e., "from 2007 through at least 2023"—"***senior executives of [Discover] were aware*** that numerous Discover consumer credit cards were improperly classified as 'commercial' credit cards and were therefore assessed a higher interchange fee," and "despite this awareness, DFS's senior management failed to take adequate steps to correct the Firm's Discover Card Interchange Fee Practices."[14]

12.     The regulatory findings and Discover's (belated) admissions are consistent with the contemporaneous accounts of six former Discover employees ("FEs") who performed compliance and control-related functions at the Company and interacted with senior executives. ¶¶ 110-68. Among other things, as employees alerted senior management during meetings Hochschild attended, the compliance department lacked the staff and expertise necessary to perform its job effectively. ¶¶ 153–56. Further, the Company's vaunted "three lines of defense" were compromised by conflicts of interest and internal tension, resulting in delayed control testing and the sanitizing of reports that were supposed to address, not ***conceal***, problems. ¶¶ 116-33. Reflecting these deficiencies, Discover had hundreds of unresolved regulatory violations, which "freaked out" the president of its U.S. Cards business. ¶ 158. Hochschild received reports alerting him to this issue. ¶¶ 157, 159.

13.     In short, (1) Defendants engaged in a more than 15-year practice of improperly classifying credit card revenues for the purpose of generating increased revenues; (2) senior executives at Discover knew about this practice yet failed to correct it; (3) the revenue misclassification resulted from Discover's failure to implement an appropriate CMS and to

---

[14] 2025 Federal Reserve Board Consent Order at 2, 3.

maintain an effective control environment, which (as Discover admits) reflected failings of "integrity and ethical values"; (4) Discover's control failure led to material weaknesses in the Company's internal control over financial reporting ("ICFR") that caused a material misstatement of Discover's financial results during the Class Period; and (5) Discover replaced Hochschild as CEO as part of its efforts to "remediate" the Company's ethical shortcomings. This all adds up to one ineluctable conclusion: Defendants committed fraud.

2. **Violations of Consumer Protection Laws Relating to Student Loans**

14. In addition to the Card Misclassification Scheme, for years Discover violated consumer protection laws and regulations in numerous respects, which led to damning findings and fines by federal regulators.

15. Specifically, in 2015 the CFPB issued a consent order finding that the Company had, among other things, (1) engaged in deceptive and unfair practices in providing tax information statements to student loan borrowers; (2) misrepresented the amounts due for thousands of borrowers over several years; (3) made thousands of improper phone calls to borrowers; and (4) failed to provide important information to borrowers regarding loans that had been "charged off," in violation of federal law. ¶¶ 238-51. The Company agreed to refund $16 million to borrowers; pay a $2.5 million penalty; and improve its billing, student loan interest reporting, and collection practices. ¶ 237.

16. Over the next five years, however, the situation at Discover worsened, leading to a *second* consent order by the CFPB, which found that the Company had failed to correct problems identified in the agency's 2015 order and engaged in additional improper conduct. ¶¶ 255-70. Given Discover's "numerous" violations, which "harmed tens of thousands of

8

consumers," the CFPB required it to pay $10 million in consumer redress and a $25 million civil penalty. ¶¶ 258, 271.

17. Like the Card Misclassification Scheme, these violations were the natural result of Discover's failure, as the FDIC found, "to establish and maintain" a CMS "providing for compliance with all applicable consumer protection laws and implementing regulations,"[15] as well as the Company's failure to maintain an appropriate control environment.

### B. In Concealing the Misconduct, Discover and the Officer Defendants Knowingly or Recklessly Made False and Misleading Statements of Material Fact to Investors.[16]

18. Through numerous affirmative misstatements and half-truths, Defendants concealed the above highly material facts from investors and other market participants during the Class Period.[17] Among other things, Discover and the Officer Defendants:

---

[15] 2025 Amended FDIC Consent Order at 1.

[16] Plaintiffs provide here several examples of Defendants' false or misleading statements, which are more fully identified and detailed in ¶¶ 189-232 and ¶¶ 276-95 below. With respect to the various representations Defendants issued or otherwise made throughout the Class Period, Plaintiffs identify (1) the materially false or misleading statements in those representations (which are **bolded and italicized**); and (2) why those statements were false or misleading when made, including the information Defendants either misstated or failed to disclose.

[17] In its March 31, 2025 Opinion and Order (Dkt. 104, "March 2025 Order"), the Court held none of the alleged misrepresentations in Plaintiffs' prior Class Action Complaint (Dkt. 74, "CAC")—including statements regarding Discover's purported commitment to compliance, the purported effectiveness of its compliance infrastructure and processes, and its investments in compliance measures—were actionable under Section 10(b) of the Exchange Act. Plaintiffs respectfully disagree with the Court's ruling, but in any event this Complaint includes additional misrepresentations that were not included in the CAC. Plaintiffs have also included several of the dismissed statements, both because Plaintiffs believe the additional facts detailed in this Complaint render those statements materially false or misleading when made and to preserve their appellate rights.

(a) falsely reported revenues associated with credit card interchange fees and made other materially false statements regarding the Company's financial results during the Class Period;

(b) falsely represented in Discover's quarterly SEC reports that "[t]he accompanying condensed consolidated financial statements *have been prepared in accordance with accounting principles generally accepted in the United States ('GAAP')* for interim financial information";

(c) falsely certified that Discover's annual SEC filings "*fairly present in all material respects the financial condition, results of operations and cash flows of [Discover]* as of, and for, the periods presented in th[e] report[s]";

(d) falsely or misleadingly represented, with respect to discount and interchange revenue, that "*[c]ontractually defined per-transaction fee amounts typically apply* to each type of transaction processed and are recognized as revenue at the time each transaction is captured for settlement";

(e) falsely certified that the Company's ICFR were "*effective*";

(f) falsely or misleadingly represented that Discover's Credit Risk Management ("CRM") department "sets risk management standards and policies *that are consistent with the size and complexity of our business, industry practices and applicable legal and regulatory requirements*"; and

(g) falsely or misleadingly represented that the Company's risk management framework was "*based upon industry standards for managing risk and controls.*"

10

19. As detailed in ¶¶ 296-322 below, Discover and the Officer Defendants made the above representations and others knowing or recklessly disregarding that they were false or misleading. Their scienter rests on two independently sufficient grounds:

(a) Conscious misbehavior or recklessness. The accounts of well-placed former Discover employees, the findings by the Federal Reserve Board, the FDIC, and the CFPB, as well as Defendants' own admissions (among other things) demonstrate the Officer Defendants knowingly misrepresented the state of Discover's risk, compliance, governance, and control infrastructure and practices, or at least recklessly disregarded readily apparent facts that ran contrary to their statements to investors. Further, these Defendants knowingly or recklessly failed to implement appropriate ICFR, CMS, and related risk management policies or practices. The concealed facts, moreover, did not reflect isolated or sporadic events, but rather significant, long-running problems that plagued the Company. At minimum, the Officer Defendants consciously disregarded these glaring red flags for years.

(b) Motive and opportunity. The Officer Defendants also had the motive and opportunity to commit fraud. Because the compensation of certain executives, in particular Hochschild, depended heavily on Discover meeting earnings per share ("EPS") targets, they were highly motivated to artificially inflate revenues associated with credit card fees, which in turn artificially inflated the Company's EPS. The Officer Defendants also had an incentive to keep the Company's expenses artificially low, which would likewise help boost EPS. Hochschild and others achieved that objective by, at least in part, failing to sufficiently invest in risk management, compliance, corporate governance, and internal controls. At the same time, they caused the Company to buy back significant amounts of its stock, which lowered the number of publicly traded shares and in turn raised EPS (i.e., fewer shares resulted in a lower

11

denominator in the earnings/share calculation).  The Officer Defendants thus sacrificed investors' interests for their personal gain.

### C. Defendants' Misconduct Was Revealed Through a Series of Disclosures in 2022, 2023, and 2024, which Caused Billions of Dollars in Losses to Discover Shareholders.

20.     When facts undermining Defendants' representations emerged through a series of disclosures from July 2022 to January 2024, the price of Discover shares declined significantly as investors learned the extent of Discover's systemic and pervasive failures.

21.     The first of these corrective disclosures occurred on July 20, 2022, when Discover revealed that problems relating to its servicing of student loans caused the Company to initiate an internal investigation and suspend its stock repurchase program.  While the CFPB Consent Orders detailing student loan servicing issues were already public, the market did not appreciate the extent to which they were impacting the Company until the serious revelations in July 2022.  This is particularly so given Defendants' continual assurances to analysts and investors that the Company was devoting sufficient resources to ensuring compliance with applicable laws and regulations, and was maintaining appropriate processes and practices for managing risk and ensuring compliance.

22.     Then, on July 19, 2023, Discover announced it had overcharged merchants on card interchange fees for more than 15 years and was engaged with the FDIC regarding a consent order addressing systemic compliance failures at the Company.  The Company further disclosed it "ha[d] decided to pause share repurchases while the internal review of compliance, risk management and corporate governance is pending."[18]  As *Reuters* reported in the wake of these revelations:

---

[18] July 19, 2023 Press Release, "Discover Financial Services Reports Second Quarter 2023 Net Income of $901 Million or $3.54 Per Diluted Share," available at

12

Discover's stock plunged 16% on [July 20, 2023] amid a deluge of bad news. The company said that it had overcharged merchants and their banks due to misclassifying some cards. The financial impact is a trifle. But it came alongside the revelation that regulators have proposed serving Discover with a punitive "consent order," for other undisclosed shortcomings. To cap it off, Discover paused stock buybacks—a big deal for a company that repurchased 50% of its shares over the past decade.[19]

23.     Less than a month later, on August 14, 2023, Discover announced that its board and Hochschild had "agreed" he would "step down" as CEO, President, and a director "effective immediately." The Company's press release also quoted Interim CEO John Owen as stating "[t]he Board is continuously focused on Discover reaching its full potential across the business, including our commitment to enhancing compliance, risk management and corporate governance."[20] The message was clear: contrary to Defendants' prior representations, Discover had not sufficiently invested in risk management and compliance, and did not implement and maintain processes and practices to enable it to appropriately manage risk and comply with applicable laws and regulations. Indeed, Discover later admitted Hochschild's resignation was among the steps the Company has taken to "remediate" its material weaknesses in ICFR. Analysts and investors were correct in connecting Hochschild's departure to compliance or risk management problems.

---

https://investorrelations.discover.com/newsroom/press-releases/press-release-details/2023/Discover-Financial-Services-Reports-Second-Quarter-2023-Net-Income-of-901-Million-or-3.54-Per-Diluted-Share/default.aspx.

[19] John Foley, "*Discover dabbles with two types of delinquency*," *Reuters* (July 21, 2023), https://www.reuters.com/breakingviews/discover-dabbles-with-two-types-delinquency-2023-07-21.

[20] August 14, 2023 Press Release, "Discover Financial Services Announces Leadership Transition," available at https://investorrelations.discover.com/newsroom/press-releases/press-release-details/2023/Discover-Financial-Services-Announces-Leadership-Transition/default.aspx.

24.     Further, both Hochschild and Greene have directly contradicted their Class Period statements touting Discover's investment in risk management and compliance by since admitting that the Company had "*underinvested*" in compliance.  In July 2023, when an analyst asked him about compliance, Hochschild replied, "I do believe *we underinvested and that's something I take accountability for*."[21]  And in August 2023, after Hochschild had abruptly resigned, an analyst asked Greene about Discover's "compliance investment . . . versus the industry," to which Greene responded, "[w]hat I would say is *the company historically underinvested.  And we're paying the price right now*."[22]  Additionally, during a call with analysts on December 5, 2023, Greene admitted that Discover's decision (announced on November 29, 2023) to sell its entire $10.4 billion student lending business was due to "*perennial issues in our ability to service that portfolio*" and because "*[the Company's] internal systems capabilities weren't on par with what a professional servicing organization could do*."[23]

25.     Additional facts undermining Defendants' prior representations emerged on October 18, 2023, when Discover disclosed that total operating expenses rose $83 million year over year, "primarily driven by," among other things, "expenses for professional fees . . . driven by continued investment in compliance and risk management initiatives."[24]  This news partially (though not completely) alerted investors to problems relating to risk management, compliance, and related matters.

---

[21] Discover 2Q 2023 Earnings Call (July 20, 2023).

[22] Discover Business Update Call (August 17, 2023).

[23] Discover Presentation at Goldman Sachs Financial Services Conference (December 5, 2023).

[24] October 18, 2023 Press Release, "Discover Financial Services Reports Third Quarter 2023 Net Income of $683 Million or $2.59 Per Diluted Share," available at https://investorrelations.discover.com/newsroom/press-releases/press-release-details/2023/Discover-Financial-Services-Reports-Third-Quarter-2023-Net-Income-of-683-Million-or-2.59-Per-Diluted-Share/default.aspx.

26.     Finally, in announcing its 4Q 2023 financial results on January 17, 2024, Discover disclosed a significant increase in operating expenses, which resulted largely from "investments in compliance and risk management" as well as an $80 million reserve "for customer remediation."[25]  Analysts were quick to highlight the connection between disappointing earnings and "higher provisions and compliance and risk management expenses."[26]

27.     During an earnings call held the next day, John Owen noted Discover "increased [its] investments on risk and compliance in 2022 and 2023 up to about a $500 million level" and acknowledged the Company "still ha[s] quite a bit of work to do" in those areas.  He also previewed potential further regulatory action relating to the Card Misclassification Scheme. Additionally, CFO John Greene specified that the $80 million remediation reserve "related to [student loan] servicing issues" and "is not connected to the issues that we discussed in July [2023]."[27]

28.     The reactions of analysts and investors following each of the above disclosures demonstrate the importance of the previously concealed information, the impact of Defendants' false and misleading statements on the price of Discover stock, and the losses investors suffered

---

[25] January 17, 2024 Press Release, "Discover Financial Services Reports Fourth Quarter 2023 Net Income of $388 Million or $1.54 Per Diluted Share and Full Year Net Income of $2.9 Billion or $11.26 Per Diluted Share," available at
https://investorrelations.discover.com/newsroom/press-releases/press-release-details/2024/Discover-Financial-Services-Reports-Fourth-Quarter-2023-Net-Income-of-388-Million-or-1.54-Per-Diluted-Share-and-Full-Year-Net-Income-of-2.9-Billion-or-11.26-Per-Diluted-Share/default.aspx.

[26] *See* Barclays, "Discover Financial Services 4Q23 First Look: Big Miss and Messy Guide" (Jan. 17, 2024) (noting "4Q EPS of $1.54, missed our $2.54 and consensus of $2.52 due to higher provisions and compliance and risk management expenses").

[27] Discover 4Q 2023 Earnings Call (January 18, 2024).

due to those misrepresentations. The below graph illustrates the stock price movement in response to the corrective disclosures:



### D. Defendants' Misconduct Gives Rise to Liability Under the Exchange Act.

29. Based on the foregoing facts, which are further detailed below, Plaintiffs assert claims under Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) against Discover and the Officer Defendants.

30. Plaintiffs also assert claims under Section 10(b) and SEC Rule 10b-5(a) and (c) against Discover and the Officer Defendants for perpetrating a fraudulent scheme or course of conduct on Plaintiffs and other Class members. Defendants knowingly or recklessly concealed, among other things, information regarding systemic and pervasive risk management and compliance failures, including the Card Misclassification Scheme and the artificially inflated

16

revenues it generated. At the same time, these Defendants caused Discover to underinvest in risk management and compliance so they could instead pursue an aggressive stock repurchase program that directly inflated Hochschild's and other Company executives' personal compensation.

31. The Officer and Director Defendants are also liable under Section 20(a) of the Exchange Act as "controlling persons" of Discover during the Class Period. In their roles as the Company's most-senior executives, the Officer Defendants regularly acted and spoke on the Company's behalf regarding the issues detailed in this Complaint, and directed or oversaw others whose actions (or inaction) contributed to the significant failures in risk management, compliance, corporate governance, and internal controls that Defendants concealed through their representations to investors.

32. Additionally, the Director Defendants participated in or oversaw activities at the core of the fraud detailed in this Complaint, in particular through their participation on board committees—the Risk Oversight Committee and the Audit Committee—whose stated purposes, objectives, and responsibilities addressed risk management, compliance, corporate governance, and internal controls. The Director Defendants' involvement in activities at the core of this case is even more pronounced given the CFPB's directives to the Discover board connected to examining and rectifying the significant compliance issues the agency identified in its 2015 and 2020 Consent Orders. Given the facts relating to the Director Defendants, they are also liable as "controlling persons" under Section 20(a).

17

## II.   JURISDICTION AND VENUE

33.   This Court has jurisdiction over the subject matter of this action in accordance with 28 U.S.C. §§ 1331 and 1337 as well as Section 27 of the Exchange Act, 15 U.S.C. § 78aa.

34.   Personal jurisdiction exists over Defendants in accordance with Section 27 of the Exchange Act and comports with constitutional due process principles.

35.   Venue is proper in this District in accordance with Section 27 of the Exchange Act and 28 U.S.C. § 1391(b).  Discover is headquartered in this District and many of the acts and practices alleged in this Complaint occurred in substantial part in this District.

36.   In connection with the misconduct alleged in this Complaint, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including the U.S. mails, interstate telephone communications, and the facilities of the national securities markets.

## III.   CLASS ACTION ALLEGATIONS

37.   Plaintiffs bring this action on their own behalf and as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of all entities and individuals who purchased or otherwise acquired the publicly traded common stock of Discover during the period between February 21, 2019 and January 17, 2024, inclusive, and were damaged thereby (the "Class").  Excluded from the Class are Defendants; members of the immediate families of the Officer Defendants or the Director Defendants; the Company's subsidiaries and affiliates; any person who is or was an officer or director of the Company or any of the Company's subsidiaries or affiliates during the Class Period; any entity in which any Defendant has a controlling interest; and the legal representatives, heirs, successors, and assigns of any such excluded person or entity.

38.   The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  The disposition of their claims in a class action will

18

provide substantial benefits to the parties and the Court. Discover has approximately 250 million shares of common stock outstanding and actively trading on the NYSE. While Plaintiffs do not currently know the exact number of Class members, Plaintiffs believe there are thousands of them.

39. Record owners and other members of the Class may be identified from records maintained by Discover or its transfer agent, and may be notified of the pendency of this action by mail, using a form of notice similar to that customarily used in securities class actions.

40. Plaintiffs' claims are typical of the claims of other Class members. All members of the Class were similarly affected by Defendants' wrongful conduct in violation of the Exchange Act, as detailed in this Complaint.

41. Plaintiffs will fairly and adequately protect the interests of the members of the Class, and have retained counsel competent and experienced in class and securities litigation.

42. Common questions of law and fact exist as to all Class members, and those questions predominate over any questions solely affecting individual Class members. The questions of law and fact common to the Class include:

(a) Whether the federal securities laws were violated by Defendants' acts and omissions as detailed in this Complaint;

(b) Whether the statements made to the investing public during the Class Period contained material misrepresentations or omitted to state material information;

(c) Whether and to what extent the market price of Discover common stock was artificially inflated during the Class Period because of the material misstatements and omissions identified in this Complaint;

19

(d)     Whether Discover and the Officer Defendants acted with the requisite level of scienter;

(e)     Whether the Officer Defendants and the Director Defendants were controlling persons of the Company;

(f)     Whether reliance may be presumed; and

(g)     Whether the members of the Class have sustained damages as a result of the conduct alleged in this Complaint and, if so, the proper measure of damages.

43.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy because, among other things, joinder of all members of the Class is impracticable.  Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation render it practically impossible for Class members individually to redress the wrongs done to them.  Finally, there will be no difficulty in the management of this case as a class action.

## IV.     PARTIES AND NON-PARTY FORMER DISCOVER EMPLOYEES

### A.     Plaintiffs

44.     On November 30, 2023, this Court appointed KBC Asset Management NV ("KBC"), as well as New York City Employees' Retirement System, New York City Police Pension Fund, New York City Fire Department Pension Fund, and Teachers' Retirement System of the City of New York (the "NYC Funds"), to serve as Lead Plaintiffs in this action pursuant to the Private Securities Litigation Reform Act of 1995 ("PSLRA").

45.     KBC is an asset management company based in Brussels, Belgium.  As set forth in its PSLRA certification, KBC's funds purchased Discover common stock during the Class Period and suffered damages as a result of the securities law violations alleged in this Complaint. *See* Dkt. 16-1.

20

46.     The NYC Funds are retirement plans established by law to provide benefits to New York City employees.  As set forth in their PSLRA certification, the NYC Funds purchased Discover common stock during the Class Period and suffered damages as a result of the securities law violations alleged in this Complaint.  *See* Dkt. 12-2.

### B.     Defendants

#### 1.     Discover

47.     Defendant **Discover Financial Services**, incorporated in Delaware with principal executive offices at 2500 Lake Cook Road, Riverwoods, Illinois 60015, provides digital banking products and services, as well as payment services, through its subsidiaries.  It offers private student loans, credit card loans, personal loans, home loans, and deposit products.  The Company also operates the Discover Network, the PULSE Network, and Diners Club International, collectively known as the Discover Global Network.  The Discover Network "processes transactions for Discover-branded credit and debit cards and provides payment transaction processing and settlement services."[28]

48.     On February 19, 2024, Capital One Financial Corporation and Discover announced they had "entered into a definitive agreement under which Capital One will acquire Discover in an all-stock transaction valued at $35.3 billion."[29]  The companies further announced that under the terms of the agreement, Discover shareholders will receive 1.0192 Capital One shares for each Discover share, and when the transaction closes, Capital One shareholders will own approximately 60% of the combined company and Discover shareholders will own approximately 40%.

---

[28] 2021 Form 10-K at 1.

[29] Feb. 19, 2024 Press Release, "Capital One to Acquire Discover," available at https://investor.capitalone.com/news-releases/news-release-details/capital-one-acquire-discover.

49. Capital One and Discover shareholders approved the proposed merger in February 2025, and on April 18, 2025, the companies announced that the Federal Reserve Board and the Officer of the Comptroller of the Currency had approved it. The companies further reported that "the transaction is expected to close on May 18, 2025, subject to the satisfaction of customary closing conditions."[30]

### 2. Officer Defendants

50. Defendant **Roger C. Hochschild** served as Discover's CEO and President, and as a director on Discover's board, from October 2018 until his resignation on August 14, 2023. Hochschild signed Discover SEC filings throughout the Class Period, including its Form 10-K for the year ended December 31, 2019, filed on February 26, 2020 ("2019 Form 10-K"); its Form 10-K for the year ended December 31, 2020, filed on February 17, 2021 ("2020 Form 10-K"); its Form 10-K for the year ended December 31, 2021, filed on February 24, 2022 (as defined above, the 2021 Form 10-K); and its Form 10-K for the year ended December 31, 2022, filed on February 23, 2023 ("2022 Form 10-K"). Hochschild made numerous other statements on the Company's behalf during the Class Period.

51. Defendant **John T. Greene** has served as Discover's CFO and EVP since September 18, 2019. Greene signed Discover SEC filings over much of the Class Period— including the 2019, 2020, 2021, and 2022 Form 10-Ks—and made numerous other statements on the Company's behalf during the Class Period.

52. Defendant **R. Mark Graf** served as Discover's CFO and EVP from April 2011 until September 18, 2019. Graf signed Discover SEC filings during the Class Period, including

---

[30] Apr. 18, 2025 Press Release, "Capital One Receives Final Regulatory Approvals for Acquisition of Discover" available at https://ir-capitalone.gcs-web.com/news-releases/news-release-details/capital-one-receives-final-regulatory-approvals-acquisition.

22

its Form 10-K for the year ended December 31, 2018, which was filed after the market closed on February 20, 2019 ("2018 Form 10-K"), and made other statements on the Company's behalf during the Class Period.

53. As noted above, Defendants Hochschild, Greene, and Graf are sometimes referenced collectively in this Complaint as the "Officer Defendants."

### 3. Director Defendants

54. Defendant **Mary K. Bush** served as a director of Discover from before the Class Period until on or about June 2, 2023, including as a member of the board's Risk Oversight Committee.

55. Defendant **Candace H. Duncan** has served as a director of Discover from before the Class Period, including as a member (and currently as Chair) of the board's Audit Committee.

56. Defendant **Joseph F. Eazor** has served as a director of Discover from before the Class Period, including as a member of the Audit Committee.

57. Defendant **Cynthia Glassman** served as a director of Discover from before the Class Period until on or about May 11, 2023, including as Chair of the Audit Committee.

58. Defendant **Thomas G. Maheras** has served as a director of Discover since before the Class Period, and was named "Independent Chairman" in May 2020. He has served as a member of the Risk Oversight Committee since before the Class Period.

59. Defendant **Michael Moskow** served as a director of Discover from before the Class Period until on or about May 11, 2023, including as Chair of the Risk Oversight Committee.

60.     Defendant **Daniela O'Leary Gill** has served as a director of Discover since June 14, 2023, including as Interim Chair of the Risk Oversight Committee and as a member of the Audit Committee.

61.     Defendant **John B. Owen** has served as a director of Discover since June 2022, including as a member of the Risk Oversight Committee from June 2022 until August 14, 2023, when—following Hochschild's resignation—Owen was appointed Interim CEO and President. On December 11, 2023, the Company announced that the Board of Directors had appointed Michael G. Rhodes as CEO and President effective on or before March 6, 2024, and that Owen would continue as a director after Rhodes officially joined the Company. But shortly after joining Discover, Rhodes left to become CEO of Ally Financial. Discover board member J. Michael Shepherd then became Interim CEO and President of Discover in April 2024, and has served in those roles since. Owen currently serves as Chair of the Risk Oversight Committee.

62.     Defendant **David L. Rawlinson II** has served as a director of Discover since on or about February 22, 2021, including as a member of the Audit Committee.

63.     Defendant **Jennifer L. Wong** has served as a director of Discover since 2019, including as a member of the Risk Oversight Committee.

64.     The individuals identified in ¶¶ 54-63 above are sometimes referenced collectively in this Complaint as the "Director Defendants." The Director Defendants and the Officer Defendants collectively comprise the "Individual Defendants."

### C.     Former Discover Employees with Contemporaneous Knowledge of Relevant Facts

65.     Among the numerous sources of factual support for the allegations in this Complaint are contemporaneous accounts by six former Discover employees (collectively, the

24

"FEs"), each of whom worked at the Company during the Class Period and had responsibilities relating to compliance or risk management.

