# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |
|---|---|
| KBC ASSET MANAGEMENT NV, NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM, NEW YORK CITY POLICE PENSION FUND, NEW YORK CITY FIRE DEPARTMENT PENSION FUND, and TEACHERS' RETIREMENT SYSTEM OF THE CITY OF NEW YORK, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiffs,<br><br>v.<br><br>DISCOVER FINANCIAL SERVICES, ROGER C. HOCHSCHILD, JOHN T. GREENE, R. MARK GRAF, MARY K. BUSH, CANDACE H. DUNCAN, JOSEPH F. EAZOR, CYNTHIA GLASSMAN, THOMAS G. MAHERAS, MICHAEL MOSKOW, DANIELA O'LEARY GILL, JOHN B. OWEN, DAVID L. RAWLINSON II, and JENNIFER L. WONG,<br><br>Defendants. | Case No. 1:23-cv-06788<br><br>CLASS ACTION<br><br>Hon. Martha M. Pacold |

**REPLY IN FURTHER SUPPORT OF LEAD PLAINTIFFS'**
**MOTION FOR LEAVE TO AMEND**

**TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ................................................................................ 1

ARGUMENT ......................................................................................................... 3

I.  Plaintiffs' Allegations Give Rise to an Inference of Fraud at Least as Likely as Any Plausible Opposing Inference. ................................................... 3

    A.  The SCAC Alleges the Officer Defendants' Conscious Misbehavior or Recklessness, as well as Their Motive and Opportunity to Commit Fraud. .......... 3

    B.  Defendants Have Not Overcome the Strong Inference of Scienter. ...................... 8

II.  The SCAC Pleads the Falsity of Defendants' Non-Admitted Misstatements. ............... 11

    A.  Plaintiffs Plausibly Allege Discover's Representation About "Contractually Defined" Merchant Fees and Associated Revenues Was False or Misleading. ......................................................................................... 11

    B.  Plaintiffs Also Sufficiently Allege Defendants Misled Investors Regarding Discover's CMS, Legal and Regulatory Compliance, and ICFR. ....................... 13

        1.  The Court's prior rulings do not preclude claims based on the discrete compliance and risk management statements identified in the SCAC. ................................................................................... 14

        2.  Plaintiffs sufficiently allege the falsity of SOX certifications. ................ 15

III.  The SCAC Sufficiently Pleads Loss Causation Regarding Discover's Misstated Financial Results and Representations of GAAP Compliance. ...................................... 17

IV.  The SCAC Also States Cognizable Scheme Liability and Control Person Claims. ......... 19

    A.  Plaintiffs Sufficiently Plead Scheme Liability. ....................................................... 19

    B.  Plaintiffs Sufficiently Plead Control Person Liability. ......................................... 20

CONCLUSION .................................................................................................... 20

# TABLE OF AUTHORITIES

**Page**

**Cases**

*In re Akorn, Inc. Sec. Litig.*,
240 F. Supp. 3d 802 (N.D. Ill. 2017) ............................................................7, 18, 19

*Allison v. Oak St. Health, Inc.*,
2023 WL 1928119 (N.D. Ill. Feb. 10, 2023) ....................................................5, 13

*Anderson v. Spirit Aerosystems Holdings, Inc.*,
827 F.3d 1229 (10th Cir. 2016) ................................................................................5

*Azar v. Grubhub, Inc.*,
2021 WL 4077327 (N.D. Ill. Sept. 7, 2021) ...........................................................9

*In re Bally Total Fitness Sec. Litig.*,
2006 WL 3714708 (N.D. Ill. July 12, 2006)..........................................................10

*In re Baxter Int'l Inc. Sec. Litig.*,
2021 WL 100457 (N.D. Ill. Jan. 12, 2021)..............................................................5

*Buhrke Family Revocable Trust v. U.S. Bancorp*,
726 F. Supp. 3d 315 (S.D.N.Y. 2024).....................................................................4

*Chow v. Archer-Daniels-Midland Co.*,
2025 WL 790854 (N.D. Ill. Mar. 12, 2025).............................................................7

*Constr. Workers Pension Fund—Lake Cty. & Vicinity v. Navistar Int'l Corp.*,
114 F. Supp. 3d 633 (N.D. Ill. 2015) .......................................................................5

*Davis v. SPSS, Inc.*,
385 F. Supp. 2d 697 (N.D. Ill. 2005) .....................................................................10

*Desai v. Gen. Growth Props., Inc.*,
654 F. Supp. 2d 836 (N.D. Ill. 2009) ................................................................19, 20

*In re Enzymotec Sec. Litig.*,
2015 WL 8784065 (D.N.J. Dec. 14, 2015)............................................................17

*Flynn v. Exelon Corp.*,
2021 WL 1561712 (N.D. Ill. Apr. 21, 2021) .........................................................14

*Fryman v. Atlas Fin. Holdings, Inc.*,
2022 WL 1136577 (N.D. Ill. Apr. 18, 2022)..........................................................17

**TABLE OF AUTHORITIES**
(continued)

Page

*FTC v. IFC Credit Corp.*,
 543 F. Supp. 2d 925 (N.D. Ill. 2008) ...............................................................................11

*Greater PA Carpenters Pension Fund v. Whitehall*,
 2005 WL 61480 (N.D. Ill. Jan. 10, 2005) ........................................................................19

*Heavy & Gen. Laborers' Loc. 472 & 172 Pension & Annuity Funds*
 *v. Fifth Third Bancorp*,
 2022 WL 1642221 (N.D. Ill. May 24, 2022) .............................................................3, 7, 8

*Hedick v. Kraft Heinz Co.*,
 2021 WL 3566602 (N.D. Ill. Aug. 11, 2021) ............................................................ *passim*

*In re Hertz Glob. Holdings, Inc. Sec. Litig.*,
 2017 WL 1536223 (D.N.J. Apr. 17, 2017), *aff'd*, 905 F.3d 106 (3d Cir. 2018).......................8

*Janbay v. Can. Solar, Inc.*,
 2012 WL 1080306 (S.D.N.Y. Mar. 30, 2012) ...................................................................19

*Last Atlantis Capital LLC v. AGS Specialist Partners*,
 533 F. Supp. 2d 828 (N.D. Ill. 2008) ...............................................................................10

*In re LendingClub Sec. Litig.*,
 254 F. Supp. 3d 1107 (N.D. Cal. 2017) ..............................................................................7

*Lorenzo v. SEC*,
 587 U.S. 71 (2019)............................................................................................................19

*Lowry v. RTI Surgical Holdings, Inc.*,
 532 F. Supp. 3d 652 (N.D. Ill. 2021) .................................................................................7

