IN THE UNITED STATES DISTRICT COURT
                      NORTHERN DISTRICT OF ILLINOIS
                           EASTERN DIVISION

KBC ASSET MANAGEMENT NV,          )  Case No. 23-cv-06788
etc., et al.,                     )
                    Plaintiffs,   )
          v.                      )
                                  )
DISCOVER FINANCIAL SERVICES,      )
et al.,                           )  Chicago, Illinois
                                  )  February 25, 2026
                    Defendants.   )  9:36 a.m.


                  TRANSCRIPT OF PROCEEDINGS - MOTION
              BEFORE THE HONORABLE MARTHA M. PACOLD

APPEARANCES:

For the Plaintiffs:    LIEFF CABRASER HEIMANN & BERNSTEIN, LLP
                       BY:  MR. MICHAEL J. MIARMI
                       250 Hudson Street, 8th Floor
                       New York, New York 10013

                       COHEN MILSTEIN, SELLERS & TOLL, PLLC
                       BY:  MS. CAROL V. GILDEN
                       200 S. Wacker Drive, Suite 2375
                       Chicago, Illinois  60606

                       MOTLEY RICE LLC
                       BY:  MR. JOSHUA C. LITTLEJOHN
                       28 Bridgeside Boulevard
                       Mt. Pleasant, SC 29464

For the Defendant      SULLIVAN & CROMWELL LLP
Discover Financial     BY:  MR. CHRISTOPHER M. VIAPIANO
Services:                   MR. DAVID N. WHALEN
                       1700 New York Avenue, N.W., Suite 700
                       Washington, DC 20006

                       SULLIVAN & CROMWELL LLP
                       BY:  MR. LEONID TRAPS
                       125 Broad Street
                       New York, New York 10004

APPEARANCES:   (Continued)

For Defendant          WINSTON & STRAWN LLP
Hochschild:            BY:  MR. JOSEPH L. MOTTO
                            MR. THOMAS M. LEINENWEBER, JR.
                       300 N. LaSalle Drive, Suite 4400
                       Chicago, Illinois  60654

For Defendant          WINSTON & STRAWN LLP
Hochschild:            BY:  MR. JOSEPH L. MOTTO
                            MR. THOMAS M. LEINENWEBER, JR.
                       300 N. LaSalle Drive, Suite 4400
                       Chicago, Illinois  60654

For Defendant Greene:  GOODWIN PROCTER LLP
                       BY:  MR. JOHN A. BARKER
                       100 Northern Avenue
                       Boston, Massachusetts 02210

For Defendant Graf:    SIDLEY AUSTIN LLP
                       BY:  MS. HILLE VON ROSENVINGE SHEPPARD
                            MR. CHRISTOPHER Y. LEE
                       One S. Dearborn Street
                       Chicago, Illinois  60603

For Defendant Bush:    WILLKIE FARR & GALLAGHER
                       BY:  MR. JOSHUA S. LEVY
                       1875 K Street, N.W.
                       Washington, DC 20006

Court Reporter:        KATHLEEN M. FENNELL, CSR, RMR, FCRR
                       Official Court Reporter
                       219 South Dearborn Street, Room 2328A
                       Chicago, Illinois  60604
                       Telephone:  (312) 435-5569
                       Kathleen_Fennell@ilnd.uscourts.gov

                       *   *   *   *   *

                PROCEEDINGS REPORTED BY STENOTYPE
       TRANSCRIPT PRODUCED USING COMPUTER-AIDED TRANSCRIPTION

(Proceedings heard in open court:)

(Call to order.)

THE CLERK: Calling Case No. 23-cv-6788, KBC Asset Management, et al., v. Discover Financial Services, et al., for oral argument.

Counsel, please state your name for the record.

MR. MIARMI: Good morning, Your Honor. Michael Miarmi of Lieff Cabraser Heimann & Bernstein on behalf of the plaintiffs, and with me are my colleagues, Josh Littlejohn, Motley Rice, and Carole Gilden, Cohen, Milstein, Sellers & Toll.

THE COURT: Good morning.

MR. VIAPIANO: Good morning, Your Honor. Christopher Viapiano of Sullivan & Cromwell. I represent Discover Financial Services. I'm joined today by my colleagues Leonid Traps and David Whalen.

MS. SHEPPARD: Good morning, Your Honor. Hille Sheppard of Sidley Austin for defendant Mark Graf. With me is my colleague, Christopher Lee.

MR. LEVY: Josh Levy, Willkie, Farr & Gallagher, on behalf of the director.

MR. BARKER: Good morning. John Barker from Goodwin Procter on behalf of defendant John Greene.

MR. MOTTO: Good morning, Your Honor. Joe Motto and Tom Leinenweber for defendant Robert Hochschild.

THE COURT: Good morning, everyone.

We're here for the argument on the motion for leave to amend.

Are the parties ready to proceed with that?

MR. MIARMI: Yes, Your Honor.

MR. VIAPIANO: Yes, Your Honor

THE COURT: Okay. So I guess before we actually start, I have a few questions I wanted to let you know about.

And I apologize because I'm now just telling you at the beginning of the argument, so I'm sorry for not thinking of it sooner and giving you more of a heads up, but -- and you may well have been intending to address at least some of this already.

But one is can you please -- okay. So this one question is I realize in and of itself probably a lot, but can you please walk through the briefing and the proposed second amended complaint and just highlight what pieces are new information and what pieces are old information that were addressed by the prior -- or what's addressed by the prior ruling?

I know you attached the tracked changes version of the complaint, but it's hard to -- you know, sometimes when the tracked changes, it just like shows every change that includes formatting and stuff. That made it hard to actually identify -- the point of the tracked changes was to identify

those changes, and because of the way the formatting worked, it was not really isolated to the changes, if that makes sense.