66.     **FE 1** worked at Discover as a principal risk compliance manager starting in the first half of 2021 until the fall of 2023.  FE 1's responsibilities included building out a first-line scoping program for the Company, which encompassed the deposits, personal loans, home loans, student loans, and cards business units, as well as building out the remediation and restitution process in response to the 2020 CFPB Consent Order.  FE 1 also created a policy for the cards business with respect to credit card interchange fees.

67.     **FE 2** worked at Discover as a risk manager from before the Class Period until late 2020.  FE 2 reported to Dianne Rischke, who served from January 2017 to November 2022 as Vice President, Credit and Card Operations Risk Officer/Consumer Banking Risk Officer.  In that position, Rischke (according to her LinkedIn profile) "manag[ed] operational and compliance risk for all banking products: Deposits, Personal Loans, Student Loans, and Home Equity Loans," and "serv[ed] as the businesses' voice of risk to the CEO and President governing the bank's risk profile."[31]

68.     **FE 3** worked at Discover from before the Class Period until the late summer/early fall of 2022.  FE 3's responsibilities included leading a team of student loan call center representatives and working as a member of the student loan restitution team formed in response to the 2020 CFPB Consent Order.

69.     **FE 4** worked at Discover from before the Class Period until the fall of 2021.  FE 4 was involved in two of the Company's "three lines of defense" with respect to risk management (discussed in ¶¶ 116-33 below), including as a senior manager of business risk and internal

---

[31] https://www.linkedin.com/in/diannerischke/.

controls, which FE 4 described as part of the "1.5 line of defense" (i.e., a "0.5" addition to the first-line of defense). FE 4 reported to a director under President - Consumer Banking Carlos Minetti's reporting structure.[32]

70. **FE 5** worked at Discover from before the Class period until the fall of 2021, including most recently as a senior manager who worked in compliance.

71. **FE 6** worked at Discover for more than a decade, until the summer of 2022. FE 6's responsibilities while at the Company included serving as a director of risk management and compliance for the cards and consumer banking units during the Class Period, reporting to Scott Michelau, who at the time was Vice President - US Cards Risk Officer and reported to EVP Dan Capozzi.[33] FE 6 also had "dotted line" reporting responsibilities to Dianne Rischke, who in turn reported to Carlos Minetti. Capozzi and Minetti reported to Hochschild.

## V. DISCOVER FAILED TO ESTABLISH OR MAINTAIN AN APPROPRIATE CMS OR INTERNAL CONTROLS, WHICH ALLOWED DEFENDANTS TO PERPETUATE THE CARD MISCLASSIFICATION SCHEME

### A. Discover's Ability to Manage Risk Depended on Having a CMS that Was Commensurate with the Company's Operations and Complied with Industry Standards.

72. The concepts of risk management and compliance are closely related. Indeed, as Hochschild stated during the Class Period, "compliance and a lot of the focus, it's risk management."[34]

---

[32] References to "directors" in the FEs' accounts refer to management-level positions, not members of Discover's board of directors.

[33] Capozzi has served as Discover's EVP and President - Consumer Banking since July 2023. In that role, he "oversees enterprise marketing, consumer products (US Cards, Lending and Deposits) and customer care operations." Amended 2023 10-K at 26. Capozzi previously served as President - US Cards from December 2020 to 2023. *Id.* Before that, in October 2018 he was appointed as EVP and President - Credit Operations and Decision Management. *Id.*

[34] Discover 2Q 2023 Earnings Call (July 20, 2023).

73. These concepts are embodied in principles espoused by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO"). COSO began in 1985, in the wake of accounting scandals of the 1970s and 80s, as an initiative to investigate the factors that lead to fraudulent financial reporting. It was initially led by former SEC Commissioner James C. Treadway, Jr., and was sponsored by several major U.S. professional associations: the American Accounting Association, the American Institute of Certified Public Accountants, Financial Executives International, the Institute of Internal Auditors, and the National Association of Accountants (n/k/a Institute of Management Accountants). COSO's stated mission is "to help organizations improve performance by developing thought leadership that enhances internal control, risk management, governance and fraud deterrence."[35] To that end, COSO has issued widely followed guidance and practices in those areas.

74. COSO defines **compliance risks** as "those risks relating to possible violations of applicable laws, regulations, contractual terms, standards, or internal policies where such violation could result in direct or indirect financial liability, civil or criminal penalties, regulatory sanctions, or other negative effects for the organization or its personnel."[36] Further, "[a]lthough most compliance risks relate to specific laws or regulations, others do not"; the latter "may include risks associated with failures to comply with professional standards, internal policies of an organization (including codes of conduct and business ethics), and contractual obligations."[37]

75. **Enterprise risk management** (or "**ERM**") consists of "[t]he culture, capabilities, and practices, integrated with strategy-setting and its performance, that organizations rely on to

---

[35] https://www.coso.org/about-us.

[36] COSO, *Compliance Risk Management: Applying the COSO ERM Framework*, at 1, https://www.fdic.gov/news/financial-institution-letters/2006/2cep_compliance.pdf.

[37] *Id.*

manage risk in creating, preserving, and realizing value."[38]  **Consumer compliance risk management** "considers the adequacy of board and management oversight of compliance-related activities and includes policies and procedures, monitoring activities supported by management information systems, and internal controls."[39]  Because "value that has been created by an organization can quickly become impaired when accompanied by violations of laws and regulations," compliance risk management "is an important element of both the internal control and the broader ERM functions and processes of an organization."[40]

76.     The FDIC has explained that to address risks inherent in operating its business, "a financial institution must develop and maintain a sound compliance management system that is integrated into the overall risk management strategy of the institution."[41]  Compliance thus "should be part of the daily routine of management and employees of a financial institution."[42]

77.     An effective compliance management system typically consists of "three interdependent elements": (1) "Board and management oversight," (2) "Compliance program," and (3) "Compliance audit."[43]  When all of these elements "are strong and working together," the financial institution "will be successful at managing its compliance responsibilities and

---

[38] *Id.* at 4.

[39] Kathleen Benson (Lead Examiner, Federal Reserve Bank of Chicago), "Compliance Risk Assessments," *Consumer Compliance Outlook* (2023), https://www.consumercomplianceoutlook.org/2023/second-third-issue/compliance-risk-assessment/.

[40] COSO, *Applying the COSO ERM Framework*, at 5.

[41] FDIC, *Compliance Management System*, at 1.

[42] *Id.*

[43] *Id.*

risks."[44] On the other hand, failure to comply with federal consumer protection laws and regulations "can result in monetary penalties, litigation, and formal enforcement actions."[45]

78.     Discover has acknowledged the importance of implementing and maintaining effective compliance and risk management systems. In the 2022 Annual Report accompanying its Form 10-K, for example, the Company noted "[m]anaging risk is an essential part of the way we work and requires a strong compliance management system (CMS)."[46]

79.     To this end, Discover represented that its "enterprise risk management philosophy" was reflected through "five key principles": "Comprehensiveness, Accountability, Independence, Defined Risk Appetite and Transparency."[47] In particular, the Company highlighted its "three lines of defense along the principles of risk management execution, oversight and independent validation."[48]

80.     As its "first line of defense," the Company's business units "seek to achieve business objectives while identifying and managing risks that arise from day-to-day operations as well as those driven by change."[49] The Company further stated its "second and third lines of defense" operate "independently of the business units."[50] The "second line of defense" includes the Company's corporate risk management ("CRM") department, led by its Chief Risk Officer. The CRM department "(i) oversees the establishment of enterprise-level risk management

---

[44] *Id.*

[45] *Id.*

[46] Discover 2022 Annual Report (Mar. 2023) at 10.

[47] 2022 Form 10-K at 11.

[48] *Id.*

[49] *Id.* at 11-12.

[50] *Id.* at 12.

standards and policies; (ii) oversees the processes that are designed to be consistent with the size and complexity of our business, industry practices and applicable legal and regulatory requirements; and (iii) independently test[s] business units' compliance with applicable regulatory requirements."[51]  The "third line of defense" consists of the internal audit department, which "performs periodic, independent reviews and tests compliance with risk management policies, procedures and standards across [the] Company," and "periodically reviews the design and operating effectiveness of our risk management program and processes," including "the independence and effectiveness of our CRM function."[52]

81.     Discover represented throughout the Class Period that "[c]ompliance risk exposures are actively and primarily managed by our business units in conjunction with our Compliance department."[53]

82.     A company's risk management and compliance processes and practices reflect its culture of compliance, which flows from the top.  In other words, as the FDIC has instructed, "[l]eadership on compliance by the board of directors and *senior management* sets the tone in an organization."[54]  Setting a proper tone is necessary to ensure that managers who report to senior management, as well as staff members, "have a clear understanding that compliance is important to the board and senior management, and that they are expected to incorporate compliance in their daily operations."[55]  Fostering a culture of compliance also requires that management "provide the firm's employees with the necessary tools and resources to fulfill their compliance

---

[51] *Id.*

[52] *Id.*

[53] *E.g.*, 2020 Form 10-K at 15.

[54] FDIC, *Compliance Management System*, at 2.

[55] *Id.*

functions, such as hiring the right people, developing effective compliance controls, and designing appropriate policies and procedures that take into consideration the firm's fiduciary obligations to its clients."[56]

83.     In the same vein, senior management is responsible for ensuring appropriate risk management processes are in place.  The Federal Reserve Board, for example, directs that senior management "is responsible for implementing strategies in a manner that manages, monitors, and mitigates risks associated with each strategy and that promotes compliance with laws and regulations on both a long-term and day-to-day basis."[57]  To that end, "senior management should be fully involved in the activities of their institutions and possess sufficient knowledge of all major business lines to ensure that appropriate policies, controls, and risk monitoring systems are in place and that accountability and lines of authority are clearly delineated."[58]  Senior management "is also responsible for establishing and communicating a strong awareness of and need for effective internal controls and high ethical standards," which "requires senior managers of a bank or bank holding company to have a thorough understanding of banking and financial market activities and detailed knowledge of the activities their institution conducts, including the nature of internal controls necessary to manage, monitor, and mitigate the related risks."[59]

84.     As one commentator has aptly noted:

---

[56] SEC Comm'r Luis A. Aguilar, "Doing the Right Thing: Compliance That Works for Investors," Presented to The Regulatory Compliance Association (Apr. 18, 2013), https://www.sec.gov/news/speech/2013-spch041813laahtm.

[57] Board of Governors of the Federal Reserve System, Division of Banking Supervision and Regulation, SR 95-51 (SUP), *Rating the Adequacy of Risk Management Processes and Internal Controls at State Member Banks and Bank Holding Companies*, Nov. 14, 1995 (rev. Feb. 26, 2021) ("Fed Board SR 95-51 (SUP)"), https://www.federalreserve.gov/boarddocs/srletters/1995/sr9551.htm.

[58] *Id.*

[59] *Id.*

31

[I]ntegrity flows outward from the CEO and her office. Without a deeply committed and constantly consistent CEO who leads the performance with integrity . . . there can never be the requisite high-integrity culture. Such a culture is based on shared principles (values, policies, and attitudes) and shared practices (norms, systems, and processes) that influence how people feel, think, and behave.[60]

85.     Further, as part of "'operationalizing' . . . high performance with high integrity," the CEO (aided by others) must, among other things, "embed[] integrity practices in business operations in the core areas of prevention, detection, and response—through risk assessment of business processes, appropriate risk mitigation techniques, constant monitoring and review, and appropriate discipline and remediation when wrongdoing occurs."[61]

86.     Discover has represented that the CEO "is ultimately responsible for risk management," and in that capacity "establishes a risk management culture throughout [the] Company and ensures that businesses operate in accordance with this risk culture."[62]  Given the CEO's leading role in risk management within the Company, failures in risk management or compliance ultimately rest with him.

87.     More broadly, the CEO establishes (or helps establish) a company's "tone at the top," which reflects "a company's management and board of director's leadership and their commitment to being honest and ethical."[63]  The term originated from auditing firms, "where it was used to reference the attitude of a company's management towards internal controls and

---

[60] Ben W. Heineman, Jr., "*Only the Right CEO Can Create a Culture of Integrity*," Harvard Law School Forum on Corporate Governance & Financial Regulation (June 5, 2013), https://corpgov.law.harvard.edu/2013/06/05/only-the-right-ceo-can-create-a-culture-of-integrity/.

[61] *Id.*

[62] 2022 Form 10-K at 14.

[63] Corporate Finance Institute, "Tone at the Top," available at https://corporatefinanceinstitute.com/resources/management/tone-at-the-top/.

ethics."[64]  The tone at the top, as the term implies, "starts at the top and trickles down into middle-management and eventually to the bottom line."[65]  A poor tone at the top "results in a company that is more likely to display unethical behavior, engage in fraudulent activity, and not support internal controls."[66]

**B.      Effective Internal Controls Were Critical to Discover's Ability to Prevent or Address Misconduct, and More Broadly to Manage Risk.**

88.      COSO defines "internal control" as "a process, effected by an entity's board of directors, management, and other personnel, designed to provide reasonable assurance regarding the achievement of objectives relating to operations, reporting, and compliance."[67]

89.      This definition reflects a number of "fundamental concepts," including that internal control "consist[s] of ongoing tasks and activities—a means to an end, not an end in itself"; and it is "not merely about policy and procedure manuals, systems, and forms, but about people and the actions they take at every level of an organization to affect internal control."[68]

90.      A company's "control environment" consists of "the set of standards, processes, and structures that provide the basis for carrying out internal control across the organization."[69]  The control environment encompasses, among other things, "the integrity and ethical values of the organization."[70]  The resulting control environment "has a pervasive impact on the overall

---

[64] *Id.*

[65] *Id.*

[66] *Id.*

[67] COSO, *Internal Control – Integrated Framework* (May 2013) ("COSO Framework"), Executive Summary at 3.  While the COSO Framework refers to "internal control," the Fed and other sources refer to "internal controls."  The terms are used interchangeably in this Complaint.

[68] *Id.*

[69] *Id.* at 4.

[70] *Id.*

system of internal control."[71] Notably, "[t]he board of directors and senior management establish the ***tone at the top*** regarding the importance of internal control including expected standards of conduct."[72]

91.     Among the types of internal controls, ICFR is:

[a] process designed by, or under the supervision of, the issuer's principal executive and principal financial officers, or persons performing similar functions, and effected by the issuer's board of directors, management and other personnel, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles.[73]

92.     According to COSO, a system of ICFR "is designed and implemented to prevent or detect, in a timely manner, a material omission from or misstatement of the financial statements due to error or fraud."[74] "When assessing risks to the achievement of financial reporting objectives," organizations should consider, among other things, "Illegal Acts," which are defined as "[v]iolations of laws or governmental regulations that could have a material direct or indirect impact on the external financial reports."[75]

93.     Because reliable financial statements must be materially accurate, "a central purpose of the assessment of [ICFR] is to identify material weaknesses that have . . . more than a remote likelihood of leading to a material misstatement in the financial statements."[76] While

---

[71] *Id.*

[72] *Id.*

[73] *See* SEC Rules 13a-15(f) and 15d-15(f).

[74] COSO, *Internal Control – Integrated Framework* (May 2013), at 78.

[75] *Id.* at 79.

[76] SEC Division of Corporation Finance, Office of the Chief Accountant, *Staff Statement on Management's Report on Internal Control Over Financial Reporting* (May 16, 2005) ("SEC Staff Statement re ICFR"), https://www.sec.gov/info/accountants/stafficreporting.htm.

identifying control deficiencies is important, "the overall focus of internal control reporting should be on those items that could result in material errors in the financial statements."[77]

94.     Inadequacies or failures of ICFR typically are classified as "deficiencies," "significant deficiencies," or "material weaknesses." A **deficiency** exists "when the design or operation of a control does not allow management or employees, in the normal course of performing their assigned functions, to prevent or detect misstatements on a timely basis."[78] A deficiency in design exists "when (a) a control necessary to meet the control objective is missing or (b) an existing control is not properly designed so that, even if the control operates as designed, the control objective would not be met."[79] A deficiency in operation exists "when a properly designed control does not operate as designed, or when the person performing the control does not possess the necessary authority or competence to perform the control effectively."[80] A **significant deficiency** is "a deficiency, or a combination of deficiencies, in [ICFR] that is less severe than a material weakness, yet important enough to merit attention by those responsible for oversight of the company's financial reporting."[81] A **material weakness** is "a deficiency, or a combination of deficiencies, in [ICFR], such that there is a reasonable

---

[77] *Id.*

[78] Public Company Accounting Oversight Board ("PCAOB"), AS [Auditing Standard] 2201: *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements*, App'x A - Definitions, https://pcaobus.org/oversight/standards/auditing-standards/details/AS2201.

[79] *Id.*

[80] *Id.*

[81] *Id.*

possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis."[82]

95.    Internal controls are closely related to risk management.  Reflecting this connection, the Fed emphasizes "the importance of sound risk management processes and strong internal controls when evaluating the activities of the institutions it supervises."[83]  Accordingly, "while an institution's financial performance is an important indicator of the adequacy of management," the quality of risk management practices and internal controls is "significant . . . when evaluating the management and overall financial condition of banking organizations."[84]  Indeed, "comprehensive internal controls" are elements of "a sound risk management system."[85]

### C.    Discover Failed to Establish and Maintain a Legally Required CMS.

96.    Contrary to Discover's obligations referenced above, the FDIC has determined that—as described in a Consumer Compliance Report of Examination issued in 2021 ("2021 ROE")—Discover "(i) recklessly engaged in unsafe or unsound banking practices" by, among other things, "failing to establish and maintain" a proper CMS; and "(ii) engaged in violations of, among other things," consumer protection statutes and regulations.[86]

97.    The FDIC first addressed Discover's deficient CMS in September 2023.  Then, on April 16, 2025, the FDIC "amend[ed] and restat[ed]" its 2023 Consent Order and added "an Order of Restitution[] and an Order to Pay," which expanded on its findings.

---

[82] *Id.*  A "reasonable possibility" exists "when the likelihood of the event is either 'reasonably possible' or 'probable,' as those terms are used in Financial Accounting Standards Board Statement No. 5, Accounting for Contingencies ('FAS 5')."  *Id.*

[83] Fed Board SR 95-51 (SUP).

[84] *Id.*

[85] *Id.*

[86] 2025 Amended FDIC Consent Order at 1-2.

98.    The FDIC specified that Discover "fail[ed] to establish and maintain a compliance management system (CMS) providing for compliance with all applicable consumer protection laws and implementing regulations, including":

> (a) board of directors (Board) and Bank management oversight and commitment, change management, comprehension, identification, and management of risk, corrective action and self-identification, and third party risk management; and (b) written policies, procedures, standards, and/or processes (collectively, Procedures), training, monitoring and testing, audit, and consumer complaint response programs designed to prevent, or identify and self-correct violations of Consumer Protection Laws and Regulations and associated consumer harm with internal controls and information systems and audit systems appropriate to the size of the Bank and the nature, scope and risk of its activities, whether conducted by the Bank or on behalf of the Bank through Third-Party Relationships.[87]

99.    The FDIC further found that Discover "violat[ed]," among other things, Section 5 of the FTCA; the Truth-in-Lending Act, 15 U.S.C. § 1601, *et seq.*; the Servicemembers Civil Relief Act, 50 U.S.C. § 501, *et seq.*; and the Electronic Records and Signatures in Commerce Act, 5 U.S.C. § 7001, *et seq.*; as well as related implementing regulations.[88]

100.    The 2021 ROE, which led to the FDIC Consent Orders, was based on "the findings of the FDIC's October 18, 2021 examination along with Consumer Financial Protection Bureau (CFPB) findings during the review period for the 2021 ROE, and the findings of subsequent FDIC visitations, targeted reviews, and monitoring."[89]

101.    Notably, while Discover did not "admit[] or deny[] any charges or unsafe or unsound banking practices or violations of law or regulation," it "consented to the issuance of" the FDIC Consent Orders.[90]

---

[87] *Id.*

[88] *Id.* at 2.

[89] *Id.* at 1.

[90] *Id.* at 3.

102. The FDIC made numerous findings and issued directives addressing the deficiencies it identified. For example, the FDIC ordered that Discover's board of directors "must immediately and appropriately increase, commensurate with the size of the Bank and the nature, scope and risk of Bank Activities," the board's "supervision and direction of Bank management," as well as "its oversight and monitoring of the Bank's enterprise risk management framework (ERM Framework), corporate governance framework (CG Framework), consumer compliance program (CC Program), and compliance vendor management program (CVM Program)."[91]

103. The FDIC further specified that the Board "must, at a minimum," take the following measures:

a) "set and clearly communicate expectations regarding ethics and compliance with Consumer Protection Laws and Regulations for the Board, Bank management, staff, and any person associated with a business arrangement between the Bank and another entity, by contract or otherwise," including third parties;

b) "ensure that the Bank establishes and maintains a proactive, effective risk-based ERM Framework, CC Program and CVM Program";

c) "ensure that the Bank maintains one or more compliance officers with appropriate experience and expertise and sufficient authority, independence, and suitable resources, both staffing and systems, to enable them to satisfactorily oversee the implementation of the CC Program and the CVM Program and assure the Bank's compliance with Consumer Protection Laws and Regulations";

d) "ensure adequate information systems and Procedures are in place to provide the Board with timely, relevant and accurate information regarding risks related to potential and identified violations of Consumer Protection Laws and Regulations and incidents that may involve consumer harm in a consistent and readily understandable format at regular intervals and enable it to act on such reporting";

e) "engage in robust consumer compliance-related discussions as part of all full Board and appropriate Board committee meetings," as well as

---

[91] 2023 FDIC Consent Order at 2-3.

38

"comprehensively and accurately document those discussions in meeting minutes";

f) "set clear and measurable expectations for Bank management regarding their (a) ethics and commitment to compliance with Consumer Protection Laws and Regulations; (b) leadership across business lines and operations; (c) sound and consistent management of the Bank's ERM Framework, CC Program and CVM Program; (d) oversight and monitoring of Third-Party Relationships providing products, services, and/or conducting other activities either to, through, or on behalf of the Bank, for compliance with Consumer Protection Laws and Regulations; and (e) managing consumer compliance risks to stay within the Board's risk appetite parameters and established risk limits, and establish and maintain Procedures to monitor and regularly evaluate Bank management's adherence to these Board expectations";

g) "have and maintain Procedures to monitor and regularly evaluate the adherence to and effectiveness of the Bank's ERM Framework, CC Program and CVM Program," and "ensure appropriate revisions are timely made . . . to assure on-going compliance with Consumer Protection Laws and Regulations";

h) "ensure the Bank's internal audit function (Internal Audit) (a) is appropriate to the size of the Bank and the nature and scope of Bank Activities; (b) appropriately considers available risk assessments, studies, reports, including regulatory findings, plans, and/or Procedures related to the Bank's compliance with Consumer Protection Laws and Regulations; and (c) appropriately assesses the Bank's implementation of and adherence to the Bank's ERM Framework, CC Program, CVM Program and any other Procedures adopted by the Board related to compliance with Consumer Protection Laws and Regulations and any revisions to them"; and

i) "have and maintain Procedures to track actions to (a) eliminate or correct any unsafe or unsound banking practices identified and violations of law or regulation cited in reports of examination, visitation reports or supervisory letters; (b) appropriately address any instances of consumer harm and/or any deficiencies or weaknesses identified in future reports of examination, visitation reports or supervisory letters; and (c) appropriately address non-compliance with Consumer Protection Laws and Regulations and corrective and preventive action for identified deficiencies and weaknesses in the Bank's ERM Framework, CC Program and/or CVM Program to ensure such corrective actions are implemented in a timely

39

manner and thereafter monitor implementation of and adherence to resulting revisions."[92]

104.    The FDIC also ordered that Discover's board must, among other things, "ensure that the Bank takes all steps necessary, consistent with other provisions of this ORDER and safe and sound banking practices, to": (1) "eliminate or correct, and prevent the unsafe or unsound banking practices and the violations of law or regulation identified in the 2021 ROE"; (2) "appropriately address the instances of consumer harm and the deficiencies and weaknesses identified in the 2021 ROE in a timely manner"; and (3) "fully comply with the provisions of this ORDER in a timely manner."[93]

> **D.      Discover Has Admitted that It "Failed to Maintain an Appropriate Control Environment" and that Its ICFR Suffered from Material Weaknesses.**

105.    As noted above, in connection with Discover's restatement of previously issued financial results, the Company disclosed it "identified material weaknesses in [its] internal control over financial reporting that led to a material misstatement of the Company's consolidated financial statements."[94]  Based on "the existence of these material weaknesses," the Company "concluded [it] did not maintain effective internal control over financial reporting" as of December 31, 2023.[95]  Management "also concluded that the Company's disclosure controls and procedures were not effective as [of] December 31, 2023, because of these material weaknesses in its [ICFR]."[96]

---

[92] *Id.* at 3-5.

[93] *Id.* at 5.

[94] Amended 2023 10-K at 46.

[95] *Id.* at 160.

[96] *Id.* at explanatory note.

106. Discover further admitted that based on criteria issued by COSO, the Company "***did not demonstrate an appropriate commitment to integrity and ethical values***, specifically in the approach to evaluating and addressing the card product misclassification, and this control deficiency constitutes a material weakness."[97]

107. Discover also acknowledged "[t]he material weakness in the control environment ***persisted for an extended period of time***" and "contributed to the other weaknesses within [the Company's] system of internal control over financial reporting at the control activity level."[98]

108. Addressing its card misclassification improprieties, the Company specified the following material weaknesses: (1) it "did not have controls designed or implemented to ensure that Discover Bank-issued credit cards were placed in appropriate merchant and merchant acquirer pricing tiers ('pricing tiers'), which in turn led to inaccurate revenue recognition"; and (2) "[i]n quantifying the historical revenue error and associated card product misclassification refund liability, the Company selected a methodology which the [SEC] Staff believed to be, and the Company ultimately accepted as, a misapplication of GAAP."[99]

109. Discover also disclosed that these material weaknesses "cannot be considered remediated until applicable controls have been designed, implemented, have operated for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively."[100] The Company noted that while it "ha[d] not remediated these control deficiencies as of December 31, 2023," it was "continuing its remediation efforts to reemphasize

---

[97] *Id.* at 161.