*Macovski v. Groupon, Inc.*,
 553 F. Supp. 3d 460 (N.D. Ill. 2021) ...............................................................................17

*Makor Issues & Rights, Ltd. v. Tellabs Inc.*,
 513 F.3d 702 (7th Cir. 2008) .....................................................................................5, 8, 9

*Middlesex Ret. Sys. v. Quest Software Inc.*,
 527 F. Supp. 2d 1164 (C.D. Cal. 2007) ............................................................................17

*Motorola Sols., Inc. v. Hytera Commc'ns Corp.*,
 2023 WL 7738652 (N.D. Ill. July 11, 2023).....................................................................17

**TABLE OF AUTHORITIES**
(continued)

Page

*Mulderrig v. Amyris, Inc.*,
492 F. Supp. 3d 999 (N.D. Cal. 2020) ......................................................................12

*Norfolk Cty. Ret. Sys. v. Ustian*,
2009 WL 2386156 (N.D. Ill. July 28, 2009)...........................................................6, 11, 12

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
895 F.3d 933 (7th Cir. 2018) ...................................................................................5

*Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*,
266 F. Supp. 3d 1154 (E.D. Wis. 2017), *aff'd*, 895 F.3d 933 (7th Cir. 2018) .........................9

*Phx. Ins. Co. v. ATI Physical Therapy, Inc.*,
690 F. Supp. 3d 862 (N.D. Ill. 2023) ....................................................................7, 14

*In re Proquest Sec. Litig.*,
527 F. Supp. 2d 728 (E.D. Mich. 2007)....................................................................6

*Rabkin v. Lion Biotechnologies, Inc.*,
2018 WL 905862 (N.D. Cal. Feb. 15, 2018) ............................................................16

*Ray v. Citigroup Glob. Mkts., Inc.*,
482 F.3d 991 (7th Cir. 2007) ................................................................................19

*Ross v. Career Educ. Corp.*,
2012 WL 5363431 (N.D. Ill. Oct. 30, 2012)..............................................................6

*SEC v. Winemaster*,
529 F. Supp. 3d 880 (N.D. Ill. 2021) ....................................................................19

*Seeks v. Boeing Co.*,
752 F. Supp. 3d 992 (N.D. Ill. 2024) ....................................................................15

*Singer v. Reali*,
883 F.3d 425 (4th Cir. 2018)................................................................................12

*Stransky v. Cummins Engine Co.*,
51 F.3d 1329 (7th Cir. 1995) ............................................................................12, 13

*Takara Tr. v. Molex Inc.*,
429 F. Supp. 2d 960 (N.D. Ill. 2006) ....................................................................20

**TABLE OF AUTHORITIES**
(continued)

**Page**

*Toft v. Harbor Diversified, Inc.*,
  2025 WL 357776 (E.D. Wis. Jan. 30, 2025)...........................................................................9

**Other Authorities**

7th Cir. Pattern Civ. Jury Instruction 1.12 .........................................................................4

*Certification of Disclosure in Companies' Quarterly and Annual Reports*,
  67 Fed. Reg. 57276 (Sept. 9, 2002) ....................................................................................16

*Comm'n Guidance Regarding Mgmt.'s Rep. on Internal Control Over Fin.
  Reporting Under Section 13(a) or 15(d) of the Sec. Exch. Act of 1934*,
  Release Nos. 33-8810, 34-55929 (June 20, 2007)..............................................................16

**PRELIMINARY STATEMENT**[1]

Defendants concede that the SCAC sufficiently pleads materially false statements regarding Discover's Class Period financial results. But they contest the falsity of other statements and dispute loss causation and scienter. These challenges are unavailing.

*First*, viewed holistically, Plaintiffs' allegations raise a strong inference of scienter. The uncontested facts show (1) Discover "***recklessly*** engaged in unsafe and unsound banking practices by . . . failing to establish and maintain" an appropriate "compliance management system (CMS)"; (2) the Company suffered from long-running material weaknesses in its control environment and, specifically, its internal control over financial reporting ("ICFR"), including a lack of ***any*** controls to ensure Discover credit cards were properly classified for purposes of charging interchange fees to merchants; (3) as a result of those deficiencies, the Company overcharged merchant customers ***for more than 15 years*** "***for the purpose of*** increasing [its] revenues"—that is, intentionally; (4) the card misclassification allowed Discover to misreport revenues, EPS, and other financial results during the Class Period; (5) "senior executives" of Discover "were aware" of the card misclassification yet "failed to take adequate steps to correct" it; (6) by Discover's own admission, in failing to maintain an effective control environment it "did not demonstrate an appropriate commitment to ***integrity and ethical values***, specifically ***in the approach to evaluating and addressing the card product misclassification***"; and (7) defendant Roger Hochschild's ouster as CEO was necessary to "remediat[e]" the Company's control deficiencies. ¶¶ 4-17, 191-200.

These facts are consistent with the FEs' accounts, which detail material deficiencies in Discover's CMS, risk management, and internal controls, of which Hochschild and other senior

---

[1] Unless otherwise indicated, (i) terms and abbreviations are retained from Plaintiffs' opening brief (Dkt. 108); (ii) "¶ __" refers to paragraphs of the SCAC; (iii) emphasis has been added, and internal citations and quotation marks have been omitted; and (iv) page numbers for court filings refer to the CM/ECF numbering.

executives were aware. ¶¶ 110-68. The Officer Defendants also benefitted personally from the Company's artificial inflation of revenues and EPS. ¶¶ 299(c), 300(b), 317-22.

In short, while the PSLRA does not require a "smoking gun," the barrel of this one is undeniably hot. Plaintiffs have satisfied their pleading burden for scienter.

*Second*, Plaintiffs sufficiently allege falsity with respect to the disputed statements. Defendants, for example, represented that they applied contractually required fees for credit card transactions and booked the corresponding revenues accordingly. Now they argue those statements did not imply "the transaction fee amounts that Discover assessed and collected ***were always the right ones***." Dkt. 110 ("Opp.") at 23. The resolution of this question turns on whether a reasonable investor could interpret "contractually defined" to mean "done in accordance with the contract." That is, at the very least, a plausible reading of the statement. Moreover, by choosing to discuss the basis for its interchange fees and associated revenues, Discover was required to disclose that it was rampantly misclassifying merchant transactions to artificially inflate revenues. Contending otherwise, Defendants ask the Court to resolve this fact-based inquiry, as a matter of law, against Plaintiffs at this stage—contrary to bedrock pleading principles.