So that's just one question.

A second question, which is primarily for the plaintiffs, is: Is your theory that the new information gave rise to new liability, or is it that it clarified the materiality of the old statements that the prior ruling found insufficient?

So that's just a second question, which is probably primarily for plaintiffs.

And then there's a third question, and this perhaps -- this may not be in the briefing. It seems like there is a lot of new information that only came into existence after the original complaint was filed, but what this motion is requesting is amendment. It's a motion to amend, as opposed to a motion to supplement, and those are two different processes under the rule, Rule 15.

And so do the parties have views on how I should treat information that post-dates the complaint, keeping in mind the distinction between those two types of motions, a motion for leave to amend versus a motion for leave to supplement?

And so that's the third question.

Now, there are a couple of -- or I guess one I would call it a subsidiary question or a related question to that third question, which is there's a -- there's Seventh Circuit

case law, including this case called *Runnion* that stands for the principle that -- you know, typically on a first dismissal, I'll grant leave to amend, and that's based on the low or pretty liberal standard for leave to amend should be freely granted. That's, as I understand it, that's the basis of that principle.

But bearing in mind that, for any information that post-dates the complaint we're not under the amendment rule, we're under the supplementing rule, those are different rules, does *Runnion*, does the principle that leave to amend should be freely granted and the *Runnion* principle that the companies -- or is basically an application of that, you know, free leave to amend, does that transfer over, does that also apply in the context of a motion to supplement where the information post-dates the complaint?

Relatedly there is a Seventh Circuit case called *Saint Anthony Hospital v. Whitehorn*, 132 F.4th 962, 979-80. I'll say the cite again, 132 F.4th 962, 979-80, which is a Seventh Circuit *en banc* case from 2025, and the Seventh Circuit -- I mean, there's just a short portion of that opinion that perhaps may just relate to this issue, so I would ask the parties to take a look at that.

Obviously, I just gave you this information, and you may not have had a chance to consider it. I mean, I just told you, so I know you haven't had a chance to consider it, so on

this third issue about the motions to amend versus motion to supplement, if you need some more time to think about it and file supplemental briefs within a couple weeks, we could do something like that if the parties would like some time to think about it before addressing it.

I think the first two questions are hopefully ones that you may have already given thought to in the process for preparing for the argument today, but perhaps the third question might benefit from some more time to think about it.

MR. MIARMI: Your Honor, in terms of arguing today, how would you like us to approach time? Should we keep -- should we keep time for our respective 15 minutes? I'd like to reserve a few minutes for rebuttal, if that's acceptable.

THE COURT: Yeah, I think it makes sense. If I could ask the parties to keep time, that would be helpful.

And, yes, that's totally fine to reserve some time for rebuttal.

MR. MIARMI: Okay, great.

Thank you, Your Honor. Again, Michael Miarmi of Lieff Cabreser for the plaintiffs.

On the first question regarding what's new and what's old, the -- there are several new things. One is that defendants made several admissions. They admitted that their internal control over financial reporting, or ICFR, was not effective during the class period.

They also admitted that because of the ongoing pervasive, long-running card misclassification improprieties, those improprieties directly impacted the company's financial results. That's something that we did not have last time because they did not at that point make a material restatement of their financial results. So they have since admitted that there are material misstatements in that -- that are at play here, which the Court found there were not in the last iteration of the complaint.

We also have findings from some of Discover's primary regulators. In particular, the Federal Reserve Board found that the misconduct was widespread, lasting for about 16 years. It impacted millions of credit cards, and that "senior executives of Discover," and that's a quote, were aware that cards were being misclassified but failed to take adequate steps to correct it.

Discover also has since admitted that part of its "remediation" efforts to reemphasize its commitment to integrity and ethical values and its control environment which it admitted was materially deficient, the company appointed new individuals in key roles, including the Chief Executive Officer -- that's Mr. Hochschild -- and the board approved a new code of ethics for senior financial officers which emphasized the importance of ethics and compliance in the expectation of the company's leaders at the tone at the top.

I think it's notable that in connection with the misstatement and the restatement, the company admitted that the restatement directly resulted from the card misclassification improprieties and also resulted from a failure of integrity and ethical conduct in both the evaluation and the assessment of the card misclassification scheme.

So while defendants try to portray this as merely a technical disagreement with the SEC over the way to account for the misclassification scheme, their own words suggest that that's not correct, and in fact, they resisted a restatement for a long time and only did so under pressure from the SEC.

We think all of these things, which are all new, all of these things support a scienter inference and also confirm that there are material misstatements of fact.

Now, in the previous iteration of the complaint, the Court found that there were not materially misleading statements because it interpreted the complaint as alleging that Discover was representing in its statements that it had perfect compliance, and essentially the Court said no reasonable investor would interpret the statements that way.

Now, we respectfully disagree with the ruling. That's not what we alleged, we say. But in any event, the context and the facts have changed here because the Court even said in the initial ruling that plaintiffs did not with any particularity allege that defendants had misstated their financial results or

that the internal controls were deficient. Here, we now have both.

And I want to point out that defendants talk about the findings, the regulatory findings, as being based not on particularized facts, and that's just not true. The findings by the Fed Board, for instance -- and this is based on an investigation, by the way, that happened at least, in part, during the class period. They even say that the Federal Reserve Bank of Chicago investigated this and informed Discover during the class period that they had significant deficiencies with respect to card misclassification.