[98] *Id.*

[99] *Id.*

[100] *Id.*

[its] commitment to integrity and ethical values in [its] control environment."[101] Those "remediation efforts" included "appoint[ing] new individuals in key roles *including the Chief Executive Officer* and other leadership roles."[102] The Company thus effectively admitted that Hochschild, who departed as Discover's CEO in August 2023, was forced out due to his failure to live up to the Company's purported "commitment to integrity and ethical values."

       E.      **FEs with Firsthand Knowledge of Discover's Risk Management, Compliance, and Internal Control Processes Have Detailed Major Deficiencies at the Company.**

110. Six former Discover employees who were deeply involved in the Company's risk management, compliance, and internal control systems and processes have confirmed they were woefully deficient and led to serious compliance and control failures.

       1.      **Discover had "a culture of non-compliance."**

111. According to FE 1, a former principal risk compliance manager at Discover from 2021 to 2023, "there was genuinely a terrible compliance situation" at Discover. FE 1 added that the apathy toward compliance came from the top; the Company's executives "did not care – there was a culture of non-compliance."

112. Indeed, when FE 1 was hired in 2021, a Discover human resources representative told FE 1 that the Company's compliance efforts were "just beginning." Other members of the risk and compliance organization also told FE 1 that the Company's compliance culture was "beginning, burgeoning, new" as of 2021. FE 1 thought it was "weird" that a company as large and old as Discover was only beginning its compliance efforts in 2021.

---

[101] *Id.*

[102] *Id.*

113. FE 6 recounted raising concerns as far back as 2013 that Discover was not "reviewing processes," a "basic" and necessary step in identifying control gaps, which typically entails "mapping out" a company's business processes and assessing whether there are adequate controls related to them. Brian Hughes, who later became the Company's CRO, told FE 6 it was "too much work" to map out the processes and review them for control gaps.

114. FE 6 described the culture of risk and compliance in Discover's U.S. cards business and the consumer banking business as the "wild west" when FE 6 joined the cards business in 2017. FE 6 recounted that the first line of defense "did not have a handle on what risk and controls were," and the focus was getting out new products and services. FE 6 noted, "It was market, market, market, how do we get [products] out there," with little attention to the risk management function.

115. FE 1 recounted flaws in Discover's compliance practices. FE 1 explained that across the banking industry, the first line of defense performs "process" testing (such as testing a deposit process or a mail return process) while the second line performs regulatory testing. At Discover, however, that structure was "flipped." FE 1 complained "incessantly" about this violation of industry standards, but was told: "This is how it functions at Discover."

**2. Discover's "three lines of defense" were plagued by problems.**

116. FE 2, a former risk manager who left Discover in 2021, recounted that the Company did not structure its "three lines of defense" appropriately. FE 2 explained that a company's business managers, who comprise the first line of defense, are the "risk owners" who are supposed to understand the regulations and conduct their businesses in compliance with those standards. But at Discover, FE 2 added, rather than truly owning the risk themselves, the Company's executives "leaned on" compliance personnel—specifically, "a little mini risk office inside the business to help the business with risk, controls and compliance," known at Discover

43

as the "one and half lines of defense"—to "do their controls and their compliance for them." In other words, instead of truly knowing the regulations, business executives had a "mini team" to tell them "if their stuff was working the way it needed to." FE 1 identified this group as business unit testing and monitoring, i.e., "BUTM."

117. According to FE 2, this delegation of responsibilities "is probably what has led to some of the [regulatory] issues" the Company experienced. FE 2 noted the managers responsible for the student loan business "didn't know the regulations that applied to student loans."

118. Further, FE 1 recounted that when FE 1 joined Discover in 2021 the BUTM group was "widely ineffective" across the bank because it engaged only in control "validation" and not control "testing." The difference between validation and testing, FE 1 explained, is that the latter not only checks whether a given control was actually implemented but also whether it was effective and operated with the appropriate frequency. As a result, FE 1 had to build the first-line testing function "from scratch" because "whatever regulatory testing was happening before . . . was not happening at the first line."

119. FE 4 likewise recounted that until FE 4 departed Discover in 2021, the first-line testing team was only testing whether controls happened, not whether they were effective—i.e., "Are you executing [a documented control], not are you executing the way you should or was the control the right thing to do?" Further, "the compliance structure lacked the right roles and responsibilities" and Discover "lacked the right leadership to instill effective compliance and controls."

120. After FE 1 joined Discover, the Company organized a group to perform first-line control testing, which was divided into a "scoping" team and a "testing" team. The scoping team reviewed internal control standards (i.e., "CSTs," which FE 1 described as "laypeople

44

interpretations of the regulations") and business unit data to determine the fundamentals of the testing that needed to occur. The testing team carried out the tests, liaised with the business unit staff to preliminarily review initial testing results, and provided the scoping team with a testing report. After the tests were run, the scoping team worked with the business unit heads to issue a final first-line compliance report. FE 1 noted the separation of first-line scoping and testing was abnormal in the banking industry.

121.     FE 1 recounted that the separation of scoping and testing led to tensions between the teams. According to FE 1, meetings between the scoping and testing teams were "terrible and combative." First-line testing would not tell first-line scoping what they were actually testing, and the testing team had "major issues" with what its counterpart was scoping, usually because the scoping team was preparing for more tests than the testing team wanted to perform. Indeed, FE 1 observed, first-line testing was often delayed, and the testing team would sometimes refuse to start testing until the scoping team agreed to remove certain points that the testing team did not want to perform.

122.     According to FE 1, this toxicity led the scoping and testing teams to file human resources reports against each other, with the scoping team saying the testing team was "demeaning" and creating a "hostile work environment," and the testing team saying the scoping team lacked experience and was "bullying" the testing team. FE 1 recounted that Discover did not implement any changes or positive improvements in response to these complaints.

123.     Additionally, FE 1 described that first-line scoping reported to first-line management, while first-line testing reported to second-line management (that is, the Director of Testing reported to Vesela Zlateva, the second-line testing vice president). FE 1 described this reporting structure as a "massive problem and a huge conflict of interest." Because of this

45

structure, in the course of reviewing the first-line testing, the second-line team would only speak with the first-line scoping team—not with the first-line testing team. As a result, the second line would confirm that a particular procedure existed but was unable to identify gaps in the procedure or its execution.

124. FE 6 likewise recounted that it was inappropriate for first-line testing to report into the second line. That arrangement allowed the first-line testing team to reject the testing plans FE 6's team attempted to implement. FE 6 complained to Vice Presidents Scott Michelau and Dianne Rischke about the first-line testing team's refusal to conduct planned tests.

125. FE 1 also recounted that the first-line testing team refused to put their "scripts of what they were actually testing" in Discover's internal tracking software (known as Archer). FE 1 explained this was a "big problem" because it meant the scoping team could not validate that the scope of a test had been met, even though its responsibilities included this validation requirement. Because the first-line testing team did not want the first-line scoping team "to touch their stuff," the only group looking at the scripts was the second line—but (as noted in ¶ 123 above), the first-line testing team *was actually part of the second line*. FE 1 noted this overlap in personnel created a conflict of interest and resulted in no oversight of the scripts being used to test compliance.

126. FE 1 repeatedly told Michelau that the compliance function was "not working," that the second-line compliance team did not know what they were doing, and that there was a lack of experience across both the first and second lines.

127. Further, noting Discover "did not have a culture of taking compliance seriously," FE 1 recounted that business unit executives *would refuse to sign off on first-line compliance*

46

*reports until certain findings were removed*.  The first-line scoping team "fought viciously" with the business units over this matter, telling the executives this was "ridiculous."

128.   FE 6 likewise noted business units—typically the directors in those businesses—pushed to get findings removed from risk reports or to get findings downgraded to observations.

129.   There were also significant issues with CSTs.  FE 1 explained that compliance risk assessment at Discover entailed second-line compliance personnel assigning a risk rating to all consumer regulations that applied to the Company, and first-line tests were supposed to be scheduled and conducted according to the risk rating for each regulation the second-line compliance personnel established.

130.   Because (as noted above) CSTs were interpretations of applicable regulations, when the scoping team was designing the tests, it was not doing so based on the actual regulatory language.  Notably, FE 1 recounted that the CSTs *were incomplete and did not have all the control standards that applied to a particular regulation*, which meant the scoping team would have to check the regulations on their own if they wanted to be sure that "all the pieces had been added."  Compounding this difficulty, FE 1 noted, was the fact that after a CST was edited, employees could not see when it was last modified or what it previously said.  FE 1 added that the CSTs were also supposed to be mapped to Discover's various business units and products, but the mapping was "garbage."  Further, FE 1 noted, as a unit of just four to eight employees, the scoping team did not have time to do everything necessary to ensure the CSTs were accurate and relevant.

131.   When FE 1 complained to others, including Michelau, about the CSTs and emphasized to them that the scoping team needed to use the actual regulatory language and not interpretations of the regulations, Michelau told FE 1: "This is how Discover does it."  As a

result, FE 1 recounted, the first- and second-line scoping teams continued to be "forced to scope on non-regulatory language."

132. According to FE 1, at the end of 2021 the compliance group began to revamp the CSTs to make them "more complete and accurate." But FE 1 recounted that the revamping project did not guarantee the CSTs were complete and accurate (though employees can now see the date a CST was last updated).

133. Additionally, FE 6 recounted that just after the middle of 2021, FE 6 learned from Dianne Rischke that with respect to the consumer banking business (which, as noted above, included student loans), the testing group was "not going to test controls, only transactions," which FE 6 found ludicrous. FE 6 discussed the issue with superiors, including Vesela Zlateva, to no avail. FE 6 emphasized that senior management "did not like control testing."

<div style="margin-left:2em;">

**3. Discover's compliance department was severely understaffed, lacked the requisite expertise, and suffered from significant turnover.**

</div>

134. While Defendants represented to investors that they devoted significant resources to compliance, in fact the Company's compliance department was critically understaffed. FE 1 recounted that in 2021, the scoping team had just four employees and the testing team had just three employees, and while Discover later increased the scoping team's size from four to six or eight, there was a "lot of turnover" and both teams were chronically understaffed. FE 1 estimated the scoping team alone needed 15 employees to adequately handle the workload. Further, FE 1 noted that while Discover increased the size of the first-line group (though not to an adequate level), those additional members were "just internal transfers who did not have any experience in compliance."

135. FE 4 similarly recounted that Discover was "significantly under-resourced" in compliance.

<div style="text-align:center;">48</div>

136. FE 1 recounted that others, including Michelau, told FE 1 they did not "have budget" for more staffing. Although FE 1 was told staffing would increase "next year," inevitably it did not.

137. FE 1 described how FE 1 and other first-line compliance employees would work up to 80-hour weeks due to lack of staffing: "There were a number of us who were in these horrendous situations."

138. According to FE 1, there were other first-line functions beyond FE 1's testing group. In these other groups, too, there was "a real big problem" of understaffing: "The entire compliance, across the entire Company, first and second line, was understaffed." These other understaffed groups included the "process and control assessment testing" function, which was responsible for correcting compliance failures.

139. FE 1 reported that Discover had a "massive layoff" in the second-line compliance group in early 2023, which did not make sense to FE 1 because the compliance organization was already so understaffed.

140. FE 1 further recounted that there was a lot of turnover in the CRO and chief compliance officer positions. FE 4 likewise recounted that there was an abnormal amount of turnover at the executive compliance level, and while FE 4 was at Discover the Company did not have a "leader who knows how to run a compliance program."

141. Compounding the understaffing problem, Discover hired people who were unqualified to handle the Company's compliance matters. FE 2 recounted that instead of hiring leaders from outside the Company who had experience with addressing compliance problems, the Company frequently hired unqualified candidates from within. Indeed, FE 2's own supervisor had a background "that was not really in risk management." FE 1 similarly observed

49

there "was a tendency toward nepotism," noting, for example, that when Jennifer Rubin recently took over Scott Michelau's role as Vice President, she promoted all of her friends to director positions. FE 4 likewise recounted that Discover failed to put the right resources and structure in place for compliance. In other words, "If it's the wrong people or they are not directed at the right thing, it is not a good investment." FE 4 further noted the Company regularly transferred employees from non-compliance groups and roles to work in compliance: "They put people in compliance positions [who] were shocking to me, just to put a body in there."

142. FE 6 similarly recounted the lack of experience among risk personnel at Discover. During FE 6's last two years at the Company, FE 6's team was responsible for first-line compliance testing. FE 6 noted, "They literally gave me call center agents to do compliance testing." FE 6 explained that Discover needed first-line testing staff who could evaluate business processes and determine whether the Company met its regulatory obligations related to those processes, which the call agents were "not well equipped to do." Indeed, FE 6 added, those call agents comprised the entire BUTM team for the U.S. cards business. FE 6 further noted call agents worked in first-line testing for the consumer banking business, which encompassed student loans, home loans, personal loans, and deposits.

143. FE 4 observed that because Discover did not have the right employees in compliance, there was a "lack of ability within the compliance function." As a result, the business units "did not have confidence in the people in compliance and their understanding of compliance programs—there was no faith that people in those positions knew what they were doing." FE 4 recalled hearing those sentiments repeatedly from the business units. Further, given the lack of compliance acumen at the "second line" of defense, more responsibility was placed on the first line to say whether the business units "met regulatory requirements." That

50

should have been the second line's function; but, according to FE 4, they were not capable of doing so.

144. The understaffing and significant turnover in Discover's compliance department undermined its ability to effectively test for and address compliance-related problems.

145. FE 1 observed regular delays in testing. For example, there was one test using data from the third quarter of 2021 that did not finish until late summer 2022. FE 1 added: "It is not supposed to take that long"; rather, testing should have been completed in three to five months, rather than spanning an "eight, nine, ten-month period." Similarly, FE 1 recounted, the testing team was supposed to plan scripts and begin testing for the fourth quarter of 2021 in the first quarter of 2022; however, the testing team did not even begin to look at the tests until April 2022. These delays affected all of the business units in the bank.

146. FE 1 noted Vice Presidents Scott Michelau and Vesela Zlateva received reports of regular meetings between the first-line scoping and testing teams, where attendees discussed the delays and that first-line testing was "getting cancelled" (which Michelau had to approve). Additionally, FE 1 recounted, the scoping team regularly complained to Michelau and Zlateva about the testing delays. FE 1 further noted the first-line testing team argued that planned testing should be cancelled because "the second line was already testing it," but the first and second lines of testing serve different purposes, and the second line was *also* understaffed.

147. Indeed, FE 1 recounted that the testing team would frequently cancel planned tests due to understaffing. For instance, FE 1 designed a test for compliance with certain regulations the CFPB Consent Orders determined Discover was violating, but the first-line testing team "got the test cancelled because they said they did not have enough resources." FE 1 noted there were "endless examples" of the testing team filing "plan change requests" to cancel

tests due to insufficient capacity. FE 1 further recounted that in addition to the testing unit not having the staffing to run the tests, the relevant business units also frequently "did not have capacity." As FE 1 noted, insufficient staffing is not a "legitimate reason for not conducting necessary testing in the eyes of regulators."

148. To put the understaffing problem in perspective, in its Annual Report accompanying the 2021 Form 10-K, Discover reported that in 2021 it had *$93.7 billion in loans (including $10.1 billion in student loans), $61.9 billion in consumer deposits, and $503 billion in total network volume*. It was virtually impossible for the Company's thinly staffed compliance department to test for and attempt to rectify issues associated with such a massive level of business.

149. Indeed, FE 6 recounted that due to the volume of new products or services the cards or consumer banking businesses were trying to "get out the door," risk personnel could not possibly review everything that needed to be assessed, but instead only performed a "cursory review."

     **4.    Discover had hundreds of unresolved regulatory violations, of which senior management—including Hochschild—was aware.**

150. Discover's lack of appropriate commitment to risk management and compliance—reflected in the numerous structural and performance issues recounted by the well-placed former employees referenced above—resulted in an inordinate number of internal findings of regulatory violations. Senior management long knew about these issues, but failed to timely address them.

151. FE 5 stated that based on the regulatory information presented to the board on a quarterly basis, Defendants had information about the number of open regulatory findings available to them at any given time. FE 5 further observed that Hochschild would have received

those quarterly reports via the main PowerPoint slides and the supplemental information included in the board package, which included an inventory of regulatory findings. In other words, FE 5 noted, "the information was cascaded up for every board report," including newly issued findings, if volumes were going up or down, and trends.

152. FE 5 also recounted that Hochschild was a member of the Compliance Committee, which met more frequently than once a quarter—potentially "seven or nine times a year"—each time for approximately 90 minutes to two hours. FE 5 explained that the Compliance Committee materials included a page of various metrics and disclosures for each Discover product, and the members received the materials in advance of the meetings to allow the Committee members to review the information. FE 5 recalls Hochschild actively participating in Compliance Committee meetings.

153. FE 6 similarly recounted that Hochschild received a "monthly scorecard on risk management activity," which was prepared by the risk group and presented to Hochschild in "monthly business review" meetings. FE 6 noted there were separate monthly review meetings for the U.S. cards business and the consumer banking businesses. FE 6 attended meetings for the U.S. cards business, which also included—in addition to Hochschild—all the vice presidents in that business as well as Capozzi, Michelau, and Rischke, and the head of technology.

154. FE 6 further recounted that the risk scorecard showed "where the remediations were" for the cards business. FE 6 explained that "because our processes caused consumer harm, we showed month over month, how many projects were messed up and caused consumer harm"—specifically, the number of open issues and how many had been closed, as well as delays in closing issues.

155.     FE 6 prepared the portion of the reports addressing risk.  According to FE 6, the reports, which were originally in Tableau format and then PowerPoint as of around the beginning of 2021, were e-mailed to Hochschild before the meetings so he could review them.  FE 6 observed Hochschild reviewing the decks during meetings.

156.     FE 6 recalled that meeting attendees said they did not have enough resources to address issues requiring remediation, as well as statements to the effect of "we do not have the right people with the right skillset" to complete "fixes."  FE 6 noted Hochschild was present when these statements were made.  FE 6 further recounted that Scott Michelau told FE 6 not to even ask for more resources, including during monthly business review meetings, "because you are not going to get it."

157.     Given the extent and frequency of the information they received regarding compliance and risk management issues, Hochschild and other senior executives knew of the serious challenges facing the compliance department—and its failure to meet those challenges.

158.     Indeed, FE 1 recounted that around May 2023, FE 1 was present when Dan Capozzi (President, U.S. Cards) "freaked out" about the number of open regulatory findings at the Company.  FE 1 observed Capozzi "yelling at people in meetings" about the issue.  FE 1 noted that at that time Discover had *more than 250 open regulatory findings*, and a few months earlier there were more than *300*.  According to FE 1, these findings had apparently been known to management "for a long time."

159.     FE 1 specified that during one nine-hour meeting held via Microsoft Teams in May 2023, Capozzi was "screaming at people that if they don't" close the regulatory findings, "it is a fireable offense," and said the findings needed to be closed because "it is a big issue for

Roger [Hochschild]." FE 1 noted Capozzi "heavily implied" that Hochschild knew how many open regulatory findings there were.

160. FE 1 further recounted that senior vice presidents told Capozzi they were hindered in their ability to close regulatory findings because "they did not have the staff or the technology," and that if they devoted resources to closing regulatory findings, other projects would be delayed.

161. FE 1 noted the nine-hour meeting in May 2023 was not the only time senior management and executives complained they did not have sufficient resources to perform important compliance functions; FE 1 recalled Michelau and Vice President Dan Nickele raising similar issues.

**5. Reflecting Defendants' awareness of compliance and control issues at Discover, the Company initiated an effort to address the problems—but then failed to rectify them.**

162. Discover management knew the Company suffered from serious deficiencies with respect to risk management, compliance, corporate governance, and internal controls. But their attempts to address those issues were lackluster—exemplified by the inaptly named "Project Operational Excellence," which was ostensibly intended to address internal control issues but only highlighted how broadly and deeply the Company's problems ran.

163. FE 4 recounted that in 2020, Discover initiated Project Operational Excellence to "clean house" and "make sure all the control deficiencies were identified and reported internally" so they could be "fixed." FE 4 emphasized that the project had the attention of the most senior leadership at the Company. For example, there were "project sponsors" among the executive team, including CRO Brian Hughes.

164. FE 4 explained that Project Operational Excellence involved several steps: *First*, the various business processes at the Company were defined, which entailed specifying the

55

minimum requirements to manage a given process, defining the associated job aids, mapping out systems used in the process, and determining what other procedures were tied to the process. Representatives from various functions—including first-line risk, compliance, the business units, information technology, and others—participated in defining the processes. Each business process had various levels, including offering an account, opening an account, etc. *Second*, the risks associated with the process were identified. *Third*, there was an assessment of what the business needed to do to ensure compliance for the process. And *fourth*, the controls for the process were evaluated.

165. FE 4 estimated there may have been around 100 processes defined and mapped for each of the consumer bank businesses (student loans, personal loans, home loans, deposits, and credit cards). Employees working on the project had to complete a "read-out" of a given process within an assigned number of weeks, before moving to the next process. The read-outs, which were documented in PowerPoint, specified the control gaps identified for a given process. FE 4 noted it was not unusual to have as many as ten control gaps per process, and the number of control gaps "really started to build" across all of the consumer bank by the time FE 4 left the Company in the second half of 2021. All of the control gaps identified through the project were entered into the Archer GRC information system, which resulted in "many things to solve or tackle."

166. FE 6 similarly recounted that Discover identified numerous control gaps through Project Operational Excellence.

167. By the time FE 4 left Discover, the Company had identified "all this information" and control gaps, but did not have a plan for resolving them: "It was more like we have all these gaps. What are we going to do with all this information?" FE 4 noted the project went "down a

very crazy path," meaning the control gaps had been identified but no one seemed to be focused on determining "what direction was needed" next or "what is all this coming to."

168.    Even more alarming to FE 4 was that no one seemed to be addressing "the bigger scope of what do we expect of a compliance program for a control environment."  Indeed, the project seemed to go "way off the rails" because of failed leadership and "tapping into resources for support when we were already stretched thin."

**F.    Defendants' Failure to Establish an Appropriate CMS and the Company's Material Weaknesses in ICFR Invited and Perpetuated the Card Misclassification Scheme.**

169.    Demonstrating Discover's failure to implement and maintain appropriate risk management and compliance systems and practices, as well as its deficient internal controls, the Company misclassified credit card interchange revenues for more than 15 years.

170.    Discover first admitted to the Account Misclassification Scheme in a July 2023 press release stating that the Company "incorrectly classified certain credit card accounts into [its] highest merchant and merchant acquirer pricing tier."[103]

171.    At the time of this initial disclosure, the Company recognized a liability of $365 million "to provide refunds to merchants and merchant acquirers as a result of the card product misclassification."[104]  In its Form 10-K annual report for 2023, filed on February 23, 2024, Discover increased the balance of that liability to $375 million, "reflecting an additional $11 million for the estimated effect of the current price tiering on discount and interchange assessments recorded in each of the third and fourth quarters of 2023."[105]  Just three months

---

[103] Discover July 19, 2023 Press Release.

[104] *Id.*

[105] Discover Form 10-K for year ended Dec. 31, 2023, filed on Feb. 23, 2024, at 130-31.

later, in a quarterly report filed on May 1, 2024, Discover disclosed that it had set aside *$1.2 billion* for liabilities relating to the Card Misclassification Scheme.[106]

172. By way of background, credit card transactions involve several components and participants: (1) the cardholder, who makes the purchase; (2) the merchant; (3) the acquiring bank (i.e., "acquirer"), an intermediary that pays the transaction funds to the merchant; (4) the card processor, which works with the acquirer to process card transactions; (5) the cardholder's issuing bank, which issues the credit card; and (6) the card network.

173. A credit card transaction goes through several steps:

(a) When a Discover cardholder uses a Discover card to make a transaction, the merchant processes the transaction and submits it to the card processor, who in turn submits the transaction to the card network.

(b) Because Discover issues its cards directly to consumers (rather than through third-party banks), it serves as both the issuing bank and the card network.

(c) The card network then processes the transaction, which includes assigning an interchange fee for the transaction. The fee is based primarily on the applicable interchange rate, expressed as a percentage of the transaction amount. Discover assigns an interchange rate and calculates the interchange fee for a transaction.

(d) Discover (as the issuing bank) then charges the full transaction amount to the cardholder's account and sends that amount, less the interchange fee, to the acquirer. For most merchants, the acquirer or processor passes the interchange fee on to the merchant directly in the form of a reduced payment to the merchant on the transaction (for some merchants, the

---

[106] Discover Form 10-Q for quarter ended Mar. 31, 2024, filed on May 1, 2024 ("1Q:24 10-Q"), at 29.

acquirer or processor charges the merchant indirectly for the interchange fee, which also results in reduced payment to the merchant on the transaction).

(e)     Finally, the processor deducts its own fee (a "markup") and the acquirer may deduct its own fee (an "assessment") from the amount received from the issuing bank.  The processor then deposits the remaining amount for the transaction into the merchant's account.

174.    The amount of Discover's interchange fees differs based on the category of cardholder involved in the transaction.  As a general matter, the interchange fees for Discover "commercial" credit cards were higher than the interchange fees for Discover "consumer" credit cards.

175.    As Discover ultimately admitted, since at least 2007 it misclassified certain cardholders into its highest merchant and merchant-acquirer pricing tier, and in doing so charged those merchants higher interchange fees than the Company had represented it would charge them.

176.    Additionally, FE 1 recounted that in September 2023, Scott Michelau and Vice President of Consumer Banking Ed Carlos asked FE 1 to write a policy for the cards business unit regarding account classification.  FE 1 discerned from that meeting that "a huge population of accounts was misclassified."

177.    The policy FE 1 wrote detailed that accounts needed to be properly classified in accordance with a network agreement, and directed employees involved with the interchange fee process to consult the network agreement for information about the classifications and interchange rates.  According to FE 1, *this policy did not exist before September 2023*.

178.    In the wake of Discover's disclosure of its long-running misclassification of credit card interchange fees, during the Company's 2Q 2023 earnings call on July 20, 2023, Hochschild

59

admitted the misclassification issue "underscored *deficiencies in our corporate governance and risk management*." He added, "We're in discussions with our regulators regarding these matters."