Relying largely on the Court's prior opinion, Defendants also contest the falsity of statements regarding risk management and compliance as well as the Officer Defendants' SOX certifications. But they fail to appropriately account for the SCAC's new factual allegations— which, in addition to detailing severe deficiencies in Discover's risk management, compliance, and internal control infrastructure and processes, reveal ***the complete absence*** of controls for card classification. These allegations directly contradict Discover's representation, for example, that its risk management framework was consistent with industry standards for similarly sized banks. Further, Discover has now admitted its control environment suffered from a material weakness

that "persisted for an extended period of time" and caused the Company to issue materially false financial results. ¶ 107. Whether "those conclusions were reached '[s]ubsequent to the original evaluation'" (Opp. at 10 (alteration and emphasis in original)) is beside the point, as the deficiencies indisputably existed at the time the Officer Defendants certified to the contrary.

*Third*, Defendants contend Plaintiffs cannot show a causal connection between representations regarding Discover's revenues, EPS, and other key financial metrics and any of the corrective disclosures because the Company's restatement occurred after the Class Period. But Defendants' failure to admit the falsity of Class Period financial results until recently does not preclude Plaintiffs from pleading loss causation. The SCAC alleges in detail that the truth regarding those financials was at least partially revealed through earlier disclosures about the Card Misclassification Scheme. Neither Rule 8 nor substantive loss causation principles demand more.

*Finally*, because the SCAC states cognizable claims under Rule 10b-5(b), as well as scheme liability claims under Rule 10b-5(a) and (c), it also satisfies the modest standard for pleading control person liability under Section 20(a) against the Officer and Director Defendants. Because the SCAC would withstand a motion to dismiss, the Court should grant leave to amend.

## ARGUMENT

I. **Plaintiffs' Allegations Give Rise to an Inference of Fraud at Least as Likely as Any Plausible Opposing Inference.**

A. **The SCAC Alleges the Officer Defendants' Conscious Misbehavior or Recklessness, as well as Their Motive and Opportunity to Commit Fraud.**

In light of the PSLRA's mandatory discovery stay, it is rare to have objective evidence of a defendant's misconduct at the pleading stage. But here we do. After a lengthy investigation in coordination with the FDIC, the Federal Reserve Board of Governors (the "Fed") found that Discover engaged in card misclassification specifically "for the purpose of" increasing its revenues, and "senior executives of [Discover] were aware" of the misconduct yet "failed to take

adequate steps to correct" it. ¶¶ 5, 11. Contrary to Defendants' mischaracterization, these are "particularized *facts* supporting [the order's] assertions," and are inculpatory regardless of the "standard of proof or knowledge [the Fed] relied on" (Opp. at 27, 28 (emphasis in original)). In any event, this is very different from a "single stray comment in a press release," which the court deemed insufficient in *Buhrke Family Revocable Trust v. U.S. Bancorp*, 726 F. Supp. 3d 315, 329-30, 361 (S.D.N.Y. 2024). Nor must the regulators' findings "mention any of the Officer Defendants by name" (Opp. at 28) to support an inference of their knowledge. *See, e.g.*, 7th Cir. Pattern Civ. Jury Instruction 1.12 ("The law makes no distinction between the weight to be given to either direct or circumstantial evidence."). And even if the Officer Defendants were not among the "senior executives" with actual knowledge of the card misclassification, their disregard of such extensive misconduct known to other senior executives suggests actionable recklessness.

The accounts of six well-placed former Discover employees corroborate the regulators' findings. Among other things, the FEs confirm "there was a culture of non-compliance" at Discover, as its executives "did not care" and the Company focused on "market, market, market," with little attention to risk management. ¶¶ 111, 114. Discover's compliance department was also severely understaffed, which enabled significant deficiencies and outright gaps in the Company's risk management and control infrastructure and processes. ¶¶ 134-49. For example, senior managers, including Vice Presidents Scott Michelau and Dan Nickele, complained they did not have sufficient resources for important compliance functions. ¶ 161. FE 6 raised these concerns as far back as 2013, but Brian Hughes, who later became Discover's Chief Risk Officer, said "it was 'too much work' to map out the processes and review them for control gaps." ¶ 113.

FE 6 also attended monthly U.S. cards business meetings where Hochschild reviewed "a monthly scorecard on risk management activity," which noted "how many projects" relating to the

- 4 -

cards business "were messed up and caused consumer harm." ¶¶ 153-55. Further, attendees said in Hochschild's presence that they did not have enough resources to remediate these issues. ¶ 156. And around May 2023 the President of U.S. Cards "freaked out" about Discover's open regulatory findings and "heavily implied that Hochschild knew" how many there were. ¶¶ 158-59.

Defendants do not dispute that these accounts are "set forth in convincing detail" and the FEs "were in a position to know at first hand the facts to which they are prepared to testify." *Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 712 (7th Cir. 2008). And other courts have held similar allegations supported scienter. *See, e.g.*, *Hedick v. Kraft Heinz Co.*, 2021 WL 3566602, at *12 (N.D. Ill. Aug. 11, 2021) (strong inference where, *inter alia*, "Kraft Heinz tracked its cost-cutting with monthly internal 'scorecards,' which each Executive Defendant had access to, that showed the Company's failure to achieve cost-cutting targets and [showed] losses").[2]

Moreover, because the SCAC "alleg[es] that executives attended meetings or received reports discussing an issue . . . that is critical to [Discover]'s core operations," the Court "can assume knowledge." *Constr. Workers Pension Fund—Lake Cty. & Vicinity v. Navistar Int'l Corp.*, 114 F. Supp. 3d 633, 661-62 (N.D. Ill. 2015). Defendants assert that to warrant such an inference, the matter in question must "'constitute[] nearly all'" of a company's business. Opp. at 30 n.11 (quoting *In re Baxter Int'l Inc. Sec. Litig.*, 2021 WL 100457, at *13 (N.D. Ill. Jan. 12, 2021)). But "the Seventh Circuit has indicated that the core operations inference applies where the practices 'are a significant part of [a company]'s financial picture.'" *Allison v. Oak St. Health, Inc.*, 2023 WL 1928119, at *10 (N.D. Ill. Feb. 10, 2023) (quoting *Pension Tr. Fund for Operating Eng'rs v. Kohl's Corp.*, 895 F.3d 933, 937 (7th Cir. 2018)). The Card Misclassification Scheme comprised

---

[2] By contrast, in *Anderson v. Spirit Aerosystems Holdings, Inc.*, the witness's accounts, among other things, "d[id] not allege that the four Spirit executives actually received the internal business group's . . . regular reports regarding the projects' losses" and "d[id] not adequately describe the contents of the quarterly reports allegedly sent to the Spirit executives." 827 F.3d 1229, 1240 (10th Cir. 2016).

a significant part of Discover's financial picture, as confirmed by the restatement. And Hochschild acknowledged "strong governance and risk management" were "critical" to the Company. ¶ 307.