So this is not fraud by hindsight. That old shibboleth doesn't work here. And in addition, the Fed order talks about the time period of misconduct happening from 2007 through at least 2023, what the misconduct specifically entailed, charging merchant customers the higher interchange fees associated with commercial credit cards for the purpose of increasing Discover's revenues. That is a direct quote from the Fed. That's a finding. Discover doesn't admit it, but they don't deny it, and they don't contest it because they can't because they allowed for the consent order to be filed.

And so that is not only knowledge, it's intention for the purpose of improperly increasing Discover's revenues.

It describes the scope of the misconduct, noting at the end of 2022, for example, Discover's misclassification

affected approximately 5 million credit cards. That is widespread, pervasive, long-running misconduct. That's unlike the cases that defendants cite, *Fifth Third Bancorp*, *U.S. Bancorp,* where the unauthorized accounts comprised hundreds or maybe even thousands, and the courts there found that that's not pervasive enough. We don't know enough to say that the senior executives could be aware of that or at least ignored a substantial risk that their misstatements, that they've been making material misstatements.

And that's the standard under the Seventh Circuit. It doesn't mean actual knowledge of the card misclassification scheme, although I think we have it here, but it actually says a reckless disregard of a substantial risk of falsity, and that's the Seventh Circuit in *Tellabs*.

The Fed order also says how the misconduct was allowed to occur and persist. Discover lacked any policies, procedures, or other controls to ensure those cards were properly classified.

That's also another difference between this complaint, Your Honor, and the previous complaint. The last time Your Honor said that statements, for instance, that the Compliance Management System, or CMS, of the company was designed appropriately for the size of the bank and to meet regulatory requirements, Your Honor said that, well, that is not materially misleading because investors wouldn't assume that

the Compliance Management System caught everything, that there was perfect compliance.

But this is different because this means that they didn't actually have a policy in place with respect for card misclassification, and so that's a different context in which to evaluate even those statements. And we've reiterated several of those statements in the complaint in addition to the new statements that we include here.

And then finally, specific allegations of knowledge, that senior executives were aware that cards were improperly classified.

Now, defendants make a lot out of the fact that the order, which is the product of the consent negotiation with the government, doesn't specifically call out Hochschild, Greene or Graf as one of those senior executives, but that doesn't -- that does not require it for scienter purposes, and I venture to say that very few settlements with the government call for the company to air its dirty laundry completely.

But I think that saying that senior executives were aware goes beyond any of the federal -- the findings that are involved in the other cases that they cite because the findings talk about, well, the company was aware, for instance, that hundreds or thousands of accounts were unauthorized or something like that. That's a far different finding than specifically saying senior executives were aware.

And even if those senior executives don't include Hochschild, Greene or Graf, then they certainly include folks just under them, and so that would allow you to infer that the senior executives, the officer defendants, at least recklessly disregarded information particularly that's so important to the company that was so long running, so pervasive and that impacted the company's financials as it did.

And, moreover, those very defendants repeatedly signed stock certifications saying that we designed the internal controls or caused them to be designed with the ICFR in order to reasonably assure that the financial results of the company were -- were correct, and that we -- and that the financial -- and that the ICFR were effective.

They're trying to say, well, that didn't really mean anything. We didn't say anything for it. We didn't say they were always effective. We weren't involved in compliance. Mr. Graf, Mr. Greene say, well, that's an illusory distinction because as we now know, compliance is very much tied in this company to the ICFR and to its financial results.

And so saying that you didn't have specialized knowledge for compliance doesn't really get around the fact that you repeatedly certified to the effectiveness of the internal controls and that you designed them appropriately when, in fact, here we know they didn't.

You know, we have a bunch of other indicia of scienter

as well. A bunch of it has been previously presented in our earlier complaint with the former employees whose accounts, they don't say that the employees had -- didn't have the proper basis for making these statements or that they weren't in positions to recount the facts that they do, and for that reason, their accounts shouldn't be discounted.

And then we have the FDIC as well saying in its recent order that the company recklessly engaged in improper banking practices in connection with, among other things, the card misclassification scheme. So we have new things here.

And in terms of, you know, does this implicate new claims or new liability, or is it sort of an offshoot of what we had before? I think it's both because the claims are the same, the 10b-5 claims, the 20(a) claims are the same, but they're -- what this shows is that there's additional bases for those claims.

And so there are additional statements that weren't included before because we didn't know that the card misclassification scheme, albeit serious, caused a material misstatement of the financial results. We know that now, including artificial inflation of earnings per share, EPS, of as much as 15 percent in third quarter 2023. We know that stuff now.

So those are bases for additional misstatements, which is part of the claim; but it also puts, as I said before, into

context some of the material that the Court found inactionable previously.

And so I think, Your Honor, just in terms of the last question, and I think we will reserve with Your Honor's permission the right to have some additional briefing on this, but I don't see, respectfully, a material difference, at least in this instance, between a motion to amend and a motion to supplement.

Motions to amend are often based on facts that come to light after the initial complaint is filed. And so supplementing the record for something that was, you know, later discovered I don't think is materially different here. The Court granted us leave to amend. We proceeded under that standard. That's typical in these cases, either you give -- amend and then have defendants move to dismiss, or, as here, just provide for a motion for leave to amend.

So I don't really think, at least in this case, there's a difference there. I think the standard is that leave to amend should be freely granted, and because there's -- the claims are not futile here, we should be granted leave to amend.

Thank you, Your Honor.

THE COURT: Okay.

One quick thing on that last point though, the difference between a motion for leave to amend and a -- or a

motion to supplement, it does seem like there is at least -- there is at least a difference in that a motion for leave to amend, or an amendment, a proposed amendment, is supposed to be based on new facts that come to light but predate the filing of the complaint, whereas, a motion to supplement, as I understand it, is on new facts that come to light that did not exist at the time of the filing of the complaint.