179. Hochschild further explained that the proposed consent order Discover had received from the FDIC, which ultimately led to the 2023 FDIC Consent Order, "d[id] not cover the misclassification topic," and that "[w]e believe additional supervisory actions could occur." Hochschild thus acknowledged there could be additional fallout from the misclassification problem. The Company later made this explicit in its Form 8-K disclosing the 2023 FDIC Consent Order: "[T]he consent order does not address the card product misclassification matter disclosed by [Discover] earlier this year. As regulatory review of the card product misclassification matter is ongoing, additional enforcement actions or other supervisory activity from the FDIC and other regulatory agencies remain possible."[107] As the Company continued to increase its anticipated liabilities for its Card Misclassification Scheme, it continued to disclose the likelihood of future enforcement actions.[108]

180. The FDIC continued to investigate the Card Misclassification Scheme. And as noted above, in its 2025 Consent Order the agency found that Discover (i) "*recklessly* engaged in unsafe or unsound banking practices by, among other things, failing to establish and maintain a [CMS] providing for compliance with all applicable consumer protection laws and implementing

---

[107] Discover Form 8-K (Sept. 29, 2023) at Item 8.01.

[108] *E.g.*, 1Q:24 10-Q at 29 ("[T]he Company increased its liability to $1.2 billion through a charge to other expense for the three months ended March 31, 2024, to reflect the total amount the Company now expects is probable to be disbursed in relation to the card product misclassification. The Company remains in discussions with its regulators regarding this matter. The Company expects these discussions will likely result in enforcement actions, which may include, among other remedies, monetary penalties, the amount of which cannot be estimated at this time and could be material.").

regulations," including Section 5 of the FTCA; and (ii) "engaged in violations of, among other things, Section 5 [of the FTCA]," including "related to the classification of certain credit card accounts for purposes of assessing fees in connection with accepting or facilitating payments on the Discover Network"—i.e., the Card Misclassification Scheme.

181. Further, the Federal Reserve found that "during the Relevant Period"—i.e., "from 2007 through at least 2023"—"*senior executives of [Discover] were aware* that numerous Discover consumer credit cards were improperly classified as 'commercial' credit cards and were therefore assessed a higher interchange fee," and "despite this awareness, DFS's senior management failed to take adequate steps to correct the Firm's Discover Card Interchange Fee Practices."

182. The remedial obligations imposed on Discover under the FDIC's 2025 Consent Order further illustrate the extent of the Company's failings. The FDIC has directed that Discover's board must "ensure" that Discover adopts "Account Classification Procedures" that include (1) "clear lines of authority and responsibility for establishing and monitoring adherence to applicable Account Classification Procedures by both" Discover and relevant third parties; (2) "processes for effective risk assessment of Account Classifications"; (3) "processes for timely and accurate reporting related to Account Classification Procedures," including adherence to such procedures by Discover and relevant third parties; and (4) "processes for ensuring proactive and effective compliance with Consumer Protection Laws and Regulations."[109]

183. The FDIC also required Discover to submit to third-party monitoring of its "Account Classification Procedures." Under the 2025 Consent Order, Discover must engage an "independent third party" approved by the FDIC to (1) "assess whether Account Classifications

---

[109] 2025 Amended FDIC Consent Order at 7.

confirm to all Interchange Disclosures"; (2) "assess whether Account Classification Procedures are acceptable and satisfactorily provide (A) clear lines of authority and responsibility for establishing and monitoring adherence to applicable Account Classification Procedures by the Bank and any Third-Party Relationship involved with Account Classification; (B) processes for effective risk assessment; (C) processes for timely and accurate reporting; and (D) processes for ensuring compliance with Consumer Protection Laws and Regulations" (the "AC Assessment"); (3) "identify any inaccuracies in Account Classifications, discrepancies between Account Classifications and any Interchange Disclosures, gaps and/or areas where additional Account Classification Procedures are required or require enhancement," and (4) prepare a written report reflecting the findings of the AC Assessment including recommendations for the Company to address "any inaccuracies, discrepancies, gaps, deficiencies, weaknesses, issues and/or concerns."[110]

184. The FDIC noted the provisions of the Consent Order did not preclude the FDIC or any other federal or state agency or department "from taking any other action against the Bank, any of the Bank's current or former [institution-affiliated parties], or any of their respective directors, officers, employees and agents."[111]

185. The FDIC Consent Orders thus establish that the FDIC had determined as of 2021—*more than two years before the end of the Class Period*—that whatever CMS Discover had implemented was deficient, the Company had violated numerous laws and regulations, and in the 2021 ROE the agency had identified specific "deficiencies and weaknesses."[112]

---

[110] *Id.* at 7-8.

[111] *Id.* at 19.

[112] *Id.* at 7.

186.    Further, given the FDIC's directive that Discover's board must "ensure" that the Company has "clear lines of authority of responsibility for establishing and monitoring adherence to Account Classification Procedures," "processes for effective risk management of Account Classifications," and "processes for timely and accurate reporting related to Account Classification Procedures,"[113] the clear implication is that Discover *had not established* any compliance or risk management systems with respect to the Company's classification of credit card accounts. So, too, with respect to the FDIC's directives that the board must "ensure that the bank has a proactive, effective risk-based ERM Framework," and "establish and maintain Procedures to monitor and regularly evaluate Bank management's adherence to . . . Board expectations" regarding, among other things, "managing consumer compliance risks to stay within the Board's risk appetite parameters and established risk limits."[114] And the FDIC's other directives listed above reflect the agency's official determination that Discover's existing systems, processes, and measures were deficient.

187.    The issues identified in the FDIC Consent Orders are consistent with those detailed by the FEs, including the need to ensure the Company maintains one or more compliance officers "with appropriate experience and expertise," as well as "suitable resources, both staffing and systems," to enable them "to satisfactorily oversee the implementation of the [consumer compliance] Program . . . and assure the Bank's compliance with Consumer Protection Laws and Regulations."[115]

---

[113] *Id.*

[114] *Id.* at 4-5.

[115] *Id.* at 4.

188.     Defendants almost certainly had contemporaneous knowledge of the problems identified in the FDIC's 2021 ROE.  In addition to the FEs' accounts detailing the systemic nature of risk management and compliance problems at Discover and Hochschild's participation on the Compliance Committee—all of which indicate he and others knew about these issues even before the 2021 ROE—the FDIC has explained ROEs "*will . . . be communicated to the Board of Directors and management of the institution*."[116]  An ROE "provides an account of the strengths and weaknesses of a compliance management system"; it "is more than an exception-based document and should add value to the institution's compliance efforts."[117]  Thus, the FDIC's written policies required it to contemporaneously provide the 2021 ROE to Discover's board and senior management, including Defendants.

## VI.     DISCOVER'S CMS AND INTERNAL CONTROL FAILURES, INCLUDING THE CARD MISCLASSIFICATION SCHEME, RENDERED DEFENDANTS' CLASS PERIOD STATEMENTS FALSE OR MISLEADING

189.     In light of the broad, long-running deficiencies in Discover's compliance and risk management organization and practices, their numerous representations to investors touting those very systems and practices were false or misleading when made.

190.     Defendants disseminated both false and misleading statements during the Class Period.  In this regard, while certain of Defendants' statements may have been literally true, Defendants' concealment of the myriad facts detailed in Section V above rendered those statements at least materially misleading.

---

[116] FDIC, *Consumer Compliance Examination Manual*, at II - 1.4 (June 2019), https://web.archive.org/web/20210826105046/https://www.fdic.gov/resources/supervision-and-examinations/consumer-compliance-examination-manual/documents/2/ii-1-1.pdf.

[117] *Id.*

**A.    Discover Materially Misstated Its Financial Results as a Result of the Card Misclassification Scheme.**

191.    Disclosure of the Card Misclassification Scheme has forced Discover to restate certain previously reported financial results.  Specifically, on December 23, 2024, the Company filed its Amended 2023 10-K with the SEC "to amend and restate its audited financial statements and related footnote information as of December 31, 2023 and 2022, and for each of the three years in the period ended December 31, 2023, previously included in its Annual Report on Form 10-K filed with the [SEC] on February 23, 2024."[118]

192.    The Amended 2023 10-K also includes "restated quarterly financial information pertaining to" numerous previously issued resulted included in Discover's quarterly reports filed with the SEC in 2022 and 2023.  Specifically, the Company restated:

a)    **Unaudited condensed consolidated statements of financial condition** as of March 31, 2023, June 30, 2023, and September 30, 2023;

b)    **Unaudited condensed consolidated statements of income, including the related statements of comprehensive income**, for the three months ended March 31, 2023 and 2022, three and six months ended June 30, 2023 and 2022, and three and nine months ended September 30, 2023 and 2022;

c)    **Unaudited condensed consolidated statements of cash flows** for the three months ended March 31, 2023 and 2022, six months ended June 30, 2023 and 2022, and nine months ended September 30, 2023 and 2022; and

d)    **Unaudited condensed consolidated statements of changes in stockholders' equity** for the three months ended March 31, 2023 and 2022, three and six months ended June 30, 2023 and 2022, and three and nine months ended September 30, 2023 and 2022.

193.    The restatement impacted, among other things, the Company's previously reported revenues associated with credit card interchange fees (further detailed below) and its previously reported EPS, as specified below:

---

[118] Amended 2023 10-K at explanatory note.

**Basic EPS**

|  | 1Q 2023 | 2Q 2023 | 3Q 2023 | 4Q 2023 | 2023 |
|---|---|---|---|---|---|
| **Original** | $3.58 | $3.54 | $2.59 | $1.54 | $11.26 |
| **Restated** | $3.50 | $3.49 | $2.21 | $1.45 | $10.71 |
| **Adjusted $** | ($0.08) | ($0.05) | ($0.38) | ($0.09) | ($0.55) |
| **Adjusted %** | -2.23% | -1.41% | -14.67% | -5.84% | -4.88% |

194. In detailing the "Restatement Background" (first in a November 2024 Form 8-K and later in the Amended 2023 10-K), Discover noted that when it first disclosed the card misclassification issue in July 2023, the Company "recognized a liability of $365 million for counterparty restitution that was accounted for as the correction of an error." At that time Discover "determined that the revenue impact was not material to the consolidated financial statements of the Company for any of the impacted periods" and thus "it was not necessary" for Discover to restate any previously issued interim or annual financial statements. But "the cumulative misstatement was deemed material to the three and six months ended June 30, 2023 condensed consolidated financial statements, and therefore, the Company determined that adjustment of the $365 million only through 2023 earnings was not appropriate." Discover accordingly recorded the $365 million liability (which it now refers to as the "Initial Liability") as of June 30, 2023 "with offsetting adjustments to merchant discount and interchange revenue and retained earnings, along with consequential impacts to deferred tax accruals." The Company made "[c]omparable corrections" to all prior periods presented in its Form 10-Qs for the periods ended June 30, 2023 and September 30, 2023, as well as its original 2023 Form 10-K.[119] "As originally reported, the balance of the counterparty restitution liability as of December 31, 2023 was $375 million."[120]

---

[119] Discover Form 8-K (Nov. 25, 2024) at Item 4.02; Amended 2023 10-K at explanatory note.

[120] Amended 2023 10-K at explanatory note.

66

195. The Company subsequently disclosed in its Amended Form 10-Q for the period ended March 31, 2024 "that it had determined to increase its counterparty restitution liability to *$1.2 billion*"—a more than threefold increase—"through a charge to other expense for the three months ended March 31, 2024, to reflect the total amount the Company then expected was probable to be disbursed in relation to the card product misclassification."[121]

196. Further, in connection with its review of Discover's historical financial statements, the SEC "disagreed with" the Company's application of revenue recognition guidance under the Financial Accounting Standards Board's ("FASB") Accounting Standards Codification ("ASC") Topics 605, *Revenue Recognition*, and 606, *Revenue from Contracts with Customers*, "in connection with the Company's measurement of the revenue error and recording of the [$365 million] Initial Liability as of June 30, 2023." Based on its interactions with the SEC, Discover management concluded it needed "to correct the revenue error related to the card product misclassification using the maximum amount agreed to be paid by the Company in restitution in respect of the card product misclassification (excluding interest, legal fees and other concessions)."[122]

197. As a result of (belatedly) accounting for its credit card revenues properly, Discover "will have restated cumulative discount and interchange revenue by a total of *approximately $992 million as of June 30, 2023, and $1,047 million as of December 31, 2023*." The Company is "reclassifying these amounts from revenue (including through adjustments to retained earnings) to a refund liability consistent with ASC 606-10-32-10."

---

[121] Discover Amended Form 10-Q for quarter ended Mar. 31, 2023, filed on Dec. 23, 2024, at explanatory note.

[122] *Id.*

198. Accordingly, on November 25, 2024, the Audit Committee of Discover's Board of Directors concluded that the Company's audited financial statements and unaudited condensed consolidated financial statements referenced in ¶¶ 192-97 above "should no longer be relied upon and should be restated to reflect" the proper accounting (which the Company euphemistically refers to as the "Alternative Approach"). Discover has further directed that "any previously issued or filed reports, press releases, earnings releases and investor presentations or other communications describing the Company's consolidated or condensed consolidated financial statements and other related financial information covering the periods described [above] should no longer be relied upon." The Audit Committee also concluded that the report in the original 2023 Form 10-K by Discover's outside auditor Deloitte & Touche LLP on the consolidated financial statements as of December 31, 2023 and 2022, and for each of the three years in the period ended December 31, 2023, "should no longer be relied upon."[123]

199. By restating these financial results, Discover admitted the previously issued figures constituted *misstatements of material fact*. The FASB provides that the provisions of its Accounting Standards Codification, which is "the source of authoritative general accepted accounting principles (GAAP) recognized by the FASB to be applied by nongovernmental entities,"[124] "need not be applied to immaterial terms."[125]

200. The SEC explains that "[t]he omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have

---

[123] *Id.*

[124] ASC 105-10-05-1

[125] ASC 105-10-05-6.

been changed or influenced by the inclusion or correction of the item."[126]  Discover thus

acknowledged its financial misstatements were material to Discover shareholders.  Indeed, in its

Amended 2023 10-K, Discover explicitly admits it made "a *material* misstatement of the

Company's consolidated financial statements."

### B. Discover's Severe CMS and Control Failures Rendered Numerous Additional Representations False or Misleading.

201.    Discover's CMS and control deficiencies, as well as the ongoing Card

Misclassification Scheme itself, rendered the following statements (in addition to the statements

of financial results specified in ¶¶ 192-97 above) materially false or misleading when made.

### 1. Statements Regarding GAAP Compliance

202.    Under "Basis of Presentation" in Discover's 2022 Form 10-K, the Company

represented that "[t]he accompanying consolidated financial statements have been prepared in

accordance with accounting principles generally accepted in the U.S. ('GAAP')."[127]

203.    Similarly, under "Basis of Presentation" in Notes to the Condensed Consolidated

Financial Statements (unaudited) in Discover's 1Q:22 Form 10-Q, 2Q:22 Form 10-Q, 3Q:22

Form 10-Q, 1Q:23 Form 10-Q, 2Q:23 Form 10-Q, and 3Q:23 Form 10-Q, Discover represented

that "[t]he accompanying condensed consolidated financial statements have been prepared in

accordance with accounting principles generally accepted in the U.S. ('GAAP') for interim

financial information and with the instructions to Form 10-Q and Article 10 of Regulation S-X."

204.    Each of the above statements was false or misleading when made because

Defendants failed to disclose that (a) for approximately 15 years Discover had been

misclassifying revenue associated with interchange fees; (b) as a result of the Card

---

[126] SEC Staff Accounting Bulletin: No. 99 – Materiality ("SAB 99").

[127] 2022 Form 10-K at 85.

Misclassification Scheme, Discover materially misstated its financial results in 2022 and 2023; and (c) Discover engaged in unsafe and unsound banking practices by failing to establish and maintain a CMS that provided for compliance with all applicable consumer protection laws and associated regulations, which allowed the Card Misclassification Scheme to persist during the Class Period. Accordingly, (i) Discover's consolidated financial statements included with its 2022 Form 10-K *were not* prepared in accordance with GAAP; and (ii) the Company's condensed consolidated financial statements included with its Form 10-Qs specified above *were not* prepared in accordance with GAAP for interim financial information or with the instructions to Form 10-Q and Article 10 of Regulation S-X.

### 2. SOX Certifications Regarding No "Untrue" or "Misleading" Statements, as well as "Fairly Present[ing] Financial Information

205. In certifications required by Section 906 of the Sarbanes-Oxley Act of 2022 in Discover's 1Q:22 Form 10-Q, 2Q:22 Form 10-Q, 3Q:22 Form 10-Q, 1Q:23 Form 10-Q, 2Q:23 Form 10-Q, and 2022 Form 10-K, Defendants Hochschild and Greene attested that "[t]he information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company." Greene also made this attestation in Discover's 3Q:23 Form 10-Q (which was filed after Hochschild resigned as CEO).

206. Hochschild and Greene likewise attested in certifications in Discover's 2022 Form 10-K that:

- "*Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*"; and

- "*Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the*

70

***financial condition, results of operations and cash flows of [Discover] as of, and for, the periods presented in this report*.**"

207. Each of the above statements was false or misleading when made because Defendants failed to disclose that (a) for approximately 15 years Discover had been misclassifying revenue associated with interchange fees; (b) as a result of the Card Misclassification Scheme, Discover materially misstated its financial results in 2022 and 2023; and (c) Discover engaged in unsafe and unsound banking practices by failing to establish and maintain a CMS that provided for compliance with all applicable consumer protection laws and associated regulations, which allowed the Card Misclassification Scheme to persist during the Class Period; and (d) the Company's ICFR suffered from material weaknesses that led to a material misstatement of the Company's consolidated financial statements. Accordingly, (i) contrary to Hochschild's and Greene's certifications, Discover's Form 10-Qs and Form 10-K specified above ***did not*** "fairly represent[], in all material respects," the Company's financial condition, results of operations, and cash flows; and (ii) also contrary to their certifications, the Company's 2022 Form 10-K ***did*** "contain . . . untrue statement[s] of a material fact or omit[ted] to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the [subject] period."

### 3. Statements Regarding Interchange Revenue

208. For the same reasons, the representations in Discover's 2018, 2019, 2020, 2021, and 2022 Form 10-Ks regarding "Discount and Interchange Revenue"—specifically, that "***[c]ontractually defined per-transaction fee amounts typically apply*** to each type of transaction processed and are recognized as revenue at the time each transaction is captured for settlement"—were false or misleading when made. In fact, Discover's discount and interchange

71

revenue in material respects *did not* consist of "contractually defined per-transaction fee amounts," as the Company was *violating* those contractual provisions.

### 4. SOX Certifications Regarding Discover's ICFR

209. Throughout the Class Period, Discover represented in its Form 10-Ks that management "assessed the effectiveness of [Discover's] internal control over financial reporting" as of each annual reporting period and in making that assessment, "used the criteria set forth in" COSO 2013. The Company further represented that "[b]ased on management's assessments and those criteria, management has concluded that our internal control over financial reporting *was effective* as of December 31, [2018, 2019, 2020, 2021, and 2022]."

210. Additionally, each of the Company's Form 10-Ks and Form 10-Qs filed during the Class Period contained SOX certifications, signed by Hochschild (until his departure in August 2023) and either Graf or Greene, that addressed the Company's ICFR.[128] In each of those filings, the Officer Defendants certified that they were "responsible for establishing and maintaining disclosure controls and procedures" and "internal control over financial reporting," as defined in applicable SEC rules, and that they:

- "*Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*"; and

- "*Disclosed in this report any change in [Discover]'s internal control over financial reporting that occurred during [Discover]'s most recent fiscal quarter (the [Company]'s fourth fiscal quarter in the case of an annual*

---

[128] Hochschild and Graf signed the SOX certifications for Discover's 2018 Form 10-K (filed on February 20, 2019) and for its 1Q 2019 and 2Q 2019 Forms 10-Q (filed on May 2 and August 1, 2019, respectively). Hochschild (until his departure in August 2023) and Greene signed the SOX certifications in Discover's Form 10-Qs and 10-Ks during the remainder of the Class Period.

*report) that has materially affected, or is reasonably likely to materially affect, the [Company]'s internal control over financial reporting*."

211. Additionally, the Officer Defendants represented that they "disclosed, based on [their] most recent evaluation of [ICFR], to [Discover]'s auditors and the audit committee of [Discover]'s board of directors (or persons performing the equivalent functions)":

- "*All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect [Discover]'s ability to record, process, summarize and report financial information*"; and

- "*Any fraud, whether or not material, that involves management or other employees who have a significant role in [Discover]'s internal control over financial reporting.*"

212. As Discover has now admitted, however, its ICFR suffered from "material weaknesses . . . that led to a material misstatement of the Company's consolidated financial statements" with respect to credit card interchange revenues. Based on "the existence of these material weaknesses," the Company "concluded [it] did not maintain effective internal control over financial reporting" as of December 31, 2023. Management "also concluded that the Company's disclosure controls and procedures were not effective as [of] December 31, 2023, because of these material weaknesses in its [ICFR]."

213. Specifically, the Company (1) "did not have controls designed or implemented to ensure that Discover Bank-issued credit cards were placed in appropriate merchant and merchant acquirer pricing tiers ('pricing tiers'), which in turn led to inaccurate revenue recognition"; and (2) "[i]n quantifying the historical revenue error and associated card product misclassification refund liability, the Company selected a methodology which the [SEC] Staff believed to be, and the Company ultimately accepted as, a misapplication of GAAP."

214. These deficiencies existed throughout the Class Period. In this regard, Discover has admitted "[t]his material weakness in the control environment *persisted for an extended*

73

*period of time*" and "contributed to the other weaknesses within [the Company's] system of internal control over financial reporting at the control activity level." Additionally, the well-placed former Discover employees referenced in this Complaint recounted numerous problems plaguing the Company's control functions. Among other things, senior executives were apprised of gaps in internal controls through their implementation of "Project Operational Excellence," but failed to take action to remedy those deficiencies. ¶¶ 162–68. Additionally, as noted above, FE 1 recounted that in September 2023 Scott Michelau and Vice President of Consumer Banking Ed Carlos asked FE 1 to write a policy for the cards business unit regarding account classification, and FE 1 discerned from that meeting that "a huge population of accounts was misclassified." The policy FE 1 wrote detailed that accounts needed to be properly classified in accordance with a network agreement, and directed employees involved with the interchange fee process to consult the network agreement for information about the classifications and interchange rates. According to FE 1, *this policy did not exist before September 2023*.

215. Considering the above facts, each of the Officer Defendants' SOX Certifications during the Class Period was false or misleading when made. Specifically:

(a) Discover's ICFR *were not* "effective," as they suffered from "material weaknesses . . . that led to a material misstatement of the Company's consolidated financial statements" with respect to credit card interchange revenues.

(b) The Officer Defendants *had not* "[d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be designed under [their] supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." To the contrary, as Discover has now admitted, it had

*no* controls "designed or implemented to ensure that Discover Bank-issued credit cards were placed in appropriate merchant and merchant acquirer pricing tiers," which "led to inaccurate revenue recognition"; and the Company "misappli[ed]" GAAP in determining "the historical revenue error and associated card product misclassification refund liability."

      (c)     The Officer Defendants *had not* disclosed to Discover's auditors "[a]ll significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect [Discover]'s ability to record, process, summarize and report financial information."

      (d)     Nor had the Officer Defendants disclosed to the Company's auditors "[a]ny fraud, whether or not material, that involves management or other employees who have a significant role in [Discover]'s internal control over financial reporting."  As the Federal Reserve Board has found, "senior executives of [Discover] were aware that numerous Discover consumer credit cards were improperly classified as 'commercial' credit cards and were therefore assessed a higher interchange fee," yet "despite this awareness, DFS's senior management failed to take adequate steps to correct the Firm's Discover Card Interchange Practices," which caused Discover's merchant customers "monetary harm of approximately one billion dollars."[129] The Officer Defendants, who by their own account were "responsible for establishing and maintaining disclosure controls and procedures" and "internal control over financial reporting," thus committed fraud, which they did not disclose to Discover's auditors.

---

[129] 2025 Federal Reserve Board Consent Order at 3.

**5.      Statements Representing Adherence to Industry Standards and Regulatory Requirements Regarding Risk Management**

216.    In each of its Form 10-Ks filed during the Class Period, which were signed by Hochschild as CEO and either Graf or Greene as CFO, Discover made misrepresentations regarding its risk management standards and policies and similar matters.[130]

217.    Specifically, Defendants represented:

a)      "*The CRM department sets risk management standards and policies that are consistent with the size and complexity of our business, industry practices and applicable legal and regulatory requirements*";[131]

b)      "*Our risk governance framework is implemented such that bank-level risk governance requirements are satisfied as well*";[132] and

c)      "*Our enterprise risk management principles are executed through a risk management framework that is based upon industry standards for managing risk and controls.*"

218.    The foregoing statements were all materially false or misleading when made because, as the FDIC Consent Orders and Discover's admissions demonstrate, the Company had glaring and significant deficiencies in its risk management and compliance framework.  Indeed,

---

[130] These statements, as well as the statements in ¶ 217, are from the Company's 2018 Form 10-K and appear in substantially similar form in the subsequent Form 10-Ks (certain relevant language was altered in subsequent years; those alterations are indicated in footnotes after the relevant text).

[131] This sentence was revised as follows in subsequent Form 10-Ks:  2019 Form 10-K ("The CRM department sets risk management standards and policies that are designed to be consistent with the size and complexity of our business, industry practices and applicable legal and regulatory requirements."); 2020 Form 10-K ("The CRM department oversees the establishment of enterprise-level risk management standards and policies and designs processes that are designed to be consistent with the size and complexity of our business, industry practices and applicable legal and regulatory requirements."); 2021 Form 10-K ("The CRM department (i) oversees the establishment of enterprise-level risk management standards and policies; (ii) oversees the processes that are designed to be consistent with the size and complexity of our business, industry practices and applicable legal and regulatory requirements; and (iii) independently test [sic] business units' compliance with applicable regulatory requirements."); 2022 Form 10-K (same).

[132] "[I]mplemented" is revised to "designed" in the 2019, 2020, 2021, and 2022 Form 10-Ks.