"The magnitude of [D]efendants' alleged fraud," which was "both widespread and pervasive," also "lends weight to [P]laintiffs' allegations of scienter." *Ross v. Career Educ. Corp.*, 2012 WL 5363431, at *9 (N.D. Ill. Oct. 30, 2012). The Card Misclassification Scheme encompassed millions of transactions and persisted for the better part of two decades. The scheme also was not complicated and did not require judgment or specialized accounting knowledge; rather, Discover consciously chose to violate the clear provisions of its merchant agreements for the purpose of artificially inflating revenues. *See, e.g.*, *Norfolk Cty. Ret. Sys. v. Ustian*, 2009 WL 2386156, at *10 (N.D. Ill. July 28, 2009) (accounting violations were "relatively straightforward . . . and therefore easily identified by responsible corporate management").

Additionally, while the Card Misclassification Scheme was raging and despite the ample evidence alerting them to significant deficiencies in Discover's risk management, compliance, and internal controls, the Officer Defendants "signed SOX certifications attesting to the adequacy of [Discover]'s internal controls, but the Company later admitted that it lacked adequate controls." *Kraft Heinz*, 2021 WL 3566602, at *13.[3] Considered with the facts detailed above, the SOX certifications "provide evidence either that [the Officer Defendants] knew about the improper [card misclassification] practices or, alternatively, knew that the controls [they] attested to were inadequate." *In re Proquest Sec. Litig.*, 527 F. Supp. 2d 728, 743 (E.D. Mich. 2007).

---

[3] Defendants offer no credible reason to distinguish *Kraft Heinz* simply because plaintiffs there alleged the CEO and CFO "'*kn[ew] that the SEC was investigating* Kraft Heinz's accounting practices.'" Opp. at 32 n.14 (emphasis in original) (quoting *Kraft Heinz*, 2021 WL 3566602, at *7). The court in *Kraft Heinz* did not suggest that fact was dispositive to its scienter analysis. Moreover, by the same token, at the time they made the misstatements identified in the SCAC the Officer Defendants knew the FDIC and the CFPB were scrutinizing Discover's compliance and risk management practices. ¶¶ 96-104, 353-55, 362.

Nor does the scienter inference turn on whether the Officer Defendants "had concluded" at "the time of the certification[s]" that those deficiencies existed (Opp. at 32). Similar to *In re Akorn, Inc. Securities Litigation*, (1) the Officer Defendants "had the duty to design or supervise" Discover's ICFR; (2) under their leadership, the Company "suffered from serious deficiencies in its internal controls for several years"; (3) the deficiencies "were well-known among employees" and senior management, including Hochschild; and (4) the Officer Defendants failed to remediate them. 240 F. Supp. 3d 802, 819 (N.D. Ill. 2017); *see also* ¶¶ 4-17, 96-188, 209-15. The SCAC thus relies on far more than "'signatures on SEC filings and certifications'" (Opp. at 34 (quoting *Heavy & Gen. Laborers' Loc. 472 & 172 Pension & Annuity Funds v. Fifth Third Bancorp*, 2022 WL 1642221, at *22 (N.D. Ill. May 24, 2022))). Nor can defendants John Greene and Mark Graf escape liability, as "[i]nternal controls over *financial* reporting fell squarely within [their] oversight" as CFOs. *In re LendingClub Sec. Litig.*, 254 F. Supp. 3d 1107, 1122 (N.D. Cal. 2017) (emphasis in original); *see also Lowry v. RTI Surgical Holdings, Inc.*, 532 F. Supp. 3d 652, 662 (N.D. Ill. 2021) (strong inference of scienter where "each of the individual defendants . . . was responsible for designing and supervising RTI's internal controls over financial reporting").

Soon after the news of Discover's fraud hit the market, Hochschild abruptly resigned as CEO. *E.g.*, ¶¶ 22-23, 366. Analysts noted that given his "surprise" departure, "[d]eficiencies in [c]orporate [g]overnance & [c]ontrols [were] [l]ikely [b]ehind" it. ¶¶ 367, 369. And Discover has since admitted Hochschild's resignation was among the "remediation efforts to emphasize [its] commitment to integrity and ethical values in [its] control environment." ¶¶ 9, 305. That the Board and the SEC pursued investigations into the card misclassification "cement[s] the strong inference that can be drawn" from Plaintiffs' allegations. *Chow v. Archer-Daniels-Midland Co.*, 2025 WL 790854, at *4 (N.D. Ill. Mar. 12, 2025); *see also Phx. Ins. Co. v. ATI Physical Therapy,*

*Inc.*, 690 F. Supp. 3d 862, 894 (N.D. Ill. 2023) (resignation that was "close to the date of negative disclosures" and not accompanied by an immediate replacement supported scienter inference).[4]

Finally, while not necessary to plead scienter, the fact that the Officer Defendants directly benefitted from the misconduct bolsters the inference. Their annual compensation "was 'tied' to Discover's EPS and stock price" (¶¶ 317-20), and by underinvesting in compliance even amid regulatory scrutiny and consent orders issued by the CFPB and the FDIC, these Defendants depressed expenses, which further inflated EPS and thus their own compensation. ¶ 321. Discover was simultaneously buying back substantial amounts of its stock, which decreased its shares outstanding and increased EPS even more. ¶ 322; *see also* ¶¶ 394-408. Thus, unlike in the cases Defendants cite, Plaintiffs allege a direct connection between the fraudulent practices and the Officer Defendants' compensation. *Cf. Fifth Third Bancorp*, 2022 WL 1642221, at \*23 (plaintiff "d[id] not tie [executives'] incentive compensation specifically to the challenged practices").

Considered together, the SCAC's extensive allegations indicate the Officer Defendants were at least "reckless in disregarding a substantial risk that" their statements regarding Discover's financial results, card classification, compliance, risk management, and internal controls "w[ere] false." *Tellabs*, 513 F.3d at 704. Plaintiffs have met their burden under Rule 9(b) and the PSLRA.

### B.      Defendants Have Not Overcome the Strong Inference of Scienter.

Despite the SCAC's particularized allegations that speak to their actions and knowledge ***during the Class Period***, Defendants claim Plaintiffs merely allege they "*must have known*" of the fraud. Opp. at 18 (emphasis in original). That is plainly incorrect. Indeed, Defendants do not

---

[4] By contrast, in *In re Hertz Global Holdings, Inc. Securities Litigation* the company stated more generically that it had "taken . . . action to remediate the identified material weaknesses," including hiring a new CEO. 2017 WL 1536223, at \*21 (D.N.J. Apr. 17, 2017), *aff'd*, 905 F.3d 106 (3d Cir. 2018). In any event, the court's analysis in *Hertz* conflicts with caselaw in this District.

explicitly articulate any opposing narrative, much less a cogent one, explaining how Hochschild, Greene, and Graf could have remained blissfully unaware of a fraud spanning more than 15 years or the serious control deficiencies that allowed it. They instead isolate and mischaracterize Plaintiffs' allegations. But "[D]efendants cannot defeat [the SCAC] by cherry picking particular allegations that, standing alone, might not meet the heightened pleading standard." *Azar v. Grubhub, Inc.*, 2021 WL 4077327, at \*6 (N.D. Ill. Sept. 7, 2021).