And I -- I think there is -- there's a Seventh Circuit case that talks about the difference. It says: Normally a complaint can seek relief only for events that have already occurred, and before the complaint may be brought and to encompass subsequent events, the plaintiff must move to supplement it, and a different rule, Federal Rule of Civil Procedure 15(d) provides a mechanism for doing just that.

And I just need to find the exact source of that -- that case, but basically there is at least some difference, and -- okay. So the cite is *Chicago Regional Council of Carpenters v. Village of Schaumburg*, 644 F.3d 353, 356 (7th Cir. 2011).

And so I take the point that, you know, at the end of the day, perhaps there's not much of a -- well, I just don't know. I guess that's the question I'm asking, does that difference -- so there are different rules. There's 15(a) versus 15(d) for amendments versus supplements. But does that mean at the end of the day that they're nonetheless similar

enough that they should be treated more or less similarly, or is there more of a distinction such that it doesn't make sense to treat them basically similarly and apply the *Runnion* rule to both, and et cetera, et cetera. That's sort of what I'm asking, I guess.

MR. MIARMI: Sure. And admittedly I'm speaking a little off-the-cuff because I haven't read the Seventh Circuit authority that Your Honor is citing yet, but, I guess, my -- I've never seen a motion, in a securities context at least, in terms of allowing for another complaint be dealt with under 15(d) rather than 15(a). It doesn't mean it hasn't happened.

But I take Your Honor's point, and we certainly would welcome the opportunity to brief it, but I do feel like at the end of the day, as a practical matter at least, we're going to be in the same place.

THE COURT: Okay.

Okay. Thank you.

MR. MIARMI: Thank you.

MR. VIAPIANO: Good morning, Your Honor. Christopher Viapiano. I'm going to be speaking on behalf of all of the defendants today. I will try to do my best to keep my own time here.

I want to start where Your Honor left off, which is what's new, and does it change the outcome? And the reality is there's actually very little that's new notwithstanding the

very messy redline that the plaintiffs submitted to Your Honor, which I think as Your Honor recognized is almost impossible to follow.

There really are two new things here, and in plaintiffs' presentation, they want to talk about what's new, but they don't want to connect it to the actual statements that they challenge, and that's the problem for plaintiffs. They want to talk about this issue that happened at Discover but not connect it to the securities fraud claims that they're actually bringing.

So let me start with what's new. The two consent orders issued by the Federal Reserve and the FDIC, plaintiffs' counsel spoke at length about them, but they contain very few facts and, in fact, the facts of the card misclassification issue were disclosed by Discover itself in July of 2023. They're in the first complaint, and they were considered at length by Your Honor in your first opinion.

The FDIC order doesn't actually contain any facts at all, and I will get to the couple of things in the Fed order on which plaintiff seized in just a moment.

The other thing that's new is Discover's restatement of its financials, but that did follow back-and-forth with the SEC over a technical accounting question, and that's in the complaint, that's in the documents cited in the complaint, this question of how to account for the revenue and the moneys that

Discover was going to pay back to merchants in restitution; was that the correction of an error or did that give rise to a restatement? That is a very technical dispute, and you see that at Docket 110-4. That's Discover's amended securities filing.

But I think perhaps the more important point on the restatement is it doesn't actually say anything about the underlying card misclassification issue, which, again, Discover had already disclosed. It doesn't speak to who was involved or who at Discover, a company that employed tens of thousands of people, knew what and when, and those are essential elements of pleading a securities fraud claim under Rule 9(b) and the PSLRA, and it doesn't just add to those facts.

The restatement when it was made in November of 2024 also was old news because in May of 2024, Discover had disclosed to the public that it was increasing the restitution amount on this card misclassification issue to about a billion dollars. So by the time you get to the restatement six months later, all the SEC is insisting on is how to account for that, where in -- which line item in Discover's books does it go to.

So that's -- that's really what's new, and it doesn't change, plaintiffs' proposed amended complaint, doesn't sort of change that this case I think is still in search of a securities fraud theory.

The first time around, as Your Honor recognized, the

20

plaintiffs challenged 143 statements, anything that could plausibly be said to touch on compliance or risk management, and I think Your Honor saw through that.

Now plaintiffs want to say we've got more. We have the restatement. But that introduces new problems in this mismatch in loss causation, and that's why I said, Your Honor, I want to really focus on the securities fraud claims and what are the elements of them.

Plaintiffs just want to talk about this went on for a while, the Fed said senior executives, but there are elements of their claims that they have to plead, and this is why I think whether it's a motion to amend or to supplement, at the end of the day, their proposed pleading does not state securities fraud claims.

So let me -- let me start with loss causation because this really is very straightforward.

The Supreme Court in *Dura* said there has to be a causal connection between the alleged misrepresentation and the loss. Now, on plaintiffs' first 31 statements, these are the statements of revenue, the things implicated by the restatement, those were in Discover's 2022-2023 securities filings, the plaintiffs say those were misstated. We're not going to take that on on this motion, given the restatement. But the correction of those revenue and other financial line items came in November and December of 2024.

Now, in the typical case, plaintiffs would say that is the corrective disclosure, that's what revealed that the statements were misleading, and that's what caused investors' losses.

But they don't do that here. They do not propose to amend their complaint to make those statements corrective disclosures or to extend the class period, and there's a very simple reason. The stock price of Discover did not fall following any of those announcements. It didn't actually fall in May when Discover increased and announced the restitution amount.

So that's it. There's no loss causation for those statements.