76

the FDIC has found that Discover's CMS did not "provid[e] for compliance with all applicable consumer protection laws and implementing regulations." Among other things, Discover lacked "written policies, procedures, standards, and/or processes . . . designed to prevent, or identify and self-correct violations of Consumer Protection Laws and Regulations and associated consumer harm with internal controls and information systems and internal audit systems *appropriate to the size of the Bank and the nature, scope and risk of its activities*." This is precisely the *opposite* of what Defendants represented to investors. Additionally, when Discover first revealed its more than 15-year practice of misclassifying credit card interchange fees, Hochschild *admitted* that the misclassification "underscored deficiencies in our corporate governance and risk management." ¶ 178. And the Federal Reserve Board has found that Discover "did not have *any* policies, procedures, or other controls to ensure that credit cards were properly classified as 'consumer' or 'commercial' for interchange fee purposes."[133]

219. The regulators' findings are consistent with the contemporaneous accounts of the FEs detailed in ¶¶ 110-68 above, who observed systemic and pervasive deficiencies at Discover. *First*, there was a toxic compliance culture at the Company. *Second*, the Company's risk management framework—highlighted by its "three lines of defense"—was plagued by internal tensions and organizational dysfunction. *Third*, the compliance department was woefully understaffed, lacked the expertise necessary to appropriately perform its functions, and suffered from significant turnover. *Fourth*, Discover had hundreds of unresolved regulatory violations, which caused senior management to "freak out." Hochschild and other senior executives also received regular reports highlighting the number of open regulatory issues. And *fifth*, senior executives were further apprised of gaps in internal controls through their implementation of

---

[133] 2025 Federal Reserve Board Consent Order at 3.

"Project Operational Excellence," but failed to take action to remedy those deficiencies.  ¶¶ 162-68.

220.     Given the above facts, Discover's risk management standards and policies *were not* "consistent with the size and complexity of [its] business, industry practices and applicable legal and regulatory requirements."  In the same respects, Discover's risk governance framework *was not* "implemented such that bank-level risk governance requirements [we]re satisfied as well," and its risk management framework *was not* "based upon industry standards for managing risk and controls."

**6.      Statements Regarding Compliance with Applicable Banking and Consumer Protection Laws**

221.     Defendants continually represented that Discover complied with governing banking and consumer protection laws.  During Discover's 2022 annual shareholders meeting held on May 19, 2022, for example, Hochschild—pointing to "some of the things we're doing this year"—emphasized that "[t]op of the list is our focus on compliance first, which means *we'll continue to strengthen and fine-tune our processes and comply with all the regulations required of a large national bank*."

222.     Additionally, throughout the Class Period Discover publicly disseminated its Code of Conduct (including on its website), and regularly referenced it in SEC filings and other Company documents.  The Code of Conduct stated, among other things:

- "*The Company complies with both the letter and the spirit of fair and responsible banking laws*" (Oct. 23, 2019 version);[134] and

- "*[T]he Company complies with federal and state laws that prohibit unfair, deceptive, or abusive acts or practices*" (2024 version).

---

[134] The version as of December 8, 2020 similarly stated: "*We comply with both the letter and the spirit of fair and responsible banking laws.*"

223.    Those statements were false or misleading when made, considering the facts detailed in Section V above.  In particular, as the FDIC has found, Discover "recklessly engaged in unsafe or unsound banking practices by, among other things, failing to establish and maintain a [CMS] providing for compliance with all applicable consumer protection laws and implementing regulations," including Section 5 of the FTCA.[135]  The FDIC specified that the CMS failed to include:

> written policies, procedures, standards, and/or processes . . ., training, monitoring and resting, audit, and consumer complaint response programs designed to prevent, or identify and self-correct violations of Consumer Protection Laws and Regulations and associated consumer harm with internal controls and information systems and internal audit systems appropriate to the size of the Bank and the nature, scope and risk of its activities.[136]

224.    Additionally, the FDIC has found that Discover "engaged in violations of, among other things, Section 5 [of the FTCA]," including "the unfair acts or practices of the Bank related to" credit card misclassification.[137]  And in imposing a $100 million civil monetary penalty under the Federal Deposit Insurance Act "for the unsafe or unsound practices" relating to the Card Misclassification Scheme, the Federal Reserve Board specified the penalty was imposed "*for a violation of law* for purposes of 26 U.S.C. § 162(f) and 26 C.F.R. § 1.162-21."[138]

225.    The regulators' determinations are consistent with the contemporaneous accounts of the FEs detailed in ¶¶ 110-68 above, whose accounts reveal systemic and pervasive deficiencies at Discover.  *First*, there was a toxic compliance culture at the Company.  *Second*, the Company's risk management framework—highlighted by its "three lines of defense"—was

---

[135] Amended 2025 FDIC Consent Order at 1-2.

[136] *Id.* at 2.

[137] *Id.*

[138] 2025 Federal Reserve Board Consent Order at 4, 8.

plagued by internal tensions and organizational dysfunction. *Third*, the compliance department was woefully understaffed, lacked the expertise necessary to appropriately perform its functions, and suffered from significant turnover. *Fourth*, Discover had hundreds of unresolved regulatory violations, which caused senior management to "freak out." Hochschild and other senior executives also received regular reports highlighting the number of open regulatory issues. And *fifth*, senior executives were further apprised of gaps in internal controls through their implementation of "Project Operational Excellence," but failed to take action to remedy those deficiencies. ¶¶ 162-68.

226.    Given the above facts, contrary to its representations to investors, Discover did not "compl[y] with federal and state laws that prohibit unfair, deceptive, or abusive acts or practices," as it perpetrated the Card Misclassification Scheme for more than 15 years in violation of (at least) federal law.

227.    In the same respects, Discover did not "compl[y] with both the letter and the spirit of fair and responsible banking laws."

228.    Defendants also made representations specifically regarding Discover's CMS. In its 2022 Annual Report following Hochschild's letter, for example, Discover noted it "focused on three key areas to strengthen our CMS over the past few years," including "***strong compliance programs to ensure we understand and follow regulatory requirements, identify potential risks, and put in place robust, effective processes that we regularly monitor and test to be certain they are working as designed***."[139]

229.    Considering the facts detailed above, these statements were false or misleading when made, as Discover did not have "[s]trong compliance programs to ensure [the Company] . .

---

[139] Discover 2022 Annual Report (Mar. 21, 2023) at 10.

. follow[ed] regulatory requirements." As the regulators have found and the FEs confirm, Discover lacked "strong compliance programs," and its CMS was severely deficient. Indeed, the FDIC found that the Company "recklessly engaged in unsafe or unsound banking practices by, among other things, failing to establish a [CMS] providing for compliance with all applicable consumer protection laws and implementing regulations," including "written policies, procedures, standards, and/or processes . . ., training, monitoring and testing, audit, and consumer complaint response programs designed to prevent, or identify and self-correct violations of Consumer Protection Laws and Regulations and associated consumer harm with internal controls and information systems and internal audit systems appropriate to the size of the Bank and the nature, scope and risk of its activities." In this same regard, the Company did not—contrary to its representation to investors—"put in place robust, effective processes."

### C. Defendants' Violation of Item 303 of SEC Regulation S-K Also Rendered Their Statements False or Misleading When Made.

230. Considering the misconduct detailed above, Defendants also violated Item 303 of SEC Regulation S-K (17 C.F.R. § 229.303), which addresses "Management's discussion and analysis of financial condition and results of operations." Item 303 directs that "[t]he objective of the discussion and analysis is to provide material information relevant to an assessment of the financial condition and results of operations of the registrant including an evaluation of the amounts and certainty of cash flows from operations and from outside sources." The discussion and analysis "must focus specifically on material events and uncertainties known to management that are reasonably likely to cause reported financial information not to be necessarily indicative of future operating results or of future financial condition," including "descriptions and amounts of matters that have had a material impact on reported operations, as well as matters that are reasonably likely based on management's assessment to have a material impact on future

81

operations." Each of Discover's Form 10-Qs and Form 10-Ks issued during the Class Period included a section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" (the "MD&As").

231. None of the MD&As disclosed the information detailed in this Complaint regarding the systemic, pervasive, and long-running deficiencies and failures relating to Discover's CMS and internal controls, as well as the Card Misclassification Scheme specifically. Those issues "had a material impact on [Discover]'s reported operations" and were "reasonably likely . . . to have a material impact on future operations." Among other things, these systemic deficiencies and failures—in particular, Defendants' perpetration of the Card Misclassification Scheme for more than 15 years—were reasonably likely to, and did, result in regulatory actions that would have a material effect on Discover's future operating results. They also exposed the Company to significant, negative reputational risk.

232. These problems materially impacted Discover's reported operations and were reasonably likely to materially impact the Company's future operations. Item 303 required Defendants to timely and accurately disclose these issues during the Class Period, but they failed to do so.

## VII. DISCOVER'S CMS AND CONTROL DEFICIENCIES ALSO RESULTED IN SYSTEMIC IMPROPRIETIES RELATING TO STUDENT LOAN SERVICING, WHICH DEFENDANTS CONCEALED FROM INVESTORS[140]

233. Further evidence of Discover's deficient internal controls and risk management is its serious, long-term misconduct with respect to servicing student loans.

234. On September 17, 2010, Discover paid $600 million to acquire Citigroup's student loan division (formally known as the Student Loan Corporation). In doing so, Discover became the loan servicer for more than 800,000 private student loan accounts with a combined balance (at that time) of approximately $4.2 billion.

235. As a loan servicer, Discover was responsible for performing basic services for its borrowers, including providing periodic account statements reflecting the amount due, as well as year-end tax information, and contacting borrowers to collect past-due payments.

236. The risk management and compliance problems detailed above led to pervasive, deficient student loan servicing practices that violated consumer protection laws and regulations. Indeed, FE 3 recounted that "most of the compliance and risk issues" at Discover pertained to the student loan business. And Hochschild has acknowledged the 2020 CFPB Consent Order "was a compliance matter," noting "there is a link between that and the broader focus on our compliance management system."[141]

---

[140] Plaintiffs appreciate that in its March 2025 Order, the Court determined the statements in Section VII.B below were not actionable under Section 10(b) of the Exchange Act. Under the assumption that the Court will not revisit that ruling in evaluating any pleading motion addressed to this Complaint, Plaintiffs include these statements primarily to preserve their appellate rights. In any event, the significant student lending-related misconduct detailed below provides further evidence of Defendants' general failure to set and maintain a proper "tone at the top" or to establish and maintain effective risk management, compliance, corporate governance, and control systems at Discover. These facts thus support—in addition to the facts detailed in Section V above and in Section VIII below—Defendants' scienter with respect to the statements alleged in Section VI above.

[141] Discover 2Q 2023 Earnings Call.

**A.** **Discover's Misconduct Goes Back at Least to 2015, When the CFPB Revealed Significant Improprieties that the Company Agreed to (But Did Not) Rectify, and Continued During the Class Period.**

237.    On July 22, 2015, the CFPB announced that Discover agreed to a consent order with the agency regarding serious issues with the Company's student-loan servicing.  The 2015 Consent Order revealed the Company had been severely deficient in executing its basic duties as a student loan servicer, which harmed thousands of borrowers.  As a condition of the consent order, Discover agreed to refund $16 million to consumers, pay a $2.5 million penalty, and improve its billing, student loan interest reporting, and collection practices to eliminate the misconduct the agency had identified.

238.    The CFPB determined Discover engaged in numerous improper activities, detailed below.

239.    *First*, Discover engaged in deceptive and unfair practices with respect to providing tax information statements to student loan borrowers, which were likely to cause consumers substantial injury.[142]

240.    By way of background, student loan servicers are required to provide borrowers who paid more than $600 in student loan interest during a calendar year with a Form 1098-E specifying the amount of interest paid.[143]  This information is important because the borrower may be able to deduct the interest as an adjustment to income.[144]  A Form 1098-E is only proper for borrowers who have certified that the loan proceeds will be used solely to pay for "qualified

---

[142] 2015 CFPB Consent Order ¶¶ 26-29.

[143] *Id.* ¶ 14.

[144] *Id.* ¶ 11.

higher education expenses."[145]  That certification can be made via a W-9S form or incorporated into other loan documents.[146]

241.     The CFPB found that Discover (1) failed to provide its borrowers with a Form 1098-E unless the borrower had previously submitted a W-9S form; and (2) did not send borrowers the W-9S form unless the borrower requested it, and did not alert borrowers who were lacking a W-9S form about the absence of this document or that its absence would prevent the borrower from receiving a Form 1098-E.[147]  Instead, on the first or second page of borrowers' October or November billing statements in 2011 and 2012, Discover told borrowers they would not receive a Form 1098-E unless they had submitted a W-9S.[148]

242.     This was not a harmless technicality.  Borrowers who did not have a W-9S form on file with Discover would be informed through the Company's website that the qualified interest they paid during the relevant tax year was "$0.00."[149]  This was true even if the borrowers had in fact paid interest on their private student loans.[150]

243.     *Second*, Discover misrepresented the amounts due for thousands of student loan borrowers over several years.

244.     When a loan exits its grace status and enters repayment, the borrower receives a statement reflecting the minimum amount due.[151]  The statements Discover was sending to those

---

[145] *Id.* ¶ 12 (quoting 26 C.F.R. § 1.6050S-3(e)(2)).

[146] *Id.* ¶ 13.

[147] *Id.* ¶¶ 15-16.

[148] *Id.* ¶ 17.

[149] *Id.* ¶¶ 19-20.

[150] *Id.* ¶¶ 21, 25.

[151] *Id.* ¶ 30.

borrowers included "(1) the actual minimum amount due on loans in or approaching repayment and (2) interest accrued on loans that were still in deferment and thus not required to be paid."[152] By including interest accrued on loans that were still in deferment, the account statements Discover provided "substantial[ly] overstate[d]" the minimum payment due in many cases.[153]

245.    The CFPB found that from January 2011 to January 2014, Discover overstated the minimum payment due in approximately 30,000 account statements sent to around 7,000 borrowers, which constituted deceptive acts or practices.[154]

246.    *Third*, the CFPB found that Discover violated applicable regulatory requirements by making thousands of improper phone calls to borrowers, which constituted unfair practices likely to cause substantial injury to consumers.[155]

247.    Specifically, between January 2011 and January 2013, Discover initiated over 150,000 collection calls to the cellphone numbers of student loan borrowers before 8:00 a.m. or after 9:00 p.m. in the time zone of the borrower's address.[156]  Many borrowers received multiple collection calls at "these inconvenient times," and over 1,000 consumers received *dozens* of calls during these prohibited hours.[157]

248.    *Fourth*, the CFPB determined Discover violated the Fair Debt Collection Practices Act ("FDCPA") by failing to provide important information to borrowers regarding loans that had been "charged off" (i.e., written off).

---

[152] *Id.* ¶ 31.

[153] *Id.*

[154] *Id.* ¶¶ 32, 35.

[155] *Id.* ¶¶ 40-41.

[156] *Id.* ¶ 36.

[157] *Id.* ¶ 38.

249. The CFPB reported that more than 6,000 of the student loans Discover had acquired from Citigroup were in charged-off status when Discover purchased them.[158] Although Discover referred some of these defaulted loans to third-party collection agencies, it retained some of the loans for collection.[159] The Company collected on more than 250 of these defaulted loans by making an initial telephone call to the borrowers.[160]

250. Noting Discover was a "debt collector" under the FDCPA with respect to the defaulted loans, the CFPB explained Section 809 of the Act requires debt collectors "to provide consumers with specific information about the amount and source of the debt and the consumers' right to contest the debt's validity."[161] Debt collectors must provide this information "during the debt collector's initial communication with the consumer or in a written debt-validation notice sent within five days of that initial communication."[162]

251. The CFPB found that Discover had failed to provide the required information to the affected borrower during the initial calls or in writing within five days, which violated the FDCPA.[163]

252. As a result of its findings, the CFPB "permanently restrained" Discover from calling consumers at improper times or "[f]ailing to comply with the requirements of the FDCPA."[164] The CFPB further directed that in connection with servicing student loans,

---

[158] *Id.* ¶ 42.

[159] *Id.* ¶ 43.

[160] *Id.* ¶ 44.

[161] *Id.* ¶ 46 (citing 15 U.S.C. § 1692g(a)(1)-(5)).

[162] *Id.* (citing 15 U.S.C. § 1692g(a)).

[163] *Id.* ¶¶ 47-48.

[164] *Id.* ¶ 49(a).

87

Discover "may not misrepresent, or assist others in misrepresenting . . . to consumers" (1) "the minimum periodic payment owed by consumers"; (2) "the amount of interest paid by consumers"; or (3) "any other fact material to consumers concerning the servicing of their loans."[165]  The CFPB also required Discover to take a number of "affirmative actions" to address the improper practices with respect to borrowers' tax forms and account statements.[166]

253.    Additionally, the CFPB ordered Discover to submit "a comprehensive compliance plan designed to ensure that [Discover]'s student-loan-servicing activities comply with the terms of this Consent Order."[167]  And the CFPB directed that Discover's board or a board committee must review the compliance plan before it was submitted to the agency.[168]

254.    The CFPB also ordered that within 30 days of the Consent Order's effective date, Discover must deliver a copy of the order to "each of its board members and executive officers," among others, and that for five years after the effective date, the Company must deliver a copy to "any future board members and executive officers," among others, "before they assume their responsibilities."[169]

255.    Despite the requirements imposed by the 2015 CFPB Consent Order, Discover continued to engage in improper loan servicing practices, including some practices expressly prohibited by the 2015 CFPB Consent Order.  Indeed, the Company's misconduct led to a *second* consent order issued in December 2020, in which the CFPB found the Company had failed to comply with the agency's prior directives.

---

[165] *Id.* ¶ 49(b).

[166] *Id.* ¶ 49(c).

[167] *Id.* ¶ 50.

[168] *Id.* ¶ 53.

[169] *Id.* ¶ 73.

256.     The CFPB examined Discover in September 2017 to assess its compliance with the 2015 CFPB Consent Order."[170]

257.     As recounted in the 2020 Consent Order, also in September 2017 (approximately two years after the 2015 CFPB Consent Order was issued), Discover began migrating its student loan servicing platform to a new system.[171]  FE 3 recounted that the new system was called Finacle, a third-party platform developed by Infosys.  The CFPB noted Discover migrated approximately 1.5 million student loans for 778,000 borrowers to the new system.[172]

258.     Based on its examination of Discover, the CFPB found that the migration to the new system ***resulted in hundreds of issues "that harmed tens of thousands of consumers" and resulted in "numerous" violations of the 2015 CFPB Consent Order*** (referenced in the 2020 CFPB Consent Order as "Consent Order Violations").

259.     The CFPB further found that Discover knew about potential violations of the 2015 CFPB Consent Order but failed to report them to the Bureau during its September 2017 examination, and made "incomplete and misleading" representations to the agency.  Specifically:

- "[Discover] knew shortly after the Migration that many Migration Issues were leading to potential Consent Order Violations";

- "Although [Discover] was aware of potential Consent Order Violations arising from the Migration while Bureau examiners were on-site examining [Discover]'s compliance with the 2015 Consent Order, [Discover] did not report these violations to the Bureau at that time";

- "While Bureau examiners were on-site, [Discover] was also aware of other potential Consent Order Violations that occurred before the Bureau's examination that were unrelated to the Migration," yet "[Discover] did not

---

[170] 2020 CFPB Consent Order ¶ 12.

[171] *Id.* ¶ 9.

[172] *Id.* ¶ 10.

89

report these potential pre-Migration Consent Order Violations to the Bureau while Bureau examiners were on-site"; and

- "[Discover]'s representations to the Bureau during the examination about its compliance with the 2015 Consent Order were incomplete and misleading."[173]

260.   The agency specified that Discover violated the 2015 CFPB Consent Order by making numerous material misrepresentations to consumers.

261.   *First*, in violation of the CFPB's prior directive that "[Discover] 'may not misrepresent . . . the minimum periodic payment owed by consumers,'" the Company "made misrepresentations to more than 100,000 consumers about the minimum periodic payment these consumers owed."[174]  Specifically, Discover either overstated or understated the minimum periodic payments those borrowers owed, which harmed them, as some borrowers "pa[id] more or less than the correct monthly amount" and some "may have become late or delinquent because they could not pay the amount they believed was the minimum amount due."[175]

262.   *Second*, in violation of the CFPB's prior directive that "[Discover] 'may not misrepresent . . . the amount of interest paid by consumers,'" the Company "misrepresented to more than 8,000 consumers" the amount of interest they had paid on their student loans.[176] Specifically, Discover either overstated or understated the amount of interest those borrowers paid by amounts of up to more than $40,000, "which could have impacted consumers' student loan interest deductions by as much as $2,500."[177]  Those misrepresentations "may have caused

---

[173] *Id.* ¶¶ 13-16.

[174] *Id.* ¶¶ 21-22 (ellipsis in original) (quoting 2015 CFPB Consent Order ¶ 49(b)(i)).

[175] *Id.* ¶¶ 24-25.

[176] *Id.* ¶¶ 27, 29 (ellipsis in original) (quoting 2015 CFPB Consent Order ¶ 49(b)(ii)).

[177] *Id.* ¶¶ 31-32.

consumers to claim an inaccurate student loan interest deduction, which could lead to financial harm."[178]

263.    *Third*, in violation of the CFPB's prior directive that "[Discover] 'may not misrepresent . . . any other fact material to consumers concerning the servicing of their loans,'" **the Company "misrepresented multiple other facts material to the terms and servicing of consumers' student loans to more than 390,000 consumers**."[179]  Specifically, Discover falsely represented:

> (a) the amount of interest some consumers owed due to charging incorrect interest rates or incorrectly capitalizing interest, (b) the applicable interest rate, (c) how payments would be allocated by failing to properly apply consumers' payments, (d) the due date, amount due, or whether a payment was past due, (e) repayment information, and (f) the availability of a reward or a discount, among other things.[180]

264.    Those misrepresentations "were material because they related to important facts about consumers' loans that could influence consumers' decisions about their loans."[181]

265.    The CFPB determined Discover's "numerous misrepresentations" violated the 2015 CFPB Consent Order and the Consumer Financial Protection Act.[182]

266.    Additionally, in violation of the 2015 CFPB Consent Order's requirement that Discover provide monetary remediation to borrowers it had called six or more times before 8:00 a.m. or after 9:00 p.m. in their respective time zones, the Company improperly excluded borrowers it had called between January 29, 2014 and July 21, 2015, which affected hundreds of

---

[178] *Id.* ¶ 33.

[179] *Id.* ¶¶ 35-36 (ellipsis in original) (quoting 2015 CFPB Consent Order ¶ 49(b)(iii)).

[180] *Id.* ¶ 38.

[181] *Id.*

[182] *Id.* ¶¶ 26, 34, 39.

individuals.[183] Discover only rectified the situation "more than two years after the 2015 [CFPB] Consent Order was issued, after the Bureau questioned [Discover] about its failure to remediate this population."[184]

267. The CFPB also found that Discover engaged in additional improper practices not previously identified in the 2015 CFPB Consent Order.

268. For example, **Discover withdrew automatic payments from more than 17,000 borrowers' bank accounts without proper authorization**.[185] The improper conduct included withdrawing more than the amount specified in the borrower's billing statement, withdrawing unauthorized automatic payments without providing advance notice to the borrower, and withdrawing the same automatic payment twice.[186] As a result of Discover's actions, borrowers "were deprived the use of their funds and may have incurred [non-sufficient funds] and overdraft charges or other fees."[187]

269. Additionally, Discover cancelled or failed to withdraw automatic payments with respect to 14,000 borrowers without notifying them.[188] As a result, the Company incorrectly placed some of these 14,000 borrowers in delinquency status, caused some of their loans to accrue excess interest, and deprived borrowers of certain interest rate benefits.[189]

---

[183] *Id.* ¶¶ 41-42.

[184] *Id.* ¶ 43.

[185] *Id.* ¶ 48.

[186] *Id.*

[187] *Id.* ¶ 49.

[188] *Id.* ¶ 50.

[189] *Id.* ¶ 51.

270. The CFPB determined the above conduct constituted unfair acts and practices in violation of the CFPA, and violated the Electronic Fund Transfer Act.[190]

271. Considering Discover's numerous violations of law, ***the CFPB required the Company to pay $10 million in consumer redress and an additional $25 million civil penalty***.[191] The 2020 CFPB Order also mandated that Discover, among other things:

- "must consider compliance with the Consent Order in any new initiatives affecting its student loan servicing";

- may not misrepresent, or assist others in misrepresenting, to borrowers (a) the minimum periodic payment owed by student loan borrowers, (b) the amount of annual interest student loan borrowers paid, or (c) "any other fact material to consumers concerning the servicing of their student loans"; and

- may not withdraw payments from borrowers' accounts without authorization, or cancel authorized withdrawals or fail to withdraw payments from borrowers' accounts without providing notice to borrowers.[192]

272. FE 3 recounted that "everyone" at the executive level was "very aware of DSL's [Discover Student Loans] issues." FE 3's observation was based on calls and other conversations FE 3 had with several managers, directors, and vice presidents, who informed FE 3 that they had calls with Hochschild as well as EVP (and President, Consumer Banking) Carlos Minetti regarding student loan issues. Indeed, the managers, directors, and vice presidents specified to FE 3 that they were having a call to discuss the "status of DSL and the [2020 CFPB] consent order." FE 3 further recounted that Hochschild reportedly was involved in some of those calls. FE 3 believes the information discussed on the calls between higher-level managers and

---

[190] *Id.* ¶¶ 54, 60; *see also id.* ¶ 63.

[191] *Id.* ¶¶ 77, 87.

[192] *Id.* ¶¶ 64-69.

Hochschild or Minetti was from the ServiceNow system, a common software used in the loan industry for issues management. In general, FE 3 emphasized, "all the executives were really concerned with what was going on in the student loan business unit."

273. The 2020 CFPB Consent Order was far from the end of Discover's risk management and compliance issues. To the contrary, the Company continued to experience pervasive problems well after the consent order was issued.

274. FE 1 recounted that understaffing impacted efforts to remediate student loan borrowers. FE 1 was involved in "exception handling"—the process of responding to computer program errors—for student loan remediation. To write the processes for that program, FE 1 needed the assistance of "data people" within Discover, but there were not enough. FE 1 accordingly held a call with senior management in which FE 1 pleaded for just two data employees to work with FE 1 on writing those processes. Discover subsequently assigned two people, including Senior Manager of Business Strategy Margaret Winters, to work on the project. But doing so prevented Winters from completing "multiple other procedures that needed to happen," according to FE 1.