Defendants attempt to distract from "the underlying misclassification issue" by focusing on their "disagreement" with the SEC over ASC 606's "technical accounting rules for recording the historical revenue" associated with the misclassification (Opp. at 20). But Plaintiffs allege Discover's prior inflation of revenues was itself fraudulent, which the subsequent restatement further supports. The salient question is whether the Officer Defendants had information during the Class Period that "placed [them] on notice of a risk" of the misclassification and its impact on Discover's financial results. *Tellabs*, 513 F.3d at 704. The above facts strongly indicate they did.[5]

Defendants' reliance on *Pension Trust Fund for Operating Engineers v. Kohl's Corp.* is therefore misplaced, as those claims turned on whether the executives were "so familiar with" the subject accounting rules "so as to see a problem in the company's accounting before their auditors did." 266 F. Supp. 3d 1154, 1167 (E.D. Wis. 2017), *aff'd*, 895 F.3d 933 (7th Cir. 2018). And that case did not include damning governmental findings or the company's admission that its material

---

[5] Whether ASC 606's application in this case was "complex and technical" (Opp. at 21) is subject to dispute. Further, Discover's GAAP violation in quantifying the financial misstatement suggests it attempted to conceal the full impact of the Card Misclassification Scheme and avoid a restatement. Unlike in *Toft v. Harbor Diversified, Inc.*, on which Defendants rely, there is no dispute about Discover's obligations under the subject contracts. 2025 WL 357776, at \*3 (E.D. Wis. Jan. 30, 2025). Additionally, the defendant company in *Toft* "described [in SEC filings] its dispute with United and the amount then at issue and explained that it had recognized the disputed amount in its consolidated financial statements." *Id.* at \*8. Discover, on the other hand, did not disclose the Card Misclassification Scheme until after it had improperly recognized revenues, and it long resisted the need for a commensurate restatement. ¶¶ 22, 191-200.

misstatement of revenues resulted from internal control weaknesses stemming from a failure of integrity and ethical values. That Discover acquiesced to the restatement only after pressure from the SEC (¶ 196) further suggests fraud. *See Kraft Heinz*, 2021 WL 3566602, at *13 ("the timing of the write-down—after the SEC began an investigation—support[ed] an inference of scienter").[6]

Defendants also attempt to minimize the Fed's uncontested findings. But those findings, which are based on an investigation conducted at least in part during the Class Period, speak to conduct at the time of Defendants' misrepresentations. And *Last Atlantis Capital LLC v. AGS Specialist Partners*, which Defendants highlight, **supports** a scienter inference. The consent orders there "implicate[d] . . . eleven of the defendants"—all broker-dealer entities—that "consented to the entry of written findings" that they "improperly handl[ed] orders to buy and sell options on hundreds of occasions during specific periods." 533 F. Supp. 2d 828, 831 (N.D. Ill. 2008). Even though "the violations in question [were] not scienter-based," the court held "plaintiffs' proposed inference of scienter against the eleven sanctioned specialists, based on the nature of the specific conduct identified, [wa]s 'at least as compelling' and cogent as the competing inferences." *Id.* While the Officer Defendants are not identified by name in the consent orders here, **Discover is**. ¶¶ 50-52, 181. Under the reasoning of *Last Atlantis*, then, a scienter inference is compelling.

Defendants contend the FDIC's finding that Discover was "reckless[]" in "failing to establish and maintain a [CMS] providing for compliance with all applicable *consumer protection laws*" (¶ 299(d)) has "nothing to do with *card misclassification*." Opp. at 28 (emphasis in original).

---

[6] In *Davis v. SPSS, Inc.*, by contrast, plaintiffs' GAAP allegations were "too vague and insufficiently tied to defendants' alleged conduct." 385 F. Supp. 2d 697, 715 (N.D. Ill. 2005). Further, the complaint "d[id] not provide any indication of the scope or impact of the[] sales practices" plaintiff alleged were improper. *Id.* at 716. And while noting it was "not prepared to say that the magnitude of a restatement could never contribute to an inference of scienter," the court in *In re Bally Total Fitness Securities Litigation* determined "this is not such a case, especially considering that the SEC filings and press releases at issue did not consistently overstate revenues and income or consistently understate losses." 2006 WL 3714708, at *8 (N.D. Ill. July 12, 2006). Discover, however, **did** consistently overstate revenues and EPS. ¶¶ 191-200.

But the order's plain language demonstrates otherwise. The FDIC determined Discover "engaged in violations of . . . Section 5 [of the Federal Trade Commission Act], including the unfair acts or practices . . . related to the classification of certain credit card accounts." ¶ 224. And the order includes Section 5 among the "*Consumer Protection Laws and Regulations*" Discover violated by "failing to establish and maintain" an appropriate CMS. ¶¶ 223-24. Nor does the fact that the card misclassification related to "*merchants, merchant acquirers, and other intermediaries*" (Opp. at 28 (emphasis in original)) undermine the relevance of the FDIC's findings. *See, e.g.*, *FTC v. IFC Credit Corp.*, 543 F. Supp. 2d 925, 941 (N.D. Ill. 2008) ("small businesses . . . are consumers and are entitled to protection from deceptive and unfair acts and practices").

In the end, the inference of the Officer Defendants' (and thus Discover's) culpability is at least as likely as the inference that they simply missed the rampant misconduct at the Company or that the facts were hidden from them. "Negligence can always be offered as an explanation for fraudulent behavior, but here it does not create an inference that is *more compelling* than [P]laintiffs'." *Ustian*, 2009 WL 2386156, at *11.

## II. The SCAC Pleads the Falsity of Defendants' Non-Admitted Misstatements.

### A. Plaintiffs Plausibly Allege Discover's Representation About "Contractually Defined" Merchant Fees and Associated Revenues Was False or Misleading.