Now, plaintiffs want to say, well, our existing corrective disclosures corrected those misstatements. In fact, if you look at the redline of their complaint, which is Docket 108-3, I believe, the one section that's actually very easy to follow is the loss causation section because there's virtually no redlining. They didn't change anything in that section.

And so what they say now in briefing is, oh, well, the previous corrective disclosures also corrected these revenue figures. But if you look at their allegations, if you look even at their reply brief at page 18, where they describe the corrective disclosures, they say nothing about revenue. They

say nothing about GAAP. And if you look at the substance of what Discover disclosed about this issue, at the time the amount was thought to be 365 million. That's not material to Discover in any period in that 15-year period. There's no way that could have corrected this issue of the misstated financials.

And plaintiffs allege as much. At paragraph 22 of their complaint, they quote a Reuters article saying that the financial impact is a trifle, referring to the card misclassification issue. So plaintiffs have a very basic pleading failure on anything to do with the restatement, and that is an essential element of their claims.

And I think, just mindful of the time, if you look at the cases that they cite, like the *Kraft Heinz* case, for example, there the plaintiffs' argument was that defendants didn't -- the defendants' argument was that plaintiffs didn't explain the corrective disclosures enough.

That's not the case here. There's just a complete disconnect.

So for that reason alone before you even get to who knew what when, plaintiffs can't amend or supplement to state claims based on the financials. That's 31 of the new statements that they want to add to this case.

THE COURT: Can I just ask on that? So I think in my earlier ruling, it was based on materiality, not loss

causation.

So, like, the argument that you just gave is a loss causation argument, and that sounds like -- I mean, are you essentially saying, well, amendment would be futile because this new theory would also not survive a motion to dismiss?

MR. VIAPIANO: That's exactly right, Your Honor.

THE COURT: Okay. So I think that -- I mean, on that point, it's possible to -- it is possible to rule on a motion for leave to amend on that sort of basis, in other words, like a reverse 12(b)(6) motion, like --

MR. VIAPIANO: Correct.

THE COURT: -- you know, concluding that the amendment would be futile because it would fail the motion to dismiss, would not make it past the motion to dismiss; but sometimes if the amendments -- or if the -- sometimes when I see this happening, like this meaning it's really creating a reverse motion to dismiss type of situation, sometimes I find it easier to, because it's -- I'm just more used to seeing motions to dismiss with the kind of standard sequence of briefing that that entails, as opposed to kind of looking at it in this reverse posture, I will sometimes just grant the amendment and then do the motion to dismiss so that I can see it teed up in the -- again, just more of the standard sequence of briefing.

Now, I don't know -- I don't know whether I will do that here or not because sometimes -- I mean, people do

consider these, you know, motions for leave to amend, and people do sometimes issue decisions or issue rulings in that posture. It's just that sometimes it can be a little bit -- sometimes for me anyway, it can be a little bit more efficient and a little bit -- sometimes it can be a little more cumbersome just as a matter of what I'm used to reading.

MR. VIAPIANO: Right, and it certainly could be done that way, Your Honor, though our arguments would be exactly the same, right?

The reason that amendment to add the misstated financials is futile is that it would not survive defendants' motion under 12(b)(6), 9(b), and the PSLRA. So it is exactly that point. It is the failure to plead in the proposed amendment an essential element of a securities fraud claim.

So here we're just doing it because it's their motion following your initial motion.

This is -- this is one, unlike some of my arguments that do not flow from your first opinion because these are entirely new statements that they seek to add to their complaint but, again, without changing anything about their -- their corrective disclosures.

To continue on the theme, though, of the plaintiffs not connecting the little that's new to their securities fraud case, plaintiffs also want to add one other net new statement. This comes from Discover's annual reports on Form 10-K in a

section called Significant Revenue Recognition Accounting Policies. And if Your Honor would permit me, I'd just like to hand up the demonstrative, it's actually the actual filing that the plaintiffs challenge, Exhibit 65 to our opposition.

(Tendered.)

THE COURT: Thank you.

MR. VIAPIANO: Now, as always, context is key, and we've highlighted the one sentence in this section of Discover's annual report that plaintiffs challenge. The sentence that contractually defined per-transaction fee amounts typically apply to each type of transaction processed and are recognized as revenue at the time each transaction is captured for settlement. It's part of a much longer section on, as I said, significant accounting policies.

Now, as I think you can see, all that Discover is saying is that a defined per-transaction fee amount typically applies to each transaction and that revenue is recognized at the time each transaction is captured for settlement.

In other words, it's describing the structure or the process by which it charged and recorded merchant discount and interchange fees. That's true. That is the process that Discover followed, and there aren't allegations to the contrary.

Now, plaintiffs want to argue otherwise. They say in their papers that we want you to assume that investors would

understand that Discover was charging the wrong fees. Not at all. We just want you to look at the statement, which is about accounting policy and how Discover records revenue. That the card misclassification issue meant that in some cases it charged the wrong fees doesn't render misleading this statement about accounting policy and how Discover recorded revenue.

So, once again, in plaintiffs' proposed amendment, we have this mismatch between the facts that they want to talk about and the securities fraud case that they want to bring.

And I think when you look at the cases that they cite, like the *Singer* case where the defendants are talking about training doctors to get reimbursed for using their medical device, they say, hey, we're training doctors. They don't say that they're training doctors to do it fraudulently and to defraud Medicare.

Discover is not saying anything in here about classification of cards. It's talking about how it records revenue. So this isn't one of those statements that's misleading because it's incomplete.

The plaintiffs also don't plead scienter for this statement. You know, they don't plead how any of Discover's executives would have been reckless in knowing that this statement about an accounting policy was somehow misleading.