275. FE 3 specified that by early 2022, a "backlog" of "400 items"—i.e., "outstanding issues that had to go through restitution and redress"—had developed in the student loan business. FE 3 noted that even with the addition of staff hired from another company, Protiviti, resolving the backlog of open issues was rushed and likely resulted in errors; the "deadline and resources, human capital was not sufficient." Adding to that problem, the remediation process "was really awful," with "not a lot of standardization." FE 3 further observed there was no quality process in place, resulting in delays in executing remediation efforts due to quality personnel taking time "to decide that restitution [wa]s good to go on a particular ticket."

94

According to FE 3, one of the reasons issues in Discover's student loan business persisted for so long was that there were "a lot of problems committing to one plan and executing a plan without changing it a million times." FE 3 believes that as a result of its problematic remediation efforts, Discover "absolutely missed people" whom the Company was required to remediate.

**B.      Discover's Student-Lending Misconduct Rendered Numerous Class Period Statements False or Misleading When Made.**

276.    In earnings calls, presentations, and other forums throughout the Class Period, the Officer Defendants highlighted Discover's purported commitment to compliance efforts— emphasizing, in particular, the extent of the Company's investment in compliance. Those representations were materially false or misleading when made, however, given the facts detailed in ¶¶ 237-75 above.

**1.      Statements Regarding Discover's Investment in Compliance**

277.    On October 22, 2020, Discover held its 3Q 2020 earnings call, in which Hochschild and Greene participated. During the call, an analyst noted "some concern among investors when [the Company] gave guidance earlier th[at] year, pre COVID, that Discover lost its expense discipline," adding, "And that's the reason you guys had, at the time, guided to negative operating leverage was due to years of chronic underinvestment." The analyst asked Hochschild whether he could "speak to [his] confidence level in being able to continue to generate positive operating leverage as we look to the other side of this." Hochschild responded:

> So first, having been here for over 20 years, ***I have to maybe disagree with the phrase chronic underinvestment***. ***I think our investments have been appropriate.*** But at the beginning of the year, we saw an opportunity to invest more. And so I would characterize it that way.

278.    Hochschild's disagreement "with the phrase chronic underinvestment," and his statement that "I think our investments have been appropriate," were materially false or misleading when made because for years Discover failed to make critical investments in

95

compliance and risk management, including investments necessary "to establish and maintain a compliance management system [] providing for compliance with Consumer Protection Laws and Regulations." ¶ 98. Indeed, Hochschild and Greene have since *admitted* the Company "*underinvested* [in compliance]." ¶ 24.

279. Additionally, Hochschild's representations regarding Discover's "appropriate" investment in compliance were directly undermined by the FDIC Consent Orders and revelations at the end of the Class Period, which confirm the Company's risk management and corporate governance framework suffered from significant gaps and deficiencies. Among other things, the FDIC determined Discover "recklessly engaged in [] unsafe and unsound banking practices by . . . *failing to establish and maintain* a compliance management system for providing for compliance with Consumer Protection Laws and Regulations." ¶ 96. Additionally, Defendants *admitted* that Discover's more than 15-year practice of misclassifying credit card interchange fees "underscored deficiencies in our corporate governance and risk management." ¶ 178.

280. The facts detailed in the 2020 CFPB Consent Order further illustrate the significance and pervasiveness of Discover's compliance, risk management, and internal control deficiencies, which at the very least rendered Hochschild's positive statements regarding investment in compliance materially misleading. The CFPB detailed widespread, systemic practices that affected thousands—in some cases, hundreds of thousands—of student loan borrowers. Further, the 2020 CFPB Consent Order resulted in part from Discover's *failure to comply* with obligations of which it was aware from the 2015 CFPB Consent Order. The 2020 CFPB Consent Order, in conjunction with Discover's disclosure in June 2022 that "student loan servicing practices and related compliance matters" led to an internal investigation and the

suspension of the Company's share repurchase program, demonstrate the extent of Defendants' compliance failures. ¶¶ 255-70.

281. Information provided by the former Discover employees detailed in ¶¶ 110-68 above also contradicts Hochschild's representations. The FEs recounted numerous issues plaguing the Company's compliance, risk management, corporate governance, and internal control functions. *First*, there was a toxic compliance culture at Discover. *Second*, the Company's ERM framework—highlighted by its "three lines of defense"—was plagued by internal tensions and organizational dysfunction. *Third*, the compliance department was woefully understaffed, lacked the expertise necessary to appropriately perform its functions, and suffered from significant turnover. *Fourth*, Discover had hundreds of unresolved regulatory violations, which caused senior management to "freak out." Hochschild and other senior executives also received regular reports highlighting the number of open regulatory issues. And *fifth*, senior executives were further apprised of gaps in internal controls through their implementation of "Project Operational Excellence," but failed to take action to remedy those deficiencies.

282. During the 22nd Annual Crédit Suisse Virtual Financial Services Forum on February 25, 2021, Greene was asked about Discover's guidance on expenses for 2021 and his "views on operating efficiency, how they evolved over the last year and how we should kind of think about that going forward." Greene responded:

> [W]hat we are going to do is manage the business efficiently. ***And so by that, I mean, is a real focus on corporate cost and those dollars that aren't directly attributable to our ability to grow or our ability to grow in a compliant way. So we're a regulated financial services institution. We're going to put money into risk and compliance as we want to.***

283. Greene's statement that, as "a regulated financial institution," Discover was "ab[le] to grow in a compliant way" was materially false or misleading when made because, as

97

he later **admitted**, the Company "historically underinvested" in compliance, experienced "perennial issues in [its] ability to service [its student loan] portfolio," and had "internal systems capabilities [that] weren't on par with what a professional servicing organization could do." ¶ 24. Nor did the Company "grow in a compliant way." Among other things, the FDIC determined Discover "fail[ed] to establish and maintain a compliance management system [] providing for compliance with all applicable consumer protection laws and implementing regulations." ¶ 98. This included failing to provide "written policies, procedures, standards, and/or processes [ ], training, monitoring and testing, audit, and consumer complaint response programs designed to prevent, or identify and self-correct violations of Consumer Protection Laws and Regulations." *Id.* Additionally, Defendants **admitted** in the wake of disclosing Discover's more than 15-year practice of misclassifying credit card interchange fees that the misclassification "underscored deficiencies in our corporate governance and risk management." ¶ 178. The 2020 CFPB Consent Order, in conjunction with Discover's disclosure in June 2022 that "student loan servicing practices and related compliance matters" led to an internal investigation and the suspension of the Company's share repurchase program, also demonstrated the extent and seriousness of Defendants' compliance failures. ¶¶ 353-54.

284. Further underscoring its prior underinvestment in compliance, after Discover disclosed the September 2023 FDIC Consent Order and the Card Misclassification Scheme, the Company announced significant expense increases related to risk management and corporate governance. For example, during the Company's September 12, 2023 analyst conference call, Greene stated "so from 2021, when we [sic] first begin how can we involve the investment in risk and compliance, we've invested an incremental $300 million." One month later, on October 19, 2023, Greene told analysts that for 3Q 2023 "[t]otal operating expenses were up $86 million

year-over-year . . . and up 4% from the prior quarter," which was "driven primarily by investments in our compliance and risk management programs."

285. Discover's numerous gaps and deficiencies in risk management, compliance, corporate governance, and internal controls are further detailed by well-placed former employees with firsthand knowledge. ¶¶ 110-68. These contemporaneous facts likewise undermined Greene's representations during the financial services forum.

### 2. Statements Regarding Discover's Compliance with Applicable Laws and Regulations

286. As discussed above, during Discover's annual shareholder meeting on May 19, 2022, Hochschild emphasized "some of the things we're doing this year" and highlighted "*our focus on compliance first*, which means *we'll continue to strengthen and fine-tune our processes and comply with all the regulations required of a large national bank*."

287. While Hochschild's statement was materially false or misleading considering Discover's severe CMS and internal control deficiencies and the related Card Misclassification Scheme (*see* ¶¶ 72-232), it also misled investors by concealing the Company's legal violations related to student lending.

288. Indeed, at this time Hochschild almost certainly knew the FDIC's 2021 ROE included findings that Discover, among other things, suffered from systemic compliance gaps and failures, rendering it unable to reasonably ensure compliance with consumer protection laws and regulations. ¶¶ 96-100. Hochschild, like Greene, was also in a position to know the Company "historically underinvested" in compliance. Indeed, Hochschild admitted as much in July 2023 when he acknowledged "we underinvested [in compliance] and that's something I take accountability for." ¶ 24.

289. Discover's numerous gaps and deficiencies in risk management, compliance, corporate governance, and internal controls are further detailed by well-placed former employees with firsthand knowledge. ¶¶ 110-68. These contemporaneous facts likewise undermined Hochschild's representations during the annual shareholder meeting.

290. For these same reasons, Hochschild's attempt to downplay any compliance issues as simply warranting "fine-tun[ing]" of "[Discover's] processes" was materially false or misleading, as was his representation that the Company would "continue to . . . comply with all the regulations required of a large national bank."

291. Additionally, in a March 21, 2023 letter to shareholders accompanying Discover's 2022 Annual Report, Hochschild emphasized that the Company "*invested significantly in key areas of our business*" to, among other things, "*strengthen compliance*"; and in its 2022 Annual Report following Hochschild's letter, Discover noted it "*focused on three key areas to strengthen our CMS over the past few years*," including "*[s]trong compliance programs to ensure we understand and follow regulatory requirements, identify potential risks, and put in place robust, effective processes that we regularly monitor and test to be certain they are working as designed*," and "*[i]dentifying and solving problems before customer harm happens, or when mistakes do occur, find the root causes, fix them quickly and prevent them from happening again.*"

292. The above statements were materially false or misleading when made because they concealed Discover's systemic and pervasive risk management, compliance, corporate governance, and internal control failures. These included (1) Discover's "fail[ure] to establish and maintain a [CMS] providing for compliance with Consumer Protection Laws and Regulations," as the FDIC found; (2) the admitted "deficiencies in [Discover]'s corporate

100

governance and risk management" that allowed for and perpetuated the Card Misclassification Scheme; and (3) Discover's unlawful practices with respect to student loans, as detailed in the CFPB Consent Orders, which in part caused the Company to engage in a "broader focus on our compliance management system" and once again suspend its share buyback program, as disclosed in July 2023. ¶¶ 98, 178, 236. Discover's numerous gaps and deficiencies in risk management, compliance, corporate governance, and internal controls are further detailed by well-placed former employees with firsthand knowledge. ¶¶ 110-68. These contemporaneous facts likewise undermined Hochschild's statements in his letter to shareholders and Discover's representations in the 2022 Annual Report.

### 3. Statement Relating to Share Buyback Suspension

293. During the Crédit Suisse 24th Annual Financial Services Forum on February 14, 2023, an analyst asked about Discover's "targeted capital levels" and how it saw those levels "evolving over time," given that the Company "paused [its] capital return for a portion of 2022," i.e., suspended its share repurchase program. Greene responded:

> Yes, so, what we've historically said is we would—we had a target of 10.5% and we've been persistently higher than that. In 2022, we put forward a really, really robust plan in terms of return of capital. We are executing on that very, very well, and then we had to pause at the end of the second quarter into the third quarter. ***Fortunately, we got that behind us.*** At the end of the year, I believe we had $2.8 billion remaining on our authorization, and the plan is to execute on that authorization in the first quarter of '23 and into the second quarter of '23. Then, we'll share a proposal with our Board. The expectation is that we'll continue to maintain our capital allocation priorities. So first, investment in organic growth; second, return excess capital to shareholders; and then third, if there's some sort of bolt-on M&A, we'll look at it. But no major changes in the priorities.

294. Greene's statement that "Fortunately, we got that behind us" was materially false or misleading when made because the July 2022 share buyback suspension, according to the Company's own statements, was specifically tied to "student loan servicing practices and related compliance matters," an issue that was not in fact "behind [the Company]" in February 2023 or

101

even today. Indeed, as recently as January 18, 2024, Greene disclosed that Discover had incurred an additional $80 million charge "related to servicing issues," the "lion's share" of which "related to student loans."

295. Greene's representation further concealed Discover's chronic and persistent compliance failures, including (1) the FDIC's determination that Discover "fail[ed] to establish and maintain a [CMS] providing for compliance with Consumer Protection Laws and Regulations"; and (2) Discover's unlawful practices with respect to student loans, as detailed in the CFPB Consent Orders, which in part caused the Company to engage in a "broader focus on our compliance management system" and once again suspend its share buyback program, as disclosed in July 2023. ¶¶ 98, 236. Discover's failures with respect to risk management, compliance, corporate governance, and internal controls are further detailed by well-placed former employees with firsthand knowledge. ¶¶ 110-68. These contemporaneous facts likewise undermined Greene's statements during the forum.

## VIII. DISCOVER AND THE OFFICER DEFENDANTS MADE THEIR MISREPRESENTATIONS KNOWINGLY OR WITH RECKLESS DISREGARD FOR THE TRUTH

296. The facts detailed in Sections V and VII.A above, in conjunction with the additional indicia of scienter discussed in ¶¶ 298-322 below, collectively demonstrate that throughout the Class Period, Discover and the Officer Defendants knew the statements identified in Sections VI and VII.B were materially false and misleading when made. At the very least, these Defendants were severely reckless in disregarding the falsity of those statements.[193]

---

[193] For ease of reference, Plaintiffs sometimes use "falsity" to encompass both affirmative falsehoods and misleading statements.

297. In this regard, these Defendants knew their statements would be issued and disseminated to the investing public, knew analysts and investors were likely to rely upon those misrepresentations and omissions, and knowingly and recklessly participated in the issuance and dissemination of those statements. Indeed, the ongoing fraud detailed in this Complaint could not have been perpetrated without the knowledge or recklessness of personnel at the highest level of the Company, including the Officer Defendants.

298. Numerous facts and inferences demonstrate these Defendants' scienter, as summarized below.

### A. Regulatory Findings

299. The regulators' findings with respect to the Card Misclassification Scheme strongly indicate the Officer Defendants knew or recklessly disregarded the long-standing and pervasive misconduct at the Company. Specifically:

(a) The Federal Reserve Board has found that "*senior executives of [Discover] were aware* that numerous Discover consumer credit cards were improperly classified as 'commercial' credit cards and were therefore assessed a higher interchange fee," but "*despite this awareness*, *[Discover's] senior management* failed to take adequate steps to correct [Discover's] Discover Card Interchange Fee Practices."

(b) The Federal Reserve Board also determined the card misclassification misconduct impacted millions of credit cards. It found that "at the end of 2022, [Discover] had classified approximately *five million* 'consumer' credit cards as 'commercial,' and approximately *98%* of those cards were 'consumer' cards that were misclassified." The magnitude of the misclassifications, as well as the more than 15-year duration of this misconduct—from 2007 through 2023—indicates the Officer Defendants were aware of it.

103

Otherwise, these senior executives were reckless in disregarding such significant and long-running impropriety occurring on their watch.

(c)     The Federal Reserve Board further found that Discover improperly charged merchant customers higher interchange fees "*for the purpose of increasing [Discover]'s revenues*." This finding strongly indicates the card misclassification was done *intentionally* to artificially inflate Discover's revenues.

(d)     The FDIC has found, based at least in part on investigations it conducted during the Class Period, that Discover "recklessly engaged in unsafe or unsound banking practices by, among other things, failing to establish and maintain a [CMS] providing for compliance with all applicable consumer protection laws and implementing regulations," and violated governing law in misclassifying credit card accounts for purposes of assessing interchange fees.

### B.     Discover's Admissions Regarding Integrity and Internal-Control Material Weaknesses

300.     Discover's recent admissions in connection with the Card Misclassification Scheme strongly indicate scienter. Specifically:

(a)     Discover admitted it "did not maintain an effective control environment, as *the Company did not demonstrate an appropriate commitment to integrity and ethical values*, specifically in the approach to evaluating and addressing the card product misclassification." The Company further acknowledged "this control deficiency constitutes a material weakness," which "*persisted for an extended period of time*" and "contributed to the other weaknesses within our system of internal control over financial reporting at the control activity level." Discover thus effectively acknowledged the Card Misclassification Scheme did not involve mere mismanagement or even negligence, but rather reflected a failure of "integrity

104

and ethical values." While Discover (like most companies that engage in malfeasance) did not outright admit fraud, the message was clear: the Card Misclassification Scheme involved *intentional* misconduct.

(b)     The Company also admitted it "did not have controls designed or implemented to ensure that Discover Bank-issued credit cards were placed in appropriate merchant and merchant acquirer pricing tiers . . ., which in turn led to inaccurate revenue recognition." Indeed, while the Company did not expressly admit it, as noted above the Federal Reserve Board has found the Company did so "for the purpose of increasing [its] revenues."

(c)     Additionally, Discover admitted that "[i]n quantifying the historical revenue error and associated card product misclassification refund liability, the Company selected a methodology which the [SEC] Staff believed to be, and the Company ultimately accepted as, a misapplication of GAAP." The Company further disclosed that "[t]he deficiency related to the misapplication of GAAP is specific to the historical quantification of revenue and refund liability associated with the card product misclassification." While GAAP violations might not, *standing alone*, suggest fraud, they are probative of scienter where, as here, other indicia of fraud are present. This is especially so because Discover's GAAP violations relate to fundamental aspects of the Company's financial performance, including revenues.

### C.     Discover's Restatement of Previously Issued Financial Results

301.    Discover's restatement of previously issued financial results due to the Card Misclassification Scheme further indicates Defendants' scienter. While a restatement might not, standing alone, suggest fraud, it is probative of scienter where, as here, other indicia of fraud are present. Further, the restatement was in connection with a more than 15-year-long practice that Discover has admitted was improper and regulators have found violated the law, and this

105

misconduct allowed Discover to artificially inflate its revenues. Indeed, the Federal Reserve Board determined this was the very "purpose" of the misclassification.

302. That the restatement resulted from admitted material weaknesses in Discover's ICFR also indicates Defendants knew or recklessly disregarded that the misclassification was occurring and that it caused Discover's financial results to be materially misstated.

**D.**     **Hochschild's Resignation, which Discover Acknowledges Related to the Card Misclassification Misconduct**

303. The timing and circumstances surrounding the unexpected departure of the Company's CEO, Hochschild, in August 2023 further support an inference of scienter. During the Company's August 17, 2023 Business Update Call with analysts, Interim CEO John Owen conceded the connection between Hochschild's departure and Discover's pervasive risk, compliance, governance, and control failures, stating, "I think given the regulatory environment and the consent orders we're facing, it's time to make some changes in the management."

304. Analysts and the financial press also understood that Hochschild's sudden departure was both involuntary and directly related to Discover's compliance issues and related problems. For example, during the August 17, 2023 Business Update Call, an analyst with Wolfe Research stated to Owen, "*[Hochschild's] departure was certainly seen as abrupt*," and asked, "Can you give any color on perhaps the extent to which his departure might have been influenced by a lack of tolerance among regulators in this environment following the March [2023] bank failures and perhaps this is just a reflection of greater urgency that regulators want to impress on the banks that they supervise?" to which Owen responded, "it's really directed by the Board from the Board, not from the regulators." Additionally, on August 21, 2023, *Crain's Business Chicago* wrote that during Discover's "business update," Owen "made clear Hochschild was leaving because of troubles with compliance." And on August 24, 2023, S&P

106

Global Ratings stated it "believe[d] the recently announced CEO transition at [Discover] underscores compliance issues at the company."

305. Indeed, Discover has now acknowledged that Hochschild's departure related to the Company's card misclassification improprieties. Earlier this year, the Company amended its 2023 Form 10-K to state that "[a]s of December 31, 2023, the Company is continuing its remediation efforts to reemphasize our commitment to integrity and ethical values in our control environment, including" by having "appointed new individuals in key roles *including the Chief Executive Officer* and other leadership roles." The implication of this statement is twofold: *first*, that the Company had determined Hochschild's resignation was necessary to "remediate" the card misclassification misconduct, and *second*, that he was responsible (at least in part) for the lapses of "integrity and ethical values in [the Company's] control environment."

> **E. The Detailed Contemporaneous Accounts Provided by FEs Who Worked Closely on Risk Management, Compliance, and Internal-Control Matters During the Class Period**

306. The detailed accounts by former Discover employees also strongly indicate the Officer Defendants knew, or at least recklessly disregarded, the significant risk management, compliance, corporate governance, and internal-control problems at the Company. The FEs, each of whom worked at Discover in compliance or related departments for some or all of the Class Period, recounted that (1) there was a toxic compliance culture at Discover; (2) the Company's ERM framework—highlighted by its "three lines of defense"—was plagued by internal tensions and organizational dysfunction; (3) the compliance department was woefully understaffed, lacked the expertise necessary to appropriately perform its functions, and suffered from significant turnover; (4) the Company had hundreds of unresolved regulatory violations, of which senior management was aware; and (5) senior executives were further apprised of gaps in internal controls through their implementation of "Project Operational Excellence," but failed to

107

take action to remedy those deficiencies. ¶¶ 110-68. The FEs' accounts, which are consistent with each other and with the regulators' findings, are probative of fraud, and do not suggest mere mismanagement or negligence.

    **F.  The Centrality of Risk Management, Compliance, and Internal Controls to Discover's Business Operations and Financial Results**

  307. The centrality of risk management, compliance, and internal controls to Discover's business indicates the Officer Defendants knew about significant problems in those areas. As Discover operates in a heavily regulated industry, risk management, compliance, and internal controls are among the Company's core operations. Indeed, as noted by Kwabena Poku, Discover's Vice President, Enterprise, Operational, and Model Risk Management, "Risk management is embedded in everything we do." Further, Hochschild stated in the Company's 2022 ESG Report that "having strong governance and risk management *is critical*." The Officer Defendants also knew these core operations significantly impacted Discover's required financial reporting and were important to analysts and investors, as evidenced by numerous references in Defendants' public statements during the Class Period.

  308. The importance of these issues to the Company is underscored by the Officer Defendants' repeated emphasis—in SEC filings and other public statements—on Discover's purported commitment to, and investment in, compliance and risk management. That the Officer Defendants focused attention on risk management matters during their calls with analysts also indicates they acted with scienter.

  309. Further, the Officer Defendants' detailed and continual pronouncements on risk management and compliance provide strong evidence that they were receiving specific information about the Company's efforts (or lack thereof) on these matters. Alternatively, if the Officer Defendants did not know about the widespread, long-standing, and significant problems

related to the Company's deficient CMS, risk management processes, and internal controls, they were at least reckless in disregarding them.

### G.    The Officer Defendants' Attestations in SOX Certifications

310.    The Officer Defendants' SOX certifications indicate they knew about or recklessly disregarded the issues detailed in this Complaint, at least with respect to the material weaknesses in ICFR that led to and perpetuated the Card Misclassification Scheme. Additionally, Discover's public filings confirm that management assessed the Company's ICFR during the Class Period under COSO 2013, ¶ 209, a framework that, by definition, includes an evaluation of "[v]iolations of laws or governmental regulations that could have a material direct or indirect impact on the external financial reports."[194]  Discover later admitted to a "material weakness in [its] control environment" that "persisted for an extended period of time."

311.    SOX's certification requirements were designed to prevent senior executives from adopting a "head in the sand" defense to securities fraud committed on their watch.  SOX required the Officer Defendants to evaluate Discover's ICFR and perform an inquiry sufficient to enable them to attest that the Company's financial statements were fairly presented—which, as the SEC has directed, includes making any disclosure "necessary to provide investors with a materially accurate and complete picture of an issuer's financial condition, results of operations and cash flows."[195]  Further, the Officer Defendants repeatedly represented to investors that management, in fact, made such evaluations into the Company's ICFR:  "[b]ased on *management's assessments* and [the COSO 2013] criteria, management has concluded that our internal control over financial reporting was effective as of December 31, [2018, 2019, 2020,

---

[194] COSO, *Internal Control – Integrated Framework* (May 2013), at 79.

[195] SEC Release No. 8124, 67 Fed. Reg. 57276, at 57279.

2021, and 2022].”[196] It is therefore evident, particularly in light of all the other facts suggesting the Officer Defendants' knowledge, that in performing their statutory duties under SOX, the Officer Defendants became aware (to the extent they did not already know) of the major gaps and material deficiencies impacting Discover's ICFR.

312. In other words, if the Officer Defendants evaluated the effectiveness of the Company's ICFR, as they claimed in Discover's Forms 10-K and related SOX certifications (“*our* supervision” and “*our* conclusions”),[197] then the Card Misclassification Scheme could not have occurred at all, or at least could not have persisted during the Class Period.

313. Indeed, the magnitude, scope, and duration of the Company's internal control failures described in this Complaint indicate scienter. Given the statements in the SOX certifications, it is highly probable that Discover's systemic and long-standing ICFR deficiencies occurred without the Officer Defendants' knowledge. Indeed, the Company has admitted that “[t]he material weakness in the control environment” that “contributed to the other weaknesses” within the Company's ICFR “*persisted for an extended period of time*.”

---

[196] *E.g.*, 2022 Form 10-K at 144 (“Management assessed the effectiveness of our internal control over financial reporting as of December 31, 2021. In making this assessment, management used the criteria set forth in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on management's assessments and those criteria, management has concluded that our internal control over financial reporting was effective as of December 31, 2021.”).

[197] *E.g.*, 2022 Form 10-K at Ex. 31 (“The registrant's other certifying officer [i.e., the CEO or CFO] . . . (a) [d]esigned such internal control over financial reporting, or caused such internal control over financial reporting to be *designed under our supervision*, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles; . . . [and] (c) [e]valuated the effectiveness of the registrant's disclosure controls and procedures and presented in this report *our conclusions about the effectiveness* of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation”).

> ### H. Discover's Long-Running and Significant Student-Lending Misconduct

314. The CFPB Consent Orders detailed systemic and pervasive failures in Discover's risk management, compliance, corporate governance, and internal controls that persisted for years. Further, as the executive responsible for maintaining a corporate culture that fostered compliance (i.e., a "tone at the top"), Hochschild either knew of these widespread deficiencies, or if he did not, acted recklessly by exhibiting deliberate indifference to them.

315. The inference of Hochschild's scienter, as well as that of Greene and Graf, is particularly compelling in light of the directives in both the 2015 and 2020 CFPB Orders requiring "timely reporting by management to the Board" and "timely and appropriate corrective action" to "ensure adherence" to the Orders. Further, the fact that Discover repeatedly violated the 2015 CFPB Consent Order—which in part led to the 2020 CFPB Consent Order—indicates senior management did not adhere to those directives. Given the Officer Defendants' indisputable awareness of the CFPB's mandates, it is evident that their failure to comply with them was deliberate.