Discover's representation that it charged "[c]ontractually defined per-transaction fee amounts" that "are recognized as revenue at the time each transaction is captured for settlement" was false or misleading in two respects. *First*, Discover did not "typically" apply the agreed-upon fees. To the contrary, "[f]rom 2007 through 2023, [Discover] did not disclose to its Merchant Customers that it was charging the higher 'commercial' interchange fees for certain credit cards that were used for ordinary consumer spending," and "at the end of 2022, [Discover] had classified approximately five million 'consumer' credit cards as 'commercial,' and approximately 98% of

those cards were 'consumer' cards that were misclassified." ¶ 5. *Second*, Discover did not recognize "contractually defined" amounts as revenue; rather, it "charged its Merchant Customers the higher interchange fees associated with the 'commercial' credit cards *for the purpose of increasing [Discover]'s revenues* for certain credit cards *that did not meet the definition of 'commercial' in Discover Network's standard contracts* and operating regulations." *Id.*

Defendants contend Discover represented only that it was charging *a* contractually defined fee, not necessarily "the right ones." Opp. at 23. But their argument divorces the statement from its context and asks the Court to accept (as a matter of law) the unsupported and nonsensical inference that investors assumed the Company was charging the wrong fees. And contrary to Defendants' suggestion, the statement's inclusion among the "Significant Revenue Recognition Accounting Policies" highlighted in Discover's Forms 10-K renders it *more, not less, likely* that investors would expect the Company typically adhered to its interchange-fee contractual provisions and recognized revenues accordingly. Whether Discover "always" did so (Opp. at 23) is irrelevant. *See Mulderrig v. Amyris, Inc.*, 492 F. Supp. 3d 999, 1017 (N.D. Cal. 2020) ("The fact that defendants explained how ASC 606 was supposed to be applied and how that differed from the prior accounting rule could not correct the misrepresentations caused by defendants' alleged revenue recognition inconsistent with that rule."). Additionally, by choosing to discuss the basis for interchange fees, Discover assumed a duty to "speak the whole truth," *Stransky v. Cummins Engine Co.*, 51 F.3d 1329, 1331 (7th Cir. 1995), including its misclassification of those fees and the internal control weaknesses that allowed the misconduct to occur.

*Singer v. Reali*, which Defendants do not distinguish, is instructive. The Fourth Circuit there reversed the dismissal of Section 10(b) claims based on the company's failure to disclose that it was encouraging physicians to use legally non-compliant procedure codes when seeking

- 12 -

reimbursement, which allowed the company to improperly inflate revenues. While defendants "informed the market that the Company was assisting surgeons in obtaining reimbursements for the System" and "acknowledged the AMA's designation of the System as a Category III procedure," they "did not disclose that the Company was coaching surgeons to improperly use a Category I code for the System." 883 F.3d 425, 441 (4th Cir. 2018). Discover likewise cannot evade liability simply by noting it had a policy for interchange fees and revenues without disclosing that it was actively misclassifying those fees to generate false revenues. *See also Allison*, 2023 WL 1928119, at *6 (plaintiffs sufficiently pleaded falsity because defendants "chose to explain that Oak Street provided patient transportation but omitted that the company's marketing strategy also relied on offering transportation to *prospective* patients, which [plaintiffs] allege is specifically disallowed by the [Anti-Kickback Statute]" (emphasis in original)).

Defendants' reliance on this Court's prior ruling regarding Greene's statement that "we got that behind us" (Opp. at 23) is unavailing. The Court determined Greene was not referring to "student-loans-related compliance issues" and "no reasonable investor hearing Greene's answer to a question about Discover's 'targeted capital levels' would make the sweeping inference that Discover had resolved its compliance issues." Dkt. 104 at 24. By contrast, there is no dispute that the present statement refers to interchange fees and associated revenues. And to the extent the scope of that representation is unclear, "[w]hat is clear is that on a motion to dismiss [the Court] should make all reasonable inferences in favor of [Plaintiffs] and should not resolve the interpretation of the [statement] against [Plaintiffs]." *Stransky*, 51 F.3d at 1335.

### B. Plaintiffs Also Sufficiently Allege Defendants Misled Investors Regarding Discover's CMS, Legal and Regulatory Compliance, and ICFR.

As an initial matter, Defendants' objection to the inclusion of previously dismissed statements in the SCAC to preserve Plaintiffs' appellate rights is of no moment because (a) the

- 13 -

SCAC clearly delineates which statements are not encompassed by this motion, avoiding the need to "slog[] through allegations [the Court] already dismissed" (Opp. at 10); and (b) if the Court grants this motion and deems it necessary to remove the subject statements, Plaintiffs can readily do so. In any event, Defendants' challenges to the statements actually at issue miss the mark.

> **1. The Court's prior rulings do not preclude claims based on the discrete compliance and risk management statements identified in the SCAC.**

Contrary to Defendants' assertion, the Court's prior opinion does not foreclose Plaintiffs' modified allegations regarding representations about compliance (¶¶ 217, 221-22, 228). Discover claimed to maintain appropriate compliance programs and controls when, in fact, a key control to determine the correct pricing tier for purposes of interchange fees and associated revenues—which ultimately led to investors' losses—did not exist. Defendants' statements thus were, in that respect, "determinate" and "verifiabl[y]" false. *Phx. Ins.*, 690 F. Supp. 3d at 878.

Discover represented, for example, it had "risk management standards and policies that are consistent with the size and complexity of our business, industry practices and applicable legal and regulatory requirements." ¶ 217(a). This was false because Discover "did not have *any* policies, procedures, or other controls to ensure that credit cards were properly classified" (¶ 218), which conflicted with COSO—a well-recognized authority on industry practice (¶¶ 88-95, 106)—and as the regulators found, violated applicable legal and regulatory requirements. Discover thus took those representations "out of the realm of nonactionable aspirational statements and into the realm of statements regarding the Company's conduct," and "implie[d] compliance." *Flynn v. Exelon Corp.*, 2021 WL 1561712, at *9 (N.D. Ill. Apr. 21, 2021).

Additionally, Hochschild said that Discover's "focus on compliance first" was at the "[t]op" of its "list" and that the Company would "continue to strengthen and fine-tune [its] processes and comply with all the regulations required of a large national bank." ¶¶ 221, 286.

A reasonable investor would understand this to mean that at a minimum Discover had implemented controls essential to key aspects of its business, like card classification. In fact, it had not. And given that Discover's deficient CMS had already been exposed in two consent orders issued by the CFPB (¶¶ 237-71), it is reasonable to infer that investors placed greater weight on Defendants' statements regarding the Company's compliance with applicable laws and regulations. *See Seeks v. Boeing Co.*, 752 F. Supp. 3d 992, 1017 (N.D. Ill. 2024) (because "investors might have been looking to Boeing to affirm that the 737 MAX was a safe plane," the court could not "determine as a matter of law that a reasonable investor would not find these statements . . . material").