Two more things I want to touch on, Your Honor. One, the statements about compliance. Plaintiffs said when he was

up here that the context has changed, but Your Honor in her original opinion made legal determinations that these statements were the kind of statements on which no reasonable investor would rely.

That hasn't changed. That legal determination that these are the kind of statements that no reasonable investor relies on, that hasn't changed because they're not -- as Your Honor recognized, these statements weren't guarantees that Discover was perfect.

So nothing -- the fact that there are a tiny, tiny number of new facts that Discover was missing one control, it doesn't change those legal determinations. They weren't -- they were not guarantees, as I think Your Honor recognized repeatedly in her original opinion.

They also were statements about how Discover designed things or intended things to work, and just to take one example, a statement that Discover's controls or its risk management is based upon industry standards, that's still true. They were based upon industry standard, and there's been no allegations that the missing of this one control somehow means that the design of Discover's compliance program or its risk management program wasn't based upon industry standards or wasn't intended to do something.

So I really don't think your ruling on any of those change.

Now, last, I'm mindful that I'm sort of right at my time, I do want to round out on scienter if I could, which is where I think plaintiffs spent the bulk of their time, whether there is intent to defraud or reckless disregard.

Again, it's actually not even necessary to get here because plaintiffs' claims fail for lack of loss causation. They're futile under the terms of the rule, lack of loss causation, lack of falsity because they're immaterial.

But if Your Honor does get here and looks at what the plaintiffs point to, the Federal Reserve consent order, there is no specificity. The order says senior -- alternatively, senior executives knew and senior management failed to take adequate steps to address the issue.

There are numerous, numerous cases. We cite them in our papers in our opposition brief about how that kind of consent order, where we don't know the facts behind it cannot satisfy plaintiffs' burden, and it is their burden, to plead particularized facts that give rise to a strong inference of scienter.

We don't know who the Fed was referring to, and plaintiffs don't plead anything that helps us with any inference. And I think the *Last Atlantis Capital* case is really instructive because there you had regulatory consent orders against 11 specific defendants, and the court held there's scienter as to those folks but the folks that aren't

named I cannot, you know, get there on the -- on the scienter inference.

And here you have something similar. You have a statement about senior executives, but you just don't know what's behind it.

Then plaintiffs point to things like this went on for a while. Discover restated things. Again, in all the case law that's cited in our brief, just the fact that something went on for a while, yes, this was an issue that Discover had and had to deal with. That doesn't say anything, again, about who knew what and when.

The fact that the CEO retired in August of '23 just as well could reflect that at a company with compliance issues, the board decided it was time to make a change. And, again, there are cases on this. They're cited in our papers. That is not enough in the absence of the particularized facts that the PSLRA and Rule 9(b) requires.

Your Honor, on the motion to supplement, motion for leave to amend, we're happy to put in some briefing. I think at the end of the day, it won't matter because our argument is fundamentally plaintiffs' proposed amended pleading does not state a claim. It would not survive, whether it's a motion to dismiss or a determination of futility under the applicable pleading standards.

THE COURT: Okay. Thank you very much.

MR. VIAPIANO: Thank you, Your Honor.

MR. MIARMI: Your Honor, Mr. Viapiano led with his chin in that argument starting with loss causation because in our view, that's the easiest issue for us.

It's a Rule 8 standard for one thing. You don't need a strong inference or even particularized facts, and under the substantive law, contrary to what Mr. Viapiano was saying, you don't need a mirror image disclosure in order to sufficiently plead or, frankly, even approve loss causation.

So the fact that there were earlier disclosures regarding the card misclassification scheme that they don't challenge on loss causation grounds is perfectly sufficient to -- to confirm that the misstatements that were ultimately revealed to be material by the restatement were false or misleading when made.

So it's not necessary for the restatement to have actually resulted in a decrease in the stock price, and that's confirmed by the *Whitehall Jewelers* case which defendants don't even attempt to distinguish. It was then District Judge St. Eve where the very same thing happened.

There were impartial disclosures earlier in the class period, and then the restatement didn't happen until one of them at the end of the class period and there was no stock movement, and one was even after the class period and there was no stock movement.

The court said loss causation was sufficiently pleaded there in light of the earlier disclosures, which nobody contests here relate to the card misclassification scheme. And that's particularly so, given that even in disclosing the card misclassification improprieties in July 2023, Discover said that there are ongoing discussions with our regulators and there could be further announcements.

So by the time the restatement happened, investors understood that, okay, this was the result of the card misclassification improprieties. We already built that in to our reaction to the earlier disclosures, and so it's understandable why there would not have been a meaningful reaction to the later restatement announcement.

The -- again, the attempt to discuss the card misclassification improprieties as a technical matter, a technical disagreement that happened with respect to some cards is a remarkable rewriting of history in their own statements and admissions regarding the impact of this misconduct.

This is not a case that depends for falsity or scienter on whether ASC 605 or ASC 606 applies. That may have been the -- what ultimately determined the extent of the impact of these improprieties, but there was no question that the card misclassification improprieties were improper and increased improperly revenue and artificially inflated it during the class period, artificially inflated EPS during the class period

and, as the Fed Board found, were done for that purpose, i.e., intentionally.

We do connect the statements to the card misclassification misconduct repeatedly. For a complaint that he claims is almost impossible to discern, they certainly seem to have been able to interpret it.

I think that it's pretty clear as we go through the statements that we are connecting each one to the misconduct, both the internal controls, the lack of effective internal controls, which both relate to the card misclassification and to the other issues we identify in the complaint, and we go through each statement to explain how it was false or materially misleading when made as a result of not only the admissions. This is not only they admitted this later so this must have been before. This is not fraud by hindsight.