> ### I. The Officer Defendants' Motive and Opportunity to Commit Fraud

316. In addition to the myriad facts indicating conscious misbehavior or recklessness by Discover and the Officer Defendants, the Officer Defendants—in particular, Hochschild—had the motive and opportunity to commit fraud. As Discover's senior executives, the Officer Defendants had the opportunity to subvert the Company's interests in favor of their own. And, as further detailed in ¶¶ 317-22 below, they did.

317. As reported in Discover's 2019 Definitive Proxy Statement, for example, "a significant portion" of Hochschild's and other executives' annual compensation was "tied" to Discover's EPS and stock price. Specifically, if the Company failed to meet cumulative three-

year EPS targets, those executives would receive none of their awards of performance stock units ("PSUs"), which represented **50% or more** of Hochschild's total compensation during the Class Period. The Officer Defendants thus had a strong financial motive to do whatever they could to increase the Company's EPS and stock price.

318. This motivation explains Defendants' perpetration of the Card Misclassification Scheme. In particular, as a senior executive of Discover from 2004 until 2023—first as the Chief Operating Officer (from 2004 to 2018) and then as CEO—Hochschild was a central figure at the Company when the Card Misclassification Scheme began in 2007 and while it persisted until 2023. Graf and Greene were (and in Greene's case, remain) senior executives with significant financial reporting responsibilities.

319. As discussed above, the improper card misclassification was done, as the Federal Reserve Board found, "for the purpose of increasing [Discover]'s revenues." And as Discover has now admitted, that purpose was realized, as the Company improperly booked revenues based on its misclassification.

320. Artificially inflating revenues allowed Discover to, in turn, report artificially inflated EPS, which personally benefited the Officer Defendants—most notably Hochschild.

321. The Officer Defendants were also motivated to underinvest in compliance, which Hochschild and Greene ultimately admitted the Company did. That underinvestment kept the Company's expenses artificially low and, in turn, caused its EPS to be higher than it otherwise would have been.

322. Further, because stock buybacks increase a company's EPS by reducing the number of publicly traded shares, the Officer Defendants were motivated to initiate and maintain Discover's stock repurchase program while artificially inflating the Company's revenues (as a

result of the Card Misclassification Scheme) and maintaining expenses at artificially depressed levels. In doing so, they contributed to the Company's failure to implement and maintain appropriate risk management, compliance, and corporate governance systems and practices, as well as effective internal controls.

## IX. DEFENDANTS' MISREPRESENTATIONS WERE MATERIAL

323. Defendants' numerous misrepresentations during the Class Period were material, and the information Defendants concealed would have been important to investors in determining whether to invest in Discover stock.

324. *First*, as discussed above (*see* ¶¶ 191-200), by restating certain of its previously issued Class Period financial results, Discover has admitted those results contained **misstatements** of **material** fact. A restatement, by definition, acknowledges that a prior statement was false, and restatements are only warranted where the prior financial misstatement was material.

325. *Second*, Discover's admitted "material weaknesses" in ICFR were, by definition, material. As noted above, in this context a material weakness means "a deficiency, or a combination of deficiencies, in [ICFR], such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis."[198] Reasonable investors plainly would consider a deficiency that could lead to a material financial misstatement significant to their investment decisions. That is especially so where, as here, the material weakness in ICFR stemmed from an admitted "material weakness in the [Company]'s control environment" that "persisted for an extended period of

___

[198] PCAOB, AS 2201: *An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements*, App'x A - Definitions, https://pcaobus.org/oversight/standards/auditing-standards/details/AS2201.

time" and was tied to the Company's failure to "demonstrate an appropriate commitment to integrity and ethical values."

326. *Third*, Defendants highlighted the importance of issues relating to risk management, compliance, corporate governance, and internal controls by repeatedly addressing—and touting—the processes and practices Discover purportedly had implemented and maintained in those areas. Beyond discussing these issues in filings and conferences throughout the Class Period, the Officer Defendants emphasized them to analysts during regularly scheduled calls regarding the Company's business practices, financial condition, and prospects. Indeed, in addition to Defendants' numerous statements detailed above, Dan Capozzi (EVP & President, US Cards) addressed an analyst's inquiry during the KBW Fintech Payments Conference on March 1, 2023, regarding any "regulatory" concerns for the Company:

> **[Analyst:]** Okay. And any other . . . regulatory stuff that you're concerned about?
>
> **[Capozzi:]** Just the continued heightened focus of the regulatory environment on financial services is something I spent a lot of time on, but ***nothing***, and I think it is fair.

Analysts' strong interest in risk management and compliance issues at Discover, and Discover executives' continual assurances to analysts regarding those matters, evidence the importance market participants placed on those issues and demonstrates the materiality of Defendants' representations.

327. *Fourth*, the context in which Defendants made those representations indicates their materiality, including that Defendants intended (or at least expected) analysts and investors would rely on their statements. Defendants did not make statements regarding the importance of compliance to the Company or their commitment to compliance, for example, in a vacuum. Rather, they did so in connection with assuring analysts and investors about Discover's financial

114

stability and prospects—whether in the Company's SEC filings, on earnings calls, or through other means—which depended substantially on the Company's ability to appropriately manage risk and on its compliance with applicable laws and regulations. The context surrounding Defendants' representations rendered it reasonable for investors to rely on those statements. Further, in repeatedly highlighting, in particular, Discover's risk management and compliance, Defendants signaled the extent to which *they* regarded those issues as important to the Company and investors' evaluation of it.

328. *Fifth*, risk management, compliance, corporate governance, and internal controls were core to Discover's operations, rendering Defendants' representations regarding those and related matters material to investors. While those functions arguably are important for any number of businesses, ***they are essential to Discover's very ability to conduct business***. A financial institution such as Discover simply cannot operate effectively without appropriately managing risk; implementing and maintaining sufficient policies and practices to comply with the laws and regulations that govern the banking and student loan industries; and establishing and maintaining appropriate and effective internal controls, including ICFR.

329. Risk management, compliance, corporate governance, and internal controls were even more significant to investors during the Class Period given the CFPB Consent Orders and the 2023 FDIC Consent Order. The agencies' enforcement actions, including their findings of serious failings at the Company, rendered it all the more important for Defendants to implement and maintain sufficient systems, practices, and controls for managing risk, ensuring compliance with legal (including contractual) and regulatory requirements, and promoting proper corporate governance. Amid the revelations of the regulators' findings and ensuing directives, Defendants

115

assured analysts and investors that Discover **had** implemented and **was** maintaining such systems, practices, and controls.

330. *Sixth*, internal controls are critical to a public company and its investors because they are supposed to provide reasonable assurance that the company's reported financial results are materially accurate and that any material fraud is detected. Among other things, SOX emphasizes the importance of internal controls by placing specific obligations on a company's senior executives to meaningfully assess the condition of its ICFR and identify any substantial deficiencies. SOX certifications thus stand as important indicators to investors that senior management has complied with those responsibilities and is presenting "a materially accurate and complete picture of an issuer's financial condition, results of operations and cash flows."[199] By concealing the facts detailed in this Complaint, the Officer Defendants failed to meet those obligations, to investors' detriment.

331. *Seventh*, Defendants' knowledge or reckless disregard of facts undermining their representations indicates those statements, as well as the information Defendants withheld from investors, were material. That Defendants continually chose to mislead the market regarding Discover's ability to manage its risk and comply with legal and regulatory requirements strongly indicates Defendants understood that investors regarded those issues as critical and would rely on statements addressing them.

332. *Eighth*, the market's strong, negative reaction when the previously concealed facts described in this Complaint were publicly revealed demonstrates the importance of those facts to investors, as well as the extent to which investors had relied on Defendants' misrepresentations.

---

[199] SEC Release No. 8124, 67 Fed. Reg. 57276, at 57279.

## X. DEFENDANTS' PURPORTED "CAUTIONARY" LANGUAGE CANNOT IMMUNIZE THEM FROM LIABILITY FOR THEIR MISREPRESENTATIONS

333. None of the purported "risk" disclosures or other "cautionary" language included in Defendants' filings or accompanying certain of their public statements limit or preclude their liability for the false and misleading statements identified in this Complaint.

334. For example, the PSLRA's statutory "safe harbor" applicable to "forward-looking statements" under certain circumstances does not apply to any of Defendants' misrepresentations. Many of these statements were not identified as "forward-looking statements" when made. And to the extent any of the representations identified in this Complaint constitute "forward-looking statements" as contemplated by the PSLRA, they were not accompanied by "meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the forward-looking statement."[200] Such cautions were glaringly absent from Defendants' Class Period statements.

335. Further, there can be no safe harbor protection where the supposed cautionary language remained fixed even as the relevant risks changed. Discover's purported cautionary language remained substantially the same throughout the Class Period, despite changing—indeed, worsening—conditions. The consistency of Defendants' language over time despite the existence of new or evolving information belies any contention that the "cautionary" language was tailored to a specific future projection.

336. This is especially so because the risks addressed in Defendants' "cautionary" statements *had already materialized*. In other words, "'[b]y superficially warning of possible risks while failing to disclose critical facts, [Discover] was akin to someone who warns his

---

[200] 15 U.S.C. § 78u-5(c)(1)(A)(i).

117

hiking companion to walk slowly because there might be a ditch ahead when he knows with near certainty that the Grand Canyon lies one foot away.'"[201]

337. Discover's 2019 Form 10-K filed with the SEC on February 20, 2020, for example, contained the following boilerplate "cautionary" language:

> Our risk management framework seeks to identify and mitigate risk and appropriately balance risk and return. We have established processes and procedures intended to identify, measure, manage, monitor and report the types of risk to which we are subject, including credit risk, market risk, liquidity risk, operational risk, compliance and legal risk, and strategic risk. We seek to monitor and control our risk exposure through a framework of policies, procedures, limits and reporting requirements.

338. This supposed cautionary statement failed to warn the market of the systemic and pervasive failures with respect to risk management, compliance, corporate governance, and internal controls of which the Officer Defendants were aware or recklessly disregarded. Defendants simply repeated this statement (or a substantially similar version) in similar filings for the duration of the Class Period.[202] Cautions cannot be "meaningful" if they merely repeat

---

[201] *Pierrelouis v. Gogo, Inc.*, 2021 WL 1608342, at *11 (N.D. Ill. Apr. 26, 2021) (quoting *In re MF Glob. Holdings Ltd. Sec. Litig.*, 982 F. Supp. 2d 277, 318 (S.D.N.Y. 2013)).

[202] *See also* 2020 Form 10-K at 35 ("Our risk management framework seeks to identify and mitigate risk and appropriately balance risk and return. We have established processes and procedures intended to identify, measure, manage, monitor and report the types of risk to which we are subject, including credit risk, market risk, liquidity risk, operational risk, compliance and legal risk and strategic risk. We seek to monitor and control our risk exposure through a framework of policies, procedures, limits and reporting requirements."); 2021 Form 10-K at 35 ("Our risk management framework seeks to identify and mitigate risk and appropriately balance risk and return. We have established processes and procedures intended to identify, measure, manage, monitor and report the types of risk to which we are subject, including credit risk, market risk, liquidity risk, operational risk, compliance and legal risk and strategic risk. We seek to monitor and control our risk exposure through a framework of policies, procedures, limits and reporting requirements."); 2022 Form 10-K at 36 ("Our risk management framework seeks to identify and mitigate risk and appropriately balance risk and return. We have established processes and procedures intended to identify, measure, manage, monitor and report the types of risk to which we are subject, including credit risk, market risk, liquidity risk, operational risk, compliance and legal risk and strategic risk. We seek to monitor and control our risk exposure through a framework of policies, procedures, limits and reporting requirements.").

themselves, reporting period after reporting period, without taking into account material changes to the business.

339. Additionally, to the extent any of the statements identified in this Complaint constitute "forward-looking statements" as defined in the PSLRA, Defendants are liable because—as detailed in ¶¶ 296-322 above—at the time each such statement was made (1) the person responsible for the statement knew it was false, or (2) the statement was authorized or approved by an executive officer of the Company who knew it was false. Indeed, in failing to apprise investors of material, existing facts of which Defendants were aware, the above statements and similar purported "cautions" were themselves false or misleading.

340. The foregoing considerations likewise apply to Defendants' other purported "risk" disclosures. For example, Discover's 2022 Form 10-K states:

> Regulatory and legislative developments, findings and actions have had and could continue to have a negative impact on our business strategies or require us to: limit, exit or modify our business practices and product offerings; restructure our products in unanticipated ways; invest more management time and resources in compliance efforts; limit the fees we charge for services; impact the value of our assets; or limit our ability to pursue certain innovations and business opportunities and obtain related required regulatory approvals.

341. Referencing that unspecified regulatory "developments," findings, and actions had impacted unspecified "business strategies" is quite different from disclosing the systemic and pervasive failures in risk management, compliance, corporate governance, and internal controls detailed in this Complaint. Further, suggesting those developments, findings, and actions "*could* . . . require [the Company] to," among other things, "invest more management time and resources in compliance efforts" did not inform investors that the Company *already had*—as Hochschild and Greene later admitted—"*underinvested*" in those areas.

342. The same is true with respect to Discover's statements that "supervisory guidance and practices, or the application thereof, *may* adversely affect our business," that "[l]itigation and

119

regulatory actions *could* subject us to significant fines, penalties," and other consequences, and that the Company's risk management framework "*may* not be effective." Conditional words like "may" and "could" do not meaningfully caution investors where, as here, the hypothetical scenarios they envision have already manifested.

343. Nor did Discover's statement that one of the "key areas to strengthen [its] CMS" was "when mistakes do occur, find the root causes, fix them quickly and prevent them from happening again" provide meaningful caution to investors. The severe deficiencies and misconduct detailed in this Complaint—including the Card Misclassification Scheme—were not mere "mistakes." And Discover did not "fix them quickly" or "prevent them from happening again." The Card Misclassification Scheme, in particular, persisted for more than 15 years.

344. Similarly, Discover's statements regarding "inherent limitations to the effectiveness of any system of internal control over financial reporting" did not render its representations regarding the effectiveness of ICFR true or not misleading. The Company specified that those purported limitations "include the possibility of human error, the circumvention or overriding of the system and reasonable resource constraints." None of those "limitations" applied to the material weaknesses existing at the time, which—by Discover's own admission—involved *the lack of* "controls designed or implemented to ensure that Discover Bank-issued credit cards were placed in appropriate merchant and merchant acquirer pricing tiers . . ., which in turn led to inaccurate revenue recognition," and reflected a failure of "integrity and ethical values."

120

## XI.    PLAINTIFFS AND OTHER CLASS MEMBERS ARE ENTITLED TO A PRESUMPTION OF RELIANCE ON DEFENDANTS' FALSE AND MISLEADING STATEMENTS

345.    Plaintiffs and other Class members are entitled to a presumption of reliance established by the fraud-on-the-market doctrine as endorsed in *Basic Inc. v. Levinson*, 485 U.S. 224 (1988), and the presumption of reliance for omissions as endorsed in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972).

346.    A presumption of reliance under the fraud-on-the-market doctrine is appropriate because, among other things:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    The misrepresentations and omissions were material;

(c)    The Company's stock traded in an efficient market; and

(d)    Plaintiffs and other Class members purchased common stock between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowing of the misrepresented or omitted facts.

347.    At all relevant times, the market for Discover common stock was efficient for the following reasons, among others:

(a)    The stock was actively traded on the NYSE, an internationally efficient market, throughout the Class Period.  Shares were highly liquid during the Class Period, with an average daily volume of approximately 2.3 million shares traded;

(b)    The Company regularly communicated with public investors by means of established market communication mechanisms, including through regular dissemination of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and others;

121

(c) Discover stock was covered by numerous securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective firms, which were publicly available; and

(d) The market reacted promptly to public information disseminated by the Company.

348. As a result of the foregoing facts, the market for Discover common stock promptly digested current information regarding the Company from all publicly available sources and reflected such information in the stock price. Under these circumstances, all purchasers of Discover common stock during the Class Period suffered similar injury through their purchase of the Company's common stock at artificially inflated prices, and a presumption of reliance applies.

349. In addition to the *Basic* presumption, a classwide presumption of reliance is appropriate under the Supreme Court's holding in *Affiliated Ute* to the extent Plaintiffs' claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding Discover's business operations and financial performance—information Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. Rather, all that is necessary to invoke the *Affiliated Ute* presumption of reliance is that the withheld facts were material in that a reasonable investor would have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions as set forth above, that requirement is satisfied.

## XII.   DEFENDANTS' MISREPRESENTATIONS CAUSED INVESTORS' LOSSES

350.    During the Class Period, Defendants' material misstatements and omissions detailed in Sections VI and VII.B above caused the price of Discover common stock to be artificially inflated, whether by introducing new inflation into the stock or by maintaining preexisting inflation, with the stock price reaching as high as $135.69 per share on August 13, 2021.  As a result of their purchases of Discover common stock during the Class Period, Plaintiffs and other Class members suffered economic loss under the federal securities laws when Defendants' prior misrepresentations, omissions, and fraudulent conduct were disclosed to the market, causing the share price to decline significantly as the artificial inflation in the stock price dissipated.

351.    The previously misstated or concealed facts emerged through a series of disclosures (i.e., "corrective disclosures") starting in July 2022 and following in July 2023, August 2023, October 2023, and January 2024.  Defendants' misstatements and omissions were the proximate cause of those stock declines and the losses suffered by Plaintiffs and other Class members.

352.    The declines in the price of Discover common stock following the corrective disclosures resulted directly from Defendants' fraudulent misrepresentations being revealed to the market.  The timing and magnitude of the price declines in Discover common stock compared to contemporaneous changes in equity market and peer company indices, as well as a review of the Company's disclosures and subsequent commentary by market professionals, negate any inference that investors' losses resulted from changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to the fraud detailed in this Complaint.

123

A. *July 20, 2022*: **Disclosure of Internal Investigation and Suspension of Discover's Share Repurchase Program**

353.    On July 20, 2022, investors began to learn the relevant truth relating to Defendants' false and misleading statements, as Discover disclosed an internal investigation into its student loan servicing practices and related compliance matters and announced the Company was suspending its share repurchase program.  Specifically, the Company stated in a press release:

> During the second quarter of 2022, the company repurchased approximately 5.8 million shares of common stock for $601 million.  Shares of common stock outstanding declined by 2.0% from the prior quarter.  The company is suspending until further notice its existing share repurchase program because of an internal investigation relating to its student loan servicing practices and related compliance matters.  The investigation is ongoing and is being conducted by a board-appointed independent special committee.

354.    Further, during the Company's 2Q 2022 earnings call that day, it became clear that the matters addressed in the CFPB Consent Orders were at least in part related to the "student loan servicing practices and related compliance matters" encompassed by the internal investigation:

> **[Analyst**:]  [I]n the public, we know that there's also a consent order related to this with the CFPB, it looks like in 2020, and I believe it's even tied to a consent order for 2015.  Did that . . . influence the [share buyback] suspension?  And was there something new that develop[ed] that caused the internal investigation?
>
> **[Hochschild**:]  I guess the only thing I can say is both the consent order and the investigation are in the area of student loan servicing.  But beyond that, there really isn't anything else I can add at this time.

355.    While the CFPB Consent Orders had been publicly disclosed in 2015 and 2020, respectively, Defendants' July 2022 revelation of the internal investigation and suspension of the share buyback program alerted investors (though not entirely) to the scope of the compliance issues at Discover and their impact on the Company's financial condition and prospects.

124

356. Indeed, analysts emphasized the significance of the compliance issues. On July 20, 2022, Citi published a report ("2Q22 First Look; Very Strong Results Overshadowed by Announced Investigation and Suspended Buyback") noting "[t]he suspension of share repurchases could mean a significant expected legal/regulatory reserve" and expressing "disappoint[ment]" about "this newly announced investigation."

357. Also that day, Wells Fargo published a report ("DFS: Q2 Early Look—Good Results, but Halts Buy-Back on Student Loan Issue") stating "[t]he big news was that Discover halted its share buy-back given an ongoing internal investigation related to its student loan servicing practices."

358. The next day, Stephens published a report ("The Debate On the Student Lending Investigation; Fundamentals Otherwise Strong") stating:

> The investigation into Discover's student loan servicing, and related suspension of share repurchases, dominate our investor discussions and is driving DFS shares down 9% as of this writing. . . . The bear case is that the share repurchase suspension must be due to significant issues that will impair the student lending business.

359. Bank of America similarly noted in a July 22, 2022 report ("Uncertainty is a potent overhang; but patience could be rewarded; Reiterate Buy") that Discover shares "declined 9% yesterday, following news that it had suspended share buybacks amidst an internal Board investigation into DFS' student loan servicing practices and associated compliance matters."

360. Additionally, Evercore ISI noted that on the earnings call, "Mgmt confirmed that the investigation and DFS' existing consent order with the CFPB are both generally tied to the same area—i.e[.,] student loan servicing practices."

361. In response to the Company's disclosures, the price of Discover stock fell $9.80 per share, or 8.9%, from a closing price of $109.80 on July 20, 2022 to a closing price of

125

$100.00 on July 21, 2022, on extraordinary trading volume of more than 6.5 million shares (approximately 3.6 times the average daily volume during the prior year).

> **B.**     *July 19-20, 2023*:  **Disclosure of Card Misclassification Issue, Proposed FDIC Consent Order, and Another Share Buyback Suspension**

362.     Almost exactly a year after the initial corrective disclosure, on July 19-20, 2023 Discover made several disclosures relevant to the Company's risk management, compliance, corporate governance, and internal controls:

- "Beginning around mid-2007, Discover incorrectly classified certain credit card accounts into our highest merchant and merchant acquirer pricing tier," and "[a]s of June 30, 2023, the Company's consolidated financial statements reflect a liability of $365 million within accrued expenses and other liabilities to provide refunds to merchants and merchant acquirers as a result of the card product misclassification";

- "An investigation into this issue by an external law firm working at the direction of the Audit Committee of the Board of Directors is ongoing";

- "Discover is in discussions with its regulators regarding this matter and corporate governance and risk management";

- The Company "received a proposed consent order from the FDIC in connection with consumer compliance," which "does not include the card product classification matter";

- "Additional supervisory actions could occur"; and

- "The Company has decided to pause share repurchases while the internal review of compliance, risk management and corporate governance is pending."

Relatedly, Hochschild noted during the Company's 2Q 2023 earnings call on July 20, 2023 that there was "a link between" the 2020 CFPB Consent Order "and the broader focus on our compliance management system."

363.     Analysts emphasized the seriousness of the revelations.  On July 20, 2023, for example, Citi published a report ("2Q23 Review; Déjà Vu All Over Again") stating "[t]he second year in a row of regulatory issues followed by pausing share repurchases, higher

126

expenses and internal investigations has us feeling as if we've gone down this road before." The report further noted "the uncertainty about the regulatory fallout is the same," and "[t]he negative share reaction, down 15% midday, seems appropriate due to this uncertainty, the impact to EPS from lower buybacks and notably higher expenses to boost its compliance functions. . . . The [net interest income] was a miss as well as the surprise regulatory announcements further exacerbating the negative impact."

364. Also that day, Jefferies published a report ("2Q Recap: Qtr and Guide Mixed but Biz Intact; Issue Is Temporary and Dip is Opp") stating: "Buyback pause and internal issue was a surprise . . . . Compliance & risk management top priorities. Top of mind was the buyback pause due to the misclassification of certain credit card accounts into the highest merchant and merchant-acquiring pricing tiers."

365. In response to the Company's disclosures, the price of Discover stock fell $19.40 per share, or 15.9%, from a closing price of $121.85 on July 19, 2023 to a closing price of $102.45 on July 20, 2023, on extraordinary trading volume of more than 11.2 million shares (approximately 5.5 times the average daily volume during the prior year).

> **C.** *August 14, 2023*: **Hochschild's Resignation, Which Market Participants (Correctly) Understood Was Connected to Discover's Compliance and Related Issues**

366. On August 14, 2023, Discover announced that the board of directors and Hochschild "agreed that Hochschild will step down as Chief Executive Officer and President and as a member of the Board." Immediately after thanking Hochschild for his "years of service," the release stated: "The Board is continuously focused on Discover reaching its full potential across the business, *including our commitment to enhancing compliance, risk management and corporate governance*. We will continue to take actions to advance Discover's strategic priorities and generate high returns and capital."

367. Analysts understood that Hochschild's departure resulted from Discover's risk management, compliance, and corporate governance failures. On August 14, 2023, for example, RBC Capital Markets published a report ("Roger Hochschild steps down as CEO and President effective immediately. New CEO search underway") describing Hochschild's resignation as "a surprise given that the company had not previously signaled a CEO succession plan to the investor community" and noting "we expect investors to question if the recently disclosed merchant pricing issues or last year's student loan servicing issues were factors in the CEO change." The report further observed that Discover "disclosed pending regulatory action by the FDIC surrounding compliance management and an eventual consent order," adding "[o]ur view is that investors will assume a more negative read from this change."

368. Likewise, on August 15, 2023, Morgan Stanley published a report ("CEO Resignation: More Regulatory Actions Coming?") noting "CEO immediate resignation a surprise," and explaining:

> While we do not know what drove this resignation, given the regulatory reviews of DFS currently in motion, we would not be surprised if the Board is looking for a CEO with additional qualifications to address any potential regulatory/compliance issues. Especially after the number of compliance issues that have emerged in recent years, particularly within student loan servicing as well as the recently announced card misclassification issue. . . . Discover board separately announced the addition of a new board member, J. Michael Shepherd, who has "deep experience" in compliance, risk management, and corporate governance.

369. On August 15, 2023, Wolfe Research published a report ("DFS: Unexpected CEO Exit Likely a Result of Regulatory Shortfalls; Shares Likely Range-Bound NT") stating "Deficiencies in Corporate Governance & Controls Likely Behind Unexpected CEO Exit. The investment community regarded Hochschild as an exceptionally strong CEO operationally, and [Discover's] announcement yesterday evening that he would be stepping down came as a surprise to the market."