### 2. Plaintiffs sufficiently allege the falsity of SOX certifications.

Defendants' reliance on the Court's prior rulings regarding SOX certifications is likewise misplaced. Considering Discover's recent admissions that material weaknesses in its control environment and ICFR existed during the Class Period, as well as the resulting restatement, regulatory findings, and the FEs' accounts, the SCAC "allege[s], with . . . particularity, that Discover's internal control over financial reporting was inadequate" and "that Discover's financial reporting or accounting practices were deficient" (Dkt. 104 at 36, 38). *E.g.*, ¶ 300(a). Regardless whether the certifications "convey concrete assurances about the adequacy of Discover's compliance program" in general (Dkt. 104 at 37), at the very least they contain verifiable representations that, for example, the Officer Defendants or others working under their supervision designed Discover's ICFR "to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with [GAAP]." ¶ 210. In any event, the Court cannot determine at the pleading stage—particularly considering Discover's admissions—that no reasonable investor would understand the SOX certifications to convey *anything* about the adequacy or effectiveness of the Company's ICFR.

Additionally, the long-running material weaknesses in Discover's control environment and the absence of specific controls, which "led to inaccurate revenue recognition" (¶ 8), undermined the Officer Defendants' certifications that Discover's financial results were fairly presented. *See Rabkin v. Lion Biotechnologies, Inc.*, 2018 WL 905862, at \*10 (N.D. Cal. Feb. 15, 2018) (certifications that "failed to provide a sufficient litmus test by which a reasonable investor might determine the company's financial standing" were actionable). SOX requires executives to certify the "fair presentation" of a company's financials, which entails "provid[ing] assurances that the financial information disclosed in a report, viewed in its entirety, meets a standard of overall material accuracy and completeness that is broader than financial reporting requirements under [GAAP]." *Certification of Disclosure in Companies' Quarterly and Annual Reports*, 67 Fed. Reg. 57276, at 57279 (Sept. 9, 2002). This includes "disclosure of financial information that is informative ***and reasonably reflects the underlying transactions and events***." *Id.* By failing to disclose the long-running and pervasive card misclassification misconduct and its impact on revenues, the Officer Defendants' certifications were materially false or misleading.

Further, inherent in such certifications is management's use of "entity-level controls in assessing financial reporting risks and the adequacy of controls," which include "management's ***philosophy and operating style, integrity and ethical values***." *Comm'n Guidance Regarding Mgmt.'s Rep. on Internal Control Over Fin. Reporting Under Section 13(a) or 15(d) of the Sec. Exch. Act of 1934*, Release Nos. 33-8810, 34-55929, at \*2, \*5 n.21 (June 20, 2007). As Discover admits, it "did ***not*** demonstrate an appropriate commitment to integrity and ethical values . . . ***in the approach to evaluating and addressing the card product misclassification***." ¶ 9.

Defendants also contend the SOX certifications convey inactionable opinions. "For these certifications to have any substance," however, "signatories . . . must be held accountable for the

- 16 -

statements." *Middlesex Ret. Sys. v. Quest Software Inc.*, 527 F. Supp. 2d 1164, 1189 (C.D. Cal. 2007). Plaintiffs sufficiently allege the certifications "are actionable because . . . the company restated its financials and admitted that its internal controls were materially deficient." *Kraft Heinz*, 2021 WL 3566602, at *10. In short, "in contrast to the certifications," Plaintiffs "specifically allege that the internal controls were deficient, such that Defendants were allowed to engage in the allegedly fraudulent behavior during the Class Period." *In re Enzymotec Sec. Litig.*, 2015 WL 8784065, at *16 (D.N.J. Dec. 14, 2015). And even if the statements are opinions, Plaintiffs allege the Officer Defendants "had actual knowledge of, and omitted material facts that contradicted their internal control attestations." *Fryman v. Atlas Fin. Holdings, Inc.*, 2022 WL 1136577, at *17 (N.D. Ill. Apr. 18, 2022).

Finally, Defendants' "[p]erfunctory and undeveloped argument[]" (introduced in a footnote) that Plaintiffs fail to plead loss causation because Discover's admissions regarding its control environment and ICFR came after the Class Period (Opp. at 32 n.15) is "waived." *Motorola Sols., Inc. v. Hytera Commc'ns Corp.*, 2023 WL 7738652, at *4 (N.D. Ill. July 11, 2023) (Pacold, J.). In any event, the argument lacks merit for the reasons detailed in Section III below.

### III. The SCAC Sufficiently Pleads Loss Causation Regarding Discover's Misstated Financial Results and Representations of GAAP Compliance.

"[L]oss causation allegations need only provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Macovski v. Groupon, Inc.*, 553 F. Supp. 3d 460, 488 (N.D. Ill. 2021). Thus, the "pleading standards of Rule 8(a)(2)" apply. *Fryman*, 2022 WL 1136577, at *32. Defendants' assertion that Plaintiffs must plead loss causation "with [p]articularity" (Opp. at 16 (bold omitted)) is therefore contrary to law.

Defendants contend that because Discover issued its restatement after the Class Period, there is no causal connection between the admittedly false financial results and Plaintiffs' losses.

But "a plaintiff may plead loss causation without alleging a disclosure that precisely mirrors the substance of a prior undisclosed fraud." *Kraft Heinz*, 2021 WL 3566602, at *17. The SCAC "allege[s] facts that support an inference that Defendants' misstatements and omissions concealed the circumstances that bear upon the loss suffered such that Plaintiffs would have been spared all or an ascertainable portion of that loss absent the fraud." *Akorn*, 240 F. Supp. 3d at 821.

Plaintiffs allege four corrective disclosures that relate, at least in part, to the Card Misclassification Scheme. On July 19-20, 2023, Discover revealed the scheme, further stating an internal investigation into it was "ongoing," the Company was "in discussions with its regulators regarding this matter," and "[a]dditional supervisory actions could occur." ¶ 362. Analysts at Citi noted "the uncertainty about the regulatory fallout" and observed "[t]he negative share reaction . . . seem[ed] appropriate due to this uncertainty." ¶ 363. Less than a month later, on August 14, 2023, Discover announced Hochschild's immediate resignation, indicating it related to the Board's "commitment to enhancing compliance, risk management and corporate governance." ¶ 366. In response, Morgan Stanley noted "the number of compliance issues that have emerged in recent years," including "the recently announced card misclassification issue." ¶ 368.

Additionally, on October 18, 2023, Discover disclosed an $83 million year-over-year increase in operating expenses that was "primarily driven by," among other things, "continued investment in compliance and risk management initiatives." ¶ 373. Piper Sandler reported that Discover "stat[ed] a continued focus on risk management capabilities and engaging in discussions with merchants on the card product misclassification." ¶ 374. Finally, on January 17, 2024, Discover reported an 18% year-over-year increase in operating expenses, due in part to "investments in compliance and risk management." ¶ 378. The next day, Interim CEO John Owen previewed potential further regulatory action relating to the card misclassification issue. ¶ 379.