This is saying we have specific facts, both based on the findings that are, again, based on investigations that occurred at least in part during the class period, our FEs which recount contemporaneously the meetings that Hochschild participated in that had monthly scorecards that talked about gaps in internal controls and other risk management problems, and FE 6 specifically observed Hochschild at those meetings and reading the materials, and FE 6 participated in preparing those materials, and those materials were specific at least in part to the U.S. cards business, the very unit in which the card

misclassification improprieties was occurring.

So we have -- we have all of this. This is not just about the regulatory findings, although the regulatory findings are quite damning, and I think they do distinguish this case from a number of the other cases, all the other cases that defendants cite and the cases that this court has previously dismissed.

For instance, on the widespread conduct, the court in *Chandler v. Ulta Beauty* recognized that widespread, pervasive, nationwide conduct by a company is probative of scienter as long as there are other indicia of scienter that are alleged in the complaint.

In that case, the court said that those other indicia weren't present. Here they are. It's abundant the additional facts that we have.

Mr. Viapiano helpfully discussed the *Last Atlantis* case because that case supports us. The -- Discover was named in the Federal Board findings, unlike the entities in *Last Atlantis* that the court didn't find scienter for. Discover was named here. So the *Last Atlantis* case not only undermines them, it really helped us.

Judge Bucklo there said, while I can't find a strong inference of scienter with respect to the entities that were not named, but with respect to the entities that were sanctioned and were named in those findings, I can find that

the inference is at least as compelling as an opposing inference. And that's all you have to find here.

And I think as another matter, part of what *Twombly* instructs is that the court has to apply a good dose of common sense. Is it really common sensical that defendants that repeatedly certified to the internal controls effectiveness and that they designed them appropriately, that they repeatedly certified to this contractually defined per-transaction fee, that they repeatedly certified to the accuracy and the reliability of the company's financials, that they all of a sudden had nothing to do with at least knowing about or at least recklessly disregarding a long-running, widespread misconduct.

I don't think that that's common sensical at all.

And I think that with respect to the -- oh, just one thing with respect to the leave to amend. I think Your Honor can look at the *Macovski* case. It's from 2021. There, Judge Kennelly dealt with a motion for leave to amend, as opposed to a sort of typical sequencing of an amended complaint and then a motion to dismiss. And he evaluated under the Rule 15(a) standard and held that the claim would not be futile and so allowed them to proceed and go to discovery.

And I think as Mr. Viapiano acknowledged, they would make the same arguments in a motion to dismiss that they're making here. So regardless of the somewhat unusual sequencing,

I don't think that really changes things.

THE COURT: Sorry, what's the name of that --

MR. MIARMI: Oh, sure. It's *Macovski*, I believe it's M-A-C-O-V-S-K-I, *v. Groupon*, I believe. It's a 2021 case from this district.

THE COURT: Okay. Thank you.

MR. MIARMI: Sure.

And I think finally on this, once again, I think that the defendants tried to isolate each individual allegation or series of allegations about scienter rather than dealing with them collectively holistically, which, of course, *Tellabs* prescribes.

And what does that mean? It means not only saying, okay, is this enough, is this enough, 1, 2, 3, 4, 5, but you say is this probative scienter in relation to all the other things that are also alleged in the complaint.

And so if we have the widespread nature of the misconduct, we have the Fed findings, we have the FDIC's findings, we have the -- we have the reliable accounts of well-placed former employees, we have that they repeatedly signed stock certifications, we have the raft of additional misconduct that was pleaded in our initial complaint about student loan compliance, et cetera, which also just adds to the general culture of compliance, as one of our FEs put it, at Discover, that's all relevant. Not to mention that these are

issues that were core to the company's financial well-being, which, of course, we know now because their failures of internal controls directly led to financial misstatements, improper recognition of revenue, et cetera.

And Hochschild's resignation. He didn't retire. He was pushed out by the board, and it was in connection very much with the card misclassification as they later admitted.

So, finally, on this contractually defined term, it's another I think an outgrowth of the thing they tried to argue about, the internal controls, we said this, but we didn't really mean anything by this; we didn't really assure you of anything as an investor.

The idea that a contractually defined per-transaction fee and the revenues that were recognized as a result of that contractually defined fee that cannot be interpreted by a reasonable investor to assume that at least the company would typically as it says be applying the correct contractually defined fee is nonsensical.

And actually on this motion, Seventh Circuit precedent I think precludes you from dismissing on that ground. You can look at *Stransky*, which is a Seventh Circuit case, and where there is a reasonable interpretation proffered by the plaintiffs about the misleading nature, what a statement means, what it could mean to a reasonable investor, then you have to let it through at this stage.

I mean, they try to finally distinguish *Singer v. Reali*, which we, of course, had in our opening brief, but that's very similar because they didn't say -- they said we're training people.

By their logic, it would mean, well, we didn't necessarily train them correctly, we didn't necessarily train them not to commit fraud. But that case the Fourth Circuit says said, no, you can't just say these things and they don't implicate anything with respect to the accuracy or correctness of what you're saying.

So in all, Your Honor, I think we can move forward with this -- this complaint, the claims would not be futile, and we should proceed to discovery.

Thank you very much.

THE COURT: Okay. Thank you.

Okay. So I guess we should discuss the schedule for if anybody would like to submit a brief on the issue of supplementing versus amending, would that -- would it be feasible to do simultaneous briefs in a couple weeks from now? Would that be okay?

MR. VIAPIANO: Your Honor, I think from our perspective that would be fine, if we can say three weeks from today simultaneous.

MR. MIARMI: That's fine with us, Your Honor.

THE COURT: Okay.

Okay. So -- so that takes us to March 18th. So that will be the date for the simultaneous supplemental briefs on supplementing versus amending.