128

370.    On August 21, 2023, *Crain's Business Chicago* published an article referencing Discover's "hastily scheduled" Business Update call, during which Interim CEO John Owen "made clear Hochschild was leaving because of the troubles with compliance."[203]  The article also highlighted that during the call, CFO John Greene "gave a sense of just how substantial Discover's underinvestment in compliance had been over the years," from which the article concluded "the regulatory cloud over Discover seems potentially darker than it appeared last month when Discover first disclosed that the [FDIC] was preparing a consent order in response to compliance shortcomings over several years."  The article recounted that "[u]sing bracing language, Greene told analysts Discover is in the process of 'ensuring we don't put profits before compliance excellence,'" and that "[u]nspoken but implied . . . was that that was the outcome."  Finally, the article observed that Hochschild's "abrupt[]" "remov[al]" had "jolted investors and spurred a high-volume sell-off of Discover stock over two days."

371.    In response to the Company's disclosures, the price of Discover stock fell $9.69 per share, or 9.4%, from a closing price of $102.65 on August 14, 2023 to a closing price of $92.96 on August 15, 2023, on extraordinary trading volume of more than 8.6 million shares (approximately 4.2 times the average daily volume during the prior year).  The news caused the stock to continue to decline on August 16, 2023, to a closing price of $90.26 that day, on extraordinary volume of more than 7.5 million shares (approximately 3.6 times the average daily volume during the prior year).  The stock's two-day decline totaled $12.39, or nearly 12.1%.

---

[203] Steve Daniels, "Discover's CEO was pushed out by board; The credit-card company held a hastily arranged call with analysts to discuss Roger Hochschild's departure and its regulatory problems," *Crain's Chicago Business* (Aug. 21, 2023), https://www.chicagobusiness.com/finance-banking/discovers-board-pushed-hochschild-out-ceo-not-regulators.

372. Discover has since confirmed that the market's understanding that Hochschild's departure related to compliance and related issues was correct. The Company has acknowledged that "[a]s of December 31, 2023," its "remediation efforts to reemphasize [its] commitment to integrity and ethical values" included "appointing new individuals in key roles," including "the Chief Executive Officer," i.e., Hochschild.

**D.** *October 18, 2023*: **Ongoing Compliance Review and Continuation of Share Buyback Suspension**

373. On October 18, 2023, Discover disclosed that total operating expenses rose $83 million year over year, "primarily driven by," among other things, "expenses for professional fees . . . driven by continued investment in compliance and risk management initiatives."

374. Following that announcement, Piper Sandler published a report on October 18, 2023 ("First Look: Sizable Reserve Build Overshadows Core PPNR Beat") noting Discover "stat[ed] a continued focus on risk management capabilities and engaging in discussions with merchants on the card product misclassification."

375. On October 19, 2023, Citi published a report ("3Q23 Review: Good, Bad, and Uncertain") stating, "Discover reported a big miss primarily from an unexpected large loan loss reserve build to address higher expected losses in 2024 and weakening macro factors . . . . still paused share buybacks, and worries about expenses to meet its FDIC consent order compliance issues."

376. Likewise, on October 19, 2023, Evercore ISI published a report ("3Q Call Takes: Credit Takes Center Stage; CEO Search Ongoing & Buybacks Still on Hold") stating "[r]eserve build at forefront" and noting "[s]hare repurchases remain on pause."

377. In response to the Company's disclosures, the price of Discover stock fell $7.26 per share, or 7.9%, from a closing price of $91.85 on October 18, 2023 to a closing price of

$84.59 on October 19, 2023, on extraordinary trading volume of more than 7.1 million shares (approximately 3.2 times the average daily volume during the prior year).

        **E.**     ***January 17-18, 2024*: Increased Expenses Primarily Due to Investments in Compliance and Risk Management as Well as Customer Remediation**

378. In a press release issued after the market closed on January 17, 2024, Discover announced its financial results for 4Q 2023. Among other things, the Company reported a $267 million, or 18%, year-over-year increase in operating expenses, resulting largely from "investments in compliance and risk management" as well as an $80 million reserve "for customer remediation." Analysts responded negatively. For example, that day Barclays noted "4Q EPS of $1.54 missed our $2.54 and consensus of $2.52 due to higher provisions and compliance and risk management expenses," and TD Cowen observed "[t]he miss to our est[imate] was primarily driven by higher-than-expected opex ($0.59 impact), driven by investments in compliance and risk mgmt, reserve for customer remediation (we assume this is about the card tiering issue)."

379. During an earnings call held on January 18, 2024, Interim CEO John Owen specified that Discover "increased [its] investments on risk and compliance in 2022 and 2023 up to about a $500 million level." Owen further acknowledged that while the Company has "made improvements in risk and compliance," they "still have quite a bit of work to do." He also previewed potential further regulatory action relating to the card misclassification issue, noting the 2023 FDIC Consent Order "does not include the misclassification issue in its scope of work" and "[w]e're working closely with our regulators on that topic and really don't have anything further to add on that topic at this point in time." Additionally, Greene addressed the $80 million remediation reserve, which "related to servicing issues," noting "the significant share of that was

131

related to student loans" and the reserve "is not connected to the issues that we discussed in July [2023]."

380. Following that announcement, Evercore ISI published a January 18, 2024 report ("4Q Call Takes: Credit Stress, Regulatory Issues & Loan Growth Outlook Take Center Stage") stating:

> ***New 4Q23 customer remediation charge un-related to recent merchant tiering issue****. . . .* Separately, mgmt noted that the FDIC consumer compliance consent order disclosed in 3Q23 does not include the merchant tiering issue. . . . While the fact that the $500M [expectation for risk/compliance costs] is intact is encouraging, we do not rule out upside risk to this amount as new regulatory/customer issues surface and broaden.

381. On January 19, 2024, J.P. Morgan published a report ("2023 Vintage Performance Will Be Key To 2024 Outcomes") stating:

> Compliance risk remains elevated . . . . The prior CFPB consent order did not include the card tiering issue, as management consistently points out, ***and today's disclosure of a $83M reserve for issues related to student loan servicing (and a little related to personal loans) goes to show that more issues may be discovered*** as DFS ramps up compliance efforts.

382. The information discussed on January 17 and 18, 2024 revealed new facts regarding the scope of Discover's failures in risk management, compliance, corporate governance, and internal controls.

383. In response to the Company's disclosures, the price of Discover stock fell $11.74 per share, or nearly 10.8%, from a closing price of $108.74 on January 17, 2024 to a closing price of $97.00 on January 18, 2024, on extraordinary trading volume of more than 11.2 million shares (approximately 4.9 times the average daily volume during the prior year).

384. Through the above corrective disclosures, investors and other market participants became aware of the true state of affairs at Discover: that, contrary to Defendants' repeated representations touting Discover's risk management, compliance, and corporate governance

132

policies and practices, as well as attesting to the effectiveness of its ICFR, the Company suffered from chronic and widespread failures in all of those critical areas. As a result of these disclosures, the artificial inflation in Discover's stock price dissipated, causing damages to Plaintiffs and other Class members who had purchased shares at artificially inflated prices.

## XIII. CLAIMS FOR RELIEF

### COUNT I

**Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b)**
**Against Discover and the Officer Defendants**

385. Plaintiffs incorporate the allegations in ¶¶ 1-384 above as if fully set forth in this paragraph.

386. Plaintiffs assert this Count under Section 10(b) of the Exchange Act and SEC Rule 10b-5(b) against Discover and the Officer Defendants (i.e., Hochschild, Greene, and Graf).

387. Throughout the Class Period, these Defendants, individually and in concert, directly and indirectly, by the use of the means or instrumentalities of interstate commerce, the mails or the facilities of national securities exchanges, made materially untrue statements of material fact or omitted to state material facts necessary to make their statements not misleading, and carried out a plan, scheme, and course of conduct, in violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b).

388. Discover and the Officer Defendants intended to and did deceive the investing public, including Plaintiffs and other Class members, and artificially inflated and maintained the price of Discover common stock. These Defendants were individually and collectively responsible for making the materially false and misleading statements and omissions alleged in this Complaint, and having engaged in a plan, scheme, and course of conduct designed to deceive Plaintiffs and other members of the Class, by virtue of having made public statements

133

and prepared, approved, signed, or disseminated documents that contained untrue statements of material fact or omitted facts necessary to make their statements not misleading. *See, e.g.,* ¶¶ 189-232, 276-295 (identifying Defendants' false and misleading statements during the Class Period).

389. As set forth above, Discover and the Officer Defendants made their materially false and misleading statements and omissions, and engaged in the fraudulent activity described in this Complaint, knowingly and intentionally, or in such a deliberately reckless manner as to constitute willful deceit and fraud upon Plaintiffs and other Class members who purchased Discover common stock during the Class Period. *See, e.g.,* ¶¶ 296-322 (scienter).

390. Further, Defendants' false and misleading representations were material to investors, in that the statements conveyed or concealed information a reasonable investor would deem important in determining whether to invest in Discover stock. *See, e.g.,* ¶¶ 323-32 (materiality).

391. In ignorance of the materially false and misleading nature of those statements and omissions, and relying directly or indirectly on those statements, on the integrity of the market price for the Company's common stock, or on Defendants' omissions, Plaintiffs and other members of the Class purchased the Company's common stock at artificially inflated prices during the Class Period. But for the fraud, Plaintiffs and other Class members would not have purchased the Company's stock at such artificially inflated prices. *See, e.g.,* ¶¶ 345-49 (reliance).

392. When the true facts were subsequently disclosed, the price of Discover common stock declined precipitously, and Plaintiffs and other Class members were damaged as a direct and proximate result of their purchases of the stock at artificially inflated prices and the

134

subsequent decline in the stock price when the truth was disclosed to the investing public. *See, e.g.,* ¶¶ 350-84 (loss causation and economic loss).

393. Discover and the Officer Defendants accordingly are liable to Plaintiffs and other Class members for violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5(b).

### COUNT II

**Violation of Section 10(b) of the Exchange Act and SEC Rule 10b-5(a) and (c)
Against Discover and the Officer Defendants**

394. Plaintiffs incorporate the allegations in ¶¶ 1-384 above as if fully set forth in this paragraph.

395. Plaintiffs assert this Count under the Exchange Act as well as SEC Rule 10b-5(a) and (c). Accordingly, Plaintiffs need not allege or prove for this Count that any of the Defendants made any misrepresentations or omissions of material fact for which they may also be held liable under Rule 10b-5(b) or any other provision of law.

396. During the Class Period, the Officer Defendants carried out a common plan, scheme, and unlawful course of conduct that was intended to, and did, (1) deceive the investing public, including Plaintiffs and other Class members; (2) artificially inflate the price of Discover common stock; and (3) cause Plaintiffs and other Class members to purchase Discover common stock at artificially inflated prices.

397. In furtherance of this unlawful plan, scheme, and course of conduct, the Officer Defendants employed devices, schemes, and artifices to defraud, and knowingly or recklessly engaged in acts, transactions, practices, and courses of business that operated as a fraud and deceit on Plaintiffs and other Class members in connection with their purchases of Discover common stock, in violation of Section 10(b) of the Exchange Act as well as SEC Rule 10b-5(a) and (c).

135

398.    The Officer Defendants' deceptive acts, practices, and course of business included the knowing or reckless cover-up, suppression, and concealment of, among other things, (1) information regarding systemic and pervasive risk management, compliance, corporate governance, and internal control failures that the Officer Defendants knew about or recklessly disregarded during the Class Period; (2) causing Discover to underinvest in those areas so the Company could instead pursue an aggressive stock repurchase program that directly impacted Defendant Hochschild's and other Company executives' personal compensation, as set forth below; and (3) perpetrating the Card Misclassification Scheme for the purpose of artificially inflating the Company's revenues and other financial results, including EPS.

399.    While Plaintiffs and other Class members reasonably relied on the integrity of the market price for Discover shares, they were unaware that Discover's stock repurchase program was occurring at a time when Discover was systemically, pervasively, and secretly underinvesting in risk management, compliance, corporate governance, and internal controls.



400.    In 2019, 2020, 2021, 2022, and 2023, respectively, Discover repurchased $2.1 billion, $1.8 billion, $0.3 billion, $2.3 billion, $2.4 billion, and $1.9 billion in stock, as depicted in the following graph (excerpted from Discover's January 17, 2024 Form 8-K):[204]



401.    Discover's SEC filings confirm that the number of outstanding shares substantially decreased during the Class Period.  For example, from approximately February 15, 2019 to July 21, 2023, the Company's outstanding shares decreased from approximately 328 million to 249 million, a 24.4% decline.  *Compare* 2018 Form 10-K (reporting 328,386,672 shares of common stock outstanding as of Feb. 15, 2019), *with* 2Q 2023 Form 10-Q (reporting 249,947,996 shares of common stock outstanding as of July 21, 2023).

402.    The stock repurchases also had a direct impact on Hochschild's and other executives' compensation.  According to Discover's 2020 Definitive Proxy Statement, "a significant portion" of Hochschild's (and other executives') annual compensation—in the form of PSUs—was "directly" tied to Discover's EPS and stock price:

> **At-risk [PSUs] are granted annually at the beginning of _a three-year Company performance period_** to further reinforce [executive management's] accountability for the Company's future financial and strategic goals by tying a **_significant portion_ of compensation**

---

[204] Discover Form 8-K (Jan. 17, 2024), Ex. 99.3, at 10.

> ***directly to the Company's EPS** and ultimately the Company's stock price.*

> […]

> Target PSU payout will be achieved if the Company meets its cumulative business plan goals, while achievement of maximum and threshold performance goals are each expected to be infrequent in occurrence. ***Participants will receive no portion of the award if the minimum performance is not met. If the Company exceeds the target performance hurdles, the [executive officer] can potentially earn an award in excess of the target,*** up to a maximum of one and one-half times the target award based on Company performance.[205]

403. In other words, if Discover failed to meet cumulative three-year EPS targets, Hochschild and other executives would receive "no portion" of their PSU awards; if targets were met three years later, they could receive additional PSUs.[206] For Hochschild, this EPS target was particularly significant given that 50% or more of his total compensation during the Class Period was in "at-risk" PSUs. Hochschild and other Discover executives thus had strong financial motives to (1) artificially inflate Discover's revenues through the Card Misclassification Scheme and (2) undervest in compliance. Each of those efforts, independently and collectively, caused the Company's EPS and stock price to be artificially elevated.

404. It is well established that stock repurchases increase a public company's EPS, and in turn its stock price, because they reduce the number of publicly traded shares:

> Why are such massive resources being devoted to stock repurchases? Corporate executives give several reasons . . . [b]ut none of them has close to the explanatory power of this simple truth: Stock-based instruments make up the majority of their pay, and in the short term buybacks drive up stock prices. In 2012, the 500 highest-paid executives named in proxy statements of U.S. public companies received, on average, $30.3 million each; 42% of

---

[205] Discover Definitive Proxy Statement (Mar. 23, 2020) at 31.

[206] Similar provisions tying Hochschild's compensation directly to EPS targets were included in his compensation plans for 2020, 2021, and 2022—years when he also received a significant portion of compensation in the form of PSUs.

138

their compensation came from stock options and 41% from stock awards. ***By increasing the demand for a company's shares, open-market buybacks automatically lift its stock price, even if only temporarily, and can enable the company to hit quarterly earnings per share (EPS) targets.***[207]

405.    In sum, the Officer Defendants' fraudulent scheme and course of conduct included causing Discover to pursue an aggressive stock repurchase program—thereby lifting the Company's EPS, and in turn Hochschild's and others' compensation—at a time when they were artificially inflating the Company's revenues through the Card Misclassification Scheme and when critical investments in risk management, compliance, corporate governance, and internal controls were necessary to address pervasive and longstanding deficiencies in these areas.

406.    While perpetuating their scheme, neither Discover nor the Officer Defendants disclosed the extent of those deficiencies to investors. Had Plaintiffs and other Class members known the true extent of these Defendants' conduct, they would not have purchased Discover's common stock, or if they had, would not have done so at the artificially inflated prices they paid.

---

[207] William Lazonick, *Profits Without Prosperity*, HARV. BUS. REV. (Sept. 2014), https://hbr.org/2014/09/profits-without-prosperity; *see also* Hannah Miao, *Corporate Stock Buybacks Keep Market Afloat*, WALL ST. J. (Feb. 27, 2023), https://www.wsj.com/articles/corporate-stock-buybacks-help-keep-market-afloat-67f95615 ("The fewer shares outstanding on the market as a result of buybacks . . . have the effect of lifting a company's per-share earnings."); Lenore Palladino, *The $1 Trillion Question: New Approaches to Regulating Stock Buybacks*, 36 YALE J. ON REG. BULL. 89, 94-95 (2018) ("Stock buybacks have become a favorite corporate practice because they are a straightforward and fast mechanism to raise share prices and boost [EPS]. . . . Corporate executives hold large amounts of stock and their compensation is often tied to an increase in the company's [EPS] metric. That gives executives a personal incentive to time buybacks so that they can profit off of a rising share price."); Bruce Dravis, *Dilution, Disclosure, Equity Compensation, and Buybacks*, 74 BUS. LAW. 631, 656 (2019) ("By repurchasing shares, a company can spread a given level of earnings over a lower number of shares, raising [EPS]."); Heitor Almeida, Vyacheslav Fos & Mathias Kronlund, "The Real Effects of Share Repurchases," 119 J. FIN. ECON. 168, 168 (2016) ("[M]anagers are willing to trade off investments and employment for stock repurchases that allow them to meet analyst EPS forecasts."); Statement by Jaime Lizárraga, SEC Comm'r, *Modernizing Share Repurchase Disclosures* (May 3, 2023), https://www.sec.gov/news/statement/lizarraga-statement-share-repurchase-disclosure-modernization-050323 ("CFO surveys have indicated that increasing [EPS] is an important factor affecting share repurchase decisions.").

407.    As a direct and proximate result of these Defendants' scheme to defraud and such unlawful course of conduct, Plaintiffs and other Class members suffered damages in connection with their purchases of Discover common stock during the Class Period.

408.    Discover and the Officer Defendants accordingly violated Section 10(b) of the Exchange Act as well as SEC Rule 10b-5(a) and (c).

## COUNT III

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

409.    Plaintiffs incorporate the allegations in ¶¶ 1-408 above as if fully set forth in this paragraph.

410.    Plaintiffs assert this Count under Section 20(a) of the Exchange Act against each of the Individual Defendants.

411.    As alleged above, Discover violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 by making materially false and misleading statements in connection with the purchase and sale of the Company's common stock, and by participating in a fraudulent scheme and course of business or conduct throughout the Class Period.

412.    By virtue of the Individual Defendants' positions within Discover, they had access to undisclosed adverse information about the Company, its business, operations, operational trends, finances, and present and future business prospects.  The Individual Defendants ascertained such information through the Company's internal corporate documents, conversations, and connections with other corporate officers, bankers, traders, risk officers, marketing experts, employees, attendance at management and board meetings (including board committees), and through reports and other information provided to them in connection with their roles and duties as Company officers or directors.

140

413. It is appropriate to presume that the materially false and misleading information detailed in this Complaint resulted from the collective actions of the Individual Defendants. The Individual Defendants, by virtue of their high-level positions within the Company, directly participated in the management of the Company, were directly involved in the day-to-day operations of the Company at the highest levels, and were privy to confidential proprietary information concerning the Company, its business, operations, prospects, growth, finances, and financial condition, as alleged in this Complaint.

414. The Individual Defendants were involved in drafting, producing, reviewing, approving, or disseminating the materially false and misleading statements identified in this Complaint, and approved or ratified these statements, in violation of the federal securities laws.

415. As controlling persons of a publicly held company whose common stock was and is registered with the SEC pursuant to the Exchange Act, traded on the NYSE, and governed by the provisions of the federal securities laws, each of the Individual Defendants had a duty to disseminate prompt, accurate, and truthful information with respect to Discover's financial condition and performance, growth, operations, financial statements, business, markets, management, risk, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.

416. As detailed in this Complaint, Hochschild served as Discover's CEO during the Class Period until he resigned from that position in August 2023. As CEO, Hochschild bore significant responsibility for, among other things, setting an appropriate "tone at the top," managing Discover's risk, overseeing the Company's financial reporting and other financial

matters, and designing and maintaining appropriate and effective internal controls, including ICFR.

417.    Hochschild also served on or otherwise closely engaged with Discover's Compliance Committee, which was formed by the Company's Risk Committee.  The Compliance Committee (as well as the Risk Committee) provides "oversight" of Discover's "compliance program," which "governs the management of compliance risk" at the Company.[208]

418.    The Risk Committee is "an executive management-level committee that establishes and oversees a comprehensive enterprise risk management program," which includes:

- "providing a regular forum for representatives of our different functional groups to identify and discuss key risk issues and to recommend to senior management actions that should be taken to manage the level of risk taken by the business lines";

- "establishing and overseeing an enterprise-wide approach to risk management through the development of our Enterprise Risk Management Policy and the associated oversight framework for the identification, measurement, monitoring, management and reporting of enterprise risk";

- "communicating our risk appetite and philosophy, including establishing limits and thresholds for managing enterprise-wide risks"; and

- "reviewing, on a periodic basis, our aggregate enterprise-wide risk exposures and the effectiveness of risk identification, measurement, monitoring, management and reporting policies and procedures and related controls within the lines of business."[209]

419.    Additionally, the Risk Committee "has formed and designated a number of committees to assist it in carrying out its responsibilities," including the Compliance

---

[208] 2022 Form 10-K at 16.

[209] *Id.* at 13.

Committee.[210]  These committees are "made up of representatives from senior levels of management."[211]

420.    As detailed in this Complaint, Graf served as CFO for part of the Class Period, and Greene served as CFO for the rest of the Class Period and remains in that role.  As CFO, Graf and Greene bore significant responsibility for, among other things, setting an appropriate "tone at the top," managing Discover's risk, overseeing the Company's financial reporting and other financial matters, and designing and maintaining appropriate and effective internal controls, including ICFR.

421.    The Director Defendants participated in or oversaw activities at the core of the fraud detailed in this Complaint, including through their participation on two board committees: the Risk Oversight Committee and the Audit Committee.  Each of those Committees was tasked with addressing issues that were inextricably related to risk management, compliance, corporate governance, and internal controls.

422.    The Risk Oversight Committee, for example, is "responsible for overseeing [Discover's] risk management policies and the operations of [its] enterprise-wide risk management framework."  Among other things, the Committee "receiv[es] and review[s] regular reports from our CRO . . . on risk management deficiencies and significant risks," and "receiv[es] reports on compliance with our risk appetite and limit structure and risk management policies, procedures and controls."[212]

---

[210] *Id.*

[211] *Id.*

[212] *Id.* at 12-13.

143

423. The Audit Committee's responsibilities include "receiving and reviewing reports from [Discover's] CRO and other members of management as the Committee deems appropriate on the guidelines and policies for assessing and managing [the Company's] exposure to risks, the corporation's major financial risk exposures and the steps management has taken to monitor and control such exposures," and "sharing information and liaising with the Risk Oversight Committee as necessary or desirable to help ensure that the committees have received the information necessary to permit them to fulfill their duties and responsibilities with respect to oversight of risk management matters."[213]

424. In addition to the general obligations the Director Defendants undertook as members of one or more of these committees, the CFPB tasked the Discover board generally with examining and rectifying the significant compliance issues the agency identified in the CFPB Consent Orders.

425. By virtue of the foregoing facts, the Individual Defendants each had the power to, and did, influence and control (directly or indirectly) the decision-making of the Company, including the content of its public statements with respect to risk management, compliance, corporate governance, and internal controls.

426. The Individual Defendants are thus liable to Plaintiffs and other Class members as controlling persons of Discover under Section 20(a) of the Exchange Act.

## XIV. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment as follows:

(a) Determining this is a proper class action maintained under Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, certifying Plaintiffs as class representatives, and

---

[213] *Id.* at 13.

144

appointing Motley Rice LLC and Lieff Cabraser Heimann & Bernstein, LLP as class counsel under Rule 23(g);

(b) Declaring and determining that Defendants violated the Exchange Act by reason of the acts and omissions alleged in this Complaint;

(c) Awarding Plaintiffs and other Class members compensatory damages against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including prejudgment interest;

(d) Awarding Plaintiffs and other Class members their reasonable costs and expenses incurred in connection with this action, including attorneys' fees and costs; and

(e) Granting such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: May 14, 2025                                    Respectfully submitted,

**MOTLEY RICE LLC**                                    **LIEFF CABRASER HEIMANN**
                                                       **& BERNSTEIN, LLP**


*/s/ Gregg S. Levin*                                   */s/ Michael J. Miarmi*
Gregg S. Levin                                         Steven E. Fineman (*admitted pro hac vice*)
Lance V. Oliver                                        Daniel P. Chiplock (*admitted pro hac vice)*
William S. Norton                                      Michael J. Miarmi (*admitted pro hac vice*)
Christopher F. Moriarty                                Gabriel A. Panek (*admitted pro hac vice*)
Joshua C. Littlejohn (*admitted pro hac vice*)         250 Hudson Street, 8th Floor
28 Bridgeside Blvd.                                     New York, NY 10013
Mt. Pleasant, SC 29464                                 Telephone: (212) 355-9500
Telephone: (843) 216-9000                              Facsimile: (212) 355-9592
Facsimile: (843) 216-9450                              sfineman@lchb.com
glevin@motleyrice.com                                  dchiplock@lchb.com
loliver@motleyrice.com                                 mmiarmi@lchb.com
bnorton@motleyrice.com                                 gpanek@lchb.com
cmoriarty@motleyrice.com
jlittlejohn@motleyrice.com                             Richard M. Heimann (*admitted pro hac vice*)
                                                       275 Battery Street, 29th Floor
*Counsel for Co-Lead Plaintiff KBC Asset*              San Francisco, CA 94111
*Management NV and Co-Lead Counsel for*                Telephone: (415) 956-1000
*the proposed Class*                                   Facsimile: (415) 956-1008

rheimann@lchb.com

*Counsel for Co-Lead Plaintiffs the NYC Funds and Co-Lead Counsel for the proposed Class*

**KIRBY MCINERNEY LLP**
Anthony E. Maneiro
211 West Wacker Drive, Suite 550
Chicago, IL 60606
Telephone: (312) 767-5180
Facsimile: (312) 757-5181
amaneiro@kmllp.com

*Local Counsel for KBC Asset Management NV*

**COHEN MILSTEIN SELLERS**
  **& TOLL, PLLC**
Carol V. Gilden
190 South LaSalle Street, Suite 1705
Chicago, IL 60603
IL Bar: 6185530
Telephone: (312) 357-0370
cgilden@cohenmilstein.com

*Liaison Counsel for the proposed Class*

146