Plaintiffs thus allege that the truth regarding the Card Misclassification Scheme "gradually emerged through a series of partial disclosures and that an entire series of partial disclosures caused the stock price deflation." *Akorn*, 240 F. Supp. 3d at 822. That the Company did not decide until late 2024—under pressure from the SEC—to restate its financials is consistent with Plaintiffs' theory of loss causation, as the restatement reflected the "[a]dditional supervisory actions" Discover had said "could occur" (¶ 362). *See Greater PA Carpenters Pension Fund v. Whitehall*, 2005 WL 61480, at *5 (N.D. Ill. Jan. 10, 2005) (rejecting argument that plaintiff failed to plead loss causation "because the price did not fall following either of the restatement disclosures," as plaintiff "pled that Defendants partially disclosed some adverse information pertaining to the alleged fraud which caused Whitehall's price to decline prior to the . . . restatements").[7]

## IV. The SCAC Also States Cognizable Scheme Liability and Control Person Claims.

### A. Plaintiffs Sufficiently Plead Scheme Liability.

Rule 10b-5's scheme liability provisions "capture a wide range of conduct." *Lorenzo v. SEC*, 587 U.S. 71, 79 (2019). Plaintiffs in *SEC v. Winemaster*, for example, sufficiently alleged the defendant engaged in deceptive acts by executing sales agreements to inflate revenues and failing to disclose the agreements, which led to improper revenue recognition. 529 F. Supp. 3d 880, 917-22 (N.D. Ill. 2021). The SCAC alleges a similar theory. ¶¶ 394-408. And unlike in *Desai v. General Growth Properties, Inc.*, Plaintiffs provide "an explanation as to who played what role in the alleged scheme." 654 F. Supp. 2d 836, 862 (N.D. Ill. 2009).

---

[7] In contrast to *Janbay v. Canadian Solar, Inc.*, where the court held none of the alleged partial disclosures revealed the sham sales at issue, 2012 WL 1080306, at *15-16 (S.D.N.Y. Mar. 30, 2012), the above disclosures expressly address the card misclassification issue. And in *Ray v. Citigroup Global Markets, Inc.*, the court of appeals affirmed **summary judgment** where the complaint "allege[d] that it was not until June 2002 that [defendants] discovered [the] alleged lies," but "by that time . . . the price of [the] shares had already collapsed." 482 F.3d 991, 995 (7th Cir. 2007). No such pre-disclosure collapse occurred here.

### B. Plaintiffs Sufficiently Plead Control Person Liability.

The Officer Defendants' passing suggestion that Plaintiffs assert control person claims "exclusively because each 'was a senior executive'" (Opp. at 37 (quoting Dkt. 108 at 30)) borders on frivolous. The SCAC details that Hochschild, Greene, and Graf (1) signed SEC filings or otherwise made statements to investors on Discover's behalf regarding risk management and compliance, both of which were severely deficient, as well as the Company's financial results, which were materially misstated; and (2) bore responsibility for designing and implementing an appropriate control environment and ICFR, which were materially impaired. ¶¶ 50-52, 82-95, 191-229, 409-26. Nothing more is required. *See Takara Tr. v. Molex Inc.*, 429 F. Supp. 2d 960, 983 (N.D. Ill. 2006) (upholding Section 20(a) claim based on similar facts).

The Director Defendants' assertion that the SCAC fails to allege their control over Discover's "operations or financial reporting" (Opp. at 36) is also unavailing. Each of these directors served on the Board's Risk Oversight Committee or Audit Committee (¶¶ 54-63); those committees played critical roles in overseeing the Company's risk management policies and operations (¶¶ 31-32, 421-23), the failure of which allowed for and perpetuated the Card Misclassification Scheme and other misconduct. The Audit Committee also oversaw the Officer Defendants' efforts with respect to ICFR (¶ 211), which suffered from material weaknesses. Moreover, the regulators' findings confirm the Board's significance with respect to compliance, risk management, and internal controls. *E.g.*, Dkt. 110-16 at 5-16; Dkt. 110-17 at 6-7 (¶ 2). These allegations go well beyond "plead[ing] a bare legal conclusion." *Desai*, 654 F. Supp. 3d at 863.

### CONCLUSION

Considering the foregoing arguments and authorities, as well as those in Plaintiffs' opening brief, the Court should grant the motion to amend.

Dated: July 30, 2025

**MOTLEY RICE LLC**

*/s/ Gregg S. Levin* (with consent)
Gregg S. Levin
Lance V. Oliver
William S. Norton
Christopher F. Moriarty
Joshua C. Littlejohn (*admitted pro hac vice*)
28 Bridgeside Blvd.
Mt. Pleasant, SC 29464
Telephone: (843) 216-9000
Facsimile: (843) 216-9450
glevin@motleyrice.com
loliver@motleyrice.com
bnorton@motleyrice.com
cmoriarty@motleyrice.com
jlittlejohn@motleyrice.com

*Counsel for Co-Lead Plaintiff KBC Asset Management NV and Co-Lead Counsel for the proposed Class*

Respectfully submitted,

**LIEFF CABRASER HEIMANN
  & BERNSTEIN, LLP**

*/s/ Michael J. Miarmi*
Steven E. Fineman (*admitted pro hac vice*)
Daniel P. Chiplock (*admitted pro hac vice)*
Michael J. Miarmi (*admitted pro hac vice*)
Gabriel A. Panek (*admitted pro hac vice*)
250 Hudson Street, 8th Floor
New York, NY 10013
Telephone: (212) 355-9500
Facsimile: (212) 355-9592
sfineman@lchb.com
dchiplock@lchb.com
mmiarmi@lchb.com
gpanek@lchb.com

Richard M. Heimann (*admitted pro hac vice*)
275 Battery Street, 29th Floor
San Francisco, CA 94111
Telephone: (415) 956-1000
Facsimile: (415) 956-1008
rheimann@lchb.com

*Counsel for Co-Lead Plaintiffs the NYC Funds and Co-Lead Counsel for the proposed Class*

**KIRBY MCINERNEY LLP**
Anthony E. Maneiro
211 West Wacker Drive, Suite 550
Chicago, IL 60606
Telephone: (312) 767-5180
Facsimile: (312) 757-5181
amaneiro@kmllp.com

*Local Counsel for KBC Asset Management NV*

**COHEN MILSTEIN SELLERS
  & TOLL, PLLC**
Carol V. Gilden
200 South Wacker Drive, Suite 2375
Chicago, IL 60606
IL Bar: 6185530
Telephone: (312) 357-0370
cgilden@cohenmilstein.com

*Liaison Counsel for the proposed Class*