MR. VIAPIANO: Should we say five pages, Your Honor?

THE COURT: I think that makes sense.

Is that okay, five pages?

MR. MIARMI: That's fine with us, Your Honor, yes.

THE COURT: Okay. Great.

I also will give some thought in the meantime to this issue of the posture of the briefs. You know, a motion for leave to amend versus a motion to dismiss.

And I know that -- well, I'll try to make a decision on that reasonably soon one way or the other just because otherwise you're spending more time on these supplemental briefs, and I just -- I think it makes sense for me to try to get a decision on that because it's just a -- it's just a procedural thing that's holding up the case possibly and causing you to incur more costs and all that.

So I -- I will try and get you a ruling on that one way or the other as soon as I can.

MR. VIAPIANO: Okay.

MR. MIARMI: Thank you, Your Honor.

MS. SHEPPARD: Your Honor, Hille Sheppard on behalf of defendant Mark Graf.

I understand the procedural posture question, but for

Mr. Graf who left the company, retired in September of 2019, he is only alleged to have made one of the new statements that's at issue, which is the accounting principle statement that Mr. Viapiano passed up to you.

I think it's impossible really to find a strong inference that he could be intending to commit fraud with respect to that statement in the accounting policies. And it's a serious thing to be a defendant in a securities case.

And I would ask that you -- he's not alleged to have done anything with respect to any of the statements, any of the restatement. That all happened long after he left. All of the new stuff related to the restatement has nothing to do with Mr. Graf.

Like I said, it's -- it's a serious thing to be accused of securities fraud, and I think there's no basis for him to remain in this case on this complaint, which has just the one new statement in paragraph 208.

MR. MIARMI: I'd like to respond to that briefly, Your Honor.

I mean, there are -- he did also certify to internal controls while he was there, so there are statements for which he is responsible.

Also, it's not that he was there when the card misclassification improprieties were not occurring. He was there for over a decade before, or at least part of the

misclassification improprieties were happening for over a decade before he left. This was not a situation where an executive leaves only a few months into misconduct or something like that.

So I think it's -- I mean, I don't really understand the point whether he should just be dismissed right now. I think we're in the process of briefing an additional issue.

But Mr. Graf is very much part of the allegations in our case and in our proposed amended complaint, and I don't think we need to be separating out him, certainly not at this point.

THE COURT: Okay. Any further --

MS. SHEPPARD: Yes, he was at the company for a long time, but the only statements that he's alleged to have made that are challenged in the complaint, and as Mr. Viapiano said, this is a securities fraud case. It's based on allegedly false statements.

The one statement that we just discussed at paragraph 208, which is not something that could possibly give rise to a strong inference of fraud, and then the additional statements that are rechallenged are from paragraph 217.

Your Honor went through those with care in the earlier dismissal opinion at pages 10 through 13 of your complaint -- I'm sorry -- your opinion, and found that those did not -- could not be seen by the investors as materially misleading. I

don't think you need to go through that again as to Mr. Graf.

I think it's something where should you decide to permit -- I mean, I think you should deny leave to amend overall, but I think he simply just does not belong in this case based on the statements that he's alleged to have made that are challenged here in this case.

MR. MIARMI: I don't think Mr. Graf gets special treatment. He's in the case. He can be part of whatever decision the Court makes on the proposed amended complaint.

Also, the stock certifications, as we pointed out, it's a different context now because they have admitted that there was no internal control relating to the card misclassification. It was something that was not before the Court previously.

And so I think that -- I understand it's a serious thing to be accused of securities fraud. We think we, you know, we have a strong basis against all these defendants, and the Court can deal with them together in the ordinary course.

THE COURT: Okay.

Well, thanks, everybody. I'll just -- I guess we'll proceed as scheduled and go from there.

Let me also just ask, only -- not for any particular reason to this case but just because I'm always asking in every case, trying to prioritize different rulings, is there any prospect of settlement?

Are the parties discussing that at all, or are you just -- you just need a ruling?

MR. VIAPIANO: No, Your Honor, not at this time. I think we need a ruling on the pending motions.

THE COURT: Okay.

MR. VIAPIANO: Okay. So we'll --

THE COURT: I mean, I -- again, it's not because of anything about this case that I'm asking that. It's just that I am now routinely asking that because I've had it sometimes where I spend a long time on an opinion, and then all of a sudden it settles, and I could have used that time for something else, so that's really --

MR. MIARMI: We won't waste your time here, Your Honor. I don't think there's a prospect of that before ruling.

THE COURT: Okay.

MR. VIAPIANO: Okay. So we will get the supplemental submissions in in three weeks to Your Honor.

THE COURT: Okay.

If there's any way you could do it in two weeks, that would help me. But I also -- you know, three weeks is also okay.

MR. VIAPIANO: Your Honor, I think that's fine. Looking at Mr. Miarmi --

MR. MIARMI: Yeah. No, we're fine. We're fine with two weeks, as long as defendants are. I think it's okay with

us.

THE COURT:  Okay.  Great.  Thank you.  So it will be March 11th.  Okay -- for the supplemental briefs, that is.

All right.  Thank you everyone.

And also I realize I -- I know at least some people had to travel in the midst of the blizzard and the aftermath, so thank you very much.  I just definitely appreciate that and am grateful that you made it happen.  So thank you.

MR. MIARMI:  Thanks very much, Your Honor.

MR. VIAPIANO:  Thank you, Your Honor.

(Concluded at 10:38 a.m.)

*   *   *   *   *

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

*/s/Kathleen M. Fennell*          *March 2, 2026*
Kathleen M. Fennell               Date
Official Court Reporter